1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CENTRAL DIVISION

- - -

HONORABLE MICHAEL W. FITZGERALD
UNITED STATES DISTRICT JUDGE PRESIDING
- - -


KANDACE SIMPLIS, ET AL.,          )
                                  )
            PLAINTIFF,            )
                                  )
VS.                               )     CV 10-9497-MWF
                                  )
CULVER CITY POLICE DEPARTMENT,    )     VOLUME II
ET AL.,                           )
                                  )
            DEFENDANT.            )
_____)




**JURY TRIAL, DAY 1 PM**

LOS ANGELES, CALIFORNIA

APRIL 30, 2013






ROSALYN ADAMS, CSR 11794
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
(213) 894-2665

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3            LAW OFFICES OF DALE K. GALIPO
                BY:  DALE K. GALIPO
 4            21800 BURBANK BOULEVARD
                SUITE 310
 5            WOODLAND HILLS, CALIFORNIA 91367
                (818) 347-3333
 6
              MC NICHOLAS AND MC NICHOLAS LLP
 7              BY:  MATTHEW S. MC NICHOLAS
                10866 WILSHIRE BOULEVARD
 8            SUITE 1400
                LOS ANGELES, CALIFORNIA 90024
 9              (310) 474-1582

10
      ON BEHALF OF DEFENDANT:
11
              CARPENTER ROTHANS AND DUMONT
12              BY:  STEVEN J. ROTHANS
                     JILL WILLIAMS
13            888 SOUTH FIGUEROA STREET
                SUITE 1960
14            LOS ANGELES, CALIFORNIA 90017
                (213) 228-0400
15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1                        **I N D E X**

2

                                                    <u>**PAGE**</u>

3

**OPENING STATEMENTS FOR PLAINTIFFS**

4           BY MR. GALIPO ........................   19
            BY MR. MC NICHOLAS ...................   39

5

6

**OPENING STATEMENTS FOR DEFENDANTS**

7           BY MR. ROTHANS .......................   53

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 30, 2013; 1:15 P.M.

2                          --oOo--

3

4

5         THE COURT:  COUNSEL, HOW MUCH TIME DO THE

6   PLAINTIFFS INTEND TO USE FOR THEIR OPENING STATEMENTS?

7         MR. GALIPO:  I COULD ONLY SPEAK FOR MYSELF.  I'M

8   ANTICIPATING APPROXIMATELY 30 MINUTES.

9         THE COURT:  ALL RIGHT.

10        MR. MC NICHOLAS:  YOUR HONOR, I WILL BE EDITING ON

11  THE FLY, SO IT WILL CERTAINLY BE LESS THAN 30 MINUTES.

12        THE COURT:  ALL RIGHT.  AND MR. ROTHANS?

13        MR. ROTHANS:  I WOULD ANTICIPATE LESS THAN

14  30 MINUTES AS WELL, YOUR HONOR.

15        THE COURT:  ALL RIGHT.  SO ALL THAT SOUNDS FINE,

16  THEN.

17        OKAY.  LET'S'S GET THE JURORS.

18                    (JURORS ENTER.)

19        THE COURT:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

20        I HOPE YOU ENJOYED YOUR LUNCH.

21        BEFORE -- I HAVE SOME PRELIMINARY INSTRUCTIONS TO

22  READ TO YOU, AS I MENTIONED.  BEFORE DOING THAT, LET ME SAY A

23  COUPLE THINGS.  ONE IS:  WHY AM I READING THESE INSTRUCTIONS?

24        THE COURT OF APPEALS, IN CONSULTATION WITH MEMBERS

25  OF THE BAR AND PROFESSORS AND THAT, HAS COME UP WITH SOME

1    LANGUAGE THAT IS -- OR, AT LEAST, SO THE COURT HOPES, IS

2    CLEAR AND FAIR TO BOTH THE PLAINTIFFS AND THE DEFENDANTS.

3    IT'S OBVIOUSLY DIFFICULT TO READ SOMETHING AND MAKE IT SOUND

4    FRESH AND INTERESTING, MAINTAIN EYE CONTACT, BUT I WILL DO MY

5    BEST AND PLEASE BEAR ALONG.

6          THE SECOND THING IS THAT WHEN THIS COURTHOUSE WAS

7    BUILT IN THE 1930S, THIS COURTROOM WAS THE COURTROOM OF THE

8    COURT OF APPEALS, NOW IT HAS ITS OWN COURTHOUSE OUT IN

9    PASADENA.  THAT IS WHY WE HAVE THESE WINDOWS.  USUALLY

10   THEY'RE NOT WINDOWS IN A TRIAL COURTROOM FOR A VARIETY OF

11   REASONS.  SO ENJOY THE NATURAL LIGHT COMING IN HERE, BUT I

12   WILL TAKE JUDICIAL NOTICE OF THE FACT THAT THERE IS TRAFFIC

13   ON THE HOLLYWOOD FREEWAY, THE HALL OF JUSTICE OUT THERE IS

14   NOT GOING ANYWHERE, THE CATHEDRAL IS NOT GOING ANYWHERE, SO

15   PLEASE TRY TO IGNORE THE VIEW AND FOCUS ON WHAT'S GOING ON

16   HERE IN THE COURTROOM.

17         LADIES AND GENTLEMEN, YOU ARE NOW THE JURORS IN

18   THIS CASE AND I'M GOING TO TAKE A FEW MINUTES TO TELL YOU

19   ABOUT YOUR DUTIES AS JURORS AND TO GIVE YOU SOME PRELIMINARY

20   INSTRUCTIONS.  AT THE END OF THE TRIAL, I WILL GIVE YOU MORE

21   DETAILED WRITTEN INSTRUCTIONS THAT WILL CONTROL YOUR

22   DELIBERATIONS.  ALL OF THE COURT'S INSTRUCTIONS, WHETHER

23   GIVEN BEFORE, DURING OR AFTER THE TAKING OF TESTIMONY,

24   INCLUDING THE INSTRUCTIONS I GAVE YOU BEFORE YOU WERE CHOSEN

25   AS JURORS ARE IMPORTANT.

```
 1            WHEN YOU DELIBERATE, IT WILL BE YOUR DUTY TO WEIGH

 2    AND TO EVALUATE ALL THE EVIDENCE IN THE CASE; AND, IN THAT

 3    PROCESS, TO DECIDE THE FACTS.  YOU MUST APPLY THE LAW, AS I

 4    STATED TO YOU, TO THE FACTS AS YOU DETERMINE THEM AND IN THIS

 5    WAY ARRIVE AT YOUR VERDICT.

 6            YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

 7    RECEIVED IN THE TRIAL AND NOT FROM ANY OTHER SOURCE AND ON

 8    THE LAW AS I HAVE GIVEN IT TO YOU, WHETHER YOU ARE AGREE WITH

 9    THE LAW OR NOT, AND YOU MUST NOT BE INFLUENCED BY ANY

10    PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.

11    DO NOT TAKE ANYTHING I MAY SAY OR DO DURING THE TRIAL AS

12    INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT YOUR VERDICT

13    SHOULD BE; THAT IS A MATTER ENTIRELY UP TO YOU.

14            EVIDENCE IS THE SWORN TESTIMONY OF WITNESSES, THE

15    EXHIBITS THAT ARE RECEIVED INTO EVIDENCE, AND ANY FACTS TO

16    WHICH THE PARTIES AGREE.  IN DECIDING THE FACTS IN THIS CASE,

17    YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH

18    TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE EVERYTHING A

19    WITNESS SAYS OR PART OF IT OR NONE OF IT.

20            IN EVALUATING TESTIMONY OF WITNESSES, CONSIDERING

21    THE FOLLOWING QUESTIONS:  ONE, HOW WELL COULD THE WITNESS SEE

22    OR HEAR OR OTHERWISE SENSE THE THINGS ABOUT WHICH THE WITNESS

23    TESTIFIED?  TWO, HOW WELL WAS THE WITNESS ABLE TO REMEMBER

24    AND DESCRIBE WHAT HAPPENED?  THREE, WHAT WAS THE WITNESS'

25    BEHAVIOR WHILE TESTIFYING?  FOUR, DID THE WITNESS UNDERSTAND
```

1    THE QUESTIONS AND ANSWER THEM DIRECTLY?  FIVE, DID THE

2    WITNESS HAVE A REASON TO LIE SUCH AS BIAS OR PREJUDICE OR

3    PERSONAL INTEREST INTO HOW THE CASE IS DECIDED?  SIX, WHAT

4    WAS THE ATTITUDE OF THE WITNESS ABOUT THE CASE OR ABOUT

5    TESTIFYING?  SEVEN, HOW REASONABLE IS THE TESTIMONY WHEN YOU

6    CONSIDER ALL THE OTHER EVIDENCE IN THE CASE?  AND EIGHT, DID

7    OTHER EVIDENCE IN THE CASE PROVE OR DISPROVE ANY FACT ABOUT

8    WHICH THAT WITNESS TESTIFIED?

9          USE YOUR COMMON SENSE AND GOOD JUDGMENT TO EVALUATE

10   THE TESTIMONY BASED ON ALL THE CIRCUMSTANCES.

11         THERE ARE TWO KINDS OF EVIDENCE, DIRECT AND

12   CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF A FACT

13   SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS

14   PERSONALLY SAW OR HEARD OR DID.  CIRCUMSTANTIAL EVIDENCE IS

15   INDIRECT EVIDENCE; THAT IS, IT IS PROOF OF ONE OR MORE FACTS

16   FROM WHICH YOU COULD CONCLUDE THAT OTHER FACTS EXIST.  YOU

17   ARE TO CONSIDER DIRECT AND CIRCUMSTANTIAL EVIDENCE.  EITHER

18   CAN BE USED TO PROVE ANY FACT.  THE LAW MAKES NO DISTINCTION

19   BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR

20   CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

21   WEIGHT TO GIVE TO ANY EVIDENCE.

22         AT TIMES, I MAY FIND IT NECESSARY TO DIRECT ONE OR

23   ALL OF THE ATTORNEYS TO DO OR NOT DO CERTAIN THINGS.  I MAY

24   EVEN FIND IT NECESSARY TO MAKE SOME CRITICISM OF AN

25   ATTORNEY'S CONDUCT.  IF I DO SO, YOU MUST NOT SHOW PREJUDICE

| | |
|---|---|
| 1 | TOWARDS THE ATTORNEY OR THE SIDE THE ATTORNEY REPRESENTS |
| 2 | SIMPLY BECAUSE I HAVE FOUND IT NECESSARY TO SAY SOMETHING TO |
| 3 | THE ATTORNEY.  AS I SAID, YOU MUST ACCEPT AND FOLLOW THE LAW |
| 4 | AS I STATE IT TO YOU, WHETHER OR NOT YOU AGREE WITH THE LAW. |
| 5 | IF ANYTHING CONCERNING THE LAW SAID BY THE ATTORNEYS IN THEIR |
| 6 | ARGUMENTS OR AT ANY OTHER TIME DURING THE TRIAL CONFLICTS |
| 7 | WITH MY INSTRUCTIONS ON THE LAW, YOU MUST FOLLOW MY |
| 8 | INSTRUCTIONS. |
| 9 | THE FOLLOWING THINGS ARE NOT EVIDENCE AND YOU MAY |
| 10 | NOT CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THE |
| 11 | CASE:  STATEMENTS OR ARGUMENTS BY ATTORNEYS ARE NOT EVIDENCE. |
| 12 | QUESTIONS AND OBJECTIONS ARE NOT EVIDENCE.  DO NOT ASSUME TO |
| 13 | BE TRUE ANY INSINUATION SUGGESTED BY A QUESTION ASKED A |
| 14 | WITNESS.  A QUESTION MAY BE CONSIDERED ONLY AS IT HELPS YOU |
| 15 | TO UNDERSTAND THE ANSWER. |
| 16 | THERE ARE RULES THAT CONTROL WHAT CAN BE PRESENTED |
| 17 | IN A CASE.  WHEN AN ATTORNEY ASKS A QUESTION OR OFFERS AN |
| 18 | EXHIBIT INTO EVIDENCE AND THE ATTORNEY ON THE OTHER SIDE |
| 19 | THINKS IT IS NOT PERMITTED BY THE RULES, THAT ATTORNEY MAY |
| 20 | OBJECT.  IF A QUESTION IS OBJECTED TO AND THE OBJECTION IS |
| 21 | SUSTAINED, WHICH THE MEANS THE WITNESS MAY NOT RESPOND, YOU |
| 22 | MUST NOT GUESS ABOUT WHAT THE ANSWER MIGHT HAVE BEEN OR THE |
| 23 | REASON FOR THE OBJECTION. |
| 24 | OF COURSE, IF THE OBJECTION IS OVERRULED AND THE |
| 25 | WITNESS IS ALLOWED TO ANSWER, YOU MAY CONSIDER THAT ANSWER AS |

1   YOU WOULD ANY OTHER EVIDENCE IN THE CASE.  PLEASE REMEMBER

2   THAT IT IS AN ATTORNEY'S DUTY TO OBJECT TO QUESTIONS THAT THE

3   ATTORNEY BELIEVES ARE NOT PROPER, AND YOU SHOULD NOT SHOW

4   PREJUDICE TOWARD THE ATTORNEY OR THE SIDE THE ATTORNEY

5   REPRESENTS BECAUSE THE ATTORNEY MAKES AN OBJECTION.

6          LADIES AND GENTLEMEN, THAT'S SOMETHING WHERE TV AND

7   THE MOVIES DO GET IT RIGHT.  THERE WILL BE MANY OBJECTIONS IN

8   THIS TRIAL MADE BY ALL THE ATTORNEYS, SOME WILL BE SUSTAINED,

9   SOME WILL BE OVERRULED, IT'S NOT REALLY ANYTHING THAT SHOULD

10  BEAR ON YOUR DETERMINATION OF WHAT THE FACTS ARE IN THIS

11  CASE.

12         YOU CANNOT CONSIDER AS EVIDENCE ANYTHING YOU MAY

13  SEE OR HEAR WHEN THE COURT IS NOT IN SESSION, EVEN IF WHAT

14  YOU SEE OR HEAR IS DONE OR SAID BY ONE OF THE PARTIES OR BY

15  ONE OF THE WITNESSES.  SOMETIMES I MAY ORDER THAT EVIDENCE BE

16  STRICKEN AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

17  MEANS THAT WHEN YOU ARE DECIDING THE CASE YOU MUST NOT

18  CONSIDER THAT EVIDENCE FOR ANY PURPOSE.  TREAT IT AS THOUGH

19  YOU HAD NEVER HEARD OF IT.

20         SOME EVIDENCE MAY BE ADMITTED ONLY FOR A LIMITED

21  PURPOSE.  WHEN I TELL YOU THAT CERTAIN EVIDENCE HAS BEEN

22  ADMITTED FOR A LIMITED PURPOSE, YOU MAY CONSIDER IT FOR THAT

23  PURPOSE ONLY AND NOT FOR ANY OTHER PURPOSE.

24         YOU SHOULD DECIDE THE CASE AS TO EACH DEFENDANT

25  SEPARATELY.  UNLESS OTHERWISE STATED, THE INSTRUCTION OF

1   WHAT -- THE INSTRUCTIONS APPLY TO ALL OF THE PARTIES.

2          YOU WILL BE GIVEN NOTEBOOKS AND PENCILS.  IF YOU

3   WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE EVIDENCE.

4   IF YOU DO TAKE NOTES, KEEP THEM TO YOURSELF UNTIL YOU AND

5   YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE THE CASE.

6   YOU SHOULD NOT PERMIT NOTETAKING TO DISTRACT YOU OR PREVENT

7   YOU FROM LISTENING CAREFULLY TO OTHER TESTIMONY.  REMEMBER

8   THAT YOU ARE THE JUDGES OF THE BELIEVABILITY OF THE

9   WITNESSES.

10          NOTES ARE ONLY TO ASSIST YOUR MEMORY AND SHOULD NOT

11  TAKE THE PLACE OF YOUR MEMORY.  JURORS SHOULD NOT BE OVERLY

12  INFLUENCED BY WHAT THAT JUROR OR ANY OTHER JUROR DECIDES TO

13  WRITE DOWN.  SOME TESTIMONY MIGHT HAVE SEEMED UNIMPORTANT AT

14  THE TIME IT WAS PRESENTED AND THEREFORE WAS NOT WRITTEN DOWN,

15  BUT IT MIGHT TURN OUT TO BE IMPORTANT LATER IN THE TRIAL

16  AFTER ALL THE EVIDENCE IS SUBMITTED AND YOU HAVE HEARD THE

17  ARGUMENTS OF COUNSEL AND THE JURY INSTRUCTIONS.

18          A JUROR WHO DOES NOT TAKE NOTES SHOULD RELY ON HIS

19  OR HER RECOLLECTION OF THE EVIDENCE AND NOT BE INFLUENCED BY

20  THE FACT THAT OTHER JURORS DO TAKE NOTES.

21          LEAVE THE NOTEBOOKS ON YOUR SEAT WHEN YOU LEAVE

22  EACH DAY AND AT EACH RECESS.  YOU WILL BE ABLE TO TAKE THEM

23  INTO THE JURY ROOM WHEN YOU DELIBERATE.

24          NOW, LADIES AND GENTLEMEN, YOU KNOW, I'M OLD ENOUGH

25  TO HAVE GONE TO COLLEGE WHEN I WAS USED TO TAKING NOTES WITH

1    LONGHAND, PERHAPS SOME OF YOU ARE USED TO ALWAYS USING

2    COMPUTERS.  THIS WHOLE NOTEBOOK THING MUST SEEM -- AND THE

3    PENCILS, PROBABLY SEEMS VERY OLD SCHOOL.  BUT I'M SURE THE

4    DAY WILL COME WHERE I'LL BE ABLE TO OFFER ALL OF YOU TABLETS,

5    IF YOU WOULD LIKE THEM.  THAT DAY IS NOT NOW, SO DO YOUR BEST

6    WITH THE NOTES.  AND, AS I SAID, DON'T LET NOTETAKING KEEP

7    YOU FROM PAYING ATTENTION TO WHAT ACTUALLY IS GOING ON IN THE

8    COURTROOM.

9             BY THE WAY, YOU MAY SEE ME TAKING NOTES DURING THE

10    TRIAL, BUT I TAKE NOTES FOR DIFFERENT REASONS.  WHEN YOU SEE

11    ME WRITING SOMETHING DOWN, IT DOESN'T NECESSARILY MEAN THAT

12    YOU SHOULD WRITE IT DOWN.

13             AT THE END OF THE TRIAL, YOU WILL HAVE TO MAKE YOUR

14    DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL

15    NOT HAVE A WRITTEN TRANSCRIPT OF THE TRIAL.  I URGE YOU TO

16    PAY CLOSE ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

17             NOW, WHAT YOU WILL HAVE IS A COPY OR EACH OF YOU

18    WILL HAVE A COPY OF MY JURY INSTRUCTIONS AS I'LL GIVE THEM TO

19    YOU AT THE END OF THE CASE.  AND THE OTHER THING YOU WILL

20    HAVE IS A SET OF THE EXHIBITS THAT HAVE BEEN ADMITTED INTO

21    EVIDENCE.  YOU'LL SEE THEM AS -- AT LEAST IN PART, AS THEY

22    COME INTO EVIDENCE.  WE'LL DISPLAY THEM UP ON THE SCREENS,

23    AND FOR MANY OF THE WITNESSES, THEIR TESTIMONY WOULDN'T MAKE

24    A LOT OF SENSE UNLESS YOU WERE FOLLOWING ALONG LOOKING AT

25    WHAT THE EXHIBITS ARE.

1           SO JUST TO MAKE THIS CLEAR, AT THE END OF THE CASE,

2    WHAT YOU WILL HAVE IN THE JURY ROOM ARE YOUR NOTES, YOU WILL

3    HAVE A COPY OF ALL OF THE EXHIBITS THAT HAVE BEEN ADMITTED

4    AND YOU WILL EACH HAVE A COPY OF THE JURY INSTRUCTIONS.

5           YOU WILL BE PERMITTED TO SEPARATE AT RECESSES.  YOU

6    MUST RETURN FOLLOWING THE RECESSES AT SUCH TIMES AS I

7    INSTRUCT YOU.  DURING RECESSES, AS I'VE SAID, YOU MUST NOT

8    DISCUSS WITH ANYONE ANY SUBJECT CONNECTED WITH THIS TRIAL,

9    AND YOU CANNOT EVEN DISCUSS THE TRIAL AMONG YOURSELVES.  WHEN

10   YOU ARE TOGETHER IN THE HALL OR JURY ROOM OR ANYWHERE ELSE,

11   YOU MUST SPEAK ONLY OF MATTERS ENTIRELY UNRELATED TO THE

12   TRIAL.

13          LET ME NOW SHARE WITH YOU SOME OF THE RULES THAT

14   EXIST IN THIS REGARD.  THIS IS REALLY THINGS THAT I'VE

15   ALREADY TOUCHED ON WITH YOU ALREADY.  ONE, KEEP AN OPEN MIND

16   THROUGHOUT THE TRIAL AND DO NOT DECIDE WHAT THE VERDICT

17   SHOULD BE UNTIL YOU AND YOUR FELLOW JURORS HAVE COMPLETED

18   YOUR DELIBERATIONS AT THE END OF THE CASE.  SECOND, DO NOT

19   TALK TO ANYONE ABOUT THIS CASE OR ABOUT ANYONE WHO HAS

20   ANYTHING TO DO WITH IT UNTIL YOU GO TO THE JURY ROOM TO

21   DELIBERATE AND DECIDE YOUR VERDICT.  THE CASE INCLUDES

22   ANYTHING YOU SEE OR HEAR IN THE COURTROOM SUCH AS THE

23   TESTIMONY OF WITNESSES, THE PHYSICAL EVIDENCE AND ANYTHING

24   ELSE SAID BY THE LAWYERS, THE COURT, MY STAFF, AND ANYONE

25   ELSE IN THE COURTROOM SUCH AS THE SPECTATORS.  THIS MEANS YOU

```
 1   ARE ORDERED NOT TO HAVE ANY CONVERSATION AT ALL WITH THE
 2   ATTORNEYS, THE PARTIES OR ANY WITNESS CALLED IN THIS CASE.
 3   WHEN YOU SEE ANY OF THESE PEOPLE IN THE HALL OR ANYWHERE
 4   ELSE, DO NOT GREET THEM, DO NOT ASK THEM FOR DIRECTIONS TO
 5   ANYWHERE, DON'T ASK THEM HOW MUCH LONGER THE TRIAL IS GOING
 6   TO LAST.  THERE SHOULD BE NO CONVERSATION OF ANY KIND.
 7           NOW, THE LAWYERS, JUST BECAUSE THEY'LL KNOW WHO YOU
 8   ARE AND KNOW YOUR JURY BADGES, WON'T TALK TO YOU.  I HOPE THE
 9   WITNESSES WILL DO THE SAME THING, BUT THEY MIGHT NOT BE AWARE
10   OF THAT.  SO IF SOMEBODY APPROACHES YOU TO TALK ABOUT THE
11   CASE, REGARDLESS OF WHO IT IS, SIMPLY DON'T TALK TO THEM.
12   CERTAINLY, THE PARTIES AND THE ATTORNEYS WILL NOT BE OFFENDED
13   IF YOU IGNORE THEM, AND NOR SHOULD YOU TAKE OFFENSE IF THEY
14   IGNORE YOU.
15           IF ANYONE TRIES TO TALK TO YOU ABOUT THE CASE, TELL
16   THEM THAT YOU WILL NOT TALK TO THEM ABOUT THE CASE AND PLEASE
17   LET MS. SANCHEZ OR MS. MOMII KNOW SO THEY CAN LET ME KNOW
18   ABOUT IT.
19           NOW, DON'T BE CONCERNED IF YOU SEE THE WITNESSES
20   TALKING TO EACH OTHER OR TO THE ATTORNEYS.  THAT IS
21   PERMISSIBLE.  JUST MAKE SURE THAT YOU DON'T OVERHEAR ANY OF
22   THOSE CONVERSATIONS.
23           OUTSIDE THE JURY ROOM OR OUTSIDE THE COURTHOUSE, DO
24   NOT TALK TO ANYONE ABOUT THE CASE UNTIL THE TRIAL HAS ENDED
25   AND YOU HAVE BEEN DISCHARGED.  ANYONE ELSE INCLUDES YOUR
```

1    SPOUSE, YOUR PARTNER, YOUR FAMILY, ANYONE AT HOME, ANYONE AT

2    WORK, YOUR FRIENDS AND NEIGHBORS, ANYONE AT ALL.  YOU MAY

3    TELL THEM THAT YOU WERE ON A JURY IN A CIVIL CASE IN FEDERAL

4    COURT, BUT SAY NOTHING ELSE ABOUT IT UNTIL YOU ARE

5    DISCHARGED.

6         THIRD, DO NOT LET ANYONE TALK TO YOU ABOUT THE CASE

7    OR ABOUT ANYONE WHO HAS ANYTHING TO DO WITH IT.  AS I'VE

8    SAID, PLEASE LET ME KNOW THROUGH MS. SANCHEZ OR MS. MOMII IF

9    ANYONE TRIES TO DO THAT.

10        FOURTH, YOU MUST NOT INDEPENDENTLY INVESTIGATE THE

11   FACTS OR THE LAW OR CONSIDER OR DISCUSS FACTS TO WHICH THERE

12   IS NO EVIDENCE.  THIS MEANS, FOR EXAMPLE, THAT YOU MAY NOT

13   VISIT OR VIEW ANYPLACE THAT YOU HEAR DESCRIBED IN THIS CASE.

14   DO NOT SEARCH FOR INFORMATION ON ANY OF THE PARTIES,

15   WITNESSES, ATTORNEYS, LAW FIRMS OR ME UNTIL THE CASE IS OVER.

16   DO NOT CONDUCT ANY EXPERIMENTS.  DO NOT READ NEWS STORIES OR

17   ARTICLES OR LISTEN TO OR WATCH ANY RADIO OR TELEVISION

18   REPORTS ABOUT THE CASE OR ABOUT ANYONE WHO HAS ANYTHING TO DO

19   WITH IT.

20        DO NOT GOOGLE OR OTHERWISE RESEARCH ON THE INTERNET

21   OR LOOK UP ANY INFORMATION ABOUT THE CASE OR ANYONE WHO HAS

22   ANYTHING TO DO WITH IT OR DO ANY RESEARCH WITH ANY ELECTRONIC

23   DEVICE, INCLUDING DROIDS, IPHONES, IPADS, BLACKBERRIES, PALM

24   PILOTS OR ANY MOBILE WEB DEVICE.  DO NOT COMMUNICATE BY

25   E-MAIL, TEXT MESSAGE, BLOG, INSTAGRAM, MYSPACE, FACEBOOK,

```
 1    ELECTRONIC BULLETIN BOARD, CHAT ROOM, MESSAGE BOARD, TWITTER

 2    OR TWEET ANYTHING ABOUT THE CASE TO ANYONE WHILE THE CASE IS

 3    GOING ON.

 4              DON'T ASK ANYONE FOR INFORMATION RELATED TO THE

 5    CASE, EVEN IF YOU DON'T SAY THAT YOU'RE ON A JURY OR THAT'S

 6    WHAT YOU'RE DOING.  PERHAPS A FRIEND OF YOURS WILL HAVE

 7    KNOWLEDGE ABOUT SOMETHING THAT COMES UP IN THIS CASE AND

 8    YOU'RE JUST KIND OF CURIOUS ABOUT SOMEBODY WHO'S UNRELATED TO

 9    THE TRIAL, WHAT HE OR SHE HAS TO SAY ABOUT IT.  DO NOT ASK

10    THEM.

11              DO NOT LOOK UP ANY WORDS IN THE DICTIONARY.  I WILL

12    GIVE YOU THE INSTRUCTIONS THAT YOU NEED, AND IF AT THE END OF

13    THE CASE YOU'RE ALL TOGETHER BACK THERE AND YOU CAN'T FIGURE

14    OUT WHAT A WORD MEANS, THEN YOU CAN SEND ME A NOTE AND I'LL

15    DO MY BEST TO HELP YOU.

16              NOW, THIS IS IMPORTANT FOR THE REASONS I ALREADY

17    GAVE YOU.  YOU HAVE TO ALL BE ON THE PLAYING FIELD WHILE

18    YOU'RE DELIBERATING ABOUT THE CASE AND IT'S UNFAIR TO HAVE

19    SOME OF YOU BASING YOUR VERDICT ON INFORMATION WHICH HAS NOT

20    BEEN TESTED HERE IN COURT.

21              IF ANY OF YOU VIOLATE THESE RESTRICTIONS, THEN IT

22    NOT ONLY JEOPARDIZES THE FAIRNESS OF THE PROCEEDINGS, BUT IT

23    COULD RESULT IN A MISTRIAL AND THAT WOULD BE A HUGE WASTE OF

24    TIME AND MONEY FOR ANYBODY, INCLUDING THE TAXPAYERS.  AND

25    SINCE THIS COURT IS BEING CLOSED DUE TO THE SEQUESTER FOR
```

1   SEVEN DAYS BETWEEN NOW AND SEPTEMBER 30TH, THE LAST THING WE

2   NEED IS TO TAKE TIME AND MONEY TO START THIS TRIAL ALL OVER

3   AGAIN.

4          I WILL -- LET ME ADD TWO PERSONAL THINGS.  I WAS

5   PRESIDING OVER A BENCH TRIAL, WHICH IS TO SAY A TRIAL WITHOUT

6   A JURY, AND I REALIZED ONE WEEKEND THAT I WAS DRIVING RIGHT

7   BY THE PLACE WHERE THE INCIDENT IN THAT TRIAL HAD TAKEN PLACE

8   AND I WAS ACTUALLY SOMEWHAT TAKEN ABACK BY HOW STRONG THE

9   TEMPTATION WAS TO JUST GET OFF THE 101 FREEWAY AND DRIVE OVER

10  THERE AND JUST SEE FOR MYSELF, BUT I REMINDED MYSELF THAT

11  THERE WERE LOTS OF DIAGRAMS AND PHOTOGRAPHS OF THE LOCATION

12  AND THAT I HAD EVERYTHING I NEEDED TO DECIDE THAT CASE.  SO

13  I'M SAYING THAT -- AND I STAYED ON THE FREEWAY.  SO I'M

14  SAYING THAT, IS, I CAN SYMPATHIZE WITH THE DESIRE TO TRY TO

15  FIND OUT MORE OR TAKE A LOOK AT THE LOCATION, EVEN IF IT'S

16  JUST USING GOOGLE MAPS, BUT IT'S SOMETHING THAT YOU HAVE

17  TO -- IT'S SOMETHING THAT YOU HAVE TO -- A TEMPTATION YOU

18  HAVE TO RESIST.

19          I ALSO WAS LISTENING ONE MORNING TO NATIONAL PUBLIC

20  RADIO AND I REALIZED THAT -- AGAIN, THIS WAS IN A BENCH TRIAL

21  WHERE I WAS HEARING THE CASE WITHOUT A JURY THAT THERE WAS A

22  REFERENCE, NOT EVEN ON NATIONAL PUBLIC RADIO, BUT THROUGH ONE

23  OF THE SPONSOR SQUIBS THAT HAPPENS, WHERE THEY WERE TALKING

24  ABOUT THE TRIAL.  SO I TURNED THE RADIO OFF.  AND, AGAIN, I

25  DON'T KNOW HERE WHETHER THERE WILL BE ANY MEDIA INTEREST IN

```
1    THIS CASE.  I DON'T KNOW IF THERE WILL BE ANY REFERENCE, BUT

2    IF YOU HEAR SOMEBODY TALKING ABOUT THIS TRIAL OR YOU HEAR

3    IT -- YOU'RE LOOKING IN THE NEWSPAPER AND YOU SEE A

4    REFERENCE, IF YOU HEAR ABOUT IT ON THE RADIO OR TV, THEN JUST

5    TURN OFF THE RADIO AND TV AND IGNORE IT.  AS I SAID, I

6    SYMPATHIZE WITH THE DESIRE NOT TO DO THAT, BUT IT IS VERY

7    IMPORTANT.

8         NOW, THIS IS AN OPEN COURTROOM, AS I'VE SAID.

9    ANYONE CAN COME IN HERE AND WATCH.  IF A FRIEND OF YOURS

10   COMES IN AND WATCHES, THEN DO NOT TALK TO HIM OR HER ABOUT

11   WHAT HAPPENED WHILE YOU WERE OUT OF THE COURTROOM.

12        SO WITH THAT, WE ARE READY TO GET STARTED.  AS I

13   SAID, THE FIRST PHASE OF THIS TRIAL WILL BE OPENING

14   STATEMENTS.  THE OPENING STATEMENTS ARE NOT ARGUMENTS.  THEY

15   DON'T TALK ABOUT THE LAW.  THEY DON'T TALK ABOUT ALL OF THE

16   INFERENCES AND REASONING THAT MIGHT SUPPORT ONE SIDE OR

17   ANOTHER, BUT AS YOU'VE ALREADY FIGURED OUT, THE EVIDENCE

18   ABOUT WHAT HAPPENED IS GOING TO COME IN THROUGH VARIOUS

19   WITNESSES AND IT'S HELPFUL TO YOU OR SO -- OR, PERHAPS, IT

20   WILL BE HELPFUL TO YOU OR THE ATTORNEYS HOPE IT WILL BE

21   HELPFUL TO YOU TO HAVE AN OVERVIEW OR ROADMAP OF WHAT THE

22   ATTORNEYS EXPECT THE EVIDENCE TO BE.

23        AFTER THOSE OPENING STATEMENTS, THERE WILL BE THE

24   ACTUAL RECEIPT OF EVIDENCE.  WITNESSES WILL BE CALLED.  THEY

25   WILL TESTIFY ON DIRECT.  THE EXHIBITS WILL BE ADMITTED.  THE
```

1  OPPOSING SIDE WILL HAVE THE OPPORTUNITY TO CROSS-EXAMINE THAT

2  WITNESS.  SOMETIMES THAT -- THE LINES OF DIRECT AND

3  CROSS-EXAMINE -- EXAMINATION ARE GOING TO BE A LITTLE

4  BLURRED.  FOR INSTANCE, IN THIS CIVIL TRIAL, THE PLAINTIFFS

5  MIGHT CALL SOME OF THE CULVER CITY POLICE OFFICERS AND THEN

6  THE DEFENSE, WHEN IT'S THEIR TURN, WILL ASK A LOT OF

7  QUESTIONS ON DIRECT TO BRING OUT THE FACTS WHICH THOSE

8  LAWYERS BELIEVE ARE FAVORABLE TO CULVER CITY AND OFFICER

9  MARTINEZ.  SO ALL OF THE EVIDENCE, AS IT COMES IN, APPLIES TO

10  ALL OF THE PARTIES.  IT'S NOT AS IF THE ONLY EVIDENCE THAT IS

11  USEFUL TO THE PLAINTIFFS IS ELICITED BY THE PLAINTIFF'S

12  ATTORNEYS OR ANY OF THE EVIDENCE THAT MATTERS FOR THE

13  DEFENDANTS IS ELICITED BY THE DEFENSE ATTORNEY.  ALL OF THE

14  EVIDENCE -- ALL OF THE TESTIMONY AND ALL OF THE EXHIBITS

15  APPLY TO ALL OF THE PARTIES UNLESS I INSTRUCT YOU OTHERWISE.

16          SO AFTER ALL OF THE WITNESSES HAVE TESTIFIED, AFTER

17  ALL OF THE EXHIBITS HAVE BEEN ADMITTED, THEN THE LAWYERS --

18  I'LL INSTRUCT YOU ON THE LAW AND THE LAWYERS WILL THEN HAVE

19  THE OPPORTUNITY TO USE THE EVIDENCE THAT WAS ADMITTED AND MY

20  INSTRUCTIONS TO TRULY ARGUE THE CASE IN A WAY THAT THEY CAN'T

21  RIGHT NOW IN OPENING STATEMENTS AND SUGGEST TO YOU REASONS

22  WHY THEIR RESPECTIVE CLIENTS SHOULD RECEIVE YOUR VERDICT.

23  AFTER THAT, THE CASE WILL BE SUBMITTED TO YOU.

24          NOW, IN ORDER TO KEEP TRACK OF THE EXHIBITS DURING

25  THE PRETRIAL PORTIONS OF THE CASE, THEY'RE GIVEN NUMBERS.  SO

```
1    THAT DOES MEAN THAT ALL OF THOSE NUMBERS -- ALL OF THOSE

2    EXHIBITS ARE GOING TO BE USED.  SO IF YOU HEAR -- LIKE

3    THERE'S EXHIBIT 200 SUCH AND SUCH, THEN DON'T WORRY IF AT THE

4    END OF THE CASE THERE AREN'T EXHIBITS 1 THROUGH 199.  I MEAN,

5    SOME OF THE EXHIBITS WILL BE ADMITTED AND SOME OF THEM WON'T.

6    AND ALSO DON'T THINK THAT YOU'LL NECESSARILY HAVE ALL OF THE

7    EXHIBITS BE ADMITTED.  THESE BINDERS OVER HERE ARE THE

8    EXHIBITS, BUT THAT DOESN'T NECESSARILY MEAN THAT ALL OF THOSE

9    EXHIBITS ARE GOING TO BE ADMITTED.  AGAIN, ONE OF THE

10   PURPOSES OF THE TRIAL IS TO HELP DETERMINE WHICH OF THE

11   EXHIBITS WILL TRULY BE WORTH YOUR TIME AND CONSIDERATION IN

12   THE JURY ROOM.

13        WITH THAT, WE ARE READY TO BEGIN THE OPENING

14   STATEMENTS, AND THEREFORE, BOTH MR. GALIPO AND MR. MC

15   NICHOLAS WILL BE MAKING OPENING STATEMENTS ON BEHALF OF THEIR

16   RESPECTIVE CLIENTS.

17        MR. GALIPO, YOU MAY BEGIN.

18        MR. GALIPO:  THANK YOU.

19        GOOD AFTERNOON, LADIES AND GENTLEMEN.  I WANT TO

20   THANK YOU IN ADVANCE FOR YOUR TIME AND ATTENTION TO THE CASE.

21        I WANT TO INTRODUCE MY CLIENTS AND I'M GOING TO TRY

22   MY BEST TO PRONOUNCE ALL THEIR NAMES CORRECTLY.  ONE OF THEM

23   IS JUST WAKING UP A LITTLE BIT HERE.

24        SO THESE ARE THREE OF THE CHILDREN OF LEJOY

25   GRISSOM, WHO'S THE DECEDENT.  AND DAJAYNE IS 10-YEARS-OLD;
```

1    AND DEUJANYE IS 8; AND DYVONN IS 6, BUT HIS BIRTHDAY IS

2    COMING UP MAY 2ND.  SO THEY'RE MY CLIENTS.  AND THEIR MOTHER,

3    KHANDI ROSE, IS HERE ON THEIR BEHALF.  MR. MC NICHOLAS

4    REPRESENTS ANOTHER CHILD OF THE DECEDENT.

5            I HOPE TO GIVE YOU A LITTLE BIT OF AN OUTLINE OF

6    WHAT THE CASE IS ABOUT, A LITTLE BIT ABOUT THE FACTS, A

7    LITTLE BIT ABOUT THE WITNESSES THAT ARE EXPECTED TO TESTIFY,

8    THE ORDER THAT THEY'RE EXPECTED TO TESTIFY IN SO, HOPEFULLY,

9    IT'LL HELP YOU FOLLOW ALONG A LITTLE BIT WITH THE CASE.

10           I DON'T EXPECT TO GO THROUGH EVERY WITNESS OR ALL

11   THE DETAILS, BUT I WANT TO GIVE YOU A GENERAL IDEA.  AS THE

12   JUDGE POINTED OUT, IN ADDITION TO HEARING FROM THE WITNESSES,

13   YOU'LL ALSO HAVE SOME PHOTOGRAPHS, SOME DIAGRAMS, AND THINGS

14   OF THAT NATURE.  THIS WILL BE MY LAST CHANCE TO TALK TO YOU

15   UNTIL THE END OF THE CASE.  I'LL JUST BE KIND OF ASKING THE

16   WITNESSES QUESTIONS.

17           SO THE INCIDENT HAPPENED ON APRIL 25TH, 2010, AT

18   ABOUT 11:30 IN THE MORNING.  THE MAIN ISSUE IN THE CASE THAT

19   YOU'RE GOING TO BE ASKED TO DECIDE AT THE END IS WHETHER THE

20   USE OF DEADLY FORCE WAS EXCESSIVE OR UNREASONABLE UNDER THE

21   CIRCUMSTANCES.  THE PLAINTIFFS BELIEVE THE EVIDENCE WILL

22   SUPPORT THAT IT WAS.  AND, IN DECIDING ABOUT DEADLY FORCE,

23   YOU'RE GOING TO HAVE A LITTLE GUIDANCE IN THE EVIDENCE.  THE

24   JUDGE WILL GIVE YOU SOME INSTRUCTIONS AT THE END OF THE CASE

25   IN THAT REGARD, BUT YOU'RE GOING TO HAVE SOME GUIDANCE AS

1    WELL IN THE EVIDENCE BECAUSE YOU'LL GOING TO HEAR, FIRST OF

2    ALL, FROM THE OFFICERS.  IN FACT, THE FIRST SEVEN WITNESSES

3    WILL BE POLICE OFFICERS.  WE'RE GOING TO CALL THEM IN OUR

4    CASE.

5          THE -- AS I'LL EXPLAIN IN A MOMENT, THE SHOOTING

6    HAPPENED IN RESPONSE TO A ROBBERY ALARM AT A RADIO SHACK.

7    AND SEVERAL CULVER CITY POLICE OFFICERS HEARD THIS ALARM.

8    THEY HEARD SOME INFORMATION OVER THE POLICE RADIO.  THEY HAD

9    HAD PRIOR INFORMATION OF SOME ROBBERIES, AND THEY RESPONDED

10   TO THE RADIO SHACK.

11         AT THE TIME THEY GOT THERE, THE PERSON THAT WAS

12   INVOLVED WAS GONE.  HE WAS OBSERVED TO HAVE FLED ON FOOT.

13   THEY DID HAVE A DESCRIPTION OF HIM.  THERE WAS A GUN SEEN,

14   DESCRIBED AS A SILVER OR CHROME GUN; AND SO THE OFFICERS

15   ATTEMPTED TO SEE IF THEY COULD LOCATE ANY POTENTIAL SUSPECTS.

16   AN OFFICER LOPEZ, WHO IS THE FIRST OFFICER WHO WILL TESTIFY,

17   OBSERVED A VEHICLE WITH A FEMALE DRIVER AND A MALE PASSENGER.

18   THE MALE PASSENGER IN THE VEHICLE WAS LEJOY GRISSOM; HE WAS

19   THE PERSON SHOT AND KILLED.

20         AT SOME POINT, OFFICER LOPEZ DECIDED TO ACTIVATE

21   HIS LIGHTS TO PULL THE VEHICLE OVER.  THE VEHICLE VERY

22   QUICKLY PULLED OVER AND, IN FACT, PULLED INTO A SMALL PARKING

23   LOT.  AND YOU'LL SEE SOME PHOTOGRAPHS OF THIS PARKING LOT.

24   AND YOU'LL SEE IN THIS PICTURE WHAT APPEARS TO BE A DONUT

25   KING AND SOME POLICE CARS.  AND TOWARDS THE FRONT WAS THE

```
 1   CAR; THE GREEN CAR WAS THE VEHICLE IN WHICH LEJOY GRISSOM WAS

 2   IN.  YOU'RE GOING TO SEE DIFFERENT SHOTS OF THE VEHICLE FROM

 3   DIFFERENT LOCATIONS AS THE EVIDENCE GOES ON.  AND SO WHAT THE

 4   FOCUS IS GOING TO BE ON IS:  WHAT HAPPENED IN THAT PARKING

 5   LOT?  WHAT HAPPENED LEADING UP TO THE SHOOTING?  AND YOU'RE

 6   GOING TO HEAR A LOT OF EVIDENCE ON THAT.

 7           NOW, YOU WILL LEARN THAT THE VEHICLE TO THE LEFT

 8   DIRECTLY BEHIND THE GREEN CAR WAS OFFICER LOPEZ'S VEHICLE.

 9   HE'S THE FIRST OFFICER WHO WILL TESTIFY; HE'S THE ONE THAT

10   PULLED THE CAR OVER.  VERY SHORTLY AFTER HE PULLED THE CAR

11   OVER, OFFICER FAIRBANKS AND OFFICER ZERBEY WHO WILL BOTH

12   TESTIFY ARRIVED IN THIS CAR AND PARKED NEXT TO OFFICER LOPEZ.

13   SHORTLY THEREAFTER, OFFICER MARTINEZ ARRIVED AND THAT IS HIS

14   VEHICLE TO THE LEFT.  OFFICER MARTINEZ IS THE OFFICER WHO

15   SHOT AND KILLED MR. GRISSOM.

16           NOW, WHAT YOU WILL HEAR IS WHAT EACH OFFICER DID

17   PRECISELY, WHAT THEIR POSITION WAS, WHAT COMMANDS WERE GIVEN,

18   WHAT THEY SPECIFICALLY OBSERVED FROM THE TIME THEY ARRIVED TO

19   THE TIME OF THE SHOOTING.  THE TIME ESTIMATES SUGGEST THAT IT

20   WAS APPROXIMATELY THREE, AT MOST, FOUR MINUTES IN BETWEEN THE

21   TIME THE CAR WAS PULLED OVER AND THE FATAL SHOTS WERE FIRED.

22   YOU'RE ALSO GOING TO HEAR A LITTLE BIT ABOUT WHAT'S CALLED A

23   FELONY TRAFFIC STOP AND WHAT THE PROCEDURES ARE TO DO A

24   FELONY TRAFFIC STOP.

25           BEFORE I GET INTO THE DETAILS OF WHAT THE
```

1    TESTIMONY'S GOING TO BE AND WHAT THE OFFICERS ARE GOING TO

2    SAY, I WANT TO TELL YOU A LITTLE BIT WHAT THE EVIDENCE IS

3    GOING TO BE ON DEADLY FORCE BECAUSE, IF YOU HAVE TO DECIDE

4    WHETHER DEADLY FORCE WAS EXCESSIVE OR NOT, YOU NEED TO KNOW

5    AND WILL YOU HEAR FROM THE EVIDENCE WHEN OFFICERS CAN AND

6    CANNOT USE DEADLY FORCE.

7              NOW, THERE ARE TWO POLICE PRACTICE EXPERTS THAT

8    YOU'RE GOING TO HEAR FROM, ONE RETAINED FROM EACH SIDE.  THE

9    PLAINTIFFS HAVE RETAINED ROGER CLARK.  HE IS A WELL-RESPECTED

10   EXPERT IN THIS FIELD WHO SERVED 27 YEARS WITH THE LOS ANGELES

11   COUNTY SHERIFFS DEPARTMENT, AND HE HAS REVIEWED THIS CASE.

12             THE DEFENSE HAS RETAINED A GENTLEMAN NAMED CLARENCE

13   CHAPMAN.  HE ALSO HAS A BACKGROUND OF WORKING WITH THE

14   SHERIFFS DEPARTMENT.  BOTH EXPERTS AGREE ON MANY IMPORTANT

15   POINTS WITH RESPECT TO THE USE OF DEADLY FORCE, AND YOU'RE

16   GOING TO HEAR ABOUT POST STANDARDS.  "POST" STANDS FOR POLICE

17   OFFICER STANDARDS AND TRAINING.  WHEN POLICE OFFICERS GO TO

18   THE ACADEMY THEY HAVE TO LEARN ABOUT DIFFERENT TOPICS, AND

19   ONE OF THE TOPICS THEY HAVE TO LEARN ABOUT IS THE USE OF

20   FORCE, WHEN THEY CAN AND CANNOT USE FORCE.  AND THAT

21   ENCOMPASSES A WIDE VARIETY OF TYPES OF FORCE -- PEPPER SPRAY,

22   POLICE BATON, A TASER; OF COURSE, THE HIGHEST LEVEL OF FORCE

23   IS DEADLY FORCE.  AND WHAT YOU WILL HEAR IN THE EVIDENCE IS

24   THAT DEADLY FORCE IS A LAST RESORT.  IT IS ONLY TO BE USED IN

25   THE DIREST OF CIRCUMSTANCES.  THAT'S WHAT THE POST STANDARDS

1    TEACH, AND THE OFFICERS AND THE EXPERTS WILL CONCEDE THIS

2    POINT.

3         DEADLY FORCE, YOU WILL HEAR, SHOULD ONLY BE USED

4    WHEN NO OTHER REASONABLE MEASURES ARE AVAILABLE AND ALL OTHER

5    REASONABLE MEASURES HAVE BEEN EXHAUSTED.  OFFICERS ARE TAUGHT

6    ABOUT THE REVERENCE FOR HUMAN LIFE; ALSO, A WARNING THAT

7    DEADLY FORCE IS GOING TO BE USED, SHOULD BE GIVEN, OR THAT

8    TRAINING MUST BE GIVEN WHEN FEASIBLE.  SO YOU'RE GOING TO

9    HAVE SOME OF THIS INFORMATION AVAILABLE TO YOU WITH RESPECT

10   TO DEADLY FORCE.

11        THERE'S SOME OTHER POINTS YOU'RE GOING TO HEAR

12   ABOUT.  SUBJECTIVE FEAR IS INSUFFICIENT.  IN OTHER WORDS, IF

13   AN OFFICER SAYS, "I WAS IN FEAR," THAT'S NOT ENOUGH.  THERE

14   HAVE TO BE SUBJECTIVE FACTS TO SUPPORT THAT AND IT HAS TO BE

15   AN IMMEDIATE DEFENSE OF LIFE SITUATION.  AN OVER REACTION,

16   YOU WILL HEAR, IS EXCESSIVE FORCE.  AND I WOULD SUBMIT TO YOU

17   IN THE EVIDENCE IN THIS CASE IS, AT A MINIMUM, THERE WAS AN

18   OVER REACTION BY OFFICER MARTINEZ.

19        NOW, YOU WILL ALSO HEAR IN THE EVIDENCE THAT YOU

20   CANNOT SHOOT SOMEONE SIMPLY BECAUSE THEY'RE A SUSPECT IN AN

21   ARMED ROBBERY OR EVEN IF YOU BELIEVE THEY COMMITTED ONE OR

22   MORE ROBBERIES.  THAT'S WHAT WE HAVE THE CRIMINAL JUSTICE

23   SYSTEM FOR.

24        NOW, IN ANY EVENT, YOU WILL HEAR SOME EVIDENCE THAT

25   OFFICER MARTINEZ BELIEVED THAT LEJOY WAS, IN FACT, A PERSON

```
 1    WHO HAD BEEN INVOLVED IN PRIOR ROBBERIES.  IN FACT, THERE'S
 2    EVEN SOME BULLETINS THEY HAD REGARDING THESE ROBBERS.  AND I
 3    ANTICIPATE DEFENSE COUNSEL IS GOING TO WANT TO SHARE THESE OR
 4    SHOW THESE WITH YOU AT SOME POINT, MAYBE EVEN IN HIS OPENING
 5    STATEMENT.  BUT WHAT'S IMPORTANT TO NOTE IS TWO THINGS WITH
 6    RESPECT TO THE BULLETINS:  ONE, THEY DON'T JUSTIFY THE USE OF
 7    DEADLY FORCE BY THEMSELVES; AND, TWO, THERE'S NO DESCRIPTION
 8    OF ANYONE EVER BEING INJURED, ANY SHOTS BEING FIRED AT ANY
 9    TIME.  IN FACT, IN ONE OF THE INCIDENTS, THERE WAS AN APOLOGY
10    BY THE PERSON WHO WAS ASKING FOR THE MONEY, SAYING HE WAS
11    DOING THIS FOR HIS CHILDREN.  AND THE WEAPON THAT WAS
12    DESCRIBED WAS SILVER OR CHROME, AND THAT WILL BECOME
13    IMPORTANT IN A MOMENT.
14            SO WHAT HAPPENED?  WE'RE IN THE PARKING LOT AND THE
15    DIFFERENT OFFICERS GET IN PLACE.  OFFICER LOPEZ IS THERE BY
16    HIMSELF FIRST.  AND THE FIRST THING HE DOES, AFTER THE
17    VEHICLE ALMOST IMMEDIATELY PULLED OVER, IS TO TELL THEM TO
18    KEEP THEIR HANDS UP.  HE ALSO DISPATCHED TO OTHER OFFICERS
19    THAT HE HAD A POSSIBLE SUSPECT, AND THEY RESPONDED TO THAT --
20    IN THAT AREA.
21            THE COURT:  MR. GALIPO, I'M SORRY TO INTERRUPT YOU,
22    BUT IF YOU COULD PLEASE STATE WHICH EXHIBIT NUMBER THIS IS
23    THAT YOU'VE EXPLAINED TO THE JURY?
24            MR. GALIPO:  ABSOLUTELY.  THIS IS -- THE NUMBERS
25    ARE KIND OF LENGTHY SO I APOLOGIZE -- 372-145.
```

1          THE COURT:  ALL RIGHT.  GO AHEAD.  THANK YOU.

2          MR. GALIPO:  OKAY.

3          IN ANY EVENT, HE TELLS THEM TO PUT THEIR HANDS UP.

4   THE FEMALE DRIVER OF THE VEHICLE PUTS HER HANDS UP; SHE'S

5   STILL IN THE CAR.  THE FRONT PASSENGER, LEJOY GRISSOM, WHO

6   ENDED UP BEING SHOT AND KILLED, PUT HIS HANDS UP.  NOW ZERBEY

7   ARRIVED, FAIRBANKS ARRIVED, MARTINEZ ARRIVES, OTHER OFFICERS

8   ARRIVE; AN OFFICER BROWN, AN OFFICER MOORE.  YOU'RE GOING TO

9   HEAR FROM ALL OF THEM.  THEY ALL AGREE THEY'RE LOOKING AT HIM

10  IN THE CAR.  IT'S DAYLIGHT.  IT'S 11:30.  THEY HAVE A CLEAR

11  VIEW.  THEY COULD SEE THEIR HANDS.  THEY COULD SEE THEIR

12  HANDS ARE UP.  THEY'RE EVEN DESCRIBED AS BEING "CLOSE TO" OR

13  "ON TOP OF" THE HOOD LINER OF THE VEHICLE.  AND ALL OF THEM

14  AGREE, "WE COULD SEE NOTHING IN THEIR HANDS."

15         NOW, THEY WILL TELL YOU THAT TWICE IN THIS PERIOD

16  OF TIME WHILE THEY WERE IN THE CAR -- AND SOME OFFICERS

17  ESTIMATE THE TIME TO BE FIVE OR TEN MINUTES, BUT I THINK THE

18  EVIDENCE WOULD BE IT WAS PROBABLY CLOSER TO THREE MINUTES --

19  MR. GRISSOM'S LEFT HAND DROPPED OUT OF VIEW TWICE.  HIS LEFT

20  HAND.  AND THEY WERE ASKED TO GIVE AN ESTIMATE OUT OF ALL OF

21  THE TIME THEY WERE IN THE CAR FOR HOW MUCH A PERIOD OF TIME

22  DOES HIS LEFT HAND DROP OUT OF VIEW?  THE ESTIMATE:  FIVE TO

23  TEN SECONDS, TOTAL.

24         AND YOU WILL HEAR EVIDENCE THAT AT SOME POINT

25  MR. GRISSOM IS ASKED TO GET OUT OF THE CAR.  AND BEFORE HE'S

1    ASKED TO GET OUT OF THE CAR, HE'S ASKED TO PUT HIS HANDS OUT

2    THE OPEN PASSENGER'S SIDE WINDOW.  SOME OF THIS IS STANDARD

3    IN A FELONY TRAFFIC STOP SITUATION, YOU WILL HEAR.  AND HE

4    DOES.  SO HE PUTS HIS HANDS OUTSIDE THE OPEN PASSENGER

5    WINDOW.  EVERY OFFICER THAT WILL TESTIFY WILL TELL YOU, "WE

6    COULD SEE HIS HANDS.  HE HAD NOTHING IN HIS HANDS."  AND THEY

7    WILL ALSO TELL YOU HE DID THAT IN COMPLIANCE WITH THEIR

8    REQUEST.  NOW, AT SOME POINT HE'S ASKED TO GET OUT OF THE

9    CAR.  MR. GRISSOM SAYS, "I HAVE A SEAT BELT ON.  IS IT OKAY

10   IF I TAKE MY SEAT BELT OFF?"

11              AND OFFICER ZERBEY SAYS, "YES."

12              AND MR. GRISSOM LOWERS HIS LEFT HAND, THE ONE THAT

13   WENT OUT OF VIEW FOR FIVE TO TEN SECONDS, TOTAL, TO TAKE HIS

14   SEAT BELT OFF AND HE TAKES HIS SEAT BELT OFF.  NOW THEY TELL

15   HIM, "OPEN THE CAR DOOR FROM THE OUTSIDE."  AND THIS IS ALSO

16   PART OF OFFICER TRAINING BECAUSE THEY WANT TO MAKE SURE AND

17   SEE HIS HANDS, PARTICULARLY SINCE THEY HAVE INFORMATION THAT

18   HE MAY HAVE BEEN INVOLVED IN A ROBBERY AND IT'S POSSIBLE A

19   GUN WAS INVOLVED.

20              MR. GRISSOM, IN ANOTHER ACT OF COMPLIANCE, EXPLAINS

21   TO THE OFFICER, "IT'S BROKEN," THE DOOR FROM THE OUTSIDE.

22              "IS IT OKAY IF I OPEN THE DOOR FROM THE INSIDE?"

23              AND SHOWING YOU EXHIBIT 377-004, OFFICER ZERBEY --

24   AND WE'RE GOING TO GO INTO WHEN THE OFFICERS TESTIFY TO HELP

25   CLARIFY FOR YOU.  I'LL ASK EACH ONE WHERE THEY WERE STANDING,

1    SPECIFICALLY, SO YOU'LL HAVE AN IDEA OF THEIR POINT OF VIEW.

2            OFFICER ZERBEY TELLS HIM, "YES, IT'S OKAY TO OPEN

3    THE DOOR FROM THE INSIDE."

4            NOW, LOOKING AT EXHIBIT 372-005, LOPEZ'S VEHICLE IS

5    THE VEHICLE TO THE LEFT, ZERBEY AND FAIRBANKS' VEHICLE, TO

6    THE RIGHT.  WHEN OFFICER MARTINEZ APPROACHED -- AND REMEMBER

7    HE'S THE ONE THAT'S THE SHOOTER -- HE WENT TO THE DRIVER'S

8    SIDE OF LOPEZ'S VEHICLE IN THE OPEN -- V OF THE OPEN DOOR.

9    THAT'S HE SHOT FROM.  OTHER OFFICERS, YOU WILL HEAR, WERE

10   BETWEEN THE VEHICLES AND TO THE PASSENGER'S SIDE OF THE

11   VEHICLE AND IN OTHER LOCATIONS.

12            IN ANY EVENT, EVERY OFFICER AND BOTH EXPERTS AGREE

13   THAT BASED ON EVERYTHING THEY KNEW AND EVERYTHING THEY SAW

14   WHEN MR. GRISSOM WAS IN THE CAR, AND BASED ON ALL THEIR

15   TRAINING, YOU COULD NOT SHOOT HIM.  SO NOW THE EVIDENCE WILL

16   BE HE IS SURRENDERING; HE IS COMPLYING.  NOT ONLY PUT HIS

17   HANDS UP, ASKED TO TAKE THE SEAT BELT OFF, PUT HIS HANDS OUT

18   THE WINDOW, NOTHING IN HIS HANDS, ASKED TO OPEN THE DOOR FROM

19   THE INSIDE; HE OPENS THE DOOR AND NOW HE GETS OUT.  AND

20   YOU'RE GOING TO HEAR A LOT OF DETAILS ON WHAT HAPPENED.

21            SOME PEOPLE ESTIMATE IT TO BE 20 TO 30 SECONDS FROM

22   THE TIME HE GOT OUT TO THE TIME OF THE SHOOTING.  THE

23   EVIDENCE MAY SUPPORT IT MAY HAVE BEEN SUBSTANTIALLY LESS THAN

24   THAT.  IN ANY EVENT, HE GETS OUT.  NOW, EVERY SINGLE OFFICER

25   THAT WILL TESTIFY, WITH THE EXCEPTION OF OFFICER MARTINEZ --

1    AND HE'S THE SHOOTER AND YOU'RE GOING TO HAVE TO JUDGE HIS

2    CREDIBILITY -- EVERY SINGLE OFFICER WILL SAY THAT MR. GRISSOM

3    GOT OUT WITH HIS HANDS UP AND NOTHING IN HIS HANDS AND THEY

4    COULD SEE HIS HANDS, INCLUDING THE PALMS OF HIS HANDS.  AND

5    EVERY SINGLE OFFICER -- WITH THE EXCEPTION OF OFFICER

6    MARTINEZ, THE SHOOTER -- WILL SAY, WHEN MR. GRISSOM GOT OUT,

7    HE IMMEDIATELY TURNED TOWARDS THE OFFICERS AND TOWARDS THE

8    POLICE VEHICLES.  SO LOOKING AT EXHIBIT 377-004, HE GOT OUT

9    AND IMMEDIATELY WAS FACING TOWARDS THOSE POLICE VEHICLES.

10   NOW -- AND EVERY SINGLE OFFICER, WITH THE EXCEPTION OF

11   OFFICER MARTINEZ, WILL TELL YOU, "HIS HANDS WERE UP AND WE

12   COULD SEE NOTHING IN HIS HANDS."

13           NOW, THERE WILL BE A DISCREPANCY IN THE EVIDENCE AS

14   TO HOW MANY PEOPLE WERE SHOUTING COMMANDS.  IN A FELONY

15   TRAFFIC STOP, YOU WILL HEAR FROM THE POLICE PRACTICE EXPERTS

16   AND FROM SOME OF THE OFFICERS, THERE'S A CERTAIN WAY DO IT.

17   NORMALLY, ONE OFFICER SHOULD GIVE COMMANDS -- NOT MORE THAN

18   ONE -- BECAUSE YOU DON'T WANT TO HAVE CONFUSION ON THE PART

19   OF THE PERSON GETTING OUT.  SO ONE OFFICER SHOULD TAKE THE

20   LEAD.

21           NOW THE OFFICERS, THE INVOLVED -- SOME OF THEM WILL

22   CLAIM ONLY ONE OFFICER WAS GIVING COMMANDS, BUT OTHERS WILL

23   ADMIT IT WAS MULTIPLE OFFICERS YELLING AT THE SAME TIME.  SO

24   YOU'RE GOING TO HAVE TO LISTEN TO THAT.

25           NOW THERE'S ALSO CERTAIN COMMANDS THAT ARE GIVEN IN

| | |
|---|---|
| 1 | ADDITION TO, "KEEP YOUR HANDS UP," SUCH AS, "TURN AROUND," |
| 2 | "WALK BACK IN MY DIRECTION," "GET DOWN ON THE GROUND," |
| 3 | WHATEVER THE PROGRESSION IS.  THE EVIDENCE WILL BE THOSE |
| 4 | COMMANDS -- ACCORDING TO THE OFFICERS -- AT LEAST SOME OF |
| 5 | THEM WERE NOT GIVEN.  IN ANY EVENT, EVERY OFFICER AND, |
| 6 | IMPORTANTLY, YOU WILL HEAR THAT EVERY OFFICER THERE AT THE |
| 7 | SCENE -- AND I'M TALKING ABOUT LOPEZ, MARTINEZ, ZERBEY, |
| 8 | FAIRBANKS, BROWN -- ALL HAD THEIR WEAPONS POINTED RIGHT AT |
| 9 | MR. GRISSOM, ALL OF THEM, WHEN HE GOT OUT OF THE THAT |
| 10 | VEHICLE.  AND ALL OF THEM ARE TRAINED THAT, IF IT'S A REAL |
| 11 | LIFE-THREATENING SITUATION -- SOMEONE COMES OUT WITH A GUN OR |
| 12 | SOMETHING TO THAT EFFECT -- TO SHOOT.  NONE OF THEM SHOT. |
| 13 | THE ONLY PERSON THE EVIDENCE WILL BE THAT SHOT IS OFFICER |
| 14 | MARTINEZ.  AND OFFICER MARTINEZ HAD WHAT'S CALLED AN MP5, |
| 15 | WHICH IS BASICALLY A SUBMACHINE GUN.  HE HAD IT ON A |
| 16 | THREE-ROUND BURST WHICH MEANS:  ONE PRESS TO THE TRIGGER, |
| 17 | THREE BULLETS COME OUT. |
| 18 | THE EVIDENCE WILL ALSO BE THAT OFFICER MARTINEZ, AT |
| 19 | THE REQUEST OF HIS SUPERVISORS FOR THE CITY, WAS ON HIS 17TH |
| 20 | HOUR OF WORK AT THE TIME THIS INCIDENT HAPPENED.  HE STARTED |
| 21 | AT ABOUT 7 O'CLOCK THE NIGHT BEFORE AND WAS SUPPOSED TO GET |
| 22 | OFF AT ABOUT 7:00 IN THE MORNING, A 12-HOUR SHIFT; BUT HE WAS |
| 23 | ASKED TO CONTINUE ON ANOTHER FOUR, FIVE OR SIX HOURS.  SO |
| 24 | YOU'LL HAVE TO DECIDE WHETHER THE FATIGUE PLAYED A PART OR |
| 25 | NOT. |

1      BUT, IN ANY EVENT, WE'RE UP TO THE POINT WHERE

2   EVERY SINGLE OFFICER, EXCEPT OFFICER MARTINEZ, SAYS THAT

3   MR. GRISSOM GETS OUT, IMMEDIATELY FACES THE OFFICERS, WAS

4   ONLY FACING THE OFFICERS WITH HIS HANDS UP.  NOW, A FEW SAY

5   HE DROPPED HIS HANDS A LITTLE BIT AND WE TOLD HIM TO PUT HIS

6   HANDS UP AGAIN, AND HE PUT HIS HANDS UP.  BUT ALL OF THEM

7   SAY, "WE COULD SEE HIS PALMS.  NOTHING WAS IN HIS HANDS.

8   HE'S 10, 15, 20 FEET FROM US.  WE HAVE A CLEAR, UNOBSTRUCTED

9   VIEW."

10      SUDDENLY, THE SHOTS RING OUT.  SUDDENLY, THE SHOTS

11   RING OUT.  NOW, AT THE TIME THE SHOTS RING OUT, THERE'S EVEN

12   BYSTANDERS AND INNOCENT PEOPLE THAT HAVE NOTHING DO WITH THIS

13   IN THE BACKGROUND.  YOU CAN SEE FROM THE PHOTOGRAPHS THAT

14   THERE'S BUSINESSES IN THE BACKGROUND.  PERHAPS THIS ONE,

15   372-005, IS A GOOD SHOT OF THAT (DISPLAYING).

16      NOW, MR. GRISSOM IS HIT WITH THREE SHOTS TO THE

17   CHEST; ALL THREE SHOTS STRUCK HIM IN THE CHEST.  HE FELL UP

18   AGAINST THE OPEN DOOR OF THE CAR ONTO HIS BACK ON THE GROUND.

19   HE WAS SUBSEQUENTLY APPROACHED, PATTED DOWN FOR ANY POTENTIAL

20   WEAPONS , SEARCHED, HANDCUFFED.

21      NOW, ALL OF THESE OFFICERS AFTER THIS INCIDENT GAVE

22   RECORDED STATEMENTS.  OFFICER MARTINEZ, BECAUSE IT WAS

23   DETERMINED HE WAS TOO FATIGUED TO GIVE A STATEMENT THAT DAY,

24   WENT HOME AND WAS ALLOWED TO GIVE A STATEMENT THE FOLLOWING

25   DAY.  AND IN THE EVIDENCE, DEPENDING ON WHAT THEY TESTIFY TO,

1    WE WILL REFER TO WHAT THEY SAID IN THEIR RECORDED STATEMENTS

2    BECAUSE WE HAVE THE TRANSCRIPTIONS OF THOSE.  THEIR

3    DEPOSITIONS HAVE ALSO BEEN TAKEN UNDER OATH, SO WE HAVE A

4    PRETTY GOOD IDEA OF WHAT THEY'RE GOING TO SAY.  IN FACT, MANY

5    OF THOSE DEPOSITIONS HAVE BEEN VIDEOTAPED, SO IF THEIR

6    TESTIMONY HERE IS INCONSISTENT, YOU MAY SEE SOME PORTIONS OF

7    THE VIDEOTAPE.

8         NOW, EVERY SINGLE OFFICER WHO GAVE A RECORDED

9    STATEMENT, WITH THE EXCEPTION OF OFFICER MARTINEZ, "THERE WAS

10   NOTHING IN HIS HAND.  I COULD SEE HIS HAND.  HE IMMEDIATELY

11   FACED TOWARDS US.  SHOTS RANG OUT.  HE WENT TO THE GROUND.

12   WE DIDN'T SEE ANYTHING COME OUT OF HIS HAND.  WE DIDN'T SEE

13   ANY OBJECT AROUND HIM."  ZERO.

14        OFFICER BROWN PATTED HIM DOWN CAREFULLY, HE WILL

15   TELL YOU, AT THE SCENE TO SEE IF THERE WAS ANY WEAPONS IN HIS

16   WAISTBAND, HIS POCKET.  HE WENT ALL THE WAY DOWN TO HIS

17   ANKLES.  NO GUN.  NOTHING.

18        NOW, THERE WAS NO MENTION IN ANY OF THE ORIGINAL

19   STATEMENTS, INCLUDING OFFICER MARTINEZ'S, OF ANYTHING ABOUT A

20   CELL PHONE.  AND I BRING THE CELL PHONE ISSUE UP TO YOU NOW

21   BECAUSE YOU'RE GOING TO HEAR ABOUT A CELL PHONE.  NOW, IT

22   TURNS OUT THAT SOME OF THE PHOTOGRAPHS YOU'RE GOING TO SEE IS

23   OF A BLACK CELL PHONE.  AND THE EVIDENCE WILL BE THIS BLACK

24   CELL PHONE LOOKS NOTHING LIKE A GUN.  THE EVIDENCE WILL ALSO

25   BE THIS BLACK CELL PHONE WAS NOT IN HIS HAND AT THE TIME HE

1    WAS SHOT.

2         SO WHAT'S OFFICER MARTINEZ'S STORY?  I TOLD YOU

3    WHAT THE OTHER OFFICERS HAVE TO SAY, MORE OR LESS.  WELL,

4    HERE'S OFFICER MARTINEZ'S VERSION OF WHAT HAPPENED:

5    MR. GRISSOM GETS OUT AND DOES NOT FACE ALL THE OFFICERS.  IN

6    FACT, HE DOES THE OPPOSITE; HE FACES AWAY FROM ALL THE

7    OFFICERS FOR 10 TO 20 SECONDS.  THIS IS OFFICER MARTINEZ'S

8    VERSION.  AND HE ADMITS HE GOT OUT.  I COULD SEE HIS HANDS,

9    NOTHING IN HIS HANDS.  HE TURNED AWAY.  HE HAD HIS HANDS UP.

10   I COULDN'T SEE ANYTHING IN HIS HANDS.

11        THEN OFFICER MARTINEZ SAYS, CONTRARY TO EVERY OTHER

12   OFFICER, "HE SUDDENLY THEN SPUN TO HIS RIGHT.  I SAW A SILVER

13   OBJECT IN HIS RIGHT HAND" -- SILVER, HENCE THE ALLEGED CHROME

14   HANDGUN -- "AND I SHOT HIM WITHIN ONE SECOND OF THE TURN."

15   THAT'S OFFICER MARTINEZ'S STORY.  HE'S 10 TO 20 SECONDS, LIKE

16   THIS (DEMONSTRATING).  HE TURNS AND WITHIN ONE SECOND OF THIS

17   TURN, I SHOT HIM.  AND YOU'RE GOING TO HAVE TO DECIDE IN

18   LISTENING TO OFFICER MARTINEZ AND ALL THE OTHER OFFICERS AND

19   THE PERCIPIENT WITNESS OR SO, THAT YOU'RE GOING TO HEAR FROM,

20   WHETHER THAT HAPPENED.

21        ONE PERCIPIENT WITNESS, AMANDA MEDEIROS, WAS IN THE

22   DONUT KING.  AND, IN FACT, IRONICALLY, THERE WAS SOME TYPE OF

23   DISPUTE IN THE DONUT KING BETWEEN A CUSTOMER AND A MANAGER.

24   SO SHE WAS THERE WITH A FRIEND, AND THEY CALLED THE POLICE.

25   SO WHEN ALL THE POLICE CARS ROLLED UP, SHE THOUGHT, "MY GOD,

1  I'VE NEVER SEEN SERVICE LIKE THIS," THINKING THEY WERE COMING

2  IN RESPONSE TO HER CALL.  BUT, IN ANY EVENT, SHE'S WATCHING

3  VERY CAREFULLY OUT THE WINDOW.  AND SHE SAW MR. GRISSOM GET

4  OUT OF THE CAR WITH HIS HANDS UP, AND SHOT WITH HIS HANDS UP

5  AND NOTHING IN HIS HANDS.  SHE COULD SEE THIS RIGHT OVER THE

6  CAR.

7        NOW, MR. GRISSOM, THE EVIDENCE WILL BE, WAS FAIRLY

8  HALL, 6'3", 6'4".  HE HAD HIS HANDS UP.  EVEN THE OFFICERS

9  WILL SAY HIS HANDS WERE UP AT LEAST TO THE SIDE OF HIS HEAD,

10  MAYBE EVEN A LITTLE HIGHER.  NOW, THEY'RE GOING TO TESTIFY

11  BEFORE YOU, I ANTICIPATE FROM THEIR DEPOSITIONS, "WELL, HIS

12  HANDS LOWERED JUST BEFORE THE SHOTS."  PLEASE LISTEN

13  CAREFULLY WHETHER THEY'RE SAYING BOTH HANDS LOWERED, ONE HAND

14  LOWERED.  DID IT LOWER TO HIS CHEST?  TO HIS STOMACH, WHERE?

15  THEY ALL WILL AGREE IT NEVER WENT IN THE POCKET; IT NEVER

16  WENT IN THE WAISTBAND, AND THEY WERE ALWAYS VISIBLE.  SO I

17  WANT YOU TO LISTEN CAREFULLY.

18        OFFICER MARTINEZ, FOR EXAMPLE -- WELL, A COUPLE

19  OFFICERS MAY SAY, "BOTH OF HIS HANDS LOWERED SOME."

20        OFFICER MARTINEZ SAYS, "NO, HIS LEFT HAND NEVER

21  LOWERED.  HIS LEFT HAND WAS UP TO THE SIDE OF HIS HEAD.  IT

22  NEVER LOWERED; ONLY THE RIGHT HAND LOWERED."

23        NOW, LET'S TALK ABOUT THE CELL PHONE FOR A MOMENT.

24        WE TOOK OFFICER MARTINEZ'S DEPOSITION UNDER OATH --

25  MR. MC NICHOLAS AND I -- ON BEHALF OF THE MINOR CHILDREN, AND

1   WE WANTED TO GET HIS VERSION OF WHAT HAPPENED AND WE WANTED

2   TO ASK HIM SOME FOLLOW-UP QUESTIONS.  WE HAD READ HIS

3   STATEMENT, AND THERE'S NO MENTION OF A CELL PHONE.  SO IN HIS

4   DEPOSITION AND AT THE TIME OF THE DEPOSITION THE EVIDENCE

5   WILL BE THAT THE ONLY PHOTOS THAT HAD BEEN USED IN THE

6   LITIGATION WERE OVERHEAD PHOTOS; NO SCENE PHOTOS LIKE YOU'RE

7   SEEING IN THIS PICTURES.

8          AND SO IN HIS DEPOSITION ON MORE THAN ONE OCCASION,

9   PERHAPS FIVE OCCASIONS, EVEN CLARIFICATION WITH COUNSEL AT

10  ONE POINT IN A QUESTION HIS OWN ATTORNEY ASKED HIM, HE SAID

11  AFTER THE SHOOTING, HE APPROACHED THE AREA OF THE CAR AND

12  UNDERNEATH THE CAR -- UNDERNEATH THE CAR -- THEY WERE VERY

13  SPECIFIC.  NOT OUT FROM THE CAR; UNDERNEATH THE CAR,

14  UNDERNEATH WHERE THE PASSENGER WILL SIT.  BUT NOT IN THE CAR;

15  UNDERNEATH THE CAR WITH THE INFERENCE BEING, IF YOU CAN'T SEE

16  THE SILVER CELL PHONE IN THE OVERHEAD PHOTOGRAPHS BECAUSE

17  IT'S UNDER THE CAR.  THAT'S HIS TESTIMONY UNDER OATH, A

18  SILVER CELL PHONE UNDER THE CAR.

19         SOMETIME THEREAFTER WE GET THE PHOTOGRAPHS.  THE

20  PHOTOGRAPHS SHOW A BLACK CELL PHONE SOME SIX FEET FROM THE

21  CAR; NO SILVER CELL PHONE, NOTHING UNDER THE CAR.  AND YOU'RE

22  GOING TO SEE PICTURES OF THIS.  AND YOU CAN SEE WHERE I'M

23  POINTING TO (POINTING), AND YOU'LL SEE OTHER CLOSE-UPS OF A

24  BLACK CELL PHONE.  NOW, INTERESTINGLY YOU WILL HEAR THAT

25  THESE PHOTOGRAPHS WERE NOT TAKEN FOR APPROXIMATELY TWO HOURS

```
1    OR SO AFTER THE SHOOTING.

2            THE COURT:  AND THIS EXHIBIT NUMBER, MR. GALIPO?

3            MR. GALIPO:  YES, SORRY.  372-223.

4            AT SOME POINT THERE'S EVIDENCE NUMBERS ASSIGNED.

5    YOU'LL SEE A NUMBER 2.  AND I WANT TO DO A LITTLE -- AND

6    THAT'S 130-360.

7            AND NOW I'M SHOWING YOU 377-061.  PROUD TO SAY I

8    DIDN'T DO THE NUMBERING ON THIS.  BUT, IN ANY EVENT.  I'M

9    GOING TO ZOOM IN A LITTLE BIT.  YOU SOME SEE OF HIS CLOTHING

10   AND YOU'RE GOING TO SEE A BLACK CELL PHONE.  NOW WHAT'S

11   INTERESTING AND YOU'LL HEAR FROM THE EVIDENCE, NOT ONE

12   OFFICER SAYS HE SAW A CELL PHONE.  WE ASKED THEM AT THE TIME

13   OF THEIR DEPOSITIONS.

14           "WHEN WE WENT UP TO HANDCUFF HIM TO CHECK HIM FOR

15   WEAPONS, WE FOUND NO WEAPONS.  NO WEAPONS FOUND AT THE

16   SCENE -- PERIOD -- ON HIM OR IN THE CAR ANYWHERE."

17           WE ASKED, "DID YOU SEE A CELL PHONE ON THE GROUND?"

18           THEY ALL SAID, "NO, I DIDN'T SEE ANY CELL PHONE.  I

19   DIDN'T SEE ANY OBJECTS AROUND HIM."

20           IN ANY EVENT, WE HAVE THE CELL PHONE WHICH IS BLACK

21   AND CERTAINLY DOES NOT LOOK LIKE A SILVER HANDGUN.  SO YOU'RE

22   GOING TO HAVE TO DECIDE:  A), IF YOU THINK HE HAD ANYTHING

23   HIS HAND; AND, B), WHETHER A BLACK CELL PHONE LOOKS LIKE A

24   SILVER HANDGUN.

25           IN ANY EVENT, THESE OFFICERS HAD WHAT'S CALLED
```

1    COVER.  OFFICER MARTINEZ HAD A BULLETPROOF VEST.  HE WAS

2    BEHIND A VEHICLE.  HE HAD COVER.  NO WARNING WAS GIVEN.  IN

3    FACT, THE OFFICERS WERE ASKED, "DID YOU EVER AT ANY TIME TELL

4    MR. GRISSOM TO DROP IT IN THE CAR, OUT OF THE CAR?"

5         THE ANSWER, "NO."

6         "WHY NOT?"

7         "WE NEVER SAW ANYTHING IN HIS HANDS."

8         SO HE GETS OUT, UPON THE REQUEST OF THE OFFICERS,

9    SURRENDERING WITH HIS HANDS UP, MULTIPLE PEOPLE YELLING AT

10   HIM, WHETHER HIS HANDS SLIGHTLY LOWERED OR NOT -- YOU'LL HAVE

11   TO DECIDE -- AND HE SHOT AND KILLED HIM.  AND MR. CLARK WHO

12   IS OUR POLICE PRACTICE EXPERT WILL TELL YOU, UNDER THOSE

13   FACTS AND BASED ON POLICE OFFICERS TRAINING AND POST

14   STANDARDS, THIS SHOOTING WAS EXCESSIVE AND UNREASONABLE.  IT

15   VIOLATED POST STANDARD AND POLICE OFFICERS TRAINING.

16   MR. CLARK WILL ALSO TELL YOU IT'S SIGNIFICANT THAT ONLY ONE

17   OFFICER SHOT.

18        NOW, SHOULD MR. GRISSOM HAVE BEEN DETAINED OR TAKEN

19   INTO CUSTODY TO LET THE CRIMINAL JUSTICE SYSTEM WORK?  OF

20   COURSE.  NOT KILLED.  AND THAT'S WHY WE'RE HERE ON BEHALF OF

21   HIS CHILDREN.

22        NOW, AFTER YOU'RE GOING TO HEAR FROM ALL THE

23   OFFICERS, WE MAY HEAR FROM SOME DETECTIVES, A PARAMEDIC, THE

24   MEDICAL EXAMINER WHO PERFORMED THE AUTOPSY.  EVENTUALLY,

25   YOU'RE GOING TO HEAR FROM THE PLAINTIFFS.  AND I WILL TELL

1    YOU, WITHOUT GOING INTO A LOT OF DETAIL, HE WAS VERY CLOSE

2    WITH HIS CHILDREN, VERY CLOSE.  HIS CHILDREN WERE EVEN

3    YOUNGER THAN THEY ARE NOW WHEN HE WAS KILLED.  AND IT'S BEEN

4    A DEVASTATING LOSS FOR THE CHILDREN.  DEVASTATING.

5           AT THE END OF THE CASE -- AFTER YOU HEAR FROM ALL

6    THE OFFICERS, AT LEAST ONE PERCIPIENT WITNESS, THE EXPERTS,

7    THE FAMILY MEMBERS -- WE'RE GOING TO ASK YOU FOR A VERDICT IN

8    FAVOR OF THE PLAINTIFFS, A FINDING THAT THE USE OF DEADLY

9    FORCE WAS EXCESSIVE AND UNREASONABLE AND ASK YOU TO AWARD

10   APPROPRIATE DAMAGES FOR THESE CHILDREN.

11          AND ONE OTHER POINT I'D LIKE TO MAKE -- AND

12   MR. CLARK WILL TELL YOU THIS, THE POLICE PRACTICE EXPERT --

13   EVEN IF THIS HAPPENED AS DESCRIBED BY OFFICER MARTINEZ THAT

14   HE SPUN AROUND WITH HIS CELL PHONE IN HIS HAND, THIS SHOOTING

15   IS STILL EXCESSIVE AND UNREASONABLE EVEN IF IT HAPPENED THE

16   WAY OFFICER MARTINEZ SAID.  BUT THE EVIDENCE WILL BE, LADIES

17   AND GENTLEMEN, IT DID NOT HAPPEN THE WAY HE DESCRIBED.

18          I THANK YOU FOR YOUR ATTENTION AND YOUR ATTENTION

19   THROUGHOUT THE TRIAL.  I LOOK FORWARD TO SPEAKING WITH YOU AT

20   THE END OF THE CASE.  THANK YOU VERY MUCH.

21          THE COURT:  THANK YOU, MR. GALIPO.

22          LADIES AND GENTLEMEN, BEFORE MR. MC NICHOLAS TALKS

23   TO YOU ABOUT HIS CLIENT, I JUST WANT TO EXPLAIN SO IT WILL

24   HELP YOU FOLLOW ALONG THAT THROUGHOUT THE TRIAL WE'LL GO IN

25   THE SAME ORDER:  MR. GALIPO, ON BEHALF OF HIS CLIENTS, MR. MC

1    NICHOLAS ON BEHALF OF HIS, AND THEN THE TWO DEFENDANTS

2    THROUGH THEIR ATTORNEYS.  SO THAT'S THE ORDER WE'RE GOING IN.

3         YOU MIGHT BE WONDERING WHY THE PLAINTIFFS GO FIRST,

4    AND THE REASON WHY IS BECAUSE THEY BEAR THE BURDEN OF PROOF

5    ON THEIR CLAIMS.  I WANT TO SAY, THOUGH, THAT SINCE SOME OF

6    YOU HAVE CRIMINAL JURY EXPERIENCE, THIS IS NOT PROOF BEYOND A

7    REASONABLE DOUBT THAT YOU'VE, I'M SURE, HEARD ABOUT OR MIGHT

8    HAVE FIRSTHAND FAMILIARITY WITH FROM CRIMINAL CASES.

9         THE BURDEN IN THIS CIVIL CASE IS A PREPONDERANCE OF

10   THE EVIDENCE.  AND BY THAT I MEAN THAT IT MUST BE EVIDENCE

11   THAT PERSUADES YOU THAT THE CLAIM IS MORE PROBABLE THAN NOT.

12   SO IT'S NOT THE BEYOND A REASONABLE DOUBT CLAIM THAT APPLIES

13   IN A CRIMINAL CASE.

14        ALL RIGHT.  MR. MC NICHOLAS.

15        MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.

16        GOOD AFTERNOON, LADIES AND GENTLEMEN.  MY NAME IS

17   MATTHEW MC NICHOLAS AND I HAVE THE DISTINCT PLEASURE OF

18   REPRESENTING MS. KANDACE SEMPLIS AND HER DAUGHTER, WHO'S NOW

19   3 BUT NOT WITH US TODAY, KAYLAN GRISSOM.  AND KAYLAN GRISSOM

20   IS THE DAUGHTER OF KANDACE AND LEJOY GRISSOM, THE DECEDENT.

21        AND I WON'T REPEAT EVERYTHING THAT MR. GALIPO SAID,

22   BUT I BELIEVE THAT SOME PIECES OF THE EVIDENCE BEAR SOME

23   HIGHLIGHTING.

24        IF WE COULD BRING UP EXHIBIT 21, PLEASE.  AND IF WE

25   COULD CROP THAT A LITTLE BIT.

```
 1          THIS IS AN AERIAL PHOTOGRAPH (INDICATING).  NOW,
 2   YOU WILL SEE VARIOUS PHOTOGRAPHS FROM VARIOUS DIFFERENT
 3   ANGLES.  BUT THROUGHOUT THE TRIAL, THE PHOTOGRAPHS HAVE THE
 4   POLICE CRUISERS; THE BLACK AND WHITES ARE IN THE SAME
 5   POSITION.  THIS IS TO HELP ORIENT YOU, AND I WILL SHOW YOU A
 6   FEW AERIAL PHOTOGRAPHS.
 7          JEFF, COULD WE SPIN THAT ONE, TURN TO THE RIGHT.
 8   THERE WE GO.  OKAY.
 9          THE STREET THAT GOES LEFT TO RIGHT, THAT'S VENICE
10   BOULEVARD.  SO EAST WOULD BE TO YOUR LEFT; WEST WOULD BE TO
11   YOUR RIGHT.  AND WE'RE LOOKING SOUTHBOUND ONTO MOTOR AVENUE.
12          ALL RIGHT.  IF WE CAN LOOK AT EXHIBIT 22.  AND
13   ROTATE THAT, PLEASE.
14          THAT'S A SLIGHTLY DIFFERENT ANGLE, BUT YOU CAN
15   STILL ORIENT YOURSELF TO THE GREEN SEBRING VEHICLE IN THE
16   DONUT KING PARKING LOT, THE BLACK AND WHITE IMMEDIATELY
17   BEHIND THE GREEN SEBRING, THAT'S OFFICER LOPEZ'S VEHICLE.  HE
18   INITIATED THE STOP.  IMMEDIATELY TO THE RIGHT IS FAIRBANKS
19   AND ZERBEY.  THEY WERE PARTNERS THAT DAY.  THEY RODE
20   TOGETHER.
21          IF WE COULD LOOK AT EXHIBIT 20.
22          WE ARE NOW LOOKING FROM THE EAST TO THE WEST.
23   AGAIN VENICE AND MOTOR, YOU CAN SEE THE VEHICLES ARE IN THE
24   SAME SPOT.  THIS GIVES YOU A SLIGHTLY DIFFERENT PERSPECTIVE
25   OF WHERE THE VEHICLES WERE.
```

```
 1              JEFF, IF WE COULD GO TO EXHIBIT 38, PLEASE.

 2              THAT'S A LITTLE BIT CLOSER.  WE ARE NOW -- OR I

 3   WOULD SAY, THE HELICOPTER IS NOW TO THE SOUTH OF THE

 4   SHOOTING, LOOKING TOWARDS THE NORTH.  THIS GIVES YOU SOME

 5   PERSPECTIVE AS TO HOW CLOSE THE FRONT END OF THOSE TWO BLACK

 6   AND WHITES WAS TO THE GREEN SEBRING, NO MORE THAN ONE CAR

 7   LENGTH AWAY.

 8              MR. GOLD, COULD WE GO TO EXHIBIT 17.

 9              AGAIN, SLIGHTLY DIFFERENT ANGLE.  THE GREEN

10   SEBRING -- THAT RED X, BY THE WAY, WAS ADDED IN THE

11   DEPOSITION.  IF YOU'RE SEEING THE RED X IN THE PHOTOGRAPH,

12   THAT WAS ADDED IN THE DEPOSITION, THAT WILL BE EXPLAINED AT A

13   LATER TIME.  AGAIN, THE POLICE CRUISERS, THE BLACK AND WHITES

14   THAT ARE -- MY EYES AREN'T THAT GOOD ANY MORE -- IN THE TOP

15   OF THE PICTURE.

16              IF WE COULD GO TO EXHIBIT 8.  NOW, AS MR. GALIPO

17   WAS TELLING YOU, THERE WAS A SILENT ALARM AT A RADIO SHACK.

18   NOW, ON THIS DAY, THIS IS THEIR DAYWATCH.  IT BEGINS AT 7:30

19   A.M.  OFFICER MARTINEZ, THE SHOOTER, ACTUALLY STARTED WORK AT

20   7:00 P.M., SATURDAY NIGHT.  OFFICER MARTINEZ LIVES 30 TO

21   35 MILES FROM THE STATION.

22              POLICE OFFICERS WHO WERE ON PATROL, MEANING WHO PUT

23   UNIFORMS ON AND THEIR SAND BROWN AND THEIR GUN AND THEIR

24   VEST, GET DRESSED AT THE STATION WHICH MEANS, IN ORDER TO BE

25   AT ROLL CALL WHICH YOU SEE ON TV WHICH EVERY POLICE OFFICER
```

1    GOES THROUGH AND THEY WILL TESTIFY -- THE OFFICERS WILL

2    TESTIFY -- THERE WAS A ROLL CALL.  YOU'VE GOT TO GET TO THE

3    STATION; YOU'VE GOT TO GET CHANGED; YOU'VE GOT TO GET IN YOUR

4    UNIFORM; YOU'VE GOT TO PUT ON YOUR VEST AND YOUR BELT AND GET

5    INTO ROLL CALL WHICH MEANS, IF HE'S SHOWING UP TO WORK FOR A

6    7:00 P.M. ROLL CALL ON A SATURDAY NIGHT FROM THE GENERAL AREA

7    OF WHITTIER TO GET TO CULVER CITY, HE'S GOT TO BE UP AT LEAST

8    TWO HOURS BEFORE THAT.

9         SO, AT A MINIMUM, HE'S UP AT 5:00 P.M., ON SATURDAY

10   EVENING.  NOW, MIND YOU, HE HAD WORKED A 12-HOUR SHIFT,

11   FRIDAY NIGHT; 7:00 P.M. FRIDAY NIGHT TO 7:30 A.M., SATURDAY

12   MORNING.  GOES HOME, TAKES CARE OF HIS PERSONAL BUSINESS.

13   HE'S GOT TO BE BACK ON THE JOB 7:00 P.M., SATURDAY NIGHT.

14        HE GOES THROUGH THE NIGHT, THROUGH THE GRAVEYARD

15   SHIFT, AS HE CALLED IT, TO 7:30 A.M., AND HE IS TOLD HE'S

16   GOING TO BE HELD OVER, AND HE IS.  AND HE CONTINUES TO WORK

17   THROUGH THE SHIFT.  AT THE MOMENT HE PULLS THE TRIGGER, IT IS

18   11:30 IN THE MORNING.  HE HAS BEEN UP SINCE A MINIMUM OF 5:00

19   P.M. THE DAY BEFORE.  WE ARE APPROACHING 18, 19 HOURS OF

20   AWAKE TIME.  NO NAPS, NO REST, NO SLEEP; 18, 19 HOURS OF

21   AWAKE TIME WHEN HE IS ATTEMPTING TO ASSESS WHETHER LETHAL

22   FORCE, TAKING A MAN'S LIFE, IS APPROPRIATE.

23        NOW, ON THIS DAYWATCH THERE ARE A TOTAL OF FOUR

24   CRUISERS OUT IN THE FIELD.  I KNOW YOU SEE MORE IN THIS

25   PICTURE.  THERE ARE SUPERVISOR VEHICLES IN THIS PICTURE.

GENERALLY, THE WAY THAT WORKS IS PATROL OFFICERS DRIVE AROUND THE FIELD.  THEY RESPOND TO CALLS.  IF SOMETHING OUT OF THE ORDINARY HAPPENS, THEY CALL FOR A SUPERVISOR.  THEY USE THE RADIOS ON THEIR UNIFORMS TO RADIO IN THEIR CALL.  OBVIOUSLY, SUPERVISORS WERE CALLED IN THIS SITUATION.

WHY DO I TELL YOU THAT?  BECAUSE WHEN THE SILENT ALARMED OCCURRED AT THE RADIO SHACK, ALL OF THE PATROL OFFICERS RESPONDED.  ALL OF THEM.  THE ENTIRE CULVER CITY PATROL RESPONDED.  AT SOME POINT AFTER THAT, OFFICER LOPEZ IS SITTING OVERLAND NORTHBOUND AT A RED LIGHT, SEES A GREEN SEBRING WHICH HE WILL DESCRIBE AS DRIVING "ERRATICALLY." THOSE ARE HIS WORDS, NOT MINE.

IN THE SECOND OR TWO IT TAKES THE GREEN SEBRING TO GO FROM HIS LEFT TO HIS RIGHT, HE BELIEVES HE IDENTIFIES PEOPLE MATCHING THE DESCRIPTION OF CERTAIN FLYERS HE HAD SEEN IN CERTAIN ROBBERIES.  HE'LL TELL YOU THAT.  SO HE IMMEDIATELY MAKES THE RIGHT TURN AND GETS BEHIND THEM.

NOW, HE WILL TESTIFY, BECAUSE I ASKED HIM THIS QUESTION SPECIFICALLY, THAT ONCE HE MAKES THE RIGHT TURN -- SO HE'S HEADING EASTBOUND BEHIND THE VEHICLE -- NO LONGER DOES HE SEE THE VEHICLE DRIVE ERRATICALLY, EVER.

HE'LL ALSO TESTIFY THAT THERE WAS A VEHICLE IN HIS LANE BETWEEN HE AND THE GREEN SEBRING.  SO IT'S GREEN SEBRING, OTHER VEHICLE, LOPEZ.  AND WHAT HE SAYS IS EITHER THAT INTERVENING VEHICLE MOVED OUT OF THE WAY, OR LOPEZ WENT

1   AROUND THE INTERVENING VEHICLE SUCH THAT HE WAS NOW

2   IMMEDIATELY BEHIND THAT CAR, THE GREEN SEBRING.

3           AND HE WILL TESTIFY THAT HE WAS ONE BLOCK WEST OF

4   THIS INTERSECTION WHEN HE IS ABLE TO MANEUVER AND GET BEHIND

5   THE GREEN SEBRING.  SO IT'S HIM AND THE SEBRING.  HE IS ONE

6   BLOCK WEST.  THE VEHICLE DIDN'T SPEED AWAY.  THE VEHICLE

7   DIDN'T MAKE ANY ERRATIC TURNS.  HE DECIDED WITHIN THAT ONE

8   BLOCK THAT THIS IS -- I BELIEVE THIS IS THE SUSPECT.  AND SO

9   WITHIN THAT ONE BLOCK, HE LIGHTS HIM UP; THAT'S POLICE

10  PARLANCE FOR TURN ON THE LIGHTS AND GIVE A CHIRP OF THE

11  SIREN.

12          HE WILL TESTIFY THAT THE VEHICLE IMMEDIATELY MADE A

13  RIGHT TURN, A GENTLE RIGHT TURN ONTO SOUTHBOUND MOTOR, AND

14  IMMEDIATELY PULLED INTO THE DONUT KING PARKING LOT AND

15  STOPPED THERE.  COMPLETE COMPLIANCE.  HE WILL TELL THAT HE

16  BROADCAST WHAT THEY CALL A RADIO TRAFFIC.  YOU PUT OUT RADIO

17  TRAFFIC; THAT HE IS DOING A FINAL STOP AT THE PARKING LOT OF

18  THE DONUT KING.  AND, AS MR. GALIPO REFERRED TO, THIS WILL BE

19  A FELONY STOP.  IT'S A TERM OF ART IN POLICE PARLANCE.

20          SO WHAT DOES MR. LOPEZ DO?  HE GETS OUT OF HIS

21  VEHICLE WHICH IS C63, AS YOU CAN SEE ON THE ROOF

22  (INDICATING), AND HE GETS TO A POSITION BEHIND THE TRUNK SO

23  THAT HE CAN HAVE A STRAIGHT LINE OF SIGHT TO THE VEHICLE.

24  THAT'S CALLED A POSITION OF COVER, MEANING THE VEHICLE WILL

25  PROTECT HIM FROM ANY -- POTENTIALLY, ANY THREATS.

1          THE NEXT VEHICLE THAT ARRIVES IS C62.  THAT'S

2     OFFICERS ZERBEY AND FAIRBANKS.  ZERBEY GETS OUT OF HIS

3     VEHICLE, OPENS HIS DRIVER'S DOOR AND STANDS AT THE APEX.  YOU

4     CAN SEE A RED X AT THE DRIVER'S DOOR OF C62 (INDICATING).

5          FAIRBANKS GETS OUT HIS MP5 -- THEY CALL IT

6     DEPLOY -- HIS SUBMACHINE GUN AND HE GOES OUT TO THE FLANK.

7     AND YOU CAN SEE THAT THERE IS A MINIVAN AND THEN A VEHICLE

8     IMMEDIATELY ABOVE IT.

9          MR. GOLD IS GOING TO PUT A LITTLE MARK THERE.

10         OFFICER FAIRBANKS TAKES A POSITION THERE, A

11    FLANKING POSITION, SO THAT HE CAN SEE FROM THE SIDE.  AS HE

12    MOVES OUT FROM THE PASSENGER'S SIDE OF C62, LOPEZ GOES FROM

13    THE BACK OF HIS TRUNK AT C63 AND NOW MOVES AROUND TO THE OPEN

14    PASSENGER DOOR OF C62.  AT THAT MOMENT THERE ARE ONE, TWO,

15    THREE OFFICERS WITHIN 10 TO 15 FEET OF THE VEHICLE, WEAPONS

16    DRAWN AND TRAINED, LOOKING THROUGH WINDOWS THAT ARE UNTINTED.

17    THREE OFFICERS.

18         MARTINEZ ARRIVES.  NOW THIS IS ALL FLUID, MIND YOU.

19         C65 IN THE BOTTOM LEFT, THAT'S THE SHOOTER VEHICLE.

20    HE ARRIVES AND HE ALSO DEPLOYS HIS SUBMACHINE GUN; MEANING HE

21    TAKES IT OUT OF THE RACK, HE UNLOCKS A MAGAZINE, HE POPS IT

22    IN, SLINGS IT OVER HIS SHOULDER AND HE GETS OUT.  AND HE

23    PUSHES UP TO THE DRIVER'S DOOR OF C63, AND THEN OFFICER BROWN

24    SHOWS UP.  THIS IS EVERYBODY IN PATROL.  EVERYBODY IN CULVER

25    CITY PATROL IS THERE.  AND OFFICER BROWN MOVES UP BEHIND

```
 1    OFFICER FAIRBANKS, WHO'S AT THE PASSENGER SIDE OF C62.  ONE,
 2    TWO, THREE, FOUR, FIVE OFFICERS.
 3         WHY IS THAT IMPORTANT?  BECAUSE THE EVIDENCE WILL
 4    BE THAT THE OFFICER WHO HAD BEEN UP FOR ALMOST 18 HOURS DID
 5    NOT HAVE TO BE INVOLVED IN IT.  THERE WERE FOUR OTHER
 6    OFFICERS THERE, READY TO HANDLE THE FELONY STOP.  IT WAS
 7    COMPLETELY UNNECESSARY.
 8         OKAY.  SO AT SOME POINT ZERBEY TAKES COMMAND IN THE
 9    FIELD AND THE PLAINTIFFS POLICE PRACTICE EXPERT, ROGER CLARK,
10    WILL SAY THAT IN A FELONY STOP OR ANY STOP -- WE HAVE
11    MULTIPLE OFFICERS -- YOU WANT SOMEBODY TO TAKE FIELD COMMAND.
12    WHY?  BECAUSE YOU DON'T WANT CONFLICTING COMMANDS.  IF MR.
13    GALIPO IS TELLING YOU TO GET DOWN, DOWN ON YOUR KNEES, AND
14    I'M TELLING YOU TO STAND UP AND TURN AROUND, WHICH ONE ARE
15    YOU GOING TO DO?
16         NOW, I'M NOT SAYING THAT THOSE CONFLICTING COMMANDS
17    WERE GIVEN IN THIS CASE.  WHAT I AM TELLING YOU IS THAT'S WHY
18    SOMEBODY TAKES CONTROL OF THE SITUATION.  AND AT A CERTAIN
19    POINT OFFICER ZERBEY -- I THINK HE'S NOW A SERGEANT, HE'S
20    BEEN PROMOTED -- TESTIFIED THAT, YES, HE TOOK COMMAND.  AND
21    HE SAID TO THE GROUP, "WE'RE GOING TO GET THE PASSENGER OUT
22    FIRST, NOT THE DRIVER."
23         NOW, THERE WILL BE TESTIMONY FROM THE VARIOUS
24    OFFICERS THAT THEY ARE ALL YELLING, SPEAKING LOUDLY, TO THE
25    PEOPLE IN THE CAR TO KEEP THEIR HANDS UP.  THERE IS PROBABLY
```

```
1   A FEW EXPLETIVES TOO.  FINE.  AND, AS MR. GALIPO STATED, ALL
2   OF THESE OFFICERS WERE INTERVIEWED BY SHERIFFS, SAME
3   SHERIFFS -- CULVER CITY USES THE SHERIFFS DEPARTMENT TO DO
4   THEIR OFFICER-INVOLVED SHOOTING INVESTIGATIONS.  OKAY.
5            IN HIS DEPOSITION, WHEN I WAS GOING THROUGH THE
6   CIRCUMSTANCES WITH OFFICER ZERBEY, HE SAID AT SOME POINT --
7   MR. GRISSOM STUCK HIS HEAD OUT THE WINDOW AND SAID, "MY SEAT
8   BELT'S ON."
9            I SAID, "WELL, WHAT DID YOU SAY?"
10           I SAID, "I TOLD HIM TO TAKE IT OFF."
11           "DID HE COMPLY?"
12           "YES, HE DID."
13           WELL, CLEARLY, IN ORDER TO COMPLY WITH TAKING YOUR
14  SEAT BELT OFF AS THE PASSENGER IN A VEHICLE, SOMETHING IS
15  GOING TO HAVE TO GO DOWN TO TAKE THE SEAT BELT OFF.  WHEN YOU
16  HAVE EVERYBODY YELLING, "GET YOUR FUCKING HANDS UP," AND
17  NOBODY'S LISTENING TO WHAT EVERYBODY ELSE IS SAYING, THEY
18  DON'T KNOW THAT.
19           HOW DO THEY KNOW THAT?  BECAUSE EVERY OTHER OFFICER
20  SAID, "I NEVER HEARD THE SUSPECT" -- "I NEVER HEARD
21  MR. GRISSOM SAY, 'MY SEAT BELT'S ON.'  I NEVER HEARD OFFICER
22  ZERBEY SAY, 'TAKE YOUR SEAT BELT OFF.'"  CONFUSION AND CHAOS.
23           IN ANY EVENT, MR. GALIPO IS CORRECT, AT ONE POINT
24  HE'S TOLD TO PUT HIS HANDS OUT THE WINDOW.  THEN HE'S TOLD TO
25  OPEN THE DOOR FROM THE OUTSIDE.  HE RESPONDS AND SAYS, "I
```

```
1    CAN'T.  THE DOOR HANDLE IS BROKEN."  AND YOU'LL SEE THAT AT
2    SOME POINT THERE IS NO DOOR HANDLE ON THE OUTSIDE OF THE
3    PASSENGER DOOR OF THAT GREEN SEBRING.
4              SO OFFICER ZERBEY SAYS, "OKAY, PUT YOUR HAND BACK
5    IN AND OPEN THE DOOR."  AND HE DOES.  AND HE BEGINS TO GET
6    OUT.  AND THE EVIDENCE WILL BE UNDISPUTED THAT FROM THE TIME
7    OFFICER LOPEZ FIRST GETS BEHIND THE GREEN SEBRING, TO THE
8    TIME THAT MR. GRISSOM STARTS TO STEP OUT OF THE VEHICLE THAT
9    IT WAS NOT APPROPRIATE TO USE DEADLY FORCE, THAT HE COULD NOT
10   HAVE BEEN SHOT OR KILLED.  SO EVERYBODY AGREES ON THAT.  SO,
11   FACTUALLY, THAT'S ALL BEHIND US.
12             NOW, WE'VE JUST GOT TO DEAL WITH HIM OUT OF THE
13   VEHICLE.  OUR FOCUS IS VERY NARROW NOW.  AS MR. GALIPO SAID,
14   THE FOCUS WILL BE VERY NARROW ON WHAT HAPPENED IN A VERY FEW
15   SECONDS AT THE SCENE.
16             THE OFFICERS WERE ALL ASKED, "COULD YOU SEE HIS
17   HANDS IN THE CAR?"
18             THERE WERE VARIOUS RESPONSES OF, "YES."
19             SOME SAID, "YES."
20             SOME SAID, "I COULD ONLY SEE THE BACKS."
21             SOME SAID, "I COULD SEE PART OF HIS HANDS."
22             BUT THEY ALL SAID, "I DID NOT SEE ANYTHING IN HIS
23   HANDS."
24             WHEN HE GETS OUT -- AND HE'S GOT TO GET OUT -- THEY
25   SAY, "WE SEE HIS HANDS."  AND THEY SEE NOTHING, NOTHING IN
```

```
 1    HIS HANDS.  AND HE STANDS UP.  AND THEY ALL AGREE AT THAT
 2    POINT THERE'S NO REASON TO SHOOT HIM.  SO NOW WE'VE GOT HIM
 3    OUT OF THE CAR AND STANDING.
 4           NOW, WHAT THE SHOOTER SAYS -- THE MAN WHO'S BEEN UP
 5    FOR 18, 19 HOURS SAYS -- HE GETS OUT OF THE VEHICLE, AND
 6    FACES AWAY FOR 20 TO 30 SECONDS (DEMONSTRATING).  THAT WAS 10
 7    SECONDS.
 8           THE SHOOTER THEN SAYS HE SPUN RAPIDLY TO HIS RIGHT
 9    AND DROPPED HIS HAND; NOT TURNED AROUND, SPUN RAPIDLY.  SNAP.
10    "AND IN THAT SNAP, I SAW SOMETHING SHINY AND SILVER IN HIS
11    HAND AND I PULLED THE TRIGGER."
12           WELL, THERE WAS NOTHING SHINY AND SILVER IN HIS
13    HAND.  EVERYBODY ADMITS THAT.  THERE'S NOTHING SHINY AND
14    SILVER AT THE SCENE.  BUT THE OTHER FOUR OFFICERS -- THE
15    OTHER ONES WHO HAD ONLY STARTED WORK AT 7:00 IN THE MORNING,
16    7:30 -- NOT ONE OF THEM SAW MR. GRISSOM GET OUT AND FACE
17    AWAY.  THEY ALL SAID, "HE GOT OUT AND FACED US."
18           IN FACT, OFFICER ZERBEY WENT SO FAR AS TO SAY IT
19    WAS KIND OF ODD.  HE WAS VERY CALM.  WHY IS THIS SIGNIFICANT
20    IF I'M FACING YOU LIKE THIS (DEMONSTRATING)?  WHAT CAN YOU
21    SEE?  MY HANDS.  AND THEY ALL SAY, "WE SAW HIS HANDS.  WE SAW
22    THE PALMS OF HIS HANDS.  THEY WERE EMPTY."  AND THEN SHOTS
23    RANG OUT.
24           NOW, AS MR. GALIPO SAID, THERE WAS AN ISSUE OF A
25    CELL PHONE AND IN HIS DEPOSITION -- IF WE COULD BRING UP
```

```
 1   EXHIBIT 13, AND IT'S GOING TO NEED TO BE ROTATED ONCE TO THE
 2   RIGHT.  THERE WE GO.
 3          THAT IS A PICTURE OF THE GREEN SEBRING AND LET ME
 4   JUST GIVE YOU SOME BACKGROUND.  THAT IS A PICTURE OF THE
 5   VEHICLE AFTER IT HAS LEFT THE SCENE.  ALL RIGHT.  IT IS NOT
 6   PARKED IN FRONT OF THE DONUT KING.  ALL RIGHT.  AND IN HIS
 7   DEPOSITION HE SAYS, "IT WAS ABSOLUTELY IMPORTANT.  I PUSHED
 8   UP AND I SAW IT."  IT WASN'T IN HIS STATEMENT.
 9          AND I ASKED HIM, "WHEN WAS THE FIRST TIME YOU
10   MENTIONED THIS TO SOMEBODY?"
11          "LAST WEEK."
12          LAST WEEK?  A YEAR AFTER THE SHOOTING, ONE WEEK
13   BEFORE HIS DEPOSITION, HE FINALLY MENTIONS THAT HE ABSOLUTELY
14   SAW A CELL PHONE, AND THAT RED CIRCLE IS THE GENERAL AREA.
15   AND, AS MR. GALIPO SAID, "IT'S UNDER THE CAR."  SO TOUCHING
16   THE GROUND, (DEMONSTRATING) UNDER THE PASSENGER FLOOR BOARD.
17   AND HE CIRCLED IT AND HE WAS SURE.
18          NOW, IF WE LOOK AT EXHIBIT 78, THERE'S THE CELL
19   PHONE; NOWHERE NEAR UNDER THE CAR, ON THE GROUND IN PLAIN
20   VIEW.  AND WHY IS THAT IMPORTANT?  BECAUSE, WHEN EVERY ONE OF
21   THESE OFFICERS WAS INTERVIEWED BY THE SHERIFFS, NOT ONE OF
22   THEM SAID, "OH, AND BY THE WAY, WE SAW A CELL PHONE," NOT
23   EVEN MARTINEZ, THE SHOOTER.
24          AND THEN WHEN WE DEPOSED HIM, HE SAID, "DID YOU SEE
25   ANYTHING ON THE GROUND?"
```

1           "NO."

2           "DID YOU SEE A CELL PHONE?"

3           "I CAN'T REMEMBER," WERE A COUPLE OF THE ANSWERS.

4           THERE'S A DIFFERENCE BETWEEN, "NO," AND "I CAN'T

5   REMEMBER."

6           NOW, MR. GALIPO TOLD YOU ABOUT OFFICER BROWN DOING

7   THE PAT DOWN.  IT IS STANDARD PROCEDURE IN A FELONY STOP OR

8   IN ANY TYPE OF SITUATION WHERE AN OFFICER USES DEADLY FORCE

9   THAT YOU WILL PUSH UP ON THE SUSPECT -- YOU'LL PUSH UP ON THE

10  PERSON AND YOU WILL HANDCUFF THEM.

11          WHY?  STANDARD PROCEDURE.  BECAUSE YOU DO NOT KNOW

12  WHAT THE CAPACITY OR INCAPACITY OF THE PERSON IS AND IF THEY

13  HAVE ANOTHER WEAPON OR ANY WEAPON.

14          WHY IS THAT IMPORTANT?  THE EVIDENCE WILL BE THAT

15  THAT'S IMPORTANT BECAUSE, WHEN THEY APPROACH HIM, THEY ARE

16  LOOKING FOR THIS.  THAT'S THE WHOLE PURPOSE OF HANDCUFFING

17  HIM, IS TO RENDER HIM SAFE.  AND SO THEY'RE LOOKING.  WHAT

18  CAN HE REACH?  THEY'RE GOING TO TELL YOU THIS.  WE WANTED TO

19  SEE IF THERE'S ANYTHING HE CAN REACH, IF THERE'S ANYTHING ON

20  HIM.

21          AND OFFICER BROWN WILL SAY THAT HE PULLED THE BODY

22  AWAY FROM THE VEHICLE BY GRABBING HIS ARMS THAT WERE AT HIS

23  SIDE AND PULLING HIM AWAY, GRABBING HIS ARMS; AND THAT HE

24  HANDCUFFED HIM, TURNED HIM ONTO ONE SIDE, PATTED HIM DOWN,

25  PUT HIS THUMB INSIDE THE WAISTBAND ALL THE WAY AROUND, BACK;

```
1    CROUCHED DOWN TO THE ANKLES, IN THE ANKLES, UP THE OTHER
2    SIDE, IN THE POCKETS, FRONT AND BACK; FLIPPED HIM ONTO THE
3    OTHER SIDE, DID IT AGAIN.  NOTHING.  AND NONE OF THEM SEE THE
4    CELL PHONE.
5              THAT IS WHAT THE EVIDENCE WILL SHOW YOU.  THAT IS
6    WHAT THE EVIDENCE WILL BE.  AND, AS MR. GALIPO SAID, AS THE
7    SHERIFFS DO THE INVESTIGATION, THEY DON'T SHOW UP FOR ABOUT
8    AN HALF AND A HALF.  WE ACTUALLY HAVE A DOCUMENT THAT LOGS
9    PEOPLE WALKING ONTO THE SCENE AND THE SHERIFFS ARE THERE
10   ABOUT AN HOUR-AND-A-HALF LATER.  AND THE PLAINTIFFS FORCE
11   EXPERT WILL TELL YOU THAT THIS WAS EXCESSIVE FORCE AND THAT
12   MR. GRISSOM SHOULD NOT HAVE BEEN SHOT AND KILLED.  THANK YOU.
13             THE COURT:  LADIES AND GENTLEMEN, WE WILL TAKE OUR
14   AFTERNOON BREAK NOW SO YOU CAN HEAR FROM -- THE OPENING
15   STATEMENT FOR OFFICER MARTINEZ AND CULVER CITY.
16             LET'S MAKE THIS A SHORT BREAK.  BE READY TO START
17   AGAIN AT 3:15.  REMEMBER MY ADMONITIONS.  DON'T DISCUSS THE
18   CASE AMONG YOURSELVES, AND CERTAINLY KEEP AN OPEN MIND.
19   YOU'VE ONLY HEARD THE OPENING STATEMENTS FOR ONE SIDE OF THE
20   CASE.  ALL RIGHT.
21                       (JURORS EXIT.)
22             THE COURT:  ANYTHING FROM THE PLAINTIFFS?
23             MR. GALIPO:  NO, YOUR HONOR.
24             THE COURT:  ANYTHING FROM THE DEFENSE?
25             MR. ROTHANS:  JUST THAT MY OPENING MAY BE A LITTLE
```

```
1    LONGER THAN 30 MINUTES, IN LIGHT OF THE ELOQUENT PRESENTATION

2    BY COUNSEL.

3              THE COURT:  TAKE AS MUCH TIME AS YOU NEED.

4              MR. ROTHANS:  THANK YOU, YOUR HONOR.

5              THE COURT:  IF IT'S GOING TO GO MUCH LATER, LONGER

6    THAN AN HOUR, LET ME KNOW; BUT, OTHERWISE, YOU CAN CERTAINLY

7    FEEL FREE TO TAKE AN HOUR.

8              MR. ROTHANS:  THANK YOU, YOUR HONOR.

9                        (RECESS.)

10             THE COURT:  MS. SANCHEZ, PLEASE GET THE JURY.

11             THE CLERK:  YES, YOUR HONOR.

12             MR. GALIPO:  YOUR HONOR, WE'RE GOING TO GO TILL

13   4:30 TODAY?

14             THE COURT:  YES, DEPENDING WHETHER OR NOT YOU'LL

15   HAVE TO PUT ON YOUR WITNESS.

16             MR. GALIPO:  IF WE GET CLOSE, I'LL DEFER TO YOU.

17             THE COURT:  YES.

18             MR. GALIPO:  THANK YOU.

19             THE COURT:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

20             MR. ROTHANS, YOU MAY PRESENT YOUR OPENING

21   STATEMENT.

22             MR. ROTHANS:  THANK YOU, YOUR HONOR.

23             COUNSEL, LADIES AND GENTLEMEN.  FIRST OF ALL, I

24   WANT TO START BY THANKING YOU FOR YOUR SERVICE.  I'M SURE,

25   WHEN YOU CAME THIS MORNING, YOU DIDN'T REALIZE YOU WERE GOING
```

```
 1   TO BE SITTING HERE FOR THE NEXT FOUR, FIVE, OR SIX DAYS.  SO

 2   THANK YOU FOUR YOUR SERVICE TO OUR COMMUNITY.

 3         POLICE OFFICERS ARE EXPECTED TO MAKE SPLIT-SECOND

 4   DECISIONS, SPLIT-SECOND JUDGMENTS IN CIRCUMSTANCES THAT ARE

 5   TENTHS UNCERTAIN AND RAPIDLY EVOLVING.  THAT'S THIS CASE.

 6         THESE FINE LAWYERS JUST SPENT THE BETTER PART OF AN

 7   HOUR TALKING ABOUT AN INCIDENT THAT, FROM THE TRAFFIC STOP AT

 8   MOTOR AND VENICE UNTIL THE SHOTS FIRED, WAS LESS THAN

 9   TWO-AND-A-HALF MINUTES.  FROM THE TRAFFIC STOP TO SHOTS FIRED

10   LESS THAN TWO-AND-A-HALF MINUTES, THESE LAWYERS ANALYZED IT

11   AND TORE IT APART FOR THE BETTER PART OF AN HOUR.  AND, IN

12   FACT, WE'VE SPENT THREE YEARS ANALYZING THIS INCIDENT THAT

13   OFFICER LUIS MARTINEZ HAD LITERALLY A SPLIT SECOND TO MAKE A

14   DECISION.

15         NOW, YOU'VE MET THE PLAINTIFFS IN THIS CASE.  I

16   WANT TO INTRODUCE FORMALLY DETECTIVE LUIS MARTINEZ.

17         DETECTIVE, IF YOU'LL STAND.

18         AND ALSO CHIEF DON PEDERSEN FROM THE CULVER CITY

19   POLICE DEPARTMENT.  THE ONLY TWO DEFENDANTS IN THIS CASE ARE

20   OFFICER MARTINEZ AND THE CITY OF CULVER CITY.

21         OTHER NAMES THAT YOU MAY BE HEARING THROUGHOUT AND

22   YOU HAVE HEARD DURING THEIR OPENING WAS LEJOY GRISSOM.

23         LAYLA GRISSOM WAS NOT MENTIONED DURING THEIR

24   OPENING.  LAYLA GRISSOM WAS THE DRIVER OF THE CAR.  LAYLA

25   GRISSOM WAS IN THE RADIO SHACK BEFORE THE ARMED ROBBERY AND
```

1    CASED THE PLACE OUT --

2           MR. GALIPO:  I'M GOING TO OBJECT, YOUR HONOR, AS --

3    PURSUANT TO OUR MOTIONS IN LIMINE.

4           THE COURT:  COUNSEL, IT'S -- YOU CAN -- JUST MOVE

5    ON WITH -- YOU CAN STATE THE CONTENTION OF THE CITY AS TO WHO

6    MS. GRISSOM WAS AND WHAT HER ROLE WAS IN THE ROBBERY, BUT

7    THEN MOVE ON.

8           MR. ROTHANS:  WELL, JAVIER SANCHEZ WHO WAS THE

9    VICTIM OF THIS ARMED ROBBERY, JAVIER SANCHEZ WHO WORKED IN

10   THE RADIO SHACK, TOLD DETECTIVE LUIS MARTINEZ PRIOR TO THE

11   SHOOTING ABOUT LAYLA GRISSOM'S PRESENCE IN THE STORE; AND

12   THAT SHE HAD COME IN FOR THREE TO FIVE MINUTES AND WALKED

13   AROUND, DIDN'T SELECT ANY ITEMS, DID NOT COMMUNICATE WITH THE

14   SHOP CLERK, AND WALKED OUT, TO BE FOLLOWED BY LEJOY GRISSOM.

15          THERE ARE FOUR THEORIES OR CLAIMS IN THIS CASE:

16   NEGLIGENCE, BATTERY, INTERFERENCE WITH FAMILIAL RELATIONS,

17   AND EXCESSIVE FORCE; BUT THEY ALL COME DOWN, FOLKS, TO ONE

18   CRITICAL ISSUE.  DID OFFICER LUIS MARTINEZ USE EXCESSIVE

19   FORCE?  DID HE REASONABLY BELIEVE THAT THE SUSPECT POSED A

20   THREAT OF GREAT BODILY INJURY OR DEATH TO THE OFFICER OR

21   FELLOW OFFICERS IN THE VICINITY?

22          NOW, THIS PARTICULAR INCIDENT DIDN'T JUST START

23   THAT DAY, THAT MORNING, APRIL 25, 2010.  THIS INCIDENT AND

24   THE EVENTS THAT SET THIS INCIDENT IN MOTION STARTED EARLY

25   2010.

1          THERE WAS A SERIES OF RETAIL ROBBERIES AT GUNPOINT

2    OF A NUMBER OF ESTABLISHMENTS IN SOUTHERN CALIFORNIA,

3    STARTING WITH FEBRUARY 2ND, 2010.  ON FEBRUARY 2ND, 2010,

4    POLICE RESPONDED TO A CALL OF AN ARMED ROBBERY THAT OCCURRED

5    AT A KENTUCKY FRIED CHICKEN IN ALHAMBRA.  THE SUSPECT WAS

6    DESCRIBED AS A MALE, BLACK, APPROXIMATELY SIX-FOOT TALL AND

7    OVER 200 POUNDS, IN HIS 20'S, AND WEARING A DARK-COLORED

8    BASEBALL CAP AND A RED, ZIP-UP, HOODED SWEATER.  THE SUSPECT

9    WAS REPORTED TO BE CARRYING A SMALL, CHROME, SEMI-AUTOMATIC

10   HANDGUN.

11          THIS IS THE FIRST REPORTED ARMED ROBBERY IN 2010,

12   FEBRUARY 2ND, 2010, IN THE CITY OF ALHAMBRA.  THIS PARTICULAR

13   BULLETIN THAT WE SEE ON THE SCREEN, WHICH HAS BEEN MARKED AS

14   EXHIBIT 42, IS AN ACTUAL BULLETIN FROM THE ALHAMBRA POLICE

15   DEPARTMENT THAT WAS DISTRIBUTED TO ALL LOCAL SOUTHERN

16   CALIFORNIA AGENCIES.  IT'S ALSO KNOWN AS A B.O.L.O., A

17   BE-ON-THE-LOOKOUT BULLETIN.

18          ALL POLICE DEPARTMENTS IN SOUTHERN CALIFORNIA WERE

19   PROVIDED THIS IN FEBRUARY OF 2010.

20          IF WE COULD ENHANCE THE UPPER PHOTOGRAPH ON

21   EXHIBIT 42, WE SEE A LARGE, AFRICAN-AMERICAN GENTLEMAN WITH A

22   SMALL FIREARM IN HIS HAND.  THIS WAS AN ARMED ROBBERY.

23          LEJOY GRISSOM, BY THE WAY, WAS SIX-FOOT FOUR,

24   270 POUNDS.  WEEKS LATER, ON FEBRUARY 24, 2010, POLICE

25   RESPONDED TO A CALL OF AN ARMED ROBBERY THAT OCCURRED IN AN

1    AUTO ZONE, AN AUTO PARTS PLACE IN THE CITY OF TORRANCE.  THE

2    SUSPECT WAS DESCRIBED AS A BLACK MALE, APPROXIMATELY 6'2"

3    TALL, AND 205 POUNDS, WEARING A BLACK BASEBALL CAP AND A RED

4    JACKET.  THE SUSPECT WAS REPORTED TO BE CARRYING A SMALL,

5    STAINLESS-STEEL HANDGUN.  NO BE-ON-THE-LOOKOUT BULLETIN WAS

6    CREATED BY TORRANCE P.D. IN RESPONSE TO THIS, BUT NOTICE WAS

7    PROVIDED TO ALL LOCAL AGENCIES ABOUT THIS REPORTED, ARMED

8    ROBBERY OF THE AUTO ZONE IN TORRANCE.

9         A MONTH LATER, MARCH 24, 2010, POLICE RESPONDED TO

10   A CALL OF AN ARMED ROBBERY THAT OCCURRED AT A RADIO SHACK IN

11   HARBOR CITY.  WE'RE NOW LOOKING AT EXHIBIT 43.  THIS IS

12   ANOTHER B.O.L.O., BE-ON-THE-LOOKOUT BULLETIN.  THIS WAS PUT

13   OUT BY THE L.A.P.D.  THE SUSPECT WAS DESCRIBED AS A BLACK

14   MALE, 6'1", 230 POUNDS, 20-TO-30 YEARS OLD, BEARING A TATTOO

15   OF AN "A" ON THE TOP OF ONE OF HIS HANDS AND WEARING A BLACK

16   BASEBALL CAP WITH A RED OR ORANGE ZIPPERED, HOODED

17   SWEATSHIRT.  THE SUSPECT, AGAIN, WAS REPORTED TO BE CARRYING

18   A SMALL, CHROME HANDGUN.  LEJOY GRISSOM, FOLKS, HAD AN "A"

19   TATTOOED ON HIS LEFT HAND.

20        THIS BULLETIN, AGAIN, EXHIBIT 43 WAS DISTRIBUTED TO

21   ALL LAW ENFORCEMENT AGENCIES IN SOUTHERN CALIFORNIA,

22   INCLUDING THE PHOTOGRAPHS.

23        MARCH 31, 2010, EXHIBIT 44 SHOWS ANOTHER BULLETIN

24   THAT WAS CREATED, THIS TIME BY THE CULVER CITY POLICE

25   DEPARTMENT.  ON MARCH 31, 2010, THE POLICE RESPONDED TO A

1    CALL OF AN ARMED ROBBERY AT THE SAME RADIO SHACK, 4137

2    SEPULVEDA BOULEVARD, IN CULVER CITY.  THE SUSPECT WAS

3    DESCRIBED AS A BLACK MALE, APPROXIMATELY 6'4" INCHES TALL,

4    265 POUNDS, 32- TO 36-YEARS OF AGE, WEARING A BLACK BASEBALL

5    CAP, AND A RED- OR ORANGE-HOODED SWEATSHIRT.  THE SUSPECT WAS

6    REPORTED TO BE CARRYING A SMALL, SILVER, SEMI-AUTOMATIC

7    HANDGUN.  AGAIN, THIS WAS EXHIBIT 44 FROM THE MARCH 31, 2010,

8    ABOUT THREE WEEKS BEFORE OUR INCIDENT.

9            APRIL 1, 2010, POLICE RESPONDED TO A CALL -- I'M

10   SORRY.

11           LET'S BACK UP TO THAT LAST IMAGE.  THE NEXT PAGE.

12           THIS IS PAGE 2 OF EXHIBIT 44.  THESE ARE IMAGES OF

13   MR. GRISSOM AT THE RADIO SHACK IN CULVER CITY, 4137

14   SEPULVEDA, MARCH 31, 2010.  THESE ARE FROM THE SURVEILLANCE

15   CAMERAS.  THAT, AGAIN, IS PAGE 2 OF EXHIBIT 44.

16           MOVING AHEAD.  APRIL 1, 2010, POLICE RESPOND TO A

17   CALL OF AN ARMED ROBBERY AT A RADIO SHACK IN TORRANCE.  THE

18   SUSPECT WAS DESCRIBED AS A BLACK MALE, APPROXIMATELY 6'1" OR

19   6'2" INCHES TALL, AND 240 POUNDS, BEARING A TATTOO OF AN "A"

20   ON HIS HAND AND WEARING A BLACK BASEBALL CAP AND A BROWN

21   HOODIE.  THE SUSPECT WAS REPORTED TO BE CARRYING A SMALL,

22   SILVER RESOLVER.

23           IF YOU CAN ENHANCE THE PHOTO ON THAT PARTICULAR

24   B.O.L.O.

25           AGAIN, THIS IS EXHIBIT 45.

```
1            AGAIN, LEJOY GRISSOM WAS 6'4", 270 POUNDS.

2            MOVING AHEAD.  APRIL 19, 2010.  EXHIBIT 46 IS THIS

3   WAS CUT OFF IT WAS FAXED TO CULVER CITY THIS IS ANOTHER

4   B.O.L.O. ANOTHER BE-ON-THE-LOOKOUT BULLETIN ON APRIL 19,

5   2010, POLICE RESPONDED TO CALL OF ARMED ROBBERY THAT OCCURRED

6   AT A SUBWAY RESTAURANT IN LOS ANGELES.  THE SUSPECT WAS

7   DESCRIBED AS A BLACK MALE, APPROXIMATELY 6-FOOT TALL, AND

8   200 POUNDS WEARING A BASEBALL CAP AND A RED HOODED

9   SWEATSHIRT.  THE SUSPECT WAS REPORTED TO BE CARRYING A SMALL

10  CHROME SEMI-AUTOMATIC HANDGUN.

11           IF WE COULD ENHANCE ONE OF THESE PHOTOS,

12  EXHIBIT 46.  THIS AGAIN IS THE SUSPECT FROM THE APRIL 19,

13  2010, ROBBERY AT THE SUBWAY IN LOS ANGELES THIS BULLETIN WITH

14  THESE PHOTOS WAS PUT OUT BY THE LOS ANGELES POLICE DEPARTMENT

15  PRIOR TO THE SHOOTING OF APRIL 25TH, ALL OF THE OFFICERS HAD

16  COPIES OF THESE PHOTOS.

17           ON APRIL 20, 2010, POLICE RESPONDED TO A CALL OF AN

18  ARMED ROBBERY THAT HAD TAKEN PLACE AT THE METRO P CS STORE ON

19  VENICE BELIEVED IN LOS ANGELES, EXHIBIT 47.  THE SUSPECT WAS

20  DESCRIBED IN THE APRIL 20TH ROBBERY AS A MALE BLACK,

21  APPROXIMATELY 6'1" OR 6'2", 190 TO 210 POUNDS, WEARING A

22  BLACK HAT.  THE SUSPECT WAS REPORTED TO BE CARRYING A SMALL,

23  SILVER HANDGUN.  THIS IS FIVE DAYS BEFORE THE SUBJECT ROBBERY

24  AT THE RADIO SHACK.

25           THIS SAME BULLETIN WILL STAY UP THERE BECAUSE
```

1    SEVERAL ROBBERIES, ARMED ROBBERIES, WERE CONDUCTED ON THE

2    SAME DAY; IN FACT, THREE ON APRIL 21ST.

3          ON APRIL 21, AT 2010, SHORTLY AFTER 11:00 IN THE

4    MORNING, POLICE RESPONDED TO A CALL OF AN ARMED ROBBERY THAT

5    OCCURRED AT A RADIO SHACK ON MELROSE IN LOS ANGELES.  THE

6    SUSPECT WAS DESCRIBED AS A BLACK MALE, APPROXIMATELY 6'2"

7    INCHES TALL AND 250 POUNDS, AND WAS WEARING A BLACK CAP AND A

8    RED SWEATER.  THE SUSPECT WAS REPORTED TO BE CARRYING A SMALL

9    CALIBER, CHROME HANDGUN.

10          THAT SAME BULLETIN, EXHIBIT 47, APRIL 21, THE SAME

11    DAY SHORTLY AFTER 7:00 O'CLOCK AT NIGHT, POLICE WERE CALLED

12    TO AN ARMED ROBBERY THAT OCCURRED AT A RADIO SHACK ON LINCOLN

13    BOULEVARD IN LOS ANGELES.  THE SUSPECT WAS DESCRIBED AS A

14    BLACK MALE, APPROXIMATELY SIX-FOOT TALL, 200 POUNDS, WEARING

15    A DARK-COLORED BASEBALL CAP AND A RED HOODIE.  THE SUSPECT

16    WAS REPORTED TO BE CARRYING A CHROME, SEMI-AUTOMATIC PISTOL.

17          AGAIN, EXHIBIT 47, THE THIRD ROBBERY WAS

18    APRIL 21ST, 2010.  SHORTLY AFTER 7:45 IN THE EVENING, POLICE

19    RESPONDED TO A CALL OF AN ARMED ROBBERY THAT OCCURRED AT A

20    RADIO SHACK IN CULVER CITY.  THE SUSPECT WAS DESCRIBED AS A

21    BLACK MALE, APPROXIMATELY 6'2" TO 6'4," WITH A MEDIUM BUILD,

22    WEARING A BLACK BASEBALL CAP.  THE SUSPECT WAS REPORTED TO BE

23    CARRYING A SMALL, SILVER, SEMI-AUTOMATIC HANDGUN.

24          THOSE TEN ARMED ROBBERIES TOOK PLACE BETWEEN

25    FEBRUARY AND APRIL 25TH, 2010.  LAW ENFORCEMENT REFERRED TO

1    THIS SUSPECT, TO APPEAR TO BE THE SAME INDIVIDUAL IN ALL TEN

2    OF THESE ARMED ROBBERIES, AS THE "BIG RED BANDIT" BECAUSE, IN

3    THE VAST MAJORITY OF THOSE ARMED ROBBERIES, HE WAS WEARING

4    THE RED SWEATSHIRT OR SWEATER AS DEPICTED IN SOME OF THOSE

5    PHOTOGRAPHS.

6            AGAIN, THESE BE-ON-THE-LOOKOUT BULLETINS, THESE

7    WANTED BULLETINS, WERE DISTRIBUTED TO EVERY LAW ENFORCEMENT

8    AGENCY IN SOUTHERN CALIFORNIA, PAYING SPECIAL ATTENTION TO

9    THE RADIO SHACK ROBBERIES BECAUSE THAT SEEMED TO BE THE PLACE

10   THE ROBBER HIT THE MOST.

11           ON APRIL 24TH, 2010, THE DAY BEFORE THIS PARTICULAR

12   SHOOTING, DETECTIVE LUIS MARTINEZ FROM THE CULVER CITY POLICE

13   DEPARTMENT WAS WORKING A ROBBERY SUPPRESSION UNIT.  HE

14   RECEIVED THESE BULLETINS, HE GATHERED THESE BULLETINS AND HE

15   GAVE A BRIEFING THAT NIGHT.  THE NIGHT BEFORE THE SHOOTING,

16   LUIS MARTINEZ INFORMED ALL OF THE OTHER PATROL OFFICERS WHO

17   WERE COMING ON DUTY THAT SHIFT ABOUT THIS BIG RED BANDIT AND

18   THE DETAILS OF ALL OF THESE ARMED ROBBERIES IN SOUTHERN

19   CALIFORNIA AND THE CONSISTENCY -- LARGE MAN,

20   AFRICAN-AMERICAN, LARGE BUILD, RED-HOODED SWEATSHIRT OR

21   SWEATER, SMALL CHROME HANDGUN.  HE SHARED THAT WITH ALL OF

22   THE OFFICERS WHO WERE ON DUTY THE NIGHT BEFORE -- THE EVENING

23   BEFORE THIS PARTICULAR INCIDENT.

24           WE MOVE TO THE MORNING OF APRIL 25, 2010.

25           LAYLA GRISSOM ENTERED THE RADIO SHACK AT ABOUT

```
1    10:30 IN THE MORNING.  SHE DID NOT COMMUNICATE WITH

2    37-YEAR-OLD JAVIER SANCHEZ WHO WAS THE RETAIL CLERK WORKING

3    IN THE RADIO SHACK, BUT SHE WALKED AROUND THE STORE.

4              HE TRIED TO ENGAGE HER.  THIS IS EXHIBIT 329.

5              MR. GALIPO:  YOUR HONOR, I'M GOING TO OBJECT TO

6    THIS AS BEYOND ANY INFORMATION THAT OFFICER MARTINEZ HAD AT

7    THE TIME OF THE SHOOTING.

8              MR. ROTHANS:  THIS INFORMATION WAS PROVIDED TO

9    OFFICER MARTINEZ WHEN HE RESPONDED TO THE RADIO SHACK IN

10   QUESTION BEFORE THE SHOOTING.

11             MR. GALIPO:  HE DID NOT SEE ANY VIDEO, YOUR HONOR.

12   I'D ASK TO APPROACH IF NECESSARY.

13             THE COURT:  COUNSEL, MAY APPROACH.

14                      (SIDEBAR.)

15             MR. GALIPO:  TWO OBJECTIONS, YOUR HONOR.  FIRST OF

16   ALL, MR. ROTHANS, WHO I HAPPEN TO LIKE VERY MUCH -- HE SENT

17   ME THE EXHIBITS HE WAS GOING TO USE IN OPENING STATEMENT AND

18   HE NEVER SENT ME THE VIDEO, SO THAT'S WHY I DIDN'T BRING IT

19   UP.

20             MR. ROTHANS:  THE VIDEO IS NOT BEING SHOWN AND I

21   SENT YOU THIS DEMO.

22             MR. GALIPO:  CLEARLY, I THINK THE COURT HAS

23   ALLOWED, VERY FAIRLY, THE DEFENSE TO GET INTO THE EVIDENCE OF

24   WHAT OFFICER MARTINEZ WAS AWARE OF OR SAW, AND THAT'S WHY IT

25   LET IN THESE BOLO'S, WHAT WE'VE BEEN LISTENING TO OVER
```

1    20 MINUTES, BUT HE NEVER SAW ANY VIDEO OF THIS ROBBERY OR ANY

2    OTHER ROBBERY, AND THAT WOULD BE UNFAIR.

3         THE COURT:  I THINK THAT -- LOOK, THERE REALLY IS

4    NOT GOING TO BE, I DON'T THINK, FOR THE JURY MUCH ISSUE AS TO

5    WHETHER SHE HAD PARTICIPATED IN THE ROBBERY.  ULTIMATELY, IN

6    A SENSE, IT'S -- IT DOESN'T MATTER, FRANKLY.  IT COULD BE A

7    DEFENSE VERDICT EVEN IF THE JURY IS CONVINCED NEITHER OF THEM

8    HAD ANYTHING TO DO WITH THE ROBBERY.  IF THEY THOUGHT OFFICER

9    MARTINEZ REASONABLY BELIEVED THAT THEY WERE -- AND IF HE DID

10   NOT SEE THAT IMAGE, THEN I DON'T THINK IT'S APPROPRIATE FOR

11   THE JURY TO -- IF THE JURY IS GOING TO KNOW EVERYTHING NOW,

12   WHICH IS WHAT HE KNEW AT THE TIME.

13        MR. ROTHANS:  YOUR HONOR, I'M GOING TO PROPOSE A

14   STIPULATION THAT IF COUNSEL WILL ENGAGE ME AND STIPULATE THAT

15   SHE WAS ACTIVELY ENGAGED AS AN ACCOMPLICE, I HAVE NO PROBLEM

16   WITH THAT.

17        WHAT I'M HEARING FROM MR. MC NICHOLAS, AMONG OTHER

18   THINGS, IS THIS CAR WASN'T DRIVING ERRATICALLY; HE WASN'T

19   DOING ANYTHING WRONG, THEY WAS FULLY COMPLIANT; THESE PEOPLE

20   WERE NOT ENGAGED IN THIS ARMED ROBBERY.  THAT'S EXACTLY WHERE

21   THEY'VE GONE IN THEIR QUESTIONING, EVERY SINGLE ONE.  YOU

22   DIDN'T KNOW WITH CERTAINTY THAT THEY WERE --

23        MR. GALIPO:  THE POINT IS, AS THE COURT POINTED

24   OUT, WHAT OFFICER MARTINEZ --

25        THE COURT:  OFFICER MARTINEZ -- I DON'T MIND --

```
1    CLEARLY, OFFICER MARTINEZ BELIEVED IF HE -- CAN HE TELL THE

2    JURY WHAT IT IS THAT HE WAS TOLD, THAT IF HE WAS NOT SHOWN

3    THE VIDEO, THEN THE REASON THE B.O.L.O.'S ARE COMING IN IS

4    PRECISELY FOR THE REASONS YOU SAID.  I DIDN'T KNOW THERE WAS

5    THAT MUCH AMBIGUITY OF MY MOTIONS IN LIMINE, IF HE KNEW IF

6    IT'S COMING IN, IF IT INDEPENDENTLY COULD HAVE AFFECTED HOW

7    THE DECEDENT ACTED, SUCH AS IT CAN COME IN.  BUT, BEYOND

8    THOSE TWO THINGS, I DON'T SEE WHY IT'S COMING IN.

9              MR. ROTHANS:  I UNDERSTAND, YOUR HONOR.  BUT HE WAS

10   AWARE -- MARTINEZ WAS AWARE OF LAYLA'S INVOLVEMENT --

11             THE COURT:  THEN TELL THEM THAT, BUT THEY DID NOT

12   SEE THE VIDEO -- THE JURY DOES NOT NEED TO SEE THE VIDEO.

13             MR. ROTHANS:  OKAY.

14                       (END SIDEBAR.)

15             THE COURT:  MR. ROTHANS, YOU MAY PROCEED.

16             MR. ROTHANS:  THANK YOU.

17             OFFICER MARTINEZ WAS TOLD, WHEN HE ULTIMATELY

18   RESPONDED TO THE RADIO SHACK AT 4137 SEPULVEDA BOULEVARD, IN

19   CULVER CITY, THAT THERE WAS WOMAN WHO HAD CASED THE JOINT,

20   THAT CASED THE PLACE, PRIOR TO THE GENTLEMAN WHO CAME IN WITH

21   A SMALL, SILVER, CHROME HANDGUN.

22             APPROXIMATELY 11:00 A.M., THAT SAME MORNING,

23   APRIL 25, 2010, MR. GRISSOM ENTERS THE ESTABLISHMENT, WALKS

24   AROUND, LOOKS AT VARIOUS ITEMS; ULTIMATELY, PULLS OUT A

25   SMALL, SILVER, CHROME HANDGUN.  IN FACT, IT MEASURES ABOUT
```

1    FOUR INCHES.

2          AT 11:17 IN THE MORNING, CULVER CITY POLICE

3    RECEIVED A CALL OF A SILENT ALARM.  A PRIVATE SECURITY

4    COMPANY ACTUALLY CALLS DISPATCH AT CULVER CITY AND REPORTS

5    THAT THE RADIO SHACK HAS ACTIVATED THE SILENT ALARM, AND THEY

6    THEN DISPATCH OFFICERS TO THE RADIO SHACK AT 4137 SEPULVEDA.

7          JAVIER SANCHEZ IS THE GENTLEMAN WHO WAS THE

8    COUNTER.  HE WAS 37-YEARS OF AGE.  AND HE MEETS WITH

9    DETECTIVE LUIS MARTINEZ AND SERGEANT MARK REPPUCCI AND RELAYS

10   TO HIM THE FACTS OF WHAT HAPPENED.  AT THIS POINT THE GOAL OF

11   THE OFFICERS IS TO GET A DESCRIPTION OF THE SUSPECT, SEE IF

12   YOU CAN IDENTIFY THE VEHICLE, AND GET AS MUCH INFORMATION AS

13   YOU CAN BROADCAST OUT TO OTHER OFFICERS SO THEY CAN INTERCEPT

14   AND STOP THE SUSPECTS.

15         WHEN OFFICER MARTINEZ -- OR DETECTIVE MARTINEZ

16   SPOKE TO JAVIER SANCHEZ, THE CLERK TOLD HIM THAT IT WAS AN

17   AFRICAN-AMERICAN MALE, THAT HE WAS 6' TO 6'2" TALL, THAT HE

18   WAS HEAVY BUILD, THAT HE WAS WEARING A DARK-COLORED SHIRT AND

19   BLUE JEANS, AND THAT IT WAS LIKELY THE SAME GUY THAT HAD BEEN

20   INVOLVED IN THE PREVIOUS ROBBERY ON MARCH 31, ABOUT THREE

21   WEEKS EARLIER, THAT HE WAS AROUND WITH A CHROME, SMALL

22   CALIBER HANDGUN.

23         MR. SANCHEZ TOLD DETECTIVE MARTINEZ THAT THE

24   SUSPECT HELD THE GUN TO SANCHEZ'S HEAD AND THAT HE TOOK

25   IPODS, LAPTOP, CASH, VARIOUS OTHER ITEMS FROM THE RADIO

1    SHACK.  THIS INFORMATION, FOR THE MOST PART, WAS BROADCAST

2    OUT OVER THE RADIO TO FELLOW OFFICERS WHO ARE NOW LOOKING FOR

3    THE SUSPECT THROUGHOUT THE CITY OF CULVER CITY.

4           AT APPROXIMATELY 11:30, OFFICER ROY LOPEZ, WHO HAD

5    SEEN ALL OF THE B.O.L.O.'S, WHO HAD SEEN ALL OF THE

6    BULLETINS, WHO WAS AWARE OF THIS HISTORY AND SERIES OF ARMED

7    ROBBERIES IN SOUTHERN CALIFORNIA, WAS STOPPED AT A LIGHT,

8    FACING NORTHBOUND AT OVERLAND AND VENICE BELIEVED.

9           AS HE SAT AT THE LIGHT, A GREEN, CHRYSLER SEBRING

10   DROVE FROM HIS LEFT TO HIS RIGHT, FROM THE WEST TO THE EAST,

11   PASSED HIM, AND RATHER FAST.  SO HE KIND OF GLANCED OVER AT

12   THIS VEHICLE, AS IF, WHY IS THIS VEHICLE DRIVING SO FAST; WHY

13   IS IT DRIVING IN THE FAR-RIGHT LANE, WHAT'S KNOWN AS THE

14   PARKING LANE OR THE CURB LANE; AND IT IS DRIVING IN A

15   DIRECTION AWAY FROM THE RADIO SHACK?  NOT TOWARDS THE RADIO

16   SHACK, BUT TO THE EAST AND AWAY FROM THE RADIO SHACK.

17          WHEN HE GLANCES AT THE CAR VERY QUICKLY, HE SEES A

18   LARGE, AFRICAN-AMERICAN MALE IN THE FRONT PASSENGER SEAT.  HE

19   THEN PULLS BEHIND THE VEHICLE AND PUTS OUT OVER THE RADIO

20   THAT HE'S FOLLOWING A VEHICLE.  HE GIVES OUT THE LICENSE

21   PLATE OF THE VEHICLE.  INITIALLY, HE THINKS, I'M ALL ALONE.

22   I'M GOING TO WAIT FOR BACKUP.  I'M GOING TO WAIT TILL I HAVE

23   SOME OTHER OFFICERS WITH ME BECAUSE THIS IS CLEARLY GOING TO

24   BE A FELONY TRAFFIC STOP.  BUT HE DOESN'T HAVE THAT LUXURY.

25   THERE ARE NO OFFICERS IN THE IMMEDIATE AREA ALONG VENICE.  SO

```
 1    HE PUTS OUT THE CALL, REQUESTS BACKUP.  AND THEN, AS THEY GET
 2    CLOSER TO MOTOR AND VENICE, HE PUTS ON HIS OVERHEAD EMERGENCY
 3    LIGHTS AND HIS SIREN.
 4          NOW, UNLIKE MOST MOTORISTS WHO WOULD PULL TO THE
 5    RIGHT SIDE OR PARK AT THE CURB OR IN THE CURB LANE,
 6    MS. GRISSOM MAKES A RIGHT-HAND TURN IMMEDIATELY ON MOTOR AND
 7    ANOTHER RIGHT-HAND TURN IMMEDIATELY INTO THE DONUT KING
 8    PARKING LOT.  MOST MOTORISTS, AGAIN, WILL PULL OFF TO THE
 9    SIDE OR PULL DOWN A SIDE STREET.  SHE PULLS INTO THE PARKING
10    LOT.
11          OFFICER LOPEZ PULLS BEHIND HER, SLIGHTLY TO THE
12    LEFT, THE BEST THAT HE CAN.  THERE'S A LOT OF VEHICLES;
13    THERE'S A LOT OF PEOPLE IN THE THIS PARTICULAR PARKING LOT.
14    HE'S ALL ALONE.  HE GRABS HIS FIREARM -- HIS HANDGUN -- AND
15    HE GETS OUT.  HE GOES TO THE BACK BECAUSE HE BELIEVES THAT
16    THIS MAN IS THE ARMED ROBBERY SUSPECT.  HE BELIEVES THIS MAN
17    IS ARMED.
18          HE PUTS OUT A CALL ON HIS RADIO THAT HE HAS AN
19    AFRICAN-AMERICAN MALE IN THE PASSENGER SEAT, A FEMALE
20    AFRICAN-AMERICAN IN THE DRIVER'S SEAT.  HE'S ORDERED THESE
21    FOLKS TO RAISE THEIR HANDS INSIDE THE CAR, WHICH THEY DO, AT
22    WHICH POINT HE SEES THE "A," OR THE TATTOO, ON THE HAND OF
23    THE PASSENGER.  SINCE SEVERAL OF THE B.O.L.O.'S MAKE
24    REFERENCE TO THE TATTOO, THAT'S SIGNIFICANT.  HE THINKS THIS
25    MIGHT BE THE SUSPECT WHILE HE'S STILL INSIDE THE CAR WITH HIS
```

1    HANDS UP.

2              AS YOU KNOW, OTHER OFFICERS RESPOND; ONE AFTER THE

3    OTHER, AFTER THE OTHER.  AND, AS IN MOST FELONY STOPS, YOU

4    HAVE TO DEAL WITH THE CIRCUMSTANCES YOU'RE CONFRONTED WITH.

5    IT'S NOT AN IDEAL FELONY STOP BECAUSE THEY'RE IN A PARKING

6    LOT, AND A PARKING LOT WITH SEVERAL CARS AND LOTS OF FOLKS.

7              OFFICERS TAKE DIFFERENT POSITIONS.  SOME GO TO THE

8    NORTH.  SOME STAY BACK TO THE SOUTHEAST CORNER.  SOME GET

9    BEHIND THE DOORS OF THE CARS THAT ARE CLOSER, BUT THEY

10   POSITION THEMSELVES IN VARIOUS POINTS ALONG THIS AREA.

11             OFFICER LEON MOORE RESPONDS TO THE SCENE.

12             EVERYONE ON THE SCENE HAS SEEN THE B.O.L.O.'S.

13   EVERYONE ON THE SCENE IS AWARE OF THE SERIES OF ARMED

14   ROBBERIES.  EVERYONE IS AWARE THAT THE SUSPECT WHO HAD JUST

15   COMMITTED THIS CRIME AT 4237 SEPULVEDA HAD A GUN.

16             SO LEON MOORE GETS THERE AND HIS ROLE IS TO CLEAR

17   OUT BYSTANDERS, TO GET PEOPLE OUT OF THE WAY.  IN CASE A

18   GUNFIGHT STARTS, WE'VE GOT TO GET PEOPLE OUT FROM THE BACK

19   DROP AREA WHERE MR. GRISSOM WAS GOING TO BE TAKEN OUT OF THE

20   CAR.  SO HE'S WORKING ON CLEARING FOLKS BACK OVER THERE.

21             SEVERAL OF THE OFFICERS ONLY HAVE THEIR HANDGUNS

22   OUT.  NOW, SOME MENTION WAS MADE OF THE FACT THAT DETECTIVE

23   LUIS MARTINEZ HAD AN MP5 WEAPON.  YOU WILL HEAR TESTIMONY

24   THAT, FOLKS, SINCE THE NORTH HOLLYWOOD SHOOTING WITH THE

25   L.A.P.D., THE FIRE POWER, THE WEAPONS THAT POLICE ARE GIVEN

1    HAS CHANGED.

2             WHEN THE BAD GUYS HAVE FULLY-AUTOMATIC WEAPONS AND

3    ARE WEARING BODY ARMOR, WE NEED TO EQUIP OUR POLICE OFFICERS

4    WITH MORE WEAPONS, WITH MORE POWERFUL WEAPONS TO DEFEND

5    THEMSELVES.

6             LUIS MARTINEZ PULLS AN MP5 FOR A NUMBER OF REASONS.

7    IT FIRES A THREE-ROUND BURST.  SO IF THERE'S A GUNFIGHT,

8    HE'LL GET OFF THREE ROUNDS FOR EVERY BULLET THAT THE SUSPECT

9    FIRES AT HIM.  IT'S ALSO MORE ACCURATE.  THERE'S GLASS ALL

10   AROUND THIS STRIP MALL.  THERE ARE BYSTANDERS IN THE PARKING

11   LOT.  THERE ARE PEOPLE GETTING INTO THEIR CARS.  THERE'S

12   PEOPLE IN THE DONUT SHOP.  HE NEEDED TO MAKE SURE THAT

13   WHATEVER HE EQUIPPED HIMSELF WITH WAS ACCURATE, AND THE

14   OFFICERS WILL TELL YOU AN MP5 IS MUCH MORE ACCURATE THAN A

15   FIREARM, A HANDGUN, A 45-CALIBER WEAPON.  IT SHOES SIMILAR

16   ROUNDS, NINE-MILLIMETER.  NINE-MILLIMETER ROUNDS ARE USED IN

17   AN MP5, AS THEY ARE IN MOST HANDGUNS; HOWEVER, IT IS MORE

18   ACCURATE.  IT HAS SIGHTS.  AND IT'S MUCH MORE LIKELY TO TAKE

19   OUT A SUSPECT WHO POSES A THREAT OF DEATH OR INJURY TO OTHERS

20   THAN IT WOULD A FIREARM, A HANDGUN.  SO THAT'S WHY HE DEPLOYS

21   THE MP5.

22             EVERY ONE OF THE OTHER OFFICERS ONLY HAS HIS

23   FIREARM, HIS HANDGUN, EXCEPT OFFICER FAIRBANKS WHO IS TO THE

24   NORTH OF THIS LOCATION, SLIGHTLY FARTHER AWAY THAN LUIS

25   MARTINEZ, AND HE'S LOOKING DIRECTLY IN THE DIRECTION OF THE

1    DONUT SHOP AND ALL THE GLASS WINDOWS THAT WERE THERE.

2         THE OFFICERS WILL COME IN HERE AND THEY'LL TELL YOU

3    WHAT THEY REMEMBER FROM THAT INCIDENT AS TRAUMATIC AS IT WAS,

4    AND THEY ARE NOT ENTIRELY CONSISTENT.  IF THEY CAME IN HERE

5    AND WERE ENTIRELY CONSISTENT IN WHAT THEY REMEMBERED, THEY

6    WOULD COMMENT ON THAT.  AND THEY WOULD TELL YOU THEY ALL HAD

7    THEIR STORIES STRAIGHT.  THEY ALL GOT IT STRAIGHT.  THEY ALL

8    SAID THE SAME, EXACT THING.  EVERY ONE OF THEM REMEMBERS THIS

9    THING HAPPENING A LITTLE BIT DIFFERENTLY, BUT THEY'RE

10   CONSISTENT ON SOME FACTS.

11        WHILE MR. GRISSOM HAD HIS HANDS UP IN THE CAR AT

12   TIMES, AT OTHER TIMES HE DID NOT.  AND IT APPEARED THAT HE

13   WAS CONCEALING SOMETHING OR HIDING SOMETHING IN THE CONSOLE

14   AREA TO HIS LEFT BETWEEN HIMSELF AND THE PASSENGER.

15        THERE WAS NO CONFUSION ABOUT, "TAKE YOUR SEAT BELT

16   OFF," "DON'T TAKE YOUR SEAT BELT OFF."  THAT WASN'T THE

17   NONCOMPLIANCE.  THE NONCOMPLIANCE WAS WHEN HE WAS TOLD,

18   CLEARLY AND UNEQUIVOCALLY, "KEEP YOUR HANDS UP," THEY

19   DISAPPEARED; MAYBE ONLY TWO OR THREE TIMES, BUT THEY

20   DISAPPEARED.  AND THE OFFICERS ARE TRYING TO FIGURE OUT WHAT

21   IS HE DOING IN THE CAR?  WHAT IS HE CONCEALING?  WHAT IS HE

22   HIDING OR WHAT IS HE GRABBING?  HE ULTIMATELY GETS OUT.  THE

23   OFFICERS HAVE DIFFERENT RECOLLECTIONS IN TERMS OF HIS ACTIONS

24   ONCE HE GOT OUT.

25        MOST SAY HE GOT OUT AND HE FACED TO THE NORTH AND

1    THEN BACK TOWARDS THE OFFICERS, TO THE EAST.  SOME SAY HE GOT

2    OUT AND FACED TO THE SOUTH AND TURNED COUNTERCLOCKWISE.  THEY

3    REMEMBER THIS STRESSFUL SITUATION DIFFERENTLY.

4             OFFICER MARTINEZ, HOWEVER, NEVER TESTIFIED AT HIS

5    DEPOSITION, NOR DID HE TELL THE L.A. COUNTY SHERIFFS

6    DETECTIVES WHO INVESTIGATED THIS SHOOTER THAT LEJOY GRISSOM

7    GOT OUT OF THE CAR AND FACED AWAY FROM HIM FOR 20 OR

8    30 SECONDS AND WASN'T LOOKING AT THE OFFICERS AND HAD HIS

9    HANDS UP -- THAT'S NOT AT ALL WHAT HE SAID.

10            LUIS MARTINEZ TOLD THE L.A. COUNTY SHERIFFS

11   DETECTIVES THAT, AS LEJOY GRISSOM EXITED, HE HAD BOTH HANDS

12   UP.

13            MR. GALIPO:  I...

14            THE COURT:  MR. GALIPO?

15            MR. GALIPO:  I APOLOGIZE.  I THINK IT WOULD BE

16   HEARSAY WHAT HE TOLD THE DETECTIVES, YOUR HONOR.

17            THE COURT:  THAT -- LADIES AND GENTLEMEN, WHAT IS

18   IMPORTANT IN A TRIAL IS THE TESTIMONY THAT COMES FORTH ON THE

19   STAND BECAUSE YOU GET TO SEE IT, YOU GET TO SEE IT

20   CROSS-EXAMINED.

21            OCCASIONALLY, FOR VARIOUS REASONS THE LAW ALLOWS

22   PRIOR STATEMENTS THAT A WITNESS HAS MADE TO COME IN.  WHETHER

23   THAT IS TRUE IN THIS CASE OR NOT REMAINS TO BE SEEN.  WE'VE

24   BEEN HEARING REFERENCES TO PRIOR STATEMENTS ON VARIOUS PARTS

25   OF WITNESSES THAT, TIME WILL TELL, WHETHER THOSE ARE SHARED

```
 1   WITH YOU.  IF THEY AREN'T -- AGAIN, IT'S NOT BECAUSE

 2   SOMETHING IS BEING HIDDEN FROM YOU.  IT'S BECAUSE IT SIMPLY

 3   WOULD NOT ADD TO YOUR UNDERSTANDING OF WHAT'S COMING IN AT

 4   THE TRIAL.

 5         I RIGHT NOW DON'T KNOW HOW MUCH OF THOSE PRIOR

 6   STATEMENTS YOU'RE GOING TO HEAR.  I'LL REMIND YOU THAT THE

 7   OPENING STATEMENTS ARE NOT EVIDENCE, THEY'RE JUST PREDICTIONS

 8   OF WHAT THE TRIAL IS GOING TO LOOK LIKE.

 9         MR. ROTHANS, GO AHEAD.

10         MR. ROTHANS:  WHEN LEJOY GRISSOM EXITED, HE HAD HIS

11   BACK TO US.  HE MADE A SCREAMING MOTION TO HIS RIGHT.  HE

12   KEPT HIS LEFT HAND UP, BUT HE DROPPED HIS RIGHT HAND AND WENT

13   TOWARDS THE CENTER, LIKE, HIS STOMACH AREA.  "AND THAT IS

14   WHEN I SAW SOMETHING METALLIC IN HIS HAND."

15         DETECTIVE LUIS MARTINEZ DID NOT TELL THE SHERIFFS

16   DETECTIVES THAT HE SAW A SHINY, SILVER OBJECT.  HE SAID HE

17   SAW A METALLIC OBJECT IN HIS HAND WHEN HE DROPPED HIS RIGHT

18   HAND TOWARDS HIS WAIST AREA.

19         DETECTIVE MARTINEZ WILL ALSO TELL YOU THAT THE

20   REASON HE DEPLOYED THE MP5, THE REASON HE WAS CONCERNED FOR

21   HIS SAFETY AND THE SAFETY OF THE OTHER OFFICERS AND ALL THE

22   BYSTANDERS IN THE AREA, WAS A FELONY STOP INVOLVING AN

23   ARMED-ROBBERY SUSPECT WHO CLEARLY WAS BELIEVED TO HAVE A GUN

24   IS ONE OF THE MOST DANGEROUS ENCOUNTERS A POLICE OFFICER CAN

25   OF GET INVOLVED IN.  HE ALSO KNEW FROM HIS TRAINING THAT IT
```

1    WAS NOT UNCOMMON FOR ARMED ROBBERY SUSPECTS TO WEAR

2    BULLETPROOF VESTS.

3            OFFICER ZERBEY, NOW SERGEANT ZERBEY, WAS ON THE

4    SCENE.  HE GAVE THE VAST MAJORITY OF THE COMMANDS.  COUNSEL

5    SUGGESTED THAT THERE WERE CONFLICTING COMMANDS AND LEJOY DID

6    NOT KNOW WHAT TO DO.  WE BELIEVE YOU WILL HEAR DIFFERENT

7    TESTIMONY FROM THE WITNESS STAND.

8            THE COMMANDS WERE CLEAR.  THE COMMANDS WERE

9    CONCISE.  HE WAS TOLD TO KEEP HIS HANDS UP.  HE WAS NEVER

10   TOLD TO TURN AROUND AND FACE THE OFFICERS.  AND, IN FACT, THE

11   TRAINING IS MOST SUSPECTS, WHEN THEY GET OUT OF THE CAR, PUT

12   THEIR HANDS UP, PUT THEIR BACKS TO THE OFFICERS.  AND THE

13   FACT THAT HE TURNED AROUND -- WHETHER HE JUST TURNED AROUND

14   NORMALLY OR HE SPUN, WHATEVER THEIR RECOLLECTION IS -- THAT'S

15   UNUSUAL.  WHEN YOU'RE CONDUCTING A STOP, THE SUSPECTS, THE

16   PASSENGERS DON'T GENERALLY TURN AND FACE THE OFFICERS; THEY

17   TURN AWAY.

18           YOU WILL BE TOLD AT THE END OF THIS CASE THAT

19   SOMETIMES DIFFERENT WITNESSES GIVE DIFFERENT VERSIONS OF WHAT

20   HAPPENS.  PEOPLE -- TWO OR MORE PEOPLE MAY SEE THE SAME

21   EVENT --

22           MR. GALIPO:  I APOLOGIZE, YOUR HONOR.  THIS SOUNDS

23   LIKE ARGUMENT.

24           THE COURT:  I THINK -- MR. ROTHANS, YOU'LL BE ABLE

25   TO MAKE THESE ARGUMENTS AT THE END OF THE CASE.  SO LET'S

1    STICK TO THE EVIDENCE.

2          MR. ROTHANS:  OFFICER FAIRBANKS WILL TESTIFY DURING

3    THIS TRIAL THAT, WHEN MR. GRISSOM EXITED THE VEHICLE, IT

4    LOOKED LIKE HE WAS FORMULATING A PLAN BECAUSE HE CONTINUED TO

5    LOOK AT THE DRIVER OF THE VEHICLE AND HE SEEMED TO BE

6    SHIFTING HIS FEET.

7          ALL OF THE OFFICERS WILL TESTIFY THAT OFFICER

8    ZERBEY ORDERED THE SUSPECT TO KEEP HIS HANDS UP.  HE WAS

9    NEVER TOLD TO PUT HIS HANDS DOWN, BUT YET HE DROPPED THEM

10   SUDDENLY.

11         OFFICER BROWN WILL TESTIFY THAT HE BELIEVED THAT

12   MR. GRISSOM WAS REACHING FOR A GUN.

13         OFFICER LOPEZ WILL TESTIFY THAT HE SAW THE SUSPECT

14   GET OUT OF THE CAR AND DROP HIS RIGHT HAND TOWARDS HIS RIGHT

15   SIDE, HIS WAISTBAND AREA, AS IF HE WAS REACHING FOR

16   SOMETHING.

17         OFFICER ZERBEY WILL TESTIFY THAT HE, TOO, SAW THE

18   SUSPECT DROP HIS HANDS AND HE MOVED HIS FINGER FROM THE

19   OUTSIDE OF HIS TRIGGER GUARD TO THE TRIGGER, ITSELF, AND HE

20   WAS ABOUT TO FIRE WHEN THE SHOTS WERE FIRED.

21         OFFICER FAIRBANKS, THE ONE WHO HAD THE OTHER MP5

22   WHO WAS LOCATED TO THE NORTH OF THIS LOCATION FACING DIRECTLY

23   TOWARDS THE DONUT SHOP, WILL TESTIFY THAT HE WAS KEEPING HIS

24   EYE ON THE DRIVER.  HIS ROLE IN THIS FELONY STOP WAS TO WATCH

25   THE DRIVER.  NO ONE KNEW WHETHER SHE HAD A WEAPON.  BUT WHEN

```
1    THE SUSPECT GOT OUT ON THE PASSENGER SIDE AND DROPPED HIS

2    HANDS, HIS FOCUS SHIFTED FROM THE DRIVER TO THE PASSENGER.

3           WITNESS JESSE WILLIS COFIELD WILL TESTIFY SHE WAS

4    INSIDE THE DONUT SHOP.  SHE SAW MR. GRISSOM DROP HIS HANDS,

5    AS IF HE WERE REACHING FOR SOMETHING.  SHE WILL ALSO TESTIFY

6    THAT SHE'S BEEN APPROACHED BY MEMBERS OF THE FAMILY AND TOLD

7    NOT TO APPEAR AT TRIAL.

8           WITNESS BRITTANY SCHIFF WILL TESTIFY.  SHE WAS IN

9    THE PARKING LOT WHEN THE INCIDENT HAPPENED.  SHE ALSO SAW

10   MR. GRISSOM DROP HIS HANDS.

11          BASED ON EVERYTHING THAT DETECTIVE LUIS MARTINEZ

12   KNEW AT THE TIME OF THIS INCIDENT; BASED ON THE SERIES OF

13   ARMED ROBBERIES THAT HE WAS AWARE OF, IT WAS THE SUSPECT HAD

14   A GUN.  BASED ON THE ACTIONS OF DROPPING HIS HANDS TWO OR

15   THREE TIMES INSIDE THE CAR, AS IF REACHING FOR SOMETHING OR

16   PUTTING SOMETHING BACK IN THE CONSOLE AREA; BASED ON HIS

17   ACTIONS WHEN HE GOT OUT AND HE TURNED AND FACED THE OFFICERS

18   AND, ACCORDING TO MARTINEZ, SPUN IN THAT DIRECTION AND NOT

19   LISTENING TO THE COMMANDS TO KEEP HIS HANDS UP, IN THAT SPLIT

20   SECOND DETECTIVE LUIS MARTINEZ BELIEVED THAT THE SUSPECT

21   POSED A SIGNIFICANT THREAT OF DEATH OR INJURY TO MARTINEZ AND

22   HIS FELLOW OFFICERS.

23          HE FIRED A SINGLE, THREE-ROUND BURST.  NO

24   BYSTANDERS WERE SHOT.  NO OTHER VEHICLES WERE SHOT.  THREE

25   ROUNDS AIMED AT CENTER MASS, WHICH IS WHAT THE TRAINING OF
```

1    POLICE OFFICERS IS WHEN YOU'RE USING DEADLY FORCE.

2              THEY TALK ABOUT FATIGUE.  THEY EMPHASIZE FATIGUE.

3    THE OFFICER WHO WAS THE CLOSEST TO LEJOY GRISSOM WHO HAD

4    DEPLOYED A PROPER WEAPON SHOT ONE TIME AND IT WAS CENTER MASS

5    AND NO ONE ELSE WAS INJURED.  HIS SHOOTING IS CONSISTENT

6    WITH -- AND YOU'LL HEAR TESTIMONY -- THE CITY OF CULVER

7    CITY'S USE OF DEADLY FORCE POLICY, THAT AN OFFICER MAY USE

8    DEADLY FORCE TO PROTECT THE OFFICER OR OTHERS FROM WHAT IS

9    REASONABLY BELIEVED TO BE A THREAT OF DEATH OR SERIOUS BODILY

10   INJURY.

11             SO YOUR ROLE WILL BE TO DECIDE WHETHER OFFICER

12   MARTINEZ REASONABLY BELIEVED THIS GUY MIGHT BE ARMED; WHETHER

13   OFFICER MARTINEZ REASONABLY BELIEVED THIS GUY MIGHT HAVE A

14   GUN AND MIGHT TRY TO SHOOT US; AND WHETHER HE REASONABLY

15   BELIEVED THAT, WHEN HE DROPPED HIS HANDS, HE WAS EITHER

16   ARMING HIMSELF OR ATTEMPTING TO USE THIS METALLIC OBJECT IN

17   HIS HAND TO SHOOT THE OFFICERS.

18             YOU'VE HEARD A LOT OF TALK ABOUT THE CELL PHONE ON

19   THE GROUND.  THE L.A. COUNTY SHERIFFS DEPARTMENT CONDUCTS THE

20   OFFICER-INVOLVED SHOOTING INVESTIGATIONS.  THEY DO IT FOR

21   MANY AGENCIES IN SOUTHERN CALIFORNIA, INCLUDING CULVER CITY.

22   THEY DID IN APRIL OF 2010.

23             THE SHERIFFS DETECTIVES WHO INVESTIGATED THE

24   SHOOTING WERE ON SCENE WITHIN HOURS.  THE VEHICLE WAS THERE.

25   SOME OF THE CLOTHING WAS THERE.  THE CELL PHONE WAS THERE.

1    THEY TOOK AERIAL PHOTOS WITH A HELICOPTER.  THEY DOCUMENTED

2    THE SCENE.  THEY DOCUMENTED THE SHELL CASINGS, THE ROUNDS

3    THAT CAME OUT FROM THE BULLETS THAT WERE AT THE SCENE.  THEY

4    DIDN'T NEED TO KNOW WHAT OFFICERS SAW AFTERWARDS, WHAT

5    EVIDENCE THEY SAW AFTERWARDS.  THE DETECTIVES DID NOT ASK THE

6    CULVER CITY OFFICERS, DID NOT ASK ANY CULVER CITY OFFICER:

7    DID YOU SEE WHERE THE SHELL CASINGS LANDED?  DID YOU SEE

8    WHERE THE CLOTHING WAS?  DID YOU SEE WHERE THE CELL PHONE

9    WAS?  THEY DIDN'T ASK THOSE QUESTIONS.  SO, OF COURSE, THE

10   CULVER CITY OFFICERS DIDN'T TELL THEM.

11          THE EVIDENCE WAS THERE, WAS PRESERVED, THE SCENE

12   WAS CONTAINED; THE SHERIFFS CONDUCTED THE INVESTIGATION.

13   MR. GRISSOM WAS TRANSPORTED BY THE PARAMEDICS TO RONALD REGAN

14   U.C.L.A. HOSPITAL, WHERE HE WAS PRONOUNCED DEAD AT 12:05 THAT

15   AFTERNOON.  AFTER THE L.A. COUNTY SHERIFFS INVESTIGATION,

16   DETECTIVE MARTINEZ WAS CLEARED OF ANY WRONGDOING.

17          MR. GALIPO:  I'M GOING TO OBJECT, YOUR HONOR.

18          THE COURT:  SUSTAINED.

19          MR. ROTHANS:  LADIES AND GENTLEMEN, WE HAVE SPENT

20   THE LAST THREE YEARS, AS I SAID AT THE OUTSET, ANALYZING THIS

21   INCIDENT THAT LASTED LESS THAN TWO-AND-A-HALF MINUTES, FROM

22   THE TIME OF THE TRAFFIC STOP INITIATED BY ROY LOPEZ UNTIL THE

23   SHOTS FIRED CALLS WENT OUT.  DETECTIVE LUIS MARTINEZ HAD LESS

24   THAN A SECOND TO MAKE THAT CALL.

25          AT THE CONCLUSION OF THIS TRIAL, JUDGE FITZGERALD

1    WILL INSTRUCT YOU ON THE LAW AND THAT THE REASONABLENESS OF

2    OFFICER MARTINEZ'S USE OF FORCE SHOULD BE JUDGED FROM THE

3    PERSPECTIVE OF A REASONABLE OFFICER --

4              MR. GALIPO:  I APOLOGIZE, YOUR HONOR.  I'M GOING TO

5    OBJECT, THIS IS ARGUMENT AND THIS IS THE LAW AGAIN.

6              THE COURT:  RIGHT.  THIS IS JUST A CONCLUSION, WIND

7    UP.  SO I'M GOING TO LET IT GO, MR. GALIPO.

8              BUT, MR. ROTHANS, THAT HAD BETTER BE WHAT IT IS.

9    IF YOU'D LIKE TO USE THIS WITH WHICH TO CONCLUDE, THEN GO

10   AHEAD.

11             MR. ROTHANS:  IT IS, YOUR HONOR.  THANK YOU.

12             YOU MUST NOT JUDGE OFFICER MARTINEZ'S USE OF DEADLY

13   FORCE FROM THE PERSPECTIVE OF A REASONABLE OFFICER ON THE

14   SCENE.  YOU MUST JUDGE FROM A REASONABLE OFFICER ON THE

15   SCENE, AND NOT WITH A 20-20 VISION OF HINDSIGHT THREE YEARS

16   LATER.

17             THANK YOU FOR YOUR SERVICE.  THANK YOU FOR YOUR

18   ATTENTION, NOT ONLY ON BEHALF OF THE FOLKS OF CULVER CITY,

19   BUT DETECTIVE LUIS MARTINEZ.  THANK YOU.

20             THE COURT:  THANK YOU, MR. ROTHANS.

21             MR. GALIPO:  SORRY.  GO AHEAD, YOUR HONOR.

22             THE COURT:  I WAS GOING TO DISMISS THE JURY, MR.

23   GALIPO, FOR TODAY, AND WE'LL START WITH TESTIMONY TOMORROW.

24             MR. GALIPO:  THAT WOULD BE FINE.

25             THE COURT:  LADIES AND GENTLEMEN, AS I SAID, MY

```
 1      GOAL IS TO HAVE THE TRIAL GO FROM 9:00 TO 4:30.  THAT IS NOT
 2      GOING TO HAPPEN TOMORROW BECAUSE THE JUDGES OF THE COURT HAVE
 3      A MONTHLY MEETING WHICH IS TAKING PLACE AT 4:00 O'CLOCK SO
 4      WE'LL END A FEW MINUTES BEFORE 4:00 TOMORROW.  IT WILL HAPPEN
 5      ON THURSDAY, IT WILL NOT HAPPEN ON FRIDAY.  FRIDAY, AS I
 6      SAID, IT'S GOING TO BE 8:30 TO 12:30.  I'M GOING TO HAVE TO
 7      TAKE THE AFTERNOON OFF BECAUSE MY COLLEAGUE, JUDGE BERNAL, IS
 8      HAVING HIS FORMAL INVESTITURE OUT IN RIVERSIDE.  SO THAT WILL
 9      BE THE SCHEDULE FOR THIS WEEK.  AND AT THE END OF THAT, I'LL
10      OBVIOUSLY HAVE A MUCH CLEARER SENSE OF EXACTLY HOW LONG THE
11      CASE IS GOING TO TAKE.
12             I AM, NONETHELESS, CONFIDENT THAT YOU'LL GET THE
13      CASE EARLY NEXT WEEK FOR YOUR CONSIDERATION.  IN THE
14      MEANTIME, PLEASE BE BACK HERE BY 9:00 O'CLOCK TOMORROW SO WE
15      CAN BEGIN PROMPTLY.  OBVIOUSLY, IF EVEN ONE OF YOU IS LATE,
16      THEN IT HOLDS UP ALL OF US.
17             AND, WITH THAT, I APPRECIATE YOUR SERVICE.  I BID
18      YOU A GOOD EVENING.  I REMIND YOU OF MY ADMONITIONS:  DON'T
19      DO ANYTHING TO INVESTIGATE THE CASE AND DON'T DISCUSS THE
20      CASE WITH ANYONE ELSE.
21             ALL RIGHT.  I WILL SEE YOU IN THE MORNING.
22             THE CLERK:  PLEASE RISE FOR THE JURY.
23                     (JURORS EXIT.)
24             THE CLERK:  PLEASE BE SEATED.
25             THE COURT:  ALL RIGHT.  MR. GALIPO.
```

1          MR. GALIPO:  THANK YOU.

2          YOU KNOW, YOUR HONOR, I GENERALLY DON'T LIKE TO

3     OBJECT DURING OPENINGS.  I THOUGHT THAT YOUR RULINGS WERE

4     PRETTY CLEAR ON THE ISSUES OF IF OFFICER MARTINEZ KNEW IT OR

5     SAW IT, IT'S FAIR GAME; IF HE DIDN'T, IT'S NOT.  SO, YOU

6     KNOW, MR. ROTHANS IS A VERY EXPERIENCED LAWYER, WHY HE WOULD,

7     GIVEN THAT, SHOW IN HIS OPENING STATEMENT A SLIDE FROM THE

8     ROBBERY ITSELF WAS SURPRISING.  BUT EVEN MORE SURPRISING,

9     CLEARLY, ANY FINDING BY THE CITY AS TO WHETHER OR NOT

10    SOMETHING WAS WITHIN THEIR POLICY OR NOT -- FIRST OF ALL,

11    WHATEVER THEY FIND TO BE WITHIN THEIR POLICY IN NO WAY IS

12    ADMISSIBLE IN THIS CASE.

13          THE COURT:  CORRECT.

14          AND, MR. ROTHANS, I MUST SAY I KNOW YOU ARE SO

15    EXPERIENCED; I DON'T KNOW WHY YOU TRIED TO SLIP THAT IN.  IT

16    JUST SEEMS PRETTY -- IT JUST SEEMS JUST CLEARLY IRRELEVANT

17    AND INADMISSIBLE.  SO...

18          MR. GALIPO:  AND I KNOW HE WANTS TO RESPOND, BUT I

19    JUST WANT TO SAY TWO THINGS:  ONE, IT PUTS US IN A VERY

20    UNCOMFORTABLE POSITION BECAUSE UNDER NORMAL CIRCUMSTANCES WE

21    SHOULD BE ASKING FOR A MISTRIAL.  I DON'T WANT TO HAVE TO DO

22    THAT BECAUSE WE HAVE SPENT SO MUCH TIME GETTING THIS JURY

23    WITH PUTTING THE TRIAL OVER FROM LAST WEEK BECAUSE OF

24    SCHEDULING ISSUES.  SO I WANT TO THINK ABOUT IT.  I THINK

25    WHAT WE'RE GOING TO REQUEST, PERHAPS, AND I'LL DISCUSS IT

```
 1    WITH MR. MC NICHOLAS, IS SOME TYPE OF AN INSTRUCTION OR
 2    ADMONITION THAT PROTECTS US BECAUSE OTHERWISE ANYBODY COULD
 3    SAY WHATEVER THEY WANT IN OPENING STATEMENT AND SOMETIMES
 4    IT'S JUST HARD TO UNRING THAT BELL.
 5         THE COURT:  WELL, I UNDERSTAND THAT.  ON THE OTHER
 6    HAND, I HAVE TOLD THE JURY SEVERAL TIMES THAT THIS IS NOT
 7    EVIDENCE, SO I WOULD -- YOU SHOULD REALLY THINK ABOUT WHAT IT
 8    IS THAT YOU REALLY WANT.  I'M NOT NECESSARILY SURE THAT
 9    CALLING ATTENTION TO IT IS IN THE INTEREST OF YOUR CLIENTS,
10    BUT YOU CERTAINLY -- THE TWO OF YOU KNOW FAR BETTER THAN I
11    WHAT IS IN THE INTEREST OF YOUR CLIENT, SO IF YOU HAVE A
12    REQUEST TO MAKE TOMORROW MORNING, THEN GO AHEAD AND MAKE IT.
13         MR. ROTHANS?
14         MR. ROTHANS:  YOU KNOW, FIRST OF ALL, I'M A LITTLE
15    CONFUSED.  MR. GALIPO SUGGESTED THAT I SAID SOMETHING TO THE
16    JURY ABOUT A FINDING BY THE CITY.  I MADE NO SUCH STATEMENT.
17    WHAT I SAID WAS THE L.A. COUNTY SHERIFFS' DEPARTMENT
18    CONDUCTED THE INVESTIGATION AND DETECTIVE MARTINEZ WAS
19    CLEARED OF ANY WRONGDOING.
20         THE COURT:  AND THAT IS INADMISSIBLE.  THE JURY
21    WILL NOT HEAR IT AND YOUR EXPERT WILL NOT TESTIFY TO THAT.
22         MR. ROTHANS:  I UNDERSTAND THAT, BUT, FIRST OF ALL,
23    THERE WAS NO MOTION IN LIMINE ON IT.  I WAS GIVE NO SUCH
24    INSTRUCTION.  SECOND OF ALL, IT'S ON OUR EXHIBIT LIST.  IT
25    WAS EXCHANGED WITH COUNSEL.  THEY HAVE A COPY OF THE LETTER
```

1    FROM THE D.A.'S OFFICE.  IT'S ON THE EXHIBIT LIST.  THEY HAD

2    PLENTY OF OPPORTUNITY TO OBJECT TO IT, TO RAISE THE ISSUE

3    WITH ME, TO MEET AND CONFER, FILE A MOTION IN LIMINE LIKE WE

4    DO.

5          SO TO SUGGEST THAT IT WAS SOMEHOW, YOU KNOW,

6    PREDESTINED AND THAT THEY WERE UNAWARE OF IT, THEY'VE GOT THE

7    LETTER, THEY HAD THE LETTER FROM THE BEGINNING, IT'S ON A

8    EXHIBIT LIST, AND THERE WAS NO MOTION IN LIMINE FILING, AND

9    CERTAINLY THE JUDGE CAN GIVE A LIMITING INSTRUCTION ON THAT

10   ISSUE.

11         BUT ALSO AS TO THIS SLIDE, IT'S NOT THE

12   SURVEILLANCE.  I WASN'T SHOWING, NOR DID I INTEND TO SHOW

13   SURVEILLANCE VIDEO OF LAYLA GRISSOM.  IT WAS A STILL FROM THE

14   VIDEO MERELY TO CONNECT THE DOTS WITH THE WOMAN AT THE SCENE,

15   AND THAT WAS INFORMATION THAT OFFICER MARTINEZ WAS AWARE OF.

16         NOW, AGAIN, FOR THE RECORD, DID HE SEE THE

17   SURVEILLANCE VIDEO OR THE STILLS BEFORE THE SHOOTING?

18         NO, SIR.

19         WAS HE AWARE OF THE INFORMATION PROVIDED BY JAVIER

20   SANCHEZ, THE RETAIL CLERK?

21         ABSOLUTELY.

22         ALL THIS WAS WAS CORROBORATION THAT SHE WAS, IN

23   FACT, IN THERE A FEW MINUTES BEFORE LEJOY WENT IN.  AGAIN, WE

24   GAVE THEM COPIES.  THEY WERE TOLD WE WERE GOING TO USE IT IN

25   OPENING STATEMENT.  THERE WAS NO MOTION IN LIMINE ON THE

```
 1   SUBJECT, AND THE COURT HAD ME TAKE IT DOWN.

 2          THE COURT:  ALL RIGHT.  THE -- ULTIMATELY, I'M THE

 3   ONE WHO DECIDES WHAT MY ORDER ON THE MOTION IN LIMINE MEANS,

 4   AND IT WAS NOT MY INTENT, MR. ROTHANS, TO ALLOW THAT.  BUT,

 5   AT THE SAME TIME, I'M STILL LISTENING TO YOU AND I DID NOTE,

 6   AS YOU MENTIONED, THE MR. MC NICHOLAS' POINT ABOUT HOW THE

 7   CAR WAS DRIVING.  THAT COULD POTENTIALLY BE RELEVANT TO

 8   SUGGEST THAT NONE OF THE OFFICERS HAD A PARTICULAR REASON TO

 9   VIEW THE COUPLE IN THE CAR AS BEING DIFFICULT OR

10   NONCOMPLIANT, BUT, AT THE SAME TIME, LOOK, I'M SAYING THIS TO

11   YOU, EITHER THE FOCUS IS GOING TO BE ON THE PARKING LOT OR

12   IT'S GOING TO BE ON THE RADIOSHACK.  IF YOU INTEND TO TRY TO

13   SUGGEST TO THE JURY THAT THIS COUPLE DID NOT ROB THE

14   RADIOSHACK, THEN OBVIOUSLY THE CITY IS GOING TO HAVE TO --

15   HAVE THE RIGHT TO TRY TO PROVE THAT THEY DID.  SO IT'S GOT TO

16   BE ONE OR THE OTHER.

17          SO, YOU KNOW -- AND, IN THAT SENSE, MY

18   UNDERSTANDING IS THAT HOW IT'S GOING TO PROCEED IS THAT THE

19   JURY WILL BE LEFT WITH THE STRONG CIRCUMSTANTIAL CONCLUSION

20   BASED ON THE THINGS THAT THEY'VE ALREADY HEARD IN OPENING

21   STATEMENT, INCLUDING THE TATTOO, THAT IT WAS ALMOST CERTAINLY

22   THIS COUPLE WHO HAD BEEN THE ROBBERS.  BUT EITHER THAT WILL

23   BE PROVED UP EXTRINSICALLY OR IT WON'T.  AND, IN PART, I

24   REALLY THINK THAT DEPENDS ON WHAT THE INTENTIONS OF THE

25   PLAINTIFFS ARE AND WHETHER TO TRY TO SUGGEST THAT THAT'S NOT
```

1     THE CASE.

2            MR. GALIPO:  WELL, YOUR HONOR, I'VE SAID BEFORE AND

3     I'LL SAY IT AGAIN, WE ARE NOT TRYING TO SUGGEST THEY WEREN'T

4     INVOLVED, THAT'S NOT GOING TO BE OUR CASE.  AS THE COURT IS

5     AWARE, WE'RE TRYING TO FOCUS PRIMARILY ON WHAT HAPPENED IN

6     THE PARKING LOT.  I CAN IMAGINE FROM THE OPENING STATEMENT

7     WE'RE GOING TO BE SPENDING A LOT OF TIME ON EACH ONE OF THESE

8     ROBBERIES, WHICH IS SOMEWHAT PROBLEMATIC BECAUSE WHAT MY

9     UNDERSTANDING WAS HE WAS AWARE OF A COUPLE OF THEM IS NOW

10    TEN, BUT, IN ANY EVENT, IT IS WHAT IT IS.

11           BUT THE OTHER ISSUE, MR. ROTHANS CLEARLY KNOWS THAT

12    A FINDING BY THE DISTRICT ATTORNEY'S OFFICE WITH RESPECT TO

13    WHETHER THEY'RE GOING TO FILE CRIMINAL CHARGES OR A FINDING

14    BY AN INVESTIGATING AGENCY IS INADMISSIBLE IN A CASE LIKE

15    THIS.  HE KNOWS THAT.  AND I AM SURPRISED THAT HE WOULD MAKE

16    THAT STATEMENT IN HIS OPENING KNOWING MOST LIKELY THAT COULD

17    NEVER COME INTO EVIDENCE, SO --

18           THE COURT:  WELL, THE FACT IS THAT IT IS NOT MY

19    INTENTION FOR IT TO COME IN.  IT WAS DETERMINED UNDER A

20    DIFFERENT STANDARD FOR DIFFERENT REASONS.  I DON'T BELIEVE IT

21    IS ADMISSIBLE AND IT DOES RAISE SOME OTHER ISSUES HERE,

22    THOUGH, AND IT'S ONE -- ONE OF THE ISSUES NOW HAVING TRIED

23    EITHER AS A BENCH TRIAL OR AS A -- OR TO THE JURY, SEVERAL

24    1983 CASES, THE USE OF THE EXPERTS BY BOTH SIDES IN SOME WAYS

25    IS PROBLEMATIC AND WE'RE EITHER GOING TO HAVE A TRIAL BASED

```
 1   ON WHAT OCCURS IN THIS COURTROOM OR WE'RE GOING TO HAVE IT IN

 2   THE CIVIL LAW SYSTEM WHERE I WOULD BE AN INVESTIGATING

 3   MAGISTRATE AND I WOULD MAKE A DECISION BASED ON

 4   ADMINISTRATIVE RECORD.  BY PHRASING IT THAT WAY, YOU KNOW

 5   WHAT MY VIEW IS WHICH IS THAT WE ARE GOING TO HAVE A

 6   TRADITIONAL AMERICAN-STYLE TRIAL WHERE THE JURY IS GOING TO

 7   MAKE ITS DETERMINATION BASED ON WHAT'S HAPPENING HERE IN THE

 8   COURTROOM.

 9          YOUR POINT, MR. GALIPO, AS TO THE HEARSAY, WAS

10   TECHNICALLY CORRECT.  YOU ARE FREE TO DO WITH THE MARTINEZ

11   DEPOSITION WHATEVER YOU WISH.  YOU COULD HAVE STOOD THERE AND

12   READ IT TO THE JURY IF YOU WANTED TO.  IT'S A STATEMENT OF A

13   PARTY OPPONENT.  THAT IS NOT THE CASE ON CULVER CITY.  AT THE

14   SAME TIME, WE -- I HAVE HEARD BOTH OF YOU, INCLUDING -- AND

15   MR. MC NICHOLAS AS WELL, TALKING ABOUT WHAT IT IS THAT THE

16   OFFICERS HAVE SAID AT VARIOUS POINTS.  I WAS NOT GOING TO

17   INTERRUPT MR. ROTHANS WHEN, FOR ALL I KNOW, A GREAT DEAL OF

18   DEPOSITION TESTIMONY IS GOING TO COME IN UNDER THE RULE OF

19   COMPLETENESS OR OTHERWISE.

20          SO, YOU KNOW, THE FACT IS IT WOULD BE HELPFUL TO ME

21   TO KNOW AHEAD OF TIME WHAT THE VIEWS OF THE PARTIES ARE TO

22   THESE PRIOR STATEMENTS.  BUT, BASICALLY, WE'RE GOING TO START

23   OUT WITH WITNESSES WILL TESTIFY.  IF THEY SAY SOMETHING

24   INCONSISTENT, THEN THAT WILL BE POINTED OUT TO THE JURY.  IF

25   YOU WANT TO BRING IN THE STATEMENTS OF PARTY OPPONENTS, THEN
```

```
1    YOU HAVE THE RIGHT TO DO THAT, THE CITY DOES NOT.  BUT THE
2    CITY ALSO HAS THE RIGHT UNDER THE RULE OF COMPLETENESS TO
3    MAKE SURE THE JURY IS NOT MISLED, AND IF THE JURY IS GOING TO
4    HEAR STATEMENTS THAT IN ALL OF THE PRIOR STATEMENTS -- I MUST
5    SAY, MR. MC NICHOLAS, I CAME VERY CLOSE TO CUTTING YOU OFF
6    BECAUSE YOU REALLY -- I WANT THIS TO NOT HAPPEN AGAIN
7    WHERE -- AGAIN, I'M NOT EXACTLY SURE WHAT IS GOING TO BE
8    OFFERED AS THE STATEMENT OF A PARTY OPPONENT SO I DIDN'T DO
9    IT, BUT THE IDEA THAT THE JURY WAS BEING TOLD AS TO THIS IS
10   WHAT THE OFFICER PREVIOUSLY SAID AS OPPOSED TO THIS IS WHAT I
11   EXPECT THE OFFICER TO SAY FROM THE STAND -- I FEEL THAT THAT
12   IS AN IMPORTANT DISTINCTION AND IT'S ONE I INTEND TO ENFORCE
13   UNLESS THE RULES OF EVIDENCE, YOU KNOW, DIRECT OTHERWISE.  SO
14   THAT -- I THINK I'VE MADE -- I HOPE I HAVE MADE MYSELF CLEAR
15   TO COUNSEL ON HOW I WANT THIS TRIAL TO GO.
16          ANOTHER THING IN THAT REGARD IS FOR YOUR EXPERTS,
17   THEY ARE GOING TO TESTIFY BASED ON HYPOTHETICALS WHICH ARE
18   DRAWN FROM THE ADMITTED EVIDENCE.  I DO NOT WANT THEM
19   SUGGESTING THAT THEY ARE IN A SUPERIOR POSITION TO THE JURY
20   TO KNOW WHAT HAPPENED BECAUSE THEY HAVE READ THE ENTIRE
21   ADMINISTRATIVE DEPOSITION RECORD.  I'M JUST SIMPLY NOT GOING
22   TO HAVE THAT.  SO, BASICALLY, I WILL ALLOW THEM TO SAY THAT
23   THEY HAVE LOOKED AT THESE THINGS SO THE JURORS KNOW THAT THEY
24   HAVE TAKEN THEIR ASSIGNMENT SERIOUSLY AND THEY JUST DIDN'T
25   WALK IN HERE OFF THE STREET, BUT I'M CERTAINLY NOT GOING TO
```

1    LET THEM SUGGEST TO THE JURY THAT THEY ARE IN A BETTER

2    POSITION THAN THE JURORS TO DETERMINE WHAT THE FACTS WERE.

3         THE SOLE PURPOSE OF THESE EXPERTS IS TO EXPLAIN THE

4    VARIOUS STANDARDS, EITHER OF POST OR CULVER CITY TO THE

5    JURORS, AND THEN THROUGH THEIR EXPERIENCE, HELP THE JURORS

6    APPLY THOSE STANDARDS TO THE FACTS AT HAND, BUT THE FACTS ARE

7    GOING TO BE BASED ON HYPOTHETICALS WHICH ARE BASED ON THE

8    EVIDENCE WHICH WAS DRAWN IN THE CASE.  IDEALLY, I WOULD FORCE

9    BOTH OF THEM TO SIT HERE THROUGHOUT THE ENTIRE TRIAL, AND

10   THEREFORE, MAKE IT CLEAR TO THE JURY THAT THEY'RE TESTIFYING

11   SOLELY ON WHAT HAPPENED HERE, BUT, OBVIOUSLY, I REALIZE THAT

12   THAT'S NOT EITHER -- BECAUSE OF EXPENSE OR TIME, IT'S NOT

13   PRACTICAL, BUT THAT'S REALLY MY VIEW OF HOW THE EXPERTS

14   SHOULD BE USED.

15        MR. GALIPO:  AND I AGREE WITH YOUR HONOR COMPLETELY

16   ON THAT POINT.  WHAT I WANT TO MAKE SURE DOESN'T HAPPEN WITH

17   EITHER OF THE EXPERTS IS FOR THEM TO CALL THEIR EXPERTS, SAY

18   THEY REVIEWED WITNESS STATEMENTS OF A WITNESS DOES NOT

19   TESTIFY AT TRIAL AND SAY HERE'S WHAT THE WITNESS SAID.

20   BECAUSE I AGREE THAT THE EXPERT OPINION SHOULD BE BASED ON

21   HYPOTHETICALS BASED ON THE EVIDENCE THIS JURY HAS HEARD AND

22   THEY SHOULD NOT BE REFERRING TO WITNESS STATEMENTS OF PEOPLE

23   WHO DON'T TESTIFY.

24        THE COURT:  MR. ROTHANS?

25        MR. ROTHANS:  I FIND THAT STATEMENT INTERESTING IN

```
 1   LIGHT OF THE FACT THAT THERE HAVE BEEN PEOPLE WHO HAVE

 2   APPROACHED A WITNESS IN THIS CASE HAVING ENGAGED IN WITNESS

 3   TAMPERING.

 4          THE COURT:  WELL, WE'LL TALK ABOUT THAT NEXT.

 5          IS THERE ANYTHING ELSE THAT YOU WANT TO RAISE WITH

 6   ME FIRST?

 7          MR. ROTHANS:  WELL, JUST TO CLOSE THE ISSUE FROM MY

 8   END, YOUR HONOR.  I KNOW MR. GALIPO AND MR. MC NICHOLAS ARE

 9   VERY FINE LAWYERS, THEY'RE VERY EXPERIENCED.  I'VE TRIED A

10   FEW OF THESE MATTERS MYSELF.  I HAVE HAD THE ISSUE OF THE

11   L.A. COUNTY DISTRICT ATTORNEYS CLEARANCE COME UP AND I HAD IT

12   ON EXHIBIT LIST, I HAVE HAD ADMITTED BEFORE THIS TRIAL.  SO

13   THE FACT THAT THEY DIDN'T BRING MOTION IN LIMINE WHEN IT'S ON

14   AN EXHIBIT LIST IS NOT MY FAULT.  IT WAS NEVER ORDERED TO BE

15   PRECLUDED IN ANY WAY, AND A LIMITING INSTRUCTION CAN CLEARLY

16   INDICATE THAT --

17          THE COURT:  MR. ROTHANS, PERHAPS I SPOKE HASTILY.

18   I DON'T MEAN TO SUGGEST THAT -- I DON'T MEAN TO SUGGEST THAT

19   I'M HOLDING IT AGAINST YOU AS AN ADVOCATE AND FAR, FAR LESS

20   AGAINST YOUR CLIENTS THAT THE MATTER WAS MENTIONED, BUT I AM

21   MAKING IT CLEAR THAT REGARDLESS OF WHAT HAPPENED IN OTHER

22   CASES, THIS COURT IS OF THE VIEW THAT IT IS NOT RELEVANT.

23          MR. ROTHANS:  UNDERSTOOD, YOUR HONOR, AND IT WILL

24   NOT COME UP FROM OUR EXPERT.

25          AS TO THE HEARSAY ISSUE, I'M NOT REALLY SURE THERE
```

1    WAS A HEARSAY ISSUE.  MR. MC NICHOLAS RAISED IN HIS OPENING

2    THE STATEMENTS THAT WERE ALLEGEDLY MADE OR HE ATTRIBUTEDLY

3    [SIC] MADE TO DETECTIVE MARTINEZ TO THE L.A. COUNTY SHERIFFS'

4    AND I WAS JUST SETTING THE RECORD STRAIGHT.

5            THE COURT:  OH, NO, I -- AGAIN, I -- DID I

6    INTERRUPT YOU, NO, BECAUSE, AGAIN, I FELT THAT IN LIGHT OF

7    THE OPENINGS, IT WAS CLEAR TO ME THAT A LOT OF STUFF IS GOING

8    TO COME IN FOR BETTER OR WORSE FROM THE DEPOSITIONS AND THE

9    STATEMENTS, AND I WAS NOT GOING TO PRESUME THAT I KNEW WHAT

10   THE RULE OF COMPLETENESS WAS GOING TO ALLOW YOU TO RAISE.

11   SO, CLEARLY, IF A STATEMENT IS MADE THAT SOMETHING WAS SAID

12   AND THE JURY COULD TAKE A DIFFERENT VIEW, THEN THAT'S --

13   WE'LL HAVE EVIDENCE ON THAT, CLEARLY.

14           MR. ROTHANS:  THANK YOU, YOUR HONOR.

15           THE COURT:  ALL RIGHT.  NOW, FIRST OF ALL, IS IT

16   DETECTIVE OR OFFICER, BECAUSE I WANT TO MAKE SURE I'M CORRECT

17   ON THAT?

18           MR. ROTHANS:  HIS CURRENT TITLE IS DETECTIVE.

19           THE COURT:  ALL RIGHT.  SO, IN THAT CASE,

20   DETECTIVE, I WILL REFER TO YOU AS DETECTIVE SINCE THAT'S YOUR

21   CURRENT RANK.

22           ALL RIGHT.  ANYTHING ELSE BEFORE TOMORROW MORNING?

23           AND THEN I DO WANT TO RAISE THIS ISSUE OF THE

24   ALLEGED WITNESS TAMPERING OR PURPORTED WITNESS TAMPERING.

25           ANYTHING ELSE?

```
1              MR. MC NICHOLAS:  IT'S JUST GETTING LONG IN THE
2    DAY, SO I WILL ONLY ADDRESS ONE POINT.
3              THE COURT:  YES?
4              MR. MC NICHOLAS:  THE NON-ERRATIC DRIVING WAS NOT
5    TO SUGGEST THAT THEY WERE OR WERE NOT INVOLVED IN THE
6    ROBBERY.  I WAS VERY CLEAR TO SAY AFTER OFFICER LOPEZ MADE
7    HIS RIGHT TURN, HE THEN SAID HE GETS BEHIND THEM ONE BLOCK
8    FROM THE INTERSECTION AND SAYS THEY'RE NOT ERRATIC.  WASN'T
9    TO SAY -- IT CLEARLY SAID HE SAW THEM GOING ERRATICALLY FROM
10   HIS LEFT TO RIGHT.  THE IDEA -- THE POINT IS WHEN IT GETS
11   DOWN TO THIS DISTILLED ENVIRONMENT OF WE'RE GOING TO MAKE A
12   TRAFFIC STOP AND PULL THEM OUT OF THE VEHICLE, THIS IS THE
13   SET OF FACTS THAT WE'RE LOOKING AT.
14             THE COURT:  RIGHT.
15             MR. MC NICHOLAS:  THAT'S -- I DID NOT -- THAT'S WHY
16   I CONFINED MY COMMENT TO THAT VERY LIMITED TIME FRAME.
17             THE COURT:  AND I DID NOT INTERRUPT YOU AND I
18   UNDERSTOOD THAT.  AS I SAID, I FELT THAT IT WAS RELEVANT TO
19   ISSUES THE JURY WILL HAVE TO DECIDE.  I JUST WISH TO MAKE IT
20   CLEAR THAT AT -- IF EFFORTS ARE MADE TO SUGGEST THAT THE
21   GRISSOMS WERE NOT THE PERPETRATORS OF THE ROBBERY, THEN,
22   OBVIOUSLY, THAT OPENS THE DOOR TO EXTRINSIC EVIDENCE FOR THE
23   CITY TO TRY TO PROVE THAT THEY WERE.  I WOULD PREFER TO STAY
24   AWAY FROM IT AND JUST LET IT -- I MEAN, THE FACT IS WHAT'S
25   IMPORTANT HERE IS NOT WHETHER OR NOT THEY, IN FACT, WERE THE
```

```
 1   ROBBERS.  I MEAN, I COULD EASILY IMAGINE A SITUATION IN WHICH

 2   THE DECEDENT WAS UTTERLY INNOCENT OF EVERYTHING, BUT IF

 3   THROUGH A FREAKISH SET OF CIRCUMSTANCES THE SHOOTER

 4   MISTAKENLY BUT QUITE REASONABLY AND OBJECTIVELY BELIEVED THAT

 5   HE WAS AN IMMINENT THREAT, THEN, OF COURSE, IT WOULD BE

 6   JUSTIFIED; OR LIKEWISE, IT COULD BE THAT THE DECEDENT WAS ON

 7   THE VERGE OF TRYING TO KILL A BUNCH OF PEOPLE, BUT IF THE

 8   SHOT WAS THROUGH SHEER DUMB LUCK, THEN THAT -- AND ALL OF

 9   THOSE REASONS WERE UNKNOWN TO THE SHOOTER, THEN IT WOULD BE

10   IRRELEVANT.

11           SO I THINK COUNSEL AND I UNDERSTAND EACH OTHER.  I

12   MEAN, THE FACT WHAT THE JURY IS GOING TO BELIEVE IS THAT IT

13   IS ALMOST CERTAINLY THE CASE THAT THEY WERE INVOLVED IN THE

14   ROBBERY AND THAT THEN OFFICER MARTINEZ BELIEVED THAT THEY

15   WERE INVOLVED IN THE ROBBERY AND HAD GOOD REASONS TO --

16   OBJECTIVELY GOOD REASONS FOR THAT TO BE THE CASE.  SO I THINK

17   THAT'S WHERE WE SHOULD LEAVE IT AND FOCUS ON WHAT HAPPENED IN

18   THE PARKING LOT.

19

20           MR. GALIPO:  SO WITH RESPECT TO THIS OTHER ISSUE, I

21   NEVER HEARD THAT BEFORE TODAY SO I'LL WAIT FOR MR. ROTHANS'

22   PROFFER.

23           THE COURT:  MR. ROTHANS, YOU KNOW, MY -- ONE OF THE

24   REASONS I GRANTED, I'M SURE MS. WILLIAMS HAS SHARED THIS WITH

25   YOU, ONE OF THE REASONS I GRANTED THE CITY'S MOTION IN LIMINE
```

```
1    ON THE GUN -- AND, AGAIN, I -- ON BEHALF OF THE COURT SYSTEM,

2    I WANT TO APOLOGIZE THAT THE SECOND PAGE OF MY MOTION IN

3    LIMINE WAS, YOU KNOW, NOT SENT OUT TO YOU.  I JUST ASSUMED

4    THAT HAPPENED, YOU KNOW, RIGHT AFTER THE HEARING THAT WE HAD.

5    BUT, YOU KNOW, THE THING IS:  REGARDLESS OF WHAT OFFICER

6    BROWN MAY OR MAY NOT HAVE DONE, IT JUST IS -- STRUCK ME AS

7    EXTREMELY PREJUDICIAL TO DETECTIVE MARTINEZ.  AND, YOU KNOW,

8    IT WASN'T AS IF -- THAT DETECTIVE MARTINEZ IS THE ONE WHO'S

9    ON TRIAL HERE, NOT OFFICER BROWN.  IF OFFICER BROWN, WHICH

10   I'M NOT MAKING FINDINGS ONE WAY OR THE OTHER, BUT EVEN IF HE

11   DID SOMETHING THAT HE SHOULDN'T HAVE DONE, IT'S NOT SOMETHING

12   THAT SHOULD REFLECT ON THE DEFENDANT WHO'S HERE AT TRIAL.

13         THERE'S NO OTHER REASON, OTHER THAN JUST SHEER

14   SPECULATION, TO THINK HE COULD POSSIBLY HAVE KNOWN OR HAD A

15   HAND IN IT.  IF THERE'S EVEN ANYTHING IN WHICH TO HAVE HAD A

16   HAND.

17         BUT, LIKEWISE HERE, WHO IS IT THAT ALLEGEDLY

18   APPROACHED THE WITNESS?

19         BECAUSE UNLESS IT IS ONE OF THE TWO MOTHERS WHO ARE

20   HERE IN THIS COURTROOM, THEN I'M NOT QUITE SURE WHAT THE

21   RELEVANCE OF IT IS.  IT'S NOT AS IF THE -- HAPPILY THE

22   WITNESS WAS NOT INTIMIDATING -- INTIMIDATED IF THE WITNESS --

23   IF THE INCIDENT, IN FACT, TOOK PLACE.

24         SO WHAT HAPPENED HERE?

25         MR. ROTHANS:  WELL, I CAN ONLY SHARE WITH YOU WHAT
```

1    WE KNOW, YOUR HONOR, AND THAT IS THERE'S A WITNESS BY THE

2    NAME OF JESSE, J-E-S-S-I-E, MAE, M-A-E, WILLIS, W-I-L-L-I-S,

3    COFIELD, C-O-F-I-E-L-D.  SHE WAS INTERVIEWED BY THE L.A.

4    COUNTY SHERIFFS' DETECTIVES AT THE SCENE AFTER THE SHOOTING.

5    HER STATEMENT IS IN THE OFFICER-INVOLVED SHOOTING

6    INVESTIGATION.  SHE CLEARLY SAID THAT THE OFFICERS YELLED

7    "SHOW ME YOUR HANDS" WHEN HE GOT OUT OF THE CAR AND THAT HE

8    DROPPED HIS HAND, AND I CAN READ IT TO YOU, BUT, ESSENTIALLY,

9    SAID PARTIALLY RAISED HIS HANDS UP.  HE WAS TOLD TO RAISE HIS

10   HANDS.  HE LOWERED ONE OF HIS HANDS AS IF HE WAS GOING TO

11   RETRIEVE A GUN OR SOMETHING.  THAT'S IN THE OFFICER-INVOLVED

12   SHOOTING INVESTIGATION REPORT.

13          SUBSEQUENT TO THAT, SOMEONE -- AND I DON'T KNOW WHO

14   AND THE WITNESS DOESN'T KNOW WHO -- CAME TO HER HOME AND

15   BECAUSE OF THIS TOLD HER SHE BETTER NOT TESTIFY.  WE

16   SUBPOENAED HER FOUR TIMES.  WE SET THE FIRST DEPOSITION IN MY

17   OFFICE.  SHE WAS SERVED.  SHE FAILED TO APPEAR.  WE SET THE

18   SECOND DEPOSITION IN THE VALLEY AT A COURT REPORTER'S OFFICE

19   BECAUSE SHE LIVES IN THE SAN FERNANDO VALLEY; SHE FAILED TO

20   APPEAR.  WE DID A THIRD NOTICE FOR THE COURT REPORTER'S

21   OFFICE THINKING IT WAS AN INCONVENIENT TIME OR DATE OR

22   SOMETHING; SHE FAILED TO APPEAR.  THE FOURTH TIME SHE WAS

23   SERVED, WE SET THE DEPO FOR HER HOME, AND SHE WAS NOT THERE

24   WHEN WE SHOWED UP FOR THE DEPOSITION.

25          RECENTLY, OUR INVESTIGATOR HAS SEVERED HER WITH A

1    SUBPOENA FOR THIS TRIAL AND SHE SAID THAT SHE HAS BEEN

2    APPROACHED, SHE HAD REPORTED TO THE L.A.P.D.  SHE CALLED THE

3    L.A.P.D. BECAUSE THESE PEOPLE WERE INTIMIDATING HERE AND THE

4    L.A.P.D. WOULDN'T DO ANYTHING.  THEY WOULDN'T EVEN TAKE A

5    REPORT.  SO SHE IS FRIGHTENED.  SHE'S IN FEAR AND SO WE'RE

6    GOING TO TRY TO ARRANGE FOR HER TO GET A RIDE HERE, BUT SHE

7    MIGHT GET ON THE STAND AND SAY, I DON'T REMEMBER ANYTHING,

8    BECAUSE SHE WAS INTIMIDATED AND APPROACHED BY SOMEONE ABOUT

9    THIS CASE AND THIS STATEMENT IN THE REPORT.

10          NOW, I CANNOT IDENTIFY WHO THEY ARE AND I DON'T

11   KNOW IF MS. MAE WILLIS-COFIELD WILL BE ABLE TO DO SO IF THESE

12   FOLKS ARE STILL HERE IN THE AUDIENCE.  SOMEONE APPROACHED

13   HER.  SOMEONE TOLD HER SHE BETTER NOT TESTIFY.  SHE FAILED TO

14   SHOW FOR FOUR PROPERLY NOTICED AND SUBPOENAED DEPOSITIONS.

15          THE COURT:  ALL RIGHT.  THE -- OBVIOUSLY, IT SOUNDS

16   TO ME, AGAIN, THAT THERE'S NO -- NOTHING LINKING THIS ACTION

17   TO THE GUARDIAN'S AD LITEM OF THE PLAINTIFFS, SO I -- AT THE

18   SAME TIME, IT DOES SOUND -- IF SHE DOESN'T TESTIFY, WE'RE

19   GOING TO HAVE TO DECIDE WHAT TO DO ABOUT THAT.  SO I HOPE

20   COUNSEL WILL CONFER AND SUGGEST A SOLUTION; IF NOT, THEN THE

21   MATTER SHOULD BE BRIEFED SO I CAN DECIDE WHAT IT IS THAT'S

22   GOING TO HAPPEN.

23          AND, OBVIOUSLY MR. GALIPO, MR. MC NICHOLAS, YOU

24   SHOULD BE THINKING ABOUT WHAT IS GOING TO HAPPEN IF, IN FACT,

25   SHE STATES THAT SHE'S UNAWARE OF -- THAT SHE DOESN'T REMEMBER

```
1    ANYTHING.  I MEAN, IT DOES SEEM THAT THERE IS A PRIOR

2    INCONSISTENT STATEMENT THAT ORDINARILY WOULD NOT COME IN FOR

3    THE TRUTH OF THE MATTER ASSERTED SINCE IT WASN'T UNDER OATH,

4    BUT WE'LL HAVE TO DECIDE WHAT TO DO ABOUT THAT.

5              MR. GALIPO:  WHAT I MIGHT RECOMMEND IS -- I'M NOT

6    SURE WHEN SHE WAS SUBPOENAED FOR, BUT IF SHE DOES SHOW UP,

7    MAYBE THAT DAY WE CAN -- 15 MINUTES, FOR EXAMPLE, BEFORE THE

8    JURY, THERE COULD BE A SHORT DISCUSSION TO FIGURE OUT EITHER,

9    A, YOU KNOW, DOES SHE RECALL THE EVENT AND IS SHE GOING TO

10   TESTIFY TO WHAT SHE RECALLS?  AND IF THIS OTHER ISSUE NEEDS

11   TO BE ADDRESSED, WE CAN ADDRESS IT HERE.  I THINK IT WILL BE

12   SIMPLER TO DO IT THAT WAY, RATHER THAN TO HAVE THIS ISSUE IN

13   FRONT OF THE JURY WITH A SIDEBAR.

14             THE COURT:  RIGHT.

15             NO.  I WANT THIS TO BE DEALT WITH OUTSIDE THE

16   PRESENCE OF THE JURY.

17             MR. GALIPO:  THANK YOU, YOUR HONOR.

18             THE COURT:  OKAY.  ANYTHING ELSE?

19             MR. GALIPO:  I'M TOO TIRED TO THINK OF ANYTHING

20   ELSE.  NO, YOUR HONOR.

21             MR. ROTHANS:  NO, YOUR HONOR.

22             THE COURT:  MR. MC NICHOLAS?

23             MR. MC NICHOLAS:  NO, THANK YOU, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  I WILL BE HERE AT 8:30 IF

25   THERE'S SOMETHING TO RAISE WITH THE COURT; OTHERWISE, I WANT
```

```
1     THE TRIAL TO COMMENCE PROMPTLY AT 9:00 O'CLOCK WITH THE FIRST

2     WITNESS.

3               AND WHO WILL THE FIRST WITNESS BE?

4               MR. GALIPO:  OFFICER ROY LOPEZ.  I CAN GIVE YOU --

5     I GAVE COUNSEL MY FIRST SEVEN, SO I CAN GIVE IT TO YOU IF YOU

6     WANT, IN ORDER IF THAT HELPS YOU.

7               THE COURT:  RIGHT.

8               MR. GALIPO:  SO ROY LOPEZ.  DETECTIVE MARTINEZ WILL

9     BE SECOND.  OFFICER ZERBEY WILL BE THIRD.  OFFICER FAIRBANKS

10    WILL BE FOURTH.  OFFICER BROWN WILL BE FIFTH.  OFFICER MOORE

11    WILL BE SIXTH.  SERGEANT REPUCCI WILL BE SEVENTH.  AND THEN I

12    BELIEVE WE'RE GOING TO GO INTO THE -- ONE OR TWO OF THE

13    DETECTIVES, THE PARAMEDIC, THE CORONER'S INVESTIGATOR, AND

14    THE MEDICAL EXAMINER, WHICH WE BELIEVE WILL TAKE US AT LEAST

15    INTO THURSDAY.  AND WE'RE ANTICIPATING HAVING AMANDA

16    MEDEIROS, WHO'S A PERCIPIENT WITNESS, AND ROGER CLARK --

17    WE'RE GOING TO TRY TO GET THEM IN BY FRIDAY AT 12:30.  THAT'S

18    KIND OF THE BASIC PLAN.

19              THE COURT:  ALL RIGHT.  ALL RIGHT.  I WILL SEE

20    COUNSEL IN THE MORNING.

21              MR. ROTHANS:  THANK YOU.

22              MR. GALIPO:  THANK YOU.

23         (WHEREUPON, COURT WAS ADJOURNED AT 4:25 P.M.)

24                        --000--

25
```

1              CERTIFICATE OF REPORTER

2

  COUNTY OF LOS ANGELES      )
3                            )  SS.
  STATE OF CALIFORNIA        )

4

5

6   I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

7   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

8   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

9   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10  CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11  PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12  TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13  OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16  DATED:  AUGUST 1, 2013

17

18       **/S/  ROSALYN ADAMS**

19  ROSALYN ADAMS, CSR 11794
    OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**