1                UNITED STATES OF AMERICA

2              UNITED STATES DISTRICT COURT

3              CENTRAL DISTRICT OF CALIFORNIA

4                   CENTRAL DIVISION

5                       - - -
            HONORABLE MICHAEL W. FITZGERALD
6        UNITED STATES DISTRICT JUDGE PRESIDING
                        - - -
7

8   KANDACE SIMPLIS, ET AL.,        )
                                    )
9               PLAINTIFF,          )
                                    )
10  VS.                             )   CV 10-09497-MWF
                                    )
11  CULVER CITY POLICE DEPARTMENT,  )      VOLUME I
    ET AL.,                         )
12                                  )
                DEFENDANT.          )
13  _____)

14

15

                _JURY TRIAL - DAY 2, AM SESSION_
16
                  LOS ANGELES, CALIFORNIA
17
                      MAY 1, 2013
18

19

20

21

22

23              ROSALYN ADAMS, CSR 11794
            FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 410
            LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2665

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3            LAW OFFICES OF DALE K. GALIPO
              BY:  DALE K. GALIPO
 4            21800 BURBANK BOULEVARD
              SUITE 310
 5            WOODLAND HILLS, CALIFORNIA 91367
              (818) 347-3333
 6
              MC NICHOLAS AND MC NICHOLAS LLP
 7            BY:  MATTHEW S. MC NICHOLAS
              10866 WILSHIRE BOULEVARD
 8            SUITE 1400
              LOS ANGELES, CALIFORNIA 90024
 9            (310) 474-1582

10

11    ON BEHALF OF DEFENDANT:

12            CARPENTER ROTHANS AND DUMONT
              BY:  STEVEN J. ROTHANS
13                 JILL WILLIAMS
              888 SOUTH FIGUEROA STREET
14            SUITE 1960
              LOS ANGELES, CALIFORNIA 90017
15            (213) 228-0400

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1                                    **I N D E X**

2
                                                                        **PAGE**
3
**OFFICER ROY LOPEZ** - PLAINTIFF'S WITNESS ............    16
4            DIRECT EXAMINATION BY MR. GALIPO ..........    17
             DIRECT EXAMINATION BY MR. MC NICHOLAS .....    53
5            CROSS-EXAMINATION BY MR. ROTHANS ........ 61, 95
             REDIRECT EXAMINATION BY MR. GALIPO ........   109
6            REDIRECT EXAMINATION BY MR. MC NICHOLAS ...   119

7
**OFFICER LUIS MARTINEZ** - PLAINTIFFS' WITNESS........   123
8            DIRECT EXAMINATION BY MR. GALIPO ..........   123

9

10                                **E X H I B I T S**

11
    **PLAINTIFFS'        MARKED FOR IDENTIFICATION        IN EVIDENCE**
12
       36-1                     --                          20
13
       372-02                   --                          23
14
       17-01                    --                          23
15
        8                       --                          56
16
        42                      --                          70
17

18
    **DEFENDANT'S        MARKED FOR IDENTIFICATION        IN EVIDENCE**
19
       010                      --                         105
20
       378-032                  --                         108
21

22

23

24

25

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 1, 2013; 8:30 A.M.

 2                            --0O0--

 3

 4

 5          THE CLERK:  IN THE MATTER OF CASE NUMBER

 6   CV-10-9497-MWF:  KANDACE SIMPLIS, ET AL. V. CULVER CITY

 7   POLICE DEPARTMENT, ET AL.

 8          COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE

 9   RECORD.

10          MR. GALIPO:  GOOD MORNING, YOUR HONOR.

11          DALE GALIPO ON BEHALF OF THE PLAINTIFFS, WITH

12   MR. MATT MC NICHOLAS.

13          THE COURT:  GOOD MORNING, COUNSEL.

14          MR. ROTHANS:  GOOD MORNING, YOUR HONOR.

15          STEVE ROTHANS ON BEHALF OF DEFENDANTS, CITY OF

16   CULVER CITY; AND OFFICER LUIS MARTINEZ, AND MY PARTNER JOE

17   WILLIAMS IS HERE.

18          THE COURT:  ALL RIGHT.  GOOD MORNING, COUNSEL.

19          GOOD MORNING, DETECTIVE.

20          GOOD MORNING, MA'AM.

21          MR. GALIPO, WHAT IS THE NAME OF THE GUARDIAN AD

22   LITEM FOR YOUR CLIENTS?  I'M SORRY.  WAS IT MS. RICE?

23          MR. GALIPO:  CANDY ROSE.

24          THE COURT:  ROSE, ALL RIGHT.  THANK YOU.

25          MS. ROSE?
```

```
 1              MR. GALIPO:  NO.  THIS IS -- THIS IS KANDACE
 2     SIMPLIS, YOUR HONOR.
 3              THE COURT:  OH, THAT'S MS. SIMPLIS.  ALL RIGHT.
 4              MR. MC NICHOLAS:  THE NAMES ARE VERY SIMILAR.
 5              THE COURT:  OKAY.  GOOD MORNING, MS. SIMPLIS.
 6              OKAY.  I JUST -- ALL RIGHT.
 7              THE FIRST THING TO DEAL WITH, OBVIOUSLY, IS THE
 8     REQUEST FOR THE LIMITING INSTRUCTION.
 9              WHAT OTHER MATTERS ARE THERE THAT -- TO DEAL WITH
10     BEFORE THE JURY COMES IN?
11              MR. GALIPO:  HERE'S THE OTHER ISSUES OF CONCERN FOR
12     US.  DURING THE OPENING STATEMENT, THERE WAS A MENTION THAT
13     THE MEASUREMENTS OF THE GUN --
14              THE COURT:  RIGHT.  I WAS GOING TO RAISE THAT.
15              MR. GALIPO:  -- WAS FOUR INCHES.
16              THE COURT:  RIGHT.  I WAS GOING TO RAISE THAT
17     MYSELF.  SO THAT'S THE -- THAT WAS MY AGENDA.  SO IS THERE
18     ANYTHING -- I JUST WANT TO GET THE AGENDA STRAIGHT.
19              MR. GALIPO:  OKAY.  SO THAT'S ONE ISSUE.
20              THE COURT:  THAT'S ONE ISSUE.  AND THEN --
21              MR. GALIPO:  SECOND ISSUE IS THAT WITH THE
22     BULLETINS, AS THE COURT MAY RECALL, THERE WAS A LOT OF
23     DISCUSSION ABOUT THIS RED SWEATSHIRT.  AFTER THE SHOOTING AND
24     NEVER SEEN PRIOR TO THE SHOOTING BY OFFICER MARTINEZ, THERE
25     WAS A RED SWEATSHIRT FOUND IN THE CAR.  AGAIN, WE'RE HOPING
```

```
 1   THAT WE'RE NOT GOING THERE BASED ON OUR PRIOR DISCUSSIONS,

 2   BUT THAT'S ANOTHER ISSUE.

 3          THIRD, THERE WAS A MENTION -- AND I CAN'T REMEMBER

 4   THE EXACT WORDING IN THE OPENING STATEMENT, BUT I THOUGHT IT

 5   WAS SOMETHING TO THE EFFECT THE FAMILY MEMBERS OR PEOPLE IN

 6   THIS COURTROOM SUGGESTING THE PLAINTIFFS HAD SOMEHOW

 7   DISSUADED A WITNESS FROM COMING TO TRIAL.  I CAN'T REMEMBER

 8   THE EXACT WORDS, BUT IT TURNED OUT WHEN WE HAD A DISCUSSION

 9   AFTER THE JURY LEFT, IF I UNDERSTOOD MR. ROTHANS CORRECTLY,

10   THAT HE DOESN'T KNOW WHO THIS INDIVIDUAL WAS, AND SO I

11   THOUGHT THAT WAS VERY INAPPROPRIATE AND INFLAMMATORY TO SAY

12   THAT IN OPENING STATEMENT BASED ON THAT PROFFER.

13          AND THE LAST ISSUE IS THE PARAMEDIC.  WE PLAN ON

14   CALLING ONE PARAMEDIC TOMORROW.  I THINK MR. ROTHANS HAS AN

15   ISSUE WITH IT, SO WE CAN DISCUSS THAT, IF NECESSARY, AT SOME

16   POINT TODAY, IT DOESN'T HAVE TO BE THIS MORNING.  AND I WILL

17   JUST SAY IN GENERAL, YOUR HONOR, THAT I DON'T LIKE TO ASK FOR

18   MISTRIALS BECAUSE, AS I STATED YESTERDAY, EVERYONE HAS SET

19   THIS TIME ASIDE, EVERYONE PUTS A LOT OF WORK INTO IT.  I

20   THINK COLLECTIVELY SOME OF WHAT HAPPENED YESTERDAY IS

21   POTENTIALLY GROUNDS FOR MISTRIAL.  WE'RE NOT GOING TO ASK FOR

22   ONE AT THIS TIME, BUT I DID WANT TO MAKE THE RECORD CLEAR

23   THAT IF WE ENCOUNTER CUMULATIVE ISSUES, WE MAY GET TO A POINT

24   WHERE WE FEEL THAT OUR CLIENTS ARE BEING DEPRIVED THE RIGHT

25   TO A FAIR TRIAL.  SO THOSE ARE THE ISSUES THAT WE HAVE.
```

1          THE COURT:  ALL RIGHT.  APART FROM THOSE ISSUES,

2   AND OBVIOUSLY YOU'LL HAVE A CHANCE TO BE HEARD, MR. ROTHANS,

3   IS THERE ANYTHING ELSE THAT THE DEFENSE WOULD LIKE TO RAISE

4   BEFORE THE JURY COMES IN?

5          MR. ROTHANS:  APART FROM THOSE ISSUES, YOUR HONOR,

6   THE ONLY OTHER MATTER WAS WHETHER WE WANT THE FIRE CAPTAIN

7   FROM THE DEPARTMENT, WHO IS A PARAMEDIC AT THE TIME WHO

8   ASSISTED IN THE EMERGENCY RESPONSE IN TREATMENT OF

9   MR. GRISSOM, TO BE WAITING AROUND THE HALLWAY TOMORROW FOR

10  HOURS AT A TIME IF, IN FACT, THE ONLY ISSUE WHICH WE HAD

11  FORESEEN WAS THE DISCOVERY OF THE GUN OR THE FAILURE TO

12  DISCOVER THE GUN IN THE SHOE BY THE PARAMEDICS.

13          THE COURT:  WELL, WE CAN DISCUSS THAT.  HE'S NOT

14  HERE NOW AND I SYMPATHIZE WITH HIS TIME, BUT I -- WE DON'T

15  NEED TO DECIDE THAT RIGHT NOW --

16          MR. ROTHANS:  OKAY.  THAT'S THE ONLY OTHER ISSUE.

17          THE COURT:  -- SO WE'LL DISCUSS THAT LATER.

18          ALL RIGHT.  ON THE LIMITING INSTRUCTION, FIRST OF

19  ALL, I DO NOT RECALL THAT IT WAS A MENTION OF A CRIMINAL

20  INVESTIGATION.  I THOUGHT IT WAS -- AND MAYBE I'M JUST

21  PROJECTING MY KNOWLEDGE OF THE INTERNAL INVESTIGATION ONTO

22  WHAT WAS SAID.  I WAS JUST GOING TO JUST REFER TO -- I'M NOT

23  GOING TO USE THESE PRECISE WORDS, BUT I WILL, SINCE YOU WANT

24  ONE, JUST SAY THAT THERE WAS A REFERENCE TO ANOTHER

25  INVESTIGATION IN REGARD TO THIS MATTER.  AN OBJECTION WAS

1    MADE AND SUSTAINED.  YOU SHOULD -- THERE WILL NOT BE EVIDENCE

2    OF THAT IN THE CASE.  ANY REFERENCE IN OPENING STATEMENT IS

3    NOT EVIDENCE AND THAT -- AND -- AND THEN THAT WILL -- THAT

4    WILL BE THAT.  AND THEN REMIND THEM THAT THEY'RE THE ONLY

5    ONES WHO ARE GOING TO BE DECIDING HOW THIS CASE TURNS OUT.

6              IN REGARD TO THE GUN, IT CERTAINLY WOULD HAVE

7    SOUNDED TO THE JURORS OR ANYONE WHO WAS UNAWARE OF THE

8    BACKGROUND OR MY GRANTING THE CITY'S MOTION IN LIMINE, THAT A

9    GUN HAD BEEN RECOVERED AND HAD BEEN MEASURED AND WAS GOING TO

10   BE PRESENTED TO THEM.  SO I DO FIND MYSELF CURIOUS AS TO WHAT

11   WAS THE PURPOSE OF THOSE REMARKS IN THE OPENING STATEMENT.

12             I MEAN, IF IT JUST IS REFERRING TO AN ESTIMATE OF

13   HOW BIG THE GUN WAS IN THE PHOTOS, WHICH ARE IN THE

14   BULLETINS, THEN FINE.  I MEAN, I -- BUT I -- IT -- CERTAINLY,

15   SOMEONE WHO IS UNAWARE OF THE BACKGROUND WOULD HAVE ASSUMED

16   THAT IT WAS SOMETHING FAR MORE SPECIFIC THAN THAT.

17             MR. ROTHANS:  YOUR HONOR, THAT'S ALL IT WAS.  IT

18   WASN'T PREPLANNED.  IT WASN'T IN MY OUTLINE.  I HADN'T

19   PREPLANNED OR STRATEGIZED TO MENTION IT.  BUT, CLEARLY, WHEN

20   YOU LOOK AT THE BLOW-UPS FROM THE BOLOS --

21             THE COURT:  RIGHT.

22             MR. ROTHANS:  -- YOU CAN SEE THE WEAPON IN HIS

23   HAND.  YOU CAN SEE IT'S A SMALL CALIBER WEAPON.  IT WAS JUST

24   A GUESSTIMATE, IF YOU WILL, OF WHAT THE LENGTH WAS BASED ON

25   THOSE PHOTOS.

1           THE COURT:  ALL RIGHT.  ON THE --

2           MR. GALIPO:  MAYBE AT SOME POINT IN THE

3    PRESENTATION OF EVIDENCE, IN FAIRNESS TO THE PLAINTIFFS, THAT

4    POINT COULD BE CLARIFIED THAT THIS FOUR-INCH ESTIMATE WAS

5    BASED ON WHAT WAS SEEN IN THE PHOTOGRAPHS, BECAUSE,

6    OTHERWISE, THE JURY WILL THINK IT MIGHT BE SOMETHING ELSE.

7           MR. ROTHANS:  WELL, YOUR HONOR, WE'RE GOING TO CALL

8    ATTENTION TO THIS ISSUE.  LET ME REMIND THE COURT, WE ARE THE

9    ONES WHO BROUGHT THE MOTION --

10          THE COURT:  RIGHT.

11          MR. ROTHANS:  -- TO EXCLUDE IT, AND SO NOW WHAT

12   COUNSEL WANTS TO DO IS FURTHER EMPHASIZE AND HIGHLIGHT THE

13   FACT THAT, WELL, THERE WASN'T A GUN THERE.  AND BY THEIR

14   QUESTIONING, HAVING SAT THROUGH 12 OR MORE DEPOSITIONS IN

15   THIS CASE, INCLUDING EXPERTS, IT'S CLEAR THAT THEY WANT TO

16   ESTABLISH THERE WAS -- AND I UNDERSTAND WE CLARIFIED THIS

17   YESTERDAY ON THE RECORD, BUT THE QUESTIONING OF ALL OF OUR

18   OFFICERS AND THE EXPERTS WAS TO ESTABLISH THERE WAS NO ARMED

19   ROBBERY, OR, AT LEAST THERE'S NO CONNECTION WITH THESE FOLKS

20   IN THE ARMED ROBBERY.  THERE'S NO WAY THAT THEY WOULD HAVE

21   KNOWN THAT THIS GUY WAS INVOLVED IN THE ARMED ROBBERY.  THAT

22   THE SWEATSHIRT THAT'S THE SAME ONE IN ALL THESE PHOTOGRAPHS

23   FROM THE BOLOS WASN'T DISCOVERED.

24           I MEAN, THEY WANT TO ESTABLISH THROUGH THEIR

25   QUESTIONING OF ALL THE WITNESSES THAT WE DIDN'T KNOW THESE

1    GUYS WERE INVOLVED IN THE ARMED ROBBERY AND THESE WERE JUST

2    SOME STRANGERS OFF THE STREET OR WERE BEING STOPPED FOR

3    ERRATIC DRIVING.

4            MR. GALIPO:  TWO POINTS:  THAT'S ABSOLUTELY UNTRUE,

5    AND THE COURT WILL SEE IN TERMS OF THE QUESTIONING HERE WE'RE

6    NOT GOING TO BE CHALLENGING THAT ISSUE IN TERMS OF OUR

7    QUESTIONING.  SECONDLY, YOU KNOW, LAWYERS HAVE TO BE CAREFUL

8    OF THEIR WORDS, AND THERE WAS MANY WAYS TO PHRASE THAT OTHER

9    THAN IT'S BEEN MEASURED TO BE FOUR INCHES.

10           THE COURT:  THE -- THERE IS GOING TO BE -- THERE IS

11   NOT GOING -- THE JURY IS NOT GOING TO HERE ANY EVIDENCE OF A

12   GUN.  THERE WILL NOT BE A GUN PRESENTED TO THEM.  GENERALLY,

13   FRANKLY, TO THE EXTENT THAT THERE -- SOMETHING IS IMPLICITLY

14   OR EXPLICITLY PROMISED IN OPENING STATEMENT THAT DOESN'T THAT

15   SEEM TO REBOUND TRADITIONALLY TO THE BENEFIT OF THE OTHER

16   PARTY, WHICH, IN THIS CASE, WOULD BE THE PLAINTIFF, SO I'M

17   NOT GOING DRAW ATTENTION TO THE MATTER.

18           IN TERMS OF THE RED SWEATSHIRT, I -- IF IT WAS

19   FOUND -- LOOK, THE JURY'S GOING TO GO BACK THERE WITH AN

20   UNDERSTANDING THAT THESE WERE, IN FACT, THE PEOPLE IN THE --

21   THAT THESE WERE, IN FACT, THE PEOPLE WHO WERE THERE IN THE

22   RADIOSHACK.  AND I DON'T -- IF THE RED -- YES, IN A TECHNICAL

23   SENSE, IF DETECTIVE MARTINEZ DIDN'T SEE IT BEFORE HE SHOT, I

24   UNDERSTAND THE BASIS OF THE THING, BUT IF IT WAS THERE IN THE

25   CAR, IF IT WAS RECOVERED IN THE THING, THERE'S GOING TO BE A

1    LOT OF EVIDENCE IN REGARD TO WHAT HAPPENED IMMEDIATELY

2    AFTERWARDS BECAUSE OF THE CELL PHONE AND BECAUSE OF THE FACT

3    THE GUN WASN'T FOUND, I JUST -- I REALLY THINK THAT IT'S

4    INNOCUOUS, FRANKLY, BECAUSE TO THE EXTENT -- THE ONLY WAY IN

5    WHICH ITS PREJUDICIAL IS THAT IT DOES, IN FACT, IS FURTHER

6    EVIDENCE THAT THESE WERE, IN FACT, THE PEOPLE INVOLVED IN THE

7    ROBBERY, BUT THEY WERE, IN FACT, THE PEOPLE INVOLVED IN THE

8    ROBBERY, AND I DON'T REALLY SEE ANY PROBLEMS IN THAT REGARD

9    FOR THE JURY TO KNOW THAT.

10          THE REASON I WAS CONCERNED YESTERDAY ABOUT CALLING

11   MS. GRISSOM IS THE IDEA WHEN YOU MENTION CONVICTIONS, I

12   CERTAINLY DON'T SEE ANY NEED FOR THE JURY TO KNOW THAT SHE

13   WAS CONVICTED OF THE ROBBERY OR SHE'S CURRENTLY IN PRISON.  I

14   THOUGHT YOU WERE REFERRING TO OTHER CONVICTIONS THAT MIGHT BE

15   ON HER RECORD AS A FORM OF IMPEACHMENT, AND I DIDN'T INTEND

16   HER TO BE CALLED THROUGH DEPOSITION AND THEN HAVE THESE OTHER

17   CONVICTIONS COME IN SOLELY TO IMPEACH A DEPONENT WHO WAS

18   BEING CALLED BY THE PARTY WHO WANTS TO MAKE HER LOOK BAD.

19          SO I THINK THE SWEATSHIRT -- IT JUST -- IT SEEMS TO

20   ME THERE'S GOING TO BE A LOT OF TESTIMONY ABOUT WHAT HAPPENED

21   AFTER THE SHOOTING, AND TO TRY TO CARVE OUT THE SWEATSHIRT

22   WHEN IT'S PREJUDICE IS SO DE MINIMUS IS JUST TRYING TO

23   ARTIFICIALLY IMPOSE CONSTRAINTS ON THE TESTIMONY OF THE

24   WITNESS.  WHOEVER THE WITNESS WAS THAT FOUND IT, IF SOMEBODY

25   WAS BEING CALLED SOLELY FOR THE PURPOSE OF SAYING I FOUND THE

1    RED SWEATSHIRT AND I REALIZE IT WAS THE SAME ONE THAT WAS IN

2    THE PHOTOGRAPHS, THEN IT MIGHT BE A WASTE OF TIME.  BUT

3    THAT'S -- I DON'T THINK I HAVE TO DECIDE THIS RIGHT NOW, BUT

4    THAT'S WHERE I'M COMING OUT ON THIS.

5                 MR. GALIPO:  MAY I MAKE ONE COMMENT ON THAT?

6                 THE COURT:  YES.

7                 MR. GALIPO:  AND I'LL BE BRIEF.

8                 THEY GOT IN -- YOU KNOW, IN DISCOVERY, MY

9    UNDERSTANDING FROM THE STATEMENTS IN DEPOS, THEY WERE AWARE

10   OF ANOTHER -- OF TWO RADIOSHACK ROBBERIES.  YESTERDAY WE

11   HEARD ABOUT TEN ROBBERIES.  WE HEARD ABOUT THE RED BANDIT OR

12   WHATEVER THE TERMINOLOGY WAS.

13                 I UNDERSTAND WHAT THE COURT IS SAYING.  THAT THE

14   JURY'S PROBABLY GOING TO CONCLUDE THESE WERE THE PEOPLE,

15   WE'RE NOT GOING TO CHALLENGE THAT IN TERMS OF OUR

16   QUESTIONING.  BUT FOR THEM TO FURTHER HAVE SOMETHING THAT WAS

17   NOT OBSERVED BY MARTINEZ AT ANY TIME, AND THEN HAVE MR.

18   ROTHANS IN CLOSING ARGUMENTS SAY THIS IS PROOF POSITIVE, THIS

19   RED SWEATSHIRT, THAT HE COMMITTED EVERY ONE OF THESE

20   ROBBERIES AND GO ONE BY ONE WITH THE EVIDENCE, I THINK IS

21   GOING OVER THE TOP.  SO I WOULD JUST LIKE THE COURT TO

22   CONSIDER THAT.

23                 THE COURT:  WE HAVE ANOTHER -- WELL, WE'LL HAVE

24   THAT.  I'M SURE THIS IS NOT GOING TO COME UP IMMEDIATELY.

25   THE -- JUST AT THE BREAK, WE CAN TALK ABOUT HOW IT IS GOING

```
 1   TO COME IN.  IT -- TECHNICALLY, YOU ARE MAKING A GOOD
 2   ARGUMENT.  AT THE SAME TIME, I AM CONCERNED ABOUT TRYING TO
 3   PUT CONSTRAINTS ON THE TESTIMONY -- ON TESTIMONY ABOUT WHAT
 4   HAPPENED AFTERWARDS.  BECAUSE OF THE LACK OF THE GUN AND THE
 5   PRESENCE OF THE CELL PHONE AND WHERE THE CELL PHONE WAS,
 6   THERE'S JUST GOING TO BE A LOT TESTIMONY ABOUT THAT.  IT'S
 7   NOT LIKE IT'S SOME SUBJECT THAT NOBODY'S GOING TO GET INTO.
 8             SO LET ME -- GIVE ME -- YOU'RE THE ONE WHO'S MAKING
 9   THE MOTION TO KEEP IT OUT.  SO GIVE ME A BETTER CONTEXT OF
10   HOW EXACTLY IT'S GOING TO COME INTO THE TRIAL AND AFFECTS
11   TRIAL.
12             FRANKLY, NEITHER SIDE IS GOING TO -- YOUR CLIENTS
13   ARE GOING TO LOSE NO MONEY BECAUSE OF THE RED SWEATSHIRT.
14   DETECTIVE MARTINEZ IS NOT GOING TO GET A VERDICT BECAUSE OF
15   THE RED SWEATSHIRT.  THE RED SWEATSHIRT IS JUST NOT IMPORTANT
16   IN THIS CASE, BECAUSE THE JURY IS ALREADY GOING TO BE LEFT
17   WITH THE FIRM SENSE THAT THESE -- AS YOU SAY, THAT THESE WERE
18   THE PEOPLE WHO WERE INVOLVED.  IT'S REALLY JUST A MATTER OF
19   MANAGING THE TRIAL.
20             IN DISSUADING THE WITNESS, I AGREE WITH YOU THAT
21   THAT IS -- THAT IT COULD VERY WELL BE THAT THERE WILL NOT BE
22   EVIDENCE OF THAT BEFORE THE JURY.  BUT THE WITNESS HASN'T
23   TESTIFIED, IT MIGHT BE THAT SHE, BECAUSE OF THE NATURE OF HER
24   TESTIMONY, THE JURY WILL HAVE TO HEAR THAT THERE WAS
25   SOMETHING IN WHICH I WOULD CAUTION THEM, THEN, THAT THERE'S
```

1    NO EVIDENCE THAT HAS ANYTHING TO DO WITH THE GUARDIANS AD

2    LITEM AND THEY -- IT SHOULDN'T BE DONE AGAINST THE PLAINTIFF.

3    FOR THE MOMENT, LET'S JUST WAIT AND SEE WHAT HAPPENS ON THIS

4    AND THEN WE CAN JUST TAKE IT UP, AND THE PARAMEDIC WE'LL DEAL

5    WITH AT ANOTHER TIME.

6              SO -- ALL RIGHT.  WITH --

7              MR. ROTHANS:  YOUR HONOR, BEFORE WE BEGIN --

8              THE COURT:  YEAH?

9              MR. ROTHANS:  -- AND CALL THE JURY IN, MAY I HAVE

10   AN OPPORTUNITY TO SPEAK TO THE WITNESSES TO REMIND THEM OF

11   THE MOTIONS IN LIMINE AND WHAT THE COURT HAS JUST SAID ON

12   THESE ISSUES?

13             THE COURT:  YOU MAY.

14             MR. ROTHANS:  THANK YOU, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  SO I WILL LEAVE THE BENCH

16   AND I'LL COME BACK IN JUST A COUPLE MINUTES.

17             THE CLERK:  ALL RISE.

18                        (RECESS.)

19             THE COURT:  MS. SANCHEZ, YOU CAN GET THE JURY.

20             THE CLERK:  YES, YOUR HONOR.

21             MR. GALIPO:  YOUR HONOR, I SHOWED MR. ROTHANS THE

22   EXHIBITS I INTEND TO USE WITH THE FIRST WITNESS, SO I MAY

23   JUST SAY "BY AGREEMENT" AND THEN GIVE THE EXHIBIT NUMBER

24   BEFORE I, YOU KNOW, MOVE IT INTO EVIDENCE, IF THAT'S

25   ACCEPTABLE.

```
1              THE COURT:  IS THERE ANY OBJECTION TO THE EXHIBITS?

2              MR. GALIPO:  NO.  THESE ARE THE AGREED UPON --

3              THE COURT:  ALL RIGHT.  SO THAT'S WHAT I WANTED TO

4    MAKE CLEAR.

5              MR. GALIPO:  RIGHT.

6              THE COURT:  WHAT ARE THE NUMBERS?

7              MR. GALIPO:  OH, YOU WANT THEM NOW?

8              THE COURT:  YES.

9              MR. GALIPO:  36-1 --

10             THE CLERK:  PLEASE RISE FOR THE JURY.

11                       (JURORS ENTER.)

12             THE CLERK:  PLEASE BE SEATED.

13             THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

14             WELCOME BACK.

15              THE LAWYERS AND I HAVE ALREADY BEEN AT WORK, SO I

16   HOPE THAT MEANS THAT THE PRESENTATION OF EVIDENCE WILL BE A

17   LITTLE SMOOTHER.

18              THE EVIDENCE WILL, IN FACT, BEGIN NOW SINCE, AS I

19   SAID, THE STATEMENTS OF LAWYERS YESTERDAY WERE NOT EVIDENCE.

20   AND IN THAT REGARD, I WANT TO EMPHASIZE THAT IN PARTICULAR

21   FOR ONE PARTICULAR STATEMENT.  IN THE DEFENSE OPENING

22   STATEMENT, THERE WAS A PASSING REFERENCE TO ANOTHER

23   INVESTIGATION, AN OBJECTION WAS MADE AND SUSTAINED.  YOU

24   SHOULD NOT MAKE -- PAY ANY ATTENTION TO THAT REFERENCE IF, IN

25   FACT, YOU EVEN REMEMBER IT.  THERE WILL NOT BE ANY EVIDENCE
```

1    OF THAT IN THIS CASE AND SORT OF ILLUSTRATES A LARGER POINT,

2    WHICH IS THAT YOU ARE NOW THE JUDGES OF THE FACTS.  THERE'S

3    NOBODY ELSE WHO YOU CAN LOOK TO TO TELL YOU HOW THE CASE

4    SHOULD COME OUT; THAT'S ENTIRELY FOR YOU TO DETERMINE.

5            I'LL GO INTO THIS A BIT LATER AS WELL, BUT BOTH

6    SIDES, AS YOU HEARD, ARE GOING TO HAVE EXPERTS.  YOU CANNOT

7    DECIDE THIS CASE ON THE BASIS OF THOSE TWO EXPERTS.  YOU

8    CAN'T SAY, WELL, I LIKE THIS SIDE'S EXPERT BETTER OR I

9    THOUGHT THE OTHER ONE TESTIFIED BETTER.  THEY'RE JUST HERE TO

10   ILLUSTRATE CERTAIN POINTS OF POLICE PROCEDURE, WHICH, AS LAY

11   PEOPLE, MIGHT NOT BE OBVIOUS TO YOU.  BUT THEIR TESTIMONY

12   CANNOT BY ITSELF DECIDE THIS CASE.  THE ONLY THING THAT IS

13   GOING TO RENDER A FAIR AND JUST VERDICT IN THIS CASE IS YOUR

14   DETERMINING WHAT THE FACTS WERE AND THEN APPLYING THE LAW.

15           SO, WITH THAT, WE WILL NOW GET UNDERWAY WITH THE

16   EVIDENCE.

17           MR. GALIPO?

18           MR. GALIPO:  YES.  THANK YOU, YOUR HONOR.

19           THE PLAINTIFFS WOULD LIKE TO CALL OFFICER ROY

20   LOPEZ, PLEASE.

21   **OFFICER ROY LOPEZ, PLAINTIFFS' WITNESS, SWORN**

22           THE CLERK:  PLEASE BE SEATED.

23           PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

24           THE WITNESS:  ROY LOPEZ; R-O-Y, L-O-P-E-Z.

25           THE CLERK:  THANK YOU.

1                    **DIRECT EXAMINATION**

2    BY MR. GALIPO:

3    Q.   GOOD MORNING, OFFICER LOPEZ.

4    A.   GOOD MORNING, SIR.

5    Q.   WHO DO YOU CURRENTLY WORK FOR?

6    A.   CURRENTLY EMPLOYED WITH THE CITY OF CULVER CITY.

7    Q.   YOU GRADUATED FROM THE POLICE ACADEMY IN APRIL 2009?

8    A.   YES, SIR.

9    Q.   YOU ACTUALLY WENT TO THE POLICE ACADEMY MORE THAN ONCE?

10   A.   YES.

11   Q.   AND YOU WERE ON PROBATION FOR ABOUT A YEAR AFTER

12   GRADUATING; IS THAT TRUE?

13   A.   YES, SIR.

14   Q.   AND YOUR GRAD -- YOUR PROBATION PERIOD ENDED IN APRIL OF

15   2010; IS THAT CORRECT?

16   A.   WOULD BE MAY 11TH, SIR, AS MY SWEAR-IN DATE.

17   Q.   MAY 11TH, 2010?

18   A.   YES, SIR.

19   Q.   AND SO THIS INCIDENT HAPPENED APRIL 25TH, 2010; IS THAT

20   CORRECT?

21   A.   YES, SIR.

22   Q.   SO ARE YOU SAYING YOUR SWEAR-IN DATE WAS AFTER THIS

23   INCIDENT?

24   A.   MY SWEAR-IN DATE WAS A COUPLE WEEKS AFTER I GRADUATED,

25   SIR.

1    Q.   WHAT YEAR WAS YOUR SWEAR-IN DATE?

2    A.   2009.

3    Q.   OKAY.  SO YOUR SWEAR-IN DATE WAS ACTUALLY MAY 11, 2009;

4    IS THAT TRUE?

5    A.   YES, SIR.

6    Q.   AND THEN YOU WERE ON PROBATION FOR A YEAR UNTIL APRIL OF

7    2010?

8    A.   TILL MAY, YES, SIR.

9    Q.   OKAY.  SO WERE YOU ON PROBATION WHEN THIS INCIDENT

10   HAPPENED ON APRIL 25TH, 2010?

11   A.   YES, SIR.

12   Q.   YOU DID GIVE A STATEMENT AT SOME POINT; IS THAT TRUE?

13   A.   YES, SIR.

14   Q.   AND WAS IT RECORDED, TO YOUR KNOWLEDGE?

15   A.   I BELIEVE SO, YES, SIR.

16   Q.   HAVE YOU BEEN PROVIDED WITH A TRANSCRIPT OF THAT

17   STATEMENT AT SOME POINT?

18   A.   YES, SIR.

19   Q.   WHEN WAS THE LAST TIME YOU HAVE REVIEWED IT?

20   A.   THIS MORNING.

21   Q.   YOUR DEPOSITION WAS TAKEN AT SOME POINT BY ATTORNEYS IN

22   THIS CASE; IS THAT TRUE?

23   A.   YES, SIR.

24   Q.   AND HAVE YOU HAD A CHANCE TO REVIEW THAT DEPOSITION?

25   A.   YES, SIR.

```
 1    Q.   WHEN WAS THE LAST TIME YOU HAVE REVIEWED THAT?

 2    A.   LAST NIGHT TO THIS MORNING.

 3    Q.   OKAY.  NOW, AT SOME POINT YOU SEE A GREEN VEHICLE,

 4    CORRECT?

 5    A.   YES, SIR.

 6    Q.   WHAT TYPE OF VEHICLE WAS IT?

 7    A.   TO WHAT I REMEMBER, A GREEN CHRYSLER SEBRING, SIR.

 8    Q.   WHERE WERE YOU WHEN YOU FIRST SAW THE CAR?

 9         MR. ROTHANS:  OBJECTION, YOUR HONOR.  VAGUE AND

10    AMBIGUOUS.  LACKS FOUNDATION.

11         THE COURT:  OVERRULED.

12         BUT I'M SURE THE JURY UNDERSTANDS THIS, MR. GALIPO,

13    BUT ESTABLISH WHEN AND WHERE THIS WAS -- THAT THIS WAS ON

14    APRIL 25TH, 2010.

15         MR. GALIPO:  OH, SUR.

16    BY MR. GALIPO:

17    Q.   DID YOU FIRST SEE THE VEHICLE AT SOME POINT ON -- IN THE

18    MORNING OF APRIL 25TH, 2010?

19    A.   YES, SIR.

20    Q.   WERE YOU STOPPED AT A RED LATE AT THAT TIME?

21    A.   YES, SIR.

22    Q.   WHAT INTERSECTION WERE YOU STOPPED FOR?

23    A.   I WAS STOPPED AT OVERLAND NORTH, JUST AT VENICE.

24    Q.   AND THE VEHICLE AT -- WHERE WAS THE VEHICLE WHEN YOU

25    FIRST SAW IT?
```

```
 1    A.   THE VEHICLE WHEN I FIRST SAW IT, IT WAS -- I HAD CAME TO

 2    A STOP AND I HAD SEEN IT, I GUESS YOU'D SAY, COME OFF AN

 3    ACCELERATION FROM MY LEFT TO MY RIGHT.  SO FROM THE EAST TO

 4    THE WEST SIDE.

 5    Q.   DID YOU OBSERVE THE VEHICLE MAKE A RIGHT TURN?

 6    A.   WHEN WAS THAT, SIR?

 7    Q.   AT ANY TIME.

 8    A.   EVENTUALLY, YES, I DID.

 9    Q.   WHAT STREET DID IT TURN RIGHT ON?

10    A.   IT TURNED RIGHT ONTO MOTOR SOUTH OF VENICE.

11    Q.   AT SOME POINT, DID YOU ACTIVATE YOUR LIGHTS?

12    A.   YES, I DID.

13    Q.   AND DID THE VEHICLE PULL OVER AFTER YOU ACTIVATED YOUR

14    LIGHTS?

15    A.   IT DID, YES.

16    Q.   AND WHERE DID IT PULL?

17    A.   IT PULLED -- AFTER THE RIGHT TURN ONTO MOTOR SOUTH, IT

18    PULLED IMMEDIATELY INTO THE DONUT KING PARKING LOT.

19    Q.   ALL RIGHT.

20            MR. GALIPO:  I'D LIKE TO SHOW YOU AN EXHIBIT BY

21    AGREEMENT, YOUR HONOR, EXHIBIT 36-1.

22            THE COURT:  IT WILL BE RECEIVED.

23               (EXHIBIT 36-1 IN EVIDENCE.)

24         MR. GALIPO:  MAY I PUBLISH?

25            THE COURT:  YOU MAY.  AND ONCE IT'S IN EVIDENCE,
```

1   YOU DON'T NEED TO ASK MY -- YOU'RE GIVEN PERMISSION TO

2   PUBLISH.

3           MR. GALIPO:  THANK YOU, YOUR HONOR.

4   BY MR. GALIPO:

5   Q.  LOOKING AT EXHIBIT 36-1, THIS, IN FACT, WAS AN EXHIBIT

6   ATTACHED TO YOUR DEPOSITION.

7           DO YOU RECOGNIZE WHAT'S IN THIS EXHIBIT?

8   A.  YES, SIR.

9           I WAS ACTUALLY WONDERING IF YOU COULD -- MIND

10  ZOOMING IT OUT A LITTLE BIT FOR ME, PLEASE.

11  Q.  WHAT WOULD YOU LIKE?

12  A.  IF YOU MIND ZOOMING IT OUT FOR ME A LITTLE BIT, PLEASE.

13  Q.  I DON'T MIND AT ALL.

14          THAT'S ALL THAT ZOOMS OUT.

15  A.  OKAY.

16  Q.  I CAN MOVE IT AROUND IF YOU WANT, BUT LET ME JUST -- LET

17  ME JUST ASK YOU A FEW BASIC QUESTIONS.

18          WE SEE A VEHICLE THAT SAYS C63 AT THE TOP.  DO YOU

19  SEE THAT?

20  A.  YES, SIR.

21  Q.  IS THAT YOUR VEHICLE?

22  A.  YES, IT IS.

23  Q.  AND TO THE RIGHT, THERE'S A VEHICLE THAT SAYS C62, DO

24  YOU SEE THAT?

25  A.  YES.

1   Q.   AND WAS THAT THE VEHICLE DRIVEN BY OFFICER ZERBEY AND

2   FAIRBANKS?

3   A.   YES, SIR.

4   Q.   AND WE SEE WHAT APPEARS TO BE THIS GREEN VEHICLE PARKED

5   IN THE PARKING LOT.

6           WAS THAT THE VEHICLE THAT YOU STOPPED?

7   A.   THE ONE DIRECTLY IN FRONT OF C63, YES, SIR.

8   Q.   ALL RIGHT.  AND, AT SOME POINT, DID YOU OBSERVE A FEMALE

9   PASSENGER --

10           THE COURT:  MR. GALIPO, IF I COULD -- SINCE THIS IS

11   THE FIRST EXHIBIT, IF I COULD ASK YOU, ORIENT US IN TERMS OF

12   NORTH, SOUTH, EAST, WEST, AND THEN MOTOR AND VENICE.

13           FOR INSTANCE, OFFICER LOPEZ, I TAKE IT THAT MOTOR

14   IS THE STREET THAT WE CAN SEE IN THE LOWER LEFT OF THE

15   EXHIBIT?

16           THE WITNESS:  YES, YOUR HONOR.

17           THE COURT:  AND SOUTH ON MOTOR WOULD BE TO THE LEFT

18   OF THE EXHIBIT?

19           THE WITNESS:  YES, YOUR HONOR.

20           THE COURT:  AND VENICE IS RUNNING FROM EAST, WEST,

21   BUT IT'S NOT REALLY VISIBLE HERE, IT WOULD BE ON THE RIGHT OF

22   THE EXHIBIT?

23           THE WITNESS:  YES, YOUR HONOR.

24           THE COURT:  THANK YOU.

25           MR. GALIPO:  THANK YOU, YOUR HONOR.

1            I'M GOING TO SHOW TWO OTHER EXHIBITS TO HELP WITH

2    THAT BY AGREEMENT, 372-02.

3            THE COURT:  ALL RIGHT.  IT WILL BE RECEIVED.

4            YOU MAY PUBLISH.

5                (EXHIBIT 372-02 IN EVIDENCE.)

6    BY MR. GALIPO:

7    Q.   JUST SO WE'RE CLEAR, THE STREET THAT WE SEE RUNNING FROM

8    LEFT TO RIGHT AT THE BOTTOM OF THIS PHOTOGRAPH IS WHAT

9    STREET?

10   A.   IT WOULD BE CONSIDERED MOTOR.

11   Q.   OKAY.  AND LOOKING AT 775-4768 BY AGREEMENT -- OH, I

12   STRIKE THAT.

13           IT'S 17-01.  IT HAS TWO MARKINGS ON IT.  IT'S 17-01

14   BY AGREEMENT.

15           THE COURT:  ALL RIGHT.  IT WILL BE RECEIVED.

16                (EXHIBIT 17-01 RECEIVED.)

17   BY MR. GALIPO:

18   Q.   AND THE ROADWAY THAT RUNS ON THE LEFT SIDE OF THIS

19   PHOTOGRAPH WOULD BE WHICH ROAD?

20   A.   IT WOULD BE CONSIDERED VENICE BOULEVARD, SIR.

21   Q.   THANKS.

22           AND DOES VENICE BOULEVARD RUN EAST AND WEST?

23   A.   YES, SIR.

24   Q.   AND LOOKING AT THIS PHOTOGRAPH, WOULD EAST BE TO THE TOP

25   AND WEST BE TO THE BOTTOM?

1    A.    YES, SIR.  EAST --

2    Q.    GO AHEAD.  I'M SORRY.

3    A.    I'M SORRY.

4          I'D SAY EAST, TOP LEFT; AND WEST, BOTTOM LEFT.

5    Q.    OKAY.  LOOKING AT THE -- WHAT TYPE OF VEHICLE WAS IT

6    AGAIN?

7    A.    WHICH VEHICLE, SIR?

8    Q.    THE GREEN VEHICLE?

9    A.    THE CHRYSLER SEBRING.

10   Q.    OKAY.  LOOKING AT THE SEBRING, WHICH DIRECTION WAS THE

11   FRONT OF THAT VEHICLE GENERALLY FACING?

12   A.    AT THE TIME OF THE STOP, IT WAS FACING WEST.

13   Q.    OKAY.  THANK YOU.

14         NOW, YOU, AT SOME POINT, GET OUT OF YOUR VEHICLE;

15   IS THAT TRUE?

16   A.    YES.

17   Q.    DO YOU MAKE A DISPATCH AT SOME POINT BEFORE GETTING OUT

18   THAT YOU BELIEVE YOU HAVE A POTENTIAL SUSPECT IN THE ROBBERY?

19   A.    PRIOR TO EVEN ACTIVATING MY LIGHTS, I DID, SIR.

20   Q.    ALL RIGHT.  AND, NOW, WHEN YOU GET OUT OF YOUR VEHICLE,

21   WHERE DO YOU FIRST GO?

22   A.    BECAUSE I WAS A ONE-MAN UNIT AND I BELIEVE THAT THE

23   SUBJECT WAS AN ACTUAL SUSPECT, I EXITED MY VEHICLE AND I WENT

24   TO THE LEFT -- LEFT REAR OF MY VEHICLE TOWARDS THE TRUNK.

25   Q.    OKAY.  WE SEE IN THIS EXHIBIT 36-1 AN L-1.  IS THAT THE

1    BASIC POSITION YOU WENT TO?  I'LL ZOOM IN A LITTLE BIT.

2    A.   YES, SIR.

3    Q.   OKAY.  SO YOU'RE ACTUALLY -- AND THE REAR PASSENGER

4    SIDE, BUT IN THE REAR ON THE RIGHT SIDE OF THE VEHICLE?

5    A.   YES.

6    Q.   OKAY.  NOW, BEFORE YOU GOT TO THAT POSITION, DID ANYONE

7    GET OUT OF THE CAR AND START RUNNING AWAY?

8    A.   FROM THE ACTUAL CAR THAT WAS PULLED OVER, SIR?

9    Q.   YES.

10   A.   NO, SIR.

11   Q.   DID THE CAR TAKE OFF WHEN YOU GOT OUT OF YOUR CAR?  DID

12   THE CAR TAKE OFF AND FLEE?

13   A.   NO, SIR.

14   Q.   OKAY.  NOW, DID YOU GIVE SOME COMMANDS TO THE PEOPLE AS

15   YOU WERE MOVING TO THAT POSITION?

16   A.   YES, SIR.

17   Q.   WHAT COMMANDS DID YOU GIVE?

18   A.   SOON AS I EXITED MY VEHICLE, I -- I DON'T REMEMBER THE

19   EXACT WORDING, BUT I SAID THINGS IN REGARD TO KEEPING THEIR

20   HANDS UP, GET YOUR HANDS UP.

21   Q.   AT SOME POINT, DID OTHER OFFICERS ARRIVE?

22   A.   YES, SIR.

23   Q.   WHO WAS NEXT TO ARRIVE?

24   A.   IT WOULD BE OFFICER ZERBEY AND OFFICER FAIRBANKS TO MY

25   RIGHT.

1    Q.   OKAY.  AND DID THEY ARRIVE IN THE VEHICLE THAT'S MARKED

2    C62?

3    A.   YES, SIR.

4    Q.   AND WERE YOU STILL IN POSITION L1 WHEN THEY ARRIVED?

5    A.   YES.

6    Q.   AND, IF YOU KNOW, WHO WAS DRIVING THAT VEHICLE?

7    A.   I DON'T REMEMBER, BUT FROM WHAT I REMEMBER ON WHERE THEY

8    WERE WHEN I MOVED, OFFICER ZERBEY WAS AT THE DRIVER'S SIDE

9    AND I WAS AT -- AND OFFICER FAIRBANKS WAS AT THE PASSENGER

10   SIDE.

11   Q.   OKAY.  AT SOME POINT, DID YOU SEE WHERE OFFICER ZERBEY

12   POSITIONED HIMSELF AFTER EXITING HIS VEHICLE?

13   A.   YES, SIR.

14   Q.   AND WHERE DID OFFICER ZERBEY POSITION HIMSELF?

15   A.   AT THAT DRIVER'S SIDE DOOR, SIR.

16   Q.   AND I'M GOING TO POINT, YOU'RE TALKING THE DRIVER'S SIDE

17   DOOR OF VEHICLE C62 WHERE I'M POINTING WITH MY PEN?

18   A.   FROM WHAT I REMEMBER, YES, SIR.

19   Q.   AND DID YOU, AT SOME POINT, CHANGE POSITIONS?

20   A.   YES, SIR.

21   Q.   WHERE DID YOU GO TO AFTER LEAVING POSITION L1?

22   A.   ON THE MAP, IT'S -- IT WOULD BE L2.  I WENT AROUND TO

23   THAT PASSENGER DOOR OF C62.

24   Q.   OKAY.  SO YOU -- AND I'M GOING TO POINT AND YOU TELL ME

25   IF THIS IS CORRECT.  THERE'S A RED X ON THE PASSENGER SIDE OF

1    C62, IS THAT THE POSITION YOU WENT TO?

2    A.    THE GENERAL AREA, YES, SIR.

3    Q.    IS THAT THE POSITION YOU WERE IN WHEN THE SHOTS WERE

4    FIRED?

5    A.    YES, SIR.

6    Q.    NOW, FOR HOW LONG, APPROXIMATELY, DO YOU THINK YOU WERE

7    AT POSITION L1?

8    A.    MAYBE A MINUTE OR TWO.

9    Q.    ALL RIGHT.  DURING THAT TIME, DID YOU EVER SEE WHAT YOU

10   BELIEVED TO BE A GUN IN THE CAR?

11   A.    FROM MY VIEW, I COULD NOT SEE, SIR.

12   Q.    WERE THE WINDOWS TINTED?

13   A.    NO, SIR.

14   Q.    WAS IT DAYLIGHT?

15   A.    YES.

16   Q.    WAS YOUR EYESIGHT GOOD AT THAT TIME, AS FAR AS YOU KNOW?

17   A.    FROM WHAT I KNOW, YES, SIR.

18   Q.    YOU DIDN'T WEAR GREASES OR CORRECTIVE LENSES, DID YOU?

19   A.    NO.  THERE WAS A SLIGHT OVERCAST, BECAUSE THE SUN, AT

20   THAT TIME, WAS KIND OF A LITTLE SOUTH, SO LITTLE BIT TOWARDS

21   THE RIGHT, BUT I -- FROM WHAT I WAS ABLE TO SEE, NO, SIR.

22   Q.    OKAY.  IN FACT, AT ANY TIME WHILE YOU WERE AT POSITION

23   L1, DID YOU SEE ANYTHING IN THE HANDS OF EITHER PERSON IN THE

24   VEHICLE?

25   A.    FROM WHAT I SAW, I COULDN'T SEE, NO, SIR.

1   Q.   AS PART OF YOUR TRAINING, IF YOU SEE AN OBJECT IN A

2   SUSPECT'S HANDS, IS PART OF YOUR TRAINING TO TELL HIM TO

3   "DROP IT"?

4   A.   YES, SIR.

5   Q.   NOW, AT ANY TIME WHILE YOU WERE AT L1, DID YOU SAY,

6   "DROP IT"?

7   A.   NO, SIR.

8   Q.   AT ANY TIME WHILE YOU WERE AT L2, DID YOU SAY, "DROP

9   IT"?

10  A.   NO, SIR.

11  Q.   DID YOU HEAR ANY OFFICER AT ANY TIME BEFORE THE SHOTS

12  WERE FIRED SAY, "DROP IT"?

13  A.   FROM WHAT I REMEMBER, I DON'T REMEMBER.

14  Q.   YOU DON'T REMEMBER WHAT?

15  A.   I DON'T REMEMBER HEARING ANYONE SAY THAT.

16  Q.   OKAY.  THANK YOU.

17          HOW FAR DO YOU THINK YOU WERE AT L2?

18          THE COURT:  I'M SORRY --

19          MR. GALIPO:  I'LL FINISH.  THAT WAS --

20  BY MR. GALIPO:

21  Q.   FOR HOW LONG A PERIOD OF TIME WERE YOU AT L2 BEFORE THE

22  SHOTS WERE FIRED?

23  A.   I WOULDN'T -- I'D ESTIMATE MAYBE A MINUTE OR TWO, NOT

24  TOO SURE, SIR.

25  Q.   OKAY.  NOW, WHILE YOU WERE AT L1, AT ANY POINT WHILE YOU

1   WERE AT L1, DID YOU SEE EITHER THE FEMALE DRIVER OR THE MALE

2   PASSENGER HAVE THEIR HANDS UP IN THE VEHICLE?

3   A.   BOTH SUBJECTS WOULD OFF AND ON DROP THEM AND RAISE THEM

4   UP AGAIN.

5   Q.   SO THERE WERE POINTS WHEN YOU DID SEE THE HANDS UP?

6   A.   YES, SIR.

7   Q.   OKAY.  NOW, WHEN YOU WERE AT L2, DID YOU SEE A TIME WHEN

8   THEIR HANDS WERE UP?

9   A.   YES, SIR.

10  Q.   DID YOU HAVE AN UNDERSTANDING AS TO WHETHER OFFICER

11  MARTINEZ ARRIVED ON SCENE AT SOME POINT?

12  A.   I KIND OF REMEMBER HIM ARRIVING, YES, SIR.

13  Q.   DO YOU KNOW WHERE HE POSITIONED HIMSELF?

14  A.   AT MY DRIVER'S SIDE DOOR --

15  Q.   OKAY.

16  A.   -- ON THE LEFT SIDE OF C63.

17  Q.   ALL RIGHT.  SO I'M GOING TO POINT TO THE DRIVER'S SIDE

18  OF C63.  TO YOUR UNDERSTANDING, THAT'S WHERE OFFICER MARTINEZ

19  WAS?

20  A.   FROM WHAT I REMEMBER, YES, SIR.

21  Q.   AND OFFICER ZERBEY, YOU TOLD ME, WAS ON THE DRIVER SIDE

22  OF C62; CORRECT?

23  A.   FROM WHAT I REMEMBER, YES, SIR.

24  Q.   AND YOU WERE ON THE PASSENGER SIDE OF C62?

25  A.   YES, SIR.

```
 1    Q.   DID YOU HAVE AN UNDERSTANDING AS TO WHERE OFFICER

 2    FAIRBANKS WAS?

 3    A.   THE GENERAL AREA, YES, SIR.

 4    Q.   WHAT WAS YOUR UNDERSTANDING?

 5    A.   TO MY RIGHT SIDE, I GUESS -- WELL, IF YOU LOOK AT THE

 6    PICTURE, IT WOULD BE TO MY RIGHT TOWARDS THE TRASH?  CAN YOU

 7    SEE THE TRASH CAN, SIR?

 8    Q.   OKAY.  ALL RIGHT.  NOW, WHAT WOULD YOU ESTIMATE --

 9    STRIKE THAT.

10         AT SOME POINT, WAS THE PASSENGER OF THE CAR ORDERED

11    OUT?

12    A.   YES, SIR.

13    Q.   AND WAS HE EVER REQUESTED TO PUT HIS HANDS OUT THE

14    WINDOW?

15    A.   AT ONE POINT, YES, SIR.

16    Q.   AND WHEN HE WAS -- WHO MADE THAT REQUEST?

17    A.   I DON'T REMEMBER SPECIFICALLY, BUT IT WAS -- IT WAS DONE

18    DUE TO THE FACT THAT HE KEPT DROPPING HIS HANDS AND KIND OF

19    MOVING AROUND IN THE VEHICLE.

20    Q.   WELL, YOUR UNDERSTANDING, THIS WAS A FELONY TRAFFIC

21    STOP; CORRECT?

22    A.   TO AN EXTENT, YES, SIR.

23    Q.   WELL, WAS THERE AN EXTENT IT WASN'T A FELONY TRAFFIC

24    STOP IN YOUR MIND?

25    A.   EVERY SITUATION IS A LITTLE DIFFERENT, SIR, AND
```

1    UNFORTUNATELY LIFE IS UNPREDICTABLE --

2    Q.   SIR, HERE'S WHAT I'M ASKING YOU:  DID YOU THINK THIS WAS

3    A FELONY TRAFFIC STOP?

4    A.   YES, I DID.

5    Q.   OKAY.  DO YOU HAVE TRAINING WITH RESPECT TO FELONY

6    TRAFFIC STOPS?

7    A.   YES, SIR.

8    Q.   AND, AS PART OF YOUR TRAINING IN A FELONY -- FOR FELONY

9    TRAFFIC STOPS TO TELL THE PERSON TO PUT THEIR HANDS OUT THE

10   WINDOW BEFORE THEY GET OUT OF THE CAR?

11   A.   IT DEPENDS.  SOME PEOPLE HAVE THEIR CAR WINDOWS ROLLED

12   UP.

13   Q.   THIS WINDOW WAS DOWN; CORRECT?

14   A.   YES, SIR.

15   Q.   IN ANY EVENT, AT SOME POINT AFTER HE WAS ASKED TO PUT

16   HIS HANDS OUT THE WINDOW, DID HE?

17   A.   YES, SIR.

18   Q.   AND WHEN HE DID THAT, WERE YOU IN POSITION L2?

19   A.   YES, SIR.

20   Q.   AND WHEN HE DID THAT, COULD YOU SEE HIS HANDS?

21   A.   YES.

22   Q.   DID HE HAVE ANYTHING IN HIS HANDS?

23   A.   FROM WHAT I COULD SEE, NO, SIR.

24   Q.   ALL RIGHT.  AND YOU WERE LOOKING RIGHT AT HIS HANDS;

25   CORRECT?

1    A.   I WAS LOOKING AT HIM, YES, SIR.

2    Q.   WELL, YOU'RE TRAINED, ARE YOU NOT, TO ALSO LOOK AT THE

3    HANDS IN THE SITUATION LIKE THIS; TRUE?

4    A.   YES, SIR.

5    Q.   AND YOU WERE FOLLOWING THAT TRAINING AND LOOKING AT HIS

6    HANDS; CORRECT?

7    A.   I WAS LOOKING AT HIM AND THE HANDS, YES, SIR.

8    Q.   ALL RIGHT.  NOW, AT SOME POINT, DID SOMEONE -- DID HE

9    SAY WORDS TO THE EFFECT:  "CAN I TAKE MY SEAT BELT OFF"?

10   A.   I DON'T REALLY REMEMBER, NO, SIR.

11   Q.   YOU DON'T REMEMBER THAT?

12   A.   NO.  I DO REMEMBER HIM, I GUESS, KEEPING ONE HAND IN AND

13   ONE HAND OUT TO OPEN THE DOOR, BUT I DON'T REMEMBER THE

14   ACTUAL WORDS BEING SAID, NO, SIR.

15   Q.   DO YOU REMEMBER AT SOME POINT HIM SAYING -- HIM BEING

16   ASKED TO OPEN THE DOOR FROM THE OUTSIDE?

17   A.   I -- I BELIEVE SO, SIR.  I DON'T REALLY REMEMBER.

18   Q.   IS THAT PART OF YOUR TRAINING ON A FELONY TRAFFIC STOP?

19   A.   IT -- IT'S -- AT THAT POINT, HE WAS GOING TO OPEN THE

20   DOOR REGARDLESS, SIR.

21   Q.   OKAY.  DO YOU RECALL HIM SAYING WORDS TO THE EFFECT,

22   "IT'S BROKEN, I CAN'T; CAN I OPEN IT FROM THE INSIDE"?

23   A.   I DON'T REALLY REMEMBER, SIR.

24   Q.   IN ANY EVENT, AT SOME POINT, DID THE DOOR OPEN?

25   A.   YES, SIR.

1    Q.   AND DID HE GET OUT?

2    A.   YES.

3    Q.   AND WHEN HE GOT OUT, WERE YOU LOOKING AT HIS HANDS?

4    A.   I WAS LOOKING AT HAS HANDS.

5    Q.   DID YOU SEE ANYTHING IN HIS HANDS AS HE GOT OUT FROM THE

6    VEHICLE?

7    A.   FROM WHAT I COULD FIGURE OUT WHAT IT WAS, NO, SIR, I

8    COULD NOT THINK OF ANYTHING.

9    Q.   WELL, DID YOU SEE ANYTHING IN HIS HANDS?

10   A.   NO --

11   Q.   I MEAN, IF YOU WOULD HAVE SEEN SOMETHING IN HIS HANDS,

12   YOU PRETTY MUCH TOLD US YOU WOULD HAVE TOLD HIM TO "DROP IT;"

13   CORRECT?

14        THE COURT:  MR. GALIPO, LET THE -- MAKE SURE THE

15   WITNESS HAS FINISHED HIS ANSWER BEFORE YOU ASK YOUR NEXT

16   QUESTION.

17        MR. GALIPO:  I APOLOGIZE.

18        THE COURT:  GO AHEAD.

19   BY MR. GALIPO:

20   Q.   WERE YOU FINISHED WITH YOUR ANSWER?

21   A.   GO RIGHT AHEAD, SIR.

22   Q.   IF YOU WOULD HAVE SEEN SOMETHING IN HIS HANDS, YOU WOULD

23   HAVE TOLD HIM TO "DROP IT;" TRUE?

24   A.   IF I WOULD HAVE SAW SOMETHING THAT I COULD DECIPHER WHAT

25   IT IS, OF COURSE, YES.

1    Q.   WELL, IF YOU SAW ANYTHING IN HIS HANDS, YOU WOULD HAVE

2    TOLD HIM "DROP IT," WOULDN'T YOU HAVE?

3    A.   OF COURSE.

4    Q.   NOW, WHEN HE GETS OUT OF THE VEHICLE HE IMMEDIATELY

5    TURNS TOWARDS THE OFFICERS; TRUE?

6    A.   YES, SIR.

7    Q.   AND WHEN HE TURNED TOWARDS THE OFFICERS, YOU'RE STILL

8    LOOKING AT HIS HANDS; CORRECT?

9    A.   I'M LOOKING AT SEVERAL THINGS, SIR.

10   Q.   INCLUDING HIS HANDS?

11   A.   INCLUDING HIS HANDS.

12   Q.   AND WHAT WOULD YOU ESTIMATE YOUR DISTANCE TO BE FROM HIM

13   AT THAT POINT?

14   A.   ANYWHERE BETWEEN 10 TO 15 FEET, PROBABLY.

15   Q.   10 TO 15 FEET.

16        WAS THERE ANYTHING OBSTRUCTING YOUR VIEW FROM HIM?

17   A.   NO, SIR.

18   Q.   NOW, AFTER HE GETS OUT AND FACES TOWARDS THE OFFICERS,

19   HE WOULD ALSO BE FACING GENERALLY IN YOUR DIRECTION; CORRECT?

20   A.   YES, SIR.

21   Q.   SO IF THE FRONT OF THE CAR WAS FACING WEST, HE WOULD BE

22   FACING EAST; CORRECT?

23   A.   TURNED AROUND, YES.

24   Q.   DID ANYONE AT ANY POINT IN TIME TELL HIM TO TURN AWAY

25   FROM THE OFFICERS BEFORE THE SHOTS WERE FIRED?

```
 1   A.   FROM WHAT I REMEMBER, NO, SIR.

 2   Q.   NOW, DID YOU HEAR OFFICER ZERBEY MAKING COMMANDS?

 3   A.   YES.

 4   Q.   YOU WERE ALSO MAKING COMMANDS; CORRECT?

 5        MR. ROTHANS:  VAGUE AND AMBIGUOUS AS TO TIME, YOUR

 6   HONOR.

 7        THE COURT:  OVERRULED.

 8        THE WITNESS:  I WASN'T MAKING COMMANDS, NO.

 9   GENERALLY, SIR, ONE PERSON KIND OF MAKES THE COMMANDS.  IF

10   ANOTHER OFFICER, DUE TO THE FACT WE HAD DIFFERENT ANGLES,

11   ANOTHER OFFICER SEES SOMETHING, WE'LL USUALLY SAY IT OUT, BUT

12   GENERALLY DUE TO THE FELONY TRAFFIC STOP, ONE PERSON IS THE

13   MAIN PERSON THAT SAYS IT, SIR.

14   BY MR, GALIPO:

15   Q.   ALL RIGHT.  FIRST OF ALL, WITH RESPECT TO YOUR

16   TRAINING --

17   A.   YES, SIR.

18   Q.   -- IN A FELONY TRAFFIC STOP YOU'RE TRAINED THAT ONLY ONE

19   PERSON SHOULD GIVE COMMANDS TO AVOID CONFUSION; CORRECT?

20   A.   YES, SIR.

21   Q.   BUT YOU, IN THIS CASE, YOURSELF, WERE GIVING COMMANDS,

22   FIRST OF ALL, WHILE HE WAS IN THE CAR; TRUE?

23   A.   WHEN WAS THIS, SIR?

24   Q.   WHILE HE WAS IN THE CAR, WERE YOU GIVING COMMANDS AT ANY

25   TIME?
```

1          THE COURT:  AND IF YOU COULD ESTABLISH WHETHER IT

2    WAS BEFORE OR AFTER ANYONE ELSE ARRIVED.

3          MR. GALIPO:  EITHER, YOUR HONOR, AT THIS POINT.

4          THE WITNESS:  GENERALLY, WHEN I GOT OUT OF THE CAR

5    UNTIL I GOT PEOPLE TO GET THEIR -- I GAVE HIM COMMANDS TO

6    KEEP HIS HANDS UP, BOTH THE FEMALE PASSENGER AND MALE

7    PASSENGER.

8    BY MR. GALIPO:

9    Q.   ISN'T IT TRUE, SIR, THAT AFTER HE GOT OUT OF THE CAR,

10   YOU WERE GIVING HIM COMMANDS?

11   A.   I GAVE HIM COMMANDS TO KEEP HIS HANDS UP.

12   Q.   YOU ACTUALLY USED AND EXPLETIVE, DIDN'T YOU?

13   A.   YES, SIR.

14   Q.   AND WHAT DID YOU SAY TO HIM AFTER HE GOT OUT OF THE CAR?

15   A.   I BELIEVE, I HAD TO SAY, "GET YOUR FUCKING HANDS UP."

16   Q.   OKAY.  SO YOU WERE GIVING COMMANDS, OFFICER ZERBEY WAS

17   ALSO GIVING COMMANDS AFTER HE GOT OUT OF THE CAR; CORRECT?

18   A.   NOT AT THE SAME TIME, NO.

19   Q.   WAS OFFICER ZERBEY GIVING COMMANDS AFTER HE GOT OUT OF

20   THE CAR?

21   A.   YES.

22   Q.   WAS OFFICER MARTINEZ GIVING COMMANDS AFTER HE GOT OUT OF

23   THE CAR?

24   A.   FROM WHAT I COULD HEAR AND WHAT I REMEMBER, I DON'T

25   REMEMBER.

```
 1   Q.   ISN'T IT TRUE, SIR, THAT MULTIPLE OFFICERS WERE GIVING

 2   HIM COMMANDS AFTER HE GOT OUT OF THE CAR?

 3   A.   HE DROPPED HIS HANDS SEVERAL TIMES AND I KNOW, BASED ON

 4   OUR TRAINING AND EXPERIENCE, WE TELL HIM TO KEEP HIS HANDS

 5   UP.

 6   Q.   SO YOUR ANSWER IS:  WERE MULTIPLE OFFICERS GIVING HIM

 7   COMMANDS AFTER HE GOT OUT OF THE CAR?

 8   A.   THEY SAW WHAT I SAW, YES.

 9   Q.   ALL RIGHT.  NOW, HOW MUCH TIME PASSED FROM THE TIME HE

10   GOT OUT OF THE CAR TO THE TIME OF THE SHOTS?

11   A.   I -- I WOULDN'T KNOW, SIR, MAYBE ONE OR TWO MINUTES.

12   MAYBE THREE.

13   Q.   AND IT'S YOUR TESTIMONY THAT FROM THE TIME HE GOT OUT

14   AND TURNED TOWARDS THE OFFICERS, WHICH WOULD BE FACING EAST,

15   HE WAS FACING EAST THE ENTIRE TIME UNTIL HE WAS SHOT;

16   CORRECT?

17   A.   HE'S FACING -- YES, EAST.

18   Q.   ALL RIGHT.  YOU NEVER SAW HIM FACING WEST WITH HIS BACK

19   TOWARDS YOU FOR 30 SECONDS OR SO, DID YOU?

20   A.   WHEN HE GOT OUT OF THE VEHICLE, YES.

21   Q.   WAS HE FACING WITH HIS BACK TOWARDS YOU FOR 30 SECONDS?

22   A.   NOT FOR 30 SECONDS, NO, SIR.

23   Q.   I MEAN, YOUR RECOLLECTION IS HE GOT OUT, AND WITHIN A

24   COUPLE SECONDS, TURNED FACING EAST; TRUE?

25   A.   YES, SIR.
```

1  Q.   AND, AT THAT POINT, HE WAS ASKED BY SOMEONE TO PUT HIS

2  HANDS UP; CORRECT?

3  A.   YES.

4  Q.   INCLUDING YOURSELF?

5  A.   YES.

6  Q.   AND YOUR RECOLLECTION IS HE DID PUT HIS HANDS UP; TRUE?

7  A.   YES.

8  Q.   AND WHEN HE PUT HIS HANDS UP, HIS PALMS WERE OUT; IS

9  THAT CORRECT?

10 A.   FROM WHAT I REMEMBER, YES.

11 Q.   SIMILAR TO HOW I HAVE MY HANDS NOW AT THE SIDE OF MY

12 HEAD, PALMS OUT; TRUE?

13 A.   YES, SIR.

14 Q.   NOW, AT THE TIME HE PUT HIS HANDS UP WITH HIS PALMS OUT

15 TO THE SIDE OF HIS HEAD, AS I HAVE MY HANDS NOW, DID YOU SEE

16 ANYTHING IN HIS HANDS?

17 A.   FROM WHAT I COULD TELL, NO.

18 Q.   AND YOU WERE LOOKING AT HIS HANDS; CORRECT?

19 A.   LOOKING AT SEVERAL THINGS, YES, SIR.

20 Q.   INCLUDING HIS HANDS?

21 A.   YES, SIR.

22 Q.   NOW, YOU HAVE AN EXHIBIT IN FRONT OF YOU.  IT'S 205, AND

23 I BELIEVE IT'S A TRANSCRIPT OF YOUR STATEMENT TAKEN IN THIS

24 CASE.  I'D LIKE YOU TO LOOK AT THE FIRST FEW PAGES AND JUST,

25 WITHOUT READING ALL OF IT, TELL ME IF THAT APPEARS TO BE THE

1    TRANSCRIPT OR A COPY OF IT THAT YOU HAVE RECENTLY REVIEWED?

2    A.   YES, SIR.

3    Q.   OKAY.  I'D LIKE YOU SPECIFICALLY --

4          MR. GALIPO:  THIS IS PLAINTIFF'S EXHIBIT 205, YOUR

5    HONOR, IF YOU HAVE THAT EXHIBIT BOOK WITH YOU.

6          THE COURT:  I AM -- I'M SURE I -- HERE IT IS.

7          THANK YOU.

8    BY MR. GALIPO:

9    Q.   AND I'D LIKE TO DIRECT YOUR ATTENTION TO PAGE 18.

10         OKAY.  LOOKING AT A RESPONSE YOU GIVE ON LINES 19

11   TO 22, READ IT TO YOURSELF JUST FOR A MOMENT AND I WANT TO

12   ASK YOU IF YOU RECALL HAVING SOME DISCUSSION WITH OFFICER

13   ZERBEY AT THE SCENE.

14         HAVE YOU READ THOSE FOUR LINES?

15         MR. ROTHANS:  YOUR HONOR, FOR THE SAKE OF

16   COMPLETENESS, COULD HE READ THE ENTIRE RESPONSE TO HIMSELF?

17         THE COURT:  YES.

18         OFFICER, YOU CAN READ BOTTOM OF PAGE 18 AND THEN

19   THE TOP OF PAGE 19.

20         THE WITNESS:  THANK YOU, SIR.

21   BY MR. GALIPO:

22   Q.   HAVE YOU HAD A CHANCE TO READ THAT?

23   A.   YES, SIR.

24   Q.   DO YOU RECALL HAVING A CONVERSATION WITH OFFICER ZERBEY

25   AT THE SCENE?

1    A.    I PROBABLY HAD SEVERAL, YES, SIR.

2    Q.    DO YOU RECALL TELLING OFFICER ZERBEY THAT HE SHOULD

3    START GIVING THE MALE SUSPECT COMMANDS TO GET DOWN?

4              MR. ROTHANS:  VAGUE AND AMBIGUOUS AS TO SPECIFIC

5    TIME, YOUR HONOR.

6              MR. GALIPO:  AT ANY TIME.

7              THE WITNESS:  I BELIEVE IT'S A TYPO AND IT SAYS,

8    "GET OUT."  MAY BE A TYPO.

9    BY MR. GALIPO:

10   Q.    YOU THINK THAT WHERE IT SAYS, "GET DOWN" IS A TYPO?

11             MR. ROTHANS:  YOUR HONOR, NOW, IT CALLS FOR

12   HEARSAY.

13             THE COURT:  THE TESTIMONY -- THE TESTIMONY STANDS.

14   THE -- AND MR. GALIPO CAN EXPLORE THAT, SO THE QUESTION IS

15   APPROPRIATE.

16   BY MR. GALIPO:

17   Q.    ARE YOU SAYING, SIR, WHERE THE TRANSCRIPT SAYS THAT

18   COMMANDS TO GET DOWN, YOU'RE SAYING THAT'S A TYPO?

19             MR. ROTHANS:  YOUR HONOR, RECITING HEARSAY AT THIS

20   POINT.

21             THE COURT:  OKAY.  OVERRULED.

22             THE WITNESS:  WELL, WHEN I GOT DEPOSED THE FIRST

23   TIME IN A -- I BELIEVE IT WAS MR. ROTHANS' -- OR MR. MC

24   NICHOLAS' OFFICES, AND I WAS ASKED IF I REVIEWED THIS, I WAS

25   ASKED IF THERE WAS ANYTHING I WOULD CHANGE, AND I SAID THERE

1    WAS SOME GRAMMATICAL ERRORS, I GUESS YOU'D SAY.  AND LOOKING

2    AT THIS RIGHT NOW, SIR, I BELIEVE IT WAS -- THERE IS A

3    GRAMMATICAL -- OR AN ERROR ON THAT POINT.

4    BY MR. GALIPO:

5    Q.   HAVE YOU EVER LISTENED TO THE AUDIO?

6    A.   OF THE ACTUAL DEPOSITION?

7    Q.   NO.  OF THE -- THIS IS A TRANSCRIPT OF YOUR INTERVIEW,

8    JUST SO WE'RE CLEAR, NOT YOUR DEPOSITION.

9            DO YOU UNDERSTAND THAT?

10   A.   YES, SIR.

11   Q.   HAVE YOU EVER LISTENED TO THE AUDIO?

12   A.   NO, SIR.

13   Q.   THEN HOW WOULD YOU KNOW IF IT WAS A TYPO OR NOT?

14            THE COURT:  BECAUSE MR. GALIPO BECAUSE HE WAS

15   THERE.  I MEAN, IF NEED BE, WE'LL LISTEN TO THE AUDIO, BUT --

16            MR. GALIPO:  THAT'S FINE.

17   BY MR. GALIPO:

18   Q.   IN ANY EVENT, LOOKING AT PAGE 22 OF THAT SAME

19   STATEMENT --

20   A.   PAGE 22, SIR?

21   Q.   YES.

22            LINES 4 AND 5, DID YOU HEAR OFFICERS ZERBEY AT SOME

23   POINT GIVING COMMANDS FOR THE DECEDENT TO START TURNING?

24   A.   CAN I READ IT, SIR?

25   Q.   SURE.

1    A.   THANK YOU.

2    Q.   HAVE YOU HAD A CHANCE TO READ THAT?

3    A.   YES, SIR.

4    Q.   IN YOUR INITIAL STATEMENT, DID YOU SAY THAT YOU HEARD

5    OFFICER ZERBEY GIVING COMMANDS TO START TURNING?

6             MR. ROTHANS:  OBJECTION.  HEARSAY, YOUR HONOR.

7             THE COURT:  OVERRULED.

8             THE WITNESS:  PRIOR TO THAT, HE WAS ACTUALLY FACING

9    US, SIR, SO --

10   BY MR. GALIPO:

11   Q.   BUT MY QUESTION IS:  DID YOU HEAR OFFICER ZERBEY GIVING

12   COMMANDS FOR MR. GRISSOM TO START TURNING?

13   A.   AT SOME POINT, BECAUSE HE WAS FACING US, HE DID GIVE HIM

14   THAT COMMAND --

15   Q.   DID YOU HEAR THAT?

16   A.   -- OF SOME SORT.

17             YES, SIR.

18   Q.   OKAY.  NOW -- SO IT'S FAIR TO SAY THAT YOU HEARD

19   COMMANDS OTHER THAN JUST PUT YOUR HANDS UP AFTER HE WAS OUT

20   OF THE CAR; CORRECT?

21   A.   HE WOULD SAY THAT, YES, SIR.

22   Q.   ALL RIGHT.  NOW, IN ANY EVENT, FROM THE TIME HE'S OUT

23   WITH HIS HANDS UP FACING EAST, PALMS OUT, AND YOU COULD SEE

24   NOTHING IN HIS HANDS, FROM THAT POINT OF TIME TO THE SHOTS,

25   HOW MUCH TIME PASSED?

1   A.   I WOULDN'T -- I WOULDN'T KNOW -- REMEMBER, SIR, MAYBE

2   ONE, TWO TO THREE MINUTES.

3   Q.   OKAY.

4   A.   ONE OR THREE MINUTES.

5   Q.   AND YOU DIDN'T SEE HIM, DID YOU, SUDDENLY MAKE A

6   SPINNING MOTION AND THEN BEING SHOT IN ONE SECOND, DID YOU?

7   A.   I SAW HIM PLACE HIS HAND -- HIS RIGHT HAND DOWN TOWARDS

8   HIS WAISTBAND.

9   Q.   I'M GOING TO GET TO THAT IN A MOMENT.  I'M JUST

10  WONDERING WHETHER YOU SAW HIM WITH HIS BACK TOWARDS YOU FOR,

11  LET'S SAY, 10, 20 SECONDS, AND THEN MAKE A SUDDEN SPINNING

12  MOTION, FIRST TIME FACING TO THE EAST, AND BEING SHOT WITHIN

13  A SECOND.  YOU DIDN'T SEE THAT, DID YOU?

14  A.   NO, SIR.

15  Q.   OKAY.  NOW, DID YOU EVER SEE EITHER OF HIS HANDS GO

16  INSIDE HIS WAISTBAND, ACTUALLY INSIDE HIS PANTS?

17  A.   I WOULDN'T REMEMBER.  I KNOW HIS RIGHT HAND WENT DOWN

18  TOWARDS HIS -- THE RIGHT SIDE OF HIS WAISTBAND.

19  Q.   DID YOU SAY YOU WOULDN'T REMEMBER?

20  A.   I DON'T REMEMBER IF IT WENT IN OR OUT.

21  Q.   DID YOU EVER, AT ANY TIME, SEE IT IN HIS WAISTBAND?

22  A.   HIS HANDS?

23  Q.   HIS HANDS?

24  A.   FROM WHAT I REMEMBER, I DON'T REMEMBER, SIR, NO.

25  Q.   YOUR RECOLLECTION IS HIS HANDS WERE NEVER IN HIS

1   WAISTBAND; IS THAT TRUE?

2   A.   FROM WHAT I REMEMBER, I DON'T REMEMBER SPECIFICALLY

3   INSIDE HIS WAISTBAND.

4   Q.   OKAY.  IN FACT, YOU COULD SEE BOTH OF HIS HANDS AT THE

5   TIME THE SHOTS WERE FIRED; TRUE?

6   A.   NO, NOT ENTIRELY THE RIGHT ONE.

7   Q.   DID YOU EVER SEE HIS HANDS IN A POCKET?

8   A.   FROM WHAT I REMEMBER, NO.

9   Q.   NOW, WHEN HE WAS GIVEN A COMMAND TO PUT HIS HANDS UP

10  AFTER HE WAS OUT OF THE CAR AND FACING EAST, IT'S YOUR

11  TESTIMONY HE DID PUT HIS HANDS UP; TRUE?

12  A.   YES, SIR.

13  Q.   DID YOU, AT ANY TIME BEFORE THE SHOTS WERE FIRED, SEE

14  ANYTHING IN HIS HAND?

15  A.   FROM WHAT I COULD MAKE OUT, NO, SIR.

16  Q.   YOU'RE SAYING THAT AT SOME POINT HIS RIGHT HAND LOWERED;

17  IS THAT CORRECT?

18  A.   YES.

19  Q.   WAS THAT BEFORE OR AFTER OFFICER ZERBEY TOLD HIM TO

20  TURN?

21  A.   I DON'T REALLY REMEMBER THE SPECIFICS, BUT IT COULD HAVE

22  BEEN AROUND THE SAME TIME.

23  Q.   OKAY.  AND AFTER YOU SAW HIS RIGHT HAND LOWER, YOU WERE

24  LOOKING AT HIS RIGHT HAND; CORRECT?

25  A.   YES.

 1    Q.   YOU NEVER SHOT, DID YOU?

 2    A.   NO, SIR.

 3    Q.   WAS YOUR GUN POINTED AT HIM?

 4    A.   YES.

 5    Q.   WHERE WAS HIS LEFT HAND WHEN HE WAS SHOT?

 6    A.   FROM WHAT I REMEMBER, KIND OF -- COULD I SHOW YOU?

 7    Q.   SURE.

 8    A.   PROBABLY AROUND HERE (INDICATING), I SHOULD SAY.  IT

 9    WASN'T ALL THE WAY UP.  YOU KNOW, IT WAS AROUND HERE

10    (INDICATING).

11    Q.   OKAY.  HOLD THAT FOR A SECOND.  I'M GOING TO TRY TO

12    DESCRIBE IT.  JUST PUT IT AS BEST YOU CAN RECALL.  SO YOU'RE

13    SAYING HIS LEFT HAND, THE LEFT ARM WAS BENT AT THE ELBOW AND

14    THE LEFT HAND WAS TO THE SIDE OF HIS HEAD, BUT MAYBE MORE IN

15    LINE WITH THE JAW LINE?

16    A.   AS YOU SAY, YES, SIR.

17              THE COURT:  ALL RIGHT.  THE RECORD WILL ALSO

18    REFLECT THAT THE WITNESS IS DEMONSTRATING THAT.

19    BY MR. GALIPO:

20    Q.   OKAY.  AND THAT'S WHERE HIS LEFT HAND WAS AT THE TIME HE

21    WAS SHOT?

22    A.   FROM WHAT I REMEMBER, SIR.

23    Q.   DID YOU EVER STATE IN A PREVIOUS STATEMENT THAT BEFORE

24    HE WAS SHOT HE WAS REACHING FOR -- TOWARDS HIS WAISTBAND WITH

25    BOTH HANDS?

```
1              MR. ROTHANS:  OBJECTION.  VAGUE AND AMBIGUOUS.
2    HEARSAY.
3              THE COURT:  OVERRULED.
4              THE WITNESS:  FROM WHAT I REMEMBER, IT WAS JUST HIS
5    RIGHT HAND.
6    BY MR. GALIPO:
7    Q.   SO WHAT I'M ASKING YOU, SIR, IF YOU EVER SAID IN A PRIOR
8    STATEMENT THAT HE WAS REACHING TOWARDS HIS WAISTBAND WITH
9    BOTH HANDS?
10   A.   FROM WHAT I REMEMBER, NO.
11   Q.   OKAY.  LET'S LOOK AT PAGE 20 OF YOUR TRANSCRIPT OF YOUR
12   RECORDED STATEMENT, AND SPECIFICALLY LOOK AT LINES 16 AND 17
13   AND SEE IF THAT REFRESHES YOUR RECOLLECTION AS TO WHETHER YOU
14   SAID IN YOUR INITIAL STATEMENT BOTH OF HIS HANDS WERE
15   REACHING FOR HIS WAISTBAND.
16             MR. ROTHANS:  YOUR HONOR, LACKS FOUNDATION.  HE'S
17   DIRECTED TO A QUESTION, NOT AN ANSWER IN THE TRANSCRIPT.
18             THE COURT:  CORRECT.
19             MR. GALIPO:  OH, FAIR ENOUGH.
20             THE COURT:  THIS IS VERY OPAQUE, MR. GALIPO.
21             MR. GALIPO:  ALL RIGHT.
22             THE COURT:  IT'S HARD TO KNOW WHAT THE WITNESS
23   MEANT WHEN HE WAS DOING THIS.  SO I DON'T THINK IT REALLY IS
24   HELPFUL TO THE JURY.
25             MR. GALIPO:  FAIR ENOUGH, YOUR HONOR.  I'LL
```

1    WITHDRAW THE QUESTION, THEN.

2    BY MR. GALIPO:

3    Q.   OKAY.  IN ANY EVENT, YOU'RE SAYING THAT AT THE TIME OF

4    THE SHOTS, YOU'RE LOOKING AT HIM, THE LEFT HAND IS UP, AS YOU

5    DESCRIBE, THE RIGHT HAND IS LOWERING TOWARDS THE WAISTBAND;

6    CORRECT.

7    A.   FROM WHAT I REMEMBER, YES.

8    Q.   AND WHEN YOU SAW THE RIGHT HAND LOWERING, DID YOU SEE

9    ANYTHING IN IT?

10   A.   FROM WHERE I COULD TELL, NO, I COULD NOT SEE.

11   Q.   IN FACT, YOU NEVER TOLD HIM TO DROP IT BECAUSE YOU NEVER

12   SAW ANYTHING IN HIS HANDS AT ANY TIME BEFORE THE SHOTS WERE

13   FIRED; IS IT TRUE?

14          MR. ROTHANS:  OBJECTION.  ASKED AND ANSWERED.

15   ARGUMENTATIVE.

16          THE COURT:  OVERRULED.

17          THE WITNESS:  I DIDN'T GIVE HIM THAT COMMAND, NO,

18   SIR.

19   BY MR. GALIPO:

20   Q.   WHY DIDN'T YOU GIVE HIM THAT COMMAND?

21   A.   I DON'T -- I DON'T RECALL SEEING ANYTHING.

22   Q.   DID YOU HEAR ANYBODY GIVE A WARNING THAT SHOTS WERE

23   GOING TO BE FIRED?

24   A.   I DON'T REMEMBER.  WE JUST ALL CONTINUED TO TELL HIM TO

25   PUT HIS HANDS BACK UP.

1  Q.   WHEN YOU SAY, "WE ALL," YOU'RE TALKING ABOUT ALL THE

2  OFFICERS THERE?

3  A.   I'M SURE A GOOD AMOUNT OF US TOLD HIM "GET YOUR HANDS

4  BACK UP."

5  Q.   SO IT'S FAIR TO SAY THAT MULTIPLE OFFICERS WERE YELLING

6  AT THE SAME TIME?

7  A.   THAT SPECIFIC THING, I WOULDN'T BE ABLE TO TELL YOU WHO,

8  BUT I KNOW I DID.

9  Q.   AND YOU HEARD OTHER PEOPLE ALSO; CORRECT?

10  A.   I BELIEVE SO, YES, SIR.

11  Q.   NOW, AFTER THE SHOTS, YOU HEARD WHAT SOUNDED LIKE A

12  THREE-ROUND BURST FROM AN MP5; CORRECT?

13  A.   YES, SIR.

14  Q.   AND YOU SAW MR. GRISSOM GO DOWN TO THE GROUND?

15  A.   YES, SIR.

16  Q.   THE DOOR ON THE PASSENGER SIDE WAS STILL OPEN; TRUE?

17  A.   YES.

18  Q.   DID YOU SEE A PART OF HIS BODY MAKE IMPACT -- MAKE

19  CONTACT WITH THE INSIDE OF THAT DOOR?

20  A.   FROM WHAT I REMEMBER, NO.

21  Q.   DO YOU RECALL HIM FALLING ON HIS BACK OUTSIDE THE

22  VEHICLE?

23  A.   HE WAS KIND OF BACK TO THE LEFT, I GUESS, WITH THE

24  PICTURE WHERE THE CAR WOULD BE MORE TOWARDS THE NORTH AGAINST

25  THE DOOR, I SHOULD SAY.

1    Q.   HIS HEAD WAS MORE TOWARDS THE WEST?

2    A.   I GUESS -- MY APOLOGIES, SIR.

3    Q.   OKAY.

4    A.   HE FELL DOWN, AND WHEN HE FELL DOWN HE FELL NOT TOWARDS

5    THE CAR BUT KIND OF AWAY BUT STILL AGAINST THE DOOR AND THAT

6    WAS OUT -- THAT WAS OPEN.

7    Q.   AT SOME POINT, SIR, DID HE LAND ON THE GROUND?

8    A.   YES, SIR.

9    Q.   AND WHEN HE WAS ON THE GROUND, WHAT POSITION WAS HE IN?

10   ON HIS SIDE?  HIS CHEST OR HIS BACK?

11   A.   FROM WHAT I REMEMBER, HIS SIDE, BACK KIND OF.

12   Q.   WAS HIS HEAD MORE TO THE WEST?

13   A.   I BELIEVE IT WAS MORE TOWARDS THE EAST.

14   Q.   OKAY.  DO YOU RECALL HIM BEING PERPENDICULAR TO THE CAR?

15   A.   I GUESS NEXT TO IT, YES.

16   Q.   DID YOU SEE ANYTHING COME OUT OF HIS HANDS AS HE WAS

17   GOING TO THE GROUND?

18   A.   FROM WHAT I COULD SEE, NO.

19   Q.   DID YOU SEE ANYTHING AROUND HIM WHILE HE WAS ON THE

20   GROUND THAT LOOKED LIKE A GUN TO YOU?

21   A.   FROM WHAT I SEE, I WASN'T REALLY LOOKING SPECIFICALLY AT

22   THAT.

23   Q.   WEREN'T YOU LOOKING AT HIM AS HE DROPPED TO THE GROUND?

24   A.   YES.

25   Q.   YOU WERE STILL IN L2; CORRECT?

1    A.    YES.

2    Q.    DID YOU SEE A CELL PHONE AROUND ANYWHERE?

3    A.    I WASN'T ABLE TO SEE, NOR DID I REALLY LOOK FOR ANYTHING

4    AT THAT POINT.

5    Q.    YOU WEREN'T ABLE TO SEE?

6    A.    NO, SIR.

7    Q.    WHY NOT?

8    A.    I WAS KIND OF LOOKING AT HIM, HIS SISTER WAS YELLING,

9    THERE WERE PEOPLE RUNNING AROUND IN THE BACKGROUND.

10    Q.    MY SPECIFIC QUESTION, SIR, IS:  DID YOU SEE A CELL

11    PHONE?

12    A.    NO, SIR, NOT THAT I SAW.

13    Q.    NOW, AT SOME POINT, THE PARAMEDICS ARRIVED; CORRECT?

14    A.    YES, SIR.

15    Q.    AND THAT WAS AFTER THEY WERE GIVEN CLEARANCE TO COME IN?

16    A.    THEY RESPONDED RIGHT AWAY.  I DON'T REALLY REMEMBER

17    SPECIFICALLY, NO, SIR.

18    Q.    AND YOU STAYED AT THE SCENE FOR SOME PERIOD OF TIME;

19    CORRECT?

20    A.    FOR SOME TIME, YES, SIR.

21    Q.    YOU HELPED PUT UP SOME TAPE; TRUE?

22    A.    YES.

23    Q.    AND YOU WERE THERE WHEN THE PARAMEDICS ARRIVED?

24    A.    I SAW THEM WORKING.  I HEARD THEM RESPOND.

25    Q.    AT SOME POINT, YOU SAW THEM PUT MR. GRISSOM ON A GURNEY?

1   A.   I DON'T BELIEVE I SAW THEM PUT HIM ON THERE, NO.  I KNOW

2   HE WAS ON THERE, AND I BELIEVE WHEN I SAW HIM I THINK THEY

3   WERE TRANSPORTING HIM OR SOME SORT.

4   Q.   AND YOU WERE GIVEN THE ASSIGNMENT OF DOING WHAT'S CALLED

5   A CRIME SCENE LOG?

6   A.   YES, SIR.

7   Q.   AND WHAT IS THAT?

8   A.   IT'S AN OVERALL LOG TO KIND OF MAKE SURE YOU KEEP A GOOD

9   RECORD OF WHO COMES IN AND OUT OF THAT SPECIFIC AREA.

10  Q.   ALL RIGHT.

11          MR. GALIPO:  MAY I -- WE HAVE -- THE CRIME SCENE

12  LOG IS EXHIBIT 18.

13          MR. MC NICHOLAS:  THE ONE YOU WANT HIM TO LOOK AT

14  IS 18-A, AS IN APPLE.

15          MR. GALIPO:  18-A, AS IN APPLE.

16          IF THERE'S NO OBJECTION, YOUR HONOR, WE WOULD MOVE

17  TO PUBLISH.  IF THERE IS, THEN I'LL GET THE EXHIBIT BOOK FOR

18  THE WITNESS.

19          MR. ROTHANS:  THERE IS AN OBJECTION, YOUR HONOR, ON

20  RELEVANCY GROUNDS.

21          THE COURT:  WELL, I DON'T KNOW RELEVANCY.  IT

22  MIGHT -- I DON'T THINK IT'S BEEN ESTABLISHED THAT IT'S NOT

23  HEARSAY.  IN ANY EVENT, JUST PUT IT BEFORE THE WITNESS FOR

24  RIGHT NOW.

25          MR. GALIPO:  OKAY.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    BY MR. GALIPO:

2    Q.   OKAY.  YOU HAVE EXHIBIT 18 IN FRONT OF YOU?

3    A.   18-A, YES, SIR.

4    Q.   AND IS THAT IN YOUR HAND?

5    A.   NOT IN MY HAND, NO, SIR, FRONT OF ME.

6    Q.   DID YOU KEEP THIS LOG?

7    A.   FOR THE MOST PART, YES.

8    Q.   AT SOME POINT, DID MR. ROTHANS ARRIVE AT THE SCENE?

9           MR. ROTHANS:  OBJECTION.  IRRELEVANT.

10          THE COURT:  LET'S -- SUSTAINED.

11   BY MR. GALIPO:

12   Q.   DO YOU KNOW WHEN THE SHERIFF'S DEPARTMENT ARRIVED AT THE

13   SCENE FROM YOUR LOG?

14   A.   I COULD PROBABLY LOOK FOR YOU, YES, SIR.

15   Q.   OKAY.  LET'S SEE IF WE CAN FIND THAT?

16   A.   WANT ME TO GO AHEAD AND LOOK?

17   Q.   SURE.

18          I'LL TRY TO HELP YOU.

19   A.   I FOUND IT, SIR.

20   Q.   OKAY.  CAN YOU TELL US WHAT TIME THE SHERIFF'S

21   DEPARTMENT ARRIVED?

22   A.   1301.

23   Q.   OKAY.  SO THAT WOULD BE MILITARY TIME FOR BASICALLY

24   1:01?

25   A.   YES, 1:01 P.M.

1    Q.   AND THE SHOOTING HAPPENED AT ABOUT 11:30?

2    A.   I WOULD SAY -- IF THAT'S -- YES.

3    Q.   SO APPROXIMATELY AN HOUR-AND-A-HALF LATER; IS THAT

4    CORRECT?

5    A.   ABOUT, YES.

6    Q.   WERE YOU STILL AT THE SCENE?  OBVIOUSLY YOU WERE;

7    CORRECT?

8    A.   YES.

9    Q.   AT ANY TIME YOU WERE AT THE SCENE, DID YOU SEE WHAT

10   APPEARED TO BE A GUN ANYWHERE OTHER THAN POLICE OFFICER GUNS?

11   A.   AT THAT POINT, DUE TO ME BEING THE CRIME SCENE LOG

12   PERSON, I WAS OUTSIDE THE INITIAL CRIME SCENE AREA, SO I WAS

13   UNABLE TO LOOK AT ANYTHING IN THAT AREA.

14   Q.   AT ANY TIME BEFORE YOU STARTED THE CRIME SCENE LOG, DID

15   YOU SEE WHAT YOU THOUGHT WAS A GUN?

16   A.   I REALLY DIDN'T LOOK, SIR, NO.

17   Q.   DID YOU SEE A CELL PHONE ANYWHERE?

18   A.   I DIDN'T LOOK, SIR, NO.

19            MR. GALIPO:  THANK YOU.

20            THAT'S ALL THAT I HAVE AT THIS TIME, YOUR HONOR.

21            THE COURT:  MR. MC NICHOLAS, DO YOU HAVE ANY

22   ADDITIONAL DIRECT?

23            MR. MC NICHOLAS:  ONE OR TWO QUESTIONS, YOUR HONOR.

24                    **DIRECT EXAMINATION**

25   BY MR. MC NICHOLAS:

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    Q.   JUST TO CLARIFY A COUPLE OF THINGS:  WHEN YOU'RE AT L2,

2    AS DEPICTED ON EXHIBIT 36, OFFICER ZERBEY IS STANDING ON THE

3    OTHER SIDE OF CRUISER C62; CORRECT?

4    A.   FROM WHAT I REMEMBER, YES, SIR.

5    Q.   DO YOU EVER RECALL MR. GRISSOM, WHILE IN THE PASSENGER

6    SEAT, SAY, "MY SEATBELT'S ON," OR WORDS TO THAT EFFECT?

7    A.   I -- HE MAY HAVE, I DON'T REMEMBER, SIR, NO.

8    Q.   MY QUESTION IS:  DO YOU RECALL THAT HAPPENING?

9    A.   HE COULD HAVE.

10   Q.   BUT YOU DON'T RECALL HEARING IT; CORRECT?

11   A.   I DON'T REMEMBER, NO, SIR.

12   Q.   DO YOU RECALL -- WELL, HOW WIDE IS THAT CRUISER?  SIX

13   FEET?  SEVEN FEET?

14   A.   ABOUT SIX FEET.

15   Q.   OKAY.  DO YOU RECALL OFFICER ZERBEY STANDING SIX FEET TO

16   YOUR LEFT SAYING, "OKAY, TAKE YOUR SEAT BELT OFF"?

17   A.   I DON'T -- I DON'T REMEMBER.  I JUST REMEMBER SEEING --

18   LIKE I SAID, SIR, BOTH HANDS WERE OUT AND ONE HAND WENT BACK

19   IN, OPENED THE DOOR AND THAT'S WHEN HE WAS OUT AGAIN.

20   Q.   MY QUESTION IS:  DO YOU RECALL OFFICER ZERBEY SAYING,

21   "OKAY, TAKE YOUR SEAT BELT OFF;" YES OR NO?

22   A.   HE COULD HAVE, SIR.

23   Q.   AT SOME POINT AFTER MR. GRISSOM IS SHOT AND HE'S ON THE

24   GROUND, YOU AND SEVERAL OTHER OFFICERS PROCEED TO THE

25   DRIVER'S SIDE OF THE GREEN SEBRING; CORRECT?

1   A.   YES, SIR.

2   Q.   AND THAT IS SO THAT THE DRIVER CAN BE REMOVED FROM THE

3   VEHICLE?

4   A.   YES, SIR.

5   Q.   I BELIEVE IT WAS DETERMINED, BECAUSE OF ALL OF THE

6   CHAOS, THAT GIVING ORAL COMMANDS WAS NOT THE APPROPRIATE

7   METHODOLOGY TO TAKE THE DRIVER OUT OF THE VEHICLE; FAIR?

8        MR. ROTHANS:   LACKS FOUNDATION.   CALLS FOR

9   SPECULATION.   IT'S ALSO ARGUMENTATIVE.

10        THE COURT:   OVERRULED.   IT'S A QUESTION, THE

11  WITNESS CAN EITHER AGREE OR NOT.

12        THE WITNESS:   WOULD YOU REPEAT THE QUESTION, SIR?

13  BY MR. MC NICHOLAS:

14  Q.   YES.

15        AFTER MR. GRISSOM WAS SHOT AND GOES DOWN, THERE IS

16  SOME CHAOS AT THE SCENE; FAIR?

17  A.   YES, SIR.

18  Q.   IT WAS DECIDED BY SOMEBODY AT THE SCENE THAT WE NEED TO

19  TAKE THE FEMALE DRIVER OUT, BUT WE CAN'T DO IT BY GIVING ORAL

20  COMMANDS; FAIR?

21  A.   YES.

22  Q.   SO THREE OFFICERS PUSH UP TOGETHER TO THE DRIVER'S SIDE

23  OF THE GREEN SEBRING, YES?

24  A.   WE WALKED AROUND -- YES, SIR.

25  Q.   AND YOU ASSIST IN REMOVING THE DRIVER FROM THE GREEN

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    SEBRING?

2    A.   YES, SIR.

3    Q.   I BELIEVE YOU CUFFED HER, YES?

4    A.   CORRECT.

5    Q.   AND THEN YOU ESCORTED HER TO ONE OF THE BLACK AND WHITES

6    ON THE SCENE?

7    A.   YES.

8    Q.   DO YOU RECALL WHICH ONE?

9    A.   IT'S -- IF YOU PAN OUT A LITTLE BIT, SIR --

10   Q.   I'M GOING TO HAVE TO SHOW YOU ANOTHER PICTURE, SO STAND

11   BY.

12   A.   THANK YOU.

13   Q.   LET'S TAKE A LOOK AT EXHIBIT 7 -- ACTUALLY, LET'S LOOK

14   AT EXHIBIT 8?

15           THE COURT:  ANY OBJECTION?

16           MR. ROTHANS:  NO OBJECTION.

17           THE COURT:  IT WILL BE RECEIVED.

18                (EXHIBIT 8 RECEIVED.)

19           MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.

20   BY MR. MC NICHOLAS:

21   Q.   OKAY.  ARE YOU GENERALLY ORIENTED TO WHAT YOU'RE SEEING

22   IN THAT PICTURE?

23   A.   YES, SIR.

24   Q.   OKAY.  ARE YOU ABLE TO SAY OR IDENTIFY FOR US WHICH OF

25   THOSE BLACK AND WHITES YOU ESCORTED THE FEMALE DRIVER TO?

1    A.    WOULD BE THE ONE ON BOTTOM LEFT, C65.

2    Q.    OKAY.  AND THAT WAS OFFICER MARTINEZ'S VEHICLE?

3    A.    YES, SIR, BLACK.

4    Q.    NOW, AT SOME POINT ON THE SCENE WHILE THE -- WHILE

5    MR. GRISSOM IS DOWN ON THE GROUND, YOU'RE AWARE THAT OFFICER

6    BROWN SEARCHED HIM, YES?

7    A.    I HAD ASKED HIM IF HE SEARCHED HIM, YES, SIR.

8    Q.    YOU WALKED UP TO OFFICER BROWN AND SAID, "DID YOU PAT

9    HIM DOWN;" CORRECT?

10   A.    YES.

11   Q.    AND YOU DID THAT WHEN OFFICER BROWN WAS IN THE VICINITY

12   OF MR. GRISSOM; CORRECT?

13   A.    NOT ENTIRELY, NO.

14         WHICH AREA ARE YOU SPEAKING ABOUT, SIR?

15   Q.    YOU SEE THE RED X NEXT TO THE RIGHT DOOR OF THE GREEN

16   SEBRING?

17   A.    YES, SIR.

18   Q.    THAT -- IT IS ACCURATE THAT THAT GENERALLY DEPICTS THE

19   LOCATION OF MR. GRISSOM'S BODY ON THE GROUND AFTER HE IS SHOT

20   BUT BEFORE HE IS REMOVED BY PARAMEDICS; FAIR?

21   A.    YES.

22   Q.    WHEN YOU SPOKE TO OFFICER BROWN AND SAID, "HEY, DID YOU

23   PAT HIM DOWN," WHERE WERE YOU STANDING?

24   A.    YOU MIND PANNING THAT OUT AGAIN?

25   Q.    SURE.

```
 1   A.   IT WAS -- IF I COULD DESCRIBE IT.  IT'S AROUND AREA

 2   OF -- I'D SAY C62 AREA, I GUESS, WHILE I WAS WALKING OFF.

 3   Q.   OKAY.  DOES --

 4            THE COURT:  MR. LOPEZ, YOU CAN DESCRIBE IT.  YOU

 5   CAN ALSO JUST DIRECTLY MARK ON THE SCREEN AND A MARK SHOULD

 6   SHOW UP IF YOU WANT TO SHOW US.

 7            THE WITNESS:  SORRY, SIR.

 8            AROUND THIS -- DO YOU JUST DRAW -- DRAG A LINE?

 9            THE COURT:  CORRECT.

10            THE WITNESS:  IT WOULD BE IN THIS -- I GUESS THIS

11   (INDICATING) GENERAL AREA, I SHOULD SAY.  I DON'T KNOW IF

12   THAT WAS RIGHT.  BASICALLY --

13            MR. MC NICHOLAS:  I'M NOT SEEING IT ON HIS SCREEN,

14   YOUR HONOR.

15            THE COURT:  I'M NOT SURE I AM EITHER.

16            MR. MC NICHOLAS:  MAY I APPROACH THE WITNESS FOR

17   ONE MOMENT?

18            THE COURT:  YOU MAY.

19            (COUNSEL APPROACHES THE WITNESS.)

20   BY MR. MC NICHOLAS:

21   Q.   I APOLOGIZE, OFFICER.

22            ARE YOU ABLE WITH YOUR FINGER TO CIRCLE THE GENERAL

23   AREA YOU WERE IN WHEN YOU ASKED OFFICER BROWN IF HE HAD

24   PATTED DOWN MR. GRISSOM?

25   A.   I CAN'T REALLY GIVE YOU A SPECIFIC AREA.
```

1    Q.   CAN YOU --

2    A.   I CAN PROBABLY GIVE YOU A WHOLE ROUND OF WHERE I WAS AT,

3    PROBABLY.

4    Q.   OKAY.  HOW ABOUT THIS:  CAN YOU CIRCLE A GENERAL AREA?

5    A.   (WITNESS COMPLIES.)

6         SURE.  AROUND THERE (INDICATING).

7    Q.   OKAY.  AND IT'S ACCURATE THAT OFFICER BROWN TOLD YOU HE

8    FOUND NO GUN; CORRECT?

9    A.   HE TOLD ME HE PATTED HIM DOWN REAL QUICK.

10   Q.   AND THAT HE FOUND NOTHING; CORRECT?

11   A.   FROM -- I DON'T REALLY RECALL WHAT HE SPECIFICALLY SAID,

12   BUT HE SAID THAT HE PATTED HIM DOWN.

13   Q.   AND HE INDICATED TO YOU IN GENERAL WORDS THAT HE FOUND

14   NOTHING; CORRECT?

15   A.   IF -- I DON'T REALLY RECALL EXACTLY WHAT HE TOLD ME, NO,

16   SIR.

17   Q.   OKAY.  AND ONE OTHER POINT OF CLARIFICATION, I KNOW I'M

18   GOING BACK IN TIME, BUT AFTER YOU NOTICED THE GREEN SEBRING

19   AND YOU MAKE A RIGHT TURN FROM NORTHBOUND OVERLAND ONTO

20   EASTBOUND VENICE; CORRECT?  IS THAT CORRECT?

21   A.   YES, SIR.

22   Q.   AND, AT SOME POINT, YOU GET BEHIND THE VEHICLE; CORRECT?

23   A.   EVENTUALLY, YES, SIR.

24   Q.   AND IT IS ACCURATE FROM THE TIME YOU TURN RIGHT ONTO

25   EASTBOUND VENICE, YOU NO LONGER SEE IT DRIVING ERRATICALLY;

1   CORRECT?

2   A.   AT THAT POINT, YOU WOULD SAY NO.

3   Q.   WELL, I'M ASKING WHAT YOU WOULD SAY, NOT WHAT I WOULD

4   SAY.

5   A.   NO, NO.

6   Q.   OKAY.  THAT'S AN ACCURATE STATEMENT?

7   A.   YES.

8   Q.   OKAY.  AND, IN FACT, YOU DECIDED TO LIGHT UP, MEANING

9   TURN YOUR LIGHTS ON AND PULL THE GREEN SEBRING OVER WHEN YOU

10  WERE LESS THAN ONE BLOCK AWAY FROM THIS INTERSECTION?

11  A.   NO, SIR.

12  Q.   HOW FAR AWAY FROM THIS INTERSECTION WERE YOU WHEN YOU

13  LIT THE VEHICLE UP?

14          THE COURT:  WELL, THAT'S A SLIGHTLY DIFFERENT

15  QUESTION.

16          MR. MC NICHOLAS:  I'LL REPHRASE.

17  BY MR. MC NICHOLAS:

18  Q.   HOW FAR AWAY FROM THE INTERSECTION OF VENICE AND MOTOR

19  WERE YOU WHEN YOU LIT THE VEHICLE UP?

20  A.   I WAS -- IF YOU LOOK AT THIS CURRENT PICTURE RIGHT HERE

21  (INDICATING), SIR --

22  Q.   YES, SIR.

23  A.   -- I BELIEVE THAT'S C61 -- YOU SEE THIS CAR RIGHT HERE

24  (INDICATING), IT WOULD BE IN THAT GENERAL WHERE I STARTED TO

25  TURN ON MY LIGHT.

```
 1   Q.   OKAY.  ALL RIGHT.  IT'S HARD TO SEE THERE.  IT LOOKS

 2   LIKE IT'S A RIGHT TURN LANE OR A PARKING LANE, SOMETHING TO

 3   THAT EFFECT?

 4   A.   THAT SPECIFIC AREA, RIGHT TURN BIKE LANE.

 5   Q.   OKAY.  SO THAT'S WHEN YOU TURNED AND PUT YOUR LIGHTS ON?

 6   A.   YES, SIR.

 7   Q.   AND THE GREEN SEBRING MAKE MADE THE RIGHT TURN ON SOUTH

 8   MOTOR, THEN PULLS INTO THE DONUT KING PARKING LOT?

 9   A.   YES, SIR.

10   Q.   AND STOPS IN THE POSITION WE SEE IN THE EXHIBIT ON THE

11   GREEN?

12   A.   YES, SIR.

13   Q.   AND THE VEHICLE NEVER MOVED AGAIN PRIOR TO THE SHOOTING;

14   IS THAT CORRECT?

15   A.   FROM WHAT I REMEMBER, IT DID MOVE VERY SLIGHTLY.

16           MR. MC NICHOLAS:  NOTHING FURTHER.

17           THE COURT:  MR. ROTHANS?

18                     CROSS-EXAMINATION

19   BY MR. ROTHANS:

20   Q.   GOOD MORNING, SIR.

21   A.   GOOD MORNING, SIR.

22   Q.   WHAT'S YOUR CURRENT ASSIGNMENT WITH THE CULVER CITY

23   POLICE DEPARTMENT?

24   A.   CURRENTLY ASSIGNED TO DETECTIVE BUREAU WORKING AS A

25   CRIME IMPACT TEAM.
```

1    Q.    SO YOU'RE CURRENTLY A DETECTIVE WITH THE DEPARTMENT?

2    A.    YES, SIR.

3    Q.    DETECTIVE, MR. GALIPO ASKED YOU SOME QUESTIONS ABOUT THE

4    ACADEMY YOU GRADUATED FROM, A POLICE ACADEMY?

5    A.    YES, SIR.

6    Q.    AND YOU INDICATED THAT WAS IN WHAT YEAR?

7    A.    GRADUATE 2009, APRIL.

8    Q.    WHICH ACADEMY DID YOU ATTEND, SIR?

9    A.    LOS ANGELES COUNTY SHERIFF'S DEPARTMENT.

10   Q.    AND HOW LONG WAS THAT PROGRAM THAT YOU ATTENDED AND

11   GRADUATED FROM?

12   A.    ABOUT FIVE, SIX MONTHS.

13   Q.    I'M SORRY?

14   A.    ABOUT FIVE TO SIX MONTHS.

15   Q.    WAS THAT ENTIRELY CLASSROOM TRAINING?

16   A.    NO, SIR.

17   Q.    WHAT DID THE FIVE OR SIX MONTHS OF THE L.A. COUNTY

18   SHERIFF'S ACADEMY TRAINING CONSISTENT OF?

19   A.    A VARIOUS AMOUNT OF THINGS FROM FIREARMS, DEFENSIVE

20   TACTICS, VARIOUS DIFFERENT TOPICS IN REGARDS TO LAW, IN

21   REGARDS TO DOMESTIC VIOLENCE TRAINING, EVERYTHING YOU'D

22   IMAGINE TO WORKING IN A VEHICLE, JUST EVERYTHING THAT YOU'D

23   NEED TO KNOW IN REGARDS TO -- AS MUCH AS YOU COULD KNOW.

24   Q.    WAS THERE PHYSICAL TRAINING INVOLVED?

25   A.    YES, SIR.

```
 1    Q.    WHAT DID THE PHYSICAL TRAINING CONSISTENT OF, GENERALLY?

 2    A.    PHYSICAL TRAINING -- ARE YOU TALKING ABOUT LIKE

 3    EXERCISE-TYPE STUFF LIKE THAT?

 4    Q.    YES, SIR.

 5    A.    VARIOUS MILE RUNS.  IT WAS -- IT WAS TOUGH.

 6    Q.    PUSH-UPS, CALISTHENICS?

 7    A.    YES, SIR.

 8    Q.    YOU HAD DRILL INSTRUCTORS?

 9    A.    YES, SIR.

10    Q.    YOU HAD SOME CLASSROOM TRAINING AS WELL?

11    A.    YES, SIR.

12    Q.    THE CLASSROOM TRAINING INCLUDE TRAINING ON THE USE OF

13    FORCE?

14    A.    CORRECT.

15    Q.    AND THAT WOULD BE BATONS AND FLASHLIGHTS AND PHYSICAL

16    OBJECTS?

17    A.    YES.

18    Q.    ALSO TRAINING ON CERTAIN CONTROL HOLDS, THAT SORT OF

19    ISSUE?

20    A.    YES.

21    Q.    DID YOU ALSO HAVE CLASSROOM TRAINING DURING THOSE FIVE

22    OR SIX MONTHS ON WHEN AN OFFICER MAY USE DEADLY FORCE?

23    A.    YES.

24    Q.    AND YOU COMPLETED ALL THAT TRAINING FOR THOSE FIVE OR

25    SIX MONTHS?
```

1    A.    YES.

2    Q.    ARE YOU FAMILIAR WITH THE TERM "POST"?

3    A.    POLICE OFFICERS STANDARDS AND TRAINING.

4    Q.    YOU'RE FAMILIAR WITH THAT TERM?

5    A.    YES, SIR.

6    Q.    IS IT YOUR UNDERSTANDING THAT IT'S AN ENTITY IN

7    SACRAMENTO THAT CERTIFIES THE LAW ENFORCEMENT ACADEMIES?

8              MR. GALIPO:  I'M GOING TO OBJECT AT THIS POINT AS

9    LEADING, YOUR HONOR.  THESE WITNESSES ARE BEING TAKEN AS

10   ADVERSE WITNESSES, THE FIRST GROUP.

11             THE COURT:  ALL RIGHT.  YOUR POINT IS WELL-TAKEN,

12   BUT THIS IS FOUNDATIONAL, SO I'LL ALLOW A CERTAIN AMOUNT OF

13   LEADING JUST TO MOVE THINGS ALONG.

14             BUT, MR. ROTHANS, WHEN WE GET TO THE INCIDENT,

15   YOU'LL HAVE TO ASK NON-LEADING QUESTIONS.

16             GO AHEAD.

17   BY MR. ROTHANS:

18   Q.    IS IT YOUR UNDERSTANDING THAT PEACE OFFERS STANDARDS AND

19   TRAINING IS AN ENTITY IN SACRAMENTO THAT CERTIFIES LAW

20   ENFORCEMENT ACADEMIES?

21   A.    YES.

22   Q.    AND WAS THE L.A. COUNTY SHERIFF'S ACADEMY A

23   POST-CERTIFIED ACADEMY WHEN YOU GRADUATED FROM THERE?

24   A.    YES.

25   Q.    VERY WELL.

1          AND YOU COMPLETED THAT FIVE OR SIX-MONTH COURSE AND

2    WERE THEN SWORN IN BY THE CULVER CITY POLICE DEPARTMENT?

3    A.   YES, SIR.

4    Q.   AND WHEN YOU SWORN IN WITH THE CULVER CITY POLICE

5    DEPARTMENT, YOU COMPLETED A PROBATIONARY OR TRAINING PERIOD?

6    A.   YES, SIR.

7    Q.   AND THAT LASTED HOW LONG, SIR?

8    A.   ABOUT A YEAR.

9    Q.   AND WHAT HAPPENED, GENERALLY, DURING THAT TRAINING

10   PERIOD AT CULVER CITY?

11   A.   FOR THE ENTIRE YEAR, YOU'RE ON PROBATION, BUT FOR THE

12   FIRST, YOU'D SAY FOUR PHASES, YOU HAVE FOUR DIFFERENT

13   TRAINING OFFICERS THAT YOU KIND OF WORK WITH, AND YOU'RE

14   EXPOSED TO A VARIETY OF THINGS IN REGARDS TO UPDATED TRAINING

15   FROM THE ACADEMY TO ACTUAL, YOU KNOW, TRAINING, HANDS-ON

16   EXPERIENCE TO EVERYTHING YOU CAN IMAGINE OUT THERE.

17   Q.   AND THESE FIELD TRAINING OFFICERS, YOU WOULD RIDE ALONG

18   WITH THEM DURING THOSE FOUR PHASES?

19   A.   YES, SIR.

20   Q.   YOU COMPLETED THAT FIELD TRAINING PROBATIONARY PERIOD

21   SUCCESSFULLY?

22   A.   YES, SIR.

23   Q.   AND DID YOU RECEIVE TRAINING AT THE ACADEMY ON FELONY

24   TRAFFIC STOPS?

25   A.   YES.

1  Q.  WERE YOU TRAINED AT THE ACADEMY THAT DURING FELONY

2  TRAFFIC STOPS ALL SUSPECTS ALWAYS ACT OR REACT THE SAME?

3  A.  NO.

4  Q.  WHAT WERE YOU TAUGHT IN THAT REGARD, GENERALLY?

5  A.  YOU HAVE TO ADAPT.  EVERYONE'S GOING TO ACT A LITTLE

6  DIFFERENT.

7  Q.  VERY WELL.

8        AND DURING YOUR PROBATIONARY PERIOD, THE ONE-YEAR

9  PERIOD DURING YOUR TRAINING AT CULVER CITY POLICE DEPARTMENT,

10  FOR THAT FIRST YEAR, DID YOU RECEIVE ANY IN-THE-FIELD

11  TRAINING ON FELONY TRAFFIC STOPS?

12  A.  YES, SIR.

13  Q.  DESCRIBE THAT GENERALLY, SIR.

14  A.  WHILE ON TRAINING, I WOULD -- WE WOULD GET TRAINED AT

15  THE STATION FOR FELONY TRAFFIC STOPS, AS WELL AS WHENEVER WE

16  WOULD GET ANY TYPE OF HIGH-RISK CALLS OR HIGH -- HIGH -- YOU

17  KNOW, HIGHER CALLS.  WE WERE OUT THERE, WE'D CONDUCT A FELONY

18  TRAFFIC STOP WITH OTHER UNITS THERE.

19  Q.  AND, GENERALLY SPEAKING, WHAT'S THE DIFFERENCE BETWEEN A

20  FELONY TRAFFIC STOP AND A NORMAL TRAFFIC STOP?

21  A.  A NORMAL TRAFFIC STOP IS SOMETHING THAT JUST HAPPENS.

22  IT'S AN UNFORTUNATE THING TO HAPPEN, BUT IT'S A THING THAT

23  HAPPENS IN REGARDS TO PULLING SOMEONE OVER FOR A VIOLATION OR

24  FOR SOME OTHER REASON SPECIFICALLY.

25  Q.  SO WHAT KIND OF VIOLATIONS ARE YOU TALKING ABOUT?

1    A.    TRAFFIC, MINOR INFRACTIONS.

2    Q.    RUNNING A STOP SIGN, RUNNING A RED LIGHT, EXCESSIVE

3    SPEED, THAT SORT OF THING?

4    A.    YES, SIR.

5    Q.    AND WHY IS A FELONY TRAFFIC STOP DIFFERENT?

6    A.    IT'S AN ELEVATED APPROACH THAT YOU HAVE A PRIOR

7    UNDERSTANDING THAT SOMETHING MAY BE VERY, I GUESS, A -- SAY

8    DANGEROUS.  YOU BELIEVE YOU HAVE SOMETHING THAT MAY BE A

9    LITTLE MORE THAN JUST A BASIC TRAFFIC STOP.  SO IF YOU HAD A

10   CALL LIKE A ROBBERY THAT JUST OCCURRED OR SHOTS FIRED AND YOU

11   HAD A DESCRIPTION OF A CAR AND YOU SAW IT THAT'S -- YOU WOULD

12   PROCEED THAT WAY BECAUSE IT'S A LITTLE SAFER AT THAT POINT.

13   Q.    WHEN YOU SAY, "A LITTLE MORE SERIOUS," ARE YOU TALKING

14   ABOUT A FELONY, A SUSPECTED FELONY?

15   A.    YES, SIR.

16   Q.    THAT'S ABOUT THE HIGHEST LEVEL CRIME ONE CAN GET -- BE

17   INVOLVED IN; IS THAT TRUE?

18            MR. GALIPO:  VAGUE AND LEADING, YOUR HONOR.

19            THE COURT:  SUSTAINED AS TO THAT QUESTION.

20            GO AHEAD.

21   BY MR. ROTHANS:

22   Q.    HOW DO YOU COMPARE A FELONY TRAFFIC STOP, A SUSPICION

23   THAT THE MOTORIST MAY HAVE BEEN INVOLVED IN A FELONY WITH A

24   SIMPLE TRAFFIC VIOLATION?

25   A.    IT'S A SERIOUS CRIME.

1    Q.    AND YOU'VE HAD TRAINING ON THOSE ISSUES AT THE L.A.

2    COUNTY SHERIFF'S ACADEMY?

3    A.    YES, SIR.

4    Q.    DID YOU HAVE TRAINING ON THOSE ISSUES DURING YOUR

5    PROBATIONARY PERIOD?

6    A.    YES.

7    Q.    WERE YOU ENGAGED IN FELONY TRAFFIC STOPS DURING THAT

8    ONE-YEAR PROBATIONARY PERIOD WITH CULVER CITY?

9    A.    SEVERAL, YES, SIR.

10   Q.    CAN YOU GIVE US AN ESTIMATE IN THAT PERIOD OF TIME,

11   NEARLY A YEAR, BEFORE APRIL 25 OF 2010, OF THE NUMBER OF

12   FELONY TRAFFIC STOPS YOU PERSONALLY WERE INVOLVED IN, SIR?

13   A.    MAYBE 6 TO 12.

14   Q.    ON APRIL 25, 2010, HAD YOU RECEIVED INFORMATION BEFORE

15   THAT TIME ABOUT A SERIES OF ARMED ROBBERIES IN THE SOUTHERN

16   CALIFORNIA AREA?

17   A.    YES.

18   Q.    HAD YOU BEEN PRESENTED OR GIVEN COPIES OF VARIOUS BOLOS,

19   BE ON THE LOOKOUT BULLETINS, PRIOR TO THE MORNING OF

20   APRIL 25, 2010?

21   A.    YES.

22   Q.    AND HOW ARE THOSE GENERALLY PRESENTED TO YOU, OR WERE

23   THEY PRESENTED TO YOU?

24   A.    EVERY WATCH, YOU KNOW, A.M. OR DAY WATCH AND NIGHT

25   WATCH, PRIOR TO GOING OUT IN THE FIELD YOU'D HAVE A BRIEFING

```
1   WITH EVERYBODY IN THE BRIEFING ROOM AND THE SERGEANTS OR THE

2   SUPERVISORS WOULD BE THERE.  EVERY ONCE IN A WHILE, DEPENDING

3   ON WHAT'S GOING ON, A DETECTIVE WOULD STAY BEHIND OR THEY

4   WOULD TALK TO US ABOUT THESE SPECIFIC CRIMES THAT ARE

5   HAPPENING IN AND AROUND THE CITY, AS WELL AS WE WOULD RECEIVE

6   THEM E-MAIL WISE, AND IT WOULD BE POSTED UP IN THE STATION AS

7   WELL.

8   Q.   SO WERE BRIEFINGS CONDUCTED WITH DIFFERENT SHIFTS EVERY

9   DAY?

10  A.   JUST ABOUT, YES.

11  Q.   AND ARE YOU SAYING THAT IN THOSE BRIEFINGS DIFFERENT

12  TOPICS WOULD BE COVERED?

13  A.   YES.

14  Q.   WERE THE TOPICS OF ARMED ROBBERIES IN THE SOUTHERN

15  CALIFORNIA AREA COVERED IN YOUR BRIEFINGS BEFORE THE MORNING

16  OF APRIL 25, 2010?

17  A.   FROM WHAT I REMEMBER, YES.

18  Q.   WAS IT COVERED JUST ONE TIME OR WERE THERE SEVERAL SUCH

19  BRIEFINGS WHERE THE SUBJECT WAS DISCUSSED?

20  A.    IT WAS SEVERAL TIMES AS WELL AS TIMES YOU'VE -- I'VE --

21  WE'VE RESPONDED TO CALLS IN REGARDS TO THAT SPECIFIC TYPE OF

22  SUSPECT.

23          MR. ROTHANS:  YOUR HONOR, MAY I PUBLISH

24  EXHIBIT 42-001, WHICH WAS SHOWN DURING OPENING?

25          THE COURT:  MR. GALIPO?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1           MR. GALIPO:  IF I MAY, YOUR HONOR.

2           WITH RESPECT TO THE NON-SHOOTING OFFICER, WE

3    BELIEVE IT'S IRRELEVANT AND 403.

4           MR. ROTHANS:  GOES TO HIS STATE OF MIND AND THE

5    REASON FOR THE TRAFFIC STOP IN THE FIRST INSTANCE, YOUR

6    HONOR.

7           MR. GALIPO:  WE'RE NOT DISPUTING THE TRAFFIC STOP,

8    AND HIS STATE OF MIND IS IRRELEVANT.

9           THE COURT:  WELL, IT'S NOT IRRELEVANT, BUT THE

10   BOLOS WILL BE ADMITTED.  EXHIBIT 42 WILL BE ADMITTED,

11   SPECIFICALLY, BUT IT DOESN'T NEED TO BE PUBLISHED TO THE JURY

12   AT THIS TIME.

13          SO GO AHEAD.

14                  (EXHIBIT 42 IN EVIDENCE.)

15   BY MR. ROTHANS:

16   Q.   SIR, IF YOU COULD LOOK IN ONE OF THE WHITE VOLUMES AT

17   EXHIBIT 42-001 TO YOURSELF, IF YOU CAN FIND THAT TAB...

18   A.   42 --

19   Q.   -001.

20   A.   OKAY.  I GOT IT.

21   Q.   DO YOU SEE THAT ONE-PAGE DOCUMENT, SIR?

22   A.   YES, SIR.

23   Q.   AND PLEASE TAKE A LOOK AT IT, YOU NEED NOT READ IT COVER

24   TO COVER, BUT IF YOU'D JUST FAMILIARIZE YOURSELF WITH IT?

25   A.   YES.

1    Q.   IS THAT A WANTED PERSON BULLETIN ISSUED BY ALHAMBRA

2    POLICE DEPARTMENT THAT YOU HAD SEEN, YOURSELF, PRIOR TO THE

3    TRAFFIC STOP ON APRIL 25, 2010?

4    A.   YES, SIR.

5    Q.   WERE YOU GENERALLY FAMILIAR WITH THE INFORMATION SET

6    FORTH IN EXHIBIT 42-001 PRIOR TO MAKING THAT PARTICULAR

7    TRAFFIC STOP?

8    A.   YES.

9    Q.   WERE YOU AWARE THAT THERE HAD BEEN A SUSPECT ENGAGED IN

10   A KENTUCKY FRIED CHICKEN ARM ROBBERY WHO HAD -- WHO DID, IN

11   FACT, HAVE A SMALL CALIBER HANDGUN?

12   A.   YES.

13   Q.   YOU WERE AWARE OF THAT INFORMATION BEFORE THIS TRAFFIC

14   STOP?

15   A.   YES, SIR.

16   Q.   DO YOU ALSO HAVE IN EXHIBIT 42-001 THREE DIFFERENT

17   PHOTOGRAPHS THAT DEPICT THE SUSPECT?

18   A.   YES.

19   Q.   YOU HAD SEEN THOSE BEFORE THAT MORNING?

20   A.   YES, SIR.

21   Q.   DETECTIVE, IF YOU'LL LOOK AT EXHIBIT 43-001, HAD YOU

22   SEEN THAT PARTICULAR CRIME ALERT BULLETIN FROM THE L.A.P.D.

23   BEFORE THE TRAFFIC STOP OF APRIL 25?

24   A.   YES.

25   Q.   AS YOU READ --

1          THE COURT:  MR. ROTHANS, EXCUSE ME FOR CUTTING YOU

2     OFF.  I'M GOING TO ADMIT EXHIBITS 43 THROUGH 47 AND THE --

3     YOU KNOW, THE JURY SAW THESE IN OPENING STATEMENT.  I'M SURE

4     THEY REMEMBER THEM.  JUST ASK DETECTIVE LOPEZ TO LOOK AT 43

5     THROUGH 47 AND ASK HIM IF HE WAS AWARE OF THOSE EXHIBITS AT

6     THE TIME HE DECIDED TO MAKE THE FELONY TRAFFIC STOPS.

7          MR. ROTHANS:  VERY WELL, YOUR HONOR.

8     BY MR. ROTHANS:

9     Q.   AS THE JUDGE JUST REQUESTED, EXHIBITS 43-001 THROUGH

10    47-001, JUST LOOK AT THEM BRIEFLY, SIR.

11    A.   YES, SIR.

12    Q.   HAD YOU BEEN PRESENTED COPIES OF THOSE AND DISCUSSED ALL

13    OF THOSE BOLOS IN BRIEFINGS BEFORE THE TRAFFIC STOP OF

14    APRIL 25, 2010?

15    A.   YES.

16    Q.   DID THEY PLAY A ROLE IN YOUR DECISION TO EFFECTUATE THAT

17    TRAFFIC STOP ON THE GREEN CHRYSLER SEBRING ON APRIL 25, 2010?

18    A.   THEY PLAYED A ROLE, YES.

19    Q.   DO YOU SPECIFICALLY REMEMBER, DETECTIVE, THE PRECISE

20    TIME THAT YOU RECEIVED A DISPATCH CALL ON THE MORNING OF

21    APRIL 25, CONCERNING AN ALLEGED ARMED ROBBERY AT THE

22    RADIOSHACK?

23    A.   I DON'T REALLY RECALL THE TIME, SIR, NO.

24    Q.   WILL YOU LOOK AT ONE OF THE WHITE VOLUMES, AND

25    SPECIFICALLY EXHIBIT 16.

1    A.   (WITNESS COMPLIES.)

2    Q.   ARE YOU FAMILIAR WITH THAT TYPE OF DOCUMENT, EXHIBIT 16?

3    A.   YES.

4    Q.   WHAT DO YOU KNOW THAT DOCUMENT TO BE?

5    A.   IT'S A PRINTOUT OF, I GUESS, THROUGH DISPATCH RADIO CALL

6    TIMES AND SPECIFICS THAT GO ALONG WITH THAT.

7    Q.   IS THAT A CAD REPORT?

8    A.   YES.

9    Q.   IS YOUR UNDERSTANDING THAT A CAD REPORT IS A

10   COMPUTER-AIDED OR ASSISTED DISPATCH RECORD?

11   A.   YES.

12           THE COURT:  MR. ROTHANS, IS THIS FOR THE PURPOSE OF

13   REFRESHING HIS RECOLLECTION, OR YOU WANT TO GET THIS BEFORE

14   THE JURY?

15           MR. ROTHANS:  FOR THE PURPOSE OF REFRESHING HIS

16   RECOLLECTION.

17           THE COURT:  ALL RIGHT.  JUST ASK HIM TO LOOK AT IT

18   AND IF THAT REFRESHES HIS MEMORY AS TO WHEN THE CALL CAME IN.

19   BY MR. ROTHANS:

20   Q.   BY LOOKING AT THAT DOCUMENT, SIR, CAN YOU TELL

21   SPECIFICALLY WHEN YOU RECEIVED A CALL FROM DISPATCH ABOUT THE

22   SILENT ALARM AT THE RADIOSHACK AT 4137 SEPULVEDA BOULEVARD?

23   A.   YES.

24   Q.   WHAT TIME WAS THAT, SIR?

25   A.   SAY, 11:18, 32 SECONDS.

1    Q.   CAN YOU SAY THAT AGAIN, SIR.

2            THE SILENT ALARM CALL CAME AT WHAT TIME?

3    A.   IT WAS 11:18 AND 32 SECONDS.

4            THE COURT:  DETECTIVE LOPEZ, YOU CERTAINLY DON'T

5    RECALL THE SECONDS THAT IT CAME IN.

6            IS THAT -- IS THAT TIME CONSISTENT WITH WHAT YOU

7    RECOLLECT FROM THAT MORNING?

8            THE WITNESS:  FROM WHAT I -- YES.  YES, YOUR HONOR.

9            THE COURT:  GO AHEAD.

10   BY MR. ROTHANS:

11   Q.   BY LOOKING AT THAT PARTICULAR DOCUMENT, EXHIBIT 16, DOES

12   IT REFRESH YOUR RECOLLECTION AS TO THE TIME THE DISPATCH WAS

13   SENT TO THE FIELD TO THE PATROL UNITS?

14   A.   IT'S ABOUT A MINUTE DELAYED, BUT YES.

15   Q.   OKAY.  LOOK AT THE SECOND PAGE, SIR, SEE IF YOU CAN

16   DETERMINE FROM THAT THE TIME THAT YOU WOULD HAVE RECEIVED THE

17   CALL IN THE FIELD?

18   A.   11:19.

19   Q.   AND ARE THERE SECONDS THERE AS WELL?

20   A.   11:19 AND 30 SECONDS.

21   Q.   AND DID YOU MAKE BROADCASTS FROM YOUR RADIO INSIDE YOUR

22   UNIT DURING THE TRAFFIC STOP?

23   A.   YES.

24   Q.   AND WOULD IT INDICATE WHEN YOU ACTUALLY RECEIVED OR

25   ARRIVED, I SHOULD SAY, AT THE PARKING LOT OF MOTOR AND

1    VENICE?

2    A.   IT SHOULD, YES.

3    Q.   REFRESH YOUR RECOLLECTION, PLEASE, AND TELL US WHAT TIME

4    YOU PUT OUT A BROADCAST THAT YOU WERE ACTUALLY AT THE PARKING

5    LOT AT MOTOR AND VENICE.

6    A.   11:31 AND 29 SECONDS.

7    Q.   AND THAT'S THE TIME THAT YOU BROADCAST TO DISPATCH AND

8    THE OTHER UNITS YOU WERE AT THE PARKING LOT?

9         MR. GALIPO:  I'M GOING TO OBJECT AS LACKING

10   FOUNDATION, YOUR HONOR, BECAUSE -- WELL, LACKS FOUNDATION AS

11   TO ANY TIME DELAY IN THE ENTRY.

12        THE COURT:  ALL RIGHT.  THIS -- YOU CAN ASK, MR.

13   ROTHANS -- LOOK, THE JURY'S GOING TO THINK THAT THE LAW IS

14   PRETTY STRANGE IF I'M ASKING WHETHER IT REFRESHES HIS

15   RECOLLECTION.  CLEARLY, DETECTIVE LOPEZ DOES NOT REMEMBER THE

16   SECOND.  EITHER THE DOCUMENT IS COMING IN AS A BUSINESS

17   RECORD OR IT ISN'T.  SO LAY A FOUNDATION AS TO WHAT THE

18   DOCUMENT IS, WHY THERE'S A REASON TO BELIEVE IT'S ACCURATE,

19   AND THEN HE CAN TESTIFY AS TO WHAT THESE TIMES ARE.  I DON'T

20   THINK THEY'RE PARTICULARLY IN DISPUTE.  SO JUST -- LET THE

21   JURY KNOW WHY THIS DOCUMENT IS ACCURATE AND WHY WE CAN RELY

22   ON IT.

23   BY MR. ROTHANS:

24   Q.   REFERRING TO THIS PARTICULAR DOCUMENT, SEVERAL PAGES,

25   EXHIBIT 16, YOU'RE NOT THE AUTHOR OF THIS DOCUMENT, ARE YOU?

1    A.    NO.

2    Q.    YOU'VE SEEN THIS CAD REPORTS OVER THE YEARS?

3    A.    YES.

4    Q.    THESE REFLECT TIMES OF VARIOUS DISPATCH ES TO AND FROM

5    DISPATCH AND UNITS?

6    A.    YES, SIR.

7    Q.    YOU PUT OUT BROADCASTS THAT DAY?

8    A.    YES, SIR.

9    Q.    OTHER OFFICERS DID AS WELL?

10   A.    YES, SIR.

11   Q.    IS THIS A RECORD THAT'S NORMALLY KEPT IN THE NORMAL

12   COURSE OF BUSINESS AT THE CULVER CITY POLICE DEPARTMENT BY

13   THE DISPATCH CENTER?

14   A.    YES.

15   Q.    DO YOU HAVE ANY REASON TO BELIEVE ENTRIES IN HERE ARE

16   INCORRECT?

17   A.    I DON'T BELIEVE SO, NO.

18   Q.    AND DO THESE HELP REFRESH YOUR MEMORY IN TERMS OF THE

19   APPROXIMATE TIMES, BROADCASTS WERE MADE, THE TRAFFIC STOP WAS

20   MADE, ET CETERA?

21   A.    JUST ABOUT, YES.

22         MR. ROTHANS:  I WOULD OFFER EXHIBIT 16, YOUR HONOR.

23         THE COURT:  WELL, THERE MIGHT BE INFORMATION IN IT

24   THE JURY DOESN'T NEED, BUT I'LL ALLOW DETECTIVE LOPEZ TO

25   TESTIFY FROM THE DOCUMENT AS TO THE TIMES.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
1              SO GO AHEAD.

2    BY MR. ROTHANS:

3    Q.   AND AS TO THE SPECIFIC TIMES, SIR -- AND, AGAIN, REFRESH

4    YOUR RECOLLECTION AS NEEDED -- THAT YOU BROADCAST TO OTHER

5    UNITS AND DISPATCH, YOU WERE IN THE PARKING LOT AT MOTOR AND

6    VENICE, WAS WHAT TIME?

7    A.   11:31 AND 29 SECONDS.

8    Q.   AND SOMEONE BROADCAST AT SOME POINT IN TIME, DID THEY,

9    THAT SHOTS WERE FIRED?

10   A.   CORRECT.

11   Q.   DO YOU KNOW WHO MADE THAT BROADCAST OR WHO MADE THE

12   INITIAL BROADCAST?

13   A.   I BELIEVE IT WAS OFFICER ZERBEY.

14   Q.   AND WHAT TIME WERE THE SHOTS FIRED -- THE CALL -- WHAT

15   TIME WAS THAT PUT OUT?

16             MR. GALIPO:  AGAIN, I'M GOING TO OBJECT ONLY

17   BECAUSE I BELIEVE THIS DOCUMENT TIMES THE TIME IT WAS

18   ENTERED --

19             THE COURT:  YOU CAN EXPLORE THAT ON

20   CROSS-EXAMINATION.

21             GO AHEAD, MR. ROTHANS.

22   BY MR. ROTHANS:

23   Q.   SIR, WHAT TIME WERE SHOTS FIRED CALL PUT OUT?

24   A.   11:34 AND 7 SECONDS.

25   Q.   NOW, GETTING BACK TO THE MORNING OF APRIL 25, 2010, SIR,
```

1    YOU HAD RECEIVED SOME INFORMATION ABOUT AN ARMED ROBBERY THAT

2    HAD TAKEN PLACE?

3    A.   YES.

4    Q.   HOW DID YOU RECEIVE THAT INFORMATION?

5    A.   PRIOR TO THE 25TH?

6    Q.   THE MORNING OF.

7    A.   I HAD RECEIVED SEVERAL BOLOS AND BRIEFINGS.

8    Q.   THE MORNING OF APRIL 25, YOU RECEIVED SOME INFORMATION

9    THAT AN ARMED ROBBERY HAD TAKEN PLACE?

10   A.   YES, SIR.

11   Q.   HOW DID YOU RECEIVE THE INFORMATION?

12   A.   OVER THE RADIO.

13   Q.   AND WERE YOU IN THE FIELD AT THE TIME?

14   A.   I WAS AT THE STATION.

15   Q.   DO YOU RECALL WHAT YOU WERE DOING AT THE STATION?

16   A.   I WAS -- I'D JUST MADE AN ARREST AND I WAS IN THE

17   STATION, THE BOOKING AREA.

18   Q.   YOU HEARD ON A RADIO THAT THERE HAD BEEN AN ARMED

19   ROBBERY?

20   A.   CORRECT.

21   Q.   WHAT DID YOU DO AT THAT POINT?

22   A.   I RESPONDED FROM THE STATION.

23   Q.   YOU WENT INTO A POLICE CAR?

24   A.   YES, SIR.

25   Q.   DID YOU GO BY YOURSELF?

1    A.   YES.

2    Q.   DID YOU HAVE A PARTNER IN THE VEHICLE WITH YOU AT THE

3    TIME?

4    A.   NO, SIR.

5    Q.   OKAY.  NOW, WHERE DID YOU PROCEED TO FROM THE STATION?

6    A.   CULVER AND SEPULVEDA.  SO I WENT WEST ON CULVER

7    BOULEVARD FROM DUQUESNE, AND I MADE A LEFT TO GO SOUTHBOUND

8    SEPULVEDA.

9    Q.   AND WHAT WAS YOUR PURPOSE IN GOING TO THAT LOCATION?

10   A.   TYPICALLY BECAUSE THE TIME DELAY AND THE SHORT AMOUNT OF

11   TIME THE UNITS WERE ACTUALLY THERE, YOU WERE TRAINED -- YOU

12   WANT TO GET TO THE MAJOR THOROUGHFARES AROUND ALL AREAS OF AN

13   EXIT OR, YOU KNOW, TO LEAVE THE AREA.

14   Q.   AND THE AREA OF CULVER AND SEPULVEDA, WHERE WAS THAT IN

15   RELATION TO THE RADIOSHACK THAT HAD BEEN ROBBED?

16   A.   I WANT TO SAY IT IS SOUTH.

17   Q.   AND WHAT WERE YOU LOOKING FOR?

18   A.   ANYTHING OUT OF SUSPICION.

19   Q.   DID YOU HAVE A DESCRIPTION OF THE GET-AWAY VEHICLE AT

20   THAT POINT?

21   A.   NO, SIR.

22   Q.   DID YOU HAVE ANY INFORMATION BEFORE YOU SAW THE GREEN

23   CHRYSLER SEBRING AS TO WHAT THE GET-AWAY VEHICLE LOOKED LIKE?

24   A.   NO, SIR.

25   Q.   DID YOU RECEIVE, WHILE YOU WERE OUT IN THE FIELD, SOME

1    INFORMATION ABOUT WHAT THE SUSPECT OF THE ARMED ROBBERY

2    LOOKED LIKE?

3    A.   YES.

4    Q.   AS YOU SIT HERE TODAY, THREE YEARS LATER, WHAT DO YOU

5    RECALL RECEIVING IN THE FIELD IN TERMS OF THE DESCRIPTION OF

6    THE SUSPECT?

7    A.   IT WAS A MALE BLACK, BLACK HAT, BLACK OR DARK-COLORED

8    LONG SLEEVE, SOME PANTS.

9    Q.   DO YOU RECALL ANY DESCRIPTION IN TERMS OF HIS HEIGHT?

10   A.   HE WAS, FROM WHAT I REMEMBER, LARGE INDIVIDUAL, ABOVE

11   SIX-FOOT.  KIND OF LIKE A LITTLE FACIAL HAIR.

12   Q.   DO YOU REMEMBER ANY OTHER DESCRIPTION THAT WAS PUT OUT

13   TO YOU BY RADIO THAT MORNING BEFORE YOU SPOTTED THE GREEN

14   CHRYSLER SEBRING?

15   A.   YES.

16   Q.   WHAT ELSE?

17   A.   IT WAS A WEAPON USED.  IT WAS A SMALL SILVER HANDGUN.

18   Q.   YOU WERE AWARE OF THAT INFORMATION WHEN YOU MADE THE

19   TRAFFIC STOP?

20   A.   YES, SIR.

21   Q.   VERY WELL.

22         AT SOME POINT, DID YOU SPOT ANYTHING UNUSUAL OR

23   WOULD APPEAR TO BE A GET-AWAY CAR IN THE AREA OF CULVER AND

24   SEPULVEDA?

25   A.   NO, SIR.

1  Q.   DID YOU PROCEED TO SOME OTHER LOCATION IN THE CITY?

2  A.   YES, I DID.

3  Q.   WHERE?

4  A.   I PROCEEDED EAST TO THE INTERSECTION OF AN AREA OF

5  OVERLAND AND WASHINGTON BOULEVARD.

6  Q.   AND WHY DID YOU GO IN THAT DIRECTION?

7  A.   JUST THINKING -- I HAD REMEMBERED THAT THERE WAS A

8  COUPLE OF THE SAME TYPE ROBBERIES DONE IN ONE DAY IN AN AREA

9  CLOSE TO EACH OTHER, SO I KNEW THAT I HAD RESPONDED TO THE

10 RADIOSHACK AT THE CULVER CENTER IN THAT AREA TO ADVISE THEM.

11 DUE TO THE FACT THAT THEY HAD BEEN ROBBED, I HAD TAKEN A

12 REPORT FROM THEM BEFORE.

13 Q.   ARE YOU SUGGESTING THERE WAS MORE THAN ONE RADIOSHACK IN

14 CULVER CITY?

15 A.   YES, SIR.

16 Q.   SO YOU WERE HEADING TO A DIFFERENT RADIOSHACK TO ALERT

17 THEM?

18 A.   YES, SIR.

19 Q.   THAT'S WHILE YOU WERE AT OVERLAND AND WHERE?

20 A.   WASHINGTON.

21 Q.   OVERLAND AND WASHINGTON.

22      OKAY.  AT SOME POINT, DID YOU ULTIMATELY GET TO A

23 LOCATION WHERE YOU SAW A GREEN CHRYSLER SEBRING?

24 A.   YES, SIR.

25 Q.   AND WHERE WERE YOU AT THAT POINT IN TIME?

1   A.   I DON'T RECALL WHICH LANE.  I WAS FIRST CAR UP AT

2   OVERLAND NORTH AND VENICE BOULEVARD.

3   Q.   SO YOU WERE GENERALLY FACING IN A NORTHBOUND DIRECTION?

4   A.   YES, SIR.

5   Q.   I BELIEVE WHEN MR. GALIPO ASKED YOU SOME QUESTIONS

6   EARLIER, YOU MAY HAVE MISSPOKEN IN TERMS OF COMPASS

7   DIRECTIONS.

8            YOU SAW A GREEN CHRYSLER SEBRING WHILE YOU WERE AT

9   THE INTERSECTION OF OVERLAND AND VENICE; IS THAT TRUE?

10  A.   YES.

11  Q.   WHICH DIRECTION DID YOU SEE THE CHRYSLER SEBRING

12  TRAVELLING?

13  A.   I DON'T REALLY REMEMBER, BUT IT WAS BASICALLY FROM MY

14  LEFT TO RIGHT.  SO COMING FROM WEST OUT OR HEADING EAST FROM

15  MY WEST TO EAST.

16  Q.   FROM YOUR LEFT TO RIGHT OR FROM WEST TO EAST?

17  A.   YES, SIR.

18  Q.   AND THE DIRECTION THE GREEN CHRYSLER SEBRING WAS

19  TRAVELLING, WAS THAT TOWARDS THE ORIGINAL RADIOSHACK WHERE

20  THE ROBBERY HAD TAKEN PLACE?

21  A.   TOWARDS, NO.

22  Q.   WAS IT AWAY FROM?

23  A.   YES, SIR.

24  Q.   AND WHAT CAUGHT YOUR ATTENTION ABOUT THIS GREEN CHRYSLER

25  SEBRING?

1    A.   SEVERAL THINGS, SIR.

2    Q.   I'M SORRY?

3    A.   SEVERAL THINGS.

4    Q.   PLEASE TELL US.

5    A.   LIKE I HAD SAID EARLIER, BECAUSE OF THE TIME DELAY, YOU

6    KIND OF WANT TO CHECK THE AREAS AROUND THE MAJOR

7    THOROUGHFARES TO GET IN AND OUT OF THE CITY.  THAT SPECIFIC

8    INTERSECTION LEADS YOU EAST OUT OF THE CITY, AS WELL YOU

9    COULD TAKE IT NORTH TO GET ONTO THE FREEWAY ON OVERLAND.

10        THE SPECIFIC VEHICLE, WHEN I WOULD WATCH IT,

11   TRAVELED FROM MY LEFT TO MY RIGHT THEY HAD JUST PROCEED --

12   TRAFFIC JUST PROCEEDED AND THAT VEHICLE SPED UP QUICKLY AND

13   GOT IN THAT FAR RIGHT LANE, THAT RIGHT TURN BUS LANE AND

14   ERRATICALLY DROVE AROUND THAT VEHICLE TO GET AROUND IT AND

15   GET INTO THAT NUMBER TWO LANE TO CONTINUE EASTBOUND.

16   Q.   WHEN YOU SAY, OFFICER OR DETECTIVE, THAT IT DROVE

17   ERRATICALLY, WHAT DO YOU MEAN BY THAT?

18   A.   IT'S NOT NORMAL.  UNSAFE, I GUESS YOU'D SAY.  WHEN

19   SOMEONE DRIVES, THEY FOLLOW MOST OF THE RULES OF THE ROADWAY.

20   MY THOUGHT, IT WAS A, HE'S EITHER TRYING TO GET SOMEWHERE

21   QUICK, PARTICULARLY HE WAS TRYING TO GET SOMEWHERE, OR IT

22   COULD POSSIBLY BE A SUSPECT VEHICLE.

23   Q.   DID YOU THEN GLANCE AT THE OCCUPANTS OF THAT VEHICLE?

24   A.   BRIEFLY, YES.

25   Q.   IT'S GOING FROM YOUR LEFT TO YOUR RIGHT TRAVELLING

1    RAPIDLY?

2    A.   YES.

3    Q.   WHAT DID YOU NOTICE?

4    A.   I WANT TO SAY IT WAS A FEMALE DRIVER, THEN A MALE

5    SUBJECT WITH A -- LIKE A LONGER BLACK OR DARK-COLORED SHIRT

6    SEATED IN THE PASSENGER SEAT.

7    Q.   DID THAT APPEAR SUSPICIOUS TO YOU IN SOME WAY?

8    A.   YEAH, IT DID, JUST BECAUSE OF EVERYTHING PRIOR TO THE

9    TIME, THE DIFFERENT ISSUES IN REGARDS TO THE ERRATIC DRIVING,

10   THE FACT THAT IT WAS GOING AWAY FROM THAT SPECIFIC LOCATION

11   MADE ME BELIEVE IT POSSIBLY COULD BE THAT SUSPECT.

12   Q.   SO PULL IN BEHIND THE GREEN CHRYSLER SEBRING?

13   A.   CAN YOU REPEAT THAT, SIR?

14   Q.   CERTAINLY.

15        DID YOU PULL IN BEHIND THE VEHICLE?

16   A.   I ATTEMPTED TO, BUT I WAS -- IT WAS A LITTLE FAR AHEAD

17   OF ME AT THAT TIME.

18   Q.   YOU MAKE A RIGHT TURN ONTO VENICE BOULEVARD?

19   A.   YES, SIR.

20   Q.   DID YOU PROCEED GENERALLY IN AN EASTBOUND DIRECTION?

21   A.   YES.

22   Q.   DID YOU FOLLOW THE VEHICLE FOR A PERIOD OF TIME?

23   A.   YES, SIR.

24   Q.   WHAT HAPPENED?  COULD YOU MAKE ANY OBSERVATIONS OF THE

25   PASSENGER AND THE OCCUPANT AS YOU'RE FOLLOWING IT, GENERALLY,

1   EASTBOUND?

2   A.   SURE.

3          AS I GOT CLOSER TO THE VEHICLE, THE REAR OF THE

4   VEHICLE -- AS I GOT CLOSER TO THE REAR OF THE VEHICLE, I WAS

5   ABLE TO SEE THE MALE SUBJECT A LOT CLEARER.  AT THAT POINT, I

6   WAS ABLE TO SEE HE WAS MALE/BLACK, AND HE HAD THE

7   DARK-COLORED SHIRT, AND HE HAD KEPT LOOKING BACK AND MOVING

8   AROUND IN THAT FRONT CABIN AREA OF HIS.

9   Q.   THOSE OBSERVATIONS, WAS THAT BEFORE THE VEHICLE TURNED

10  RIGHT OR SOUTHBOUND ON MOTOR?

11  A.   PRIOR TO.

12  Q.   WHAT WERE YOU THINKING AS THIS PASSENGER IS TURNING

13  AROUND AND LOOKING BACK TOWARDS YOU?

14  A.   IT --

15          MR. GALIPO:  I'M GOING TO OBJECT AS IRRELEVANT,

16  YOUR HONOR.

17          THE COURT:  OVERRULED.

18          THE WITNESS:  I HAD A LOT -- I WAS -- I -- LOT OF

19  EMOTIONS TOWARDS IT, I GUESS YOU'D SAY.  I WAS SCARED.  STILL

20  ON PROBATION.  YOU KNOW, I -- THIS COULD BE THE VEHICLE.

21  THIS GUY COULD BE ARMED.  THIS GUY -- YOU KNOW, I GENERALLY

22  WANTED A -- REASON WHY I DIDN'T TURN ON MY LIGHTS AS SOON AS

23  I DID IS I WAS BY MYSELF AND I WANTED TO GET OTHER UNITS

24  THERE TO HELP ME OUT AS SAFE AS POSSIBLE IF THIS WAS THE

25  ACTUAL VEHICLE.

1    Q.   DID YOU BROADCAST INFORMATION ON THE RADIO ABOUT THE

2    FACT YOU WERE FOLLOWING ANOTHER VEHICLE?

3    A.   I DID, YES, SIR.

4    Q.   AND WHY DID YOU DO THAT?

5    A.   TO ALERT OTHER OFFICERS TO COME HELP ME, MOSTLY

6    EVERYBODY ELSE WAS GOOD MILE-AND-A-HALF AWAY FROM ME.

7    MOST -- MOSTLY WEST OF ME, BACK AROUND THE ORIGINAL LOCATION.

8    THERE WAS A LITTLE TRAFFIC, I GUESS YOU'D SAY.

9    Q.   AT SOME POINT, DID YOU MAKE A DECISION TO EFFECTUATE A

10   TRAFFIC STOP?

11   A.   YES.

12   Q.   AND DID YOU PUT YOUR LIGHTS ON?

13   A.   YES, I DID.

14   Q.   DID YOU ACTIVATE YOUR SIREN?

15   A.   YES.

16   Q.   WHY DID YOU DO THAT?

17   A.   TO ADVISE THEM OF THE STOP, THE REASON WHY IT WAS MAKING

18   A RIGHT TURN -- IT GOT IN THAT RIGHT LANE, THAT RIGHT TURN

19   KIND OF BUS LINE, BIKE LANE, AND AT THAT POINT I KIND OF

20   FIGURED IN MY HEAD, YOU KNOW, THIS CAR IS GOING TO BE DRIVING

21   ERRATICALLY OR MAYBE GO THROUGH A LIGHT.  I WANT TO LET HIM

22   KNOW THAT I'M BEHIND IT.  I WANT TO STOP IT AT THIS POINT.

23   Q.   SO YOU ACTIVATED YOUR OVERHEAD LIGHTS AND YOU ACTIVATED

24   YOUR SIREN?

25   A.   CORRECT.

1    Q.   AND DID THE VEHICLE MAKE A STANDARD STOP AS MOST

2    MOTORISTS DO IN A TRAFFIC STOP?

3          MR. GALIPO:  I'M GOING TO OBJECT BECAUSE IT'S

4    LEADING AND IT ASSUMES FACTS NOT IN EVIDENCE AND ALSO VAGUE

5    AS PHRASED.

6          THE COURT:  ASK HIM WHAT THE SEBRING DID.

7    BY MR. ROTHANS:

8    Q.   WHAT DID THE SEBRING DO?

9    A.   IT PROCEEDED TO MAKE A RIGHT TURN AND THEN MADE ANOTHER

10   RIGHT TURN INTO THAT DONUT KING PARKING LOT.

11   Q.   IN THE ROUGHLY ONE YEAR BEFORE APRIL 25, 2010, IS THAT

12   GENERALLY HOW MOTORISTS GET PULLED OVER WHEN YOU TRIED TO

13   STOP THEM IN THE PAST?

14   A.   NO.  USUALLY VEHICLES WILL JUST STOP OR PULL TO THE

15   RIGHT AND STOP.

16   Q.   DID THIS CAUSE YOU ANY ALARM?

17   A.   OF COURSE.

18   Q.   WHY?

19   A.   I DIDN'T KNOW WHERE IT WAS TAKING ME.  I DIDN'T KNOW

20   WHERE IT WAS GOING.  IT'S A SMALL PARKING LOT.  I DON'T KNOW

21   WHO WAS IN THE CAR BESIDES TWO PEOPLE, I SAW.

22   Q.   DID YOU ACTUALLY DIRECT THIS GREEN CHRYSLER SEBRING TO

23   PULL INTO THE SMALL PARKING LOT?

24   A.   NO.

25   Q.   IT PULLED IN BY ITSELF?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    A.   YES.

2    Q.   WHAT HAPPENED NEXT WHEN YOU GOT THERE?

3              THE COURT:  ALL RIGHT.  IF WE'RE MOVING ON TO AT

4    LEAST A SLIGHTLY DIFFERENT TOPIC, MR. ROTHANS, I'M GOING TO

5    STOP US THERE RIGHT NOW AND WE'LL TAKE THE MORNING BREAK.

6              LADIES AND GENTLEMEN, BE PREPARED TO RETURN TO

7    COURT 20 MINUTES FROM NOW AT 10 TO 11:00.  REMEMBER MY

8    ADMONITIONS, DON'T DISCUSS THE CASE WITH ANYONE, INCLUDING

9    EACH OTHER, AND DON'T DO ANYTHING TO INVESTIGATE THE CASE.

10             THANK YOU.

11             THE CLERK:  PLEASE RISE FOR THE JURY.

12                      (JURORS EXIT.)

13             THE CLERK:  PLEASE BE SEATED.

14             THE COURT:  DETECTIVE, YOU MAY STEP DOWN.

15             MR. GALIPO, MR. ROTHANS HAS AT LEAST IMPLICITLY

16   RAISED A CERTAIN POINT IN MAKING HIS EARLIER HEARSAY

17   OBJECTION, WHICH IS:  IS IT THE CONTENTION OF THE PLAINTIFFS

18   THAT FOR THE TAPED STATEMENTS IN THE DEPOSITIONS OF THE

19   OFFICERS OTHER THAN DETECTIVE MARTINEZ, THAT THOSE ARE

20   STATEMENTS OF THE PARTY OPPONENT?

21             MR. GALIPO:  IT IS.

22             THE COURT:  ALL RIGHT.  AND THAT IS SOMETHING ON

23   WHICH I'M GOING TO WANT SOME BRIEFING, IN PART, BECAUSE,

24   OBVIOUSLY, THAT DETERMINES WHETHER AT SOME POINT IN THE CASE

25   YOU JUST STOOD IN FRONT OF A JURY AND READ THEM PORTIONS OF

```
1    THE STATEMENT WHICH -- YOU KNOW --

2            MR. GALIPO:  WELL --

3            THE COURT:  AND THE SECOND THING IS WHETHER -- NOT

4    THAT THE JURY IS POSSIBLY GOING TO UNDERSTAND THIS, BUT THERE

5    WOULD BE A DISTINCTION FOR ARGUABLE IMPEACHMENT BY PRIOR

6    INCONSISTENT STATEMENTS, THE STATEMENTS FROM THE DEPOSITIONS

7    WOULD COME IN AS WELL FOR THE TRUTH OF THE MATTER ASSERTED

8    AND THE STATEMENTS FROM THE RECORDED INTERVIEWS WOULD JUST

9    COME IN FOR PURPOSES OF SHOWING THE INCONSISTENCY, NOT THAT

10   THE JURY IS GOING TO UNDERSTAND THAT IF I TOLD THEM THAT, BUT

11   THAT'S WHAT THE LAW IS.  SO WE HAVE TO DETERMINE WHETHER THE

12   STATEMENTS ARE, IN FACT, HEARSAY OR NOT.

13           MR. GALIPO:  THANK YOU, YOUR HONOR.

14           WHAT -- PARTICULARLY WITH THE UPCOMING WITNESSES,

15   WE REALLY PLAN TO FOCUS ON THE DEPOSITIONS.  IF WE DO THE

16   STATEMENTS, IT WILL BE VERY LIMITED TO REFRESH RECOLLECTION

17   OR SPECIFIC PRIOR INCONSISTENT STATEMENTS.  WE DON'T PLAN ON

18   PLAYING PORTIONS OF THE STATEMENTS, PER SE.  WE ALSO BELIEVE,

19   AND THIS ISSUE MAY COME UP WITH OFFICER MARTINEZ, THE WAY

20   WE'RE GOING TO PRESENT OUR EVIDENCE THAT IT WILL BE HEARSAY

21   FROM MR. ROTHANS TO TRY TO READ FROM HIS STATEMENT, BUT

22   YOU'LL HAVE TO MAKE THAT CALL WHEN YOU GET THERE BASED ON THE

23   STATE OF THE EVIDENCE BECAUSE WE DON'T BELIEVE THE RULE OF

24   COMPLETENESS WILL APPLY BECAUSE WE'RE NOT GOING TO BE GETTING

25   INTO OTHER PORTIONS OF THAT STATEMENT FOR IT TO APPLY.  BUT I
```

1    UNDERSTAND THE COURT WILL HAVE TO WAIT AND SEE.

2             THE COURT:  WELL, I CERTAINLY AGREE WITH YOU THAT

3    THE FACT THAT YOU ARE USING SOME PORTION OF THE STATEMENT

4    DOES NOT MEAN THAT THE ENTIRE STATEMENT COMES IN AND THAT THE

5    DEFENSE CAN USE IT AS THEY SEE FIT.  ON THE OTHER HAND, IF

6    YOU ARE READING A PARAGRAPH TO THE JURY AND THERE'S OTHER

7    TESTIMONY IN THE STATEMENT, EITHER ON THAT TOPIC -- EITHER

8    THE PRECEDING PARAGRAPH OR MAYBE SOMETHING ELSE WHERE OUT OF

9    FAIRNESS THE JURY SHOULD KNOW WHAT HIS ENTIRE THING WAS, AND

10   THAT -- THAT'S HOW THE RULE OF COMPLETENESS IS GOING TO BE

11   APPLIED IN THIS CASE.

12            MR. GALIPO:  I UNDERSTAND AND AGREE WITH YOU.  I'M

13   JUST SAYING THAT WE EXPECT THAT WE'RE NOT GOING TO BE READING

14   PARAGRAPHS FROM THE STATEMENT.  WE'RE GOING TO BE FOCUSING ON

15   THE DEPOSITION TESTIMONY.

16            THE COURT:  ALL RIGHT.  AGAIN, THE RULE OF

17   COMPLETENESS WILL APPLY THERE AS WELL.

18            MR. GALIPO:  I UNDERSTAND.  WITHIN THE CONTEXT OF

19   THE DEPOSITION, YES.

20            THE OTHER POINT I WANT TO MAKE, AND I KNOW -- I'M A

21   LITTLE CONCERNED.  YOU KNOW, THERE'S A LOT OF CASE LAW THAT

22   INTERESTINGLY SAYS IN AN EXCESSIVE FORCE CASE, THE STATE OF

23   THE MIND OF THE SHOOTER IS NOT EVEN RELEVANT.  I HAVE TROUBLE

24   TO SOME EXTENT WITH THAT BECAUSE I GUESS THE STANDARD IS WHAT

25   A REASONABLE OFFICER WOULD DO, BUT, INEVITABLY, IN MANY OF

1     THESE CASES, WHAT THE OFFICER WAS THINKING DOES COME IN.  BUT

2     IF WE'RE GOING TO BE GOING WITH EVERY SINGLE OFFICER WHO DID

3     NOT SHOOT, ABOUT GOING THROUGH EACH OF THESE BULLETINS AND

4     ALL OF THESE OTHER ROBBERIES, AT SOME POINT, YOUR HONOR, IT

5     BECOMES CUMULATIVE AND UNDER 403.

6           NOW, I UNDERSTAND WHAT OFFICER MARTINEZ, THE COURT

7     HAS RULED THAT'S FAIR GAME.  BUT I JUST HOPE WE'RE NOT GOING

8     HAVE THIS WITH EVERY SINGLE OFFICER THAT TESTIFIES, BECAUSE,

9     AT SOME POINT, I'M GOING TO STAND UP AND OBJECT UNDER 403.

10    I'M NOT SURE WHAT YOUR HONOR WILL DO, BUT I JUST WANTED TO

11    LET YOU KNOW THAT THAT WOULD BE MY INTENT.

12          THE COURT:  ALL RIGHT.  WELL, BEFORE I HEAR FROM

13    MR. ROTHANS, LET ME TELL YOU WHAT MY THOUGHTS ARE ON THAT.

14    FIRST, ONE OF THE REASONS THAT I GIVE YOU THE TIME LIMITS IS

15    THEN I'M SURE COUNSEL KNOW BETTER THAN I DO WHAT'S IMPORTANT,

16    HOW TO PERSUADE THE JURY, WHAT IS IN YOUR CLIENT'S INTEREST,

17    SO I DON'T HAVE TO MICRO MANAGE THINGS LIKE THAT IN THE --

18    FOR THE SOLE PURPOSE OF SAVING TIME, BECAUSE THERE'S AN OUTER

19    BOUNDARY ON HOW LONG THE TRIAL IS GOING TO LAST.

20          THE SECOND POINT IS THAT I -- IN TERMS OF THE STATE

21    OF MIND OF DETECTIVE MARTINEZ, IN A TECHNICAL SENSE, THAT

22    PRIOR CASE LAW IN THE NINTH CIRCUIT IS PROBABLY NOT EVEN GOOD

23    BECAUSE THERE WAS RECENTLY A CASE THAT SAID THAT THE

24    SUBJECTIVE INTENT OF THE OFFICER IF IT, IN FACT, WAS AGAINST

25    THE DECEDENT, MIGHT ACTUALLY MATTER.  I MEAN, IF IT -- LOOK

```
1    IF HE -- IF HE INTENDED TO SHOOT HIM FOR AN IMPROPER PURPOSE.

2    I DON'T THINK THERE'S ANY -- REALLY ANY CONTENTION OF THAT

3    HERE, SO I'M -- I -- THAT'S NOT REALLY THE POINT I'M GOING

4    AT.

5              THE REAL POINT AND WHAT YOU'VE ACKNOWLEDGED IS THAT

6    IT IS UNREALISTIC TO THINK THAT THE JURY COULD DETERMINE

7    WHETHER THE OFFICER'S OBJECTIVE REACTION WAS PROPER, OR I

8    SHOULD SAY, JUDGE IT BY AN OBJECTIVE STANDARD THAT IS SO

9    OBJECTIVE THAT HIS OWN THOUGHTS DON'T GO INTO IT.  I MEAN, I

10   JUST ISN'T GOING TO HAPPEN.

11             MR. GALIPO:  I UNDERSTAND.

12             THE COURT:  NOW, BEYOND THAT, THOUGH, THERE HAS

13   BEEN AN ISSUE RAISED, IN BOTH YOUR OPENING STATEMENT AND EVEN

14   MORE IN MR. MC NICHOLAS', AS TO THE OTHER OFFICERS THERE

15   THAT, YES, IT'S ONE THING TO SAY, AS YOU DID, THAT THEY

16   DIDN'T SEE A GUN OR THEY DIDN'T SEE HIM SPIN AROUND OR THEY

17   DIDN'T SEE HIM STANDING TO THE WEST, BUT IT REALLY -- BOTH OF

18   YOUR OPENING STATEMENTS, AN MR. MC NICHOLAS' EVEN MORE, DID

19   GO BEYOND THAT, ESSENTIALLY SAYING THEY DIDN'T SHOOT, SO

20   THERE HAS TO BE WITH -- WHILE NOT LETTING IT OVERWHELM

21   THINGS, THEY HAVE TO BE GIVEN SOME BRIEF OPPORTUNITY TO

22   EXPLAIN WHY THEY DID NOT SHOOT.  I MEAN, BECAUSE IT JUST

23   REALLY THEN -- IT'S UNFAIR TO THE DEFENSE WHEN -- IN FACT, IT

24   WOULD BE UNFAIR TO THE DEFENSE IF EVEN THAT WAS IMPLICITLY

25   PART OF THE PLAINTIFF'S CASE, BUT, IN FACT, IS EXCLUSIVELY
```

1    PART OF THE PLAINTIFF'S CASE.

2           MR. GALIPO:  I AGREE WITH YOUR HONOR THAT THEY

3    SHOULD BE GIVEN THE OPPORTUNITY TO EXPLAIN THAT, CLEARLY IN

4    FAIRNESS, BUT I'M NOT SO SURE ASKING THE NON-SHOOTING

5    OFFICERS AT DIFFERENT STAGES HOW THEY FELT, WHAT THEY WERE

6    THINKING, YOU KNOW, WHAT WAS THEIR STATE OF MIND WHEN YOU

7    FIRST GOT TO THE SCENE ON YOUR WAY THERE.  I THINK WHAT'S

8    REALLY IMPORTANT IS, PERHAPS, WHY DIDN'T SHE SHOOT.  SO I

9    UNDERSTAND IT'S A FINE LINE AND A GREY AREA.

10          THE COURT:  AND TO A DEGREE, I AGREE WITH YOU,

11   WHICH IS WHY I HAD THE BOLOS DEALT WITH IN THE FASHION THAT I

12   DIRECTED.  I DON'T INTEND THAT EVERY SINGLE OFFICER IS GOING

13   TO TESTIFY ABOUT EVERY SINGLE BOLO.  CLEARLY, DETECTIVE

14   MARTINEZ WILL BE FREE TO TESTIFY TO THEM OR, FRANKLY, TESTIFY

15   TO VIRTUALLY ANYTHING HE WANTS.  IT'S NOT IMPROPER VIOLATION

16   OF RULE OF 403.  BUT I -- SO I DON'T INTEND THAT FOR ALL OF

17   THE OFFICERS THERE WOULD BE THIS LEVEL OF DETAIL, BUT I DO

18   THINK WHERE OFFICER LOPEZ HAS FIGURED SO PROMINENTLY IN THE

19   OPENING STATEMENTS AND WHERE HE IS THE FIRST OFFICER AND

20   WHERE HE DID MAKE THE DECISION TO PULL THEM OVER, THAT IT'S

21   APPROPRIATE.

22          JUST AS IN A CRIMINAL CASE, THE JURY IS CERTAINLY

23   NOT TOLD ABOUT THE ENTIRE INVESTIGATION OR IT'S NOT GIVEN A

24   SEARCH WARRANT APPLICATION, BUT THE JURY IS STILL -- THE

25   GOVERNMENT STILL HAS THE RIGHT TO BRING OUT THAT THERE WAS A

1   SEARCH WARRANT OR THERE WAS A REASONABLE SUSPICION FOR A

2   STOP.  SO THE JURY BELIEVES THAT THE TESTIFYING OFFICERS OR

3   AGENTS AREN'T SIMPLY RUNNING AMOK.  AND I THINK HERE THAT I

4   HAVEN'T SEEN ANYTHING SO FAR WITH THIS TESTIFYING WITNESS

5   THAT I THINK HAS GONE BEYOND WHAT IS APPROPRIATE, OTHER THAN

6   THE FACT THAT I DON'T INTEND ANYONE OTHER THAN DETECTIVE

7   MARTINEZ TO GO THROUGH THE BOLOS ONE BY ONE.

8           MR. GALIPO:  THANK YOU, YOUR HONOR.

9           THE COURT:  ALL RIGHT.  SO WHEN I SAID --

10  OBVIOUSLY, NOW, THE COURT REPORTER NEEDS A BREAK, WE ALL NEED

11  A BRIEF BREAK, BUT I DID GIVE THE JURY A CERTAIN TIME THAT

12  THEY SHOULD BE READY, SO LET'S TRY TO HURRY UP AND BE READY

13  TO COME BACK.

14          MR. GALIPO:  THANK YOU.

15          THE CLERK:  ALL RISE.

16          COURT IS IN RECESS.

17                    (RECESS.)

18          THE COURT:  DETECTIVE LOPEZ, YOU MAY RETAKE THE

19  STAND.

20          YOU MAY GET THE JURY.

21          THE CLERK:  YES, YOUR HONOR.

22          THE COURT:  LADIES AND GENTLEMEN, WELCOME BACK, THE

23  EIGHT JURORS ARE HERE, COUNSEL ARE HERE, THE WITNESS IS ON

24  THE STAND.

25          DETECTIVE, YOU'RE STILL UNDER OATH.

```
 1              MR. ROTHANS, YOU MAY PROCEED.

 2              MR. ROTHANS:  THANK YOU, YOUR HONOR.

 3                 CROSS-EXAMINATION (RESUMED)

 4    BY MR. ROTHANS:

 5    Q.   DETECTIVE, WE CAME TO A POINT BEFORE THE BREAK WHERE THE

 6    GREEN CHRYSLER SEBRING PULLING INTO THE DONUT KING PARKING

 7    LOT, THE SOUTHWEST CORNER OF VENICE AND MOTOR, DO YOU RECALL

 8    THAT?

 9    A.   YES, SIR.

10    Q.   DID THE VEHICLE COME TO A STOP?

11    A.   IN THE PARKING LOT, YES, SIR.

12    Q.   DID YOU PULL BEHIND IT AND COME TO A STOP AS SHOWN IN

13    THOSE DIAGRAMS WE'VE SEEN?

14    A.   YES, SIR.

15    Q.   AND WERE YOU BY YOURSELF, INITIALLY?

16    A.   YES.

17    Q.   WHEN I MEAN BY YOURSELF, ANY OTHER OFFICERS WITH YOU

18    WHEN THE GREEN CHRYSLER SEBRING CAME TO THAT STOP?

19    A.   UNFORTUNATELY NOT.

20    Q.   WAS THERE A PERIOD OF TIME BETWEEN YOU BEING ALONE AND

21    THE VEHICLE CAME TO A STOP AND OFFICERS FAIRBANKS AND ZERBEY

22    ARRIVING?

23    A.   YES.

24    Q.   CAN YOU GIVE US AN ESTIMATE OR A SENSE OF APPROXIMATELY

25    HOW LONG FROM WHEN YOU HAD THAT STOP IN THAT PARKING LOT
```

1  UNTIL THE FIRST BACKUP OFFICERS ARRIVED?

2  A.   MAYBE A MINUTE OR TWO.  I WOULDN'T REMEMBER, REALLY.

3  Q.   OKAY.  AND YOU WERE, AS YOU INDICATED, ALONE AT THAT

4  POINT?

5  A.   YES, SIR.

6  Q.   YOU WERE LOCATED AT THE BACK OF YOUR PATROL UNIT?

7  A.   THE BACK RIGHT SIDE.

8  Q.   WERE YOU SHOUTING COMMANDS TO THE PASSENGER AND THE

9  MOTORIST?

10  A.   YES.

11  Q.   AND WERE YOU THE ONLY ONE GIVING COMMANDS AT THAT POINT?

12  A.   YES.

13  Q.   DID THE PASSENGER LISTEN TO YOUR COMMANDS AND FULLY

14  COMPLY EVERY TIME YOU GAVE A COMMAND BEFORE BACKUP ARRIVED?

15  A.   NO.

16  Q.   WHAT WAS GOING ON?

17  A.   BOTH PASSENGER AND DRIVER, MORE SO DRIVER -- OR MORE SO

18  PASSENGER -- EXCUSE ME -- WOULD KEEP LOWERING THEIR HANDS,

19  DROPPING THEIR HANDS.  PASSENGER WOULD -- WOULDN'T JUST DROP

20  HIS HANDS, BUT HE'D LOOK BACK AND HE REACHED DOWN, HE'D MOVE

21  AROUND THE CABIN, IN THAT SPECIFIC AREA QUITE A BIT.

22  Q.   OKAY.  COULD YOU SEE INTO THE CAR FROM WHERE YOU WERE TO

23  SEE WHAT EXACTLY HE WAS DOING DOWN BELOW?

24  A.   I COULD SEE IN THE CAR, BUT I COULD NOT SEE WHAT HE WAS

25  DOING.

```
 1    Q.   AND WHEN HE WOULD DO THAT, WHEN HE WOULD REACH DOWN OR

 2    MOVE AROUND IN THE CAB OR CABIN, DID YOU CONTINUE TO SHOUT AT

 3    HIM?

 4    A.   YES.

 5    Q.   WHAT WOULD YOU SHOUT AT HIM?

 6    A.   GET YOUR HANDS UP, SOME SORT.

 7    Q.   AND, AT TIMES, WAS HE COMPLIANT?

 8    A.   AT TIMES, YES.

 9    Q.   OKAY.  AND WHEN HE WOULD HAVE HIS HANDS UP, WAS IT LIKE

10    THIS (INDICATING) INSIDE OF THE CAR?

11    A.   YES.

12    Q.   AND WAS THE PASSENGER ALSO, DID SHE HAVE HER HANDS

13    RAISED AT TIMES?

14    A.   YES.

15    Q.   AND DURING THOSE TIMES WHEN THE PASSENGER AND THE

16    MOTORIST, THE DRIVER HAD THEIR HANDS UP INSIDE THE CAR, COULD

17    YOU SEE ANY TATTOOS ON THE PASSENGER?

18    A.   YES.

19    Q.   WHAT DID YOU SEE?

20    A.   I BELIEVE I EVEN PUT ON THE RADIO SOMEONE WITH A TATTOO

21    ON HIS LEFT HAND.

22    Q.   AND WAS THAT SIGNIFICANT TO YOU AT ALL?

23    A.   YES, SIR.

24    Q.   WHY WAS IT SIGNIFICANT?

25    A.   ON SEVERAL OF THE BOLOS OR THE WANTED FLYERS, THE
```

```
 1   SUBJECT WAS DESCRIBED AS HAVING A TATTOO OF SOME SORT ON HIS

 2   HAND.

 3   Q.   OKAY.  AND IS THAT WHY YOU PUT IT OUT ON THE BROADCAST

 4   TO THE OTHER UNITS?

 5   A.   YES.

 6   Q.   AND YOU SAW THAT WHILE THE GENTLEMAN WAS STILL INSIDE

 7   THE VEHICLE IN THE PASSENGER SEAT?

 8   A.   YES, SIR.

 9   Q.   SO, AT SOME POINT, BACKUP ARRIVES?

10   A.   YES.

11   Q.   WAS THAT OFFICER FAIRBANKS AND OFFICER ZERBEY?

12   A.   YES.

13   Q.   COULD THEY PULL THEIR VEHICLE IN NEAR YOURS TO THE

14   NORTH?

15   A.   YES.

16   Q.   AND, AT SOME POINT, DID YOU ASK OFFICER ZERBEY -- WAS HE

17   A MORE SENIOR OFFICER AT THE TIME?

18   A.   YES, HE WAS.

19   Q.   AND WAS HE ALSO A FIELD TRAINING OFFICER?

20   A.   HE WAS.

21   Q.   DID YOU ASK OFFICER ZERBEY TO TAKE CONTROL OF THE SCENE

22   AT SOME POINT?

23   A.   YES.

24   Q.   NOW, YOU TALKED EARLIER ABOUT DIFFERENT OFFICERS

25   ARRIVING AT DIFFERENT TIMES.
```

```
 1              DID EVERYONE REMAIN RIGHT THERE NEAR C62 AND C63?

 2   A.   FROM WHAT I REMEMBER, I WOULDN'T BE ABLE TO TELL YOU YES

 3   OR NO.  I WAS -- I COULD TELL YOU WHERE I WAS AND GIVE YOU

 4   WHERE OFFICER ZERBEY WAS, MAYBE OFFICER MARTINEZ WAS, BUT

 5   THAT'S PRETTY MUCH IT.

 6   Q.   DID YOU EVER SEE WHERE OFFICER LEON MOORE WAS DURING

 7   THIS INCIDENT?

 8   A.   I BELIEVE HE WAS HOLDING THAT DRIVEWAY ONTO VENICE, BACK

 9   ONTO VENICE BOULEVARD, BUT I COULDN'T SEE HIM, NO.

10   Q.   WHEN YOU SAY, "HOLDING THE DRIVEWAY," MEANING THE NORTH

11   DRIVEWAY ON VENICE BOULEVARD RATHER THAN MOTOR?

12   A.   YES.  SO THAT ANY OTHER VEHICLES COULDN'T COME IN OR

13   HE -- THAT VEHICLE COULDN'T GET OUT OF THE PARKING LOT.

14   Q.   DO YOU HAVE A RECOLLECTION OF OFFICER MOORE PARKING HIS

15   VEHICLE ACROSS THAT DRIVEWAY?

16   A.   I -- I WOULDN'T KNOW.  I KNOW I -- THINK I HEARD HIM OR

17   I PROBABLY SAW HIS CAR.

18   Q.   DURING THIS INCIDENT, SIR, DID YOU LOOK AROUND AND TAKE

19   THE TIME TO SEE WHERE EVERY OFFICER WAS LOCATED PRIOR TO THE

20   SHOOTING?

21   A.   UNFORTUNATELY NOT, SIR.

22   Q.   NOW, WHEN THE OTHER OFFICERS WERE ON SCENE WITH YOU,

23   THERE WERE A LOT OF QUESTIONS ON CROSS-EXAMINATION ABOUT

24   MULTIPLE COMMANDS, DO YOU RECALL THAT?

25   A.   YES, SIR.
```

```
 1    Q.    DETECTIVE, DID YOU EVER HEAR CONFLICTING COMMANDS?

 2              MR. GALIPO:  OBJECTION.  VAGUE AS PHRASED.

 3              THE COURT:  OVERRULED.

 4              THE WITNESS:  NO.

 5    BY MR. ROTHANS:

 6    Q.    AND BY "CONFLICTING," I'M ASKING:  DID YOU EVER HEAR

 7    SOMEONE TELL THE PASSENGER "STAND UP" AND AT THE SAME TIME

 8    SOMEONE TELL HIM "GET DOWN"?

 9    A.    NEVER.

10    Q.    DID YOU EVER HEAR SOMEONE TELL THE PASSENGER "FACE TO

11    THE WEST, TURN AROUND" OR SOMEBODY ELSE SAYING, "FACE US"?

12    A.    NO.

13    Q.    DID YOU EVER HEAR SOMEONE SAY, "PUT YOUR HANDS UP," AND

14    ANOTHER OFFICER SAY, "PUT YOUR HANDS DOWN"?

15    A.    NO.

16    Q.    DID YOU EVER HEAR AN OFFICER TELL HIM TO DROP HIS HANDS?

17    A.    NEVER.

18    Q.    DID YOU EVER HEAR AN OFFICER TELL HIM TO DROP HIS RIGHT

19    HAND TOWARDS HIS WAISTBAND AREA?

20    A.    NEVER, SIR.

21    Q.    WHAT KIND OF WEAPON, SIR, DID YOU HAVE ON YOU AT THE

22    TIME?

23    A.    MY DEPARTMENT-ISSUED HANDGUN.

24    Q.    OKAY.  IT WAS JUST A HANDGUN, IT WASN'T AN MP5?

25    A.    NO, SIR.
```

1  Q.   HAD YOU HAD ANY TRAINING ON AN MP5 AT THAT POINT WHILE

2  YOU WERE ON PROBATION?

3  A.   YES, SIR.

4  Q.   HAD YOU LEARNED ANYTHING IN TERMS OF THE ACCURACY OF AN

5  MP5 VERSUS A HANDGUN?

6        MR. GALIPO:  I'M GOING TO OBJECT, YOUR HONOR.  IT'S

7  BEYOND THE SCOPE.  IT CALLS FOR HEARSAY AS PHRASED.

8        THE COURT:  OVERRULED.

9        AND IN TERMS, IT'S -- I DON'T THINK THE TRAINING IS

10 HEARSAY, AND IN -- WE'VE DISCUSSED IT BEYOND THE SCOPE.  I

11 MEAN, THIS IS, OBVIOUSLY, THE DIRECT OF THE WITNESS.

12        SO GO AHEAD, MR. ROTHANS.

13 BY MR. ROTHANS:

14 Q.   DID YOU HAVE ANY TRAINING, SIR, IN TERMS OF THE ACCURACY

15 OF AN MP5 WEAPON VERSUS A FIREARM OR A HANDGUN?

16 A.   YES.

17 Q.   WHAT WAS THE TRAINING, GENERALLY?

18 A.   THE MP5 IS A SHOULDER MOUNTED WEAPON, AND COMPARED TO A

19 HANDGUN, IT -- AND IT'S A LOWER CALIBER AS WELL.  IT'S

20 ACCURATE WAY MORE THAN A HANDGUN.

21 Q.   WERE THERE BYSTANDERS OR PEDESTRIANS IN THAT STRIP MALL

22 AT THE TIME OF THIS INCIDENT?

23 A.   YES, SIR.

24 Q.   ANY ESTIMATE AS TO HOW MANY PEOPLE THAT YOU SAW?

25 A.   THERE WERE A LOT OF PEOPLE IN THE BACKDROP.  WHEN

1    WERE -- WHEN I WAS HOLDING THE VEHICLE AT FIRST, YOU KNOW,

2    TO -- WHEN THE SUBJECT GOT OUT, THERE WERE A LOT OF PEOPLE

3    WALKING IN AND OUT OR KIND OF COMING OUTSIDE AND

4    LOOKING-AROUND-TYPE STUFF.

5    Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT YOU SAW THE

6    PASSENGER TURN AROUND BACK TO THE EAST TOWARDS SOME OF THE

7    OFFICERS AT SOME POINT; IS THAT TRUE?

8    A.   YES.

9    Q.   AND DID YOU -- DID HE KEEP HIS HANDS UP THE ENTIRE TIME?

10   A.   NO.

11   Q.   WERE HIS HANDS ALWAYS IN THE AIR, BENT AT THE ELBOWS THE

12   ENTIRE TIME THIS PASSENGER WAS FACING THE OFFICERS TO THE

13   EAST?

14   A.   NO, HE WASN'T.

15   Q.   DID YOU SEE HIM DROP ONE OR BOTH HANDS ON OCCASION?

16   A.   YES, SIR.

17   Q.   DID YOU EVER HEAR ANY OFFICER GIVE HIM A COMMAND OR AND

18   ORDER TO DO SO -- TO DROP HIS HANDS?

19   A.   NEVER.

20   Q.   WHAT WAS GOING THROUGH YOUR MIND WHEN YOU SAW THAT

21   OCCUR?

22   A.   I -- I DIDN'T KNOW WHAT TO EXPECT.  I WAS NERVOUS.  I --

23   YOU KNOW, I HAD -- AN EXTENT I BELIEVE THE SUBJECT WAS THE

24   SUBJECT.  IF HE WAS THE SUBJECT, I KNOW HE WAS ARMED.  BASED

25   ON INITIAL BROADCASTS AND EVERYTHING ELSE, I -- I WAS SCARED,

1    I SHOULD SAY.

2    Q.   LET ME ASK YOU TO LOOK, SIR, AT EXHIBIT 377-010.  I

3    BELIEVE IT'S GOING TO BE IN THE BLACK BINDERS, SO LOOK FOR

4    THE ONE THAT INCLUDES 377, IF YOU WOULD, SIR.

5              MR. ROTHANS:  VOLUME III, DETECTIVE.

6              THE COURT:  WHICH PAGES, MR. ROTHANS?

7              MR. ROTHANS:  377-010, SIR.

8              THE WITNESS:  YOU SAID 377-001?

9              MR. ROTHANS:  NO, 010.

10             THE COURT:  THAT IS NOT -- IT'S NOT IN MY BINDER

11   AND IT MAY NOT BE IN THE DETECTIVE'S.

12             GO AHEAD, MR. ROTHANS.

13             MR. ROTHANS:  THANK YOU, YOUR HONOR.

14   BY MR. ROTHANS:

15   Q.   SIR, IF YOU'D JUST TAKE A LOOK AT THAT FOR AT MOMENT,

16   YOU HAD TESTIFIED EARLIER ON CROSS-EXAMINATION THAT AFTER

17   MR. GRISSOM WAS SHOT THAT HE FELL DOWN TO THE GROUND?

18   A.   YES.

19   Q.   THAT HE FELL -- WHERE IN RELATION TO THE PASSENGER DOOR?

20   A.   AGAINST IT.

21   Q.   OKAY.  WAS THE PASSENGER DOOR OPEN AT THE TIME OF THE

22   SHOOTING?

23   A.   YES.

24   Q.   THE PHOTOGRAPHS THAT WE'VE SEEN, INCLUDING 377-010, SHOW

25   THE DOOR CLOSED.

1       WAS THE DOOR CLOSED WHEN THE SHOOTING TOOK PLACE OR

2  OPEN?

3  A.   IT WAS OPEN.

4  Q.   AND YOU RECALL SEEING MR. GRISSOM FALL TOWARDS THE DOOR?

5  A.   YES.

6  Q.   AND DID HE MAKE CONTACT WITH THE DOOR AFTER FALLING?

7  A.   YES.

8  Q.   DID HE LAND IN THAT AREA RIGHT BELOW THE FLOORBOARD AND

9  THE DOOR AREA?

10       MR. GALIPO:  I'M GOING TO OBJECT AS LEADING, YOUR

11  HONOR.

12       THE COURT:  SUSTAINED.

13  BY MR. ROTHANS:

14  Q.   WHERE DID HE FALL, SIR?

15  A.   FELL DOWN TOWARDS THE -- HE FELL BACK, LANDED ON THE

16  DOOR, AND HE WAS STILL PROPPED UP KIND OF AGAINST THE DOOR

17  BETWEEN THE DOOR AND THE ENTRANCE TO THE VEHICLE.

18  Q.   DETECTIVE, LOOKING AT EXHIBIT 377-010, DOES THIS

19  PHOTOGRAPH TRULY AND ACCURATELY DEPICT THE SCENE WITH THE

20  EXCEPTION OF THE CLOSED PASSENGER DOOR AS IT EXISTED AFTER

21  MR. GRISSOM FELL?

22  A.   YES.

23       MR. ROTHANS:  MAY I PUBLISH, YOUR HONOR?

24       MR. GALIPO:  I'M SORRY.  BUT I'M HAVING TROUBLE.

25       MAY I LOOK AT THAT FOR A MOMENT?

```
1              THE COURT:  YOU MAY.

2              ANY OBJECTION?

3              MR. GALIPO:  NO OBJECTION, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  010 WILL BE RECEIVED.

5              MR. ROTHANS:  THANK YOU.

6                   (EXHIBIT 010 RECEIVED.)

7    BY MR. ROTHANS:

8    Q.  LOOKING AT THAT PARTICULAR DOCUMENT, DETECTIVE, THAT

9    EXHIBIT, DOES THAT DEPICT TWO DIFFERENT PUDDLES OF BLOOD?

10   A.  YES.

11   Q.  IS THERE ONE CLOSER TO THE VEHICLE AND THEN ONE FARTHER

12   AWAY?

13   A.  YES.

14   Q.  DOES THE ONE NEAR THE PASSENGER SIDE OF THE GREEN

15   CHRYSLER SEBRING, DOES THAT DEPICT THE AREA, GENERALLY, WHERE

16   MR. GRISSOM FELL, INITIALLY?

17   A.  YES.

18   Q.  DID YOU SEE MR. GRISSOM BEING PULLED AWAY FROM THAT AREA

19   BEFORE THE PARAMEDICS ARRIVED?

20   A.  I -- I DON'T REMEMBER IF HE -- I SAW IT OR NOT, BUT I DO

21   KNOW HE WAS PULLED AWAY, I GUESS, TO PULL HIM AWAY SO THAT

22   THE MEDS COULD GET TO HIM.

23   Q.  DID YOU SEE THE AREA WHERE THE PARAMEDICS WERE WORKING

24   ON MR. GRISSOM?

25   A.  THE AREA -- GENERAL AREA, YES.
```

1    Q.   IS THAT THE DEPICTED IN THIS PHOTOGRAPH?

2    A.   IT WOULD BE -- WOULD YOU LIKE ME TO EXPLAIN?

3    Q.   EXPLAIN AND DRAW A CIRCLE ON THAT SCREEN, IF YOU MAY.

4    A.   OH, COOL.

5         WOULD BE IN THIS -- I GUESS THIS GENERAL AREA OVER

6    HERE (INDICATING).

7    Q.   THAT'S WHERE YOU RECALL THE PARAMEDICS WORKING ON

8    MR. GRISSOM?

9    A.   YES, SIR.

10   Q.   IS THAT THE AREA WHERE HE FELL?

11   A.   NO.

12   Q.   WHERE THE PUDDLE IS TO THE NORTH AND EAST OF THE

13   CHRYSLER SEBRING WHERE THE ONE MARKER IS --

14        MR. ROTHANS:  IF WE COULD BLOW UP THAT MARKER 3...

15   BY MR. ROTHANS:

16   Q.   SEE WHERE MARKER THREE IS?

17   A.   YES.

18   Q.   IS THAT WHERE MR. GRISSOM FELL?

19   A.   NO.

20   Q.   OKAY.  IS THAT NEXT TO OR ADJOINING THE AREA WHERE THE

21   PARAMEDICS WERE TREATING HIM?

22   A.   IT'S NEXT TO THE AREA WHERE HE WAS BEING TREATED.

23   Q.   YOU DID NOT PULL HIM THERE?

24   A.   NO.

25   Q.   DID YOU WATCH HIM AS HE WAS BEING PULLED FROM THE

1   ORIGINAL SPOT WHERE HE FELL TO AN AREA DEPICTED WITH MARKER

2   3?

3   A.   I DON'T -- I DON'T REMEMBER IF I DID OR NOT, NO.

4   Q.   OKAY.  WHAT WAS YOUR ROLE, GENERALLY, AFTER THE

5   SHOOTING?

6   A.   I KNOW OFFICER ZERBEY AND I FOR SURE, WE DECIDED TO PULL

7   THE DRIVER OUT OF THE VEHICLE JUST BECAUSE OF WHAT HAD

8   HAPPENED.  I WAS ON THE OTHER SIDE OF THE VEHICLE AND I GUESS

9   TO THE MORE -- MORE EAST OF.

10   Q.   SO YOUR ROLE WAS GENERALLY FOCUSED ON GETTING THE DRIVER

11   OUT OF THE CAR?

12   A.   CORRECT.

13   Q.   ONCE YOU GOT THE DRIVER OUT OF THE CAR, WERE YOU

14   RESPONSIBLE FOR KEEPING AN EYE ON HER AT THE PATROL UNIT?

15   A.   YES.

16   Q.   AND WAS THIS ON THAT SIDE OF THE SEBRING, OR SOME

17   DISTANCE AWAY?

18   A.   IT'S ON THE OTHER SIDE.

19   Q.   AND YOU STAYED BACK THERE FOR A PERIOD OF TIME?

20   A.   YES.

21   Q.   DID YOU ULTIMATELY MAINTAIN THE LOG, THE CRIME SCENE LOG

22   THAT MR. GALIPO INQUIRED ABOUT?

23   A.   CORRECT.

24   Q.   AND WHERE WERE YOU DURING THAT PERIOD OF TIME?

25   A.   TO THE REAR -- IF YOU SHOW ME A DIFFERENT PICTURE, I'D

1    BE ABLE TO GIVE IT TO YOU.  BUT IT WOULD BE TO THE REAR MORE

2    SO ON THE STREET OF MOTOR, BEHIND THOSE INITIAL VEHICLES.

3    Q.   OKAY.  WE'RE GOING TO WORK ON THAT.

4            AND, ROUGHLY, HOW LONG, SIR, WERE YOU AT THE SCENE

5    AFTER THE SHOOTING?

6    A.   I DON'T -- I DON'T REMEMBER.  I WAS THERE FOR A WHILE.

7    Q.   IF YOU WOULD LOOK AT EXHIBIT 377-32, BEFORE WE PUBLISH

8    IT.  I'M SORRY, MY MISTAKE.  378-032.

9            MR. GALIPO:  NO OBJECTION.

10           THE COURT:  AND IT WILL BE RECEIVED.

11               (EXHIBIT 378-032 RECEIVED.)

12   BY MR. ROTHANS:

13   Q.   IT WILL BE ON THE SCREEN, DETECTIVE.

14   A.   YES.

15   Q.   AGAIN, THIS IS EXHIBIT 378-032.

16           DOES THIS PARTICULAR PHOTOGRAPH -- CAN YOU SHOW US

17   THE AREA WHERE YOU WERE STANDING WHILE YOU WERE MAINTAINING

18   THE CRIME SEEN LOG?

19   A.   I WOULD BE, GENERAL AREA, AROUND THIS -- THIS SPECIFIC

20   AREA, KIND OF ALONGSIDE THE CRIME SCENE TAPE.

21   Q.   BACK OUT ON MOTOR, SOME DISTANCE EAST OF THE LOCATION?

22   A.   YES.

23   Q.   AND THAT'S WHERE YOU WERE DURING THE MAJORITY OF THE

24   TIME AFTER THE SHOOTING AFTER THE DRIVER WAS PULLED FROM THE

25   VEHICLE?

1    A.   YES.

2    Q.   OKAY.

3         MR. ROTHANS:  I HAVE NOTHING FURTHER.

4         THANK YOU, SIR.

5         THE COURT:  DETECTIVE LOPEZ, I'M SORRY, COULD YOU

6    PUT THE EXHIBIT UP JUST A MOMENT?

7         THAT'S THE CRIME SCENE TAPE GOING KIND OF

8    ZIG-ZAGGING ACROSS THE SIDEWALK AND THEN CROSSING MOTOR THERE

9    TO THE -- IN THE PHOTOGRAPH TO THE LEFT OF THE TWO POLICE

10   CRUISERS?

11        THE WITNESS:  YES.

12        THE COURT:  ALL RIGHT.  THANK YOU.

13        ALL RIGHT.  THANK YOU, MR. ROTHANS.

14        MR. GALIPO?

15        MR. GALIPO:  THANK YOU.

16                    **REDIRECT EXAMINATION**

17   BY MR. GALIPO:

18   Q.   DID YOU SAY THAT IT WAS APPROXIMATELY A ONE OR TWO

19   MINUTES BEFORE BACKUP ARRIVED?

20   A.   FROM THE INITIAL TIME THAT THE VEHICLE PULLED INTO THE

21   DONUT KING?

22   Q.   YES.

23   A.   ABOUT, FROM WHAT I REMEMBER, SIR.

24   Q.   DIDN'T YOU ALMOST IMMEDIATELY GET OUT OF YOUR VEHICLE

25   AND GO TO THE REAR TO THE SPOT L1?

1    A.   YES.

2            MR. GALIPO:  I'D LIKE TO READ FROM HIS DEPOSITION,

3    YOUR HONOR?

4            THE COURT:  PAGE AND LINE?

5            MR. GALIPO:  PAGE 58, LINES 9 THROUGH 11.

6            THE COURT:  GO AHEAD.

7    BY MR. GALIPO:

8    Q.   "QUESTION:  HOW LONG WERE YOU AT L1 PRIOR TO THE ARRIVAL

9    OF UNIT C62?

10            "ANSWER:  10, 15 SECONDS."

11            NOW, WITH RESPECT TO EXHIBIT 377-010 THAT WAS JUST

12   SHOWN, DO YOU REMEMBER THIS EXHIBIT ABOUT THE TWO POOLS OF

13   BLOOD?

14   A.   YES.

15   Q.   DID YOU ACTUALLY SEE POOLS OF BLOOD AT THE SCENE WHILE

16   YOU WERE STILL THERE?

17   A.   WHEN -- WHEN WAS THIS -- WOULD THIS BE?

18   Q.   AT ANY TIME BEFORE YOU LEFT THE SCENE, DID YOU SEE POOLS

19   OF BLOOD?

20   A.   I DON'T KNOW IF IT WOULD BE POOLS OF BLOOD, BUT I SAW

21   THERE WAS SOME BLOOD, YES.

22   Q.   OKAY.  AND WAS ANY OF THAT BLOOD THERE BEFORE

23   MR. GRISSOM WAS SHOT?

24   A.   I -- I DON'T KNOW.  I WOULD SAY NO.

25   Q.   OKAY.  AND THEN I'M GOING TO ZOOM IN A LITTLE BIT.

```
 1              SEE THAT ITEM NUMBER 2?
 2   A.   YES.
 3   Q.   CAN YOU TELL US WHAT THAT IS?
 4   A.   I WOULD SAY THAT'S THE SMALL CELL PHONE OF HIS.
 5   Q.   DID YOU EVER SEE THAT CELL PHONE IN ANYONE'S HAND WHILE
 6   YOU WERE THERE AT THE SCENE?
 7   A.   DID I EVER SEE THAT, NO.
 8   Q.   DID YOU EVER SEE THAT CELL PHONE ON THE GROUND WHILE YOU
 9   WERE AT THE SCENE?
10   A.   I WASN'T LOOKING, SIR.
11   Q.   YOU DIDN'T -- I THOUGHT YOU SAID, MAYBE I MISUNDERSTOOD
12   YOU, THAT YOU SAW MR. GRISSOM FALL TO THE GROUND TOWARDS THE
13   DOOR?
14   A.   YES.
15   Q.   WEREN'T YOU -- WERE YOU LOOKING AT HIM AT THAT POINT?
16   A.   YES.
17   Q.   AND WASN'T THERE SOME GROUND IN BETWEEN WHERE YOU WERE
18   AND WHERE HE WAS AT IN THE OPEN DOOR?
19   A.   YES.
20   Q.   YOU DIDN'T LOOK AWAY FROM MR. GRISSOM AFTER HE WAS SHOT,
21   DID YOU?
22   A.   NO.
23   Q.   WHEN WERE YOU PROMOTED TO DETECTIVE?
24   A.   OCTOBER OF 2011, OCTOBER, NOVEMBER.
25   Q.   OKAY.  SO, IN YOUR DEPARTMENT, YOU HAD JUST BEEN OFF OF
```

1   PROBATION A LITTLE OVER A YEAR AND YOU WERE PROMOTED TO

2   DETECTIVE?

3   A.   YES, SIR.

4   Q.   AND YOU SAID YOU HAD BEEN ON SIX OR TWELVE FELONY

5   TRAFFIC STOPS?

6   A.   WHEN I WAS ON PROBATION PRIOR TO THAT DATE.

7   Q.   ANY SHOTS FIRED IN ANY OF THOSE?

8           MR. ROTHANS:   OBJECTION.   IRRELEVANT.

9           THE COURT:   SUSTAINED.

10  BY MR. GALIPO:

11  Q.   YOU SAID YOU HAD TRAINING IN FELONY TRAFFIC STOPS; IS

12  THAT TRUE?

13  A.   CORRECT.

14  Q.   WERE YOU TRAINED THAT YOU SHOULD SHOOT SOMEONE JUST

15  BECAUSE IT'S A FELONY TRAFFIC STOP?

16  A.   NEVER, SIR.

17  Q.   YOU, IN FACT, NEVER SAW MR. GRISSOM TURN TO HIS RIGHT;

18  ISN'T THAT TRUE?

19  A.   WHEN HE GOT OUT OF THE VEHICLE OR WHICH -- WHAT POINT,

20  SIR?

21  Q.   ANY POINT IN TIME.

22  A.   AS HE'S FACING US, PHYSICALLY TURNED RIGHT, OR --

23  Q.   DID YOU EVER SEE HIM TURN TO HIS RIGHT?

24  A.   NOT PHYSICALLY TURN, NO.

25          THE COURT:   MR. GALIPO, I'M NOT SURE I UNDERSTAND

```
1    WHAT YOU MEAN WHEN YOU SAY, "TURN TO HIS RIGHT."

2              MR. GALIPO:  LET ME BE MORE SPECIFIC.

3              THANK YOU, YOUR HONOR.

4              IF I MAY?

5              THE COURT:  YOU MAY.

6    BY MR. GALIPO:

7    Q.   DID YOU EVER SEE HIM FACING EITHER WEST OR NORTH AND

8    THEN TURN TO HIS RIGHT SO THAT HE'S FACING EAST?  DID YOU

9    EVER SEE HIM MAKE A TURN TO HIS RIGHT TO FACE EAST?

10   A.   HE NEVER FACED NORTH, SIR.  WHEN HE GOT OUT OF THE

11   VEHICLE, HE -- I HAD SAID -- AND IT STILL IS -- WASN'T NORMAL

12   HOW HE GOT OUT OF THE VEHICLE.

13   Q.   DID YOU EVER SEE HIM TURN TO HIS RIGHT?

14   A.   HE TURNED -- OPENED UP TO HIS LEFT.

15   Q.   RIGHT.

16              SO LET ME ASK IT AGAIN.  DID YOU EVER SEE HIM TURN

17   TO HIS RIGHT?

18   A.   TO HIS RIGHT, NOT THAT I KNOW OF, NO.

19   Q.   NOW, YOU SAID THAT -- IN RESPONSE MR. ROTHANS' QUESTION,

20   YOU HAD SOME INFORMATION REGARDING A SILVER OR A CHROME

21   HANDGUN?

22   A.   YES.

23   Q.   DID YOU EVER SEE A SILVER OR CHROME HANDGUN AT THE

24   SCENE?

25   A.   NOT AT THE SCENE.
```

```
1    Q.   DID YOU SEE A SILVER OR CHROME HANDGUN AT ANY TIME IN

2    MR. GRISSOM'S HAND, EITHER WHILE HE WAS IN THE CAR OR AFTER

3    HE GOT OUT?

4    A.   IN THE WANTED FLYERS, I DID.

5    Q.   NO, NO, NO.

6           AT THE SCENE, SIR?

7    A.   NO.

8    Q.   SO YOU KNEW WHAT IT LOOKED LIKE FROM THE WANTED FLYER;

9    RIGHT?

10   A.   YES, SIR.

11   Q.   AND YOU, IN FACT, SAW IT IN HIS HAND IN ONE OF THE

12   FLYERS; TRUE?

13   A.   COUPLE OF THEM, YES, SIR.

14   Q.   ALL RIGHT.  DID YOU EVER SEE THAT SILVER OR CHROME

15   HANDGUN IN HIS HAND AT THE SCENE OF THAT PARKING LOT?

16           MR. ROTHANS:  OBJECTION.  ASKED AND ANSWERED.

17           THE COURT:  OVERRULED.

18           THE WITNESS:  NO, NOT IN HIS HAND.

19   BY MR. GALIPO:

20   Q.   YOU MENTIONED THAT THE VEHICLE WAS DRIVING RAPIDLY WHEN

21   YOU FIRST SAW IT.  WHAT WOULD YOUR ESTIMATE OF ITS SPEED BE?

22   A.   IT WASN'T OVER THE LIMIT.

23   Q.   IT WAS NOT OVER THE LIMIT?

24   A.   NO, SIR.

25   Q.   OH.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1              YOU MEAN THE SPEED LIMIT?

2    A.   YES, SIR.

3    Q.   WHAT WAS THE SPEED LIMIT THERE, IF YOU KNOW?

4    A.   IF IT IS TRUE, IT WOULD BE 35.

5    Q.   SO THIS RAPID SPEED YOU'RE TALKING ABOUT, JUST SO WE'RE

6    CLEAR, WAS UNDER 35 MILES AN HOUR?

7    A.   IT WAS AN ACCELERATION TO GET AROUND A CAR THAT IT CUT

8    OFF ON THE RIGHT SIDE.

9    Q.   BUT WAS IT UNDER 35 MILES AN HOUR, SIR?

10   A.   I WOULD THINK SO.

11   Q.   DID YOU EVER HEAR MR. GRISSOM VERBALLY THREATEN ANYONE?

12   A.   WHAT I HAD PUT IN THE REPORT?

13   Q.   NO, NO, NO.  AT THE SCENE IN THE PARKING LOT?

14   A.   AT THE PARKING LOT, NOT THAT I HEARD OF, NO.

15   Q.   YOU SAID YOU COULD SEE A TATTOO ON HIS LEFT HAND?

16   A.   SOMEWHAT OF A TATTOO, YES.

17   Q.   SO, OBVIOUSLY, YOU COULD SEE PRETTY CLEARLY IN THE CAR

18   TO PICK UP A TATTOO ON HIS HAND; TRUE?

19   A.   ABOVE -- ABOVE THE DRIVER -- LIKE THE SHOULDER AREA,

20   YES.

21   Q.   OKAY.  AND IN LOOKING THROUGH THE CAR WHERE YOU CAN

22   CLEARLY SEE, DID YOU EVER SEE AN OBJECT IN HIS HANDS?

23   A.   NOT THAT I CAN MAKE OUT, NO.

24   Q.   YOU TALKED ABOUT THE -- STRIKE THAT.

25              YOUR WEAPON IS A SEMI-AUTOMATIC WEAPON; CORRECT?
```

1    A.   YES.

2    Q.   AND YOU TALKED ABOUT THE BACKDROP.  YOU ARE TRAINED, ARE

3    YOU NOT, TO BE CAREFUL SHOOTING WHEN THERE'S PEOPLE IN THE

4    BACKDROP?

5    A.   YES.

6    Q.   DID YOU SEE PEOPLE IN THE BACKDROP WHILE YOU WERE --

7    AFTER MR. GRISSOM GOT OUT OF THE CAR?

8    A.   THERE WERE PEOPLE GOING IN AND OUT, YES.

9    Q.   AND DO YOU KNOW IF ANYONE DIRECTED THEM TO GET OUT OF

10   THE WAY BEFORE THE SHOOTING?

11   A.   I -- IT'S MOST PRACTICE -- MOST OF THE TIMES I'VE BEEN

12   INVOLVED IN A FELONY TRAFFIC STOP, YOU WANT TO PROTECT PEOPLE

13   FROM KIND OF GETTING -- INTERFERING IN CASE ANYTHING WERE TO

14   HAPPEN.

15   Q.   RIGHT.

16        WHAT I'M ASKING, SIR, IS:  DID YOU HEAR OFFICERS

17   YELLING FOR PEOPLE TO GET OUT OF THE WAY AFTER MR. GRISSOM

18   GOT OUT OF THE CAR?

19   A.   I BELIEVE SO, YES.

20   Q.   OKAY.  SO PEOPLE ARE YELLING PUT THEIR HANDS UP, YOU'RE

21   USING SOME PROFANITY, SOMEONE MAY HAVE SAID SOMETHING ABOUT

22   TURNING, AND PEOPLE ARE YELLING FOR PEOPLE TO GET OUT OF THE

23   WAY, AND ALL THIS IS GOING ON AFTER MR. GRISSOM GETS OUT OF

24   THE CAR?

25        MR. ROTHANS:  COMPOUND.

```
 1              THE COURT:  SUSTAINED.
 2    BY MR. GALIPO:
 3    Q.   AFTER MR. GRISSOM GOT OUT OF THE CAR, YOU'RE MAKING
 4    COMMANDS; CORRECT?
 5    A.   NO.
 6    Q.   I THOUGHT YOU TOLD US EARLIER THAT YOU SAID TO "GET YOUR
 7    FUCKING HANDS UP" AFTER HE GOT OUT OF THE CAR, DIDN'T YOU?
 8    A.   YES, I DID.
 9    Q.   OH.
10              AND OFFICER ZERBEY WAS MAKING COMMANDS; CORRECT?
11              MR. ROTHANS:  VAGUE AS TO TIME, YOUR HONOR.
12    BY MR. GALIPO:
13    Q.   AFTER HE GOT OUT OF THE CAR?
14    A.   THEY WEREN'T CONTRADICTING EACH OTHER, NO.
15    Q.   I'M NOT ASKING ABOUT CONTRADICTING RIGHT NOW.
16              WAS OFFICER ZERBEY MAKING COMMANDS?
17    A.   YES, HE WAS.
18    Q.   AND YOU HEARD OFFICER MARTINEZ MAKE COMMANDS; TRUE?
19    A.   I -- I DON'T KNOW WHO I HEARD, BUT I HEARD OTHER PEOPLE
20    AS WELL SAY THE SAME THING.
21    Q.   AND YOU HEARD OTHER PEOPLE YELLING FOR PEOPLE TO GET OUT
22    OF THE WAY?
23    A.   I MAY HAVE HEARD ONE PERSON, BUT I DON'T REMEMBER WHO.
24    BUT WHEN WE WERE SAYING THE COMMANDS, IT WAS THE SAME
25    COMMAND, TO GET HIS HANDS UP OF SORT SOME.
```

```
1    Q.   WELL, YOU TOLD US EARLIER THAT ONE OF THE COMMANDS YOU

2    BELIEVE YOU HEARD RIGHT BEFORE HE WAS SHOT WAS TO TURN?

3    A.   YES.

4    Q.   OKAY.  SO YOU WOULD AGREE TURNING IS DIFFERENT THAN

5    PUTTING YOUR HANDS UP?

6    A.   YES.

7              MR. GALIPO:  IF I COULD JUST HAVE ONE MOMENT, YOUR

8    HONOR?

9              THE COURT:  YOU MAY.

10   BY MR. GALIPO:

11   Q.   HOW LONG DID YOU SAY YOU WERE AT THE SCENE FOR?

12   A.   I -- I DON'T REMEMBER, SIR.

13             THE COURT:  THE ENTIRETY OF THE MORNING?

14             I'M NOT SURE I UNDERSTAND YOUR QUESTION, MR.

15   GALIPO.

16             MR. GALIPO:  IT'S PROBABLY NOT A GOOD ONE.  LET ME

17   BE MORE SPECIFIC.

18   BY MR. GALIPO:

19   Q.   FROM THE TIME THE SHOTS WERE FIRED, FOR HOW LONG A

20   PERIOD OF TIME DID YOU STAY AT THE SCENE OF THE DONUT KING,

21   IN THAT GENERAL AREA?

22   A.   I DON'T KNOW, MAYBE AN HOUR OR TWO, HOUR-AND-A-HALF.

23   Q.   DURING ANY OF THAT TIME, FROM THE TIME MR. GRISSOM GOT

24   OUT OF THE VEHICLE UP UNTIL THE TIME YOU LEFT THE SCENE, DID

25   YOU HEAR ANYONE SAY HE HAD AN OBJECT IN HIS HAND?
```

1    A.   NO.  WE'RE NOT -- WE'RE -- AFTER AN ISSUE LIKE THAT, WE

2    DON'T REALLY TALK ABOUT THAT SPECIFIC THING, SIR.

3    Q.   I SEE.  OKAY.  THANK YOU?

4         MR. GALIPO:  THAT'S ALL I HAVE, YOUR HONOR.

5         THE COURT:  MR. MC NICHOLAS.

6                    **REDIRECT EXAMINATION**

7    BY MR. MC NICHOLAS:

8    Q.   THE TATTOO THAT YOU SAW ON MR. GRISSOM'S HAND, WHAT WAS

9    IT?

10   A.   I DON'T RECALL.  I JUST KNOW I PROBABLY SAW SOMEWHERE

11   THE DESIGN OR A TATTOO.

12   Q.   WHAT COLOR WAS THE INK?

13        MR. ROTHANS:  OBJECTION, YOUR HONOR.

14   ARGUMENTATIVE.

15        THE COURT:  OVERRULED.

16        MR. ROTHANS:  CALLS FOR SPECULATION.

17        THE WITNESS:  I WOULDN'T BE ABLE TO TELL YOU.  I

18   JUST KNOW I SAW SOMETHING.

19   BY MR. MC NICHOLAS:

20   Q.   WAS IT DARK-COLORED INK?

21   A.   I GUESS YOU'D SAY, YES.

22   Q.   WHAT COLOR IS THE BACK OF HIS HAND THAT YOU SAW THE

23   DARK-COLORED INK ON?

24   A.   I DON'T REMEMBER, SIR.

25   Q.   BUT YOU WERE -- NOW, MR. ROTHANS WAS ASKING YOU SOME

1    DETAILED POSITIONING QUESTIONS BASED ON EXHIBIT 377-010 NOW

2    DISPLAYED ON THE SCREEN.

3          DO YOU GENERALLY RECALL THAT?

4    A.   YES.

5    Q.   AND HE'S ASKING YOU ABOUT THE POOLS OF BLOOD OR THE

6    BLOOD MARKS, ONE HERE BY THE EVIDENCE TAG NUMBER 3, DO YOU

7    REMEMBER THAT?

8    A.   YES.

9    Q.   DO YOU RECALL ACTUALLY SEEING MR. GRISSOM'S BODY IN THAT

10   GENERAL LOCATION AT ANY TIME YOU WERE AT THE SCENE?

11   A.   I REMEMBER THE PARAMEDICS WORKING ON HIM IN THAT AREA,

12   YES.

13   Q.   OKAY.  IN THIS AREA (INDICATING) TO MY LEFT?

14   A.   YES.

15   Q.   ALL RIGHT.  AND YOU REMEMBER THAT WHEN HE WAS SHOT HE

16   FELL DOWN IN THE AREA OF THE OTHER BLOOD STAIN IMMEDIATELY

17   ADJACENT TO THE SEBRING; CORRECT?

18   A.   ON THE DOOR PANEL, YES.

19   Q.   SO YOU'RE ACTUALLY LOOKING AT HIS BODY PHYSICALLY ON THE

20   GROUND IN THOSE TWO INSTANCES; CORRECT?

21   A.   IN SOME WAY, YES.

22   Q.   OKAY.  AND WHEN YOU'RE LOOKING AT HIS BODY, WHATEVER WAY

23   IT IS THAT YOU DID, DID YOU EVER SEE THAT CELL PHONE SITTING

24   RIGHT THERE NEXT TO EVIDENCE MARKER 2 BETWEEN THOSE TWO BLOOD

25   STAINS?

1    A.   I WASN'T LOOKING, SIR, NO.

2    Q.   DID YOU SEE THAT CELL PHONE WHEN YOU SAW MR. GRISSOM IN

3    AREA NEXT TO EVIDENCE MARKER 3 OR THE OTHER BLOOD STAIN, YES

4    OR NO?

5         MR. ROTHANS:  OBJECTION.  ARGUMENTATIVE.  ASKED AND

6    ANSWERED.

7         THE COURT:  OVERRULED.

8         THE WITNESS:  I DIDN'T SEE IT, NO.

9    BY MR. GALIPO:

10   Q.   AND YOU DIDN'T SEE IT ANYWHERE IN ANY OF THIS AREA

11   DEPICTED IN EXHIBIT 377-010, DID YOU?

12   A.   I WASN'T LOOKING, SIR.

13   Q.   YOU DIDN'T SEE IT ANYWHERE IN THAT AREA, DID YOU, SIR?

14        MR. ROTHANS:  LACKS FOUNDATION.  ARGUMENTATIVE IS

15   PUT TO THE TONE OF THE VOICE, YOUR HONOR.

16        THE COURT:  OVERRULED.  THE JURY CAN JUDGE THE

17   APPROPRIATENESS OF THE TONE OF VOICE.

18        THE WITNESS:  I WASN'T LOOKING, SIR, NO, I DIDN'T

19   SEE IT.

20        MR. MC NICHOLAS:  NOTHING FURTHER.

21        THE COURT:  MR. ROTHANS?

22        MR. ROTHANS:  JUST BRIEFLY, YOUR HONOR.

23                    FURTHER CROSS-EXAMINATION

24   Q.   DETECTIVE, HOW LARGE A MAN WAS LEJOY GRISSOM?

25   A.   HE WAS BIGGER THAN ME.  I KNOW THAT.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1    Q.   AND YOU'RE HOW TALL, SIR?

 2    A.   6'2".

 3    Q.   AND BACK IN APRIL OF 2010, ROUGHLY HOW MUCH DID YOU

 4    WEIGH?

 5    A.   OOH.  260.

 6    Q.   OKAY.  AND MR. GRISSOM WAS LARGER, TALLER AND HEAVIER

 7    THAN YOU WERE AT THAT TIME?

 8    A.   I BELIEVE SO, YES.

 9    Q.   HE WAS LAYING IN THAT AREA BETWEEN THE DOOR ON THE

10    PASSENGER SIDE AND WHERE THE PARAMEDICS WERE TREATING HIM AT

11    VARIOUS TIMES?

12    A.   THEY PULLED HIM OUT OF THAT AREA.

13    Q.   DID YOU EVER LOOK UNDER HIS BODY?

14    A.   NO.

15            MR. ROTHANS:  ALL RIGHT.  NOTHING FURTHER.

16            MR. GALIPO:  NO FURTHER QUESTIONS, YOUR HONOR.

17            THE COURT:  ALL RIGHT.  I WASN'T GOING TO GIVE YOU

18    THE OPPORTUNITY --

19            MR. GALIPO:  OH, OKAY.

20            THE COURT:  -- SO I'M GLAD WE AGREE.

21            DETECTIVE LOPEZ, YOU'RE EXCUSED.

22            THANK YOU.

23            THE WITNESS:  THANK YOU, YOUR HONOR.

24            THE COURT:  ALL RIGHT.  MR. GALIPO, THE PLAINTIFFS

25    MAY CALL THEIR NEXT WITNESS.
```

```
1              MR. GALIPO:  THANK YOU.

2              WE'D LIKE TO CALL THE DEFENDANT, OFFICER LUIS

3     MARTINEZ, PLEASE.

4          OFFICER LUIS MARTINEZ, PLAINTIFF'S WITNESS, SWORN

5              THE CLERK:  PLEASE BE SEATED.

6              PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

7              THE WITNESS:  LUIS MARTINEZ, L-U-I-S.  MARTINEZ IS

8     M-A-R-T-I-N-E-Z.

9              THE CLERK:  THANK YOU.

10             THE COURT:  MR. GALIPO, YOU MAY PROCEED.

11             MR. GALIPO:  THANK YOU.

12                      DIRECT EXAMINATION

13    BY MR. GALIPO:

14    Q.   GOOD MORNING, OFFICER MARTINEZ.

15    A.   GOOD MORNING, SIR.

16    Q.   HOW LONG HAD YOU BEEN A POLICE OFFICER AS OF APRIL 25TH,

17    2010?

18    A.   APPROXIMATELY FIVE-AND-A-HALF YEARS.

19    Q.   HOW MANY FELONY TRAFFIC STOPS HAD YOU BEEN ON BEFORE

20    APRIL 25TH, 2010?

21    A.   APPROXIMATELY 20.

22    Q.   ANY SHOTS FIRED IN ANY OF THOSE?

23             MR. ROTHANS:  OBJECTION.  IRRELEVANT.

24             THE COURT:  SUSTAINED.

25    BY MR. GALIPO:
```

1    Q.   WHEN DID YOU START YOUR SHIFT THE PREVIOUS DAY ON

2    APRIL 24TH, 2010?

3    A.   SIR, I STARTED AT 9:00 -- I'M SORRY -- 7:00 P.M.

4    Q.   AND DID YOU WORK THE PRIOR DAY?

5    A.   I BELIEVE SO, YES, SIR.

6    Q.   AND WHAT WOULD YOUR SHIFT HAVE BEEN ON THE PRIOR DAY?

7    SO I'M TALKING NOW, I THINK, APRIL 23RD.

8    A.   7:00 P.M. TO 7:30 A.M.

9    Q.   OKAY.  SO THAT'S BASICALLY A TWELVE-AND-A-HALF-HOUR

10   SHIFT?

11   A.   YES, SIR.

12   Q.   WHAT, IF ANYTHING, WOULD YOU DO TO KEEP YOURSELF ALERT

13   AND WAKE DURING THAT SHIFT?  WOULD YOU DRINK MONSTERS,

14   COFFEE, RED BULLS?  WHAT WOULD YOU DO?

15   A.   THOSE THINGS, SIR.  COFFEE OR AN ENERGY DRINK.

16   Q.   OKAY.  DID YOU HAVE A PARTICULAR CUSTOM AT THE TIME AS

17   TO WHEN YOU WOULD SLEEP IN BETWEEN HAVING THOSE SHIFTS, 7:00

18   AT NIGHT TO 7:30 IN THE MORNING?

19   A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

20   Q.   SURE.

21        AFTER -- LET'S JUST TAKE, FOR EXAMPLE -- THIS

22   HAPPENED ON A SUNDAY; IS THAT RIGHT?

23   A.   SUNDAY MORNING, YES, SIR.

24   Q.   OKAY.  SO LET'S JUST SAY WHEN YOU WOULD START YOUR SHIFT

25   AT 7:00 AT NIGHT, STAY UP BY WHATEVER MEANS, TO 7:30 THE NEXT

1    MORNING, AND YOU KNEW YOU HAD TO WORK AGAIN AT 7:00 THE

2    FOLLOWING NIGHT, WHEN WOULD YOU SLEEP?

3    A.    WHEN I GOT HOME, SIR.

4    Q.    OKAY.  AND WHEN WOULD YOU NORMALLY WAKE UP TO PREPARE

5    YOURSELF FOR THE NEXT SHIFT?

6    A.    NORMALLY I'D WAKE UP AROUND 5:00 P.M.

7    Q.    OKAY.  SO DO YOU BELIEVE ON APRIL 24TH, 2010, YOU

8    PROBABLY GOT UP AROUND 5:00 O'CLOCK; IS THAT FAIR?

9    A.    THAT IS FAIR, SIR.

10   Q.    AND YOU WERE LIVING IN WHITTIER AT THE TIME?

11   A.    YES, SIR.

12   Q.    AND THEN YOU WOULD GO TO WORK TO GET READY TO START YOUR

13   SHIFT AT 7:00?

14   A.    YES, SIR.

15   Q.    NOW, WHEN YOU STARTED THAT SHIFT, WERE YOU ANTICIPATING

16   THAT WHEN 7:30 IN THE MORNING CAME, YOU WERE GOING TO BE ABLE

17   TO GO HOME AND GO TO SLEEP?

18   A.    I WAS ANTICIPATING THAT, YES, SIR.

19   Q.    ALL RIGHT.  AND DURING THAT SHIFT, WERE YOU DOING WHAT

20   YOU NORMALLY WOULD DO, EITHER DRINK -- TRY TO DRINK COFFEE OR

21   A RED BULL OR A MONSTER OR SOMETHING TO STAY AWAKE AND STAY

22   ALERT?

23   A.    I CAN'T REMEMBER IF I DID THAT DAY.

24   Q.    ALL RIGHT.  AT WHAT POINT DURING THAT SHIFT WERE YOU

25   TOLD YOU CAN'T GO HOME AT 7:30, YOU NEED TO STAY EXTRA HOURS?

1    A.    I'D SAY SOMEWHERE AFTER 6:00 A.M., SIR.

2    Q.    OKAY.  SO YOU'RE ABOUT AN HOUR-AND-A-HALF FROM GETTING

3    OFF, AND PROBABLY LOOKING FORWARD TO GOING HOME AND GETTING

4    SOME SLEEP AND SOMEONE TELLS YOU YOU GOT TO STAY LONGER?

5    A.    THAT'S CORRECT, SIR.

6    Q.    WHO TOLD YOU YOU HAVE TO STAY LONGER?

7    A.    SUPERVISOR.

8    Q.    DO YOU REMEMBER THE NAME OF THE SUPERVISOR?

9    A.    I DO NOT.

10   Q.    WHAT WAS YOUR UNDERSTANDING AS TO WHY YOU HAD TO STAY

11   LONG?

12   A.    MY UNDERSTANDING WAS THE DAY WATCH SHIFT WAS

13   SHORTHANDED.

14   Q.    ALL RIGHT.  SO WOULD IT BE FAIR TO SAY IF YOU HAD GOTTEN

15   OFF AT 7:30, WHEN YOU NORMALLY WOULD, THAT BY 11:30 P.M. --

16   STRIKE THAT.

17          BY 11:30 A.M. YOU PROBABLY WOULD HAVE BEEN

18   SLEEPING?

19   A.    THAT'S CORRECT.

20   Q.    NOW, IN BETWEEN THE TIME WHEN YOU WERE TOLD YOU HAVE TO

21   STAY EXTRA AT 6:00 O'CLOCK IN THE MORNING, AND THE TIME OF

22   THE SHOOTING THAT HAPPENED AT ABOUT 11:30 IN THE MORNING, DID

23   YOU HAVE ANY COFFEE OR RED BULL OR MONSTER TO KEEP YOU AWAKE

24   AND ALERT?

25   A.    I CAN'T REMEMBER THAT, SIR.

1    Q.   I WANT TO ASK YOU A FEW QUESTIONS ABOUT TRAINING.  AND

2    YOU DID HAVE TRAINING AT THE ACADEMY; CORRECT?

3    A.   THAT'S CORRECT, SIR.

4    Q.   AND ALSO SOME ONGOING TRAINING AFTER THE ACADEMY?

5    A.   YES, SIR.

6    Q.   DID YOU HAVE TRAINING, FOR EXAMPLE, DURING A FELONY

7    TRAFFIC STOP, IF YOU SAW AN OBJECT IN SOMEONE'S HAND, ONE

8    THING YOU CAN DO IS TELL THEM TO DROP IT?

9    A.   THAT IS CORRECT.

10   Q.   DID YOU HAVE TRAINING, IF YOU SAW WHAT YOU BELIEVED TO

11   BE A GUN IN SOMEONE'S HAND, ONE THING COULD YOU DO IS YELL

12   OUT "GUN" TO MAKE SURE ALL THE FELLOW OFFICERS KNOW THAT YOU

13   SEE WHAT YOU BELIEVE TO BE A GUN?

14   A.   THAT'S CORRECT, SIR.

15   Q.   AND DID YOU HAVE TRAINING THAT BEFORE USING DEADLY

16   FORCE, A WARNING THAT DEADLY FORCE IS GOING TO BE GIVEN

17   SHOULD BE GIVEN WHEN FEASIBLE?

18   A.   WHEN FEASIBLE, YES, SIR.

19   Q.   ALL RIGHT.  NOW, PRIOR TO THE SHOTS IN THIS CASE, DID

20   YOU HEAR ANY OFFICER YELL "DROP IT"?

21   A.   NO, SIR.

22   Q.   PRIOR TO THE SHOTS IN THIS CASE, DID YOU HEAR ANY

23   OFFICER YELL "GUN"?

24   A.   NO, SIR.

25   Q.   PRIOR TO THE SHOTS IN THIS CASE, DID YOU HEAR ANY

1    WARNING GIVEN TO MR. GRISSOM THAT SHOTS WERE GOING TO BE

2    FIRED?

3    A.   NO, SIR.

4    Q.   DID YOU GIVE HIM ANY WARNING THAT YOU WERE GOING TO

5    SHOOT HIM UNLESS HE DID OR DIDN'T DO SOMETHING?

6    A.   NO, SIR.

7    Q.   IS IT YOUR TRAINING, OR WAS IT AT THE TIME, THAT YOU

8    COULD SHOOT SOMEONE FOR SEEING A CELL PHONE IN THEIR HAND?

9    A.   NO, SIR.

10   Q.   WAS IT YOUR TRAINING THAT YOU COULD SHOOT SOMEONE

11   BECAUSE YOU THOUGHT THEY WERE INVOLVED IN AN ARMED ROBBERY?

12   A.   NO, SIR.

13   Q.   NOW, AT SOME POINT, YOU ARRIVED AT THE SCENE; CORRECT,

14   AT THE SCENE OF THE DONUT KING PARKING LOT?

15   A.   YES, SIR.

16   Q.   I'D LIKE TO SHOW YOU EXHIBIT 8 --

17          MR. GALIPO:  WHICH I BELIEVE WE PREVIOUSLY HAVE

18   SEEN, YOUR HONOR.

19          THE COURT:  CORRECT.

20   BY MR. GALIPO:

21   Q.   DO YOU -- AND LET ME ZOOM IN JUST A LITTLE BIT.  MY EYES

22   AREN'T WHAT THEY USED TO BE HERE.

23          THERE'S A VEHICLE THAT SAYS, "C65" ON THE TOP.  IS

24   THAT YOUR VEHICLE?

25   A.   YES, SIR.

```
 1    Q.   AND IS THAT WHERE YOU PULLED IN WHEN YOU GOT THERE?

 2    A.   YES, SIR.

 3    Q.   AND WE SEE THE VEHICLE, C63 AND C62.  TO THE BEST OF

 4    YOUR RECOLLECTION, WERE THOSE VEHICLES IN THE PLACES WE SEE

 5    THEM WHEN YOU GOT THERE?

 6    A.   THAT'S CORRECT, SIR.

 7    Q.   AND WE SEE THE SEBRING, THE GREEN CHRYSLER SEBRING IN

 8    ITS POSITION, IS THAT THE POSITION GENERALLY YOU RECALL WHEN

 9    YOU GOT THERE?

10    A.   YES, SIR.

11    Q.   AND WHEN YOU FIRST GOT THERE, WERE THE OCCUPANTS OF THE

12    GREEN CAR, THE SEBRING, INSIDE THE CAR?

13    A.   YES, SIR.

14    Q.   BY THE WAY, BEFORE YOU GOT TO THE SCENE, DID YOU HAVE

15    ANY SPECIFIC INFORMATION THAT ANYONE HAD BEEN INJURED IN THE

16    ROBBERY?

17    A.   I DID NOT.

18    Q.   DID YOU HAVE ANY SPECIFIC INFORMATION THAT SHOTS HAD

19    BEEN FIRED?

20    A.   NO, SIR.

21    Q.   OKAY.  WHERE DO YOU GO AFTER GETTING OUT OF YOUR

22    VEHICLE, INITIALLY?

23    A.   I WENT TO THE DRIVER'S SIDE DOOR OF C63, SIR.

24    Q.   OKAY.  SO IF YOU RECALL, WAS THE DOOR OF C63 OPEN AT THE

25    TIME?
```

1    A.   I CAN'T REMEMBER THAT, SIR.

2    Q.   WELL, AT THE TIME YOU FIRED THE SHOTS, DO YOU RECALL

3    BEING IN THE V OF THAT DOOR?

4    A.   THAT IS CORRECT, SIR.

5    Q.   OKAY.  SO IT EITHER WAS OPEN, OR YOU WOULD HAVE OPENED

6    IT; IS THAT FAIR?

7    A.   THAT IS FAIR, SIR.

8    Q.   AND YOU ACTUALLY HAD -- WELL, YOU HAD SEVERAL ITEMS ON

9    YOU; RIGHT?  YOU HAD PEPPER SPRAY?

10   A.   YES, SIR.

11   Q.   YOU HAD A TASER?

12   A.   YES, SIR.

13   Q.   IT'S AN X26 TASER?

14   A.   THAT IS CORRECT, SIR.

15   Q.   AND THAT PARTICULAR TASER COULD BE USED IN TWO DIFFERENT

16   WAYS.  ONE WOULD BE A DRIVE STUN MODE, WHERE YOU ACTUALLY PUT

17   THE TASER AND DIRECTLY TASE SOMEONE; CORRECT?

18   A.   YES, SIR.

19   Q.   THE OTHER WAY IS IN THE PROBE OR DART MODE WHERE A

20   PERSON COULD BE SOME DISTANCE AWAY, DEPENDING ON THE

21   CARTRIDGE, AND YOU COULD HIT THEM WITH THE TWO TASER PROBES

22   IN THAT FASHION; CORRECT?

23   A.   THAT'S CORRECT, SIR.

24   Q.   AND THEN THE TRAINING IS THAT THAT WOULD, FOR A

25   FIVE-SECOND CYCLE, IMMOBILIZE THE PERSON, CAUSING THEM TO

1    FALL TO THE GROUND; CORRECT?

2    A.   THAT IS CORRECT, SIR.

3    Q.   AND, IN FACT, SOME OF THE CARTRIDGES YOU COULD TASE A

4    PERSON FROM EVEN 21 FEET AWAY; TRUE?

5    A.   TRUE, SIR.

6    Q.   AND YOU ARE TAUGHT THAT A TASER IS A LESS THAN LETHAL

7    OPTION; FAIR?

8    A.   THAT IS FAIR, SIR.

9    Q.   YOU ALSO HAVE TWO SEMI-AUTOMATIC GUNS ON YOU, DIDN'T

10   YOU?

11   A.   YES, SIR.

12   Q.   AND WHERE WERE THOSE -- WHAT TYPES OF GUNS WERE THEY AND

13   WHERE WERE THEY ON YOUR PERSON?

14   A.   MY PRIMARY HANDGUN IS A 1911, THE MODEL; THE MAKE IS

15   SPRINGFIELD ARMORY AND IT'S A .45 CALIBER.  THAT WAS ON MY

16   RIGHT HIP.

17   Q.   OKAY.  AND THOSE ARE BOTH SEMIAUTOMATICS, I THINK I

18   ALREADY SAID THAT -- SORRY.

19          AND THEN YOU GOT YOUR MP5 FROM YOUR CAR?

20   A.   CORRECT, SIR.  I DIDN'T FINISH SAYING, BUT I ALSO HAD --

21   Q.   OH, GO AHEAD.  I MIGHT HAVE CUT OFF.

22          THE COURT:  RIGHT.

23          THE -- YOU ASKED ABOUT TWO GUNS, AND WE HEARD ABOUT

24   ONE OF THEM.

25          MR. GALIPO:  MY APOLOGIES.

```
 1                    THE WITNESS:  YES, SIR.

 2                    I HAD A RUGER .380 PISTOL IN MY LEFT POCKET --

 3     FRONT LEFT POCKET ON MY UNIFORM --

 4     BY MR. GALIPO:

 5     Q.   OKAY.

 6     A.   -- PANTS.

 7     Q.   THANK YOU.

 8                    SO YOU DECIDE TO GET THE MP5?

 9     A.   YES, SIR.

10     Q.   IS THAT CONSIDERED A SUBMACHINE GUN?

11     A.   THAT IS CORRECT, SIR.

12     Q.   AND IT HAS A FEATURE ON IT THAT YOU COULD PUT IT ON A

13     THREE-ROUND BURST?

14     A.   YES, SIR.

15     Q.   AND YOU PUT IT ON THE THREE-ROUND BURST; TRUE?

16     A.   YES, SIR.

17     Q.   AND IT'S YOUR UNDERSTANDING ON THE THREE-ROUND BURST,

18     YOU PRESSED THE TRIGGER ONE TIME, THREE BULLETS COME OUT; IS

19     THAT TRUE?

20     A.   THAT IS TRUE, SIR.

21     Q.   AND WHEN YOU FIRED YOUR SHOT IN THIS CASE, YOU WERE

22     AWARE THAT IT WAS ON A THREE-ROUND BURST?

23     A.   YES, SIR.

24     Q.   AND ARE YOU TRAINED WITH RESPECT TO THE MP5,

25     PARTICULARLY WITH THE THREE-ROUND BURST, THAT MORE THAN A
```

1   SEMI-AUTOMATIC WEAPON THAT IS LIKELY TO CAUSE SERIOUS INJURY

2   OR DEATH?

3   A.   YES, SIR.

4   Q.   AND YOU KNEW THAT WHEN YOU FIRED; CORRECT?

5   A.   YES, SIR.

6   Q.   NOW, YOU'VE ALSO BEEN PROMOTED SINCE THIS INCIDENT; IS

7   THAT TRUE?

8   A.   YES, SIR.

9   Q.   AND THIS INCIDENT HAPPENED ON APRIL 25TH, 2010.

10          WHEN WERE YOU PROMOTED?

11  A.   I WAS PROMOTED TO DETECTIVE IN SEPTEMBER OF 2010.

12  Q.   THE SAME YEAR AS THIS INCIDENT?

13  A.   YES, SIR.

14  Q.   OKAY.  AND WHO GAVE YOU THAT PROMOTION?

15  A.   MY CHIEF OF POLICE.

16  Q.   OKAY.  WHO'S PRESENT HERE TODAY?

17  A.   YES, SIR.

18  Q.   ALL RIGHT.  SO I'M GOING TO POINT -- I THINK THERE'S A

19  MARKING ON THIS DIAGRAM.  LET ME JUST ZOOM OUT A LITTLE BIT.

20          THIS WAS ACTUALLY A DIAGRAM, IF YOU RECALL,

21  ATTACHED TO YOUR DEPOSITION, DO YOU REMEMBER THAT?

22  A.   YES, SIR.

23  Q.   OKAY.  WE HAVE EXHIBIT 8 AND WE HAVE MARTINEZ, AND THEN

24  IT LOOKS TO BE A NUMBER ONE WITH A LINE POINTED TO THE

25  DRIVER'S SIDE OF C63.

```
1              IS THAT THE POSITION, GENERALLY, YOU WERE IN AT THE

2    TIME OF THE SHOOTING?

3    A.   YES, SIR.

4    Q.   OKAY.  SO WOULD IT BE FAIR TO SAY YOU GOT OUT OF YOUR

5    VEHICLE, C65, AT SOME POINT GOT THE SUBMACHINE GUN AND THEN

6    WENT TO THE DRIVER'S SIDE OF C63 AND STOOD THERE UP UNTIL THE

7    TIME YOU FIRED THE SHOT?

8    A.   THAT'S CORRECT, SIR.

9    Q.   ALL RIGHT.  NOW, I'M GOING TO ZOOM IN JUST A LITTLE BIT.

10   IF WE LOOK, THERE APPEARS TO BE A RED X, IS THAT THE GENERAL

11   POSITION YOU WERE WHEN YOU FIRED?

12              MR. ROTHANS:  VAGUE AND AMBIGUOUS.  THERE ARE

13   MULTIPLE X'S.

14              THE COURT:  SUSTAINED.

15              MR. GALIPO:  FAIR ENOUGH.  LET ME BE MORE SPECIFIC.

16   BY MR. GALIPO:

17   Q.   THERE APPEARS TO BE A RED X ON THE DRIVER'S SIDE OF C63

18   WHERE I'M POINTING WITH MY PEN, IS THAT GENERALLY WHERE YOU

19   WERE?

20   A.   YES, SIR.

21   Q.   THERE'S ANOTHER RED X ON THE PASSENGER'S SIDE OF C62;

22   CORRECT?

23   A.   YES, SIR.

24   Q.   DO YOU RECALL ANY OFFICER BEING IN THAT POSITION?

25   A.   OFFICER ROY LOPEZ.
```

```
 1   Q.   OKAY.  DO YOU RECALL WHERE OFFICER ZERBEY WAS?

 2   A.   HE WAS IN THE DRIVER'S SIDE DOOR OF C62 MARKED WITH AN

 3   X.

 4   Q.   OKAY.  AND THEN THERE'S ANOTHER RED X THAT APPEARS TO BE

 5   IN THE AREA OF ONE OF THOSE BLOOD POOLS, DO YOU KNOW WHAT

 6   THAT X REPRESENTS?

 7   A.   YES, SIR.

 8   Q.   WHAT DOES THAT REPRESENT?

 9   A.   THAT IS WHERE MR. GRISSOM WAS BEING TREATED BY THE

10   PARAMEDICS.

11   Q.   WELL, ISN'T THAT THE X THAT YOU PUT IN YOUR DEPOSITION

12   AS TO WHERE HE WAS WHEN YOU SHOT HIM?

13   A.   I DON'T BELIEVE SO, SIR.

14   Q.   OKAY.  WE'RE GOING TO GET TO THIS IN A MINUTE, BUT IS IT

15   YOUR RECOLLECTION THAT HE GOT OUT OF THE CAR -- AND, BY THE

16   WAY, THE CAR WAS FACING WEST; CORRECT?

17   A.   CORRECT, SIR.

18   Q.   SO IF I HAVE MY DIRECTIONS CORRECT, THAT'S A BIG IF --

19   THE PASSENGER'S SIDE OF THE CAR WOULD BE TO THE NORTH; IS

20   THAT RIGHT?

21   A.   THAT IS CORRECT, SIR.

22   Q.   ALL RIGHT.  DID YOU OBSERVE MR. GRISSOM AFTER HE GOT OUT

23   OF THE CAR TAKE TWO STEPS TO THE NORTH?

24   A.   HE SIDE STEPPED TO THE NORTH, YES, SIR.

25   Q.   HOW MANY STEPS?
```

1    A.   I'D SAY ONE OR TWO STEPS.

2    Q.   MORE THAN TWO STEPS.

3             SO YOUR RECOLLECTION IS --

4             THE COURT:  I'M SORRY.  DETECTIVE, DID YOU SAY MORE

5    THAN TWO STEPS OR ONE OR TWO STEPS?

6             THE WITNESS:  I SAID ONE OR TWO STEPS.

7             THE COURT:  ALL RIGHT.  GO AHEAD.

8             MR. GALIPO:  I APOLOGIZE.

9    BY MR. GALIPO:

10   Q.   SO ONE OR TWO STEPS, THAT'S YOUR RECOLLECTION?

11   A.   YES, SIR.

12   Q.   SO WHEN YOU SHOT HIM, WAS HE RIGHT NEXT TO THE CAR, OR

13   WAS HE A COUPLE STEPS AWAY FROM THE CAR?

14   A.   HE WAS IN THE APEX -- THE DOOR IS CLOSED ON THIS

15   PICTURE, BUT HE WAS IN THE APEX OF THE FRONT PASSENGER DOOR.

16   Q.   ALL RIGHT.  NOW --

17   A.   THE DOOR WAS OPEN.

18   Q.   SORRY?

19   A.   THE DOOR WAS OPEN.

20   Q.   OKAY.  THANK YOU.

21            SO WAS THERE ANY TINT ON THE WINDOWS OF THAT

22   SEBRING?

23   A.   NO, SIR.

24   Q.   COULD YOU SEE INTO THE SEBRING WHEN YOU GOT TO YOUR

25   POSITION ON THE DRIVER'S SIDE OF C63?

 1    A.   YES, I COULD SEE INSIDE, SIR.

 2    Q.   AND HOW LONG WOULD YOU SAY -- WHAT'S YOUR TIME ESTIMATE

 3    AS TO THE TIME YOU GOT TO THE SCENE UNTIL THE TIME

 4    MR. GRISSOM STARTED GETTING OUT OF THE VEHICLE?

 5            MR. ROTHANS:  VAGUE AS TO SCENE.  IS HE TALKING

 6    ABOUT C62, 63 OR ARRIVAL, ON THE SCENE IN HIS CAR?

 7            MR. GALIPO:  I'LL BE MORE SPECIFIC.

 8            THE COURT:  GO AHEAD.

 9    BY MR. GALIPO:

10    Q.   HOW MUCH TIME DID IT TAKE YOU FROM THE TIME YOU GOT TO

11    THE SCENE TO THE TIME YOU GOT TO THE DRIVER'S SIDE OF C63?

12    A.   FROM THE MOMENT I GOT TO THE SCENE TO C63 OF THE

13    DRIVER'S SIDE, I WOULD SAY APPROXIMATELY TEN SECONDS.

14    Q.   OKAY.  FROM THE TIME YOU WERE ON THE DRIVER'S SIDE OF

15    C63 TO THE TIME MR. GRISSOM GOT OUT OF THE VEHICLE, HOW MUCH

16    TIME BETWEEN THOSE TWO POINTS?

17    A.   APPROXIMATELY -- IT FELT LIKE FOREVER, BUT I WOULD

18    MENTION -- I WOULD APPROXIMATE MAYBE ONE OR TWO MINUTES, SIR.

19    Q.   OKAY.  YOU PREVIOUSLY ESTIMATED FIVE OR TEN MINUTES;

20    FAIR?

21    A.   THAT'S FAIR, SIR.

22    Q.   BUT IN THINKING ABOUT IT AND LOOKING AT SOME OF THE

23    OTHER DOCUMENTS, YOU THINK IT MAY HAVE BEEN LESS THAN THAT;

24    IS THAT TRUE?

25    A.   THAT'S TRUE, SIR.

1    Q.   IN ANY EVENT, YOU TOOK THE POSITION OF WHAT'S CALLED

2    COVER; CORRECT?

3    A.   YES, SIR.

4    Q.   AND PART OF THE COVER WAS THE OPEN DOOR OF THE VEHICLE;

5    CORRECT?

6    A.   YES, SIR.

7    Q.   AND, TO YOUR KNOWLEDGE, THOSE DOOR PANELS HAVE SOME

8    BALLISTIC PROTECTION IN THEM; TRUE?

9    A.   NO, SIR.

10   Q.   YOU HAD A BULLET PROOF VEST ON AT THE TIME; CORRECT?

11   A.   THAT IS CORRECT.

12   Q.   ALSO, THE FRONT ENGINE BLOCK OF THE VEHICLE SERVES AS

13   COVER; CORRECT?

14   A.   YES, SIR.

15   Q.   AND THAT'S WHY YOU POSITIONED YOURSELF IN THE POSITION

16   YOU DID?

17   A.   YES, SIR.

18   Q.   I SEE YOU'RE WEARING GLASSES TODAY.  DID YOU HAVE THOSE

19   GLASSES ON AT THE TIME OF THE SHOOTING?

20   A.   YES, SIR.

21   Q.   DID YOU -- WERE YOU WEARING CORRECTIVE LENSES AT THE

22   TIME?

23   A.   GLASSES, SIR.

24   Q.   GLASSES.

25        OKAY.  THANK YOU.

1          DO YOU KNOW WHAT YOU NEED GLASSES FOR?

2     A.   I CAN'T -- VISION IN THE FAR; NEARSIGHTED.

3     Q.   OKAY.  SO AM I, SO I UNDERSTAND THAT.

4          IN ANY EVENT, DID YOU SEE AT ANY TIME, AFTER GOING

5     TO THE DRIVER'S SIDE OF C63, THE INDIVIDUALS IN THE VEHICLE

6     WITH THEIR HANDS UP?

7     A.   YES, SIR.

8     Q.   AND WHEN YOU SAW THEIR HANDS UP WHILE YOU WERE WATCHING

9     THEM IN THE VEHICLE, DID YOU SEE ANYTHING IN THEIR HANDS?

10    A.   NO, SIR.

11    Q.   WERE YOU LOOKING AT THEIR HANDS AT THAT POINT?

12    A.   THAT WAS ONE OF THE THINGS I WAS LOOKING AT, YES, SIR.

13    Q.   AND WHY -- YOU'RE TRAINED TO LOOK AT THE HANDS; CORRECT?

14    A.   THAT'S ONE OF THE THINGS, YES, SIR.

15    Q.   AND WHY YOU WERE LOOKING AT THE HANDS?

16    A.   THE HANDS ARE WHERE THEY CAN CONCEAL WEAPONS -- NOT

17    CONCEAL WEAPONS, BUT HOLD WEAPONS.

18    Q.   OKAY.  NOW, YOU RECALL OFFICER ZERBEY GIVING AT LEAST

19    SOME OF THE COMMANDS; CORRECT?

20    A.   CORRECT, SIR.

21    Q.   AND YOU RECALL THE DRIVER -- STRIKE THAT -- THE

22    PASSENGER'S LEFT HAND GOING DOWN OUT OF YOUR VIEW ON AT LEAST

23    TWO OCCASIONS WHILE YOU WERE POSITIONED ON THE SIDE OF C63;

24    IS THAT CORRECT?

25    A.   YES, SIR.

1  Q.   AND YOU ESTIMATED THAT COMBINED, THE TWO TIMES THAT HIS

2  HAND WENT OUT OF YOUR VIEW, WAS APPROXIMATELY FIVE TO TEN

3  SECONDS?

4  A.   CORRECT, SIR.

5  Q.   AND HE THEN WOULD PUT HIS HAND BACK UP WHEN OFFICERS

6  WOULD YELL TO PUT HIS HAND UP; CORRECT?

7  A.   YES, SIR.

8  Q.   BUT DURING THAT TIME FRAME, IT'S YOUR RECOLLECTION,

9  WHILE HE WAS IN THE CAR, YOU COULD SEE HIS RIGHT HAND UP AT

10  ALL TIMES; TRUE?

11  A.   THAT'S TRUE, SIR.

12  Q.   NOW, DID YOU HEAR AT SOME POINT A COMMAND FOR HIM TO PUT

13  HIS HANDS OUT THE OPEN PASSENGER WINDOW?

14  A.   YES, SIR.

15  Q.   AND DID HE EVER DO THAT?

16  A.   YES, SIR.

17  Q.   OKAY.  SO THIS WASN'T A SITUATION, WAS IT, WHERE HE

18  REFUSED TO PUT HIS HANDS OUT THE WINDOW?

19  A.   NO, SIR.

20  Q.   WAS IT A SITUATION WHERE HE REFUSED TO PUT HIS HANDS UP?

21  A.   NO, SIR.

22  Q.   DID YOU EVER SEE HIM GET OUT OF THE CAR AND TRY TO RUN

23  AWAY?

24  A.   NO, SIR.

25  Q.   WHEN YOU SAW HIS HANDS OUT THE OPEN PASSENGER WINDOW,

1    YOU WOULD HAVE STILL BEEN IN YOUR SPOT ON THE SIDE OF C63;

2    CORRECT?

3    A.   YES, SIR.

4    Q.   AND YOU ESTIMATED YOUR -- FROM YOUR POSITION TO THE

5    PASSENGER'S SIDE OF THAT SEBRING ABOUT 10 OR 15 FEET;

6    CORRECT?

7    A.   THAT'S CORRECT, SIR.

8    Q.   AND IT WAS LIGHT OUTSIDE; CORRECT?

9    A.   YES, SIR.

10   Q.   AND YOU HAD YOUR GLASSES ON SO YOU WERE ABLE TO SEE

11   CLEARLY; TRUE?

12   A.   TRUE SIR.

13   Q.   DID YOU SEE ANYTHING IN HIS HANDS WHEN YOU SAW HIM PUT

14   BOTH HANDS OUT THE OPEN PASSENGER WINDOW?

15   A.   NO, SIR.

16   Q.   WERE YOU LOOKING AT HIS HANDS AT THAT POINT?

17   A.   THAT WAS ONE OF THE THINGS, YES, SIR.

18   Q.   ALL RIGHT.  NOW, AT SOME POINT, DID YOU HEAR A

19   DISCUSSION ABOUT HIM WANTING TO TAKE HIS SEAT BELT OFF?

20   A.   I REMEMBER HEARING THAT, SIR.

21   Q.   OKAY.  AND HOW DID THAT CONVERSATION TAKE PLACE?

22   A.   I BELIEVE OFFICER ZERBEY WAS GIVING MR. GRISSOM COMMANDS

23   AND ONE OF THE COMMANDS WAS TO OPEN THE DOOR FROM THE

24   OUTSIDE, AND HE YELLED OUT -- MR. GRISSOM, I BELIEVE, YELLED

25   OUT "I CANT, MY SEAT BELT, I HAD MY SEAT BELT ON."

1    Q.   OKAY.  WAS THAT THE FIRST TIME YOU HEARD HIM SPEAK?

2    A.   YES, SIR.

3    Q.   SO THE FIRST THING YOU HEAR HIM SAY IS:  "I CAN'T, MY

4    SEAT BELT'S ON"?

5    A.   YES, SIR.

6    Q.   AND WHAT DOES OFFICER ZERBEY SAY IN RESPONSE TO HIM

7    SAYING, "I CAN'T, MY SEAT BELT'S ON"?

8    A.   I BELIEVE OFFICER ZERBEY SAID SOMETHING TO THE EFFECT

9    OF, OKAY, TAKE YOUR SEAT BELT OFF.

10   Q.   ALL RIGHT.  AND DID HE LOWER HIS LEFT HAND TO TAKE HIS

11   SEAT BELT OFF?

12   A.   I CAN'T REMEMBER WHICH HAND HE USED TO TAKE OFF HIS SEAT

13   BELT.

14   Q.   BUT, IN ANY EVENT, WAS IT YOUR UNDERSTANDING THAT HE'S

15   NOW BEEN GIVEN PERMISSION TO TAKE THE SEAT BELT OFF AND HE

16   DID SO?

17   A.   YES, SIR.

18   Q.   ALL RIGHT.  THEN WAS THERE A REQUEST AT SOME POINT FOR

19   HIM TO OPEN THE CAR DOOR FROM THE OUTSIDE?

20   A.   YES, SIR.

21   Q.   AND DID HE RESPOND TO THAT?

22   A.   YES, SIR.

23   Q.   WHAT DID HE SAY?

24   A.   MR. GRISSOM SAID SOMETHING TO THE EFFECT OF "I CAN'T,

25   THE DOOR HANDLE'S BROKEN."

1    Q.   OKAY.  NOW, UP TO THIS POINT IN TIME, DO YOU SEE

2    ANYTHING THAT YOU BELIEVE TO BE A WEAPON?

3    A.   NO, SIR.

4    Q.   DO YOU HEAR MR. GRISSOM USING ANY PROFANITY?

5    A.   NO, SIR.

6    Q.   WAS HE TALKING IN A FAIRLY CALM MANNER AT THAT POINT?

7    A.   YES, SIR, THAT'S FAIR TO SAY.

8    Q.   NOW, WHAT DOES OFFICER ZERBEY SAY IN RESPONSE TO

9    MR. GRISSOM SAYING, "I CAN'T OPEN IT FROM THE OUTSIDE, IT'S

10   BROKEN," OR WORDS TO THAT EFFECT?

11   A.   OFFICER ZERBEY SAID SOMETHING TO THE EFFECT OF, OKAY,

12   WELL, OPEN IT FROM THE INSIDE.

13   Q.   ALL RIGHT.  AND DO YOU RECALL WHICH HAND MR. GRISSOM

14   USED TO OPEN IT FROM THE INSIDE?

15   A.   I CAN'T RECALL THAT, SIR.

16   Q.   ALL RIGHT.  BUT, IN ANY EVENT, IT WAS ONE OF HIS HANDS?

17   A.   YES, SIR.

18   Q.   AND NOW THE DOOR IS OPEN; IS THAT CORRECT?

19   A.   YES, SIR.

20   Q.   AND THE PLAN, AS YOU UNDERSTOOD IT, WAS TO GET HIM OUT

21   OF THE VEHICLE FIRST?

22   A.   THAT'S CORRECT, SIR.

23   Q.   AND YOU'RE STILL IN THE SAME SPOT THAT YOU TOLD US, ON

24   THE SIDE OF C63?

25   A.   YES, SIR.

```
1    Q.   NOW, HAVE YOU REVIEWED YOUR STATEMENT IN THIS CASE?

2    A.   WITH THE SHERIFF'S DEPARTMENT, SIR?

3    Q.   YES.

4    A.   YES, SIR, I HAVE.

5    Q.   HAVE YOU ALSO REVIEWED YOUR DEPOSITION TRANSCRIPT?

6    A.   YES, SIR.

7    Q.   AND WHEN WAS THE LAST TIME YOU REVIEWED YOUR DEPOSITION?

8    A.   LAST NIGHT, SIR.

9    Q.   AND WHEN WAS THE LAST TIME BEFORE THAT?

10   A.   DAY BEFORE THAT, SIR.

11   Q.   OKAY.  SO YOU'VE BEEN LOOKING AT IT QUITE A BIT, IS THAT

12   FAIR, OVER THE LAST WEEK JUST TO REFRESH YOUR RECOLLECTION?

13   A.   YES, SIR.

14   Q.   BY THE WAY, HOW MANY TIMES HAVE YOU TESTIFIED IN COURT

15   BEFORE?

16   A.   IN MY ENTIRE CAREER?

17   Q.   YES.

18   A.   WELL OVER 50 TIMES.

19   Q.   OKAY.  AND YOU HAVE, IN FACT, SOME TRAINING WITH RESPECT

20   TO HOW TO TESTIFY IN COURT; TRUE?

21   A.   YES, SIR.

22   Q.   OKAY.  NOW, WE'RE UP TO THE POINT IN TIME WHEN

23   MR. GRISSOM IS GETTING OUT OF THE VEHICLE, DO YOU HAVE THAT

24   POINT IN TIME IN MIND?

25   A.   YES, SIR.
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1    Q.   WOULD IT BE FAIR TO SAY YOU'RE FOCUSED ON HIM AT THAT

2    POINT?

3    A.   YES, SIR.

4    Q.   AND, PARTICULARLY, FOCUSED ON HIS HANDS?

5    A.   THAT WAS ONE OF THE --

6    Q.   WHEN HE GETS OUT OF THE VEHICLE, DO YOU SEE ANYTHING IN

7    HIS HANDS?

8    A.   I SAW HIS RIGHT HAND WAS CUPPED.

9    Q.   MY QUESTION, SIR, IS:  DID YOU SEE AN OBJECT IN EITHER

10   ONE OF HIS HANDS WHEN HE GOT OUT OF THE VEHICLE?

11   A.   AGAIN, SIR, I SAW HIS HAND WAS CUPPED, SO I WAS UNDER

12   THE ASSUMPTION SOMETHING WAS IN HIS HAND.

13   Q.   OKAY.  WELL, LET ME ASK THIS:  DID YOU SEE ANY OBJECT?

14   FORGET ABOUT WHAT ASSUMPTIONS YOU MIGHT HAVE BEEN MAKING, I'M

15   WONDERING WHETHER YOU ACTUALLY SAW AN OBJECT.

16   A.   I SAW SOME -- I SAW SOMETHING IN HIS HAND -- I SAW HIS

17   HAND CUPPED, SO SOMETHING WAS IN HIS HAND.

18   Q.   I'M GOING TO TRY AGAIN, BECAUSE MY QUESTION -- I

19   UNDERSTAND YOU'RE SAYING -- AND I'M GOING TO GET TO THAT IN A

20   LITTLE BIT, THAT YOU'RE SAYING HIS HAND WAS -- ARE YOU SAYING

21   CUPPED?  CUPPED?  WHAT ARE YOU SAYING?

22   A.   CUPPED, SIR.

23   Q.   OKAY.

24   A.   C-U-P-P-E-D.

25   Q.   ALL RIGHT.  WHAT I'M ASKING YOU SPECIFICALLY IS:  DID

```
 1   YOU SEE AN OBJECT, SOMETHING, WHETHER IT WAS A GUN, A PHONE,

 2   ANY OBJECT, SOMETHING THAT YOU SPECIFICALLY SAW?

 3   A.   I SAW HIS HAND CUPPED, SO I -- HE WAS -- I SAW HIS HAND

 4   CUPPED, HIS RIGHT HAND WAS CUPPED, HIS LEFT HAND WAS NOT.

 5   HIS FINGERS WERE WIDE OPEN.

 6   Q.   I'M NOT ASKING YOU RIGHT NOW, SIR, WHETHER YOU SAW HIS

 7   HAND CUPPED OR NOT.  I'M ASKING IF YOU SAW A SPECIFIC OBJECT?

 8   A.   NO, SIR.

 9   Q.   OKAY.  NOW, IN FACT, ISN'T IT TRUE, SIR, THAT HE GOT OUT

10   OF THE VEHICLE, FACED TOWARDS THE OFFICERS, PUT HIS HANDS UP

11   TO THE SIDE OF HIS HEAD LIKE I HAVE MINE WITH HIS PALMS OUT

12   (INDICATING)?

13   A.   NO.  NO, SIR.

14   Q.   OKAY.  NOW, IT'S YOUR TESTIMONY THAT HE GOT OUT AND

15   FACED NORTH, WHICH WOULD BE HIS BACK TOWARDS THE CAR, FOR

16   THREE TO FIVE SECONDS; CORRECT?

17   A.   NO, SIR.

18           MR. GALIPO:  MAY I HAVE A MOMENT, YOUR HONOR?

19           THE COURT:  YOU MAY.

20           MR. GALIPO:  I'D LIKE TO REFER TO THE DEPOSITION,

21   YOUR HONOR, PAGE 318.

22           THE COURT:  LINES?

23   BY MR. GALIPO:

24   Q.   WELL, LET ME -- BEFORE I OFFER TO READ, LET ME ASK YOU

25   THIS:  WAS HE FACING NORTH AFTER HE GOT OUT OF THE CAR FOR
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    SOMETIME?

2    A.   HE WAS FACING NORTHEAST.

3    Q.   FOR HOW MANY SECONDS?

4    A.   VERY SHORT PERIOD OF TIME.

5    Q.   GIVE ME AN ESTIMATE, OFFICER?

6    A.   ONE OR TWO SECONDS.

7    Q.   OKAY.  AND THEN -- AND WHEN HE'S FACING NORTHEAST, WHERE

8    ARE HIS HANDS?

9    A.   FACING -- THE PALMS OF HIS HANDS WERE FACING NORTH --

10   Q.   WHERE ARE --

11   A.   -- NORTHEAST.

12   Q.   AT THAT POINT, ARE HIS HANDS IN HIS WAISTBAND?  IN HIS

13   POCKETS?  ARE THEY UP?  WHERE ARE THEY?

14   A.   UP, SIR.

15   Q.   AND CAN YOU SHOW ME WHERE THEY WERE UP IN RELATION TO

16   YOUR BODY?

17   A.   JUST LIKE YOU JUST HAD THEM, SIR.

18   Q.   TO THE SIDE OF THE HEAD?

19   A.   YES, SIR.

20   Q.   OKAY.  AND YOU'RE SAYING HE GETS OUT WITH HIS HANDS LIKE

21   THIS (INDICATING), HE'S FACING NORTHEAST FOR ONE OR TWO

22   SECONDS, THEN WHAT DOES HE DO?

23   A.   HE FACES AWAY FROM US --

24   Q.   AWAY?

25   A.   -- AWAY FROM ME.

1    Q.   WELL, THE FRONT OF THE CAR IS FACING WEST; CORRECT?

2    A.   FRONT OF WHICH CAR, SIR?  THE SEBRING?

3    Q.   THE SEBRING.

4    A.   YES, SIR.

5    Q.   AND IT'S YOUR TESTIMONY THAT HE THEN, AFTER GETTING OUT

6    AND FACING -- NORTHEAST, DID YOU SAY?

7    A.   YES, SIR.

8    Q.   WITH HIS HANDS UP FOR ONE OR TWO SECONDS, YOU'RE THEN

9    SAYING HE FACES WEST; CORRECT?

10   A.   THAT'S CORRECT, SIR.

11   Q.   ALL RIGHT.  SO LET ME JUST ASK YOU THIS ONE.  DID HE GET

12   OUT OF THE VEHICLE AND FACE TOWARDS THE OFFICERS?

13   A.   NO, SIR.

14   Q.   NOW, HOW LONG WOULD YOU ESTIMATE THAT HE'S FACING WEST

15   WITH HIS BACK TO YOU BEFORE HE MAKES SOME OTHER MOVEMENT?

16   A.   WELL, SIR, IT FELT LIKE ETERNITY, BUT IT WAS

17   INSTANTANEOUS BEFORE HE MADE THAT -- THAT TURNING MOVE, AND

18   SNAP OF THE FINGERS, I WOULD ESTIMATE.  IF YOU WANT ME TO

19   ESTIMATE A TIME FIGURE, SIR, I WOULD SAY A SNAP OF THE

20   FINGERS.  IT WAS THAT FAST.

21   Q.   WELL, LET ME BACK UP A LITTLE BIT.  HOW MUCH TIME WOULD

22   YOU SAY PASSED FROM THE TIME HE GOT OUT OF THE CAR TO THE

23   TIME OF THE SHOTS?

24   A.   I WOULD SAY 10 TO 15 SECONDS, FELT A LOT LONGER, BUT

25   APPROXIMATELY 10 TO 15 SECONDS.

```
 1    Q.   YOU ACTUALLY GAVE A LONGER ESTIMATE AT YOUR DEPOSITION;

 2    TRUE?

 3    A.   I DON'T EVEN -- I DON'T REMEMBER WHAT I EVEN SAID IN MY

 4    DEPOSITION, SIR.

 5    Q.   ALL RIGHT.  YOU'RE SAYING 10 TO 15 SECONDS NOW, IS YOUR

 6    ESTIMATE?

 7    A.   APPROXIMATELY, SIR.

 8    Q.   OKAY.  AND YOU SAID HE WAS NORTHEAST FOR ONE OR TWO

 9    SECONDS; CORRECT?

10    A.   THAT'S CORRECT, SIR.

11    Q.   HOW MANY SECONDS ARE YOU SAYING HE WAS THEN FACING WEST

12    WITH HIS BACK TOWARDS YOU?

13    A.   INSTANTANEOUS.  HE FACED WEST FOR LIKE A SPLIT SECOND,

14    AND THEN HE MADE THAT SPINNING MOTION, SIR.

15    Q.   IN YOUR DEPOSITION, DIDN'T YOU SAY HE WAS FACING WEST

16    FOR 19 OR 20 SECONDS?

17              MR. ROTHANS:  LACKS FOUNDATION.

18              CAN HE GIVE US A PAGE AND LINE IF HE'S GOING TO

19    REFER TO A DEPOSITION, YOUR HONOR?

20              THE COURT:  OVERRULED.

21              THE WITNESS:  I WON'T REMEMBER WHAT I SAID IN MY

22    DEPO.  IF I SAID 19 TO 20 SECONDS, THEN THAT'S WHAT I SAID,

23    SIR.

24    BY MR. GALIPO:

25    Q.   WELL, LET ME ASK YOU THIS:  WHEN YOU TOOK YOUR
```

1    DEPOSITION, MR. ROTHANS WAS PRESENT; CORRECT?

2    A.    THAT'S CORRECT, SIR.

3    Q.    AND, IN FACT, YOU HAD GONE TO THE SCENE ABOUT A --

4    SOMETIME BEFORE YOUR DEPOSITION, DIDN'T YOU?

5    A.    I BELIEVE SO, SIR.

6    Q.    AND MR. ROTHANS AND OTHER OFFICERS WERE PRESENT; TRUE?

7    A.    TRUE, SIR.

8    Q.    DID YOU SAY IN YOUR DEPOSITION THAT YOU SAW A SILVER

9    CELL PHONE UNDERNEATH THAT CAR AFTER THE SHOOTING?

10           MR. ROTHANS:  IMPROPER USE OF DEPOSITION.  LACKS

11   FOUNDATION, YOUR HONOR.

12           THE COURT:  ALL RIGHT.  THE -- THIS IS THE

13   DEFENDANT.  THEY CAN USE THE DEPOSITION HOWEVER THEY WANT.

14   BUT IF YOU'RE GOING TO GET -- IF YOU REALLY ARE ASKING HIM

15   WHAT HE SAID WITH THAT SPECIFICITY, WE REALLY SHOULD GET THE

16   PAGE AND LINE AND LET HIM LOOK AT IT.

17           MR. GALIPO:  THAT'S FINE, YOUR HONOR.  I THINK --

18   I'LL ASK A FEW MORE QUESTIONS AND I'LL GET ORGANIZED TO DO

19   THAT AFTER LUNCH, IF THAT'S OKAY.

20           THE COURT:  ALL RIGHT.  YOU MAY.

21           MR. GALIPO:  THANK YOU VERY MUCH.

22   BY MR. GALIPO:

23   Q.    NOW, JUST SO I HAVE YOUR TESTIMONY BEFORE THIS JURY

24   CLEAR THIS MORNING, HOW LONG ARE YOU SAYING HE WAS FACING

25   WEST WITH HIS BACK TO YOU?

1    A.   A SPLIT SECOND, A SNAP OF THE FINGERS.

2    Q.   A SNAP OF A FINGER?

3    A.   YES, SIR.

4    Q.   OKAY.  SO YOU'RE SAYING HE GOT OUT, WAS FACING NORTHEAST

5    FOR ONE OR TWO SECONDS, WAS FACING WEST FOR A SPLIT SECOND,

6    SO NOW WE'RE UP TO TWO OR THREE SECONDS.  THEN WHAT HAPPENS?

7    A.   MADE A SPINNING -- HE SPUN AROUND TO HIS RIGHT, HE

8    LOWERED HIS RIGHT HAND, KEPT HIS LEFT HAND UP, AND THAT'S

9    WHAT HE DID.

10   Q.   AND YOU'RE SAYING YOU SHOT HIM WITHIN A SPLIT SECOND OF

11   HIM TURNING?

12   A.   APPROXIMATELY, SIR, YES.

13   Q.   SO IF I DO THE MATH ON THAT, THAT SOUNDS LIKE THREE

14   SECONDS ALTOGETHER; ONE OR TWO HE'S NORTHEAST, A SPLIT SECOND

15   HE'S WEST, AND THEN HE TURNS AND YOU SHOOT HIM WITHIN A

16   SECOND, IS THAT WHAT YOU'RE SAYING?

17   A.   YES, SIR.

18   Q.   SO WHERE DO YOU COME UP WITH THE 10 OR 15 SECONDS?

19   A.   THAT WAS AN A APPROXIMATION, SIR.

20   Q.   AND YOU'RE SAYING HIS RIGHT HAND WAS LOWER AND HIS LEFT

21   HAND WAS UP WHEN YOU SHOT HIM?

22   A.   THAT'S CORRECT, SIR.

23   Q.   DID YOU EVER -- STRIKE THAT.

24        MR. GALIPO:  I THINK THIS WOULD BE A GOOD TIME FOR

25   A BREAK, IF IT'S GOOD FOR YOUR HONOR.

 1          THE COURT:  YES.

 2          LADIES AND GENTLEMEN, WE'LL TAKE THE LUNCH BREAK.

 3   PLEASE BE READY TO START AGAIN AT 1:15.  I WISH YOU A GOOD

 4   LUNCH.  I REMIND YOU NOT TO DISCUSS THE CASE AMONG YOURSELVES

 5   OR WITH ANYONE ELSE.

 6          AS I JOKED WITH YOU YESTERDAY, I AM QUITE CERTAIN

 7   YOU WILL NOT GO OVER TO THE CENTRAL LIBRARIAN AND ASK THE

 8   RESEARCH LIBRARIAN TO GET MAPS OF CULVER CITY; BUT, LIKEWISE,

 9   I MUST ASK YOU NOT TO USE GOOGLE MAPS OR DO ANYTHING ELSE TO

10   INVESTIGATE THE CASE.

11          ALL RIGHT.  THANK YOU VERY MUCH.

12          THE CLERK:  PLEASE RISE FOR THE JURY.

13          THE COURT:  DETECTIVE, YOU MAY STEP DOWN.

14          THE WITNESS:  THANK YOU, YOUR HONOR.

15          THE COURT:  MR. ROTHANS, IN GENERAL, I AGREE WITH

16   YOU, THAT IF THERE'S GOING TO BE REFERENCES TO THE

17   DEPOSITION, THE WITNESS SHOULD LOOK AT IT, AND ON THAT

18   SPECIFIC STANCE, YOU KNOW, HE SAID HE LOOKED AT IT.  IT'S A

19   FAIRLY IMPORTANT POINT.  IT SEEMED TO ME HE'D BE ABLE TO JUST

20   ANSWER WITHOUT LOOKING AT IT.  BUT, IN GENERAL, I THINK IT'S

21   APPROPRIATE TO -- IF THERE'S GOING TO BE QUESTIONS ABOUT THE

22   DEPOSITION, TO LET THE -- TO SPECIFY PAGE AND LINE AND LET

23   THE -- AND LET THE WITNESS LOOK AT WHAT WAS SAID.  THIS ISN'T

24   REALLY A MEMORY CONTEST AS TO WHAT WAS SAID IN THE -- IN THE

25   DEPOSITION.

1           SO, ANYWAY, WHAT ELSE IS IT THAT YOU WOULD LIKE TO

2      RAISE WITH THE COURT?

3           MR. ROTHANS:  I JUST WANTED TO COMMENT ON THAT,

4      YOUR HONOR.  IT THINK IT'S AN IMPROPER USE OF A DEPOSITION

5      TRANSCRIPT TO SAY SOMEWHERE IN THESE 200-AND-SOMETHING PAGES

6      YOU SAID "X," IT IMPLIES THERE TO THE JURY WHAT IT MAY VERY

7      WELL NEVER BEEN ASKED NOR ANSWERED.

8           THE COURT:  RIGHT.

9           AND THEN IN -- IN -- AS I SAID, IN THAT SPECIFIC

10     CASE, IT SEEMED TO ME THAT HE MIGHT BE ABLE TO JUST SAY, I

11     SAID THAT, I'M NOT SURE -- JUST WHATEVER.  I MEAN, IT WAS --

12     GENERALLY, I AGREE WITH YOU THAT THERE SHOULD BE SOME

13     SPECIFICITY AS TO WHAT --

14          MR. ROTHANS:  THE ONLY OTHER ISSUE, YOUR HONOR, IS

15     MR. GALIPO, AS YOU KNOW, IS A VERY EXPERIENCED LAWYER, AND

16     FOR HIM TO GO "UH-HUH" IN RESPONSE TO A WITNESS' ANSWER,

17     WHICH HE JUST DID WITHIN THE LAST TWO MINUTES, IS COMPLETELY

18     INAPPROPRIATE.  HE WAS QUESTIONING THE CREDIBILITY AND THE

19     HONESTY AND INTEGRITY OF THE WITNESS IN FRONT OF THE JURY BY

20     MAKING THAT COMMENT, "UH-HUH."  I THINK THAT'S INAPPROPRIATE.

21          MR. GALIPO:  TWO COMMENTS, IF I SAID THAT, I

22     APOLOGIZE AND I WILL NOT -- I WILL NOT DO THAT.  AND,

23     SECONDLY, WITH THE DEPOSITION, WHAT I'LL DO, AND I AGREE,

24     I'LL SPECIFICALLY READ QUESTIONS AND ANSWERS.  IT'S MY BELIEF

25     THAT BECAUSE HE'S THE DEFENDANT AND A PARTY, IF IT'S

```
 1    APPROPRIATE -- AND I'LL LET THE COURT AND COUNSEL KNOW WHERE

 2    I'M READING FROM -- I CAN JUST READ IT AND THAT'S WHAT I

 3    INTEND TO DO.

 4              THE COURT:  YOU ARE CORRECT.

 5              MR. GALIPO:  THANK YOU.

 6              THE COURT:  AS TO THE OTHER POINT, IT WAS OVER

 7    25 YEARS AGO, MY FIRST JURY TRIAL IN THIS COURTHOUSE I WAS

 8    CROSS-EXAMINING THE DEFENDANT.  HE GAVE AN ANSWER TO ONE OF

 9    MY QUESTIONS, I SAID, "THANK YOU."  JUDGE BYRNE CALLED ME TO

10    SIDEBAR AND SAID, "MR. FITZGERALD, BY SAYING 'THANK YOU,'

11    YOU'RE COMMENTING ON THE TESTIMONY OF THE WITNESS; THAT IS A

12    VERY BAD HABIT OF WHICH I BREAK YOU NOW."  SO I DO AGREE WITH

13    THE POINT THAT WAS MADE AND I -- LET'S -- SOMETIMES IT'S

14    INVOLUNTARILY.  IT'S NOT A BIG DEAL, BUT LET'S TRY TO

15    MINIMIZE THAT.

16              MR. GALIPO:  THAT'S FINE, YOUR HONOR.

17         THANK YOU.

18                        (LUNCH RECESS.)

19         (WHEREUPON, COURT REPORTERS WERE SWITCHED.)

20                          --O0O--

21

22

23

24

25
```

1                    CERTIFICATE OF REPORTER

2

   COUNTY OF LOS ANGELES      )
3                             )  SS.
   STATE OF CALIFORNIA        )

4

5

6  I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

7  UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

8  CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

9  TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10 CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11 PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12 TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13 OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16 DATED:  AUGUST 1, 2013

17

18 _____**/S/   ROSALYN ADAMS**_____

19 ROSALYN ADAMS, CSR 11794
   OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**