1                UNITED STATES OF AMERICA

2              UNITED STATES DISTRICT COURT

3              CENTRAL DISTRICT OF CALIFORNIA

4                   CENTRAL DIVISION

5                        - - -
              HONORABLE MICHAEL W. FITZGERALD
6          UNITED STATES DISTRICT JUDGE PRESIDING
                         - - -
7

8    KANDACE SIMPLIS, ET AL.,        )
                                     )
9              PLAINTIFF,            )
                                     )
10   VS.                             )   CV 10-09497-MWF
                                     )
11   CULVER CITY POLICE DEPARTMENT,  )      VOLUME II
     ET AL.,                         )
12                                   )
               DEFENDANT.            )
13   _____)

14

15

                  *JURY TRIAL - DAY 3, PM SESSION*
16

                   LOS ANGELES, CALIFORNIA
17
                       MAY 2, 2013
18

19

20

21

22

23              ROSALYN ADAMS, CSR 11794
            FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 410
            LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2665


            UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3             LAW OFFICES OF DALE K. GALIPO
               BY:  DALE K. GALIPO
 4             21800 BURBANK BOULEVARD
               SUITE 310
 5             WOODLAND HILLS, CALIFORNIA 91367
               (818) 347-3333
 6
               MC NICHOLAS AND MC NICHOLAS LLP
 7             BY:  MATTHEW S. MC NICHOLAS
               10866 WILSHIRE BOULEVARD
 8             SUITE 1400
               LOS ANGELES, CALIFORNIA 90024
 9             (310) 474-1582

10
      ON BEHALF OF DEFENDANT:
11
               CARPENTER ROTHANS AND DUMONT
12             BY:  STEVEN J. ROTHANS
                    JILL WILLIAMS
13             888 SOUTH FIGUEROA STREET
               SUITE 1960
14             LOS ANGELES, CALIFORNIA 90017
               (213) 228-0400
15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1                        **I N D E X**

2
                                                        **PAGE**
3

**OFFICER DEREK BROWN** - PLAINTIFFS' WITNESS ........... 6
4             DIRECT EXAMINATION BY MR. GALIPO .......... 6
              DIRECT EXAMINATION BY MR. MC NICHOLAS ..... 26
5             CROSS-EXAMINATION BY MR. ROTHANS .......... 37
              REDIRECT EXAMINATION BY MR. GALIPO ........ 45
6             REDIRECT EXAMINATION BY MR. MC NICHOLAS ... 47

7  **KELLI BLANCHARD** - PLAINTIFFS' WITNESS .............. 50
              DIRECT EXAMINATION BY MR. GALIPO .......... 50
8             CROSS-EXAMINATION BY MR. ROTHANS .......... 55

9  **DR. STEPHEN SCHOLTZ** - PLAINTIFFS' WITNESS .......... 57
              DIRECT EXAMINATION BY MR. GALIPO .......... 57
10            CROSS-EXAMINATION BY MR. ROTHANS .......... 65
              REDIRECT EXAMINATION BY MR. GALIPO ........ 70
11

12 **OFFICER LEON MOORE** - DEFENDANT'S WITNESS ........... 75
              DIRECT EXAMINATION BY MR. ROTHANS ......... 75
              CROSS-EXAMINATION BY MR. GALIPO ........... 91
13

14 **DYVONN GRISSOM** - PLAINTIFFS' WITNESS ............... 104
              DIRECT EXAMINATION BY MR. GALIPO .......... 105

15 **DAJAYNE GRISSON** - PLAINTIFFS' WITNESS .............. 107
              DIRECT EXAMINATION BY MR. GALIPO .......... 107
16

17                      **E X H I B I T S**

18

   **PLAINTIFFS'**      **MARKED FOR IDENTIFICATION**      **IN EVIDENCE**
19
        372-220                 --                          20
20      75                      --                          36
        208                     --                          62
21      377-051                 --                          100

22
   **DEFENDANT'S**      **MARKED FOR IDENTIFICATION**      **IN EVIDENCE**
23
                        [NONE OFFERED.]
24

25

                **UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1          LOS ANGELES, CALIFORNIA; THURSDAY, MAY 2, 2013; 1:30 P.M.

2                              --000--

3

4

5          THE COURT:  COUNSEL, I UNDERSTAND THAT YOU WANTED

6    TO DISCUSS SCHEDULING WITH ME.

7          MR. GALIPO:  YES, VERY BRIEFLY.

8          OUR NEXT WITNESS IS OFFICER BROWN; WE'RE FINE WITH

9    THAT, AND THEN WE'RE GOING TO CALL THE CORONER'S INVESTIGATOR

10   AND THE MEDICAL EXAMINER.  WE'RE FINE WITH THAT.  THE

11   PARAMEDIC, APPARENTLY THERE'S A LARGE FIRE THAT'S BEING

12   COVERED BY THE NEWS THAT HE WAS SUMMONED TO, SO WE HAVE

13   AGREED THAT EITHER TOMORROW OR TUESDAY WE'LL FIGURE OUT

14   AVAILABILITY FOR HIM.

15         THE COURT:  RIGHT NOW, I -- MY JUDICIAL ASSISTANT

16   WAS TELLING ME ABOUT IT, SO I'M AWARE OF THE FIRE.

17         MR. GALIPO:  RIGHT.

18         AND THEN THE OTHER ISSUE WAS AN OFFICER THAT WE HAD

19   REQUESTED TO BE HERE, AND I GUESS HE WAS HERE YESTERDAY AND

20   TODAY, IS OFFICER MOORE.  BASED ON THE WAY THE TESTIMONY HAS

21   PRESENTED ITSELF, MR. MC NICHOLAS AND I ARE NOT SURE WHETHER

22   WE ACTUALLY NEED TO CALL OFFICER MOORE.  I SHARED THIS

23   INFORMATION WITH MR. ROTHANS.  HE SAID THAT IF WE DIDN'T CALL

24   HIM HE WOULD ELECT TO CALL HIM.  AND IN LIGHT OF THE FACT

25   THAT HE'S BEEN HERE TWO DAYS NOW, WE WOULDN'T HAVE AN

```
 1    OBJECTION AT THE END OF THE AFTERNOON OF THEM CALLING HIM OUT
 2    OF ORDER, SO I JUST WANTED TO GIVE YOU THE HEADS' UP.
 3          THE COURT:  AND I DON'T HAVE AN OBJECTION EITHER,
 4    ESPECIALLY SINCE HE'S BEEN THAT PATIENT, SO...
 5          MR. GALIPO:  YES.
 6          THE COURT:  ALL RIGHT.  OKAY.  THEN, WITH THAT,
 7    LET'S GET THE JURY.
 8          MR. GALIPO, ARE YOU PROCEEDING WITH ANY PHOTOGRAPH
 9    IN REGARD TO THE MEDICAL EXAMINER, CROPPED?
10          MR. GALIPO:  ONLY THE ONE -- YES.  ONLY THE ONE
11    THAT I BELIEVE WAS THE AGREED-UPON, AND I WANTED TO SHOW IT
12    TO MR. ROTHANS AND THEN I'LL HAND IT TO YOUR CLERK WHEN SHE
13    COMES BACK TO MAKE SURE WE'RE ON THE SAME -- THAT WAS MY
14    UNDERSTANDING.
15          THE COURT:  YEAH, IT WASN'T SUPPOSED TO SHOW ANY
16    FACIAL.
17          MR. GALIPO:  RIGHT.
18          THE COURT:  FOR THE PURPOSE FOR WHICH YOU SAID YOU
19    WANTED, IT SHOULD SUFFICE FOR THAT.
20          MR. GALIPO:  RIGHT.
21          THE COURT:  OKAY.  THANK YOU, MR. GALIPO.
22                    (JURORS ENTER.)
23          COURT CLERK:  PLEASE BE SEATED.
24          THE COURT:  LADIES AND GENTLEMEN, WELCOME BACK.
25          THE JURORS ARE HERE, COUNSEL.
```

```
 1            MR. GALIPO, PLEASE CALL YOUR NEXT WITNESS.
 2            MR. GALIPO:  YES.  WE WOULD LIKE TO CALL OFFICER
 3   DEREK BROWN, PLEASE.
 4            OFFICER DEREK BROWN, PLAINTIFF'S, SWORN
 5            THE CLERK:  PLEASE STATE AND SPELL YOUR NAME FOR
 6   THE RECORD.
 7            THE WITNESS:  DEREK BROWN, D-E-R-E-K, B-R-O-W-N.
 8            THE CLERK:  THANK YOU.
 9                      DIRECT EXAMINATION
10   BY MR. GALIPO:
11   Q.   GOOD AFTERNOON, OFFICER BROWN.
12   A.   GOOD AFTERNOON.
13   Q.   WHO DO YOU CURRENTLY WORK FOR?
14   A.   THE CITY OF CULVER CITY.
15   Q.   AND WHAT IS YOUR POSITION WITH THEM?
16   A.   I'M A POLICE OFFICER.
17   Q.   AND HOW LONG HAVE YOU BEEN A POLICE OFFICER?
18   A.   FOUR-AND-A-HALF YEARS.
19   Q.   AT SOME POINT, DID YOU RESPOND TO A PARKING LOT AREA
20   THAT INVOLVED, AMONG OTHER BUSINESSES, A DONUT KING?
21   A.   YES.
22   Q.   AND THAT WAS ON APRIL 25TH, 2010?
23   A.   YES.
24   Q.   AT APPROXIMATELY 11:30 IN THE MORNING?
25   A.   YES.
```

```
 1    Q.   AND DID YOU RESPOND IN A PATROL VEHICLE?

 2    A.   I DID.

 3    Q.   AND WERE YOU DRIVING THAT VEHICLE?

 4    A.   I'M SORRY?

 5    Q.   WERE YOU DRIVING THE VEHICLE?

 6    A.   YES.

 7    Q.   WERE YOU ALONE IN THE VEHICLE?

 8    A.   I WAS.

 9    Q.   DO YOU RECALL WHERE YOU PARKED YOUR VEHICLE AFTER

10    ARRIVING?

11    A.   BEHIND TWO OTHER PATROL VEHICLES.

12    Q.   OKAY.  WE'VE LOOKED BEFORE AT EXHIBIT 8, AND CAN YOU SEE

13    THIS ON YOUR MONITOR?

14    A.   YES.

15    Q.   DOES THIS PHOTOGRAPH SHOW WHERE YOU PARKED YOUR VEHICLE?

16    A.   NO.

17    Q.   OKAY.  WHAT STREET DID YOU PARK YOUR VEHICLE ON?

18    A.   MOTOR AVENUE.

19    Q.   AND AFTER GETTING OUT OF YOUR VEHICLE, DID YOU APPROACH

20    THE PARKING LOT AREA ON FOOT?

21    A.   YES.

22    Q.   AND WHERE DID YOU GO TO?

23    A.   I HAD FIRST WENT TO THE DRIVER'S SIDE OF VEHICLE C63.

24    Q.   ALL RIGHT.  AND THAT WOULD BE THE PATROL VEHICLE THAT

25    I'M POINTING TO WITH MY PEN?
```

1    A.   YES.

2    Q.   AND WAS THE DRIVER'S SIDE DOOR OPEN AT THAT POINT?

3    A.   IT WAS.

4    Q.   AND IF YOU KNOW, WERE THERE OCCUPANTS IN THE GREEN

5    CHRYSLER SEBRING AT THAT POINT?

6    A.   YES.

7    Q.   DID YOU HAVE ANYTHING IN YOUR HANDS WHEN YOU FIRST

8    APPROACHED THE DRIVER'S SIDE OF C63?

9    A.   I HAD MY SIDE ARM IN MY HAND.  MY SIDE ARM.

10   Q.   WHICH IS YOUR GUN?

11   A.   YES.

12   Q.   AND WHAT TYPE OF GUN DID YOU HAVE?

13   A.   A SPRINGFIELD 1911.

14   Q.   IS THAT A SEMI-AUTOMATIC WEAPON?

15   A.   YES.

16   Q.   DID YOU HAVE TRAINING AT THE TIME WITH RESPECT TO

17   SHOOTING THAT PARTICULAR WEAPON?

18   A.   YES.

19   Q.   HOW LONG DID YOU STAY ON THE DRIVER'S SIDE OF C63 AFTER

20   ARRIVING THERE?

21   A.   ONLY A FEW SECONDS.

22   Q.   AND WHERE DID YOU NEXT GO?

23   A.   I WENT TO THE PASSENGER'S SIDE OF C62.

24   Q.   ALL RIGHT.  I'M GOING TO ZOOM IN A LITTLE BIT HERE.

25             THERE APPEARS TO BE A RED X ON THE PASSENGER'S SIDE

1   OF C62 IN THIS PHOTOGRAPH, DO YOU SEE THAT?

2   A.   YES.

3   Q.   IS THAT GENERALLY WHERE YOU WERE?

4   A.   GENERALLY, YES.

5   Q.   AND IF YOU RECALL, WAS THE PASSENGER DOOR OF C62 OPEN

6   WHEN YOU GOT THERE?

7   A.   YES.

8   Q.   AND WHERE WERE YOU IN RELATION TO THE DOOR?

9   A.   I WAS BEHIND IT OFF TO THE SIDE A LITTLE BIT.

10  Q.   WHY WERE YOU BEHIND THE DOOR?

11  A.   MORE OF COVER FOR THE SUBJECT INSIDE THE VEHICLE;

12  WOULDN'T BE ABLE TO LOOK BACK AND SEE ME AS WELL AS I COULD

13  SEE THEM.

14  Q.   OKAY.  AND, AT SOME POINT, WERE YOU AWARE THAT OFFICER

15  ZERBEY WAS ON THE DRIVER'S SIDE OF THAT VEHICLE?

16  A.   YES.

17  Q.   DID YOU BECOME AWARE AT SOME POINT AS TO WHERE OFFICER

18  MARTINEZ WAS?

19  A.   YES.

20  Q.   AND WHERE WAS HE?

21  A.   ON THE SIDE OF THE DRIVER'S SIDE OF C63.

22  Q.   OKAY.  THAT'S THE PLACE THAT YOU HAD INITIALLY WENT TO?

23  A.   YES.

24  Q.   WHEN YOU INITIALLY WENT TO THE DRIVER'S SIDE OF C63, DID

25  YOU SEE OFFICER MARTINEZ THERE?

1    A.   YES.

2    Q.   OKAY.  SO, AT SOME POINT, YOU WERE BOTH THERE?

3    A.   YES.

4    Q.   DID YOU NOTICE WHAT, IF ANYTHING, OFFICER MARTINEZ HAD

5    IN HIS HANDS?

6    A.   HE HAD AN MP5.

7    Q.   ALL RIGHT.  DID YOU EVER BECOME AWARE THAT OFFICER MOORE

8    WAS ON THE SCENE?

9    A.   YES.

10   Q.   AND WHERE WAS HE, IF YOU KNOW, WHEN YOU WERE ON THE

11   PASSENGER SIDE OF C62?

12   A.   HE WAS DIRECTLY IN FRONT OF US AT THE BUSINESSES

13   DIRECTING PEOPLE AWAY FROM THE SCENE.

14   Q.   OKAY.  AND DID YOU BECOME AWARE OF OFFICER FAIRBANK'S

15   PRESENCE AT SOME POINT?

16   A.   I DON'T REMEMBER SEEING HIM.

17   Q.   OKAY.  AT SOME POINT, DID YOU SEE THE MALE PASSENGER GET

18   OUT OF THE CAR?

19   A.   YES.

20   Q.   WHAT WOULD YOU ESTIMATE AS TO HOW LONG YOU WERE AT THE

21   PASSENGER'S SIDE OF C62 BEFORE YOU SAW THE MALE PASSENGER GET

22   OUT?

23   A.   A FEW SECONDS, PROBABLY MAYBE LIKE TEN SECONDS, LESS.

24   Q.   OKAY.  AND DID YOU HEAR ANYTHING WITH RESPECT TO HIS

25   SEAT BELT?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    A.   NO.

2    Q.   DID YOU HEAR ANYTHING -- ANY COMMAND GIVEN TO HIM TO

3    OPEN THE DOOR FROM THE OUTSIDE?

4    A.   I DON'T REMEMBER.

5    Q.   DID YOU SEE HOW HE GOT OUT OF THE VEHICLE?

6    A.   YES.

7    Q.   HOW DID HE GET OUT?

8    A.   HE OPENED THE DOOR.  HE STEPPED OUT WITH HIS RIGHT FOOT

9    AND THEN HE TURNED COUNTERCLOCK -- TURNED CLOCKWISE TOWARDS

10   US.

11   Q.   OKAY.  SO CLOCKWISE WOULD BE TO HIS RIGHT; IS THAT

12   CORRECT?

13   A.   YES.

14   Q.   AND WHEN HE TURNED, DID HE TURN SLOWLY?

15   A.   I WOULD SAY HE TURNED AT NORMAL SPEED.

16         MR. GALIPO:  MAY I HAVE ONE MOMENT, YOUR HONOR?

17         THE COURT:  YOU MAY.

18         MR. GALIPO:  I'D LIKE TO READ FROM THE DEPOSITION

19   TESTIMONY.  DOES THE COURT HAVE THE TRANSCRIPT OF THIS

20   WITNESS?

21         THE COURT:  I DO.

22         MR. GALIPO:  PAGE 71.

23         THE COURT:  YES.  WHICH LINES?

24         MR. GALIPO:  ONE MOMENT, PLEASE.

25         MAY I ASK A FEW FOUNDATIONAL QUESTIONS FIRST?

1            THE COURT:  YES.

2            MR. GALIPO:  ALL RIGHT.  I THINK WE ALREADY HAVE

3    THIS, BUT I'M NOT SURE.  IT'S EXHIBIT 377 -- STRIKE THAT.

4            372-220, BY AGREEMENT.  372-220.

5            THE COURT:  IT WILL BE RECEIVED.

6                (EXHIBIT 372-220 IN EVIDENCE.)

7    BY MR. GALIPO:

8    Q.   SO YOU -- AND I'M GOING TO JUST POINT WITH MY PEN,

9    YOU'RE ON THE PASSENGER'S SIDE OF THIS VEHICLE; IS THAT

10   CORRECT?

11   A.   YES.

12   Q.   AND YOU SEE WHO WE NOW KNOW TO BE MR. GRISSOM GETTING

13   OUT OF THE PASSENGER DOOR?

14   A.   YES.

15   Q.   AND WERE YOU FOCUSED ON HIM AS HE WAS GETTING OUT OF THE

16   VEHICLE?

17   A.   YES.

18   Q.   NOW, WHEN HE GOT OUT OF THE VEHICLE, DID HE EXIT THE

19   VEHICLE WITH BOTH HANDS UP?

20   A.   YES.

21   Q.   DID HE STEP OUT WITH HIS RIGHT FOOT AND THEN TURNED TO

22   FACE IN YOUR DIRECTION?

23   A.   YES.

24   Q.   AND WE HAVE HEARD THAT THE FRONT OF THE VEHICLE WAS

25   FACING WEST, DOES THAT SOUND CORRECT?

1    A.   YES.

2    Q.   SO IF HE -- IF THE FRONT OF THE VEHICLE WAS FACING WEST

3    WHEN HE GOT OUT AND TURNED FACING YOU, HE WOULD BE FACING

4    EAST; IS THAT CORRECT?

5    A.   YES.

6    Q.   NOW, HOW MUCH TIME PASSED BETWEEN THE TIME HE WAS FACING

7    EAST AND THE TIME OF THE SHOTS?

8    A.   TWO, MAYBE THREE SECONDS.

9    Q.   WERE ANY COMMANDS GIVEN TO HIM BEFORE HE TURNED AND

10   FACED TO THE EAST?

11          THE COURT:  WHILE HE WAS STILL GETTING OUT OF THE

12   CAR?

13          MR. GALIPO:  YES, THAT'S -- MAY I REPHRASE?

14          THE COURT:  YOU MAY.

15   BY MR. GALIPO:

16   Q.   AFTER HE GOT OUT OF THE CAR, BUT BEFORE HE TURNED TO

17   FACE EAST, WERE ANY COMMANDS GIVEN TO HIM?

18   A.   I DON'T RECALL.

19   Q.   DID HE APPEAR TO DO THAT JUST AUTOMATICALLY, GET OUT AND

20   TURN CLOCKWISE TOWARDS YOU?

21   A.   YES.

22   Q.   AND WHEN HE TURNED CLOCKWISE TOWARDS YOU, COULD YOU SEE

23   HIS HANDS?

24   A.   YES.

25   Q.   DID HE HAVE ANYTHING IN HIS HANDS?

1    A.   I DON'T REMEMBER SEEING ANYTHING IN HIS HANDS.

2    Q.   WERE YOU LOOKING AT HIS HANDS?

3    A.   YES.

4    Q.   DID YOU HAVE YOUR WEAPON POINTED AT HIM?

5    A.   YES.

6    Q.   DID YOU HEAR ANY COMMANDS GIVEN IN THE THREE SECONDS

7    BEFORE THE SHOOTING?

8    A.   WHEN HE TURNED TO FACE US, I THINK SOMEBODY YELLED OUT

9    "FACE THE OTHER WAY."  I DON'T REMEMBER WHO, THOUGH.

10   Q.   WHO DO YOU THINK YELLED THAT OUT?

11   A.   I DON'T KNOW.

12   Q.   OTHER THAN HEARING SOMEONE YELLING "FACE THE OTHER WAY,"

13   DID YOU HEAR ANY OTHER COMMANDS IN THE THREE SECONDS BEFORE

14   THE SHOOTING?

15   A.   NO.

16   Q.   DID YOU, YOURSELF, GIVE HIM ANY COMMANDS AFTER HE EXITED

17   THE CAR?

18   A.   NO.

19   Q.   DID YOU EVER SAY, "DROP IT"?

20   A.   NO.

21   Q.   IS ONE REASON WHY YOU DIDN'T SAY, "DROP IT," BECAUSE YOU

22   NEVER SAW ANYTHING IN HIS HANDS?

23   A.   YES.

24   Q.   JUST BEFORE THE SHOOTING -- LET'S SAY WITHIN THREE

25   SECONDS -- DID YOU HEAR OFFICER MOORE YELLING AT CIVILIANS TO

1    GET OUT OF THE WAY?

2    A.   NO.

3    Q.   DID YOU HEAR OFFICER MOORE YELLING AT CIVILIANS TO GET

4    OUT OF THE WAY AT ANY TIME?

5    A.   BEFORE HE STEPPED OUT OF THE VEHICLE, YES.

6    Q.   OKAY.  SO THAT -- YOUR RECOLLECTION IS THAT HAPPENED

7    BEFORE MR. GRISSOM GOT OUT OF THE CAR?

8    A.   YES.

9    Q.   YOUR ESTIMATE TODAY IS HOW LONG WAS HE OUT OF THE

10   VEHICLE BEFORE THE SHOTS WERE FIRED?

11   A.   LESS THAN THREE SECONDS.

12   Q.   DID YOU GIVE A DEPOSITION IN THIS CASE?

13   A.   YES.

14   Q.   DID YOU UNDERSTAND YOU WERE UNDER OATH AT THAT TIME?

15   A.   YES.

16   Q.   WERE YOU ATTEMPTING TO GIVE TRUTHFUL AND HONEST

17   TESTIMONY?

18   A.   YES.

19   Q.   AT SOME POINT -- STRIKE THAT.

20          WERE YOU AWARE THAT YOU HAD THE RIGHT TO CHANGE --

21   TO REVIEW YOUR DEPOSITION TRANSCRIPT AND CHANGE YOUR ANSWERS

22   IF YOU THOUGHT IT WAS INCORRECT?

23   A.   YES.

24   Q.   DID YOU MAKE ANY CHANGES TO ANY OF YOUR ANSWERS?

25   A.   NO.

1          MR. GALIPO:  I'D LIKE TO READ FROM PAGE 71 OF THE

2     WITNESS' DEPOSITION, LINE 24 TO PAGE 72, LINE 3.

3          THE COURT:  YOU MAY PROCEED.

4     BY MR. GALIPO:

5     Q.      "QUESTION:  HOW LONG WAS THE SUSPECT OUTSIDE THE

6     VEHICLE BEFORE SHOTS WERE FIRED?

7              "ANSWER:  I CAN'T SAY.

8              "QUESTION:  GIVE ME AN ESTIMATE.

9              "ANSWER:  MAYBE A MINUTE."

10          DO YOU RECALL THAT QUESTION AND ANSWER AT THE TIME

11     OF YOUR DEPOSITION?

12     A.   I DO NOW.

13     Q.   HAVE YOU REVIEWED YOUR DEPOSITION RECENTLY?

14     A.   YES.

15     Q.   NOW, IT'S YOUR TESTIMONY THAT -- SO YOU'RE SAYING, JUST

16     SO I CAN BE CLEAR, WHEN THE SHOTS WERE FIRED HE'S FACING

17     EAST; IS THAT CORRECT?

18     A.   YES.

19     Q.   AND IF I UNDERSTAND YOUR TESTIMONY CORRECTLY, HE WAS

20     FACING EAST WITHIN ONE SECOND, MAYBE TWO SECONDS OF HIM

21     GETTING OUT OF THE CAR; IS THAT CORRECT?

22     A.   YES.

23     Q.   AND WHATEVER THAT PERIOD OF TIME WAS UP UNTIL THE TIME

24     OF THE SHOTS, HE WAS STILL FACING EAST?

25     A.   YES.

```
1    Q.   DID YOU EVER AT ANY TIME SEE HIM FACING WEST

2    (DEMONSTRATING) AWAY FROM YOU FOR, LET'S SAY, A FIVE OR

3    TEN-SECOND PERIOD?

4    A.   NO.

5    Q.   DID YOU, AT ANY TIME BEFORE THE SHOTS WERE FIRED, AFTER

6    HE EXITED THE VEHICLE, TAKE YOUR EYES OF HIM?

7    A.   NO.

8    Q.   DID YOU, AT ANY TIME BEFORE THE SHOTS WERE FIRED, SEE

9    ANY OBJECT IN EITHER ONE OF HIS HANDS?

10   A.   I DON'T REMEMBER SEEING ANYTHING.

11   Q.   NOW, IT'S YOUR TESTIMONY THAT AT SOME POINT HE LOWERED

12   BOTH OF HIS HANDS; IS THAT CORRECT?

13   A.   YES.

14   Q.   WELL, LET ME JUST ASK YOU THIS:  WHEN HE WAS SHOT, WAS

15   HIS LEFT HAND TO THE SIDE OF HIS HEAD?

16   A.   NO.

17   Q.   DID YOU EVER, AT ANY TIME, SEE HIM PUT HIS HANDS IN ANY

18   POCKETS?

19   A.   NO.

20   Q.   DID YOU EVER, AT ANY TIME, SEE ANYTHING IN HIS HANDS

21   THAT LOOKED LIKE A GUN TO YOU?

22   A.   NO.

23   Q.   DID YOU EVER, AT ANY TIME, SEE HIM PUT HIS HANDS INSIDE

24   HIS WAISTBAND?

25   A.   NO.
```

1   Q.   DID YOU HEAR HIM VERBALLY THREATEN ANYONE AT ANY TIME?

2   A.   NO.

3   Q.   NOW, YOU HAD SOME TRAINING WITH RESPECT TO THE USE OF

4   DEADLY FORCE, CORRECT?

5   A.   YES.

6   Q.   AND YOUR TRAINING WAS IF THERE WAS AN IMMINENT OR

7   IMMEDIATE DANGER OF DEATH OR SERIOUS BODILY INJURY, AN

8   OFFICER COULD POTENTIALLY USE LETHAL FORCE; IS THAT CORRECT?

9   A.   CORRECT.

10   Q.   IF YOU HAD BELIEVED THAT YOU WERE IN IMMINENT DANGER OF

11   SERIOUS BODILY INJURY, YOU WOULD HAVE FIRED YOUR WEAPON,

12   CORRECT?

13   A.   YES.

14   Q.   DID YOU EVER FIRE YOUR WEAPON?

15   A.   NO.

16   Q.   AND YOU COULD SEE BOTH OF MR. GRISSOM'S HANDS AT THE

17   TIME THE SHOTS WERE FIRED, CORRECT?

18   A.   YES.

19   Q.   DID ANYBODY AT THE SCENE, WHILE YOU WERE THERE, MAKE ANY

20   REFERENCE TO A CELL PHONE?

21   A.   NO.

22   Q.   IS IT CORRECT THAT WHEN HE GOT OUT OF THE CAR AND HAD

23   HIS HANDS UP HIS PALMS WERE OUT?

24   A.   LIKE FACING US?

25   Q.   YES.

1    A.   YES.

2    Q.   AND THAT WAS A PERIOD OF TIME WHERE YOU COULD SEE THAT

3    HE HAD NOTHING IN HIS HAND?

4    A.   YES.

5    Q.   NOW, AFTER THE SHOTS, YOU SAW MR. GRISSOM LOOK DOWN AND

6    BRING HIS HANDS TOWARDS HIS CHEST, DIDN'T YOU?

7    A.   YES.

8    Q.   AND WHEN YOU SAW HIM DO THAT, DID YOU SEE ANYTHING IN

9    HIS HANDS?

10   A.   NO.

11   Q.   DID YOU SEE ANYTHING COME OUT OF HIS HANDS?

12   A.   NO.

13   Q.   AND HE -- YOU HAD THE IMPRESSION THAT HE LOOKED DOWN,

14   LIKE, I'M SHOT, AND PUT HIS HANDS TO HIS CHEST, CORRECT?

15           MR. ROTHANS:  OBJECTION.  CALLS FOR SPECULATION.

16   LACKS FOUNDATION.

17           THE COURT:  OVERRULED.

18           THE WITNESS:  YES.

19   BY MR. GALIPO:

20   Q.   AND THEN YOU SAW HIM GO DOWN TO THE GROUND?

21   A.   YES.

22   Q.   FEMALE PASSENGER WAS SCREAMING AT SOME POINT?

23   A.   YES.

24   Q.   DID YOU OBSERVE MR. GRISSOM BEING PATTED DOWN?

25   A.   YES.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    Q.   DID YOU OBSERVE HIM BEING HANDCUFFED AT SOME POINT?

2    A.   YES.

3    Q.   DID YOU OBSERVE WHAT APPEARED TO LABORED BREATHING?

4    A.   YES.

5    Q.   WHAT DID YOU OBSERVE IN THAT REGARD?  IN OTHER WORDS,

6    YOU COULD TELL HE WAS BREATHING, BUT IT HAD SEEMED TO BE

7    HEAVY OR LABORED?

8    A.   YES.

9              MR. ROTHANS:  OBJECTION, YOUR HONOR.

10             THE COURT:  SUSTAINED.

11             I MEAN, IF YOU WANT TO ASK IF MR. GRISSOM WAS STILL

12   ALIVE, THEN ASK THAT, BUT I -- BEYOND THAT, I DON'T THINK

13   THERE'S NEED FOR THE OTHER QUESTIONS.

14             MR. GALIPO:  OKAY.  THANK YOU.

15   BY MR. GALIPO:

16   Q.   WHEN YOU OBSERVED THE LABORED BREATHING, DID YOU HAVE

17   THE IMPRESSION THAT MR. GRISSOM WAS STILL ALIVE AT THAT

18   POINT?

19   A.   YES.

20   Q.   DID YOU OBSERVE HIM BEING PLACED ON HIS STOMACH AT SOME

21   POINT?

22   A.   YES.

23   Q.   WAS THAT BEFORE OR AFTER HE WAS HANDCUFFED?

24   A.   BEFORE.

25   Q.   WHEN YOU SAW HIM BEING PLACED ON HIS STOMACH, DID YOU

1    SEE ANY CELL PHONE AROUND HIM?

2    A.   NO.

3    Q.   AFTER HE WAS SHOT AND WENT TO THE GROUND, YOU WERE

4    OBSERVING THE AREA AROUND WHERE HE WAS ON THE GROUND,

5    CORRECT?

6    A.   I WAS LOOKING AT HIM.

7    Q.   AND YOU WERE ALSO LOOKING TO SEE IF THERE WERE ANY

8    OBJECTS OR WEAPONS IN THE AREA; TRUE?

9    A.   I WASN'T LOOKING FOR ANY OF THAT, I WAS WATCHING WHAT HE

10   WAS DOING.

11   Q.   WELL, WHAT WAS HE DOING AT THAT POINT, IF ANYTHING?

12   A.   AFTER FALLING BACK, HE LANDED ON HIS BACK AND EVENTUALLY

13   SLID DOWN ONTO THE ASPHALT.

14   Q.   DID YOU HEAR ANYTHING HITTING THE GROUND OTHER THAN HIM?

15   A.   NO.

16          MR. GALIPO:  MAY I HAVE ONE MOMENT, YOUR HONOR?

17          THE COURT:  YOU MAY.

18              (PLAINTIFF'S COUNSEL CONFER.)

19   BY MR. GALIPO:

20   Q.   OFFICER BROWN, WERE YOU THE OFFICER THAT PATTED

21   MR. GRISSOM DOWN?

22   A.   YES.

23   Q.   AND JUST TELL US, PLEASE, THE PARTS OF HIS BODY THAT YOU

24   CHECKED FOR ANY POTENTIAL WEAPONS OR OBJECTS?

25   A.   HIS WAISTBAND AREA, POCKETS AND LEGS.

```
 1   Q.   AND WHERE OR HOW WAS MR. GRISSOM POSITIONED ON THE

 2   GROUND AT THE TIME YOU PATTED HIM DOWN?

 3   A.   HE WAS ON HIS SIDE.

 4   Q.   AND WHERE WAS HE IN RELATION TO THE VEHICLE WE SEE HERE

 5   WHEN YOU PATTED HIM DOWN?

 6             THE COURT:  REFERRING TO THE SEBRING?

 7             MR. GALIPO:  YES, THANK YOU.  IN EXHIBIT 372-220,

 8   YOUR HONOR, THANK YOU.

 9             THE WITNESS:  HIS -- HE WAS LYING PRETTY MUCH WHERE

10   THE BLOOD STAIN WAS.

11   BY MR. GALIPO:

12   Q.   WELL, IT APPEARS TO BE TWO BLOOD STAINS.

13             DO YOU KNOW WHICH BLOOD STAIN HE WAS LYING WHEN YOU

14   PATTED HIM DOWN?

15   A.   THE ONE FURTHEST AWAY FROM THE VEHICLE.

16   Q.   OKAY.  THE ONE I'M POINTING TO HERE (INDICATING)?

17   A.   YES.

18   Q.   OKAY.  WAS HE ORIGINALLY, IF YOU KNOW, IN SOME OTHER

19   POSITION ON THE GROUND?

20   A.   NO, HE WAS ALWAYS ON HIS BACK --

21   Q.   OKAY.

22   A.   -- UNLESS I MOVED HIM.

23   Q.   I'M SORRY?  I DIDN'T HEAR --

24   A.   HE WAS ALWAYS ON HIS BACK UNLESS I WAS MOVING HIM DURING

25   THE SEARCH.
```

1    Q.    OKAY.  WELL, WHEN YOU FIRST APPROACHED HIM TO SEARCH

2    HIM, WAS HE ON HIS BACK?

3    A.    YES.

4    Q.    AND WHEN YOU FIRST APPROACHED HIM TO SEARCH HIM, WAS HE

5    ON HIS BACK IN THE AREA OF THE BLOOD POOL WHERE I'M POINTING

6    WITH MY PEN?

7    A.    NO.

8    Q.    OKAY.  WAS HE IN A DIFFERENT AREA ON HIS BACK WHEN YOU

9    FIRST APPROACHED HIM?

10   A.    YES.

11   Q.    AND WHERE WAS HE ON HIS BACK WHEN YOU FIRST APPROACHED

12   HIM?

13   A.    WHERE THE FIRST BLOOD STAIN WOULD BE.

14   Q.    OKAY.  THE GENERAL AREA THAT I'M POINTING WITH MY PEN

15   NOW?

16   A.    YES.

17   Q.    OKAY.  AND DID YOU MOVE HIM FROM ONE POSITION TO THE

18   OTHER?

19   A.    YES.

20   Q.    AND WHAT WAS YOUR PURPOSE IN MOVING HIM?

21   A.    PURPOSE WAS WHEN HE FELL BACK, HE WAS PARTIALLY

22   UNDERNEATH THE CAR AND I COULDN'T DO A PROPER SEARCH WITH HIM

23   THERE SO I HAD TO MOVE HIM FURTHER AWAY FROM IT IN ORDER TO

24   FACILITATE THE SEARCH.

25   Q.    OKAY.  NOW, HOW LONG AFTER THE SHOOTING DID YOU APPROACH

```
 1    HIM TO PULL HIM AWAY FROM THE CAR?

 2    A.   I THINK IT WAS A MINUTE.

 3    Q.   OKAY.  AND, IF YOU KNOW, WERE YOU THE FIRST ONE TO

 4    APPROACH HIM?

 5    A.   YES.

 6    Q.   AND HOW DID YOU -- DID YOU MOVE HIM BY YOURSELF OR WITH

 7    THE ASSISTANCE OF ANY OTHER OFFICERS?

 8    A.   JUST ME.

 9    Q.   AND HOW DID YOU MOVE HIM?  DID YOU GRAB A PARTICULAR

10    AREA OF HIS BODY?

11    A.   YES.

12    Q.   WHAT DID YOU GRAB?

13    A.   HIS ARMS.

14    Q.   BOTH OF HIS ARMS?

15    A.   YES.

16    Q.   AND SO BOTH OF HIS ARMS WERE AT LEAST ACCESSIBLE TO YOU

17    SO THAT YOU CAN GRAB THEM?

18    A.   I GRABBED ONE ARM AND PARTIALLY GRABBED HIM FROM

19    UNDERNEATH THE VEHICLE AND THAT'S WHEN I WAS ABLE TO GRAB HIS

20    OTHER AND PULL HIM ALL THE WAY BACK.

21    Q.   OKAY.  SO WOULD IT BE CORRECT THAT WHEN YOU FIRST

22    GRABBED HIS ARMS HE WAS ON HIS BACK NEAR THIS BLOOD POOL

23    CLOSER TO THE CAR AND THEN YOU PULLED HIM AWAY FROM THE CAR,

24    STILL ON HIS BACK, IN AN AREA BY THE BLOOD POOL THAT'S A

25    FURTHER DISTANCE FROM THE VEHICLE?
```

1    A.   YES.

2    Q.   OKAY.  WHEN YOU WERE PULLING HIM FROM ONE AREA TO THE

3    OTHER, DID YOU SEE A CELL PHONE AT ANY TIME?

4    A.   NO.

5    Q.   NOW, WHEN YOU PATTED HIM DOWN, DID YOU FIND ANY WEAPONS

6    ON HIM AT THE SCENE WHEN YOU PATTED HIM DOWN?

7    A.   NO.

8    Q.   AND YOU'RE SAYING YOU BASICALLY CHECKED HIS POCKETS, HIS

9    LEGS DOWN TO HIS ANKLES, HIS -- VARIOUS PORTIONS OF HIS BODY?

10   A.   YES.

11   Q.   NOW, AT SOME POINT WHEN YOU WERE PATTING HIM DOWN, DID

12   YOU TURN HIM ON A SIDE?

13   A.   YES.

14   Q.   AND WHAT WAS THE PURPOSE IN DOING THAT?

15   A.   MORE ACCESS TO THE SIDE THAT I WAS SEARCHING AT THAT

16   TIME.

17   Q.   OKAY.  AND WHEN YOU TURNED HIM ON HIS SIDE, DID YOU SEE

18   ANY CELL PHONE AROUND HIM OR UNDERNEATH HIM OR ANYTHING LIKE

19   THAT?

20   A.   NO.

21   Q.   AND THEN, AT SOME POINT, DID YOU TURN HIM ON HIS OTHER

22   SIDE?

23   A.   YES.

24   Q.   SO WOULD IT BE FAIR TO SAY AT SOME POINT YOU TURNED HIM

25   ON HIS LEFT SIDE AND AT SOME POINT YOU TURNED HIM ON HIS

```
 1    RIGHT SIDE?

 2    A.   YES.

 3    Q.   AND WHEN YOU TURNED HIM ON EITHER SIDE, DID YOU SEE ANY

 4    CELL PHONE UNDERNEATH HIM OR AROUND HIM?

 5    A.   NO.

 6    Q.   THIS PARTICULAR PHOTOGRAPH, DO YOU KNOW WHEN THIS

 7    PHOTOGRAPH WAS TAKEN IN TERMS OF WHAT TIME OF DAY?

 8    A.   NO.

 9         MR. ROTHANS:  OBJECTION.  FOUNDATION.  CALLS FOR

10    SPECULATION.

11         THE COURT:  SUSTAINED.

12    BY MR. GALIPO:

13    Q.   DID YOU, AT ANY TIME, AT LEAST, WHILE YOU WERE AT THE

14    SCENE, SEE A CELL PHONE IN BETWEEN THE TWO BLOOD POOLS?

15    A.   NO.

16         MR. GALIPO:  MAY I HAVE ONE MORE MOMENT, YOUR

17    HONOR?

18         THE COURT:  YOU MAY.

19              (COUNSEL CONFER.)

20         MR. GALIPO:  THAT'S ALL THE QUESTIONS I HAVE, YOUR

21    HONOR.

22         THE COURT:  MR. MC NICHOLAS.

23         MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.

24              **DIRECT EXAMINATION**

25    BY MR. MC NICHOLAS:
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1    Q.   GOOD AFTERNOON, OFFICER.

2    A.   GOOD AFTERNOON.

3          MR. MC NICHOLAS:  LET'S LEAVE THAT THERE FOR A

4    MOMENT, PLEASE.

5    BY MR. MC NICHOLAS:

6    Q.   OFFICER, WE'RE STILL LOOKING AT EXHIBIT 372-220.  YOU

7    SEE THAT THERE IS A BLOOD STAIN ON THE GROUND IN PART OF THAT

8    PHOTOGRAPH?

9    A.   YES.

10   Q.   AND THEN NEXT TO IT IS A SWEATSHIRT, DO YOU SEE THAT?

11          MR. ROTHANS:  LACKS FOUNDATION.

12          THE COURT:  IF HE -- I'M SURE HE SEES SOMETHING.

13   THE WITNESS CAN TELL US WHAT HE THINKS IT IS.

14          THE WITNESS:  I DON'T KNOW WHAT THAT IS.

15   BY MR. MC NICHOLAS:

16   Q.   DID YOU SEE THE SWEATSHIRT COME OFF HIS BODY WHEN HE WAS

17   AT THE SCENE?

18          MR. ROTHANS:  OBJECTION.  LACKS FOUNDATION.

19          THE COURT:  HE CAN EITHER SAY HE DID OR HE DIDN'T.

20          THE OBJECTION IS OVERRULED.

21          THE WITNESS:  I REMEMBER THEM CUTTING IT OPEN.  I

22   DON'T REMEMBER IF THEY TOOK IT OFF OR NOT.

23   BY MR. MC NICHOLAS:

24   Q.   NOW, IT'S ACCURATE THAT YOU DID NOT HEAR MR. GRISSOM SAY

25   AT ANY TIME "MY SEAT BELT IS ON"?

1    A.    CORRECT.

2    Q.    IT IS ACCURATE THAT YOU DID NOT HEAR OFFICER ZERBEY SAY,

3    "TAKE YOUR SEAT BELT OFF"?

4    A.    YES.

5    Q.    IT IS ACCURATE THAT YOU DO NOT RECALL SEEING HIM REACH

6    DOWN TO UNDO HIS SEAT BELT?

7    A.    YES.

8    Q.    NOW, LOOKING BACK AT EXHIBIT 8, YOU WERE POSITIONED --

9    STRIKE THAT.

10          AT THE TIME SHOTS WERE FIRED, YOU WERE POSITIONED

11   BEHIND THE OPEN PASSENGER DOOR AT C62, CORRECT?

12   A.    YES.

13   Q.    AND YOU WERE ACTUALLY STANDING A LITTLE BIT BEHIND

14   OFFICER LOPEZ, CORRECT?

15   A.    YES.

16   Q.    AND AFTER SHOTS WERE FIRED AND MR. GRISSOM GOES DOWN TO

17   THE GROUND, YOU AND TWO OTHER OFFICERS PUSH UP TO THE

18   DRIVER'S SIDE OF THE GREEN SEBRING, CORRECT?

19   A.    YES.

20   Q.    YOU, OFFICERS LOPEZ AND ZERBEY TAKE CERTAIN ACTIONS TO

21   GET THE DRIVER OUT OF THE GREEN SEBRING?

22   A.    YES.

23   Q.    SHE IS HANDCUFFED?

24   A.    YES.

25   Q.    AND SHE IS ESCORTED BACK TO ONE OF THE BLACK AND WHITES,

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
1    EITHER C65 OR C60; IS THAT CORRECT?

2    A.   ONE OF THOSE, YES.

3    Q.   OKAY.  AND SHE IS PUT IN THE BACK SEAT?

4    A.   YES.

5    Q.   OF ONE OF THOSE VEHICLES, CORRECT?

6    A.   CORRECT.

7    Q.   AND YOU ACTUALLY WALKED FROM THE GREEN SEBRING WITH THE

8    DRIVER BACK TO ONE OF EITHER OF THESE CARS; IS THAT CORRECT?

9    A.   NO.

10   Q.   WHERE DID YOU GO AFTER THE DRIVER WAS TAKEN OUT OF THE

11   VEHICLE AND HANDCUFFED?

12   A.   I WAS STILL COVERING OFFICER ZERBEY AND LOPEZ WHILE THEY

13   ESCORTED THE DRIVER TO ONE OF THOSE POLICE CARS, AND AT THAT

14   POINT WE -- SERGEANT PUCCI TOLD ME TO BRING A -- APPROACH THE

15   PASSENGER'S SIDE.

16   Q.   OKAY.  AND I GUESS MY QUESTION WAS NOT CLEAR, I

17   APOLOGIZE.

18        AFTER THE DRIVER IS HANDCUFFED, YOU PROVIDED COVER

19   TO OFFICERS ZERBEY AND LOPEZ GOING BACK WITH THE DRIVER TO

20   ONE OF THE BLACK AND WHITES THAT ARE OUT ON MOTOR; IS THAT

21   CORRECT?

22   A.   YES.

23   Q.   OKAY.  AND THEN FROM THERE YOU GO SOMEWHERE ELSE; IS

24   THAT CORRECT?

25   A.   CORRECT.
```

```
 1   Q.   AND ONCE THE DRIVER IS IN THE BLACK AND WHITE, WHICHEVER

 2   ONE IT IS ON MOTOR, EITHER C65 OR C60, YOU THEN PROCEED TO

 3   WALK UP TO THE AREA OF WHERE MR. GRISSOM'S BODY IS LYING ON

 4   THE GROUND, CORRECT?

 5   A.   YES.

 6   Q.   AND THEN I BELIEVE YOU PUT SOME LATEX GLOVES ON, YOU

 7   HOLSTERED YOUR WEAPON; IS THAT CORRECT?

 8   A.   YES.

 9   Q.   AND THEN WHEN YOU DID THAT YOU APPROACHED MR. GRISSOM ON

10   THE GROUND; IS THAT RIGHT?

11   A.   YES.

12   Q.   AND FROM WHAT YOU OBSERVED, NOBODY HAD MOVED HIS BODY

13   YET; IS THAT ACCURATE?

14   A.   CORRECT.

15   Q.   YOU'RE THE FIRST AND ONLY PERSON THAT PULLED HIS BODY

16   AWAY FROM THE GREEN SEBRING, CORRECT?

17   A.   YES.

18   Q.   NOW, FROM THE TIME SHOTS WERE FIRED TO THE TIME YOU

19   STARTED TO LEAVE YOUR POSITION AT C62 TO GO UP TO THE

20   DRIVER'S SIDE OF THE SEBRING, HOW LONG WAS THAT?

21   A.   I CAN'T SAY HOW LONG IT WAS.

22   Q.   CAN YOU GIVE ME AN ESTIMATE?  WAS IT TWO SECONDS?  FIVE

23   SECONDS?  TEN SECONDS?

24   A.   MIGHT HAVE BEEN 30 SECONDS, MAYBE, LESS THAN THAT.

25   Q.   20 TO 30 SECONDS, ARE YOU COMFORTABLE WITH THAT
```

 1   ESTIMATE?

 2   A.   YES.

 3   Q.   AND THEN AFTER THAT 20 TO 30 SECONDS, HOW LONG DID IT

 4   ACTUALLY TAKE YOU TO GET FROM YOUR POSITION AT C62 UP AND

 5   AROUND TO WHERE YOU GOT ON THE DRIVER'S SIDE OF THE SEBRING

 6   TO THE MOMENT WHEN THE DRIVER STARTS TO GET OUT?  DO YOU HAVE

 7   THAT TIME FRAME IN MIND?

 8        LET ME RE-ASK THE QUESTION.

 9        THERE'S A 20 TO 30-SECOND TIME PERIOD WHEN YOU'RE

10   STILL AT C62 AFTER SHOTS WERE FIRED BUT BEFORE YOU BEGIN TO

11   WALK UP TO THE DRIVER'S SIDE OF THE GREEN SEBRING, CORRECT?

12   A.   YES.

13   Q.   OKAY.  AT A CERTAIN POINT WHEN YOU GET UP TO THE

14   DRIVER'S SIDE OF THE GREEN SEBRING, YOU TAKE A POSITION OF

15   COVER, CORRECT?

16   A.   I DON'T KNOW IF I CALL IT COVER, BUT I WAS STANDING

17   BEHIND THE --

18   Q.   LET ME REFRAME BECAUSE I UNDERSTAND HOW MY QUESTION

19   COULD BE AMBIGUOUS.

20        YOU WERE A COVERING OFFICER TO PROVIDE COVER FOR

21   ZERBEY AND LOPEZ TO GET THE DRIVER OUT, CORRECT?

22   A.   YES.

23   Q.   OKAY.  I MEANT COVERING OFFICER.  I APOLOGIZE.

24        FROM THE MOMENT YOU LEFT THE PASSENGER'S SIDE OF

25   C62 TO THE MOMENT THE DRIVER BEGINS TO EXIT THE GREEN

1    SEBRING, HOW MUCH TIME ELAPSES?

2    A.   MAYBE 30 OR 40 SECONDS.

3    Q.   AND FROM THE TIME THE DRIVER OF THE GREEN SEBRING BEGINS

4    TO EXIT TO THE TIME WHERE SHE IS OUT OF THE CAR, HANDS BEHIND

5    HER BACK AND IN HANDCUFFS, HOW LONG DOES THAT TAKE?

6    A.   MIGHT TAKE US PROBABLY TEN SECONDS TO GET HER OUT OF THE

7    CAR.

8    Q.   AND TO PUT HER INTO HANDCUFFS?

9    A.   YES.

10   Q.   ONCE SHE'S IN HANDCUFFS, HOW LONG DOES IT TAKE TO WALK

11   HER BACK TO C65 OR C60 AND PUT HER IN THE BACK SEAT OF THE

12   CAR AND CLOSE THE DOOR?

13          MR. ROTHANS:  YOUR HONOR, THIS IS IRRELEVANT AND

14   CUMULATIVE.

15          THE COURT:  OVERRULED.

16          THE WITNESS:  I WASN'T LOOKING AT HER WHEN I PUT

17   HER IN THE CAR SO I CAN'T GIVE YOU AN ESTIMATE ON SECONDS.

18   BY MR. MC NICHOLAS:

19   Q.   OKAY.  ONCE SHE WAS IN HANDCUFFS, THOUGH, YOU ESCORTED

20   LOPEZ AND ZERBEY BACK TO C65 OR C60, CORRECT?

21   A.   I STOPPED AROUND THE DRIVER'S SIDE AREA OF C63 AND THEY

22   CONTINUED WALKING BACK.

23   Q.   OKAY.  AND THEN FROM C63 YOU WENT UP TO MR. GRISSOM'S

24   BODY; IS THAT RIGHT?

25   A.   YES.

1   Q.   OKAY.  SO HOW LONG WAS IT FROM THE TIME SHE WAS IN

2   HANDCUFFS, RIGHT, AND SHE STARTS WALKING -- THAT'S WHERE I

3   WANT YOU TO START -- SHE STARTS WALKING, HOW LONG WAS IT FROM

4   THAT POINT IN TIME TILL YOU WALK BACK TO THE FRONT OF C63,

5   STOP AND THEN WALK UP TO WHERE MR. GRISSOM IS AND YOU START

6   TO PUT YOUR LATEX GLOVES ON, HOW LONG IS THAT?

7   A.   I STARTED PUTTING MY GLOVES ON BACK BY C63.  AFTER

8   SPEAKING WITH SERGEANT PUCCI, HE TOLD ME YOU'RE GOING TO

9   HANDLE THE SUSPECT.  I SAID, OKAY, I'M PUTTING MY GLOVES ON,

10  AND THAT'S WHEN WE WALKED UP MAYBE --

11  Q.   WITH THAT ANSWER, LET ME REFRAME MY QUESTION, OKAY?

12       FROM THE TIME THE DRIVER OF THE GREEN SEBRING

13  BEGINS TO WALK BACK TO C65 OR C60, FROM THAT MOMENT, HOW LONG

14  IS IT BEFORE YOU ACTUALLY GET OVER TO MR. GRISSOM ON THE

15  GROUND?

16  A.   MAYBE 40 SECONDS, 30, 40 SECONDS, PROBABLY TOOK A SEAT

17  OVER THERE.

18  Q.   OKAY.

19       NOW, WHEN YOU SEARCHED HIM YOU PUT YOUR THUMB

20  INSIDE HIS WAISTBAND AND RAN IT AROUND FROM THE FRONT TO THE

21  BACK, CORRECT?

22  A.   CORRECT.

23  Q.   THAT WAS WHEN HE WAS ON ONE OF HIS HIPS, RIGHT?

24  A.   YES.

25  Q.   AND YOU ACTUALLY PUT YOUR HANDS IN HIS POCKETS, CORRECT?

1    A.   YES.

2    Q.   AND YOU SAID YOU GRABBED THE FABRIC OF HIS PANTS AND RAN

3    YOUR HAND DOWN THE INSIDE, FROM HIS CROUCH DOWN, AND THE

4    OUTSIDE OF HIS PANTS, CORRECT?

5            THE COURT:  COUNSEL, DON'T ASK HIM WHAT HE SAID,

6    JUST ASK HIM WHAT HE DID.

7            MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.

8    BY MR. MC NICHOLAS:

9    Q.   WHEN YOU SEARCHED HIS LEGS, YOU GRABBED THE FABRIC OF

10   HIS PANTS AND YOU WERE FEELING UP AND DOWN HIS LEG INSIDE AND

11   OUT, CORRECT?

12   A.   YES, I GRABBED THE FABRIC AND CLENCHED TO MAKE HIS PANT

13   LEG TIGHT SO I COULD SEE ANY OBJECTS.

14   Q.   AND YOU DID THAT ON BOTH LEGS?

15   A.   YES.

16   Q.   AND AFTER YOU HAD CUFFED HIM, ROLLED HIM ONTO ONE HIP

17   AND SEARCHED HIM, ROLLED HIM ONTO THE OTHER HIP AND SEARCHED

18   HIM, HOW DID YOU THEN ORIENT THE BODY?

19   A.   I PLACED HIM ON HIS BACK.

20   Q.   OKAY.  AND THEN YOU FOUND NO WEAPONS, CORRECT?

21   A.   NO.

22   Q.   IS THAT CORRECT?

23   A.   THAT IS CORRECT.

24   Q.   YOU FOUND NO CELL PHONE, CORRECT?

25   A.   RIGHT.

```
 1    Q.   YOU SAW NO CELL PHONE, CORRECT?

 2    A.   CORRECT.

 3    Q.   AND THEN YOU REMAINED IN THE AREA OF HIS BODY WHEN THE

 4    PARAMEDICS APPROACHED?

 5    A.   YES.

 6    Q.   AND THEN THEY ASKED YOU TO UNDO HIS HANDCUFFS?

 7    A.   YES.

 8    Q.   BECAUSE THEY WERE GOING TO TRY AND DO THEIR JOB?

 9    A.   YES.

10    Q.   SO THEN YOU HAD TO ROLL HIM OVER AGAIN AND TAKE HIS

11    HANDCUFFS OFF?

12    A.   YES.

13    Q.   AND, AT THAT TIME, YOU SAW NO OBJECTS ON THE GROUND

14    AROUND HIM, CORRECT?

15    A.   CORRECT.

16    Q.   AND THEN YOU WERE CHARGED WITH STAYING WITH THE BODY TO

17    THE HOSPITAL, CORRECT?

18    A.   CORRECT.

19    Q.   SO YOU WERE THERE WATCHING WHEN THE PARAMEDICS WERE

20    WORKING ON HIM, CORRECT?

21    A.   AT THE SCENE?

22    Q.   AT THE SCENE.

23    A.   YES.

24    Q.   YOU WERE THERE WHEN THEY PUT HIM ONTO THE GURNEY, RIGHT?

25    A.   YES.
```

```
 1    Q.   YOU WERE THERE WHEN THEY POPPED THE GURNEY UP FROM THE

 2    FOLDED POSITION TO THE UPRIGHT POSITION, RIGHT?

 3    A.   YES.

 4    Q.   YOU WERE WATCHING ALL THIS?

 5    A.   YES.

 6    Q.   AND AT NO TIME DID YOU EVER SEE A CELL PHONE, DID YOU?

 7    A.   NO.

 8    Q.   AND THEN YOU WALKED WITH THE GURNEY TO THE AMBULANCE?

 9    A.   CORRECT.

10    Q.   IF WE COULD LOOK AT EXHIBIT --

11         MR. MC NICHOLAS:  THERE'S NO OBJECTION, EXHIBIT 75,

12    YOUR HONOR.

13         THE COURT:  75 WILL BE RECEIVED.

14              (EXHIBIT 75 IN EVIDENCE.)

15         MR. MC NICHOLAS:  IF WE COULD TURN -- THANK YOU.

16         AND, MR. GOLD, COULD WE CROP OUT THE WHITE SPACE

17    BUT SO THAT WE CAN STILL SEE THE B AND THE A?

18    BY MR. MC NICHOLAS:

19    Q.   SIR, YOU GENERALLY RECOGNIZE THIS?

20    A.   YES.

21    Q.   WE LOOKED AT THIS DURING YOUR DEPOSITION?

22    A.   YES.

23    Q.   AND YOU MARKED THAT RED CIRCLE AREA, B, IN YOUR

24    DEPOSITION AS THE GENERAL AREA YOU REMAINED IN WHILE THE

25    PARAMEDICS WERE WORKING ON MR. GRISSOM?
```

1    A.   YES.

2              MR. MC NICHOLAS:  NO FURTHER QUESTIONS, YOUR HONOR.

3              THE COURT:  MR. ROTHANS?

4              MR. ROTHANS:  THANK YOU, YOUR HONOR.

5                        **CROSS-EXAMINATION**

6    BY MR. ROTHANS:

7    Q.   GOOD AFTERNOON, OFFICER.

8    A.   GOOD AFTERNOON.

9    Q.   YOU HAD BEEN A SWORN PEACE OFFICER LESS THAN A

10   YEAR-AND-A-HALF WHEN THIS FELONY TRAFFIC STOP TOOK PLACE; IS

11   THAT TRUE?

12   A.   YES.

13   Q.   DO YOU HAVE AN ESTIMATE OF THE NUMBER OF FELONY TRAFFIC

14   STOPS YOU HAD BEEN INVOLVED IN WITH CULVER CITY BEFORE THIS

15   INCIDENT?

16   A.   PROBABLY MORE THAN 20.

17   Q.   DO YOU HAVE AN ESTIMATE OF THE NUMBER OF TRAFFIC STOPS

18   YOU'VE BEEN INVOLVED IN SINCE THAT INCIDENT?

19   A.   FELONY TRAFFIC STOPS?

20   Q.   YES, SIR.

21   A.   OVER A HUNDRED.

22   Q.   SO IS IT YOUR BEST ESTIMATE, SIR, THAT YOU'VE BEEN

23   INVOLVED IN MORE THAN A HUNDRED OR 120 FELONY TRAFFIC STOPS

24   SINCE YOU BECOME A PEACE OFFICER?

25   A.   YES.

1  Q.   WOULD IT BE FAIR TO SAY, OFFICER, THAT YOUR RECOLLECTION

2  OF THIS PARTICULAR EVENT WAS BETTER THAT DAY, APRIL 25, 2010,

3  THAN IT IS TODAY?

4  A.   YES.

5  Q.   YOU GAVE A STATEMENT TO THE L.A. COUNTY SHERIFFS'

6  DETECTIVES SOMETIME THAT EVENING?

7  A.   YES.

8  Q.   THE EVENING OF APRIL 25, 2010?

9  A.   YES.

10  Q.   AND WOULD YOUR RECOLLECTION OF THE DETAILS OF THIS

11  INCIDENT BE FRESHER IN YOUR MIND THAN THE EVENING OF APRIL 25

12  THAN THEY ARE MORE THAN THREE YEARS LATER?

13  A.   YES.

14  Q.   I BELIEVE YOU TESTIFIED EARLIER ON CROSS-EXAMINATION

15  THAT YOU THOUGHT SOMEONE GAVE MR. GRISSOM A COMMAND TO TURN

16  AROUND ONCE HE GOT OUT OF THE CAR.

17        DO YOU REMEMBER THAT TESTIMONY?

18  A.   YES.

19  Q.   DO YOU HAVE THE WHITE BINDER IN FRONT OF YOU, SIR, THAT

20  HAS EXHIBIT 203?

21  A.   YES.

22  Q.   WOULD YOU TURN TO EXHIBIT 203?

23        NOW, IS THAT, SIR, A TRANSCRIPTION OF YOUR

24  INTERVIEW WITH THE L.A. COUNTY SHERIFFS' DETECTIVES FROM THE

25  EVENING OF APRIL 25, 2010?

1    A.   YES.

2    Q.   I DIRECT YOUR ATTENTION TO PAGE 23 OF THAT TRANSCRIPT.

3    I'M GOING TO ASK YOU TO READ A PORTION TO YOURSELF, NOT

4    ALOUD.

5         MR. GALIPO:  I'M GOING TO OBJECT, YOUR HONOR, AS

6    CALLS FOR HEARSAY AND THERE'S NO NEED TO REFRESH RECOLLECTION

7    AT THIS POINT.

8         THE COURT:  OVERRULED.

9    BY MR. ROTHANS:

10   Q.   READ TO YOURSELF, SIR, FROM PAGE 23, LINE 14 THROUGH

11   PAGE 24, LINE 8.  JUST TO YOURSELF.

12   A.   (WITNESS COMPLIES.)

13        OKAY.

14   Q.   AS YOU SIT HERE TODAY IN THIS COURTROOM, MORE THAN THREE

15   YEARS FROM THE INCIDENT, DOES THIS PORTION REFRESH YOUR

16   MEMORY IN TERMS OF WHETHER OR NOT AN OFFICER ORDERED

17   MR. GRISSOM TO TURN AROUND AFTER HE GOT OUT OF THE CAR?

18   A.   YES.

19   Q.   DO YOU REMEMBER WHETHER THERE WAS SUCH A COMMAND GIVEN?

20   A.   I DON'T REMEMBER.

21   Q.   IN FACT, WHEN YOU WERE ASKED THAT QUESTION BY THE

22   SHERIFFS' DETECTIVES, YOU INDICATED THAT --

23        MR. GALIPO:  OBJECTION.  IT CALLS FOR HEARSAY.

24        THE COURT:  OVERRULED.

25   BY MR. ROTHANS:

1   Q.   IS THAT TRUE, SIR?

2   A.   I'M SORRY?

3   Q.   WHEN YOU WERE ASKED THAT QUESTION BY THE SHERIFFS'

4   DETECTIVES THE VERY EVENING OF THE INCIDENT WHETHER THAT

5   COMMAND WAS GIVEN, YOU SAID, "I CAN'T REMEMBER SPECIFICALLY;"

6   IS THAT TRUE?

7   A.   YES.

8   Q.   BUT IT WAS PROTOCOL OR THAT WAS NORMAL PROCEDURE TO GIVE

9   THAT COMMAND, YOU JUST DIDN'T REMEMBER?

10   A.   CORRECT.

11   Q.   YOU HAVE A COLLEGE DEGREE?

12   A.   NO.

13   Q.   YOU ATTEND SOME COLLEGE?

14   A.   YES.

15   Q.   HOW MANY COURSES, YEARS HAVE YOU COMPLETED?

16   A.   THREE YEARS.

17   Q.   YOU GRADUATE FROM A POST-CERTIFIED POLICE ACADEMY?

18   A.   YES.

19   Q.   AND, AGAIN, IT WAS LESS THAN A YEAR-AND-A-HALF BEFORE

20   THIS PARTICULAR INCIDENT?

21   A.   LESS THAN A YEAR-AND-A-HALF SINCE I GRADUATED, YES.

22   Q.   YOU HAD TRAINING IN THE ACADEMY ON FELONY TRAFFIC STOPS?

23   A.   YES.

24   Q.   YOU HAD TRAINING AT CULVER CITY POLICE DEPARTMENT IN THE

25   YEAR-AND-A-HALF BEFORE THIS INCIDENT ON FELONY TRAFFIC STOPS?

1   A.   YES.

2   Q.   DID YOU GO THROUGH A PROBATIONARY AND TRAINING PERIOD AT

3   CULVER CITY WITH FIELD TRAINING OFFICERS?

4   A.   YES.

5   Q.   PRIOR TO APRIL 25, 2010, SIR, HAD YOU BEEN PRIVY TO OR

6   SEEN COPIES OF BOLOS, BE ON THE LOOKOUT BULLETINS, ABOUT A

7   SERIES OF ARMED ROBBERIES IN SOUTHERN CALIFORNIA?

8   A.   YES.

9   Q.   YOU READ THOSE DOCUMENTS?

10  A.   YES.

11  Q.   PROVIDED COPIES OF THOSE DOCUMENTS?

12  A.   YES.

13  Q.   WERE YOU AWARE OF THE DETAILS FROM THOSE PRIOR ROBBERIES

14  WHEN YOU RESPONDED TO MOTOR AND VENICE?

15  A.   YES.

16  Q.   AT SOME POINT, DID YOU FORM AN IMPRESSION THAT THIS

17  GENTLEMEN WHO WAS GETTING OUT OF THE PASSENGER'S SIDE OF THE

18  SEBRING MAY BE THE SUSPECT?

19  A.   YES.

20  Q.   BEFORE HE GOT OUT, DID THE PASSENGER AND THE DRIVER OF

21  THAT CHRYSLER SEBRING COMPLY WITH ALL COMMANDS TO KEEP THEIR

22  HANDS UP?

23  A.   NO.

24  Q.   WHAT DO YOU RECALL ABOUT THEIR MOVEMENT OF THEIR HANDS

25  INSIDE THE VEHICLE?

1    A.   I REMEMBER THE PASSENGER, MAINLY, BECAUSE I WAS LOOKING

2    AT HIM.  WE WAS GIVEN AN ORDER TO KEEP HIS HANDS UP BY

3    OFFICER ZERBEY, AND HE WOULD COMPLY FOR A FEW SECONDS, THEN

4    DROP THEM AGAIN.  REPEAT THE COMMAND, AND, AGAIN, HE WOULD

5    COMPLY FOR A FEW SECONDS AND THEN DROP HIS HANDS AGAIN.  THAT

6    HAPPENED A FEW TIMES.

7    Q.   WELL, WAS THE ONLY TIME THAT HE DROPPED HIS HANDS TO

8    UNFASTEN HIS SEAT BELT?

9    A.   I DON'T REMEMBER.

10   Q.   DID YOU SEE HIM MOVING HIS HANDS AROUND SOMEPLACE OUT OF

11   VIEW WITHIN THE VEHICLE?

12   A.   HE WAS DOING SOMETHING.  I DON'T KNOW WHAT HE WAS DOING

13   WHEN HE DROPPED HIS HANDS.

14   Q.   WERE YOU ABLE TO SEE WHAT, IF ANYTHING, HE WAS TOUCHING

15   INSIDE THE CAR AT THAT POINT?

16   A.   NO.

17   Q.   DID THAT CAUSE YOU ALARM?

18   A.   YES.

19   Q.   DID YOU NOTICE WHETHER THE DRIVER WAS DOING ANYTHING OF

20   THE SAME SORT?

21   A.   I DON'T REMEMBER THE DRIVER SO MUCH.

22   Q.   AT SOME POINT, MR. GRISSOM GOT OUT OF THE CAR, CORRECT?

23   A.   YES.

24   Q.   AND DID HE SPIN AROUND?

25   A.   YES.

1   Q.   HOW WOULD YOU DESCRIBE?  PLEASE DESCRIBE FOR THE JURY

2   HIS MOVEMENT WHEN HE GOT OUT OF THE CAR.

3   A.   THE DOOR OPENED, HE WAS -- HE STEPPED OUT WITH HIS RIGHT

4   FOOT.  HE HAD HIS HANDS ABOUT SHOULDER HEIGHT, AND HE JUST --

5   HE SPUN OR TURNED, HOWEVER YOU WANT TO PHRASE IT, TOWARDS US,

6   AND IN A CLOCKWISE DIRECTION.

7   Q.   AND HE DID THAT IMMEDIATELY AFTER GETTING OUT, IS THAT

8   YOUR RECOLLECTION?

9   A.   YES.

10  Q.   AND WAS HE GIVEN COMMANDS TO KEEP HIS HANDS UP ONCE HE

11  GOT OUT?

12  A.   I DON'T KNOW IF HE HAD TIME TO SAY ANYTHING TO THAT

13  MATTER, IT HAPPENED REALLY FAST.

14  Q.   FROM THE TIME MR. GRISSOM GOT OUT OF THE CAR UNTIL THE

15  SHOTS WERE FIRED, YOUR RECOLLECTION IS IT HAPPENED FAIRLY

16  FAST?

17  A.   YES.

18          MR. GALIPO:  I'M GOING TO OBJECT AS LEADING AND

19  VAGUE AS PHRASED.

20          THE COURT:  SUSTAINED AS TO LEADING.

21  BY MR. ROTHANS:

22  Q.   HOW MUCH TIME PASSED -- AND I'M NOT GOING TO GET INTO A

23  GREAT DEAL OF FIVE SECONDS HERE, TEN SECONDS THERE -- FROM

24  THE TIME MR. GRISSOM GOT OUT OF THE CAR TO YOU REMEMBER SHOTS

25  BEING FIRED, OFFICER, ANY ESTIMATE ON HOW MUCH TIME THAT WAS?

1  A.  LIKE I SAID EARLIER, LIKE THREE SECONDS, MAYBE FOUR.  IT

2  WAS REALLY QUICK.

3  Q.  OKAY.  AND DID YOU SEE MR. GRISSOM DROP ONE OR BOTH

4  HANDS BEFORE THE SHOTS WERE FIRED?

5  A.  BOTH HANDS.

6  Q.  AND DID YOU HEAR ANY OFFICER TELL HIM, COMMAND HIM TO

7  DROP HIS HANDS?

8  A.  NO.

9  Q.  WHAT KIND OF WEAPON DID YOU HAVE AT THE TIME?

10  A.  MY SIDEARM.

11  Q.  WHAT CALIBER WEAPON WAS IT?

12  A.  .45.

13  Q.  AND IT'S A HANDGUN?

14  A.  YES.

15  Q.  YOU HAD IT POINTED IN HIS DIRECTION?

16  A.  YES.

17  Q.  WERE THERE BYSTANDERS IN THE STRIP MALL AT THE TIME?

18  A.  THERE WERE.

19  Q.  WERE THERE RESTAURANTS OR BUSINESSES WITH GLASS WINDOWS

20  IN THE BACKDROP BETWEEN WHERE YOU WERE LOOKING IN HIS

21  DIRECTION?

22  A.  YES.

23  Q.  DID YOU ELECT NOT TO FIRE AT THAT TIME?

24  A.  YES.

25  Q.  AFTER THE INCIDENT, YOU'VE INDICATED THAT YOU SEARCHED

```
 1    MR. GRISSOM?

 2    A.   YES.

 3    Q.   DID YOU LOOK IN HIS SOCKS?

 4    A.   NO.

 5    Q.   DID YOU LOOK AT HIS SHOES?

 6    A.   NO.

 7    Q.   DID YOU REMOVE HIS SHOES?

 8    A.   NO.

 9    Q.   DID YOU REMOVE HIS SOCKS?

10    A.   NO.

11            MR. ROTHANS:  I HAVE NOTHING FURTHER.

12            THANK YOU, YOUR HONOR.

13            THE COURT:  MR. GALIPO?

14            MR. GALIPO:  YEAH, THANK YOU.

15            MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

16            THE COURT:  YOU MAY.

17                      REDIRECT EXAMINATION

18    BY MR. GALIPO:

19    Q.   DIDN'T -- WHEN HE STEPPED OUT AND TURNED CLOCKWISE TO

20    FACE YOU, DIDN'T HE DO IT IN A SLOW MANNER?

21    A.   I DON'T THINK IT WAS SLOW.  I DON'T THINK IT WAS FAST.

22    IT WAS A -- MAYBE A NORMAL SPEED THAT HE WOULD JUST TURN

23    AROUND AND FACE US.

24            MR. GALIPO:  I'D LIKE TO REFER TO THE DEPOSITION,

25    YOUR HONOR, PAGE 71, LINES 7 THROUGH 11.
```

```
 1              THE COURT:  PROCEED.
 2    BY MR. GALIPO:
 3    Q.         "QUESTION:  SPUN AROUND WHICH WAY?
 4               "ANSWER:  IT WOULD BE CLOCKWISE.
 5               "QUESTION:  HOW FAST DID HE SPIN?
 6               "ANSWER:  SLOW."
 7               DO YOU RECALL HIM TURNING SLOWLY?
 8    A.    I RECALL HIM TURNING AROUND AND FACING US, LIKE I SAID,
 9    SLOW -- YOU MIGHT BE ABLE TO SAY THAT, BUT...
10    Q.    NOW, PREVIOUSLY I REFERRED TO YOUR DEPOSITION WHEN YOU
11    GAVE AN ESTIMATE OF ONE MINUTE OR 60 SECONDS IN BETWEEN THE
12    TIME THAT HE GOT OUT AND THE SHOTS, DO YOU RECALL THAT?
13    A.    YES.
14    Q.    HAS SOMETHING IN THE LAST WEEK REFRESHED YOUR
15    RECOLLECTION THAT IT WASN'T 60 SECONDS, IT WAS THREE SECONDS?
16    A.    JUST REVIEWING THINGS IN MY MIND AND KNOWING THAT IT
17    SEEMED SLOW TO US, BUT THINGS WERE HAPPENING RATHER FAST.
18    Q.    WELL, LET ME ASK YOU THIS:  IN THE LAST WEEK OR SO, HAD
19    YOU HAD ANY MEETINGS WITH THE OFFICERS IN THIS CASE?
20    A.    NO.
21    Q.    ANY MEETINGS WITH THE LAWYERS?
22               MR. ROTHANS:  OBJECTION.  IRRELEVANT.  WORK
23    PRODUCT.
24               THE COURT:  SUSTAINED.
25               YOU MAY ASK -- YOU ASKED ABOUT THE OFFICERS, ANSWER
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1    WILL STAND.  I'LL SUSTAIN THE OBJECTION TO THE QUESTION OF

2    THE LAWYERS.

3    BY MR. GALIPO:

4    Q.   SO WHEN HE GOT OUT OF THE VEHICLE, IN YOUR MIND, YOU

5    BELIEVED HE WAS A SUSPECT IN THE ROBBERIES, CORRECT?

6    A.   YES.

7    Q.   BUT YOU DID NOT SHOOT, CORRECT?

8    A.   CORRECT.

9    Q.   AND THE REASON YOU DID NOT SHOOT IS BECAUSE YOU DID NOT

10   SEE AN IMMEDIATE THREAT TO LIFE; TRUE?

11   A.   CORRECT.

12   Q.   AND YOUR TRAINING IS, EVEN IF YOU THINK SOMEONE'S A

13   SUSPECT IN A ROBBERY, YOU CAN'T SHOOT UNLESS THERE'S

14   IMMEDIATE THREAT TO LIFE, CORRECT?

15   A.   CORRECT.

16        MR. GALIPO:  THANK YOU.

17                   REDIRECT EXAMINATION

18   BY MR. MC NICHOLAS:

19   Q.   MR. ROTHANS ASKED YOU ABOUT YOUR MEMORY BEING CLEARER

20   THE DAY OF THE INCIDENT.

21        AND DO YOU HAVE EXHIBIT 203 THERE IN FRONT OF YOU?

22   A.   YES.

23   Q.   WHAT PAGE ARE YOU CURRENTLY ON?

24   A.   24.

25   Q.   LET'S GO TO PAGE 10, IF YOU WOULD.
```

1    A.   OKAY.

2    Q.   SERGEANT COCHRAN WAS THE INDIVIDUAL AT THIS POINT, IN

3    THE INTERVIEW ON PAGE 10, THAT WAS INTERVIEWING YOU, CORRECT?

4    A.   YES.

5    Q.   AND HE SAID TAKE US THROUGH HOW HE ENDED UP GETTING OUT

6    OF THE CAR, RIGHT?

7    A.   YES.

8    Q.   AND YOU SAID, "OFFICER ZERBEY EVENTUALLY ORDERED HIM

9    OUT.  HE OPENED THE DOOR, STOOD UP, AND HE WAS FACING US.

10   AND, AT THAT TIME, HE HAD HIS ARMS OR HIS HANDS, I WOULD SAY,

11   PROBABLY AT SHOULDER HEIGHT, MAYBE."

12           THAT'S WHAT YOU SAID, RIGHT?

13   A.   YES.

14   Q.   YOU DID NOT SAY HE SPUN, CORRECT?

15   A.   CORRECT.

16   Q.   NOT SAY HE TURNED, CORRECT?

17   A.   CORRECT.

18   Q.   SAID HE JUST GOT OUT AND HE FACED US, RIGHT?

19   A.   YES.

20   Q.   THEN YOU'RE ASKED:  "WAS HE IMMEDIATELY ORDERED TO

21   FACE" -- "WAS HE TOLD TO FACE YOU," RIGHT?

22   A.   YES.

23   Q.   AND YOU SAY, "NO, HE WAS IMMEDIATELY ORDERED TO FACE

24   AWAY FROM US AND HE DIDN'T COMPLY."

25           THAT'S WHAT YOU SAID, RIGHT?

1    A.   YES.

2    Q.   SO SOMEBODY DID GIVE HIM A COMMAND TO TURN AWAY, RIGHT?

3    A.   SOMEBODY.

4    Q.   AND WHO WAS IT?

5    A.   I DON'T KNOW.

6              MR. MC NICHOLAS:  NOTHING FURTHER.

7                   FURTHER CROSS-EXAMINATION

8    BY MR. ROTHANS:

9    Q.   MR. MC NICHOLAS WAS JUST QUESTIONING YOU ABOUT PAGE 10

10   OF THE INTERVIEW BY THE L.A. COUNTY SHERIFFS' DETECTIVES,

11   SPECIFICALLY SERGEANT COCHRAN THE EVENING OF THIS SHOOTING,

12   CORRECT?

13   A.   CORRECT.

14   Q.   ON PAGE 10, YOU MENTIONED THAT A COMMAND WAS GIVEN FOR

15   HIM TO TURN AWAY AND HE DIDN'T COMPLY, CORRECT?

16   A.   CORRECT.

17   Q.   BUT PAGE 23, 13 PAGES LATER, SERGEANT COCHRAN IS

18   CLARIFYING THAT ISSUE WITH YOU STARTING IN LINE 24 ONTO THE

19   NEXT PAGE; IS THAT TRUE?

20   A.   YES.

21   Q.   AND, IN FACT, THEY ASK YOU SPECIFICALLY, DO YOU REMEMBER

22   SOMEBODY ORDERING HIM TO FACE AWAY, AND YOU SAID IN RESPONSE:

23   "THE EVENING OF THIS INCIDENT, I CAN'T SAY IF I REMEMBER

24   SPECIFICALLY, BUT THAT'S OUR PROCEDURE.  THAT'S WHAT I

25   FIGURED WOULD HAPPEN."

```
1              ISN'T THAT TRUE?

2    A.   YES.

3    Q.   THAT WAS CLARIFIED AFTER THE EARLIER REFERENCE ON PAGE

4    10?

5    A.   CORRECT.

6              MR. ROTHANS:  THANK YOU.

7              NOTHING FURTHER.

8              THE COURT:  ALL RIGHT.  OFFICER BROWN, YOU'RE

9    EXCUSED.

10             THANK YOU.

11             MR. GALIPO:  MAY I GET OUR NEXT WITNESS FROM THE

12   HALLWAY?

13             THE COURT:  YOU MAY.

14             MR. GALIPO:  PLAINTIFFS CALL KELLI BLANCHARD,

15   PLEASE.

16             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

17        KELLI BLANCHARD, PLAINTIFFS' WITNESS, SWORN

18             THE CLERK:  PLEASE BE SEATED.

19             PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

20             THE WITNESS:  KELLI BLANCHARD; K-E-L-L-I.  LAST

21   NAME BLANCHARD, B, LIKE BOY, L-A-N-C-H-A-R-D.

22             THE CLERK:  THANK YOU.

23                      DIRECT EXAMINATION

24   BY MR. GALIPO:

25   Q.   GOOD AFTERNOON.
```

1   A.   GOOD AFTERNOON.

2   Q.   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHO

3   YOU WORK FOR?

4   A.   I WORK FOR THE LOS ANGELES COUNTY CORONER'S OFFICE.

5   Q.   AND WHAT IS YOUR POSITION WITH THEM?

6   A.   I'M A CORONER INVESTIGATOR.

7   Q.   AND WHAT DOES A CORONER'S INVESTIGATOR DO?

8   A.   I RESPOND TO ALL DEATHS THAT MEET THE CORONER'S CRITERIA

9   AS SET FORTH BY THE STATE OF CALIFORNIA; ANY DEATHS THAT ARE

10  HOMICIDES, SUICIDES, ACCIDENTS, EVEN NATURAL DEATHS WE

11  RESPOND TO TO INVESTIGATE THE CAUSE AND THE MANNER OF DEATH.

12  Q.   HOW LONG HAVE YOU HELD YOUR POSITION?

13  A.   JUST ABOUT TEN YEARS.

14  Q.   AND DID YOU HAVE TO HAVE SPECIALIZED TRAINING FOR YOUR

15  POSITION?

16  A.   YES, I DO.

17  Q.   DO YOU HAVE ANY ESTIMATE AS TO HOW MANY DEATHS YOU HAVE

18  INVESTIGATED AS A CORONER'S INVESTIGATOR?

19  A.   SEVERAL HUNDRED.

20  Q.   WERE YOU CALLED UPON TO INVESTIGATE THE DEATH OF LEJOY

21  GRISSOM?

22  A.   YES, I WAS.

23  Q.   AND HOW WERE YOU CONTACTED?

24  A.   OUR -- WE HAVE CALL INTAKE SPECIALISTS AND THE CULVER

25  CITY POLICE DEPARTMENT HAD PHONED REPORTING THE DEATH OF THE

```
 1   DECEDENT AND WERE REQUESTING OUR RESPONSE.

 2   Q.   DID YOU, IN CONNECTION WITH YOUR WORK ON THIS CASE,

 3   PREPARE A REPORT?

 4   A.   YES, I DID.

 5   Q.   DO YOU HAVE A COPY OF THAT REPORT HANDY?

 6   A.   I DO.

 7            MR. GALIPO:  FOR THE COURT AND COUNSEL, THERE'S

 8   ALSO A COPY AS EXHIBIT 108-15, YOUR HONOR, WHICH I BELIEVE IS

 9   IN VOLUME IV OF THE PLAINTIFF'S EXHIBIT BINDERS.

10   BY MR. GALIPO:

11   Q.   AND WHERE DID YOU FIRST RESPOND TO?

12   A.   I RESPONDED TO RONALD REAGAN U.C.L.A. MEDICAL CENTER.

13   Q.   AND, AT SOME POINT, DID YOU GAIN INFORMATION THAT DEATH

14   WAS PRONOUNCED?

15   A.   YES.

16   Q.   AND, AT SOME POINT, DID YOU GO TO THE SCENE?

17   A.   I DID.

18   Q.   WHY DO YOU NORMALLY GO -- WHY DO YOU GO TO SCENES IN

19   SHOOTING INCIDENTS?

20   A.   BECAUSE IT'S PART OF DETERMINING THE MANNER AND THE

21   CAUSE OF A DECEDENT'S DEATH AND THAT'S STANDARD PROTOCOL IN

22   OUR INVESTIGATIONS.

23   Q.   AND DO YOU -- WHEN YOU CAN, DO YOU TAKE PICTURES OF THE

24   SCENE JUST TO DOCUMENT THE SCENE?

25   A.   YES, WE ALWAYS TAKE PHOTOS.
```

1    Q.   IN THIS CASE, WHEN YOU ARRIVED AT THE SCENE, DID YOU

2    REQUEST TO TAKE PHOTOS?

3    A.   I SHOWED UP AS PART OF MY INVESTIGATION AND WAS TO TAKE

4    PHOTOS, YES.

5    Q.   DID YOU TAKE PHOTOGRAPHS?

6    A.   I DID NOT.

7    Q.   WHY NOT?

8    A.   THE SHERIFFS' DEPARTMENT REFUSED TO ALLOW ME ENTRY ONTO

9    THE SCENE TO DO MY INVESTIGATION.

10   Q.   WHAT TIME, APPROXIMATELY, DID YOU GET TO THE SCENE?

11   A.   IT WAS APPROXIMATELY 7:00 P.M.

12   Q.   WAS IT STILL LIGHT OUTSIDE?

13   A.   IT WAS.

14   Q.   NOW, IS PART OF THE PURPOSE OF YOU PREPARING A REPORT TO

15   BE ABLE TO GIVE THAT TO THE MEDICAL EXAMINER SO HE AT LEAST

16   HAS THAT INFORMATION BEFORE SIGNING OFF ON THE AUTOPSY REPORT

17   OR DEATH CERTIFICATE?

18   A.   YES.

19   Q.   AND DO YOU NEED TO RELY ON DETECTIVES IN GETTING

20   INFORMATION WITH RESPECT TO HOW THE SHOOTING OCCURRED?

21   A.   THEY DO PROVIDE ME WITH THE PRELIMINARY INVESTIGATION

22   INFORMATION, YES.

23   Q.   AND WHO, IN THIS CASE -- WHAT DETECTIVES PROVIDED

24   INFORMATION TO YOU?

25   A.   DETECTIVES BLAGG AND COCHRAN WITH THE SHERIFFS'

1    DEPARTMENT HOMICIDE BUREAU.

2    Q.   DID YOU HAVE ANY INFORMATION FROM THEM ABOUT ANYTHING

3    REGARDING A CELL PHONE?

4    A.   NOT TO MY KNOWLEDGE.

5    Q.   AND DID YOU, IN YOUR REPORT, SUMMARIZE THE INFORMATION

6    THAT THEY DID GIVE YOU AS TO HOW THE SHOOTING OCCURRED?

7    A.   YES.

8              MR. ROTHANS:  THIS IS HEARSAY.

9              THE COURT:  WE AREN'T GETTING INTO THE SUBSTANCE OF

10   IT, SO OVERRULED.

11   BY MR. GALIPO:

12   Q.   NOW, DID YOU EXAMINE THE BODY AT THE HOSPITAL?

13   A.   YES, I DID.

14   Q.   WHAT'S YOUR PURPOSE IN DOING THAT?

15   A.   IT'S FIRST FOR IDENTIFICATION PURPOSES AND ALSO TO

16   ASCERTAIN ANY WOUNDS OR TRAUMA TO A DECEDENT.

17   Q.   WITHOUT GOING INTO DETAILS, BECAUSE WE'RE GOING TO BE

18   CALLING THE MEDICAL EXAMINER NEXT, DID YOU SEE SOME WOUNDS TO

19   HIS CHEST AREA?

20   A.   I DID.

21   Q.   AND THE MANNER OF DEATH WAS, BASED ON YOUR

22   INVESTIGATION, HOMICIDE?

23   A.   YES.

24             MR. GALIPO:  THANK YOU.

25             THAT'S ALL I HAVE, YOUR HONOR.

```
 1              THE COURT:  MR. MC NICHOLAS?

 2              MR. MC NICHOLAS:  NO QUESTIONS, YOUR HONOR.

 3                       CROSS-EXAMINATION

 4    BY MR. ROTHANS:

 5    Q.   GOOD AFTERNOON, MS. BLANCHARD.

 6    A.   HI.

 7    Q.   WHAT TIME, APPROXIMATELY, DID YOU ARRIVE AT THE PARKING

 8    LOT AT MOTOR AND VENICE?

 9    A.   AT ABOUT 7:00 P.M.

10    Q.   7:00 O'CLOCK AT NIGHT?

11    A.   YES.

12    Q.   YOU HAVE ANY UNDERSTANDING AS TO HOW LONG THAT IS AFTER

13    THE SHOOTING HAD TAKEN PLACE?

14    A.   FROM WHAT I RECALL, IT WAS APPROXIMATELY SEVEN TO EIGHT

15    HOURS AFTER THE SHOOTING.

16    Q.   THERE WAS, IN FACT, AN L.A. COUNTY SHERIFFS' DETECTIVE

17    AND CRIME SCENE ANALYST AND PHOTOGRAPHER THERE ON SCENE,

18    CORRECT?

19    A.   CORRECT.

20    Q.   DO YOU HAVE ANY IDEA IF THEY HAD ALREADY TAKEN

21    PHOTOGRAPHS OF THE SCENE?

22    A.   THAT, I DON'T RECALL.

23    Q.   DO YOU HAVE ANY IDEA THAT THEY ALREADY LAID OUT MARKERS

24    AND TAKEN PHOTOGRAPHS WITH MARKERS AT THE SCENE?

25    A.   THAT, I DON'T RECALL.
```

1  Q.   DO YOU HAVE ANY INFORMATION AS TO WHETHER THEY GATHERED

2  THE PHYSICAL EVIDENCE AT THE SCENE, SUCH AS CLOTHING, THE

3  SHELL CASINGS, THE CELL PHONE, THINGS OF THAT NATURE?

4  A.   THE CLOTHING WAS AT THE HOSPITAL WITH THE DECEDENT.

5  Q.   THERE WAS SOME CLOTHING IN PARKING LOT, MA'AM, WERE YOU

6  AWARE OF THAT?

7          MR. GALIPO:  I'M GOING TO --

8          THE WITNESS:  I WASN'T ALLOWED ACCESS TO THE SCENE.

9          MR. GALIPO:  I APOLOGIZE.  I WITHDRAW THE

10  OBJECTION, YOUR HONOR.

11          THE WITNESS:  I WASN'T ALLOWED ONTO THE SCENE TO

12  SEE THAT.

13  BY MR. ROTHANS:

14  Q.   WERE YOU EVER MADE AWARE OF THE FACT THAT THERE WAS

15  CLOTHING LEFT AT THE SCENE?

16  A.   NOT TO MY KNOWLEDGE.

17  Q.   OKAY.  SO WHEN YOU ARRIVED AT THE SCENE SOME SEVEN OR

18  EIGHT HOURS LATER, YOU WEREN'T GIVEN ACCESS TO THE SCENE, YOU

19  HAVE NO INFORMATION ABOUT WHAT EVIDENCE HAD BEEN MARKED OR

20  TAGGED OR GATHERED BY THAT POINT; TRUE?

21  A.   NO, I DON'T.

22  Q.   OKAY.  AND, IN FACT, IT WAS THE L.A. COUNTY SHERIFFS'

23  DEPARTMENT THAT WOULDN'T GIVE YOU ACCESS, SPECIFICALLY A

24  LIEUTENANT, CORRECT?

25  A.   IT WAS A DETECTIVE AND HER LIEUTENANT.

1    Q.    OKAY.  A DETECTIVE AND LIEUTENANT FROM THE L.A. COUNTY

2    SHERIFFS' DEPARTMENT?

3    A.    CORRECT.

4    Q.    VERY WELL.

5              MR. ROTHANS:  THANK YOU.

6              NOTHING FURTHER.

7              THE COURT:  ANYTHING FURTHER?

8              MR. GALIPO:  NO, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  MRS. BLANCHARD, YOU'RE

10   EXCUSED.

11             MR. GALIPO:  MAY I GET THE NEXT WITNESS, YOUR

12   HONOR?

13             THE COURT:  YOU MAY.

14             MR. GALIPO:  AND PLAINTIFFS CALL DR. STEPHEN

15   SCHOLTZ, PLEASE.

16             THE COURT:  DR. SCHOLTZ, YOU CAN COME FORWARD.

17             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

18       **DR. STEPHEN SCHOLTZ, PLAINTIFFS' WITNESS, SWORN**

19             THE CLERK:  PLEASE BE SEATED.

20             PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

21             THE WITNESS:  STEPHEN SCHOLTZ, S-T-E-P-H-E-N,

22   S-C-H-O-L-T-Z.

23             THE CLERK:  THANK YOU.

24                     **DIRECT EXAMINATION**

25   BY MR. GALIPO:

1    Q.    GOOD AFTERNOON, DR. SCHOLTZ.

2    A.    GOOD AFTERNOON.

3    Q.    WE MET EACH OTHER FOR THE FIRST TIME TODAY; IS THAT

4    TRUE?

5    A.    YES.

6    Q.    AND WHAT DO YOU DO FOR A LIVING, SIR?

7    A.    I'M A FORENSIC PATHOLOGIST SERVING AS DEPUTY MEDICAL

8    EXAMINER WITH THE LOS ANGELES COUNTY DEPARTMENT OF CORONER.

9    Q.    WHAT DOES IT MEAN TO BE A FORENSIC PATHOLOGIST?

10    A.    WELL, IT'S A SPECIALTY OF MEDICAL PRACTICE AND A

11    SUBSPECIALTY OF -- SPECIFICALLY OF PATHOLOGY, WHICH IS THE --

12    DEALS WITH THE EXAMINATION OF TISSUE AND OTHER BODY FLUIDS,

13    BACTERIOLOGY, CHEMISTRY, THE LABORATORY SIDE OF MEDICINE.

14    Q.    OKAY.  HOW LONG HAVE YOU WORKED FOR THE CORONER'S

15    OFFICE?

16    A.    ABOUT 22 YEARS.

17    Q.    DO YOU HAVE AN ESTIMATE, SIR, AS TO HOW MANY AUTOPSIES

18    YOU HAVE PERFORMED?

19    A.    SOMEWHERE BETWEEN FIVE AND 6,000 FORENSIC EXAMINATIONS.

20    Q.    AND DO YOU HAVE AN ESTIMATE AS TO WHAT PERCENTAGE OF

21    THOSE, APPROXIMATELY, HAS BEEN DEATH BY GUNSHOT WOUNDS?

22    A.    WELL, APPROXIMATELY, IT'S AT LEAST 10 PERCENT, I

23    BELIEVE.

24    Q.    AND HAVE YOU TESTIFIED IN COURT AS AN EXPERT BEFORE?

25    A.    YES.

```
 1    Q.    AND WOULD THAT BE IN BOTH CRIMINAL AND CIVIL CASES?

 2    A.    YES.

 3    Q.    AND DO YOU HAVE AN ESTIMATE, APPROXIMATELY, AS TO HOW

 4    MANY TIMES YOU HAVE DONE THAT?

 5    A.    WELL, TOTAL IN COURT TESTIMONY IS OVER 500.

 6    Q.    AND YOU WERE SUBPOENAED TO BE HERE TODAY BY MY OFFICE;

 7    IS THAT TRUE?

 8    A.    YES.

 9    Q.    NOW, DID YOU PERFORM THE AUTOPSY ON LEJOY GRISSOM?

10    A.    YES.

11    Q.    AND DID YOU PREPARE A REPORT IN CONNECTION WITH THAT

12    AUTOPSY?

13    A.    I DID.

14    Q.    DO YOU HAVE A COPY OF YOUR REPORT WITH YOU?

15    A.    I DO.

16          MR. GALIPO:  FOR COUNSEL AND THE COURT, IT'S ALSO

17    EXHIBIT 108, STARTING ON 108-2.

18    BY MR. GALIPO:

19    Q.    JUST SOME BASICS:  WITH RESPECT TO GUNSHOT WOUNDS, DO

20    YOU INITIALLY OBSERVE THE BODY FROM THE OUTSIDE TO SEE WHAT,

21    IF ANY, WOUNDS YOU CAN SEE?

22    A.    YES.

23    Q.    DO YOU TAKE X-RAYS BEFORE GOING INTO THE BODY?

24    A.    THERE WERE X-RAYS TAKEN, YES.

25          MR. GALIPO:  MAY I HAVE ONE MOMENT, YOUR HONOR?
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
1              THE COURT:  YOU MAY.

2    BY MR. GALIPO:

3    Q.   AND WHAT'S THE PURPOSE OF TAKING X-RAYS?

4    A.   SPECIFICALLY IN THE CASE OF DEATHS INVOLVING GUNSHOT

5    INJURIES, IT IS TO IDENTIFY THE LOCATION OF ANY PROJECTILES

6    SUCH AS BULLETS THAT MAY BE IN THE BODY.

7    Q.   LET'S JUST TALK ABOUT GUNSHOT WOUNDS IN GENERAL VERY

8    BRIEFLY.  THERE IS SOMETHING CALLED ENTRANCE WOUNDS?

9    A.   YES.

10   Q.   AND SOMETHING CALLED EXIT WOUNDS?

11   A.   YES.

12   Q.   AND IS IT POSSIBLE FOR A GUNSHOT WOUND TO ENTER THE BODY

13   BUT NOT EXIT?

14   A.   YES.

15   Q.   AND SO ON AN X-RAY, THAT'S WHEN YOU MIGHT SEE THE

16   PROJECTILE SOMEWHERE IN THE BODY?

17   A.   CORRECT.

18   Q.   IN THIS CASE, HOW MANY ENTRANCE WOUNDS WERE THERE?

19   A.   THERE WERE THREE.

20   Q.   WERE THERE ANY EXIT WOUNDS?

21   A.   THERE WERE NOT.

22   Q.   SO WERE ALL THE PROJECTILES RECOVERED FROM INSIDE THE

23   BODY?

24   A.   THAT'S CORRECT.

25   Q.   NOW, DID YOU, IN TERMS OF YOUR AUTOPSY, DISTINGUISH THE
```

```
 1    DIFFERENT ENTRANCE WOUNDS?

 2    A.    YES.

 3    Q.    AND WHERE WERE THE ENTRANCE WOUNDS?  AND IF YOU NEED TO

 4    REVIEW YOUR REPORT, IT'S -- I THINK IT WILL BE OKAY, BUT YOU

 5    CAN ASK THE JUDGE.

 6               THE COURT:  THAT WILL BE PERMISSIBLE, DOCTOR.

 7               THE WITNESS:  THANK YOU, YOUR HONOR.

 8               WELL, THERE -- IN GENERAL, THERE WERE -- THE

 9    WOUNDS -- THERE WERE THREE AND THEY WERE ALL IN THE FRONT OF

10    THE CHEST AREA.

11    BY MR. GALIPO:

12    Q.    OKAY.  AND DID ANY OF THE ENTRANCE WOUNDS GO THROUGH ANY

13    PART OF THE HEART?

14    A.    WELL, THE ENTRY WOUNDS INVOLVE THE SKIN AND THEN THERE

15    WERE PATHS FROM THOSE ENTRY LOCATIONS INTO THE BODY

16    INTERNALLY, ONE OF WHICH INVOLVED THE HEART.

17    Q.    OKAY.  YOU GAVE DESIGNATIONS OF A, B AND C TO THE THREE

18    WOUNDS; IS THAT CORRECT?

19    A.    YES.

20    Q.    LET'S JUST TALK FIRST ABOUT GUNSHOT A, CAN YOU TELL US

21    WHERE THAT ENTRY WOUND WAS?

22    A.    THAT WAS AT THE LOWER END OF THE BREAST BONE, JUST A

23    LITTLE -- SLIGHTLY TO THE RIGHT OF THE CENTER OF THE BODY.

24               MR. GALIPO:  MAY I APPROACH COUNSEL FOR ONE MOMENT,

25    YOUR HONOR?
```

```
1              THE COURT:  YOU MAY.

2              (PLAINTIFF'S COUNSEL APPROACHES DEFENSE COUNSEL.)

3              MR. GALIPO:  YOUR HONOR, WE HAVE A PHOTO BY

4    AGREEMENT, AND WITH THE COURT'S PERMISSION, I'D LIKE TO

5    IDENTIFY IT AS 208.

6              THE COURT:  EXHIBIT 208 WILL BE RECEIVED.

7                   (EXHIBIT 208 RECEIVED.)

8              MR. GALIPO:  AND MAY I PUBLISH?

9              THE COURT:  YOU MAY.

10   BY MR. GALIPO:

11   Q.   OKAY.  DOES THIS SHOW THE THREE ENTRANCE WOUNDS?

12   A.   YES.

13   Q.   OKAY.  WHICH ONE OF THE THREE DID YOU DENOTE AS A?

14   A.   THAT IS THE ONE UPPERMOST IN THE PICTURE SITUATED AT THE

15   UPPER EDGE OF THE PHOTOGRAPHER'S CARD, THE BLUE CARD THAT'S

16   INCLUDED IN THE PHOTO.

17   Q.   HERE (INDICATING)?

18   A.   YES.

19   Q.   OKAY.  THAT'S A?

20   A.   CORRECT.

21   Q.   ALL RIGHT.  TELL ME -- TELL US ANY MEASUREMENT YOU TOOK

22   WITH RESPECT TO THE TOP OF THE HEAD WHERE THAT ENTERED?

23   A.   YES, IF -- I WILL REFER TO MY REPORT --

24             MR. GALIPO:  YOU MAY.

25             THE WITNESS:  -- FOR THOSE DETAILS.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1          THAT LOCATION WAS MEASURED TO BE 19 INCHES FROM THE

2     TOP OF THE HEAD, ABOUT ONE-HALF INCH FROM THE CENTER LINE OF

3     THE BODY, AND TEN-AND-A-HALF INCHES FROM THE SURFACE OF THE

4     BACK AS MEASURED WITH THE BODY PLACED ON THE BACK ON THE

5     EXAMINING TABLE.

6     BY MR. GALIPO:

7     Q.   WHAT WAS THE PATHWAY INSIDE THE BODY OF THAT PROJECTILE?

8     A.   THAT PATH WENT -- PENETRATED INTO THE CHEST AND PASSED

9     THROUGH THE LOWER ASPECT OF THE HEART AND THEN FURTHER

10    REARWARD INTO -- THROUGH THE LUNG AND INTO THE BACK -- THE

11    POSTERIOR CHEST WALL AREA WHERE THE BULLET WAS RECOVERED.

12    Q.   AND WHAT WAS THE GENERAL TRAJECTORY IN THE BODY OF THAT

13    SHOT?

14    A.   THE PATH WAS -- WOULD BE DESCRIBED AS FRONT TO BACK AND

15    RIGHT TO LEFT, AND ESSENTIALLY HORIZONTAL.

16    Q.   OKAY.  AND THEN WHICH ONE DID YOU DESIGNATE AS B?

17    A.   THAT IS THE ENTRY WOUND WHICH IS SHOWN TOWARDS THE RIGHT

18    SIDE OF THE PICTURE AS PROJECTED, WHERE YOU'RE NOW POINTING,

19    IN THE DARK AREA JUST ABOVE, AND IN THE CORNER OF THE PHOTO

20    IS THE LEFT NIPPLE.

21    Q.   OKAY.  TELL US ABOUT THE PATHWAY OF THAT PROJECTILE,

22    PLEASE.

23    A.   THIS PATH WAS IN THE SAME DIRECTION AS A, AND THEREFORE,

24    IN A FRONT TO BACK, RIGHT TO LEFT, AND HORIZONTAL PATHS,

25    WHICH IN THIS RATHER HEAVILY BUILT INDIVIDUAL, THEN, WAS

```
 1    CONFINED TO THE SOFT TISSUES; THAT IS, THE SUBCUTANEOUS

 2    TISSUES ON THE OUTER ASPECT OF THE CHEST WALL, SOMEWHAT

 3    GRAZING THE -- A SPACE BETWEEN RIBS, BUT NOT ENTERING THE

 4    CHEST CAVITY ITSELF AND THE -- AND WITH THE BULLET THEN

 5    LODGING BENEATH THE SKIN IN THE AREA OF THE SCAPULA, THE

 6    LEFT -- THE SHOULDER BLADE IN THE BACK.

 7    Q.   ALL RIGHT.  AND THEN YOU HAVE, I GUESS, BY PROCESS OF

 8    ELIMINATION, THIS WAS GUNSHOT WOUND C WHERE I'M POINTING NOW?

 9    A.   YES.

10    Q.   AND WHAT WAS THAT PATHWAY?

11    A.   THIS PATH ALSO WAS EFFECTIVELY PARALLEL TO THE OTHER TWO

12    IN A SIMILAR FRONT TO BACK, RIGHT TO LEFT, AND HORIZONTAL

13    DIRECTION, AND THIS INVOLVED THE UPPER ABDOMINAL AREA,

14    INCLUDING THE STOMACH AND LIVER, AND THEN PASSED ALSO INTO

15    THE BACK AREA WHERE THE BULLET WAS RECOVERED.

16    Q.   OKAY.  SO ALL THREE PROJECTILES WERE RECOVERED FROM

17    WITHIN THE BODY?

18    A.   CORRECT.

19    Q.   AND YOU ATTRIBUTE CAUSE OF DEATH TO MULTIPLE GUNSHOT

20    WOUNDS?

21    A.   YES.

22    Q.   MANNER OF DEATH WOULD BE HOMICIDE?

23    A.   CORRECT.

24          MR. GALIPO:  THANK YOU VERY MUCH.

25          THAT'S ALL I HAVE.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    THE COURT:  AND, DOCTOR, YOUR USE OF THE WORD

2    "HOMICIDE" MEANS, IN THE EYES OF THE LAW, KILLING THAT WAS

3    NOT BY ACCIDENT OR OLD AGE OR SOMETHING LIKE THAT?

4    THE WITNESS:  YES, IT -- WE -- THE DEFINITION WHICH

5    WE APPLY IS AT THE HAND OF ANOTHER.

6    THE COURT:  BUT NOT SUGGESTING ANY CRIMINAL

7    LIABILITY?

8    THE WITNESS:  CORRECT.

9    THE COURT:  MR. MC NICHOLAS?

10    MR. MC NICHOLAS:  NO QUESTIONS, YOUR HONOR.

11                          **CROSS-EXAMINATION**

12    BY MR. ROTHANS:

13    Q.   GOOD AFTERNOON, DOCTOR.

14    A.   GOOD AFTERNOON.

15    Q.   WE MET AT YOUR DEPOSITION IN THIS PARTICULAR CASE, DO

16    YOU RECALL THAT?

17    A.   I -- ACTUALLY, I DON'T HAVE A DISTINCT MEMORY OF IT.

18    I'M SORRY.

19    Q.   NO PROBLEM.  MEET A LOT OF LAWYERS IN YOUR DAY, I

20    SUSPECT.

21    YOUR DEPOSITION WAS TAKEN EARLIER THIS YEAR,

22    JANUARY 20, 2012; IS THAT TRUE?

23    A.   I BELIEVE SO, YES.

24    Q.   DID MR. GALIPO GIVE YOU AN OPPORTUNITY -- DID HE GIVE

25    YOU A COPY OF YOUR TRANSCRIPT BEFORE YOU TOOK THE WITNESS

```
1   STAND TODAY?

2   A.   NOT TODAY.  I HAD, OF COURSE, REVIEWED IT.  I DO RECALL

3   REVIEWING THE TRANSCRIPT AT AN EARLIER TIME.

4   Q.   VERY WELL.

5        DOCTOR, THERE WERE POSITIVE FINDINGS IN THE

6   LABORATORY REPORTS?

7        MR. GALIPO:  I'M GOING TO OBJECT AND ASK TO

8   APPROACH, YOUR HONOR.

9        THE COURT:  ALL RIGHT.  COUNSEL MAY APPROACH.

10       (SIDEBAR.)

11       MR. GALIPO:  I HAVE THREE OBJECTIONS TO THE

12  TOXICOLOGY TEST:  BEYOND THE SCOPE; AND, TWO, IT LACKS

13  FOUNDATION BECAUSE HE DIDN'T DO ANY OF THE TESTING; HE'S

14  SIMPLY GOING TO BE LOOKING AT A REPORT THAT HE DIDN'T DO.

15  AND BASED ON THIS WITNESS, MR. ROTHANS IS GOING TO SAY WHAT

16  IT SAYS.  THIRD THING IS THERE'S NO FOUNDATION IN THIS CASE

17  AS TO WHAT EFFECT, IF ANY, THE MARIJUANA IN HIS SYSTEM WOULD

18  HAVE HAD ON HIM.  AND SO THOSE ARE MY OBJECTIONS OF DOING IT

19  THROUGH HIM, AND I CLEARLY DIDN'T GO THERE FOR OBVIOUS

20  REASONS.

21       THE COURT:  WELL, IN TERMS OF THAT, HE COULD

22  OBVIOUSLY TURN RIGHT AROUND AND CALL HIM SO -- I THINK HE'S

23  HERE, SO I'M NOT GOING TO SUSTAIN BEYOND THE SCOPE.

24       IN TERMS OF THIS -- I BELIEVE MY RULING ON THE

25  MOTION IN LIMINE, WHEN I SAID THAT IT COULD BE PREJUDICIAL --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1    ESPECIALLY HERE IN CALIFORNIA WHERE YOU CAN -- THE JURORS

2    DRIVING AROUND ARE GOING TO GO THROUGH AND SEE A BUNCH OF

3    SHOPS WITH GREEN CROSSES OUTSIDE, SO I DON'T THINK THAT THE

4    FACT OF THIS -- IT'S THERE FOR -- IT'S -- I'VE ALREADY RULED

5    ON IT.  IT'S GOING TO COME IN.  IT'S NOT INHERENTLY

6    PREJUDICIAL, AND YOUR OTHER OBJECTIONS ARE OVERRULED.

7              MR. ROTHANS:  OKAY.  THANK YOU, YOUR HONOR.

8              MR. GALIPO:  THANK YOU.

9                   (END SIDEBAR.)

10   BY MR. ROTHANS:

11   Q.   DOCTOR, YOU HAVE YOUR REPORT, INCLUDING THE LAB REPORT,

12   WITH YOU?

13   A.   YES, I DO.

14   Q.   PLEASE FREE TO REVIEW IT IF YOU NEED TO, BUT THERE WERE

15   POSITIVE DRUG FINDINGS IN THE LABORATORY REPORT; IS THAT

16   TRUE?

17   A.   YES.

18   Q.   MARIJUANA AND THC OR A BYPRODUCT OF MARIJUANA WAS FOUND

19   IN HIS BLOODSTREAM?

20   A.   YES.

21   Q.   OKAY.  WITH RESPECT TO THESE THREE WOUNDS, AS YOU

22   TESTIFIED AT YOUR DEPOSITION, ALL THREE WOULD HAVE LIKELY LED

23   TO DEATH INDEPENDENTLY; IS THAT TRUE?

24   A.   WELL, I CHARACTERIZE THE WOUNDS IN MY REPORT AS A AND C

25   BEING FATAL, AND B BEING POTENTIALLY FATAL.  I DON'T -- IF I
```

1    USED DIFFERENT LANGUAGE IN THE DEPOSITION, I'M NOT -- I DON'T

2    RECALL.

3    Q.   DO YOU HAPPEN TO HAVE A COPY WITH YOU IN YOUR MATERIALS

4    THAT YOU BROUGHT?

5    A.   NO, I DON'T.

6         MR. ROTHANS:  COUNSEL FOR THE PLAINTIFFS TOOK THE

7    DEPOSITION SO THEY WOULD HAVE THE ORIGINAL, YOUR HONOR.  I

8    DON'T HAVE A COPY FOR THE COURT, BUT MAY I APPROACH THE

9    WITNESS WITH MY COPY?

10        THE COURT:  YOU MAY.

11   BY MR. ROTHANS:

12   Q.   WOULD IT BE FAIR TO SAY, DR. SCHOLTZ, THAT ALL THREE OF

13   THE WOUNDS THAT MR. GRISSOM SUFFERED WERE WOUNDS OF THE TYPE

14   THAT WOULD LIKELY LEAD TO DEATH?

15   A.   YES.  I BELIEVE THAT'S REASONABLY ACCURATE, YES.

16   Q.   YOU'RE UNABLE TO DETERMINE FROM EXAMINING THE BODY, THE

17   SEQUENCE OF THOSE ROUNDS; IS THAT CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   IN OTHER WORDS, YOU CAN'T SAY THAT A WAS FIRST OR B WAS

20   FIRST OR C WAS FIRST; TRUE?

21   A.   CORRECT, IT'S TRUE.

22   Q.   OKAY.  I BELIEVE YOU HAVE A WHITE BINDER THERE, SIR.  IF

23   YOU COULD TURN IT TO EXHIBIT 110, AND I PRAY THAT THAT'S THE

24   RIGHT BINDER.

25   A.   THE BINDER I HAVE HAS A NUMBER OF TABS STARTING WITH

```
 1    NUMBER 130 AND GOING UPWARD IN SEQUENCE.

 2              WHERE WOULD I LOOK FOR THAT?

 3              THE COURT:  MS. WILLIAMS, PLEASE APPROACH AND GET

 4    THE RIGHT BINDER FOR DR. SCHOLTZ.

 5              (COUNSEL APPROACHES THE WITNESS.)

 6    BY MR. ROTHANS:

 7    Q.   DOCTOR, IF YOU WOULD TAKE THAT WHITE BINDER THAT'S IN

 8    FRONT OF YOU NOW AND TURN TO EXHIBIT 110.

 9    A.   I HAVE IT HERE.

10    Q.   AND SPECIFICALLY PAGE 16, IT WOULD BE 110-000016.

11    A.   I HAVE THAT.

12    Q.   LOOKING AT THE TOP PHOTOGRAPH AND COMPARING THE CASE

13    NUMBER THAT'S POSTED THERE, IS THAT -- THAT'S THE SAME

14    AUTOPSY YOU PERFORMED IN THE SAME PHOTOGRAPHS FROM THAT

15    AUTOPSY?

16    A.   YES.

17    Q.   MR. GRISSOM HAVE A LARGE A TATOOED ON HIS LEFT HAND,

18    SIR?

19    A.   WELL, THESE REPRODUCTIONS ARE RATHER DARK.  I CAN REFER

20    TO MY REPORT.

21              MR. ROTHANS:  MAY I APPROACH THE WITNESS, YOUR

22    HONOR?

23              THE COURT:  YOU MAY.

24              (COUNSEL APPROACHES THE WITNESS.)

25              THE WITNESS:  YOU'RE REFERRING TO THE TOP OF THE
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1    LEFT HAND WHERE -- THIS IS ON -- THIS IS EXHIBIT -- PHOTOS
 2    NUMBERED 110-31 AND THE EXHIBIT PAGE IS LABELLED 110 WITH
 3    FOUR ZEROS AND NUMBER 16.
 4    BY MR. ROTHANS:
 5    Q.   THAT'S CORRECT, DOCTOR.
 6    A.   AND SO THAT'S -- IN THE UPPER PHOTO, THERE IS A PHOTO OF
 7    THE LEFT HAND, WHICH SHOWS A TATTOO OF AN A, THE LETTER A.
 8    Q.   AND THAT'S FROM MR. GRISSOM, THAT'S TRUE?
 9    A.   YES, IT IS.
10    Q.   VERY WELL?
11             MR. ROTHANS:  THANK YOU.
12             I HAVE NOTHING FURTHER.
13             THE COURT:  ANYTHING, MR. GALIPO?
14             MR. GALIPO:  YES.
15                   REDIRECT EXAMINATION
16    BY MR. GALIPO:
17    Q.   DO YOU HAVE SOME GENERAL UNDERSTANDING OF WHAT DRUGS ARE
18    TESTED FOR WHEN THEY DO A TOXICOLOGY SCREEN?
19    A.   YES.
20    Q.   WHAT'S YOUR UNDERSTANDING?
21    A.   FOR CASES WHICH ARE DESIGNATED AS HOMICIDE CASE IN THE
22    ROUTINE PROCESS OF THE OFFICE IN TERMS OF WHAT WAS EARLIER
23    DISCUSSED BY THAT DEFINITION, THERE IS A SCREEN -- BLOOD TEST
24    SCREEN WHICH SCREENS BASICALLY FOR STREET DRUGS AND ALSO
25    ALCOHOL.
```

```
 1    Q.    ALL RIGHT.  SO ALCOHOL WAS TESTED FOR?

 2    A.    YES.

 3    Q.    ANY ALCOHOL IN THE BLOOD?

 4    A.    NO.

 5    Q.    BARBITURATES WERE TESTED FOR?

 6    A.    YES.

 7    Q.    ANY BARBITURATES?

 8    A.    NO.

 9    Q.    ANY COCAINE?

10    A.    NO.

11    Q.    METHAMPHETAMINE?

12    A.    NO.

13    Q.    OPIATES?

14    A.    NO.

15    Q.    THEY TEST FOR PCP ALSO?

16    A.    YES.

17    Q.    SO THE ONLY THING THAT WAS IN HIS BLOOD WAS MARIJUANA?

18            MR. ROTHANS:  OBJECTION.  LACKS FOUNDATION.

19    MISSTATES PRIOR TESTIMONY.

20            MR. GALIPO:  I'LL RE -- I'LL RE-ASK THE QUESTION.

21    BY MR. GALIPO:

22    Q.    SO WAS THE ONLY THING THAT YOU'RE AWARE OF FOUND ON

23    TOXICOLOGY CONSISTENT WITH MARIJUANA USE?

24    A.    YES.

25    Q.    COULD YOU TELL FROM LOOKING AT THE TOXICOLOGY RESULTS
```

```
 1   WHEN WAS THE LAST TIME HE HAD SMOKED MARIJUANA, WHETHER IT
 2   WAS THAT DAY OR THE DAY BEFORE?
 3   A.   NO.  I WOULD DEFER TO TOXICOLOGISTS FOR THAT.
 4   Q.   OKAY.
 5            MR. GALIPO:  THANK YOU.
 6            THAT'S ALL I HAVE, YOUR HONOR.
 7            MAY I HAVE ONE MOMENT?
 8            THE COURT:  YOU MAY.
 9                 (COUNSEL CONFER.)
10            MR. GALIPO:  THANK YOU.
11            THE COURT:  MR. ROTHANS?
12            MR. ROTHANS:  NOTHING FURTHER, YOUR HONOR.
13            THE COURT:  AND, DR. SCHOLTZ, YOU'RE EXCUSED.
14            THANK YOU.
15            THE WITNESS:  THANK YOU, YOUR HONOR.
16            MR. GALIPO:  MAY I CONSULT WITH COUNSEL FOR A
17   MOMENT?
18            THE COURT:  YOU MAY.
19                 (COUNSEL CONFER.)
20            MR. GALIPO:  YOUR HONOR, WE HAVE AGREED -- THERE'S
21   AN OFFICER THAT'S BEEN HERE.  WE HAVE AGREED TO ALLOW DEFENSE
22   COUNSEL CALL HIM OUT OF ORDER.
23            THE COURT:  ALL RIGHT.  AND -- BUT WE WILL DO THAT
24   A LITTLE BIT LATER.
25            LADIES AND GENTLEMEN, WE'RE GOING TO TAKE THE
```

```
1    AFTERNOON BREAK.  REMEMBER MY ADMONITIONS AND LET'S BE READY

2    TO START UP AGAIN IN 15 MINUTES, WHICH WOULD BE AT 3:25.

3              THANK YOU.

4              THE CLERK:  PLEASE RISE FOR THE JURY.

5                    (JURORS EXIT.)

6              THE CLERK:  PLEASE BE SEATED.

7              THE COURT:  ANYTHING ELSE, COUNSEL?

8              MR. GALIPO:  NO, YOUR HONOR.

9              MR. ROTHANS:  I DON'T THINK SO, YOUR HONOR.

10             THE CLERK:  ALL RISE.

11             COURT IS IN RECESS.

12                    (RECESS.)

13             THE COURT:  MR. ROTHANS, YOU MAY -- IS THE WITNESS

14   HERE IN THE COURTROOM?

15             MR. ROTHANS:  HE IS, YOUR HONOR.

16             THE COURT:  ALL RIGHT.  LET'S GET THE JURY.

17             MR. ROTHANS:  YOU WANT HIM TO COME UP?

18             THE COURT:  NO, YOU CAN CALL HIM IN WHEN THE JURY'S

19   HERE.

20             MR. GALIPO:  WE'RE PLANNING ON 4:30?

21             THE COURT:  CORRECT.

22             IF WE HAVE TO GO OVER A FEW MINUTES IN ORDER TO GET

23   HIM DONE, I MEAN, I --

24             MR. GALIPO:  NO.  I UNDERSTAND, OF COURSE.  WE HAD

25   ONE LITTLE -- WELL, WE WERE GOING TO DO ONE OF THE CHILDREN
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1   TODAY, BUT OBVIOUSLY WE HAVE TIME TO DO THEM WHENEVER.

 2            THE COURT:  RIGHT.

 3            THEY'RE GOING TO BE HERE.

 4            MR. GALIPO:  OF COURSE.  THEN WE MIGHT BE ABLE TO

 5   PUT ANOTHER WITNESS ON.

 6            WE HAVE -- WELL, WE'LL ASK TO APPROACH IF

 7   NECESSARY.  WE'LL SEE WHERE WE ARE TIME-WISE.

 8            THE COURT:  ALL RIGHT.

 9            MR. ROTHANS:  I WANT TO MAKE SURE, YOUR HONOR, FOR

10   THE RECORD, THAT WE'RE NOT WAIVING OUR RIGHT TO A RULE 50

11   MOTION.

12            THE COURT:  OH, NO, OF COURSE NOT.

13            MR. ROTHANS:  VERY WELL.

14            THANK YOU.

15            MR. GALIPO:  THERE COULD BE A FEW DISPUTED ISSUES

16   OF FACT.

17                      (OFF THE RECORD.)

18            THE CLERK:  PLEASE RISE FOR THE JURY.

19                      (JURORS ENTER.)

20            THE CLERK:  PLEASE BE SEATED.

21            THE COURT:  LADIES AND GENTLEMEN, AS WAS MENTIONED

22   RIGHT BEFORE YOU LEFT, WE'RE NOW GOING TO HAVE A WITNESS

23   CALLED BY THE DEFENSE AND THEN THE PLAINTIFFS WILL GO BACK TO

24   CALLING THEIR WITNESSES.  I REMIND YOU THAT ALL OF THE

25   TESTIMONY, REGARDLESS OF WHO CALLS THE WITNESS AND REGARDLESS
```

1    OF WHETHER IT'S DIRECT OR CROSS-EXAMINATION IS SOMETHING FOR

2    YOU TO CONSIDER ON ALL OF THE ISSUES IN THE CASE, UNLESS I

3    INSTRUCT YOU OTHERWISE.

4             ALL RIGHT.  MR. ROTHANS, YOU MAY CALL YOUR WITNESS.

5             MR. ROTHANS:  THANK YOU, YOUR HONOR.

6             THE DEFENSE WOULD CALL OFFICER LEON MOORE.

7             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

8           **OFFICER LEON MOORE, DEFENDANT'S WITNESS, SWORN**

9             THE CLERK:  PLEASE BE SEATED.

10            PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

11            THE WITNESS:  LEON MOORE, L-E-O-N; LAST NAME,

12   M-O-O-R-E.

13            THE CLERK:  THANK YOU.

14            THE COURT:  COUNSEL, YOU MAY PROCEED.

15            MR. ROTHANS:  THANK YOU, YOUR HONOR.

16                       **DIRECT EXAMINATION**

17   BY MR. ROTHANS:

18   Q.   GOOD AFTERNOON, OFFICER.

19   A.   GOOD AFTERNOON.

20   Q.   ARE YOU EMPLOYED CURRENTLY?

21   A.   YES, I AM.

22   Q.   BY WHOM?

23   A.   BY THE CULVER CITY POLICE DEPARTMENT.

24   Q.   WHAT IS YOUR POSITION?

25   A.   POLICE OFFICER.

```
1    Q.   AND HAVE YOU BEEN EMPLOYED WITH THE CULVER CITY POLICE

2    DEPARTMENT FOR SOME PERIOD OF TIME?

3    A.   YES, SIR.

4    Q.   FOR HOW LONG, SIR?

5    A.   FOR 29 YEARS.

6    Q.   VERY WELL.

7         SIR, WHY DON'T YOU BRIEFLY DESCRIBE FOR US YOUR

8    EDUCATIONAL BACKGROUND.

9    A.   HIGH SCHOOL, AA DEGREE AND CONTINUING STUDIES.

10   Q.   AND 29 YEARS OF WORKING THE STREETS OF CULVER CITY?

11   A.   YES, SIR.

12   Q.   VERY WELL.

13        DID YOU ATTEND A POST-CERTIFIED POLICE ACADEMY?

14   A.   YES, SIR.

15   Q.   WHICH ONE?

16   A.   LOS ANGELES COUNTY SHERIFFS' DEPARTMENT.

17   Q.   AND DO YOU RECALL WHAT YEAR YOU GRADUATED FROM THE L.A.

18   COUNTY SHERIFFS' ACADEMY?

19   A.   YES, SIR, 1981.

20   Q.   AND, IN 1981, DID YOU RECEIVE TRAINING ON, AMONG OTHER

21   SUBJECTS, THE USE OF FORCE?

22   A.   YES, SIR.

23   Q.   DID YOU RECEIVE TRAINING ON, AMONG OTHER SUBJECTS, THE

24   USE OF DEADLY FORCE?

25   A.   YES, SIR.
```

1    Q.    THAT SHERIFFS' ACADEMY COURSE THAT YOU COMPLETED IN

2    1981, HOW LONG A PERIOD OF TIME WAS THAT COURSE?

3    A.    FOUR MONTHS.

4    Q.    AND YOU GRADUATED AND ARE POST-CERTIFIED PEACE OFFICER

5    SINCE 1981?

6    A.    YES, SIR.

7    Q.    VERY WELL.

8          WHEN YOU WENT TO WORK, DID YOU GO IMMEDIATELY TO

9    CULVER CITY?

10   A.    NO, SIR.

11   Q.    WHERE WAS YOUR FIRST AGENCY?

12   A.    LOS ANGELES COUNTY SHERIFFS' DEPARTMENT.

13   Q.    HOW LONG DID YOU WORK WITH THE SHERIFFS?

14   A.    FOUR-AND-A-HALF YEARS.

15   Q.    AND FROM THERE, DID YOU GO TO A DIFFERENT AGENCY?

16   A.    YES, SIR.

17   Q.    WHICH ONE?

18   A.    CULVER CITY POLICE DEPARTMENT.

19   Q.    VERY WELL.

20          AND WHEN YOU WENT TO CULVER CITY POLICE DEPARTMENT

21   IN APPROXIMATELY -- WHAT IS THAT, 1986?

22   A.    '85, ACTUALLY.

23   Q.    '85?

24   A.    YES, SIR.

25   Q.    WERE YOU ON A PROBATIONARY OR TRAINING PERIOD?

```
 1    A.    YES, SIR.

 2    Q.    HOW LONG WAS THAT, SIR?

 3    A.    THE TRAINING WAS THREE MONTHS AND THE PROBATION IS ONE

 4    YEAR.

 5    Q.    AND DID YOU -- WERE YOU WORKING ALONGSIDE VARIOUS FIELD

 6    TRAINING OFFICERS?

 7    A.    YES, SIR.

 8    Q.    AT DIFFERENT PHASES IN YOUR TRAINING OR PROBATIONARY

 9    PERIOD?

10    A.    YES, SIR.

11    Q.    DID THEY SUPERVISE YOUR WORK IN THE FIELD?

12    A.    THAT'S CORRECT.

13    Q.    YOU PASS PROBATION?

14    A.    YES, SIR.

15    Q.    BECAME A FULL-TIME OFFICER AND HAVE BEEN SINCE 1985?

16    A.    YES, SIR.

17    Q.    WITH CULVER CITY?

18    A.    YES.

19    Q.    BEFORE APRIL 25, 2010, OFFICER, HAD YOU BEEN INVOLVED IN

20    FELONY TRAFFIC STOPS?

21    A.    YES, SIR.

22    Q.    FROM APPROXIMATELY 1985 WHEN YOU FIRST CAME TO WORK FOR

23    THE CULVER CITY POLICE DEPARTMENT UNTIL 2010, WHEN THIS

24    PARTICULAR INCIDENT OCCURRED, COULD YOU GIVE US AN ESTIMATE,

25    OFFICER, OF THE NUMBER OF FELONY TRAFFIC STOPS THAT YOU HAVE
```

```
 1    PARTICIPATED IN?

 2    A.   PROBABLY OVER 50 AND 60.

 3    Q.   OVER 50 OR 60 IN THOSE 25 YEARS?

 4    A.   YES, SIR.

 5    Q.   YOU RECEIVED TRAINING ON THOSE FELONY TRAFFIC STOPS

 6    WHILE EMPLOYED BY THE CULVER CITY POLICE DEPARTMENT?

 7    A.   YES, SIR.

 8    Q.   YOU LEARNED ABOUT THEIR POLICIES AND PROCEDURES WITH

 9    RESPECT TO THOSE FELONY TRAFFIC STOPS?

10    A.   YES, SIR.

11    Q.   ALSO FROM CULVER CITY PD, THEIR POLICIES INVOLVING THE

12    USE OF FORCE AND THE USE OF DEADLY FORCE?

13    A.   YES, SIR.

14    Q.   BEFORE THIS PARTICULAR INCIDENT, SIR, OF APRIL 25, 2010,

15    HAD YOU BECOME AWARE OF A SERIES OF ARMED ROBBERIES IN

16    SOUTHERN CALIFORNIA?

17    A.   YES, SIR.

18    Q.   HAD YOU SEEN THE BOLOS OR THE BULLETINS, BE ON THE

19    LOOKOUT FOR THIS PARTICULAR SUSPECT?

20    A.   YES, SIR.

21    Q.   HAD YOU READ THEM COVER TO COVER BEFORE THAT INCIDENT?

22    A.   YES, SIR.

23    Q.   YOU HAVE A GENERAL RECOLLECTION, OFFICER, OF THE SUSPECT

24    DESCRIPTION?  RATHER THAN SHOW YOU ONE AFTER THE OTHER, AFTER

25    THE OTHER, DO YOU HAVE A GENERAL DESCRIPTION OF THE SUSPECT
```

1    IN MIND?

2    A.   YES, SIR.

3    Q.   WHAT'S YOUR RECOLLECTION?

4    A.   MALE/BLACK, POSSIBLY IN HIS 30S, HEAVY-SET AND

5    USUALLY IN THE ROBBERIES, HE WOULD WEAR A BLACK HAT OR READ

6    HAT OR RED JACKET.

7    Q.   WAS THERE A DESCRIPTION OF A GUN INVOLVED?

8    A.   YES, SIR.

9    Q.   WHAT WOULD YOU RECALL THE DESCRIPTION TO BE?

10   A.   IT WAS A SMALL GUN IN THE PICTURE.

11   Q.   OKAY.  AND YOU SAW PHOTOS OF THAT AS WELL?

12   A.   YES, SIR.

13   Q.   ON APRIL 25, 2010, DID YOU COME TO LEARN THAT THERE HAD

14   BEEN AN ARMED ROBBERY IN THE CULVER CITY AREA?

15   A.   YES, SIR.

16   Q.   WHAT INFORMATION DO YOU RECALL RECEIVING?

17   A.   I WAS WORKING INSIDE THE STATION AND A TONE ALERT CAME

18   OF A ROBBERY IN PROGRESS, AND IT WAS AT THE RADIOSHACK IN THE

19   4100-BLOCK OF SEPULVEDA.

20   Q.   FOR MY BENEFIT, AS WELL AS THE JURY, WHAT IS A TONE

21   ALERT?

22   A.   IT'S FROM COMMUNICATION DOWNSTAIRS, DISPATCH.  AND FOR

23   HOT CALLS, ROBBERY OR BURGLARY IN PROGRESS IT'S A TONE ALERT,

24   THREE BEEPS TO LET US KNOW THAT AN IMPORTANT CALL IS COMING.

25   Q.   SO IT KIND OF PUTS THOSE IN THE STATION ON NOTICE TO BE

1   LISTENING FOR UPCOMING DISPATCH?

2   A.   YES, SIR.

3   Q.   AND WHAT DO YOU RECALL, GENERALLY, ABOUT THE DISPATCH

4   ITSELF?

5   A.   THAT A ROBBERY OCCURRED IN THE 4100-BLOCK OF SEPULVEDA

6   BOULEVARD.

7   Q.   AND DID YOU LEARN AT SOME POINT IT WAS A RADIOSHACK

8   INVOLVED?

9   A.   YES, SIR.

10   Q.   HAD YOU LEARNED PRIOR TO THAT MORNING THAT THERE HAD

11   BEEN A RADIOSHACK ROBBERY, ONE OR MORE, PRIOR TO APRIL 25?

12   A.   YES, SIR.

13   Q.   WHAT DID YOU DO UPON HEARING THE BROADCAST OR THE

14   DISPATCH ABOUT THIS PARTICULAR ARMED ROBBERY?

15   A.   THE DISPATCHER SAID IT'S A GOOD ROBBERY AND I LEFT MY

16   POST AND GOT INTO A POLICE CAR AND HEADED TOWARDS THE

17   RADIOSHACK.

18   Q.   YOU USED THE TERM THAT THE DISPATCHER SAID IT WAS A

19   "GOOD ROBBERY."  WHAT DOES THAT MEAN?

20   A.   IT MEANS, HE PROBABLY SPOKE TO THE REPORTING PERSON AND

21   THEY SAID THEY HAVE BEEN ROBBED.

22   Q.   SOMETIMES YOU GET FALSE ALARMS?

23   A.   YES, SIR.

24   Q.   SOMETIMES AN ALARM COMES THROUGH AND THERE WAS NO

25   BREAK-IN OR ARMED ROBBERY?

1    A.   THAT'S CORRECT.

2    Q.   SO THIS ONE WAS CONFIRMED AS A POSITIVE ARMED ROBBERY ON

3    THE MORNING OF APRIL 25TH?

4    A.   YES, SIR.

5    Q.   SO TELL US WHAT YOU DID, THEN, INITIATING THIS RESPONSE?

6    A.   I RESPONDED TO THE AREA OF THE 4137 SEPULVEDA TO THE

7    REAR OF THE RADIOSHACK AND I SET UP THERE.  I HEARD THAT THE

8    SUSPECT WAS LAST SEEN GOING NORTH ON SEPULVEDA TOWARDS

9    WASHINGTON BOULEVARD.

10   Q.   DID YOU HAPPEN TO SPOT ANYONE IN THAT LOCATION THAT YOU

11   THOUGHT MIGHT BE THE SUSPECT?

12   A.   NO, SIR.

13   Q.   DID YOU SPEAK TO THE VICTIM INSIDE JAVIER SANCHEZ ABOUT

14   WHAT HAD HAPPENED TO HIM?

15   A.   NO, SIR.

16   Q.   WHAT DID YOU DO?  HOW LONG DID YOU REMAIN IN THAT

17   PARTICULAR LOCATION?

18   A.   PROBABLY ABOUT A MINUTE, THEN I HEARD SOMETHING ELSE

19   COME OVER THE AIR.

20   Q.   WHAT DO YOU RECALL THAT TO BE?

21   A.   IT WAS OFFICER LOPEZ AND HE SAID HE WAS FOLLOWING A CAR,

22   THE POSSIBLE CAR MAYBE A SUSPECT MIGHT BE IN.

23   Q.   WHAT WAS YOUR NEXT RESPONSE?

24   A.   TO GO TO HIS LOCATION AND THAT LOCATION WAS VENICE

25   BOULEVARD JUST WEST OF MOTOR.

 1    Q.    AND DID YOU -- YOU DROVE YOUR PATROL UNIT THERE?

 2    A.    YES, SIR.

 3    Q.    DID YOU HAVE A PARTNER IN YOUR CAR WITH YOU AT THE TIME?

 4    A.    NO, SIR.

 5    Q.    PROCEEDED THERE ALONE?

 6    A.    YES.

 7    Q.    DID YOU PARTICIPATE IN ACTUALLY STOPPING THE VEHICLE,

 8    PULLING BEHIND THE VEHICLE THAT LOPEZ HAD SPOTTED IN LIGHTING

 9    THEM UP?

10    A.    NO, SIR.

11    Q.    WHEN YOU ARRIVED, WHERE WAS THE SUSPECT VEHICLE?

12    A.    THE SUSPECT VEHICLE WAS IN THE PARKING LOT FACING WEST.

13    Q.    DO YOU HAVE A RECOLLECTION, OFFICER, AS TO WHERE YOU

14    PARKED YOUR VEHICLE?

15    A.    YES, SIR.

16    Q.    WHERE WAS THAT?

17    A.    I WAS JUST WEST OF THE NORTH DRIVEWAY OF WHERE THE

18    SUSPECT CAR HAD PULLED IN.

19    Q.    IS THAT THE NORTH DRIVEWAY ALONG VENICE?

20    A.    THAT'S CORRECT.

21    Q.    AND THAT'S -- IS THAT THE DONUT KING STRIP MALL CENTER?

22    A.    YES, SIR.

23    Q.    IF WE COULD LOOK AT EXHIBIT 378-032 --

24          MR. ROTHANS:  WHICH I BELIEVE HAS ALREADY BEEN

25    ADMITTED, YOUR HONOR.

```
 1              THE COURT:  IT HAS BEEN.

 2              MR. ROTHANS:  378-032.

 3   BY MR. ROTHANS:

 4   Q.   TRYING TO ZOOM IN ON THIS, OFFICER, SO WE CAN GET A

 5   LITTLE CLOSER VIEW.

 6              MR. ROTHANS:  THAT MIGHT BE TOO CLOSE, DAVID.

 7   BY MR. ROTHANS:

 8   Q.   AS WE'RE LOOKING AT THIS PARTICULAR EXHIBIT FOR THE

 9   RECORD, 378-032, YOU SEE THE NORTH DRIVEWAY TO THE STRIP MALL

10   PARKING LOT?

11   A.   YES, SIR.

12   Q.   I THINK IF YOU TAB THE SCREEN OR DRAW A CIRCLE -- CAN

13   YOU CIRCLE THE DRIVEWAY ENTRANCE ON THE SCREEN?

14   A.   (WITNESS COMPLIES.)

15   Q.   BEYOND THE TREE IN THE CIRCLE, THE RED CIRCLE, THAT'S

16   THE AREA OF THE NORTH DRIVEWAY?

17   A.   YES, SIR.

18   Q.   YOU SAID YOU PARKED TO THE WEST OF THAT DRIVEWAY?

19   A.   I PARKED TO THE NORTH OF THE DRIVEWAY, BUT IT'S WEST OF

20   MOTOR AVENUE.

21   Q.   WEST OF MOTOR?

22              THE COURT:  VENICE IS RUNNING EAST TO WEST.

23   BY MR. ROTHANS:

24   Q.   DID YOU BLOCK THE DRIVEWAY?

25   A.   YES, I DID.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    Q.   WHAT WAS YOUR PURPOSE IN DOING SO?

2    A.   FOR A POSSIBLE ESCAPE IF THE SUSPECT WANTED TO DRIVE OUT

3    OF THAT DRIVEWAY.

4    Q.   DID YOU ACTUALLY GET AN OPPORTUNITY TO LOOK INTO THE

5    SUSPECT VEHICLE TO MAKE AN ASSESSMENT AS TO WHETHER THIS

6    SUSPECT, THE PASSENGER MATCHED THE DESCRIPTION OF THE ARMED

7    ROBBERY SUSPECT?

8    A.   NO, SIR.

9    Q.   WHAT ROLE DID YOU PLAY IN THIS INVESTIGATION, OFFICER?

10   A.   I SAW DIRECTLY -- APPROXIMATELY, TWO STALLS IN I SAW A

11   BLACK CAR ON THE SCREEN THERE, IT'S A MITSUBISHI, AND IT HAD

12   PEOPLE INSIDE, AND MY ROLE, FOR ME, WERE TO GET THEM OUT OF

13   THE CAR SAFELY IN CASE THEY WERE IN HARM'S WAY.  I THOUGHT

14   THEY WERE, SO I HAD THEM COME TO THE SIDEWALK.

15   Q.   OKAY.  WOULD YOU MIND DRAWING A CIRCLE AROUND THE BLACK

16   MITSUBISHI YOU'RE TALKING ABOUT?

17   A.   (WITNESS COMPLIES.)

18   Q.   THE CIRCLE ON EXHIBIT 378-032 IS AT THE TOP OF THE

19   SCREEN; IS THAT CORRECT?

20   A.   YES, SIR.

21   Q.   APPEARS TO BE, AT LEAST IN THIS PHOTOGRAPH, IN THE

22   SHADOWS?

23   A.   YES.

24   Q.   LOCATED ROUGHLY IN THE WESTERN PORTION OF THE STRIP

25   MALL?

1    A.   YES, SIR.

2    Q.   AND IS THAT WHERE IT WAS LOCATED WHEN YOU SAW THE FOLKS

3    THAT WERE -- DID YOU SAY GETTING INTO THE VEHICLE?

4    A.   NO.  THEY WERE SITTING IN THE VEHICLE AND I TRIED TO GET

5    THEM OUT OF THE VEHICLE.

6    Q.   OKAY.  AND HOW DID YOU GO ABOUT DOING THAT?

7    A.   BY WAIVING AT THEM, TRYING TO GET THEIR ATTENTION.  AT

8    FIRST, THEY DIDN'T WANT TO GET OUT OF THE VEHICLE, AND I TOLD

9    THEM THEY HAD TO GET OUT OF THE VEHICLE AND THEY DID.

10   Q.   WHERE DID YOU TAKE THEM?

11   A.   TO THE SIDEWALK, JUST TO THE REAR OF MY POLICE CAR.

12   Q.   CAN YOU PUT AN X IN THE GENERAL VICINITY?

13   A.   (WITNESS COMPLIES.)

14   Q.   SO YOU TOOK THESE FOLKS OUT OF THE BLACK MITSUBISHI,

15   TOOK THEM OVER TO THE SIDEWALK AREA TO THE NORTH AND WEST OF

16   THE SUSPECT VEHICLE?

17   A.   YES, SIR.

18   Q.   AND YOUR PURPOSE WAS TO GET THEM OUT OF HARM'S WAY?

19   A.   THAT'S CORRECT.

20   Q.   IS THAT PROTOCOL IN A FELONY TRAFFIC STOP?

21   A.   IN MY EXPERIENCE, IT IS FOR PEOPLE, BECAUSE THEN IN THAT

22   SITUATION WE HAVE PEOPLE THAT WALK OUT OF THE -- LIKE THE

23   BUSINESS THERE, WANTING TO KNOW WHAT'S GOING ON, AND STOPPING

24   TRAFFIC -- FROM THE EASTBOUND TRAFFIC ON VENICE -- THAT WAS

25   MY ROLE.

1    Q.   DO MOST FELONY TRAFFIC STOPS, OFFICER, TAKE PLACE IN A

2    STRIP MALL PARKING LOT?

3    A.   NO, SIR.

4    Q.   WAS THIS SOMEWHAT UNUSUAL IN TERMS OF WHERE THE SUSPECT

5    VEHICLE HAD PARKED?

6    A.   I WOULD SAY SO, YES.

7    Q.   ARE OFFICERS TRAINED TO ADAPT TO CHANGES IN WHERE

8    MOTORISTS PULL THEIR VEHICLE, THAT SORT OF THING?

9    A.   YES, SIR.

10   Q.   WHEN YOU ARRIVED AT THE SCENE, BEFORE YOU EXTRACTED THE

11   PASSENGERS FROM THE BLACK MITSUBISHI, WERE THERE OTHER

12   OFFICERS IN PLACE?

13   A.   YES, SIR.

14   Q.   DID YOU NOTE WHERE EVERY SINGLE OFFICER WAS IN THAT

15   LOCATION AT THE TIME?

16   A.   NO, SIR.

17   Q.   COULD YOU TELL US, FOR EXAMPLE, WHERE OFFICER MARTINEZ

18   WAS OR OFFICER LOPEZ OR OFFICER ZERBEY?

19   A.   I COULDN'T.

20   Q.   DID YOU JUST GENERALLY NOTE THAT THERE WERE OFFICERS

21   THERE IN DIFFERENT LOCATIONS AND YOU ELECTED TO TAKE THIS

22   ROLE OF EXTRACTING THE PASSENGERS FROM THE MITSUBISHI?

23   A.   YES, SIR.

24   Q.   WERE THERE OTHER PEDESTRIANS OR BYSTANDERS IN THAT

25   VICINITY AT THE WESTERN END OF THE STRIP MALL AT THE TIME?

1    A.   YES, SIR.

2    Q.   DID YOU HAVE SOME OF THEM MOVE?

3    A.   YES, SIR.

4    Q.   HOW DID YOU DO THAT?

5    A.   THERE WERE SOME IN A BUILDING DIRECTLY IN FRONT OF THE

6    MITSUBISHI, AND I TOLD THEM TO STAY INSIDE, TO GO BACK

7    INSIDE, AND THEY DID.

8    Q.   WAS YOUR ROLE IN THIS FELONY TRAFFIC STOP PRIMARILY

9    GETTING THE BYSTANDERS AND THE PEDESTRIANS OUT OF HARM'S WAY?

10   A.   YES, SIR.

11   Q.   WHILE YOU WERE AT THE SCENE, DID YOU FOCUS ON EITHER THE

12   DRIVER OR THE PASSENGER IN THE GREEN CHRYSLER SEBRING SUSPECT

13   VEHICLE?

14   A.   NO, SIR.

15   Q.   DID YOU ISSUE ANY COMMANDS TO ANYONE IN THE GREEN

16   CHRYSLER SEBRING?

17   A.   NO, SIR.

18   Q.   COULD YOU HEAR COMMANDS BEING GIVEN BY OTHER OFFICERS AT

19   THE SCENE?

20   A.   I HEARD ONE, YOU KNOW, VERY VAGUE.

21   Q.   WHAT'S YOUR RECOLLECTION?

22   A.   GET YOUR HANDS UP.

23   Q.   DID IT APPEAR TO YOU FROM YOUR RECOLLECTION OF THIS

24   EVENT THREE YEARS AGO THAT FROM THE OFFICER'S PERSPECTIVE

25   THEY WERE CHAOTIC?

```
 1    A.   NO, SIR.

 2    Q.   DID YOU HEAR CONFLICTING COMMANDS FROM DIFFERENT

 3    OFFICERS AT DIFFERENT TIMES?

 4    A.   NO, SIR.

 5    Q.   DID YOU HEAR A LOT OF OFFICERS YELLING AND SCREAMING

 6    DIFFERENT COMMANDS AT THE SAME TIME?

 7    A.   NO, SIR.

 8    Q.   FROM WHAT YOU COULD OBSERVE, BASED ON THE ROLE THAT YOU

 9    PLAYED, DID YOU SEE THE OFFICERS DOING ANYTHING OUT OF

10    PROCEDURE, OUT OF THE NORM FOR A FELONY TRAFFIC STOP?

11         MR. GALIPO:  I'M GOING TO OBJECT AS LACKS

12    FOUNDATION AS PHRASED BASED ON WHAT HE SAW.

13         THE COURT:  OVERRULED.

14         THE WITNESS:  NO, SIR.

15    BY MR. ROTHANS:

16    Q.   DID YOU WATCH THE PASSENGER FROM THE MOMENT HE GOT OUT

17    OF THE CAR UNTIL THE MOMENT THE SHOTS WERE FIRED?

18    A.   NO, SIR.

19    Q.   WHAT WAS YOUR FOCUS AT THAT TIME?

20    A.   THE PEOPLE -- THE THREE PEOPLE IN THE BLACK MITSUBISHI.

21    Q.   AFTER THE SHOOTING, SIR, DID YOU APPROACH MR. GRISSOM ON

22    THE GROUND?

23    A.   NO, SIR.

24    Q.   AFTER THE SHOOTING, DID YOU GET WITHIN 10, 15, 20 FEET

25    OF MR. GRISSOM?
```

1    A.   NO, SIR.

2    Q.   AFTER THE SHOOTING, DID YOU LOOK IN THE AREA OF WHERE HE

3    HAD FALLEN?

4    A.   JUST BRIEFLY FOR A SECOND.

5    Q.   DID YOU LOOK AROUND FOR OBJECTS ON THE GROUND, SHELL

6    CASINGS, ANYTHING ELSE THAT MIGHT BE IN THAT AREA?

7    A.   NO, SIR.

8    Q.   YOU DIDN'T -- STRIKE THAT.

9         DID YOU TALK TO OFFICER MARTINEZ, DETECTIVE LUIS

10   MARTINEZ AT THE SCENE ABOUT WHAT HAD HAPPENED?

11   A.   NO, SIR.

12   Q.   IS THAT THE NORM, TO SPEAK TO THE SHOOTING OFFICER AT

13   THE SCENE OF AN OFFICER-INVOLVED SHOOTING?

14   A.   I DON'T KNOW IF THAT'S THE NORM.  I DON'T THINK SO, BUT

15   MY JOB -- I HAD TO CONCENTRATE ON MY DUTIES.

16   Q.   AND THOSE, AGAIN, WERE CLEARING THE BYSTANDERS AND THE

17   PEOPLE IN THE MITSUBISHI?

18   A.   THAT'S CORRECT.

19   Q.   AT ANY POINT IN TIME, DID YOU SEE A GUN IN THAT PARKING

20   LOT?

21   A.   NO, I DID NOT, SIR.

22   Q.   AT ANY POINT IN TIME, DID YOU SEE A CELL PHONE IN THAT

23   PARKING LOT?

24   A.   NO, SIR.

25   Q.   OFFICER, WERE YOU LOOKING FOR A GUN OR A CELL PHONE OR A

1    DIFFERENT OBJECT ON THE GROUND?

2    A.   NO, SIR.

3    Q.   HOW LONG WOULD YOU ESTIMATE, OFFICER, YOU WERE AT THE

4    SCENE?

5    A.   HOURS.

6    Q.   AND AFTER THE SHOOTING, DID YOU -- WERE YOU RESPONSIBLE

7    FOR SORT OF CROWD CONTROL ISSUES AND CONTAINMENT ISSUES?

8    A.   YES, SIR.

9    Q.   DID YOU SPREAD OUT SOME POLICE TAPE AT SOME POINT?

10   A.   I DID NOT, SOMEONE ELSE HAD.

11   Q.   AND, ULTIMATELY, YOU LEFT THE SCENE?

12   A.   YES, SIR.

13   Q.   YOU WERE EVENTUALLY INTERVIEWED BY THE L.A. COUNTY

14   SHERIFFS' DETECTIVES?

15   A.   YES, SIR.

16   Q.   DO YOU REMEMBER WHEN THAT INTERVIEW TOOK PLACE?

17   A.   THE SAME DAY, LATER ON IN THE EVENING TIME.

18   Q.   VERY WELL.

19          MR. ROTHANS:  IF I COULD JUST HAVE A MOMENT, YOUR

20   HONOR?

21          THE COURT:  YOU MAY.

22          MR. ROTHANS:  I HAVE NOTHING FURTHER.

23          THANK YOU, YOUR HONOR.

24          THANK YOU, SIR.

25                    **CROSS-EXAMINATION**

1   BY MR. GALIPO:

2   Q.   GOOD AFTERNOON, OFFICER MOORE.

3   A.   GOOD AFTERNOON.

4   Q.   WHAT TIME DID YOU START YOUR SHIFT THAT DAY?

5   A.   2:00 A.M. IN THE MORNING.

6   Q.   AND WHAT TIME DID YOUR SHIFT END?

7   A.   AFTER 8:00 A.M. -- 8:00 P.M.  IT WAS A LONG DAY.

8   Q.   WAS THAT THE PLANNED SHIFT, OR DID IT END UP BEING

9   EXTENDED BECAUSE OF THE INCIDENT?

10  A.   EXTENDED BECAUSE OF THE INCIDENT.

11  Q.   OKAY.  WHAT WAS YOUR PLANNED SHIFT WHEN YOU STARTED?

12  A.   FROM 7:00 TO 7:00 -- 7:00 IN THE MORNING TO 7:30 AT

13  NIGHT.

14  Q.   OKAY.  DID YOU SAY YOU STARTED AT 2:00 A.M. OR MAY -- OR

15  2:00 -- I MAY HAVE MISUNDERSTOOD YOU.

16  A.   2:00 A.M., I CAME IN FOR OVERTIME.

17  Q.   OH, I SEE.

18        SO THERE WAS A LOT OF OVERTIME GOING ON AT THE

19  TIME?

20  A.   YES, SIR.

21  Q.   NOW, WITH RESPECT TO YOUR TRAINING ON DEADLY FORCE, MR.

22  ROTHANS ASKED YOU IF YOU HAD TRAINING ON DEADLY FORCE, I

23  THINK YOU SAID YES?

24  A.   YES, SIR.

25  Q.   ARE YOU TRAINED THAT IT'S OKAY TO SHOOT SOMEONE JUST

1   BECAUSE YOU SEE A GUN IN THEIR HAND?

2          MR. ROTHANS:  LACKS FOUNDATION.  INCOMPLETE

3   HYPOTHETICAL.  VAGUE.

4          THE COURT:  SUSTAINED.

5   BY MR. GALIPO:

6   Q.   FELONY TRAFFIC STOPS, I THINK YOU SAID YOU'VE BEEN ON

7   APPROXIMATELY 50 TO 60?

8   A.   YES, SIR.

9   Q.   WHAT ARE SOME OF THE TYPES OF COMMANDS BASED ON YOUR

10  TRAINING THAT ARE GIVEN IN A FELONY TRAFFIC STOP?

11  A.   USUALLY ONE PERSON SPEAKS, A PERSON WHO'S GIVING THE

12  COMMANDS TO THE PERSON INSIDE THE CAR.

13  Q.   AND WHAT'S THE PURPOSE OF THAT, AS YOU UNDERSTAND IT, TO

14  ONLY HAVE ONE PERSON SPEAKING?

15  A.   CLARITY.  SO IT'S NO CONFUSION.

16  Q.   OKAY.  NO CONFUSION ON THE PART OF THE SUSPECT?

17  A.   AND OTHER OFFICERS.

18  Q.   OKAY.  AND WHAT WOULD BE SOME OF THE TYPE OF COMMANDS

19  THAT WOULD BE GIVEN BASED ON YOUR TRAINING AND EXPERIENCE?

20  A.   TURN THE CAR OFF.  HAVE YOUR HANDS UP.

21  Q.   HOW ABOUT AFTER THEY GET OUT?

22  A.   USUALLY WHAT WE WOULD DID IS THAT WE WOULD GIVE THE

23  COMMANDS, AND THEN IF -- WHEN THE PERSON STEPS OUT OF THE

24  CAR, A COMMAND WOULD BE GIVEN FOR THAT PERSON TO STEP OUT OF

25  THE CAR AND TO USUALLY WALK BACK TOWARDS THE OFFICER'S VOICE,

1  AND, AT SOME POINT, THE OFFICER WOULD TELL THEM TO STOP, TO

2  KNEEL ON THE GROUND, AND THERE WOULD BE A -- WE CALL AN

3  ARREST TEAM WOULD GO AND SEARCH HIM BRIEFLY AND HANDCUFF HIM

4  AND BRING HIM BACK TO A SECURED PLACE.

5  Q.   OKAY.  DOES SOMETIMES -- DEPENDING ON HOW THE PERSON

6  GETS OUT, DOES SOMETIMES WITH FELONY TRAFFIC STOPS THE

7  OFFICERS TELL THEM TO TURN AWAY FROM THEM?

8  A.   I'VE SEEN THAT, YES.

9  Q.   SO IF, FOR EXAMPLE, SOMEONE GETS OUT AND HAPPENS TO BE

10  FACING THE OFFICERS, ONE COMMAND YOU'VE SEEN IS FOR THE

11  OFFICERS TO TELL THAT PERSON TO TURN AWAY?

12  A.   YES, SIR.

13  Q.   AND THEN AFTER THE PERSON TURNS AWAY, THEN YOU HAVE HIM

14  WALK BACKWARDS TO THE SOUND OF THE OFFICER'S VOICE OR

15  SOMETHING LIKE THAT?

16  A.   YES, SIR.

17  Q.   AND THEN YOU HAVE THE PERSON GET DOWN ON THE GROUND AT

18  SOME POINT OR ON THEIR KNEES?

19  A.   YES, SIR, AND THEIR HANDS BEHIND THEIR HEAD.

20  Q.   AND PUT THEIR HANDS BEHIND THEIR HEAD?

21  A.   YES, SIR.

22  Q.   NOW, YOU SAID THAT YOU PARKED YOUR VEHICLE IN A LOCATION

23  TO PREVENT A POSSIBLE ESCAPE; IS THAT CORRECT?

24  A.   YES, SIR.

25  Q.   AT LEAST WHILE YOU WERE AT THE SCENE, DID YOU SEE THE

```
 1    VEHICLE TRY TO ESCAPE AT ALL?

 2    A.   NO, SIR.

 3    Q.   WHILE YOU WERE AT THE SCENE, DID YOU SEE THE MALE

 4    PASSENGER TRY TO ESCAPE OR FLEE?

 5    A.   NO, SIR.

 6    Q.   PART OF YOUR CONCERN, AS YOU TESTIFIED, WAS FOR PEOPLE

 7    THAT WERE VISITING THE BUSINESS ESTABLISHMENTS, CORRECT?

 8    A.   YES, SIR.

 9    Q.   INCLUDING THE INDIVIDUALS IN THE VEHICLE?

10    A.   YES, SIR.

11    Q.   NOW, YOU SAID YOU ONLY HEARD ONE COMMAND.  YOU'RE NOT

12    SUGGESTING THAT ONLY ONE COMMAND WAS GIVEN, ARE YOU?  YOU'RE

13    JUST SAYING THAT YOU MIGHT HAVE ONLY HEARD ONE?

14    A.   I ONLY HEARD, YES, SIR.

15    Q.   OKAY.  DID YOU SEE THE MALE PASSENGER GET OUT OF THE

16    CAR?

17    A.   I DIDN'T SEE HIM GET OUT, NO, SIR.

18    Q.   DID YOU SEE HIM AS HE WAS GETTING OUT?

19    A.   YES, SIR.

20    Q.   PARDON?

21    A.   YES.

22    Q.   OKAY.  SO WHERE WERE YOU WHEN YOU SAW HIM GETTING OUT OF

23    THE VEHICLE?

24    A.   I WAS BETWEEN THE DRIVEWAY ENTRANCE AND THE BLACK

25    MITSUBISHI.
```

1    Q.   OKAY.  HAD THE PEOPLE IN THE MITSUBISHI GOTTEN OUT OF

2    THE MITSUBISHI WHEN YOU SAW THE DRIVER GETTING OUT OF THE

3    VEHICLE -- STRIKE THAT -- WHEN YOU SAW THE PASSENGER GETTING

4    OUT OF THE VEHICLE?

5    A.   I THINK ONE OF THEM WAS GETTING OUT OF THE VEHICLE.

6    Q.   OKAY.  AND HOW MANY PEOPLE ALTOGETHER WERE IN THAT

7    VEHICLE, IF YOU RECALL?

8    A.   THE BLACK CAR, THE MITSUBISHI?

9    Q.   YES.

10   A.   THREE.

11   Q.   THREE?

12   A.   YES, SIR.

13   Q.   SO YOU WERE TRYING TO GET THE OTHER TWO OUT?

14   A.   YES, SIR.

15   Q.   AND WHEN YOU SAW THE PASSENGER GETTING OUT OF THE GREEN

16   CHRYSLER SEBRING, DID YOU SEE HIS HANDS UP?

17   A.   IT WAS VERY VAGUE.  I DIDN'T CONCENTRATE ON HIM MUCH AT

18   ALL.

19   Q.   WELL, LET ME ASK YOU THIS:  WOULD IT BE FAIR TO SAY WHEN

20   YOU SAW THE PASSENGER GETTING OUT OF THE CAR -- AND I'M

21   TALKING ABOUT THE MALE PASSENGER GETTING OUT OF THE GREEN

22   CHRYSLER SEBRING -- DID YOU SEE HIM SLOWLY GETTING OUT OF THE

23   CAR?

24   A.   IT APPEARED SLOWLY, BUT IT WAS VERY, VERY BRIEF.

25   Q.   OKAY.  YOU HAVE -- YOU DID GIVE A RECORDED STATEMENT AT

1    SOME POINT?

2    A.   YES, SIR.

3    Q.   HAVE YOU REVIEWED THE TRANSCRIPTION RECENTLY?

4    A.   YES, SIR.

5    Q.   OKAY.  WHEN YOU SAW HIM SLOWLY GETTING OUT OF THE CAR,

6    DID YOU SEE ANYTHING IN HIS HANDS?

7    A.   DIDN'T REALLY CONCENTRATE ON HIS HANDS.  IT WAS VERY

8    BRIEF.  MY ATTENTION WAS DRAWN TO THE PEOPLE IN THE BLACK

9    MITSUBISHI.

10   Q.   DIDN'T YOU SEE HIS HANDS UP AS HE WAS EXITING THE

11   VEHICLE?

12   A.   MAYBE VERY BRIEF.  I WAS -- IT WAS OVER MY LEFT

13   SHOULDER.  AS I'M TRYING TO GET THE PEOPLE OUT OF THE CAR,

14   THE LADY WAS SCREAMING THAT WAS INSIDE THE CAR.

15   Q.   WHO WAS SCREAMING?

16   A.   THE LADY THAT WAS SITTING IN THE BLACK CAR.

17   Q.   OKAY.  WAS THAT BEFORE THE SHOTS?

18   A.   YES, SIR.

19   Q.   YOU DIDN'T THINK THAT WAS CHAOTIC AT ALL WITH PEOPLE

20   SCREAMING?

21   A.   FOR HER TO BE SCREAMING -- IN HER CAR?

22   Q.   YES.

23   A.   SHE DIDN'T WANT TO GET OUT OF THE CAR, SHE WAS SCREAMING

24   AT ME, I'M NOT GETTING OUT OF THE CAR.

25   Q.   OKAY.  NOW, YOU LOOKED OVER AS THE MALE PASSENGER WAS

```
 1    GETTING OUT OF HIS CAR AND YOU SAW HIS RIGHT ARM UP, DIDN'T

 2    YOU?

 3    A.   BRIEFLY, I BELIEVE, POSSIBLY.

 4    Q.   WELL, YOU INDICATED THAT IN YOUR STATEMENT, DIDN'T YOU?

 5    A.   YES, SIR.

 6    Q.   OKAY.  AND WHEN YOU SAW HIS RIGHT ARM UP, DID YOU SEE

 7    ANYTHING IN HIS RIGHT HAND?

 8    A.   DIDN'T CONCENTRATE ON IT, NO, SIR.

 9    Q.   WHEN YOU SAW HIS RIGHT ARM UP, WHAT POSITION WAS HE IN?

10    WAS HE FACING TOWARDS YOU OR FACING AWAY FROM YOU?

11    A.   FACING AWAY FROM ME, I THINK HE WAS FACING THE OFFICERS.

12    Q.   OKAY.  SO WOULD IT BE AT LEAST FAIR TO SAY THAT YOU SAW

13    HIM GET OUT OF THE VEHICLE SLOWLY AND WHEN YOU GLANCED YOU

14    SAW HIM FACING TOWARDS THE OFFICERS WITH HIS RIGHT ARM UP?

15    A.   YES.

16    Q.   NOW, THEN YOUR ATTENTION WAS DIRECTED BACK TOWARDS THE

17    PEOPLE IN THE CAR; IS THAT CORRECT?

18    A.   THAT'S CORRECT.

19    Q.   AND YOUR GOAL WAS TO GET THEM ALL OUT OF THE CAR,

20    CORRECT?

21    A.   THAT'S CORRECT.

22    Q.   BUT ONE PERSON, IT SOUNDS LIKE, WAS SCREAMING AT YOU AND

23    BASICALLY TELLING YOU SHE DIDN'T WANT TO GET OUT OF THE CAR?

24    A.   YES.

25    Q.   AND YOU WERE TRYING TO CONVINCE HER THAT SHE HAS TO GET
```

1   OUT OF THE CAR?

2   A.   YES, SIR.

3   Q.   AND HOW LONG DID IT TAKE YOU FROM THE TIME THAT YOU

4   LOOKED AND SAW THE MALE PASSENGER FACING THE OFFICERS WITH

5   HIS RIGHT ARM UP, AFTER THAT, HOW LONG DID IT TAKE YOU TO GET

6   ALL THOSE PEOPLE OUT OF THE CAR?

7   A.   SECONDS.

8   Q.   OKAY.  CAN YOU GIVE ME AN IDEA OF HOW MANY, BECAUSE

9   SECONDS TO SOME PEOPLE COULD MEAN THREE OR FIVE AND OTHERS

10  COULD MEAN 40 OR 50 SECONDS?  CAN YOU GIVE ME AN IDEA OF HOW

11  MANY SECONDS?

12  A.   I WOULD SAY FIVE SECONDS.

13  Q.   OKAY.  AND THEN AFTER YOU GOT THEM OUT OF THE CAR, YOU

14  WERE TRYING TO GET THEM OVER TO THE SIDEWALK AREA?

15  A.   YES, SIR.

16  Q.   OKAY.  AND HOW WERE YOU DOING THAT?  WERE YOU BASICALLY

17  ORDERING THEM TOWARDS THE SIDEWALK, GUIDING THEM THERE, HOW

18  DID THAT WORK?

19  A.   ORDERING THEM TO THE SIDEWALK.

20  Q.   OKAY.  SO -- AND WERE THEY MOVING IN THE DIRECTION OF

21  THE SIDEWALK?

22  A.   YES, SIR.

23       MR. GALIPO:  I'M NOT SURE -- THIS IS, I THINK, A

24  NEW EXHIBIT, YOUR HONOR, 377-051 BY AGREEMENT.

25       THE COURT:  051 WILL BE RECEIVED.

```
 1              MR. GALIPO:  THANK YOU.

 2                  (EXHIBIT 377-051 IN EVIDENCE.)

 3   BY MR. GALIPO:

 4   Q.   OKAY.  I'M GOING TO ZOOM IN A LITTLE BIT.  I DON'T KNOW

 5   IF YOU COULD TELL, BUT THE BLACK MITSUBISHI -- I KNOW IT'S

 6   NOT VERY CLEAR FROM THIS?

 7              MR. GALIPO:  OKAY.  WE'RE GOING TO TRY TO PUT IT IN

 8   A WAY THAT IT WILL BE CLEAR, YOUR HONOR, IF THAT'S OKAY.

 9              THE COURT:  OKAY.  GREAT.

10              MR. GALIPO:  I THINK I HAVE TO PRESS A BUTTON.

11   BY MR. GALIPO:

12   Q.   SO, AS THEY'RE PULLING THAT UP, JUST TO MAKE SURE I

13   UNDERSTAND NOW, YOU'RE TRYING TO GET THE THREE PEOPLE OUT OF

14   THE CAR, YOU THINK YOU HAVE ONE PERSON OUT, THE OTHER TWO ARE

15   STILL IN.  AT SOME POINT YOU GLANCE, I GUESS, TO YOUR RIGHT?

16   A.   MY LEFT.

17   Q.   TO YOUR LEFT -- OKAY.  YOU GLANCE TO YOUR LEFT, YOU SEE

18   THE MALE PASSENGER GETTING OUT AND TURNING TOWARDS THE

19   OFFICERS WITH HIS RIGHT ARM UP, AND THEN YOUR ATTENTION IS

20   DIRECTED BACK TOWARDS THE PEOPLE?

21   A.   YES, SIR.

22   Q.   OKAY.  SO -- AND YOU SAY IT THEN TOOK YOU APPROXIMATELY

23   FIVE SECONDS TO GET THE REST OF THE PEOPLE OUT OF THAT

24   VEHICLE?

25   A.   YES, SIR.
```

1    Q.   AND SO DURING THAT FIVE SECONDS, WOULD IT BE CORRECT

2    THAT YOU WERE NOT LOOKING AT THE GENTLEMAN DURING THOSE FIVE

3    SECONDS?

4    A.   THAT'S CORRECT.

5    Q.   THE LAST TIME YOU SAW HIM, HE'S FACING THE OFFICER WITH

6    HIS BACK TOWARDS YOU AND HIS RIGHT ARM UP?

7    A.   YES, SIR.

8    Q.   OKAY.  NOW, HOW LONG DID IT THEN -- CAN WE -- IS THAT

9    THE BLACK MITSUBISHI THAT WE SEE IN THE BACKGROUND?  CAN YOU

10   TELL?

11   A.   YES, SIR.

12   Q.   OKAY.  THANK YOU.

13         SO, THEN, YOU GET HIM OUT, AND ARE YOU -- IS THE

14   WOMAN STILL ARGUING WITH YOU AFTER SHE GETS OUT?

15   A.   SHE IS BUT, MY COMMAND PRESENCE, SHE CAME.

16   Q.   ALL RIGHT.  AND THEN WERE YOU MOVING HIM OVER TO THE

17   SIDEWALK?

18   A.   YES, SIR.

19   Q.   AND I'M GOING TO SHOW YOU ANOTHER PHOTO, SO I'M GOING TO

20   SWITCH BACK, I THINK.  THIS IS EXHIBIT 17.

21         AND THEN FROM THE TIME THAT YOU GOT THEM OUT OF THE

22   CAR, HOW LONG DO YOU THINK IT TOOK YOU TO GET HIM OVER TO THE

23   SIDEWALK?

24   A.   PROBABLY ABOUT -- I WOULD SAY THREE SECONDS.

25   Q.   OKAY.  SO IF I JUST DO THE MATH, YOU SEE THE GENTLEMAN

1    FACING AWAY FROM YOU, BACK TOWARDS YOU, FACING THE OFFICERS,

2    RIGHT ARM UP, IT TAKES YOU FIVE SECONDS TO GET HIM OUT OF THE

3    CAR, AND THEN MAYBE ANOTHER THREE SECONDS TO GO TO THE

4    SIDEWALK, SO A TOTAL OF APPROXIMATELY EIGHT SECONDS?

5    A.   YES, SIR.

6    Q.   NOW, WHEN DO YOU HEAR THE SHOTS IN THIS SEQUENCE?

7    A.   WHEN THEY STEPPED ONTO THE SIDEWALK NEAR THE CURB.

8    Q.   OKAY.  SO, APPROXIMATELY, EIGHT SECONDS HAD PASSED SINCE

9    YOU SAW THE PERSON FACING THE OFFICERS WITH HIS RIGHT ARM UP

10   TO THE SHOTS, IS THAT A FAIR ESTIMATE?

11   A.   YES, SIR.

12   Q.   DID YOU SEE THE MALE PASSENGER WHO GOT OUT OF THE

13   SEBRING EVER STANDING FACING YOU OR FACING WHERE THE

14   MITSUBISHI WAS?

15   A.   NO, SIR.

16   Q.   YOU ALSO SAW HIM FALLING TO THE GROUND, DIDN'T YOU?

17   A.   YES, LOOKED LIKE HE WAS FALLING, YES.

18   Q.   SO I TAKE IT WHEN YOU HEARD THE SHOTS, YOU THEN -- DID

19   YOU THEN LOOK IN HIS DIRECTION, OR WERE YOU LOOKING AT HIM

20   JUST BEFORE THE SHOTS?

21   A.   I LOOKED IN HIS DIRECTION WHEN I HEARD THE SHOTS, RIGHT

22   AFTER THE SHOTS.

23   Q.   OKAY.  SO YOU GET TO THE SIDEWALK, YOU HEAR THE SHOTS,

24   YOU IMMEDIATELY LOOK IN HIS DIRECTION, AND YOU SEE HIM

25   FALLING TO THE GROUND?

1   A.   YES, SIR.

2   Q.   WHEN YOU SAW HIM FALLING TO THE GROUND, DID YOU SEE

3   ANYTHING IN HIS HANDS?

4   A.   I DID NOT, SIR.

5   Q.   ANYTHING COMING OUT OF HIS HANDS?

6   A.   NO, SIR, I DIDN'T SEE ANYTHING, SIR.

7   Q.   OKAY.  NOW, WHAT DID YOU DO IMMEDIATELY AFTER THE SHOTS?

8   A.   CONCENTRATING -- THE LADY WAS SCREAMING.  THE PERSON

9   THAT WAS IN THE REAR OF THE CAR WAS SCREAMING VERY, VERY

10  LOUDLY AND I WAS TRYING TO CALM THEM DOWN.  AND THEN A PERSON

11  RAN OUT FROM THE CHECK CASHING PLACE, IT WAS THE LADY'S

12  BOYFRIEND.  HE CAME OUT.  HE HEARD -- SAID HE HEARD SOME

13  SHOOTING, WANTED TO MAKE SURE SHE WAS OKAY, AND THREE PEOPLE

14  WERE SCREAMING --

15  Q.   WAS THERE A LADY AND CHILD CRYING?

16  A.   YES, SIR.

17  Q.   IS THIS THE SAME PEOPLE OR DIFFERENT PEOPLE?

18  A.   THE SAME PEOPLE.

19  Q.   OKAY.

20          MR. GALIPO:  MAY I HAVE ONE MOMENT, YOUR HONOR?

21          THE COURT:  YOU MAY.

22  BY MR. GALIPO:

23  Q.   OH, AND THEN HOW LONG -- YOU WERE AT THE SCENE FOR HOW

24  LONG AFTER IT OCCURRED?

25  A.   PROBABLY SIX, SEVEN HOURS -- SIX HOURS.

```
 1   Q.   ANY MENTION OF A CELL PHONE BY ANYONE IN YOUR PRESENCE

 2   WHILE YOU WERE AT THE SCENE?

 3   A.   NOT IN MY PRESENCE, SIR.  I WAS WITH THE FAMILY IN THE

 4   BLACK CAR.

 5           MR. GALIPO:  MAY I HAVE ONE MOMENT?

 6           THE COURT:  YOU MAY:

 7           MR. GALIPO:  I HAVE NO FURTHER QUESTIONS, YOUR

 8   HONOR.

 9           THE COURT:  MR. MC NICHOLAS?

10           MR. MC NICHOLAS:  NO QUESTIONS, YOUR HONOR.

11           MR. ROTHANS:  NO QUESTIONS, YOUR HONOR.

12           THE COURT:  OFFICER MOORE, YOU'RE EXCUSED.

13           MR. GALIPO:  WE'RE GOING TO -- WE HAVE OUR NEXT

14   WITNESS WE'RE GOING TO GET FROM THE HALLWAY.  IT WILL BE A

15   SHORT WITNESS BOTH IN TIME AND HEIGHT.

16           OUR NEXT WITNESS IS DYVONN.  HE'S GOING TO WALK UP.

17           THE CLERK:  CAN YOU PLEASE RAISE YOUR RIGHT HAND?

18           MR. GALIPO:  YOUR OTHER RIGHT.

19       **DYVONN GRISSOM, PLAINTIFF'S WITNESS, SWORN**

20           THE CLERK:  PLEASE BE SEATED.

21           IF YOU COULD PLEASE TELL US YOUR NAME IN THE

22   MICROPHONE.

23           THE WITNESS:  DYVONN GRISSOM.

24           THE CLERK:  THANK YOU.

25           MR. GALIPO:  YOUR HONOR, CAN I JUST STAND A LITTLE
```

 1    BIT TO THE SIDE SO THE MONITOR IS NOT BLOCKING HIS FACE FROM

 2    ME?

 3              THE COURT:  YES.

 4                    **DIRECT EXAMINATION**

 5    BY MR. GALIPO:

 6    Q.   CAN YOU SEE ME, DYVONN?

 7              WHEN IS YOUR BIRTHDAY?

 8    A.   MAY 2ND.

 9    Q.   TODAY?

10    A.   YES.

11    Q.   HOW OLD ARE YOU?

12    A.   SEVEN.

13    Q.   AND YOUR FATHER WAS LEJOY GRISSOM?

14    A.   YES.

15    Q.   DO YOU REMEMBER DOING FUN THINGS WITH YOUR FATHER?

16    A.   YES.

17    Q.   WHAT ARE SOME OF THE THINGS YOU REMEMBER DOING?

18    A.   GOING TO THE PARK, RIDING ON HIS MOTORCYCLE WITH HIM,

19    AND --

20    Q.   DID YOU EVER GO SWIMMING WITH HIM?

21    A.   YES.

22    Q.   HAVE YOU EVER TESTIFIED IN COURT BEFORE, OR THIS IS YOUR

23    FIRST TIME?

24    A.   FIRST TIME.

25    Q.   OKAY.  DO YOU MISS YOUR FATHER?

```
1    A.   YES.

2    Q.   DO YOU HAVE A PICTURE OF HIM?

3    A.   YES.

4    Q.   WHAT DO YOU MISS MOST ABOUT HIM?

5    A.   ABOUT HOW SWEET HE IS AND HOW GOOD HE BEEN AND HOW GOOD

6    HE BE TREATING ME.

7    Q.   DID YOU HAVE A NICE RELATIONSHIP WITH YOUR FATHER?

8    A.   YES.

9    Q.   DID YOU LOVE HIM VERY MUCH?

10   A.   YES.

11   Q.   DID IT SEEM TO YOU LIKE HE LOVED YOU VERY MUCH?

12   A.   YES.

13   Q.   OKAY.  WELL, I WISH YOU A HAPPY BIRTHDAY, OKAY?

14   A.   OKAY.

15   Q.   ALL RIGHT.

16          MR. GALIPO:  AND THAT'S ALL I HAVE, YOUR HONOR.

17          THE COURT:  ALL RIGHT.

18          COUNSEL?

19          MR. ROTHANS:  HAPPY BIRTHDAY, DYVONN.

20          I HAVE NO QUESTIONS, YOUR HONOR.

21          THE COURT:  DYVONN, I'VE JUST GOT A COUPLE

22   QUESTIONS FOR YOU.

23          DO YOU KNOW THE DIFFERENCE BETWEEN TELLING THE

24   TRUTH AND TELLING A LIE?

25          THE WITNESS:  YES.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1              THE COURT:  ALL RIGHT.  I DON'T HAVE ANYTHING ELSE
2    TO ASK YOU.
3              HAPPY BIRTHDAY, AND YOU CAN GET DOWN NOW.
4              THANK YOU.
5              MR. GALIPO:  OKAY.  WE'D LIKE TO CALL DAJAYNE,
6    PLEASE.
7              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
8          DAJAYNE GRISSOM, PLAINTIFF'S WITNESS, SWORN
9              THE CLERK:  PLEASE BE SEATED.
10             PLEASE TELL US YOUR NAME IN THE MICROPHONE.
11             THE WITNESS:  DAJAYNE GRISSOM.
12             THE CLERK:  THANK YOU.
13                      DIRECT EXAMINATION
14   BY MR. GALIPO:
15   Q.   HI, DAJAYNE.
16   A.   HI.
17   Q.   WHEN IS YOUR BIRTHDAY?
18   A.   DECEMBER 29, 2002.
19   Q.   HOW OLD ARE YOU NOW?
20   A.   TEN.
21   Q.   DO YOU GO TO SCHOOL?
22   A.   YES.
23   Q.   WHAT SCHOOL DO YOU GO TO?
24   A.   JACOB WEINS (PHONETIC).
25   Q.   WHO IS YOUR TEACHER?
```

1    A.   MS. MARTINEZ.

2    Q.   IS SHE NICE?

3    A.   YES.

4    Q.   WHAT GRADE ARE YOU IN NOW?

5    A.   FOURTH.

6    Q.   AND YOU -- ARE YOU THE OLDEST OF THE CHILDREN FOR YOUR

7    FATHER, LEJOY GRISSOM?

8    A.   YES.

9    Q.   AND TELL ME ABOUT YOUR DAD, WHAT DID YOU LIKE DOING WITH

10   YOUR DAD?

11   A.   ME AND HIM, WE LIKED TO MESS AROUND AND STUFF AND GO

12   PLACES.

13   Q.   YEAH?

14        WHAT DO YOU MEAN BY "MESS AROUND AND STUFF," CAN

15   YOU GIVE US SOME EXAMPLES OF WHAT YOU LIKE TO DO?

16   A.   I WILL TURN ON THE TV AND TURN ON THE MUSIC AND START

17   DANCING WITH EACH OTHER.

18   Q.   OKAY.  DID HE DANCE GOOD OR FUNNY OR WHAT?

19   A.   FUNNY.

20   Q.   ALL RIGHT.  DID HE MAKE YOU LAUGH?

21   A.   YES.

22   Q.   WHAT ELSE DO YOU REMEMBER DOING WITH YOUR DAD?

23   A.   WE ALWAYS GO TO THE PARK.  WE USED TO GO FISHING.

24   Q.   WOULD YOU SEE YOUR DAD EVERY DAY?

25   A.   YES.

```
 1    Q.   DO YOU MISS YOUR DAD?

 2    A.   (WITNESS NODS HEAD.)

 3    Q.   WHAT DO YOU MISS MOST ABOUT HIM?

 4    A.   HOW HE WAS THERE FOR ME ALL THE TIME.

 5    Q.   IS YOUR BROTHER -- YOUR BROTHER'S BIRTHDAY TODAY, HUH?

 6    A.   (WITNESS NODS HEAD.)

 7    Q.   IS YOUR BROTHER PRETTY GOOD, OR DOES HE DESERVE ANY

 8    BIRTHDAY PRESENTS, OR WHAT DO YOU THINK?

 9    A.   HE'S GOOD.

10    Q.   OKAY.  DO YOU HAVE A PICTURE OF YOUR DAD?

11    A.   (WITNESS NODS HEAD.)

12    Q.   WHERE DO YOU KEEP IT?

13    A.   AT MY GRANDMA'S HOUSE.

14    Q.   OKAY.  WILL YOU BE MAD AT ME IF I DON'T ASK YOU ANYMORE

15    QUESTIONS RIGHT NOW?

16    A.   (WITNESS SHAKES HEAD.)

17    Q.   ALL RIGHT.

18         MR. GALIPO:  THAT'S ALL I HAVE, YOUR HONOR.

19         MR. ROTHANS:  NO QUESTIONS, YOUR HONOR.

20         THE COURT:  ALL RIGHT.  YOU CAN STEP DOWN NOW.

21         THANK YOU.

22         MR. GALIPO:  YOUR HONOR, MAY WE APPROACH, PLEASE?

23         THE COURT:  YOU MAY.

24                 (SIDEBAR.)

25         MR. GALIPO:  SO I'M NOT GOING TO PUT THE LAST CHILD
```

1   ON RIGHT NOW.  WE HAVE A PERCIPIENT WITNESS TOMORROW MORNING,

2   AMANDA MADEIROS, ALSO ROGER CLARK.  I THINK, WITH THE COURT'S

3   PERMISSION -- IT'S A LITTLE BIT EARLY.  IT'S 4:10, BUT I

4   THINK WE'RE ON TRACK.  WE HAVE OTHER PLAINTIFF'S, OBVIOUSLY,

5   GOING TO BE VERY SHORT.  AND AFTER WE PUT ON AMANDA MADEIROS

6   AND ROGER CLARK, WE'LL BE RESTING OUR CASE.  WE'RE DOING

7   FAIRLY GOOD TIMEWISE AND IF WE CAN PUT IT OVER -- IN THE

8   MORNING WILL BE HERE TO TAKE UP THE REST OF THE TIME.

9           THE COURT:  ALL RIGHT.  IN LIGHT OF THE FACT THAT

10  THERE IS THIS GENERAL EMERGENCY AND HE'S BEEN CALLED AWAY,

11  THEN I'LL DO THAT.  BUT I WANT US TO GET SOME WORK DONE, SO

12  COUNSEL CAN PLAN TO STAY FOR A FEW MINUTES.  I HAVE JUDGE

13  MATZ'S RETIREMENT DINNER TONIGHT, BUT THAT WON'T BE UNTIL

14  LATER IN THE EVENING.  BUT THERE'S SOME ISSUES THAT I WANT TO

15  ADDRESS WITH COUNSEL.

16          MR. ROTHANS:  SOUNDS LIKE SOMETHING TO CELEBRATE.

17          THE COURT:  HIS GOING SENIOR CREATED THE VACANCY

18  WHICH I WAS APPOINTED.  SO TO THAT DEGREE -- TO THAT EXTENT,

19  I'LL AGREE.

20                  (END SIDEBAR.)

21          THE COURT:  LADIES AND GENTLEMEN, THE WITNESS WHOM

22  WE PLANNED TO HAVE RIGHT NOW WAS UNAVOIDABLY CALLED AWAY, SO

23  THAT IS GOING TO BE THE END OF TESTIMONY FOR TODAY.  THE

24  LAWYERS AND I ARE GOING TO STAY AND BE WORKING TO HASH OUT

25  CERTAIN LEGAL ISSUES, WHICH I HOPE WILL ULTIMATELY MAKE THE

1   TRIAL SHORTER AND SMOOTHER.  SO I WANT TO REMIND YOU THAT

2   TOMORROW WE'LL BE STARTING AT 8:30 AND ENDING AT 12:30 AND

3   TAKING TWO SHORT BREAKS.

4          IN LIGHT OF JUROR NUMBERS 3 OCCUPATION, I FEEL I

5   SHOULD BRING IN A HEALTHIER SNACK THAN WHAT THERE HAS BEEN SO

6   FAR.  BUT, IN ANY EVENT, YOU MIGHT WANT TO BRING IN SOMETHING

7   TO HAVE AT THE SECOND BREAK JUST BECAUSE, YOU KNOW, LUNCH --

8   WE'LL BE GOING UNTIL 12:30, OR, IF NECESSARY, PERHAPS A

9   LITTLE THEREAFTER IN ORDER TO FINISH UP A WITNESS.

10         SO WITH THAT, I BID YOU A GOOD EVENING, AND I WILL

11  SEE YOU AT 8:30, AND PLEASE DON'T DISCUSS THE CASE AND PLEASE

12  DON'T INVESTIGATE THE CASE.

13         THANK YOU.

14         THE CLERK:  PLEASE RISE FOR THE JURY.

15                (JURORS EXIT.)

16         THE CLERK:  PLEASE BE SEATED.

17         THE COURT:  COUNSEL, ONE ISSUE THAT HAS BECOME

18  SOMETHING OF A REOCCURRING ISSUE IS MR. ROTHANS' INVOLVEMENT

19  OUTSIDE THE ACTUAL LITIGATION OF THE CASE.  ONE OF THE

20  REASONS I DIDN'T HAVE THE CALL REPORT ADMITTED, DESPITE THE

21  FACT I'M SATISFIED THAT IT'S A BUSINESS RECORD, IS ONE THING;

22  THERE SEEMED A LOT OF INFORMATION IN THERE THE JURY DIDN'T

23  NEED OR THAT MIGHT BE PREJUDICIAL.  THE OTHER THING IS I SAW

24  HIS NAME ON IT.  SO, YOU KNOW, THERE IT WAS -- HAVE BEEN SOME

25  QUESTIONING ABOUT HIS INVOLVEMENT.  I DIDN'T HEAR AN

1    OBJECTION FROM THE DEFENSE SIDE, SO I LET IT GO.  I'M NOT AT

2    ALL SURE WHAT THE RELEVANCE OF THAT IS.  I JUST WANT TO MAKE

3    SURE THAT COUNSEL UNDERSTANDS THAT OBVIOUSLY IF IN SOME SENSE

4    HE WAS A WITNESS, THERE HASN'T BEEN A MOTION TO DISQUALIFY

5    HIM, AND I'M SURE IN LIGHT OF ALL THE OTHER WITNESSES, THAT

6    WOULDN'T BE AT ALL AN APPROPRIATE MOTION TO HAVE BROUGHT, FAR

7    FROM IT, BUT I DO WANT THE DISTINCTIONS OF COUNSEL AS

8    ADVOCATES AND NOT AS WITNESSES TO BE MAINTAINED.  SO I JUST

9    WANTED TO KNOW WHETHER THIS WAS SOMETHING THAT WAS GOING TO

10   BE COMING UP IN THE FUTURE SO I COULD ANTICIPATE HOW I WANTED

11   TO DEAL WITH IT.

12           MR. GALIPO:  NO, YOUR HONOR.

13           THE COURT:  OKAY.  THE OTHER THING IS SOMETHING

14   THAT IS SOMEWHAT LEFT OPEN BY THE MOTIONS IN LIMINE AND THAT

15   IS BIFURCATION IN REGARD TO PUNITIVE DAMAGES, SO I JUST

16   WANTED TO RAISE THAT.  YOU KNOW, THERE'S VARIOUS WAYS IN

17   WHICH THIS HAS BEEN DEALT WITH.  THERE'S VARIOUS WAYS IN

18   WHICH I'VE DEALT WITH IT.  ONE IS TO INSTRUCT THE JURY ON

19   WHAT THE STANDARD IS AND ASK A QUESTION ON THE SPECIAL

20   VERDICT AS TO WHETHER THAT STANDARD IS MET, AND THEN,

21   OBVIOUSLY, ONLY IF THE ANSWER WERE YES WOULD THERE BE ANY

22   OTHER PROCEDURES.  ONE IS JUST TO IGNORE THE ISSUE ENTIRELY

23   AND SEE IF THERE IS A DEFENSE OR PLAINTIFF'S VERDICT, AND

24   THEN IF THERE'S A PLAINTIFF'S VERDICT, TO LET THE ISSUE BE

25   RAISED.

1        SO, I THINK, YOU KNOW, THESE ARE -- THE PRECISE

2   FORM OF BIFURCATION IS SOMETHING THAT'S BEEN LEFT OPEN BY THE

3   MOTIONS IN LIMINE, SO I WANTED TO ADDRESS THAT WITH COUNSEL.

4        MR. GALIPO:  MY -- OUR PREFERENCE WOULD BE -- AND

5   THE WAY THAT I NORMALLY SEE IT DONE IS TO HAVE THE PREDICATE

6   QUESTION ONLY WITHOUT ANY REFERENCE TO THE AMOUNT OR ANY

7   EVIDENCE REGARDING HIS NET WORTH, IF YOU WILL.  SO THE

8   QUESTION:  DID HE ACT WITH, YOU KNOW, MALICE, SUPPRESSION OR

9   RECKLESS DISREGARD OF THE DECEDENT'S RIGHTS, OBVIOUSLY THE

10  WAY THE JURY VERDICT FORM WILL BE IF THEY DON'T ASK LIABILITY

11  QUESTIONS IN OUR FAVOR, THEY DON'T GET TO THAT QUESTION, BUT

12  IT SEEMS TO MAKE SENSE BECAUSE WE'LL KNOW, A, IF WE EVEN

13  HAVE -- ARE GOING TO HAVE A SECOND PHASE; AND, SECONDLY,

14  OFTENTIMES I'M ABLE TO REACH A STIPULATION WITH COUNSEL IF

15  THERE IS A FINDING, SO WE MAY NOT NEED THE SECOND PHASE.

16       WE FEEL THE FINDING COULD BE IMPORTANT BASED ON

17  POST-TRIAL OR APPELLATE REVIEW EVEN THOUGH THE INTENT OF OUR

18  CASE IS NOT TO SEEK SIGNIFICANT PUNITIVE DAMAGES AGAINST

19  OFFICER MARTINEZ.  SO IF THAT PREDICATE QUESTION IS ANSWERED

20  YES, I'M HOPEFUL THAT WE COULD REACH SOME TYPE OF

21  STIPULATION.

22       THE COURT:  ALL RIGHT.  MR. ROTHANS?

23       MR. ROTHANS:  I URGE COUNSEL TO CONSIDER DISMISSING

24  A PUNITIVE DAMAGE CLAIM.  WE'VE ALL HEARD DETECTIVE MARTINEZ

25  TESTIFY IN THIS CASE, AND THERE'S CLEARLY NO INDICIA OF

1    MALICE IN THIS INCIDENT, AND THEIR ARGUMENT IS GOING TO BE

2    THAT HE WAS FATIGUED ANYWAY, AND THAT'S THE ONLY REASON HE

3    SHOT AS OPPOSED TO THE OTHERS.  CLEARLY, THE PLAINTIFFS

4    HAVEN'T RESTED.  I INTEND TO MAKE A RULE 50 MOTION AS TO

5    PUNITIVE DAMAGES, AMONG OTHER ISSUES, AND I JUST WANT

6    COUNSEL, IF THEY WOULD, TO AT LEAST CONSIDER DISMISSING THE

7    PUNITIVES AGAINST OFFICER MARTINEZ.

8              THE COURT:  ALL RIGHT.  WELL, ONE OF THE REASONS I

9    WANTED TO RAISE IT WASN'T NECESSARILY TO DECIDE IT NOW, BUT

10   JUST PUT IT ON YOUR RADAR TO THINK ABOUT IT.  SO IF THE TWO

11   OF YOU CAN GET TOGETHER AND REACH SOME SORT OF AGREEMENT

12   EITHER AS TO WHETHER IT SHOULD BE PRESENTED, AS TO HOW IT'S

13   PRESENTED, I -- WITHOUT SAYING THAT I WOULD NECESSARILY GRANT

14   ANY MOTION, JUST AS A MATTER OF COMMON SENSE, THERE IS SOME

15   INCONSISTENCIES BETWEEN CERTAIN ELEMENTS OF THE PLAINTIFF'S

16   PRESENTATION, I.E., FATIGUE, AND THE IDEA THAT IT WOULD BE

17   RECKLESS DISREGARD OF HIS RIGHTS, BUT THAT'S NOT TO PREJUDGE

18   WHETHER OR NOT THERE IS EVIDENCE FROM THE WHICH THE JURY

19   WOULD RIGHTLY OR WRONGLY ANSWER THAT QUESTION IN THE

20   AFFIRMATIVE.  SO, OBVIOUSLY, THE COURT WOULD PREFER THAT

21   COUNSEL BE ABLE TO WORK THIS OUT.

22             THE FINAL THING IS, YOU KNOW, THIS -- AND I --

23   THIS -- I DON'T NO MEAN THIS IN ANY WAY AGAINST THE PARTIES

24   OR COUNSEL AT ALL, FAR FROM IT, BUT THE FACT IS, YOU KNOW,

25   THE PRETRIAL ON THIS WAS A LONG TIME AGO, THE ORIGINAL

1    PRETRIAL WAS QUITE A WHILE AGO.  I URGE YOU TO JUST READ

2    THROUGH YOUR INSTRUCTIONS AND THE VERDICT FORM AS SUBMITTED

3    AND DECIDE WHAT MAKES SENSE IN LIGHT OF HOW THE CASE HAS

4    ACTUALLY BEEN TRIED AND SEE IF YOU EITHER CAN JOINTLY AGREE

5    ON ADDITIONAL INSTRUCTIONS, RECONCILE SOME OF THE DIFFERENCES

6    THAT THERE ARE, SEE IF SOME OF THE INSTRUCTIONS, EVEN ONES IN

7    WHICH YOU PREVIOUSLY AGREED, HAVE BECOME SUPERFLUOUS OR

8    IRRELEVANT, AND THEN SO WHEN WE APPROACH THAT IT'S NOT JUST

9    FROM THE -- YOU KNOW, SOMETHING THAT WAS ORIGINALLY THOUGHT

10   ABOUT OVER A YEAR AGO AND NOW IS -- HAS BECOME A REAL ISSUE.

11           MR. GALIPO:  WELL, THERE'S TWO ISSUES, AND WE DON'T

12   HAVE TO DECIDE THEM NOW, BUT I THINK WOULD BE SOMETHING FOR

13   EVERYONE TO THINK ABOUT.  I THINK THE CURRENT STATE OF THE

14   CLAIMS, AS I RECALL, IS A FOURTH AMENDMENT CLAIM, A 14TH

15   AMENDMENT CLAIM, BATTERY, AND NEGLIGENCE.  OBVIOUSLY, THE

16   ANALYSIS UNDER THE UNREASONABLE FORCE FOURTH AMENDMENT CLAIM

17   AND THE UNREASONABLE FORCE BATTERY CLAIM IS VERY ANALOGOUS.

18           IF EVERYONE IS IN AGREEMENT THAT IF A QUESTION ON

19   THE VERDICT FORM, FOR EXAMPLE, ASKS WHETHER THE USE OF FORCE

20   BY OFFICER MARTINEZ WAS EXCESSIVE OR UNREASONABLE, AND THEY

21   ANSWER THAT QUESTION YES, THE PLAINTIFF'S POSITION WOULD BE

22   THAT CERTAINLY UNDER STATE LAW, WITHOUT QUESTION, WE WOULD

23   GET WRONGFUL DEATH DAMAGES UNDER OUR BATTERY CLAIM AND

24   THERE'S VICARIOUS LIABILITY FOR THE CITY.  IF EVERYONE IS IN

25   AGREEMENT ON THAT PREMISE, WE MAY NOT NEED THE FOURTEENTH

1    AMENDMENT CLAIM BECAUSE TO WHATEVER EXTENT WE'RE GOING TO

2    HAVE ANOTHER STANDARD, IT DOESN'T REALLY GET US ANY EXTRA

3    DAMAGES, IF YOU WILL, IF THE PREMISE IS IF THEY FIND THE USE

4    OF DEADLY FORCE WAS UNREASONABLE AND IT GETS WRONGFUL DEATH

5    DAMAGES, A SECOND ISSUE THE COURT WILL HAVE TO DECIDE IS

6    ABOUT THE SURVIVAL DAMAGES, AND WE'LL GET YOU THAT BRIEF, AT

7    LEAST, TO CONSIDER.

8            THE OTHER ISSUE -- AND, AGAIN, I'M JUST PUTTING

9    THEM OUT THERE, AND I'LL TALK TO MR. MC NICHOLAS.  IN SOME

10   CASES, IF I GET CONSENT OF CLIENTS AND COUNSEL, I END UP

11   WITHDRAWING THE NEGLIGENCE CLAIM, BECAUSE WITH NEGLIGENCE YOU

12   HAVE CONTRIBUTORY NEGLIGENCE AND OTHER ISSUES IN THE

13   INSTRUCTIONS AND THE VERDICT FORM.  I THINK THE HEART OF THIS

14   CASE, REALLY, IS WHETHER THE USE OF DEADLY FORCE WAS

15   EXCESSIVE OR NOT OR REASONABLE OR NOT.

16           SO WE'LL HAVE THOSE DISCUSSIONS SO WHEN WE GET TO

17   GOING OVER THE JURY INSTRUCTIONS AND THE VERDICT FORM, AS THE

18   COURT IS SUGGESTING, WE MAY BE ABLE TO NARROW WHAT WE REALLY

19   NEED AND IT MIGHT MAKE IT MUCH SIMPLER FOR THE COURT.

20           THE COURT:  WELL, IN THE ABSENCE OF, YOU KNOW,

21   *MONELL* TYPE CLAIM, WHICH, AS YOU KNOW, OBVIOUSLY, IS NOT

22   PRESENT HERE.  YOU KNOW, JUDGE NGUYEN'S RULING WAS QUITE

23   SPECIFIC THAT THE REASON THE CITY REMAINS AS A DEFENDANT IS

24   TO VICARIOUS LIABILITY --

25           MR. GALIPO:  CORRECT.

```
 1          THE COURT:  -- AND NOT ANY SORT OF DIRECT

 2   LIABILITY, SO I'M NOT EXACTLY SURE, THEN, WHAT THE NEGLIGENCE

 3   CLAIM WOULD BE DOING HERE, EXCEPT TO COMPLICATE THE

 4   INSTRUCTIONS.  I MEAN, I WOULD RATHER -- I WOULD MUCH RATHER

 5   SEE A CASE IN WHICH THE ISSUES THAT THE JURY IS HERE TO

 6   DECIDE ARE THE FOCUS OF THE INSTRUCTIONS AND THAT THEN THE

 7   QUESTIONS ON THE VERDICT FORM ARE THE ANSWERS TO THOSE

 8   SPECIFIC QUESTIONS, AND NOT HAVE SOME EXCESSIVE NUMBER OF

 9   REDUNDANT CLAIMS THAT CAN'T POSSIBLY, AS YOU SAY, EITHER BE

10   ANSWERED DIFFERENTLY OR HAVE A FINDING OF LIABILITY

11   DIFFERENTLY ONE FROM THE ANOTHER OR GIVE RISE TO DIFFERENT

12   SORTS OF DAMAGES.

13          MR. GALIPO:  I WILL DISCUSS IT WITH MR. MC NICHOLAS

14   AND THE CLIENTS, SO WHEN WE NEXT DISCUSS THIS WE'LL GIVE YOU

15   WHAT WE INTEND TO DO.

16          THE COURT:  YES, MR. ROTHANS?

17          MR. ROTHANS:  JUST TO BE CLEAR ON THAT ISSUE, YOUR

18   HONOR, WE -- I DON'T HAVE THE CASE LAW AT MY FINGERTIPS.  WE

19   CAN FILE A BRIEF ON THE ISSUE IF NECESSARY.  BUT IT'S ARGUED

20   THAT EVEN UNDER A FOURTH AMENDMENT CLAIM, WHICH ARISES OUT OF

21   THE WRONGFUL DEATH STATUTES FOR UNLAWFUL SEIZURE, UNDER THE

22   CALIFORNIA WRONGFUL DEATH STATUTES COMPARATIVE FAULT IS

23   ALWAYS A DEFENSE, AND WE HAVE CASE LAW, NINTH CIRCUIT CASE

24   LAW ON THAT ISSUE.  SO EVEN IF THEY WITHDRAW NEGLIGENCE, IT'S

25   OUR VIEW COMPARATIVE NEGLIGENCE, COMPARATIVE FAULT IS STILL A
```

```
 1    VIABLE DEFENSE.

 2            THE COURT:  ALL RIGHT.  WELL, THAT'S -- I WOULD

 3    APPRECIATE SEEING THE CASE LAW ON THAT.

 4            MR. GALIPO:  THAT'S FINE.  WE HAVE CASE LAW TO THE

 5    CONTRARY, BUT THAT WOULD BE FINE.

 6            THE COURT:  ALL RIGHT.  OKAY.  ANYTHING ELSE THAT

 7    COUNSEL WOULD LIKE TO RAISE WITH ME?

 8            MR. GALIPO:  ONLY WITH REGARDS TO THE TIMING,

 9    BECAUSE I THINK WE INITIALLY TOLD THE JURY WE WOULD HOPE TO

10    GET THE CASE TO THEM BY WEDNESDAY.  I KNOW THE COURT'S DARK

11    MONDAY, AS I UNDERSTAND --

12            THE COURT:  RIGHT.

13            MR. GALIPO:  -- AND THEN WE'LL BE FINISHING AT

14    12:30 TOMORROW.  SO WE -- WE ARE GOING TO GET CLOSE TO

15    CONCLUDING OUR CASE TOMORROW.  WE MAY RUN IN JUST VERY

16    BRIEFLY INTO TUESDAY MORNING, BUT I DON'T KNOW IF MR. ROTHANS

17    HAS ANY IDEA OF WHAT THE LENGTH OF HIS CASE WOULD BE, JUST SO

18    WE CAN GET AN IDEA OF WHEN WE MIGHT BE ABLE TO GET THIS TO

19    THE JURY.

20            MR. ROTHANS:  TO BE COMPLETELY HONEST, I DO NOT

21    KNOW AT THIS TIME.  I'LL HAVE TO GO BACK AND LOOK AT OUR

22    WITNESSES.  I THOUGHT COUNSEL HAD 31 WITNESSES.  WE WERE

23    GOING TO SEE A LOT MORE PEOPLE BROUGHT IN HERE.  WE HAVE AT

24    LEAST TWO LAY WITNESSES TO THE INCIDENT, WE HAVE AN EXPERT

25    WITNESS.  WE'RE GOING TO BRING IN THE DETECTIVES FROM L.A.
```

```
 1   COUNTY SHERIFFS.  MY GUESS IS WE CAN PROBABLY GET OUR CASE

 2   DONE IN A DAY, DAY-AND-A-HALF.

 3          THE COURT:  ALL RIGHT.  WELL, THEN IT STILL MIGHT

 4   GET TO THE JURY BY WEDNESDAY, WHICH IS WHAT I AM AIMING FOR

 5   AND HOPING TO DO.  SO, I GUESS, WE'LL SEE HOW MUCH PROGRESS

 6   WE MAKE TOMORROW, THEN.

 7          ALL RIGHT.  THANK YOU, COUNSEL.

 8          MR. GALIPO:  OKAY.  THANK YOU, YOUR HONOR.

 9          THE CLERK:  ALL RISE.

10          THIS COURT IS ADJOURNED.

11      (WHEREUPON, COURT WAS ADJOURNED AT 4:24 P.M.)

12                    --000--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1              CERTIFICATE OF REPORTER

2

   COUNTY OF LOS ANGELES      )
3                             )  SS.
   STATE OF CALIFORNIA        )

4

5

6  I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

7  UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

8  CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

9  TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10 CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11 PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12 TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13 OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16 DATED:  AUGUST 2, 2013

17

18     **/S/  ROSALYN ADAMS**

19 ROSALYN ADAMS, CSR 11794
   OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**