1              UNITED STATES OF AMERICA

2            UNITED STATES DISTRICT COURT

3            CENTRAL DISTRICT OF CALIFORNIA

4                 CENTRAL DIVISION

5                    - - -
        HONORABLE MICHAEL W. FITZGERALD
6      UNITED STATES DISTRICT JUDGE PRESIDING
                       - - -
7

8   KANDACE SIMPLIS, ET AL.,        )
                                    )
9              PLAINTIFF,           )
                                    )
10  VS.                            )   CV 10-09497-MWF
                                    )
11  CULVER CITY POLICE DEPARTMENT,  )      VOLUME II
    ET AL.,                         )
12                                  )
               DEFENDANT.           )
13  _____)

14

15

                _JURY TRIAL - DAY 5, PM SESSION_
16

            LOS ANGELES, CALIFORNIA
17
                 MAY 7, 2013
18

19

20

21

22

23          ROSALYN ADAMS, CSR 11794
         FEDERAL OFFICIAL COURT REPORTER
24      312 NORTH SPRING STREET, ROOM 410
         LOS ANGELES, CALIFORNIA 90012
25              (213) 894-2665

1    **APPEARANCES:**

2    **ON BEHALF OF THE PLAINTIFF:**

3              LAW OFFICES OF DALE K. GALIPO
               BY:  DALE K. GALIPO
4              21800 BURBANK BOULEVARD
               SUITE 310
5              WOODLAND HILLS, CALIFORNIA 91367
               (818) 347-3333
6
               MC NICHOLAS AND MC NICHOLAS LLP
7              BY:  MATTHEW S. MC NICHOLAS
               10866 WILSHIRE BOULEVARD
8              SUITE 1400
               LOS ANGELES, CALIFORNIA 90024
9              (310) 474-1582

10

11   **ON BEHALF OF DEFENDANT:**

               CARPENTER ROTHANS AND DUMONT
12             BY:  STEVEN J. ROTHANS
                    JILL WILLIAMS
13             888 SOUTH FIGUEROA STREET
               SUITE 1960
14             LOS ANGELES, CALIFORNIA 90017
               (213) 228-0400

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

1                          **I N D E X**

2
                                                            **PAGE**
3
**CHIEF CLARENCE CHAPMAN** - DEFENDANT'S WITNESS .........    8
4          CROSS-EXAMINATION BY MR. GALIPO ............    8
           REDIRECT EXAMINATION BY MR. ROTHANS ........   15
5          RECROSS EXAMINATION BY MR. GALIPO ..........   17

6
**DETECTIVE STEVEN BLAGG** - DEFENDANT'S WITNESS .........   21
7          DIRECT EXAMINATION BY MR. ROTHANS ..........   21
           CROSS-EXAMINATION BY MR. GALIPO ............   35
8

9                          **E X H I B I T S**

10

11  **PLAINTIFFS'        MARKED FOR IDENTIFICATION        IN EVIDENCE**

12                          [NONE OFFERED.]

13

14  **DEFENDANT'S        MARKED FOR IDENTIFICATION        IN EVIDENCE**

15                          [NONE OFFERED.]

16

17

18

19

20

21

22

23

24

25

1          LOS ANGELES, CALIFORNIA; TUESDAY, MAY 7, 2013; 1:30 P.M.

2                              --oOo--

3

4

5               MR. GALIPO:  IF I MAY, YOUR HONOR?

6               THE COURT:  YES.

7               MR. GALIPO:  SO WE ARE -- I'M ANTICIPATING

8    APPROXIMATELY ANOTHER 20 MINUTES WITH MR. CHAPMAN.  AND WE

9    HAVE HAD SOME DISCUSSIONS, MR. MC NICHOLAS AND I, REGARDING

10   THE WITNESS COFIELD SITUATION.

11              THE COURT:  YES.

12              MR. GALIPO:  WE -- OUR THINKING IS THAT WE'RE GOING

13   TO NOT AGREE TO HAVE HER STATEMENT READ OR PLAYED AND ALLOW

14   HER TO LEAVE BECAUSE WE THINK THERE'S SOME FOUNDATIONAL

15   ISSUES AND WE THINK THAT IF THE JURY IS GOING TO HAVE HER

16   STATEMENT READ, WE AT LEAST WANT THEM TO SEE HOW SHE

17   PRESENTS.  WE DO THINK THAT IT WOULD BE INAPPROPRIATE FOR ANY

18   ACCUSATIONS THAT THE FAMILY MEMBERS HAVE TRIED TO INTIMIDATE

19   HER BECAUSE I THINK THERE'S NO EVIDENCE OF THAT.  SO THAT'S

20   KIND OF WHERE WE STAND ON THAT POINT.

21              THE COURT:  I AGREE -- I AGREE WITH YOUR LATTER

22   POINT THAT THERE'S NO EVIDENCE OF THAT.  I'M NOT SURE UNDER

23   RULE 804 THE FOUNDATIONAL THING OF THE WITNESS BEING

24   UNAVAILABLE IS SOMETHING THAT THE JURY HAS TO NECESSARILY

25   SEE.

1          YES, COUNSEL?

2          MR. ROTHANS:  YOUR HONOR, I JUST WANTED TO READ

3     FROM RULE 803 DEALING WITH HEARSAY EXCEPTIONS, SPECIFICALLY

4     RECORDED RECOLLECTION, IF I MAY.

5          THE COURT:  YES.

6          MR. ROTHANS:  "A MEMORANDUM OR RECORD CONCERNING A

7     MATTER ABOUT WHICH A WITNESS ONCE HAD KNOWLEDGE BUT NOW HAS

8     INSUFFICIENT RECOLLECTION TO ENABLE THE WITNESS TO TESTIFY

9     FULLY AND ACCURATELY, SHOWN TO HAVE BEEN MADE OR ADOPTED BY

10    THE WITNESS WHEN THE MATTER WAS FRESH IN THE WITNESS'S

11    MEMORY, AND TO REFLECT THAT KNOWLEDGE CORRECTLY.  IF

12    ADMITTED, THE MEMORANDUM OR RECORD MAY BE READ INTO EVIDENCE

13    BUT MAY NOT, ITSELF, BE RECEIVED AS AN EXHIBIT UNLESS OFFERED

14    BY AN ADVERSE PARTY."

15          SO IT WOULD SEEM THAT THESE RECORDED STATEMENTS,

16    AND WE HAVE TWO, ONE FROM CULVER CITY OFFICER SHORTLY

17    FOLLOWING THE SHOOTING AND THEN ONE FROM THE SHERIFFS WITHIN

18    AN HOUR OR TWO OF THE SHOOTING; BOTH ARE -- CLEARLY FALL

19    UNDER THAT EXCEPTION TO THE HEARSAY RULE.  IT'S OUR VIEW THAT

20    THEY SHOULD BE READ AND/OR PLAYED INTO EVIDENCE FOR THE

21    BENEFIT OF THE JURY.

22          THE COURT:  WELL, THE THING HERE IS ALSO, I THINK,

23    UNDER RULE -- THE RESIDUAL EXCEPTION, ESPECIALLY THE FIRST

24    ONE IS CLOSE TO BEING DECIDED UTTERANCE, AND OBVIOUSLY, THE

25    EXISTENCE OF THE WITNESS AND THE STATEMENT IS SOMETHING THAT

```
 1    THE PLAINTIFF HAS KNOWN FOR A WHILE.

 2          ALSO, MR. GALIPO, I'M SURE YOU KNOW BETTER THAN I

 3    WOULD WHAT'S IN THE INTEREST OF YOUR CLIENT; BUT, GENERALLY,

 4    TO HAVE A WITNESS BE RELUCTANT TO TESTIFY IS DEEMED -- DOES

 5    NOT HURT THE CREDIBILITY OF THAT WITNESS.  I MEAN, I'M NOT

 6    SURE THAT THE JURY IS GOING TO HOLD IT AGAINST THE DEFENSE

 7    THAT SHE'S BEING SO DIFFICULT WHEN THEY'RE THE ONES WHO HAVE

 8    DRAGGED HER HERE.

 9          MR. GALIPO:  I UNDERSTAND AND I AGREE WITH YOU,

10    THAT COULD CUT EITHER WAY.  IT'S JUST THAT MY IMPRESSION, AND

11    I COULD BE WRONG, I DON'T KNOW IF SHE'S UNDER MEDICATION NOW.

12    I DON'T KNOW IF SHE WAS UNDER MEDICATION AT THE TIME SHE GAVE

13    THIS STATEMENT, AND, YOU KNOW, SHE DID MENTION THAT HER

14    HUSBAND'S A POLICE OFFICER IN PART OF THE STATEMENT, WHICH

15    CLEARLY, WE THINK WOULD BE IMPORTANT IF THE JURY IS GOING TO

16    CONSIDER ANY OF IT.  BUT, YOU KNOW, SOME OF THOSE BASIC

17    QUESTIONS, SHE MAY NOT REMEMBER THIS INCIDENT, BUT SHE MAY BE

18    ABLE TO TELL US IF SHE WAS ON MEDICATION AT THE TIME BECAUSE

19    SOME OF THOSE -- SOME OF THAT COULD BE IMPORTANT TO THE JURY

20    WEIGHING.

21          THIS IS A PECULIAR SITUATION.  I UNDERSTAND THE

22    COURT WANTS TO BE FAIR TO BOTH SIDES, AND I RESPECT THAT;

23    BUT, UNFORTUNATELY FOR US, WE'RE GOING TO HAVE, REALLY, NO

24    CROSS-EXAMINATION IF THE -- IF THE STATEMENT COMES IN, WE'RE

25    STUCK WITH WHATEVER SHE WAS ASKED AT THE TIME.  AND, QUITE
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1    FRANKLY, A LOT OF THE QUESTIONS WERE QUITE LEADING AND

 2    SUGGESTIVE, BUT --

 3             THE COURT:  BUT THAT'S SOMETHING THAT WOULD BE

 4    APPARENT IF THE STATEMENT IS PLAYED AND NOT JUST SUMMARIZED

 5    BY THE DETECTIVE.

 6             IN ANY EVENT, I'M NOT GOING TO DECIDE THIS RIGHT

 7    NOW.  LET'S GET THE JURY IN HERE.

 8             WHO'S THE NEXT WITNESS AFTER MR. CHAPMAN?

 9             MR. ROTHANS:  IT IS DETECTIVE BLAGG, THE LEAD

10    INVESTIGATOR IN THE OFFICER-INVOLVED SHOOTING.

11             I JUST WANT TO POINT OUT, THOUGH --

12             THE COURT:  WHAT IS -- AND WHAT'S THE PROFFER AS TO

13    HIM?

14             MR. ROTHANS:  I NEED TO LOOK AT MY NOTES, BUT IT

15    DEALS WITH HIS SEEING THE CELL PHONE AT THE SCENE --

16             THE COURT:  ALL RIGHT.

17             MR. ROTHANS:  -- THE LOCATION.

18             THE COURT:  THAT'S OBVIOUS.

19             MR. ROTHANS:  MS. WILLIS-COFIELD DID BRING TO MY

20    ATTENTION, THOUGH, THAT SHE NEEDS TO BE OUT OF HERE BEFORE

21    3:00 O'CLOCK TO PICK UP HER GRANDCHILDREN.

22             THE COURT:  SHE WILL GET OUT OF HERE WHEN I LET HER

23    OUT OF HERE AND SHE CAN SPEND THE NIGHT AT MDC IF THAT'S --

24    UNLESS -- SHE'S SKATING ON VERY THIN ICE --

25             MR. ROTHANS:  THANK YOU, YOUR HONOR.
```

```
1              THE COURT:  -- SO SHE'S NOT IN A POSITION TO

2    DICTATE TO THE COURT WHEN SHE COMES AND WHEN SHE LEAVES.

3              MR. ROTHANS:  THANK YOU, YOUR HONOR.

4              THE CLERK:  PLEASE RISE FOR THE JURY.

5                        (JURORS ENTER.)

6              THE CLERK:  PLEASE BE SEATED.

7              THE COURT:  MR. GALIPO?

8              MR. GALIPO:  YES, THANK YOU, YOUR HONOR.

9         CHIEF CLARENCE CHAPMAN, DEFENDANT'S WITNESS,

10           PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:

11                  CROSS-EXAMINATION  (RESUMED)

12   BY MR. GALIPO:

13   Q.   GOOD AFTERNOON, MR. CHAPMAN.

14   A.   GOOD AFTERNOON, COUNSEL.

15   Q.   IN LEARNING DOMAIN 20, DOES POST TEACH THROUGH THE USE

16   OF SOME HYPOTHETICALS?

17   A.   YES, THEY DO.

18   Q.   AND IS THERE A HYPOTHETICAL THAT IS TAUGHT TO POLICE

19   OFFICERS CONCERNING SOMEONE WHO COMMITS AN ARMED ROBBERY,

20   SHOOTS AT THE POLICE, AND THEN DROPS THE GUN AND ASKS WHETHER

21   OR NOT IT'S APPROPRIATE TO SHOOT THAT PERSON OR NOT?

22   A.   I DON'T HAVE A DIRECT RECOLLECTION, BUT I'M SURE THERE

23   IS A HYPOTHETICAL THAT CONTAINS JUST THOSE ELEMENTS.

24   Q.   DO YOU THINK IT MIGHT REFRESH YOUR RECOLLECTION TO LOOK

25   AT A PARTICULAR PAGE FROM POST REGARDING A HYPOTHETICAL?
```

1   A.   I'M NOT DISAGREEING THAT IT EXISTS, BUT IF YOU'D LIKE TO

2   PUBLISH IT, IT'S UP TO THE COURT.

3   Q.   I'M NOT ASKING TO PUBLISH IT AT THIS POINT.  LET ME JUST

4   HAVE ONE MOMENT, PLEASE.

5           MR. GALIPO:  FOR THE RECORD, YOUR HONOR, IT'S

6   EXHIBIT 87-49 AND IT'S IN VOLUME II OF THE PLAINTIFFS'

7   BINDERS.  IT HAS HEY A 3-7 ON THE BOTTOM RIGHT.

8           CAN I SIMPLY HAVE THE CLERK HAND THIS ONE SHEET TO

9   THE WITNESS?

10          THE COURT:  YOU MAY.

11          MR. GALIPO:  THANK YOU, YOUR HONOR.

12          I THINK WE'RE OKAY.  I'M GOING TO HAVE THE CLERK DO

13  IT.

14  BY MR. GALIPO:

15  Q.   JUST TAKE A MOMENT AND READ THAT HYPOTHETICAL TO

16  YOURSELF AND SEE IF THAT REFRESHES YOUR RECOLLECTION AS TO

17  THE GENERAL HYPOTHETICAL THAT I WAS REFERRING TO.

18  A.   (WITNESS COMPLIES.)

19          YES.  LIKE I SAID, I'M NOT CHALLENGING THE

20  EXISTENCE OF THIS.  I JUST COULDN'T RECITE IT VERBATIM.

21  Q.   OF COURSE.

22          I WASN'T SUGGESTING YOU WERE CHALLENGE IT.  I JUST

23  WANTED THE RECORD TO BE CLEAR.

24          WOULD YOU AGREE, AT LEAST NOW HAVING YOUR

25  RECOLLECTION REFRESHED, THAT POST HAS A HYPOTHETICAL, I

1    BELIEVE, OF A BURGLARY SUSPECT WHO SHOOTS A POLICE OFFICER

2    WITH A GUN, MISSES, AND THEN DROPS THE GUN, AND THE QUESTION

3    IS WHETHER IT'S OKAY FOR THE OFFICER TO SHOOT HIM?

4    A.   THAT'S WHAT IT SAYS AND I TOTALLY AGREE WITH IT.

5    Q.   AND IT BASICALLY SAYS IT WOULD BE INAPPROPRIATE TO SHOOT

6    IF THE PERSON SURRENDERING, EVEN IF THAT PERSON SHOT AT THE

7    OFFICER; IS THAT TRUE?

8    A.   THAT'S WHAT IT SAYS AND I TOTALLY ABSOLUTELY AGREE WITH

9    THAT.

10   Q.   OKAY.  BECAUSE YOU AGREE IF A PERSON IS SURRENDERING

11   THEY SHOULDN'T BE SHOT?

12   A.   I AGREE WITH THAT, YES.

13   Q.   OKAY.  YOU MENTIONED IN TERMS OF COMMAND THAT IT'S BEST

14   IF ONE OFFICER COULD BE GIVING THE COMMAND TO AVOID

15   CONFUSION?

16   A.   THAT'S BEST TO BE ISSUED COMMANDS FROM ONE LOCATION, ONE

17   PERSON.

18   Q.   YOU WOULD AGREE, UNDER THE CONTEXT OF THIS CASE AND THE

19   HYPOTHETICALS GIVEN TO YOU BY MR. ROTHANS, THAT MR. GRISSOM

20   WAS NOT A FLEEING FELON, IF YOU WILL, AT THE TIME THE SHOTS

21   WERE FIRED?

22   A.   I AGREE WITH THAT, YES.

23   Q.   AND YOU, YOURSELF -- STRIKE THAT.

24        DID YOU EVER ACTUALLY TEACH AT THE ACADEMY?

25   A.   NO.

```
 1              I TAUGHT THE EXECUTIVE DEVELOPMENT PROGRAM, WHICH
 2    WAS POST ACADEMY AND IT'S SENIOR EXECUTIVE TRAINING.  THIS IS
 3    RECRUIT TRAINING THAT WE'RE TALKING ABOUT.
 4    Q.   OKAY.  THANK YOU.
 5              THE -- YOU SAID SOMETHING TO THE EFFECT THAT YOUR
 6    FORTE WAS CIVIL LITIGATION?
 7    A.   YES.
 8    Q.   IN FELONY TRAFFIC STOPS, ARE THERE SOMETIMES SITUATIONS
 9    WHERE DIFFERENT OFFICERS HAVE DIFFERENT ASSIGNMENTS.
10    A.   ABSOLUTELY.
11              I'D LIKE TO ADD SOMETHING.  I DON'T WANT TO MISLEAD
12    THIS JURY.  I'M NOT AN ATTORNEY.  I HAVEN'T BEEN TRAINED IN
13    THE LAW.  IF MY FORTE IS CIVIL LITIGATION, IT'S ONLY IN A
14    POLICE PRACTICE AND CONTEXT, SO I DON'T WANT THE JURY TO
15    THINK THAT I'M A LAWYER OR HAVE BEEN TRAINED IN THE LAW.
16    Q.   OKAY.
17    A.   NOW, TO ANSWER YOUR CURRENT QUESTION, YES, DIFFERENT
18    OFFICERS DO HAVE DIFFERENT ROLES INVOLVED IN TRAFFIC STOPS.
19    Q.   AND SOMETIMES SOMEONE IS ASSIGNED TO BE A LESS THAN
20    LETHAL OPTION; CORRECT?
21    A.   AT TIMES, DEPENDING ON A SITUATION, BUT NOT -- NOT ON A
22    ROUTINE TRAFFIC STOP, NO, THAT'S NOT THE CASE.
23    Q.   WITH RESPECT TO TASERS, YOU TALKED ABOUT THEM HAVING
24    CAPABILITY FOR APPROXIMATELY 25 TO 30 FEET; IS THAT CORRECT?
25    A.   YES.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1              AND THAT'S DICTATED BY THE LENGTH OF THE WIRE THAT
 2    COMES OUT OF THE TASER ITSELF.
 3    Q.    IN FACT, THE COMPANY THAT MAKES TASERS, TASERS
 4    INTERNATIONAL, THEY MAKE THEM IN A WAY THAT THEY CAN BE SHOT
 5    FROM A DISTANCE; TRUE?
 6    A.    WELL, THAT -- YES, THAT EXPLAINS THE LENGTH OF THE WIRE.
 7    Q.    AND THE IDEA BEHIND THAT IS THAT YOU CAN USE IT WITHOUT
 8    BEING PHYSICALLY NEXT TO THE PERSON YOU'RE USING IT ON; TRUE?
 9    A.    MECHANICALLY, YES, THAT FOLLOWS.
10    Q.    AND DON'T THEY ALSO MAKE THE TASERS IN A WAY THAT THE
11    PROBES CAN PENETRATE CLOTHING?
12    A.    NOT ALWAYS.  IT'S DIFFERENT KINDS OF CLOTHING.  IF
13    YOU'RE TALKING ABOUT A T-SHIRT OR MAYBE A BUSINESS SUIT,
14    YOU'VE GOT A SHOT AT IT.  IF IT'S A LEATHER JACKET OR OTHER
15    KINDS OF MATERIALS THAT THE OFFICER -- CANNOT NECESSARILY SEE
16    IF IT'S LAYERED.
17    Q.    YOU'RE NOT SUGGESTING, ARE YOU, MR. CHAPMAN, THAT TASERS
18    ARE ONLY USED ON PEOPLE THAT HAVE NO CLOTHING, ARE YOU?
19    A.    NOT AT ALL.
20    Q.    OKAY.  BUT, IN ANY EVENT, THE WAY IT'S DESIGNED, IT
21    GIVES A FIVE-SECOND CURRENT OF ELECTRICITY AND THE CONCEPT IS
22    IF SOMEONE STANDING UP THEY WILL LOSE THEIR -- I THINK THE
23    WORD YOU USED WAS "NEUROMUSCULAR TO INCAPACITATION"?
24    A.    MUSCULAR INCAPACITATION, CORRECT.
25    Q.    WHICH WOULD THEN CAUSE A PERSON TO GO TO THE GROUND;
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    CORRECT?

2    A.   IT WOULD CAUSE A PERSON TO LOSE CONTROL OVER THEIR

3    MUSCLES; THEIR MUSCLES WOULD INVOLUNTARILY CONTRACT.

4    Q.   AND THEN THE WAY THE TRAINING IS, THE OFFICERS COULD

5    THEN MOVE IN AND GET THE PERSON HANDCUFFED?

6    A.   THAT'S THE OPTIMUM OBJECTIVE.  THAT'S WHAT IT'S DESIGNED

7    TO DO WHEN IT'S EFFECTIVE AND WHEN IT'S SUCCESSFUL.

8    Q.   NOW, I WANT YOU TO ASSUME THAT A WITNESS, BRITTANY

9    SCHIFF, OBSERVED THE FOLLOWING:  LET'S ASSUME THAT SHE SAW

10   THE MALE PASSENGER GET OUT OF THE CAR, FACE THE POLICE WITH

11   HIS HANDS UP, AND SAW HIS RIGHT HAND GO -- SLIGHTLY GO DOWN

12   AND SHE HEARD THE SHOTS, DO YOU HAVE THAT IN MIND?

13   A.   YES, SIR, I DO.

14   Q.   ASSUMING THAT TO BE TRUE, WOULD THE SHOOTING BE

15   APPROPRIATE?

16   A.   NO, IT WOULD NOT.

17   Q.   LET'S ASSUME AMANDA MEDEIROS TESTIFIED THAT SHE COULD

18   SEE BOTH OF THE DECEDENT'S HANDS OVER THE HOOD OF THE CAR,

19   THEY WERE BOTH VISIBLE, PALMS OUT FACING THE OFFICERS,

20   NOTHING IN HIS HANDS:  ASSUMING THAT TO BE TRUE, WOULD THE

21   SHOOTING BE APPROPRIATE?

22           THE COURT:  MR. ROTHANS?

23           MR. ROTHANS:  OBJECTION, YOUR HONOR.  THESE ARE

24   INCOMPLETE HYPOTHETICALS, INAPPROPRIATE.

25           THE COURT:  OVERRULED.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1              LADIES AND GENTLEMEN, IT'S FOR YOU TO DETERMINE HOW

 2    APPROPRIATE THE HYPOTHETICAL IS AND WHETHER IT ACCORDS WITH

 3    YOUR RECOLLECTION OF WHAT THE TESTIMONY IS AND OBVIOUSLY YOU

 4    CAN PROPOUND SOMEWHAT DIFFERENT HYPOTHETICALS WHEN YOU HAVE

 5    THE CHANCE.

 6              ALL RIGHT.  GO AHEAD.

 7              THE WITNESS:  NO.

 8              BASED ON THE ELEMENTS OF YOUR HYPOTHETICAL, IT

 9    WOULD NOT BE REASONABLE FOR THE OFFICERS TO SHOOT IN THAT

10    CASE.

11    BY MR. GALIPO:

12    Q.   LET'S ASSUME THAT OFFICER LOPEZ OBSERVED BOTH HANDS,

13    NOTHING IN THE HANDS, AND LET'S ASSUME HE DIDN'T SHOOT.

14              DO YOU HAVE THAT IN MIND?

15    A.   YES.

16    Q.   ARE YOU CRITICAL OF HIM FOR NOT SHOOTING UNDER THAT

17    HYPOTHETICAL?

18    A.   NO.

19    Q.   LET'S ASSUME OFFICER ZERBEY SAW BOTH HANDS AND NOTHING

20    IN THE HANDS AND HE DIDN'T SHOOT, ARE YOU CRITICAL OF OFFICER

21    ZERBEY FOR NOT SHOOTING?

22    A.   NO, SIR.

23    Q.   LET'S ASSUME OFFICER FAIRBANKS SAW BOTH HANDS, HE SAW

24    THE RIGHT HAND LOWERING AND GOING TO THE RIGHT, BUT HE COULD

25    SEE BOTH HANDS AND NOTHING IN THE HANDS, WOULD YOU BE
```

1    CRITICAL OF OFFICER FAIRBANKS FOR NOT SHOOTING?

2    A.   NO.

3    Q.   OFFICER BROWN, LET'S ASSUME, SAW BOTH HANDS, SAW THEM UP

4    AND SAW THEM LOWERING, BUT COULD STILL SEE BOTH HANDS AND

5    NOTHING IN THE HANDS, ARE YOU CRITICAL OF OFFICER BROWN FOR

6    NOT SHOOTING?

7    A.   NO.

8    Q.   IS BACKDROP AN IMPORTANT CONSIDERATION WHEN OFFICERS

9    FIRE?

10   A.   ALWAYS.

11   Q.   AND IS THAT BECAUSE ONE DOES NOT WANT INNOCENT PEOPLE TO

12   BE SHOT?

13   A.   THAT'S RATIONALE, YES, THAT WOULD BE A REASONABLE

14   CONSIDERATION.

15           MR. GALIPO:  MAY I HAVE ONE MOMENT, YOUR HONOR?

16           THE COURT:  YOU MAY.

17           MR. GALIPO:  NO FURTHER QUESTIONS AT THIS TIME,

18   YOUR HONOR.

19           THE COURT:  MR. ROTHANS?

20           MR. ROTHANS:  JUST BRIEFLY, YOUR HONOR.

21                  **REDIRECT EXAMINATION**

22   BY MR. ROTHANS:

23   Q.   CHIEF, ARE OFFICERS TRAINED, GIVEN YOUR BACKGROUND

24   TRAINING AND EXPERIENCE, THAT IF THERE'S A SUSPECT WITH ALL

25   THE FOUNDATIONAL FACTS WE'VE TALKED ABOUT IN THE PREVIOUS

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1   HYPOTHETICALS, WHO'S STANDING OUTSIDE OF A SUSPECT VEHICLE
 2   WITH HIS HANDS RAISED IN THE AIR LIKE THIS (INDICATING), THAT
 3   AN OFFICER MAY SHOOT HIM WITH A TASER?
 4   A.   NO.
 5        UNDER THOSE CIRCUMSTANCES, THE OFFICER HAS TO
 6   ARTICULATE A THREAT.
 7   Q.   BASED ON YOUR YEARS OF EXPERIENCE IN LAW ENFORCEMENT,
 8   ARE OFFICERS TRAINED THAT IF A SUSPECT OF AN ARMED ROBBERY OR
 9   A SERIES OF ARMED ROBBERIES DROPS ONE OR BOTH HANDS TOWARDS
10   HIS OR WAISTBAND AREA, THAT AN OFFICER SHOULD SHOOT THEM WITH
11   A TASER?
12   A.   NO.
13        BECAUSE OF THE LACK OF OPTIMUM EFFECTIVENESS OF THE
14   TASER.  TASERS ONLY EFFECT 70 TO 75 PERCENT OF THE TIME.
15   Q.   AND IS A TASER A LETHAL WEAPON?
16   A.   A TASER IS LABELED IN REFERENCE AS LESS LETHAL; ANYTHING
17   CAN KILL YOU, SO IT'S NOT NONLETHAL.  IT'S LESS THAN LETHAL.
18   Q.   SO ARE OFFICERS TRAINED, SIR, THAT THEY MAY SHOOT OR
19   DEPLOY A TASER WHEN THE SUSPECT IS BELIEVED TO BE ARMED WITH
20   A FIREARM?  I MEAN --
21        MR. GALIPO:  I'M GOING TO OBJECT AS AN INCOMPLETE
22   HYPOTHETICAL AS PHRASED.
23        THE COURT:  OVERRULED.
24        THE WITNESS:  NO.
25        POLICE OFFICERS ARE NOT TRAINED TO USE LESS LETHAL
```

```
 1    IN SITUATIONS THAT ARE DEADLY.  POLICE OFFICERS ARE UNDER NO

 2    OBLIGATION THROUGH TRAINING OR STATUTE TO RETREAT OR TO USE

 3    THE LEAST LEVEL OF FORCE AND THEN PROGRESS TO THE ULTIMATE

 4    FORCE.

 5              MR. GALIPO:  YOUR HONOR, I'M GOING TO OBJECT AS TO

 6    THE REFERENCE TO "STATUTE" AS OPPOSED TO "TRAINING."

 7              THE COURT:  OVERRULED.

 8    BY MR. ROTHANS:

 9    Q.  CHIEF, ARE OFFICERS TRAINED, IN THE DECADES YOU'VE BEEN

10    INVOLVED IN LAW ENFORCEMENT, THEY MAY ONLY SHOOT IF A SUSPECT

11    HAS A GUN AND IS POINTING IT DIRECTLY AT A PEACE OFFICER?

12    A.  NO.

13              OFFICERS CAN SHOOT IN OTHER SITUATIONS.

14    Q.  ARE OFFICERS TRAINED THEY MAY USE LETHAL FORCE, DEADLY

15    FORCE IF THE SUSPECT POSES A SIGNIFICANT THREAT OF SERIOUS

16    BODILY INJURY OR DEATH TO THE OFFICERS OR OTHERS?

17    A.  ABSOLUTELY.

18              MR. ROTHANS:  NOTHING FURTHER.

19              THANK YOU, YOUR HONOR.

20              THE COURT:  MR. GALIPO.

21                     **RECROSS EXAMINATION**

22    BY MR. GALIPO:

23    Q.  TO USE DEADLY FORCE, WHICH IS THE HIGHEST LEVEL OF

24    FORCE, YOU WOULD AGREE?

25    A.  ABSOLUTELY.
```

1    Q.   AND IT'S LIKELY TO CAUSE SERIOUS INJURY OR DEATH; TRUE?

2    A.   CORRECT.

3    Q.   THERE HAS TO BE A LIFE-THREATENING SITUATION; CORRECT?

4    A.   YES.

5    Q.   AND IT HAS TO BE IMMEDIATE; CORRECT?

6    A.   YES.

7    Q.   MEANING AT THE TIME THE SHOTS ARE FIRED; CORRECT?

8    A.   NO, I CAN'T CONCEDE TO THAT AS FAR AS THE IMMEDIATE

9    THREAT.  IT HAS TO BE A THREAT THAT IS LIKELY TO CAUSE GREAT

10   BODILY HARM OR DEATH.

11   Q.   DOESN'T POST TEACH IT HAS TO BE IMMEDIATE OR IMMINENT?

12   A.   THAT'S WHAT POST SAYS, BUT THERE ARE EXCEPTIONS TO THE

13   RULE.

14   Q.   AND POST ALSO TEACHES THAT IT HAS TO BE A REASONABLE

15   THREAT; CORRECT?

16   A.   YES, NOW THAT'S WHAT POST SAYS, YES.

17              MR. GALIPO:  THAT'S ALL I HAVE, YOUR HONOR.

18              THE COURT:  ALL RIGHT.

19              MR. ROTHANS:  NO FURTHER QUESTIONS.

20              THE COURT:  YOU MAY STEP DOWN.

21              THE WITNESS:  THANK YOU, YOUR HONOR.

22              THE COURT:  COUNSEL, WOULD PLEASE APPROACH AT

23   SIDEBAR?

24                         (SIDEBAR.)

25              THE COURT:  MR. ROTHANS, I ASKED -- I SHOULD SAY

1    THE PLAINTIFFS HAVE TOLD ME THEIR VIEW ON FOUNDATIONAL ACT OF

2    MEMORY AS ESTABLISHED IN FRONT OF A JURY.  I DON'T THINK

3    THAT -- SINCE THIS IS NOT A CONFRONTATION CLAUSE CASE, I

4    DON'T THINK THAT'S REQUIRED BY THE CONSTITUTION OR STATUTE OR

5    ANYTHING ELSE.

6         LET ME ASK:  WHAT'S THE POSITION OF THE DEFENSE?

7    WOULD YOU PREFER THAT I JUST DISMISS HER, THEN WE FIGURE OUT

8    HOW MUCH OF THE STATEMENT SHOULD COME IN, OR DO YOU WANT TO

9    HAVE HER EXAMINED IN FRONT OF THE JURY?

10        MR. ROTHANS:  IF WITH THE UNDERSTANDING THAT

11   COUNSEL WILL STIPULATE TO THE FOUNDATION THAT SHE EITHER

12   LACKS THE RECOLLECTION OF THIS EVENT THAT TOOK PLACE THREE

13   YEARS AGO SO WE DON'T HAVE FOUNDATIONAL ISSUES PLAINTIFF

14   STATES WITH THAT STIPULATION, WE'LL EXCUSE HER.  IF THEY DO

15   NOT STIPULATE TO THE FOUNDATION, HER PRESENT RECOLLECTION IS

16   GONE OF THIS EVENT, I THINK WE HAVE TO LAY THAT FOUNDATION.

17        THE COURT:  WELL, I MEAN, IF IT HAS BEEN LAID,

18   THAT'S THE PURPOSE OF VOIR DIRE.  I DON'T KNOW WHAT ELSE CAN

19   REALLY BE ACCOMPLISHED TO HAVE IT OCCUR IN FRONT OF THE JURY,

20   WHETHER IT WOULD BE UNFAIR TO GIVE THE JURY MORE OF A SENSE

21   OF A WITNESS AS FAR AS LAYING THE FOUNDATION, IT HAS ALREADY

22   HAPPENED.  THAT WAS THE PURPOSE OF BRINGING HER IN HERE.

23        MR. ROTHANS:  I COULD INQUIRE IF COUNSEL WILL

24   AGREE.

25        MR. GALIPO:  I WILL AGREE SHE'S ALREADY TESTIFIED

1    IN RESPONSE TO THE QUESTION, THAT SHE SAYS SHE DOES NOT

2    REMEMBER THE EVENT.  WHETHER IT'S TRUE OR NOT, I DON'T KNOW,

3    BUT I WOULD AGREE THAT'S WHAT SHE WOULD TESTIFY TO.  WE'RE

4    NOT WILLING TO WAIVE EVIDENTIARY OBJECTIONS; BUT, OBVIOUSLY,

5    THE COURT WILL MAKE WHATEVER DECISION IT THINKS APPROPRIATE.

6    POINT OF MY CONCERN IS IF SHE DOESN'T TESTIFY, AND GIVEN THE

7    STATEMENT IN OPENING STATEMENT THAT THE FAMILY HAS THREATENED

8    HER FROM COMING TO COURT, I DON'T WANT THE JURY TO BE LEFT

9    WITH THAT IMPRESSION.  THAT'S ONE OF MY CONCERNS.

10         MR. ROTHANS, LET ME CLARIFY, I NEVER SAID IN

11   OPENING STATEMENT "THE FAMILY."  I SAID SHE WAS THREATENED.

12         MR. ROTHANS:  WE HAD IT PREPARED.  THAT'S WHAT YOU

13   DID SAY.

14         THE COURT:  IN ANY EVENT, THAT CAN BE DEALT WITH

15   SEPARATELY FROM THIS ISSUE, AND OBVIOUSLY THE ONLY WAY TO

16   REALLY RESOLVE THAT WITH HER IN FRONT OF THE JURY WOULD BE A

17   HUGE MISTAKE FOR ALL PARTIES, ESPECIALLY FOR THE PLAINTIFFS

18   IN THAT SENSE.  I'M GOING TO ORDER HER DISMISSED, THEN

19   PORTIONS OF HER INITIAL STATEMENT, WHICH HAVE CERTAIN INDICIA

20   FOR LIABILITY AS EXCITED UTTERANCE AND INHERENTLY BY THE FACT

21   OF HER ADMISSION IT BEING TIES TO A POLICE OFFICER IS

22   SOMETHING THE JURY WILL BE ABLE TO JUDGE HER CREDIBILITY,

23   ESPECIALLY IF IT HEARS HER VOICE.

24         MR. ROTHANS:  LET ME POINT OUT TO THE COURT, I HAVE

25   TWO OTHER OFFICERS HERE TO IMPEACH HER.  IF REQUIRED, WE CAN

```
 1    LET THEM GO.  THEN I ONLY HAVE ONE OTHER WITNESS LESS -- HE'S
 2    LESS THAN HALF AN HOUR.
 3            THE COURT:  OKAY.  THEN THAT'S THE WAY -- I'LL GIVE
 4    YOU A CHANCE FURTHER ON THE RECORD TO MAKE YOUR OBJECTION,
 5    MR. GALIPO, BUT THAT'S WHAT I'M GOING TO DO.
 6            MR. ROTHANS:  SHALL WE EXCUSE THE WITNESS?
 7            THE COURT:  YOU CAN EXCUSE THE WITNESS AND THE
 8    OFFICERS.
 9            MR. ROTHANS:  THANK YOU.
10                        (END SIDEBAR.)
11            MR. ROTHANS:  AT THIS TIME, YOUR HONOR, THE DEFENSE
12    WOULD LIKE TO CALL L.A. COUNTY DETECTIVE STEVEN BLAGG.
13            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
14      DETECTIVE STEVEN BLAGG, DEFENDANT'S WITNESS, SWORN
15            THE CLERK:  PLEASE BE SEATED.
16            PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.
17            THE WITNESS:  STEVEN BLAGG; S-T-E-V-E-N, B-L-A-G-G.
18            THE CLERK:  THANK YOU.
19            THE COURT:  YOU MAY PROCEED.
20            MR. ROTHANS:  THANK YOU, YOUR HONOR.
21                        DIRECT EXAMINATION
22    BY MR. ROTHANS:
23    Q.   GOOD AFTERNOON, SIR.
24    A.   GOOD AFTERNOON.
25    Q.   ARE YOU CURRENTLY EMPLOYED?
```

```
 1    A.   YES, I AM.

 2    Q.   BY WHOM?

 3    A.   THE LOS ANGELES COUNTY SHERIFFS' DEPARTMENT.

 4    Q.   IN WHAT CAPACITY, SIR?

 5    A.   I'M A DEPUTY SHERIFF CURRENTLY ASSIGNED AS A DETECTIVE

 6    AT OUR HOMICIDE BUREAU.

 7    Q.   AND WERE YOU ASSIGNED TO THE HOMICIDE BUREAU, SIR, IN

 8    APRIL OF 2010?

 9    A.   YES, I WAS.

10    Q.   DO YOU GENERALLY PLAY A ROLE IN OFFICER-INVOLVED

11    SHOOTING INVESTIGATIONS?

12    A.   YES.

13    Q.   AND DID YOU PLAY SUCH A ROLE ON APRIL 25, 2010, AND

14    BEYOND?

15    A.   YES, I DID.

16    Q.   WOULD YOU BRIEFLY, DETECTIVE, DESCRIBE YOUR EDUCATIONAL

17    BACKGROUND FOR US?

18    A.   I ATTENDED THE LOS ANGELES COUNTY SHERIFFS' DEPARTMENT

19    ACADEMY FOR 18 WEEKS.  UPON COMPLETION OF THE ACADEMY, I HAD

20    WORKED AT THE HALL OF JUSTICE JAIL ACROSS THE STREET FOR

21    22 MONTHS.  I THEN WENT ON A PATROL ASSIGNMENT, AND AFTER MY

22    PATROL ASSIGNMENT, WHICH LASTED APPROXIMATELY FIVE YEARS, I

23    WORKED A DETECTIVE UNIT AT PICO RIVERA STATION.  AFTER THAT,

24    I WORKED OUR MAJOR CRIMES BUREAU FOR APPROXIMATELY EIGHT

25    YEARS, AND I'VE BEEN ASSIGNED AT HOMICIDE BUREAU FOR A LITTLE
```

```
 1   OVER FIVE YEARS.  DURING THAT TIME, I RECEIVED HUNDREDS OF
 2   HOURS OF INSTRUCTION IN VARIOUS FORMS OF INVESTIGATIONS.
 3   I'VE CONDUCTED THOUSANDS OF DIFFERENT TYPES OF
 4   INVESTIGATIONS, INCLUDING EASILY WELL IN EXCESS OF 100 TO 125
 5   MURDER INVESTIGATIONS AND PROBABLY -- I'D SAY APPROXIMATELY
 6   20 TO 25 EITHER OFFICER OR DEPUTY-INVOLVED SHOOTING
 7   INVESTIGATIONS.
 8   Q.   AND WHAT WAS YOUR ROLE IN CONNECTION WITH THIS
 9   PARTICULAR OFFICER-INVOLVED SHOOTING OF APRIL 25, 2010?
10   A.   I WAS THE HANDLING INVESTIGATOR ALONG WITH MY PARTNER AT
11   THE TIME.
12   Q.   WHAT PERIOD OF TIME, DETECTIVE, DID YOUR WORK CONSIST
13   OF?
14   A.   WHAT PERIOD OF TIME?
15   Q.   RIGHT.
16   A.   FROM THE DAY I GOT THE INITIAL CALL, WHICH WAS
17   APRIL 25TH, 2010, UP UNTIL RIGHT NOW.  I MEAN, OUR
18   INVESTIGATION CONTINUES AS LONG AS THERE'S EITHER CIVIL OR
19   CRIMINAL PROCEEDINGS IN TACT.
20   Q.   DID I CONTACT YOU DIRECTLY WITHIN THE LAST DAY OR TWO IN
21   CONNECTION WITH THIS CASE?
22   A.   YES.
23   Q.   AND TELL YOU WHAT TIME AND WHERE I NEEDED YOU TO APPEAR
24   TO TESTIFY?
25   A.   YES.
```

```
1    Q.   DID I ALSO DISCUSS WITH YOU BRIEFLY SOME OF THE

2    EVIDENTIARY RULINGS ABOUT THINGS THAT YOU SHOULD AND SHOULD

3    NOT TALK ABOUT?

4    A.   YES, YOU DID.

5    Q.   DO YOU RECALL HOW MANY TIMES, IF AT ALL, WE'VE MET

6    PREVIOUSLY?

7    A.   I BELIEVE I MET YOU ONE TIME PRIOR AT MY OFFICE TO

8    REVIEW SOME EVIDENCE, AND I DON'T REMEMBER IF I MET YOU AT

9    THE SCENE OR NOT.  I -- I'M NOT SURE.  I THINK ONE TIME FOR

10   SURE PRIOR TO THIS.

11   Q.   SINCE THE WORK THAT YOU'VE DONE IN CONNECTION WITH YOUR

12   INVESTIGATION OF THIS OFFICER-INVOLVED SHOOTING, COVERED,

13   WHAT APPEARS TO BE YEARS, FROM APRIL 25 OF 2010 UP UNTIL NOW,

14   CAN YOU TELL US GENERALLY, KEEPING IN MIND THE MATTERS WE

15   TALKED ABOUT YESTERDAY, WHAT KIND OF WORK YOU DID IN

16   CONNECTION WITH THIS INVESTIGATION?

17   A.   INITIALLY, I WAS BRIEFED BY OFFICERS OF THE CULVER CITY

18   POLICE DEPARTMENT AS TO THE FACTS WHICH LED UP TO THE

19   OFFICER-INVOLVED SHOOTING.  I WALKED AND VIEWED THE CRIME

20   SCENE, THE ORIGINAL SCENE OF THE SHOOTING AS WELL AS OTHER

21   SCENES ASSOCIATED WITH THIS CASE.  I REVIEWED AND OBSERVED

22   SEVERAL PERTINENT PIECES OF EVIDENCE ASSOCIATED WITH MY

23   INVESTIGATION IN THIS CASE AND INTERVIEWED SEVERAL WITNESSES

24   ASSOCIATED WITH THIS CASE.

25   Q.   DO YOU HAVE A RECOLLECTION, DETECTIVE, AS TO
```

```
 1   APPROXIMATELY WHAT TIME YOU WOULD HAVE RECEIVED A CALL ON
 2   APRIL 25, 2010, TO RESPOND TO THIS PARTICULAR SCENE?
 3   A.   YES.
 4   Q.   WHEN WAS THAT?
 5   A.   THAT WAS AT APPROXIMATELY 12:20 P.M. ON SUNDAY,
 6   APRIL 25TH.
 7   Q.   AND DID YOU RESPOND FROM YOUR HOME?
 8   A.   YES, I DID.
 9   Q.   DO YOU HAVE AN ESTIMATE IN TERMS OF WHAT TIME YOU
10   ARRIVED AT THE SCENE AT MOTOR AVENUE AND VENICE BOULEVARD?
11   A.   YES, I DO.
12   Q.   WHAT IS THAT?
13   A.   THAT I ARRIVED AT APPROXIMATELY 2:25 P.M.
14   Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO HOW LONG PRIOR
15   TO YOUR ARRIVAL THE SHOOTING HAD TAKEN PLACE?
16   A.   YES.
17   Q.   WHAT WAS THAT, SIR?
18   A.   THE SHOOTING OCCURRED APPROXIMATELY 11:15 TO 11:20,
19   SOMEWHERE AROUND THERE, SO ROUGHLY ABOUT THREE HOURS BEFORE
20   MY ARRIVAL.
21   Q.   AND WERE YOU THE ONLY L.A. COUNTY SHERIFFS' DETECTIVE OR
22   EMPLOYEE WHO RESPONDED TO THIS SCENE?
23   A.   NO.
24   Q.   CAN YOU GIVE US A SENSE OF HOW THAT WORKS WITH YOUR
25   HOMICIDE BUREAU?
```

```
 1    A.   AS A HANDLING INVESTIGATOR, YOU AND YOUR PARTNER YOU

 2    WORK AS PARTNERS.  SO MY PARTNER AT THE TIME WAS SERGEANT

 3    JEFF COCHRAN, C-O-C-H-R-A-N, WE HAD THE LEAD ON THE

 4    INVESTIGATION.  WE WERE ALSO ASSIGNED A SECONDARY TEAM WHO --

 5    WHEN YOU HAVE THE LEAD AS THE INVESTIGATOR, YOU CONDUCT ALL

 6    OF THE INTERVIEWS AS WELL AS DIRECT THE INVESTIGATION AS THE

 7    LEADS.  OUR SECONDARY TEAM WAS TASKED WITH PROCESSING

 8    EVIDENCE AND DIRECTING THE INVESTIGATION AT ONE OF THE SCENES

 9    BECAUSE WE HAD MORE THAN ONE SCENE IN THIS INVESTIGATION.  WE

10    ALSO HAD ANOTHER TWO SET OF INVESTIGATORS.  SO JUST OF

11    SHERIFFS' HOMICIDE INVESTIGATORS, INITIALLY WE HAD EIGHT, AS

12    WELL AS MY DIRECT SUPERVISOR AT THE TIME.

13    Q.   WHEN YOU SAY, "MORE THAN ONE SCENE," ARE YOU REFERRING

14    TO THE RADIOSHACK?

15    A.   THAT IS CORRECT.

16    Q.   THE LOCATION ON SEPULVEDA WHERE THE ARMED ROBBERY HAD

17    TAKEN PLACE?

18    A.   THAT IS CORRECT.

19    Q.   DO YOU HAVE A GROUP OF HOMICIDE DETECTIVES RESPOND TO

20    THAT LOCATION AS WELL?

21    A.   YES, WE -- YES, I DID.

22    Q.   NOW, WHAT'S YOUR PROTOCOL IN TERMS OF THE -- FROM THE

23    OUTSET UPON ARRIVAL AT A SCENE OF AN OFFICER-INVOLVED

24    SHOOTING?

25    A.   ONCE ALL OF THE SHERIFFS' INVESTIGATORS ARRIVE, WE
```

1    LIAISON WITH -- IN THIS CASE, IT WAS WITH SOMEBODY FROM

2    CULVER CITY POLICE DEPARTMENT WHO BRIEFED US AS TO THE EVENTS

3    THAT LED UP AND EVENTUALLY LED TO THE OFFICER-INVOLVED

4    SHOOTING.  ONCE WE RECEIVED THAT BRIEFING, I KIND OF -- I

5    LIKE TO WAIT UNTIL ALL OF OUR INVESTIGATORS ARE THERE, THAT

6    WAY WE ONLY HAVE TO HAVE A PERSON GIVE US THE SPEECH ONE

7    TIME.  ONCE WE HAVE THAT INFORMATION, WE GET OUR CRIME SCENE

8    FOLKS WHO ARE EITHER OUR CRIME SCENE INVESTIGATORS OR, YOU

9    KNOW, PEOPLE FROM OUR FIREARMS SECTION OR CRIME SCENE

10   SECTION.  ONCE THEY ARRIVE, WE DO A WALK-THROUGH OF THE

11   SCENE, OF THE SHOOTING SCENE, AND OBSERVE ANY PERTINENT ITEMS

12   OF EVIDENCE THAT WE NOTICE OR WHICH ARE POINTED OUT TO US,

13   AND WE OBVIOUSLY MAKE NOTE OF THAT AND DIRECT OUR FOLLOW-UP

14   TEAMS ON WHAT WE SAW AND WHAT WE WANT DONE AS FAR AS THE

15   SCENE.

16   Q.   THIS BRIEFING BY THE CULVER CITY POLICE DEPARTMENT, DO

17   YOU, UPON ARRIVAL, SPEAK TO THE SHOOTING OFFICER?

18   A.   NO.

19   Q.   DO YOU, AT THE SCENE, QUESTION THE SHOOTING OFFICER IN

20   ANY FASHION?

21   A.   NO.

22        IN MY EXPERIENCE AND THE WAY THAT I HAVE BEEN

23   TAUGHT AT SHERIFFS' HOMICIDE, THE SHOOTING OFFICER, IN MY

24   EXPERIENCE, IS NEVER AT THE SCENE BY THE TIME WE ARRIVE

25   BECAUSE, OBVIOUSLY, WE ARRIVE SOMETIME AFTER THE SHOOTING

```
 1    OCCURRED.  THE OFFICER WHO HAS BEEN INVOLVED IN THE SHOOTING
 2    WILL HAVE BEEN TRANSPORTED TO THEIR STATION AND IS NOT
 3    PRESENT AT THE SCENE AT THAT TIME.  AND, IN THIS CASE, THE
 4    OFFICER WAS NOT PRESENT AT THE SCENE.
 5    Q.   SO DID YOU HAVE ANY COMMUNICATIONS, ANY DIALOGUE
 6    DIRECTLY WITH OFFICER LUIS MARTINEZ AT THE SCENE OF THIS
 7    SHOOTING?
 8    A.   NO, HE WAS NOT THERE WHEN I ARRIVED.
 9    Q.   WHEN YOU DID THE WALK-THROUGH, DID YOU DO THE
10    WALK-THROUGH WITH OFFICER MARTINEZ?
11    A.   NO.
12    Q.   WHEN YOU EVENTUALLY MET WITH HIM, DID YOU TAKE HIM BACK
13    TO THE SCENE AND DO A WALK-THROUGH?
14    A.   NO, I DID NOT.
15    Q.   DO YOU HAVE A GENERAL UNDERSTANDING OF THE PEACE OFFICER
16    BILL OF RIGHTS?
17    A.   SOMEWHAT, YES.
18    Q.   BASED ON YOUR BACKGROUND, TRAINING AND EXPERIENCE, ARE
19    YOU TAUGHT NOT TO INTERROGATE THE SHOOTING OFFICER AT THE
20    SCENE OF THESE INCIDENTS?
21    A.   I'M -- I'VE BEEN TAUGHT THAT, YES.  I DON'T -- I DON'T
22    INTERVIEW AN OFFICER WHO'S BEEN INVOLVED IN A SHOOTING AT THE
23    SCENE.  I USUALLY DO IT BACK AT THEIR STATION, MY OFFICE OR
24    SOMEWHERE AWAY FROM THE SCENE.
25    Q.   ARE YOU FAMILIAR WITH WHAT A PUBLIC SAFETY STATEMENT IS?
```

1    A.    YES.

2    Q.    DO YOU HAVE AN UNDERSTANDING AS TO HOW EXTENSIVE OR

3    COMPREHENSIVE A PUBLIC SAFETY STATEMENT IS?

4    A.    SOMEWHAT, YES.

5    Q.    WHAT'S YOUR UNDERSTANDING?

6    A.    BASICALLY A PUBLIC SAFETY --

7              MR. GALIPO:  I APOLOGIZE, YOUR HONOR.  I'M GOING TO

8    OBJECT AS IRRELEVANT AS TO HIS UNDERSTANDING.

9              THE COURT:  IT'S -- THE OBJECTION IS SUSTAINED.

10   THE JURY'S ALREADY HEARD -- HAS HEARD THIS SEVERAL TIMES,

11   INCLUDING FROM THE EXPERTS.

12             MR. ROTHANS:  VERY WELL, YOUR HONOR.

13   BY MR. ROTHANS:

14   Q.    DO YOU RECALL WHO FROM CULVER CITY GAVE YOU A BRIEFING

15   OR SOME INFORMATION ABOUT WHAT HAD HAPPENED IN THE SHOOTING?

16   A.    YES.

17   Q.    AND WHO GAVE YOU THAT INFORMATION?

18   A.    SERGEANT REPUCCI -- AND, EXCUSE ME, I DON'T REMEMBER HOW

19   TO SPELL HIS LAST NAME.

20   Q.    VERY WELL.

21             WHEN YOU DID YOUR INITIAL WALK-THROUGH, WERE OTHER

22   MEMBERS OF THE L.A. COUNTY SHERIFFS' DEPARTMENT HOMICIDE

23   BUREAU ALONG WITH YOU?

24   A.    YES.

25   Q.    ROUGHLY, HOW MANY FOLKS WOULD HAVE BEEN WITH YOU DURING

```
 1   THAT INITIAL WALK-THROUGH?

 2   A.   A TOTAL OF -- INCLUDING MYSELF AND MY PARTNER, THERE

 3   WOULD HAVE BEEN NINE OF US, INVESTIGATORS, AND ONE

 4   SUPERVISOR.

 5   Q.   DURING YOUR INITIAL WALK-THROUGH AT THIS SCENE, IT TOOK

 6   PLACE IN THE PARKING LOT AT MOTOR AND VENICE; IS THAT TRUE?

 7   A.   THAT IS CORRECT.

 8   Q.   THAT'S THE DONUT KING PARKING LOT IN THE SOUTHWEST

 9   CORNER?

10   A.   YES.

11   Q.   DURING YOUR INITIAL WALK-THROUGH, DETECTIVE, DID YOU SEE

12   A CELL PHONE ON THE GROUND?

13   A.   YES, I DID.

14   Q.   AT THE TIME YOU SAW THE CELL PHONE, WAS IT SIGNIFICANT

15   TO YOU IN ANY WAY?

16   A.   I JUST NOTICED IT AS A PIECE OF EVIDENCE THAT I DIRECTED

17   TO BE COLLECTED, OTHER THAN THAT IT WAS JUST A CELL PHONE.

18   Q.   LET ME SHOW YOU EXHIBIT 372-220, SIR.

19        MR. ROTHANS:  THAT'S 372-220, YOUR HONOR.

20        THE COURT:  ANY OBJECTION?

21        MR. ROTHANS:  IT -- I BELIEVE IT'S IN EVIDENCE.

22        THE COURT:  ALL RIGHT.  YOU'RE CORRECT IT IS.

23        ALL RIGHT.  GO AHEAD.

24   BY MR. ROTHANS:

25   Q.   DO YOU RECOGNIZE WHAT IS SHOWN HERE, DETECTIVE?
```

1    A.   YES, I DO.

2    Q.   WHAT DO YOU RECOGNIZE?

3    A.   I RECOGNIZE THIS IS THE PARKING LOT OF 10400, I BELIEVE

4    IT'S VENICE AVENUE, OUTSIDE OF THE DONUT KING, AND ALONGSIDE

5    THE CHRYSLER ON THE FLOOR, I SAW THE CELL PHONE THAT I

6    OBSERVED AS WELL AS A BLACK T-SHIRT THAT HAD BEEN CUT, I

7    BELIEVE, BY PARAMEDICS.

8    Q.   AND YOUR -- YOU INDICATED EARLIER YOU ARRIVED AT THE

9    SCENE AT APPROXIMATELY 2:25 IN THE AFTERNOON?

10   A.   THAT IS CORRECT.

11   Q.   ANY ESTIMATE AS TO HOW LONG AFTER YOUR ARRIVAL YOU DID

12   YOUR INITIAL WALK-THROUGH?

13   A.   I'D SAY ANYWHERE FROM 30 TO 45 MINUTES AFTER BEING

14   BRIEFED.

15   Q.   SO SOMETIME BETWEEN ROUGHLY 3:00 AND 3:15 IN THE

16   AFTERNOON?

17   A.   CORRECT.

18   Q.   THE CELL PHONE SHOWN IN EXHIBIT 372-220 HERE IN THIS

19   PARTICULAR PHOTOGRAPH, WAS IT IN THE LOCATION WE SEE IN THAT

20   PHOTO?

21   A.   WHEN I OBSERVED IT, YES.

22   Q.   AND WAS IT ALWAYS IN THAT LOCATION DURING THE TIME THAT

23   YOU WERE CONDUCTING YOUR INVESTIGATION?

24   A.   YES.

25   Q.   LET ME SHOW YOU A PHOTOGRAPH, 377-010 --

1          MR. ROTHANS:  WHICH I BELIEVE HAS ALSO BEEN

2    RECEIVED, YOUR HONOR.

3          THE COURT:  IT HAS BEEN.

4          MR. ROTHANS:  FOR THE RECORD, AGAIN 377-010.

5    BY MR. ROTHANS:

6    Q.   IS THIS -- GENERALLY DEPICT THE SAME SCENE AS THAT IN

7    THE PREVIOUS PHOTOGRAPH, SIR?

8    A.   YES, IT DOES.

9    Q.   THIS HAS YOUR L.A. COUNTY SHERIFFS' EVIDENCE MARKERS IN

10   PLACE?

11   A.   THAT IS CORRECT.

12   Q.   WHO PLACES THOSE MARKERS?

13   A.   THOSE WERE PLACED BY ONE OF OUR FOLKS FROM THE CRIME LAB

14   AT THE DIRECTION OF TWO OF MY PARTNERS WHO WERE AT THE SCENE.

15   THESE ITEMS WERE PLACED ON AFTER I LEFT THE PLACARDS.

16   Q.   AFTER YOU LEFT THE PLACARDS, MEANING?

17   A.   NO.  AFTER I LEFT THE SCENE, THESE PLACARDS WERE THEN

18   PLACED DOWN.

19   Q.   VERY WELL.

20          AND WHAT WE SEE HERE IN 377-010 IN TERMS OF THE

21   EVIDENCE MARKERS TWO AND THREE, DO THEY DENOTE THE LOCATION

22   THAT YOU SAW OF THE CELL PHONE AND THE BLACK T-SHIRT THAT HAD

23   BEEN CUT OFF?

24   A.   YES.

25   Q.   AT ANY POINT IN TIME DURING YOUR INVESTIGATION IN

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
1    CONNECTION WITH THIS CASE, DETECTIVE, DID YOU HAVE ANY
2    SUSPICIONS THAT THE CELL PHONE WAS PLANTED?
3    A.   NO.
4    Q.   AT ANY POINT, I'M TALKING ABOUT FROM APRIL 25 UP UNTIL
5    TODAY, MAY 7, 2013, DID YOU EVER HAVE ANY SUSPICIONS?
6    A.   NO, NOT AT ALL.
7    Q.   DID YOU CONFIRM AT SOME POINT DURING YOUR INVESTIGATION
8    THAT THE PHONE NUMBER ON THAT CELL PHONE BELONGED TO LEJOY
9    GRISSOM?
10   A.   I CONFIRMED IT FROM ANOTHER PERSON I SPOKE TO, YES, BUT
11   THE CELL PHONE WAS NOT REGISTERED TO LEJOY GRISSOM.
12           MR. GALIPO:  I'M GOING TO MOVE TO STRIKE AS CALLING
13   FOR HEARSAY, THEN, YOUR HONOR.
14           THE COURT:  SUSTAINED.
15           THE TESTIMONY IS STRICKEN, LADIES AND GENTLEMEN.
16           GO AHEAD.
17   BY MR. ROTHANS:
18   Q.   DO YOU KNOW, SIR, WHO A KELLI BLANCHARD IS?
19   A.   YES.
20   Q.   AND WHO IS SHE?
21   A.   SHE IS THE -- AN INVESTIGATOR FOR THE L.A. COUNTY
22   CORONER'S OFFICE.
23   Q.   YOU'VE WORKED WITH HER IN THE PAST?
24   A.   YES.
25   Q.   MS. BLANCHARD HAS BEEN A WITNESS IN THIS TRIAL AND HAS
```

```
1    TESTIFIED THAT SHE ARRIVED SOMETIME AFTER 6:00 O'CLOCK IN THE

2    EVENING AT THIS LOCATION AND WAS FORBIDDEN FROM TAKING

3    PHOTOGRAPHS AT THE SCENE.

4         DO YOU HAVE ANY PERSONAL KNOWLEDGE OF THAT?

5    A.   ONLY WHAT I READ IN HER REPORT.  I HAD MET WITH HER AT

6    THE HOSPITAL, NOT AT THE SCENE.

7    Q.   IS IT UNCOMMON FOR A CORONER'S INVESTIGATOR TO WANT TO

8    TAKE PHOTOGRAPHS AT A SCENE WHERE THERE'S NO LONGER A BODY?

9    A.   YES, IN MY EXPERIENCE VERY UNCOMMON.

10   Q.   WERE YOU PRESENT AND PHYSICALLY TOLD MS. BLANCHARD THAT

11   SHE SHOULDN'T TAKE PHOTOGRAPHS?

12   A.   NO.

13        I WASN'T AT THE SCENE AT THAT TIME, I -- AGAIN, I

14   MET WITH HER AT THE HOSPITAL.

15   Q.   YOU DON'T FIND IT UNCOMMON, THOUGH, THAT SHE WAS

16   PREVENTED FROM TAKING PHOTOGRAPHS AS A CORONER'S INVESTIGATOR

17   HOURS LATER?

18   A.   I DON'T FIND IT UNCOMMON BECAUSE THERE WAS NO BODY AT

19   THE SCENE AND WE HAD OUR CRIME SCENE FOLKS TAKING ALL OF THE

20   PHOTOS AT THAT TIME.

21        MR. ROTHANS:  VERY WELL.

22        I HAVE NOTHING FURTHER, YOUR HONOR.

23        THANK YOU, SIR.

24        THE COURT:  MR. GALIPO?

25        MR. GALIPO:  THANK YOU, YOUR HONOR.
```

<u>**CROSS-EXAMINATION**</u>

BY MR. GALIPO:

Q.   GOOD AFTERNOON, SIR.

A.   GOOD AFTERNOON.

Q.   WHY, IF YOU KNOW, WOULD SOMEONE LIKE KELLI BLANCHARD WHO
WORKS FOR THE CORONER'S OFFICE AND IS SUPPOSED TO DO AN
INVESTIGATION, WHY WOULD SHE BE DENIED THE OPPORTUNITY TO
TAKE PICTURES OF THE SCENE?

A.   I WASN'T THERE, NOR DID I DENY HER, SO I WOULDN'T BE
ABLE TO ANSWER THAT FOR YOU.

Q.   ALL RIGHT.  NOW, JUST SO WE CAN GET THE TIMING CORRECT,
I THINK YOU TOLD US THAT YOU ARRIVED ON SCENE AROUND 2:25?

A.   APPROXIMATELY, YES.

Q.   SO, APPROXIMATELY, THREE HOURS AFTER THE SHOOTING?

A.   CORRECT.

Q.   AND WHEN, APPROXIMATELY, DID YOU THINK YOU GOT THE
BRIEFING FROM SERGEANT REPUCCI?

A.   I BELIEVE IT WAS 30 TO 45 MINUTES AFTER I ARRIVED.

Q.   OKAY.  HAD YOU LOOKED CLOSE UP ON THE PASSENGER'S SIDE
OF THE CHRYSLER SEBRING BEFORE YOU GOT THE BRIEFING FROM
SERGEANT REPUCCI?

A.   NO, JUST FROM ACROSS THE STREET WHERE THE COMMAND POST
WAS.

Q.   SO WOULD IT BE CORRECT THAT IT WASN'T SOMETIME UNTIL
AFTER 3:00 OR 3:15 YOU WENT TO THE PASSENGER'S SIDE OF THE

1    GREEN SEBRING?

2    A.    THAT IS CORRECT.

3    Q.    AND THAT'S WHEN YOU FIRST SAW THE PHONE?

4    A.    THAT'S -- CORRECT, WHEN I FIRST SAW EXACTLY WHAT IT WAS

5    UP CLOSE.

6    Q.    DO YOU HAVE ANY IDEA EXACTLY HOW THE PHONE GOT TO THE

7    SPOT WHERE YOU SAW IT?

8    A.    NO.

9    Q.    DID ANYONE TELL YOU IN TERMS OF ANY OF YOUR

10   INVESTIGATION IN THIS CASE HOW THE PHONE GOT THERE?

11   A.    NO.

12   Q.    NOW, HAVING SEEN THE PHONE WHILE YOU WERE AT THE SCENE,

13   DID YOU ASK ANY OF THE OFFICERS ON THE SCENE WHO MIGHT HAVE

14   BEEN PRESENT AT THE TIME OF THE SHOOTING HOW THAT PHONE GOT

15   THERE?

16   A.    NO.

17   Q.    YOU APPARENTLY THOUGHT IT WAS IMPORTANT ENOUGH TO --

18   THERE'S A PLACARD NEXT TO IT, ITEM NUMBER 2; CORRECT?

19   A.    YES.

20   Q.    DID ANYONE TELL YOU AT THE SCENE HOW THAT PHONE GOT

21   THERE?

22   A.    NO.

23   Q.    DID ANYONE TELL YOU THAT PHONE HAD BEEN MOVED?

24   A.    NO.

25   Q.    ARE OFFICERS TRAINED WITH RESPECT TO PRESERVING A SCENE

```
 1   TRYING NOT TO MOVE ITEMS OF EVIDENCE?

 2   A.   YES, I WOULD SAY SO.

 3   Q.   AND ARE OFFICERS TRAINED IF CERTAIN ITEMS OF EVIDENCE

 4   ARE MOVED FOR SOME REASON THAT THEY ARE -- IF THEY WANT TO,

 5   THEY CAN TELL SOMEONE LIKE YOU WHO'S DOING THE INVESTIGATION

 6   SO THAT YOU KNOW?

 7   A.   I WOULD BELIEVE IF THEY PICKED IT UP AND ACTUALLY HAD TO

 8   MANIPULATE IT FROM ONE SPOT TO ANOTHER WHERE THEY MAY HAVE

 9   LEFT EITHER DNA OR FINGERPRINTS ON IT, YEAH.

10   Q.   DO YOU RECALL ANY BLOOD BEING ON THIS PHONE?

11   A.   THERE APPEARED TO ME TO BE, BUT NEVER HAD IT TESTED FOR

12   EXACT BLOOD, BUT YES.

13   Q.   THERE APPEARED TO BE.

14        DO YOU HAVE ANY PICTURES THAT SHOWED BLOOD ON THE

15   PHONE THAT YOU'RE AWARE OF?

16   A.   NOT PHOTOS, BUT I ACTUALLY HAVE THE PHONE WITH WHAT

17   APPEARS TO BE SMEARS OF BLOOD ON THE SCREEN.

18   Q.   WHERE IS THE PHONE NOW?

19   A.   RIGHT HERE WITH ME.

20   Q.   DOES IT LOOK LIKE A GUN TO YOU, THIS PHONE?

21        MR. ROTHANS:  OBJECTION, YOUR HONOR.  INCOMPLETE

22   HYPOTHETICAL.  VAGUE AS PHRASED.

23        THE COURT:  OVERRULED.

24        THE WITNESS:  LOOKS LIKE A CELL PHONE.

25   BY MR. GALIPO:
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1    Q.   NOW, WHERE -- WHAT TIME DID YOU LEAVE THE SCENE,
2    INITIALLY?
3    A.   TRYING TO REMEMBER EXACTLY WHAT TIME, BECAUSE FROM THERE
4    I WENT TO THE RADIOSHACK AND FROM THE -- I WOULD SAY PROBABLY
5    SOME TIME AFTER 4:00.
6    Q.   NOW, YOU -- EITHER YOU AND/OR YOUR PARTNER, DETECTIVE
7    COCHRAN, WROTE A REPORT REGARDING YOUR INVESTIGATION?
8    A.   YES.
9    Q.   BY THE WAY, IN THE BRIEFING THAT YOU GOT AT THE SCENE,
10   WAS THERE ANY MENTION OF A CELL PHONE?
11   A.   NO.
12   Q.   ANY MENTION OF AN OBJECT IN MR. GRISSOM'S HAND AT THE
13   TIME OF THE SHOOTING?
14   A.   DURING THE BRIEFING, NO.
15   Q.   DID ANYONE AT THE TIME OF THE BRIEFING TELL YOU THAT HE
16   MADE A SUDDEN SPIN AND THEN WAS SHOT WITHIN A SECOND OF THAT?
17   A.   I DON'T BELIEVE IT WAS EXACT WORDING TO THAT EFFECT
18   BECAUSE IT WAS ACTUALLY -- IT WAS -- HE TURNED AND FACED THE
19   OFFICERS AND THEN HIS RIGHT HAND DROPPED TO HIS WAIST, AND
20   THAT'S WHEN THE SHOOTING OCCURRED.
21   Q.   WELL, THAT'S NOT WHAT YOU WERE TOLD IN THE BRIEFING, WAS
22   IT?
23   A.   I BELIEVE THAT WAS PART OF IT, YEAH.
24   Q.   WEREN'T YOU TOLD IN THE BRIEFING THAT HE GOT OUT, FACED
25   THE OFFICERS, HIS HANDS WERE UP, HE LOWERED HIS HANDS, WAS
```

```
1    TOLD TO RAISE THEM UP, AND THEN HE RAISED THEM UP?

2    A.   AND THEN HE LOWERED HIS RIGHT HAND AGAIN AND THEN THAT'S

3    WHEN THE SHOOTING HAD OCCURRED.

4    Q.   WELL, LET'S TAKE THIS ONE STEP AT A TIME.

5         YOU WERE TOLD IN THE BRIEFING THAT HE GOT OUT AND

6    IMMEDIATELY FACED THE OFFICERS?

7    A.   YES.

8    Q.   YOU WERE THEN TOLD THAT HE HAD HIS HANDS UP?

9    A.   YES.

10   Q.   WERE YOU THEN TOLD HE LOWERED HIS HANDS AND WAS TOLD TO

11   PUT HIS HANDS BACK UP AND HE DID?

12   A.   YES.

13   Q.   OKAY.  WERE YOU THEN TOLD THAT BOTH OF HIS HANDS WERE

14   LOWERED, THEN HE WAS SHOT?

15   A.   I BELIEVE IT WAS HIS RIGHT HAND -- OR, NO, I'M SORRY.

16   DURING THE BRIEFING, BOTH HANDS LOWERED TOWARDS HIS WAISTBAND

17   AREA, AND THAT'S WHEN THE SHOOTING OCCURRED.

18   Q.   NO ONE TOLD YOU IN THE BRIEFING THAT JUST ONE HAND

19   LOWERED, DID THEY?

20   A.   NO, THAT WAS LATER ON IN THE INTERVIEWS OF THE OFFICERS.

21   Q.   NOW, YOU -- AT ABOUT 4:15 P.M. THAT DAY YOU DECIDED NOT

22   TO INTERVIEW OFFICER MARTINEZ; IS THAT CORRECT?

23   A.   YES.

24   Q.   AND THAT'S BECAUSE HE APPEARED TIRED, HIS EYES WERE RED,

25   AND HIS SPEECH WAS SLOW?
```

1          MR. ROTHANS:  OBJECTION.  BEYOND THE SCOPE, YOUR

2     HONOR.

3          THE COURT:  OVERRULED.

4          THE WITNESS:  IT WAS BECAUSE HE HAD BEEN WORKING

5     SINCE 7:00 P.M. THE DAY BEFORE ON SATURDAY, THE 24TH, AND HE

6     SAID THAT HE WAS EXHAUSTED AND HE APPEARED TO BE EXHAUSTED.

7     Q.   AND THAT WAS AT ABOUT 4:15 P.M., CORRECT?

8     A.   THAT IS CORRECT, LITTLE SHY OF ALMOST 24 HOURS OF WORK.

9     Q.   SO ARE YOU SAYING THAT THE EVIDENCE PLACARDS THAT WE SAW

10    IN A FEW OF THOSE PICTURES, I THINK WE CAN SEE A TWO AND A

11    THREE, TWO WITH THE CELL PHONE AND THREE WITH WHAT APPEARS TO

12    BE SOME CLOTHING, WERE THOSE DOWN YET AT THE TIME YOU LEFT

13    THE SCENE?

14    A.   THE EVIDENCE PLACARDS OR THE ITEMS.

15    Q.   THE EVIDENCE PLACARDS?

16    A.   THE EVIDENCE PLACARDS WERE NOT DOWN BY THE TIME I LEFT

17    THE SCENE.

18    Q.   SO, TO YOUR KNOWLEDGE, WERE PHOTOGRAPHS TAKEN AFTER YOU

19    LEFT THE SCENE?

20    A.   YES.

21    Q.   DO YOU HAVE ANY IDEA WHEN THOSE PHOTOGRAPHS WERE TAKEN?

22    A.   NO, I WASN'T PRESENT, SO NO.

23    Q.   JUST SOME TIME AFTER YOU LEFT THE SCENE, WHICH MAY BE

24    AROUND 4:00 O'CLOCK OR SO?

25    A.   IT WOULD HAVE BEEN AFTER I LEFT THE SCENE, SO SOME TIME

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1    AFTER 4:00, THAT'S AROUND THE TIME I LEFT, YEAH.
 2              MR. GALIPO:  MAY I HAVE ONE MOMENT, YOUR HONOR?
 3              THE COURT:  YOU MAY.
 4    BY MR. GALIPO:
 5    Q.   YOU MENTIONED DOING A WALK-THROUGH.  WHEN DID YOU DO THE
 6    WALK-THROUGH?
 7    A.   AFTER BEING BRIEFED.
 8    Q.   AND WHAT TIME, APPROXIMATELY, IF YOU ARRIVED AT 2:25,
 9    WERE BRIEFED AROUND 3:00 OR 3:15 P.M., WHEN WOULD YOU
10    ESTIMATE YOU DID THE WALK-THROUGH?
11    A.   RIGHT AFTER THE BRIEFING.  THE BRIEFING LASTED MAYBE
12    FIVE OR TEN MINUTES, IF THAT.
13    Q.   AND WHAT IS A WALK-THROUGH?
14    A.   IT'S WHERE WE WALK THROUGH THE SCENE, EITHER THE OFFICER
15    OR US AS THE INVESTIGATORS LOOK AT ITEMS OF EVIDENCE, WHAT WE
16    BELIEVE MAY BE EVIDENCE, PERTINENT EVIDENCE, AND WE WALK
17    THROUGH AND ACTUALLY TAKE A LOOK AT THE SURROUNDING AREA.
18    Q.   AND WHO DID YOU DO THE WALK-THROUGH WITH IN THIS CASE?
19    A.   ALL OF THE SHERIFFS' INVESTIGATORS THAT WERE ON SCENE,
20    MY SUPERVISOR, AND SERGEANT REPUCCI FROM CULVER CITY.
21    Q.   OKAY.  DID YOU DO THE WALK-THROUGH WITH ANY OF THE
22    OFFICERS THAT HAD BEEN ON SCENE AT THE TIME OF THE SHOOTING?
23    A.   NO.
24    Q.   AND SO YOU, AT SOME POINT, WERE INVOLVED IN THE
25    INTERVIEW OF OFFICER MARTINEZ; CORRECT?
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1    A.    CORRECT.

 2    Q.    AND PRIOR TO THE INTERVIEW, YOU HAD SEEN THAT PHONE, AS

 3    YOU INDICATED, ON THE GROUND ON THE PASSENGER'S SIDE OF THE

 4    CAR?

 5    A.    YES.

 6    Q.    DID YOU EVER ASK OFFICER MARTINEZ IF HE SAW THAT CELL

 7    PHONE IN THE PERSON'S HAND AT ANY TIME?

 8    A.    THE CELL PHONE, NO.

 9    Q.    AND YOU KNEW THE CELL PHONE WAS THERE BEFORE THE

10    INTERVIEW; TRUE?

11    A.    YES.

12    Q.    DID HE EVER MENTION ANYTHING ABOUT A CELL PHONE TO YOU

13    IN THE INTERVIEW?

14    A.    HE MENTIONED A SHINY OBJECT IN MR. GRISSOM'S HAND BEFORE

15    HE SHOT.

16    Q.    ANY DISCUSSION OF A CELL PHONE?

17    A.    NO.

18          JUST A SHINY OBJECT, WHICH THE SCREEN OF THAT CELL

19    PHONE IS SHINY.

20    Q.    DID HE TELL YOU THAT HE EVER SAW A CELL PHONE ON THE

21    GROUND AFTER THE SHOOTING?

22    A.    NO, BECAUSE HE DIDN'T APPROACH -- I DON'T BELIEVE HE

23    APPROACHED MR. GRISSOM AT THAT TIME.

24    Q.    THAT'S WHAT HE TOLD YOU; CORRECT?

25    A.    THAT'S WHAT HE TOLD ME, YES.
```

```
1              MR. GALIPO:  THANK YOU.

2              THAT'S ALL I HAVE, YOUR HONOR.

3              THE COURT:  MR. MC NICHOLAS?

4              MR. MC NICHOLAS:  NO QUESTIONS.

5              THE COURT:  MR. ROTHANS?

6              MR. ROTHANS:  NO FURTHER QUESTIONS.

7              THE COURT:  DETECTIVE, YOU'RE EXCUSED.

8              THE WITNESS:  THANK YOU.

9              THE COURT:  ANYTHING OTHER THAN THE MATTER THAT WE

10    PREVIOUSLY DISCUSSED?  ANY OTHER WITNESSES?

11             MR. ROTHANS:  NO, YOUR HONOR.

12             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN,

13    YOU'RE -- WE'LL TAKE THE AFTERNOON BREAK EARLY.  THERE'S A

14    MATTER I WANT TO DISCUSS WITH THE LAWYERS.  I THINK IT'S

15    GOING TO LEAD TO SHORTENING THE REMAINING AMOUNT OF

16    TESTIMONY, SO IT'S VERY MUCH IN ALL OF OUR INTEREST,

17    INCLUDING YOURS.  SO WITH THAT, PLEASE KEEP MY ADMONITIONS IN

18    MIND, DON'T DISCUSS THE CASE, DON'T INVESTIGATE THE CASE.  BE

19    PREPARED FOR TRIAL TO START AT TEN TO 3:00.

20             THANK YOU.

21             THE CLERK:  PLEASE RISE FOR THE JURY.

22                       (JURORS EXIT.)

23             THE COURT:  OBVIOUSLY, THE PREFERABLE SITUATION

24    WOULD BE FOR MS. WILLIS-COFIELD TO DO HER DUTY AND TESTIFY

25    AND NOT USE WHAT, IT SEEMS TO ME, IS THE EXCUSE OF NOT
```

1   REMEMBERING AS A WAY OF TRYING TO EVADE WHAT THE LAW

2   REQUIRES.  NONETHELESS, THAT'S THE SITUATION WHICH WE FIND

3   OURSELVES, WHICH DOES MEAN THAT AT LEAST SOME OF HER PRIOR

4   STATEMENTS WOULD BE ADMISSIBLE UNDER EITHER RULE 8035 OR THE

5   RESIDUAL EXCEPTION.  NOT FOR -- TECHNICALLY, IT DOES -- NONE

6   OF HER STATEMENTS FALLS WITHIN RULE 804 FOR UNAVAILABLE

7   WITNESSES, BUT CERTAINLY IT'S SIMILAR TO THOSE -- TO THOSE

8   EXCEPTIONS AND THAT IS INDICIA THAT COULD BE USED IN

9   ADMITTING IT UNDER THE RESIDUAL EXCEPTION.

10          THE REAL ISSUE HERE, AS COUNSEL -- ALL COUNSEL

11  AGREED AT SIDEBAR, THE FOUNDATIONAL FACT OF HER LACK OF

12  MEMORY AS WE ARE FORCED TO DEAL WITH IT, REALLY IS NOT

13  DISPUTED.  THAT WAS THE PURPOSE OF ESTABLISHING IT DURING THE

14  VOIR DIRE OUTSIDE THE PRESENCE OF THE JURY.  WHAT WE'RE LEFT

15  WITH, THEN, IS WHETHER THAT FACT SHOULD BE ESTABLISHED IN THE

16  JURY'S PRESENCE AND OTHER EXAMINATION TAKE PLACE.  EITHER

17  IT'S NOT REQUIRED BY THE CONSTITUTION -- THIS ISN'T A

18  CONFRONTATION CLAUSE CASE.  IT'S NOT REQUIRED UNDER THE RULES

19  OF EVIDENCE.  IT'S A FOUNDATIONAL FACT, WHICH IS FOR THE

20  COURT TO DETERMINE.  SO, REALLY, IT'S OUT OF FAIRNESS TO THE

21  PLAINTIFF TO TRY TO MAKE HER SEEM, YOU KNOW, UNCOOPERATIVE,

22  TO PUT HER STATEMENT IN CONTEXT, TO MAKE HER SEEM KIND OF A

23  NOT TO BE HONEST ABOUT IT, AND I CONSIDERED THOSE THINGS;

24  BUT, AT THE SAME TIME, THERE ARE SOME COUNTERVAILING FACTORS.

25  ONE IS, IS THAT SHE COULD BLURT OUT FACTS WHICH WOULD BE

```
 1    PREJUDICIAL TO THE PLAINTIFF AND WHICH ARE UNJUSTIFIED, THE

 2    OTHER THING IS THAT IF THE JURY HEARS HER TAPE-RECORDED

 3    VOICE, THEY CAN USE THAT AS A MEANS OF JUDGING HER

 4    CREDIBILITY AND ALSO IT DOES -- I AM INFORMED THAT IN THE

 5    STATEMENT SHE ADMITS THAT SHE -- HER HUSBAND OR FORMER

 6    HUSBAND IS A -- WAS A POLICE OFFICER, AND THEREFORE, THE JURY

 7    CAN HAVE THAT FACT IN MIND.

 8          SO BASED ON ALL OF THAT, I THINK UNDER RULE 403, IT

 9    IS APPROPRIATE NOT TO HAVE THE FOUNDATIONAL FACT ESTABLISHED

10    IN THE JURY'S PRESENCE.  SO I'LL BRIEFLY ALLOW COUNSEL TO

11    MAKE THEIR RECORDS.

12          BEYOND THAT, I DO THINK, THEN, WE HAVE TO DECIDE,

13    AND I WANT TO DO IT TODAY, WHAT IT IS THAT THE JURY'S GOING

14    TO HEAR BECAUSE I DON'T WANT THE LAST THING THE JURY HEARS

15    BEFORE INSTRUCTION AND ARGUMENT TO BE THAT ONE PARTICULAR,

16    YOU KNOW, PIECE OF EVIDENCE.  I'D RATHER THAT IT HAPPEN TODAY

17    AND THEN WE'LL START FRESH TOMORROW WITH THE INSTRUCTIONS AND

18    ARGUMENTS.

19          SO, MR. GALIPO?

20          MR. GALIPO:  YES, YOUR HONOR.

21          WELL, AS WE DISCUSSED AT SIDEBAR, I DO AGREE WITH

22    THE COURT THAT THIS WITNESS, IN THE EXAMINATION OUTSIDE THE

23    PRESENCE, SAID SHE DOESN'T REMEMBER IT AND I HAVE EVERY

24    REASON TO BELIEVE THAT'S WHAT SHE WOULD SAY IF SHE WAS BEFORE

25    THE JURY.
```

```
 1            THE COURT:  AND IT'S AGAINST THE BACKDROP OF HER

 2    PRIOR INTRANSIGENTS, YOU KNOW, OF NOT SHOWING UP FOR THE

 3    DEPOSITIONS, AND, AS WELL, HER -- AS I INDICATED MYSELF, HER

 4    QUITE MISTAKEN BELIEF THAT THERE WOULD NECESSARILY BE SOME

 5    LINK BETWEEN THE FACT THAT CERTAIN MEN APPEARED AT HER DOOR

 6    AND THE FACT THAT AN INVESTIGATOR IN THE -- IF THAT, IN FACT,

 7    IS WHO OR WHAT HE WAS, SHOWED UP PREVIOUSLY.  SO, I MEAN,

 8    IT'S IN THE CONTEXT OF ALL OF THAT THAT HER -- SHE'S MAKING

 9    THIS ASSERTION OF THE LACK OF MEMORY, BUT GO AHEAD.

10            MR. GALIPO:  WITHOUT REHASHING OUR WHOLE POSITION,

11    I JUST -- AND I KNOW THE COURT HAS CONSIDERED THIS AND HAS

12    MADE A DECISION, WE JUST WANT TO STATE OUR OBJECTION FOR THE

13    RECORD BECAUSE WE DON'T BELIEVE THAT THIS IS HEARSAY EVIDENCE

14    THAT SHOULD COME IN UNDER THE CIRCUMSTANCES SINCE WE DON'T

15    HAVE A RIGHT TO CROSS-EXAMINE HER.  I UNDERSTAND WHAT THE

16    COURT IS SAYING, IF THE JURY HEARS PORTIONS OF THE TAPE, THEY

17    COULD AT LEAST GATHER SOME CREDIBILITY IDEAS FROM THE TONE OR

18    FROM THE VOICE.  MANY OF THESE QUESTIONS WERE SOMEWHAT

19    LEADING, AND I UNDERSTAND, AGAIN, THE COURT SAYS, WELL, THEN

20    THE JURY COULD JUDGE THAT AS IT HEARS IT.

21            I ALSO AM A LITTLE BIT CONCERNED WITH TWO OTHER

22    ISSUES.  ONE WE ALREADY MENTIONED IN THE OPENING STATEMENT

23    REFERENCING, AND WE DID ORDER THE TRANSCRIPT, AND IT DOES

24    SAY -- IT MAY HAVE BEEN INADVERTENT, I DON'T KNOW, BUT MR.

25    ROTHANS DID SAY THAT THE FAMILY MEMBERS, SPECIFICALLY, HAD
```

```
 1   THREATENED HER OR DISSUADED HER FROM TESTIFYING.  I'M A
 2   LITTLE BIT CONCERNED IF THE JURY DOESN'T SEE HER, THEY'LL
 3   ASSUME THAT COULD BE TRUE.
 4         AND, LASTLY, THERE'S A LOT OF REFERENCE IN HER
 5   STATEMENT ABOUT OTHER PEOPLE IN THE DONUT SHOP FEELING THAT
 6   THE SHOOTING WAS UNJUSTIFIED.  NOW, IN SOME WAYS, THAT HURTS
 7   ME -- I MEAN, THAT HELPS ME, BUT THERE'S A LOT OF DISCUSSION
 8   ABOUT THAT, AND I THINK EARLIER IN THE TRIAL DEFENSE COUNSEL
 9   TRIED TO GET INTO THAT.  I DON'T THINK THAT'S PARTICULARLY
10   PERTINENT AS OPPOSED TO WHAT SHE OBSERVED.
11         THE COURT:  WELL, THAT GOES TO WHAT OF HER
12   STATEMENT IS GOING TO COME IN, SO THAT'S -- THAT'S
13   ENTIRELY -- WELL, NOT ENTIRELY A SEPARATE ISSUE, OBVIOUSLY,
14   BUT IT IS, IN FACT, A SEPARATE ISSUE AND I THINK -- YOU KNOW,
15   OBVIOUSLY, LINE FOR LINE -- AND THAT'S WHAT WE'RE GOING TO DO
16   RIGHT NOW SO THE JURY'S NOT KEPT WAITING IN ORDINARY LENGTH.
17   IF THEY WANT TO DECIDE WHAT'S CONSISTENT WITH 403, IN BASIC
18   FAIRNESS, SHOULD COME IN.  SO...
19         MR. GALIPO:  AND I THINK HER STATEMENTS ARE BOTH
20   EXHIBITS, SO WE HAVE THAT FOR YOUR HONOR.  AND I DO BELIEVE
21   THIS IS THE LAST PIECE OF EVIDENCE, AS I UNDERSTAND IT, IN
22   THE CASE.  THAT'S MY BELIEF.
23         THE COURT:  ALL RIGHT.  SO YOU WON'T HAVE A
24   REBUTTAL CASE?
25         MR. GALIPO:  I DON'T BELIEVE SO.  YOU KNOW, THE
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1    ONLY PEOPLE THAT WE MIGHT HAVE WANTED TO REBUT WAS -- I

2    THOUGHT ABOUT IT AFTER THEY WERE EXCUSED, THERE'S A LITTLE

3    UNCERTAINTY AS TO THE TIMING OF THESE STATEMENTS, ET CETERA,

4    ET CETERA BUT WE'LL SEE HOW IT GOES.

5            THE COURT:  MR. MC NICHOLAS?

6            MR. MC NICHOLAS:  YES, YOUR HONOR, I UNDERSTAND THE

7    COURT'S ANALYSIS ON THE ISSUE.  MY POSITION WOULD BE THAT 403

8    ACTUALLY WOULD DICTATE THAT NONE OF THIS COMES IN.  THE

9    WITNESS IS VERY UNSTABLE AND HER -- HOW DO WE KNOW SHE WAS

10   STABLE AT THE TIME?

11           NOW, I'VE LISTENED TO THE RECORDING.  SHE DOESN'T

12   SOUND UNSTABLE.  SHE JUST SOUNDS LIKE PEOPLE ARE TALKING OVER

13   EACH OTHER.  BUT THE IMPRESSION THAT YOU GET FROM HEARING HER

14   VOICE ON THOSE TAPES SAYS NOTHING, APPROACHING THE IMPRESSION

15   THAT CAME OUT THIS MORNING THAT MAYBE SHE IS MEDICATED, MAYBE

16   SHE HAS A MEDICAL CONDITION, WHO KNOWS.  BUT, AS THE COURT

17   SAID, SHE COMES ACROSS AS NUTS, AND I THINK TO SIMPLY SAY,

18   WELL, BECAUSE SHE'S NOT NUTS, WHICH WE AGREE --

19           THE COURT:  I DID NOT SAY -- I SAID THAT THAT WOULD

20   HAVE PROVIDED -- ONE OF THE REASONS YOU WANTED TO HAVE HER

21   THERE WAS TO TRY TO MAKE THAT IMPRESSION.  THE COURT ISN'T

22   MAKING THAT AS A FINDING.  THE COURT IS QUITE ANGRY WITH HER,

23   BUT NOT BECAUSE SHE'S A NUT, BECAUSE SHE'S EVADED HER LEGAL

24   DUTY.

25           MR. MC NICHOLAS:  I APOLOGIZE, AND I'LL MAKE IT MY
```

1    OWN.

2           SHE APPEARED TO ME TO NOT BE MENTALLY STABLE.  AND

3    WHEN YOU JUST PLAY HER RECORDING, IT SANITIZES HER AND RAISES

4    HER TO THE LEVEL OF SOMEBODY WHO MIGHT BE AN APPROPRIATE

5    WITNESS, AND BASED ON THE PERFORMANCE TODAY, SHE'S A

6    COMPLETELY UNRELIABLE WITNESS, AND I THINK 403 WOULD INDICATE

7    THAT NONE OF IT COMES IN.

8           THE COURT:  AND THE PROBLEM, MR. MC NICHOLAS, IS:

9    OKAY, LET'S SAY THAT YOU HAD -- LET'S SAY YOU HAD THE RIGHT

10   TO -- BUT, CERTAINLY, YOU WEREN'T SAYING UNDER RULE 403 I

11   SHOULD FORBID HER TO TESTIFY.  I MEAN, THE ALTERNATIVE WOULD

12   BE THAT SHE WOULD COME IN AND REPEAT WHAT SHE SAID WITH SUCH

13   ADDITIONAL EXTRINSIC CROSS-EXAMINATION AS I CHOSE TO ALLOW,

14   AND, IN THAT CASE, AT SOME POINT, OUT OF FAIRNESS, THE JURY

15   WOULD HAVE TO HAVE SOME -- IF SHE SAID, WELL, I'M REALLY

16   SCARED.  WELL, WHY IS THAT?  AND SHE WOULD LAUNCH INTO THIS

17   STORY WHICH IS NOT IN THE INTEREST OF THE PLAINTIFFS.  AND I

18   THINK, AS I SAID, THERE'S REALLY NO LINK BETWEEN WHAT SHE'S

19   SAYING, BUT LOOK, YOU'RE -- FACED WITH THAT, IT ISN'T AS IF

20   YOU AND MR. GALIPO ON BEHALF OF MS. SIMPLIS AND MS. ROSE ARE

21   GOING TO LET HER TESTIFY TO THAT.  I MEAN, SO THAT -- THAT

22   IS -- ONCE I PUT HER ON THE STAND, THAT IS WHERE IT WAS GOING

23   TO END UP, AND I JUST DON'T INTEND TO LET THAT HAPPEN.

24           MR. MC NICHOLAS:  I AGREE WITH THE COURT'S

25   ANALYSIS.  I UNDERSTAND WHAT THE COURT'S SAYING.  I GUESS MY

1    POINT WAS THAT ON THE TOTALITY OF THE CIRCUMSTANCES UNDER

2    403, THAT SHE NOT BE ALLOWED TO TESTIFY AT ALL, BUT I

3    UNDERSTAND THE COURT IS SAYING THAT THE COURT WOULD NOT BE

4    INCLINED TO MAKE SUCH A DECISION UNDER 403.

5            AND THEN THE ONLY OTHER POINT, WE DO HAVE THE

6    TRANSCRIPT AND MR. ROTHANS WAS VERY CLEAR, QUOTE, "SHE WILL

7    ALSO TESTIFY THAT SHE'S BEEN APPROACHED BY MEMBERS OF THE

8    FAMILY AND TOLD NOT TO APPEAR AT TRIAL," CLOSED QUOTE, PAGE

9    588 OF THE TRANSCRIPT, LINES 18 TO 20.

10            THE COURT:  WHAT --

11            MR. MC NICHOLAS:  THAT WAS A VERY POWERFUL

12   STATEMENT IN OPENING STATEMENT THAT HE BASICALLY ACCUSED THE

13   PLAINTIFFS OF TAMPERING WITH THE WITNESS, THAT NOW SHE'S

14   GOING TO -- WE'RE GOING TO PLAY THIS TAPE OF HER SAYING THAT

15   THE HANDS WERE IN VARIOUS POSITIONS AND SHE SAW HIM REACHING,

16   AND NOW MR. ROTHANS HAS SAID, WELL, THE REASON SHE'S NOT

17   COMING IS BECAUSE THE PLAINTIFFS HAVE BEEN INTIMIDATING HER,

18   AND SO NOW WE'RE LEFT WITH THAT.  AND SO I AGREE THAT THERE

19   IS NO EVIDENCE TO SUPPORT THAT, BUT SHE SAID IT.

20            THE COURT:  BUT, AGAIN, IN TERMS OF THE ISSUE THAT

21   I'M DEALING WITH RIGHT NOW, I'M LETTING YOU MAKE YOUR RECORD,

22   IF SHE HAD TESTIFIED WHAT YOU WERE GOING TO DO IN FRONT OF

23   THE JURY -- THAT'S A SEPARATE ISSUE AS TO WHAT, IF ANYTHING,

24   WE DECIDE TO DO ABOUT THAT STATEMENT, WHICH I DO BELIEVE HAS

25   NO EVIDENTIARY BASIS TO SUPPORT IT.  BUT THE POINT HERE IS,

```
 1   I'M LETTING YOU MAKE THE RECORD AS TO WHY -- AS TO WHY YOU

 2   WANTED HER TO TESTIFY.  YOU CERTAINLY DID NOT WANT TO PUT HER

 3   ON THE STAND AND ELICIT IN FRONT OF THE JURY WHAT SHE

 4   BELIEVES HAPPENED IN ORDER TO PROVE TO THE JURY THAT THERE IS

 5   NO EVIDENCE THAT WHAT SHE DID WAS COMING FROM MS. SIMPLIS OR

 6   MS. ROSE.

 7          SO, AGAIN, I -- WE CAN DISCUSS WHAT, IF ANYTHING,

 8   SHOULD BE DONE ABOUT THAT -- THE STATEMENT IN OPENING

 9   STATEMENT.  IT CERTAINLY IS NOT GERMANE TO WHETHER SHE SHOULD

10   TESTIFY.  THAT'S ACTUALLY POWERFUL EVIDENCE TO KEEP HER FROM

11   TESTIFYING.

12          MR. MC NICHOLAS:  I AGREE.  I WILL JUST MAKE MY

13   POSITION CLEAR, THEN, FOR THE RECORD AND I'LL SIT DOWN, THAT

14   UNDER 403, SHE SHOULD NOT TESTIFY AND THAT HER STATEMENT,

15   EVEN PART OR WHOLE, SHOULD NOT BE PLAYED.

16          THE COURT:  ALL RIGHT.  MR. ROTHANS, YOU CAN

17   BRIEFLY REBUT THIS, BUT I WANT TO START MOVING ON WHAT WE'RE

18   GOING TO ADMIT SO THE JURY ISN'T KEPT, YOU KNOW, WAITING

19   UNDULY.

20          MR. ROTHANS:  UNDERSTOOD, YOUR HONOR, AND IT WILL

21   BE VERY BRIEF.

22          COUNSEL MR. MC NICHOLAS COMMENTED ON THE

23   INSTABILITY.  I THINK THE RECORD IS DEVOID OF ANY EVIDENCE OF

24   INSTABILITY.  THE WOMAN TOOK THE STAND AND SAID SHE DOESN'T

25   REMEMBER THE INCIDENT.  SHE ALSO TESTIFIED UNDER OATH SHE WAS
```

```
1    INTIMIDATED AND SHE WAS FRIGHTENED AND SHE DIDN'T WANT TO BE
2    HERE.  TO CALL HER A NUT, TO CALL HER UNSTABLE, TO TALK ABOUT
3    MEDICATION, THERE'S ABSOLUTELY NO EVIDENCE IN THE RECORD SHE
4    HAD TAKEN MEDICATION NOW OR HAD TAKEN MEDICATION ON APRIL 25,
5    2010.  THEY CERTAINLY HAD AN OPPORTUNITY, IF THEY INSISTED IN
6    HER TESTIFYING LIVE, TO EXPLORE THAT WITH HER.  THEY OPTED
7    NOT TO.  THE COURT EXCUSED HER.  WE'RE WILLING TO SUBMIT ON
8    THE TRANSCRIPTS.
9         MS. WILLIAMS AND I HAVE GONE THROUGH AND
10   HIGHLIGHTED THOSE PORTIONS WE'D LIKE TO ADMIT OF BOTH
11   TRANSCRIPTS.  THEY'RE EXHIBIT 3 --
12        THE COURT:  NOW, ARE THEY BOTH TAPED, BECAUSE I
13   AM -- OR IS ONE OF THEM --
14        MR. ROTHANS:  THEY'RE BOTH TAPED.  THEY'RE BOTH
15   RECORDED.  WE HAVE THE ABILITY TO PLAY IT.
16        THE COURT:  ALL RIGHT.
17        MR. ROTHANS:  IT'S JUST THAT ONCE WE SETTLE ON THE
18   VERBIAGE, WHICH PAGE AND LINE, OUR IT GENTLEMAN HERE IS GOING
19   TO NEED A FEW MINUTES TO PULL UP THOSE CLIPS.  IT'S
20   EXHIBIT 366, STARTING ON PAGE 1.  IT'S ALSO EXHIBIT 364.  ONE
21   IS THE INTERVIEW BY SERGEANT REPUCCI THAT TOOK PLACE WITHIN
22   LITERALLY 15, 20 MINUTES OF THE INCIDENT.  THE OTHER ONE TOOK
23   PLACE WITHIN TWO HOURS AND IT WAS DONE BY DETECTIVE BROWN,
24   WHO WAS, I WANT TO MAKE CLEAR FOR THE RECORD, HERE IN THE
25   HALLWAY PREPARED TO IMPEACH THE WITNESS' TESTIMONY IF SHE HAD
```

1    GONE ASTRAY OF WHAT SHE HAD TOLD HIM DURING THE INTERVIEW.  I

2    CAN GIVE THESE TO MR. GALIPO AND MC NICHOLAS OR I COULD READ

3    THEM INTO THE RECORD.

4            MR. GALIPO:  MAY I MAKE A SUGGESTION?

5            IF YOUR CLERK, YOUR HONOR, HAS A MOMENT TO MAKE A

6    FEW COPIES OF WHAT THEY HAVE HIGHLIGHTED, I COULD MEET VERY

7    QUICKLY WITH MR. MC NICHOLAS TO FIRST, SEE WHAT PARTS, IF

8    ANY, WE'RE OBJECTING TO -- THERE ARE PAGE AND LINE NUMBERS --

9    AND THEN UNDERLINE ANY ADDITIONAL PARTS, AND THEN WE CAN HAVE

10   A QUICK DISCUSSION AS TO RULING ON ANY OBJECTIONS, AND THEN

11   WE COULD HAVE DAVID PREPARE IT, IF THAT MAKES SENSE.

12           THE COURT:  ALL RIGHT.  SO DO THAT.

13           DO YOU WANT TO JUST LOOK AT THEIR COPY, OR DO YOU

14   WANT US TO MAKE YOU A COPY, WHICH I'M HAPPY TO DO?

15           MR. GALIPO:  WELL, NO.  I DON'T MIND LOOKING AT

16   THEIR COPY AND -- BUT I WOULD ALSO WANT TO UNDERLINE PARTS --

17   I JUST WANT THE COURT TO HAVE IT AVAILABLE.

18           THE COURT:  RIGHT.

19           THEN JUST -- THAT WOULD PROBABLY BE HELPFUL TO ME

20   TO HAVE IT ALL ON THE SAME COPY.  SO UNDER -- LOOK AT THEIRS.

21   YOU KNOW, I'M -- WILL LEAVE THE BENCH.  I WILL READ THESE SO

22   I'M FAMILIAR WITH THE STATEMENTS, AND THEN I WILL COME BACK

23   ON.  WE CAN SETTLE IT.  I'LL SEND WORD TO THE JURY ABOUT WHAT

24   WE'RE DOING AND THEN WE'LL PLAY IT FOR THEM AND THEN EXCUSE

25   THEM FOR THE DAY, AND THEN TALK ABOUT THE JURY INSTRUCTIONS.

```
 1              MR. GALIPO:  THAT'S FINE.

 2              THE CLERK:  ALL RISE.

 3              COURT IS IN RECESS.

 4                      (RECESS.)

 5              THE CLERK:  PLEASE BE SEATED.

 6              THE COURT:  ALL RIGHT.  COUNSEL, AS TO EXHIBIT 364,

 7    THERE IS AN OBJECTION ON PAGE 4, STARTING AT LINE 12.  I

 8    OVERRULE THE OBJECTION THROUGH LINE 12 TO 17, SINCE THE

 9    WITNESS WITH IS SAYING WHAT IT IS THAT SHE OBSERVED.  I

10    SUSTAIN THE OBJECTION FROM 18 THROUGH 16, SINCE SHE'S JUST

11    GIVING A DISSERTATION ON HER THOUGHTS ON THE PROPRIETY OF

12    WHAT THE DECEDENT AND HIS SISTER WERE DOING.

13              MR. GALIPO:  JUST ONE MOMENT, YOUR HONOR.  I'M

14    SORRY, I WAS A LITTLE BIT BEHIND YOU.

15              SO THIS IS EXHIBIT 364?

16              THE COURT:  CORRECT.

17              MR. GALIPO:  AND WE'RE ON PAGE 4?

18              THE COURT:  ON PAGE 4, I OVERRULE THE OBJECTION

19    FROM 12 THROUGH 17, AND THEN I SUSTAIN THE OBJECTION FROM 18

20    THROUGH -- PAGE 4, LINE 18 THROUGH PAGE 5, LINE 6.

21              MR. GALIPO:  OKAY.  THANK YOU.

22              AND SO THAT -- DO YOU HAVE THE HIGHLIGHTED VERSION?

23              THE COURT:  YES.

24              MR. GALIPO:  OH, GREAT.

25              THANK YOU.
```

```
 1            THE COURT:  AND THEN THE NEXT IS -- AND THIS IS
 2   REALLY THE ONLY THING THAT REALLY MATTERS -- IS PAGE 12
 3   THROUGH -- ON PAGE 6, LINES 12 THROUGH 15 WHERE HE SAYS I
 4   HONESTLY THOUGHT HE'S GOING FOR A GUN OR SOMETHING, IS THAT
 5   APPROPRIATE LAY TESTIMONY UNDER RULE 701 AND THAT WOULD BE
 6   TRUE WHETHER SHE WAS TESTIFYING LIVE OR WHETHER SHE -- YOU
 7   KNOW, IT'S THROUGH HERE, WHETHER IT'S APPROPRIATE TO LET HER
 8   VENTURE THAT OPINION.  IT SEEMS TO ME THAT IT'S -- IT FALLS
 9   WITHIN WHAT A LAYPERSON COULD SAY.  I MEAN, IF THAT WAS HER
10   THOUGHT.  IT -- YOU KNOW, IT'S SUGGESTIVE OF A CERTAIN
11   SUDDENNESS IN THAT, SO IT'S SOMETHING UNDER RULE 701 THAT A
12   LAYPERSON CAN DO.
13            AND THEN STARTING ON PAGE 8, ALL OF THAT IS COMING
14   OUT, AND THEN OVER ON PAGE 9 THERE'S JUST NO RELEVANCE TO
15   THAT, WHATSOEVER.  AND THEN PAGE 11, THERE'S NO OBJECTION AND
16   THAT APPROPRIATELY COMES IN.
17            AND NOW, HERE, I HAVE NOT -- SURE, IT SAYS ON PAGE
18   12, LINES 6 THROUGH 13, IT -- DO PLAINTIFFS WANT THAT TO COME
19   IN OR NOT?
20            MR. GALIPO:  YEAH, WELL, NOT --
21            THE COURT:  SURE.  I SYMPATHIZE, BUT YOU HAVE TO
22   MAKE UP YOUR MIND ONE WAY OR THE OTHER.
23            MR. GALIPO:  NO, WE DON'T NEED THAT, YOUR HONOR.
24            THE COURT:  ALL RIGHT.  SO THAT WILL NOT COME IN,
25   SO THAT IS REMOVED.
```

```
 1          MR. GALIPO:  ALL RIGHT.  OKAY.  YOU KNOW, THE ONLY

 2   THING I WAS THINKING ABOUT -- I KNOW THE COURT'S ALREADY

 3   RULED, PART OF THE THING THAT'S A LITTLE TROUBLING HERE IS

 4   SHE APPARENTLY IS IN THE DONUT SHOP, SO SHE'S LOOKING OVER

 5   THE CAR JUST AS --

 6          THE COURT:  RIGHT.

 7          MR. GALIPO:  -- MS. MEDEIROS WAS.  ONE OF THE

 8   ISSUES WOULD HAVE BEEN INTERESTING TO CLARIFY IS COULD SHE

 9   ACTUALLY SEE THE HANDS AT THE TIME OF THE SHOOTING BECAUSE

10   THEY WOULD HAVE TO BEEN AT LEAST BEEN OVER THE LEVEL OF THE

11   CAR, BUT I DON'T THINK ANYTHING IN HER STATEMENT CLARIFIES

12   THAT POINT.

13          THE COURT:  AND I -- AND IF SHE WAS ON THE STAND

14   SAYING, "I DON'T REMEMBER, I DON'T REMEMBER, I DON'T

15   REMEMBER," I MEAN, YOU CAN USE THE MEDEIROS THING TO POINT

16   OUT TO THE JURY THAT IT REALLY IS NOT, YOU KNOW, TERRIBLY

17   PLAUSIBLE.  THE -- I MEAN, IF THE JURY CHOOSES TO BELIEVE

18   THAT.  I DON'T MEAN TO IMPLY ONE WAY OR THE OTHER.

19          ALL RIGHT.  ON 366, THERE -- THE OBJECTION STARTING

20   ON PAGE 3, LINES 9 THROUGH 15 IS SUSTAINED.

21          MR. ROTHANS:  THAT'S 9 THROUGH 15, YOUR HONOR?

22          MR. GALIPO:  LINES 9 THROUGH 15.

23          THE COURT:  9 THROUGH 15.

24          MR. ROTHANS:  YOUR HONOR, IF OUR IT GENTLEMAN COULD

25   HAVE A FEW MINUTES TO PUT THE CLIPS TOGETHER?
```

```
1              THE COURT:  RIGHT.

2              AND NOW LET ME -- I THINK THERE MIGHT BE A LIMITING

3    INSTRUCTION UNDER THESE CIRCUMSTANCES.  LET ME CHECK.

4              NO, THERE IS NO NINTH CIRCUIT IN THIS.

5              WHAT I INTENDED TO PREFACE THIS REMARK WITH SAYING

6    IS THAT JESSIE WILLIS-COFIELD WAS IN THE DONUT KING.  SHE

7    MADE A STATEMENT AT THE TIME.  ALTHOUGH IT'S NOT THE FAULT OF

8    EITHER PARTY, SHE'S NOT AVAILABLE TO TESTIFY LIVE NOW, AND

9    THE JURY AND -- AND SHE'S -- AND THAT WAY TO TRY TO DEAL WITH

10   THE OTHER ISSUE THAT WE'VE ADDRESSED, AND THEN TO THE EXTENT

11   THAT COUNSEL WANTS ANYTHING FURTHER -- I SAID AT SOME POINT I

12   THINK THE IDEA THAT THE JURY'S GOING TO CONNECT THIS BACK TO

13   WHAT WAS SAID THERE, I THINK IS UNLIKELY, BUT OBVIOUSLY

14   ULTIMATELY IT'S FOR PLAINTIFFS' COUNSEL TO DECIDE WHAT'S IN

15   THE INTEREST OF THEIR CLIENT.  SO TO THE EXTENT THAT YOU WANT

16   SOMETHING ELSE SAID, THEN MAKE A SUGGESTION AND I'LL CONSIDER

17   IT.

18             MR. GALIPO:  I THINK IT MIGHT BE APPROPRIATE TO SAY

19   THERE IS NO EVIDENCE THAT THE PLAINTIFFS HAD ANYTHING TO DO

20   WITH HER NOT BEING AVAILABLE TO TESTIFY, BECAUSE I THINK THAT

21   WOULD HELP COUNTERACT A LITTLE BIT THAT STATEMENT THAT

22   SPECIFICALLY SAID IT WAS THE FAMILY.  THAT WOULD BE MY

23   REQUEST.

24             THE COURT:  MR. ROTHANS?

25             MR. ROTHANS:  I'D ASK MR. MC NICHOLAS IF I COULD
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
1   SEE THE ACTUAL TRANSCRIPT THAT HE'S ORDERED BECAUSE I DON'T

2   RECALL MAKING THE STATEMENT ATTRIBUTING THE INTIMIDATION TO

3   THE FAMILY MEMBERS -- THE GRISSOM FAMILY MEMBERS.  SO IF I

4   COULD SEE THAT TRANSCRIPT...

5             MR. GALIPO:  WE'RE PULLING IT UP RIGHT NOW.

6             MR. MC NICHOLAS:  YOUR HONOR, JUST A THOUGHT, IS IT

7   OKAY IF I SPEAK FROM THE TABLE?

8             THE COURT:  YES, IT IS.

9             MR. MC NICHOLAS:  MAYBE THE COURT COULD SAY SHE DID

10  APPEAR, SOME BRIEF TESTIMONY WAS TAKEN OUTSIDE THE PRESENCE

11  TO DETERMINE THAT SHE HAD NO REAL RECOLLECTION OF IT, SO

12  WE'RE GOING TO PLAY PORTIONS OF HER INTERVIEW.  RIGHT?  SO

13  THEN THERE IS EVIDENCE THAT SHE ACTUALLY DID SHOW UP,

14  INTERVIEW WAS TAKEN, THE COURT DETERMINED THAT BECAUSE, YOU

15  KNOW, HER RECOLLECTION WAS INSUFFICIENT THAT THE RULES ALLOW

16  HER -- THIS TO BE DONE, SO WE ALL AGREE THAT THAT'S WHAT'S

17  GOING TO HAPPEN, AND THERE WAS NO EVIDENCE TO SUGGEST THAT

18  SHE WAS INTIMIDATED BY ANYBODY TO NOT APPEAR FOR ANYTHING

19  RELATED TO THIS MATTER.

20            THE COURT:  MR. ROTHANS?

21            MR. ROTHANS:  THAT'S NOT AN ACCURATE STATEMENT.

22            YES, SHE WAS HERE AND SHE WAS PREPARED TO TESTIFY,

23  BUT WE'VE DECIDED, OR, AT LEAST THE COURT'S DECIDED, NOT TO

24  ALLOW HER TO TESTIFY LIVE SINCE SHE HAD NO RECOLLECTION OF

25  THE EVENTS FEIGNED OR OTHERWISE.  BUT TO SUGGEST THAT SHE WAS
```

```
 1    NOT INTIMIDATED OR NOT FRIGHTENED IN SOME WAY, THAT'S NOT AN

 2    ACCURATE STATEMENT.

 3         MR. GALIPO:  WELL, WE WOULD AGREE THAT SHE WAS NOT

 4    INTIMIDATED BY THE PLAINTIFFS IN ANY WAY.

 5         MR. ROTHANS:  WELL, I DISAGREE WITH THAT NOTION.

 6    CERTAINLY NO ONE FROM THE CITY APPROACHED HER, CERTAINLY NO

 7    ONE FROM THE POLICE DEPARTMENT APPROACHED HER, AND CERTAINLY

 8    NO ONE FROM MY OFFICE.  SO THE -- CERTAINLY, THE IMPLICATION

 9    IS THAT SOMEONE FROM THE PLAINTIFFS' SIDE OF THE TABLE,

10    WHETHER IT'S THESE LAWYERS OR INVESTIGATORS OR SOMEONE ELSE.

11         NOW, COULD SHE IDENTIFY BY NAME THE INDIVIDUALS?

12    DID SHE DESCRIBE THEM?

13         THE COURT:  WE'RE TALKING ABOUT TWO SEPARATE THINGS

14    HERE.  ONE IS FOR SOMEBODY TO APPROACH HER, BOTH SIDES HAVE

15    THE RIGHT TO DO THAT AND BOTH SIDES HAVE DONE THAT.  I MEAN,

16    IT -- YOU CAN'T HAVE THIS EGG SHELL WITNESS THING WHERE SHE'S

17    TOO SENSITIVE TO LIVE IN THE MODERN WORLD.  PEOPLE HAVE THE

18    RATE TO APPROACH HER AND ASK WHATEVER THEY WANT TO ASK HER.

19    I MEAN, TO SAY THAT'S INTIMIDATING, ONLY IF SHE -- NOT IN THE

20    WAY THAT MOST PEOPLE LIVE THEIR LIVES, IF SHE CHOOSES TO TAKE

21    IT THAT WAY -- IN TERMS OF THE OTHER THREE MEN WHO

22    APPROACHED, SHE HAS NO BASIS FOR LINKING THAT TO THIS CASE OR

23    ANYTHING.  I MEAN, IT'S JUST THAT -- AS I SAID, IT WAS A

24    FANCY ON HER PART.

25         MR. ROTHANS:  WELL, I CERTAINLY -- TOTALLY
```

1    UNDERSTAND THAT, YOUR HONOR.  BUT TO SUGGEST, AS MR. MC

2    NICHOLAS HAS, THAT WE TELL THE JURY SHE WAS NOT FRIGHTENED OR

3    INTIMIDATED, THAT WOULD NOT BE AN ACCURATE STATEMENT.

4         MR. MC NICHOLAS:  WAIT A SECOND.

5         I TAKE GREAT UMBRAGE WITH HIS PREVIOUS COMMENT THAT

6    ACCORDING TO HIM, HE DIDN'T SEND ANYBODY THERE, SO IT

7    COULDN'T HAVE BEEN HIM.  SO IT MUST BE US OR SOMEBODY FROM

8    OUR SIDE.  FIRST OF ALL, I TAKE GREAT UMBRAGE WITH THAT.  I

9    DON'T KNOW WHO MR. ROTHANS OR HIS CLIENT SENT ANYWHERE, I'M

10   NOT PRIVY TO THAT.  WE'RE NOT GOING TO GET INTO THAT, NOR

11   DOES HE KNOW WHAT I HAVE DONE NOR MR. GALIPO HAS DONE, AND HE

12   HAS CONTINUED TO INSINUATE IN THIS COURTROOM THAT THERE IS

13   SOME FORM OF INTIMIDATION.

14        HE SHOULDN'T HAVE SAID IT IN HIS OPENING STATEMENT,

15   BECAUSE AFTER HIS OPENING STATEMENT, HIS PROFFER WAS FROM

16   THIS VERY SPOT, WELL, MY INVESTIGATOR WENT DOWN AND SHE SAID

17   SOMEBODY CAME TO THE DOOR AND SHE'S NOT SURE WHO IT WAS.  SO

18   MAYBE HE SHOULD HAVE THOUGHT ABOUT THAT BEFORE HE THREW THAT

19   OUT THERE IN OPENING STATEMENT.  I UNDERSTAND I SOUND A

20   LITTLE UPSET, BUT THAT IS A BIG THING TO SAY IN OPENING

21   STATEMENT, THAT SOMEBODY ASSOCIATED WITH THE PLAINTIFF HAS

22   INTIMIDATED A WITNESS TO NOT APPEAR.  AND SO NOW SHE COMES

23   AND THERE IS NO REASON TO CONNECT THESE DOTS AT ALL AND MR.

24   ROTHANS OBVIOUSLY AND RIGHTLY IS CONCERNED THAT HE MADE THE

25   STATEMENT IN OPENING, AND THIS IS GOING TO BE A PROBLEM FOR

1    HIM, BUT THE FACT THAT HE THINKS THAT HE CAN JUST SAY, WELL,

2    I DIDN'T DO IT, YOUR HONOR, SO THEREFORE IT MUST BE THEM.

3    THAT IS OFFENSIVE.

4            MR. ROTHANS:  YOUR HONOR, THIS IS DISINGENUOUS,

5    FRANKLY.  THE COURT HAS READ 364, EXHIBIT 364.  THE COURT HAS

6    READ EXHIBIT 366.  THIS WOMAN'S TESTIMONY, HER STATEMENTS TO

7    THE OFFICERS AT THE SCENE AND HER STATEMENTS SUBSEQUENTLY ARE

8    CLEARLY FAVORABLE TO THE DEFENSE, CLEARLY TALK ABOUT THE MAN

9    DROPPING HIS HANDS, WHICH IS CONTRARY TO THEIR EVIDENCE,

10   CONTRARY TO THEIR ARGUMENTS, AND SHE CLEARLY THOUGHT THIS MAN

11   MAY HAVE HAD -- WAS REACHING FOR SOMETHING.  AND NOW TO

12   SUGGEST, WELL, IT COULD HAVE BEEN US JUST AS WELL, WHY WOULD

13   WE INTIMIDATE A WOMAN NOT TO APPEAR WHO'S GIVING FAVORABLE

14   TESTIMONY.  SO I DON'T THINK HIS STATEMENTS AND ARGUMENTS --

15           THE COURT:  I DON'T THINK -- AS I CAN SEE, THAT

16   ANYBODY HAS DONE ANYTHING TO KEEP HER FROM -- TO KEEP HER

17   FROM DOING IT.  EVEN IF I WAS ABSOLUTELY CERTAIN THAT SOMEONE

18   FROM -- THAT AN INVESTIGATOR ASSOCIATED WITH THE PLAINTIFFS

19   WAS THE FIRST PERSON TO APPROACH HER, I COULDN'T CARE LESS.

20   IT WAS A PERFECTLY APPROPRIATE THING TO DO.  FOR HER TO SAY,

21   I'M GOING TO AVOID MY OWN LEGAL DUTY JUST BECAUSE SOMEBODY

22   APPROACHED ME, THAT THEY HAVE A PERFECT RIGHT TO DO, IS

23   INAPPROPRIATE.  SO I DON'T THINK THERE HAS BEEN NO

24   INTIMIDATION OF THIS WITNESS THAT I CAN SEE, EXCEPT IN HER

25   OWN MIND, ASSUMING THAT SHE'S NOT USING THAT AS A FURTHER

1    LIE, TO PUT IT BLUNTLY, SINCE SHE PERJURED HERSELF ON THE

2    STAND WHEN SHE SAID SHE DIDN'T REMEMBER.

3         THERE'S JUST NO REASON TO CREDIT IN THAT REGARD

4    ANYTHING SHE SAID.  HOWEVER, SHE DID MAKE THESE STATEMENTS AT

5    THE TIME AND I HAVE DECIDED THAT THE RELEVANT PORTIONS OF

6    THEM WILL BE ADMITTED, SINCE IT IS NOT -- IT IS NOT THE

7    DEFENSE -- PROBLEM OF THE DEFENSE THAT SHE'S CHOOSING TO ACT

8    THIS WAY.  YOU DID SUBPOENA HER FOUR TIMES.  SO I DO THINK

9    IT'S APPROPRIATE FOR THIS TO COME IN, BUT IT DOES PUT --

10   THERE ARE TWO ISSUES HERE:  ONE IS, IT PUTS THE PLAINTIFFS AT

11   A DISADVANTAGE, AS WE ALL KNOW.  THEY DO NOT HAVE THE RIGHT

12   TO EXAMINE WHAT HER MOTIVES WERE AND SHE, HERSELF, SUGGESTS

13   THAT SHE WAS REALLY EAGER TO GET INVOLVED IN THIS.  OF

14   COURSE, THAT CAN'T REALLY BE BROUGHT OUT WITHOUT BRINGING OUT

15   WHAT HER VIEW OF WHAT THE CRIMINAL DEFENSE LAWYER WAS DOING,

16   AND I DON'T THINK ANY OF US INTEND FOR THAT TO -- OR, AT

17   LEAST, I DON'T INTEND AND PLAINTIFFS DON'T INTEND FOR THAT TO

18   COME IN.

19        THE -- AND THE OTHER THING IS, IS THAT THERE IS A

20   LACK OF ABILITY TO CROSS-EXAMINE ABOUT WHAT EXACTLY SHE MEANT

21   BY GOING FOR A GUN OR COULD SHE REALLY SEE THE HANDS.  I

22   MEAN, YOU WERE THE ONE WHO CROSS-EXAMINED MS. MEDEIROS, AND

23   CERTAINLY MR. GALIPO HAD THE RIGHT AND IN THE IDEAL WORLD TO

24   MAKE THE SAME CROSS-EXAMINATION OF THIS WITNESS.

25        SO, HERE, I AM CONCERNED, COUNSEL, YOU AND I HAVE

1    BEEN GETTING OFF TO A BAD FOOT, I MUST SAY, AND FOR OBVIOUS

2    REASONS, AND HAS SEVERAL TIMES DEFIED THE COMMON SENSE

3    UNDERSTANDING OF WHAT I EXPECTED YOU TO DO AND I DO NOT THINK

4    THAT MOST LAWYERS WOULD HAVE DARED MADE SUCH A PROVOCATIVE

5    STATEMENT IN OPENING STATEMENT WITHOUT BEING IRON CLAD AS TO

6    WHAT WAS GOING TO HAPPEN, AND WE FOUND OUT THAT THERE IS

7    ABSOLUTELY NO BASIS, REALLY, EXCEPT FOR THE FANCY OF THIS

8    WITNESS FOR WHAT YOU SAID IN OPENING STATEMENT.

9            SO, NOW THE QUESTION IS:  WHAT ARE WE GOING TO DO

10   ABOUT IT?

11           I AM VERY INCLINED TO GIVE THE PLAINTIFFS WHAT THEY

12   WANT.  SO THE QUESTION IS:  WHAT DO THEY WANT?

13           BUT I REMIND THEM THAT I DON'T KNOW THAT THE JURY

14   HAS PAID AS MUCH ATTENTION TO THIS AS YOU SEEM TO FEAR THAT

15   THEY WILL OR THE FACT THAT WE ARE PROCEEDING THIS WAY WITH

16   THIS WITNESS IS GOING TO BE AS PREJUDICIAL TO YOUR CLIENTS AS

17   YOU SEEM TO BELIEVE.

18           SO HOW ARE WE GOING TO DEAL WITH THE FACT THAT THE

19   STATEMENT WAS MADE IN OPENING STATEMENT WHEN THERE WAS NO

20   BASIS FOR IT, AND WE DO NOW HAVE A WITNESS WHO IS NOT

21   APPEARING LIVE?

22           MR. GALIPO:  WELL, I DO AGREE WITH MR. MC NICHOLAS,

23   AND I DON'T SEE ANY HARM IN THE COURT SAYING THAT SHE DID

24   APPEAR.  BUT SHE DOES -- CLAIMS NOT TO REMEMBER THE INCIDENT,

25   AND THAT'S THE BASIS UPON WHICH THE COURT IS ALLOWING HER

```
1   STATEMENT.  AND I THINK IT'S ALSO FAIR TO SAY THAT THERE'S NO
2   CREDIBLE EVIDENCE THAT SHE WAS INTIMIDATED NOT TO APPEAR BY
3   ANYONE AND CERTAINLY NO EVIDENCE THAT THE PLAINTIFFS IN ANY
4   WAY INTIMIDATED HER NOT TO APPEAR.
5           THAT, AT LEAST, WOULD BE A LITTLE BIT HELPFUL.
6           THE COURT:  MR. ROTHANS?
7           MR. ROTHANS:  JUST FOR THE RECORD, WE WOULD OBJECT
8   TO THAT -- THE STATEMENT IN OPENING STATEMENT.  THE
9   TRANSCRIPT REFLECTS WAS THAT SHE WAS APPROACHED BY FAMILY
10  MEMBERS.  I DID NOT SPECIFY WHICH FAMILY MEMBERS OR WHICH
11  FAMILY, SO WE WOULD OBJECT TO THE LIMITING INSTRUCTION OR THE
12  COMMENT, BUT AS THE COURT DEFERS.
13          THE COURT:  ALL RIGHT.  MY PREFERENCE IS FOR THE
14  JURY TO HAVE AS ACCURATE A SENSE OF WHAT IS GOING ON AS THE
15  RULES OF EVIDENCE PROVIDE, AND THEREFORE, MY INSTINCT WOULD
16  BE TO LET THEM KNOW THAT SHE APPEARED, BUT FRANKLY, THE MAIN
17  REASON TO LET THEM KNOW THAT IS TO THEN DISPEL THE
18  INTIMIDATION THING.  SO THEN TO BOTH SAY SHE APPEARED BUT SHE
19  WASN'T INTIMIDATED, IT JUST -- DO YOU SEE WHERE I'M GOING ON
20  THIS?
21          IT'S A LITTLE INCONSISTENT AS TO WHAT POINT IT IS
22  EXACTLY WE'RE TRYING TO GET ACROSS TO THEM.  I MEAN, IF WE'RE
23  GOING TO SAY, LOOK, THROUGH NO FAULT OF EITHER PARTY, SHE IS
24  NOT AVAILABLE TO TESTIFY, SPECIFICALLY NO ONE ON THE
25  PLAINTIFFS' SIDE OF THE CASE HAS ANYTHING TO DO WITH THE FACT
```

```
1    THAT SHE'S NOT HERE TO TESTIFY LIVE, BUT BECAUSE SHE ISN'T

2    HERE TO TESTIFY LIVE WE'RE GOING TO BE LISTENING TO PORTIONS

3    OF THE STATEMENTS THAT SHE MADE AFTER THE SHOOTING.  SO

4    THAT'S HOW I WOULD PROPOSE TO DO IT, BUT LET ME HEAR FROM THE

5    PLAINTIFFS AGAIN AS TO THEIR REACTION TO THAT PROPOSAL.

6              MR. MC NICHOLAS:  DO YOU MIND IF I SPEAK TO MR.

7    GALIPO, YOUR HONOR?

8              THE COURT:  YES.

9              AND WHERE ARE WE IN GETTING THIS READY TO PLAY?

10             MR. ROTHANS:  364 IS READY TO GO, HE'S WORKING ON

11   366 AT THE MOMENT.

12             THE COURT:  OKAY.  THANK YOU, MR. ROTHANS.

13                       (COUNSEL CONFER.)

14             MR. GALIPO:  WOULD THE COURT CONSIDER SAYING

15   SOMETHING TO THE EFFECT THAT THERE IS NO EVIDENCE THAT

16   MEMBERS OF THE DECEDENT'S FAMILY APPROACHED THIS WITNESS AND

17   TOLD HER NOT TO APPEAR.

18             THE COURT:  I -- THAT IS AN ACCURATE STATEMENT AND

19   IF THAT'S WHAT COUNSEL BELIEVES IS IN THE INTEREST OF THEIR

20   CLIENTS, THEN I WILL SAY THAT, AND THEN I WILL GO ON TO SAY

21   FOR OTHER REASONS THAT ARE NOT THE FAULT OF EITHER PARTY,

22   THIS TIME WITNESS IS UNAVAILABLE TO TESTIFY, AND THEREFORE,

23   WE'RE GOING TO HAVE THESE STATEMENTS.

24             MR. GALIPO:  THAT'S FINE, YOUR HONOR.

25             MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.
```

```
 1              MR. GALIPO:  AND IN TERMS OF --

 2              THE COURT:  EXCEPT I'LL SAY THE GRISSOM FAMILY

 3    INSTEAD OF THE DECEDENT'S FAMILY SO THEY HAVE SOME IDEA OF

 4    WHO I'M TALKING ABOUT.

 5              MR. GALIPO:  THAT WILL BE FINE.

 6              THE COURT:  ALL RIGHT.  WHAT ELSE?

 7              MR. GALIPO:  WELL, THE ONLY OTHER THING -- BUT I

 8    THINK YOU ALREADY MADE UP YOUR MIND.  GIVEN THE FACT THAT WE

 9    CAN'T CROSS-EXAMINE HER, AND I UNDERSTAND THE COURT'S RULING,

10    IT IS BOTHERING ME A LITTLE BIT ABOUT HER THOUGHT THAT MAYBE

11    HE WAS GOING FOR A GUN.  YOU KNOW, HER THOUGHT.  THE SHOOTING

12    OFFICER DOESN'T EVEN SAY THAT.  I JUST -- I'M JUST AFRAID --

13    I'M SURE I'M GOING TO HEAR THAT OVER AND OVER AGAIN IN THE

14    CLOSING ARGUMENT AND IT IS A LITTLE BIT DIFFICULT WHEN WE

15    DON'T EVEN HAVE A CHANCE TO EXPLORE THAT, BUT THAT'S MY ONE

16    MAIN ISSUE.

17              THE COURT:  MR. ROTHANS?

18              MR. ROTHANS:  JUST BRIEFLY, YOUR HONOR.

19              YOU'VE READ EXHIBIT 364 AND EXHIBIT 366.  THERE'S A

20    SNIPPET WHERE THE WITNESS SAYS HE DROPPED HIS RIGHT HAND A

21    LITTLE, AND I THINK IF YOU PLAY JUST A LITTLE AND YOU DON'T

22    ADD THIS PORTION THAT YOU'VE ALREADY RULED ON, OVERRULING THE

23    PLAINTIFFS' OBJECTION THAT IT LOOKED LIKE HE WAS GOING FOR A

24    GUN, THE IMPRESSION IS GOING TO BE THAT HE JUST DROPPED HIS

25    HANDS ALONG THE SIDE OF HIS HEAD A LITTLE.  WE NEED A LITTLE
```

1    MORE CLARIFICATION AS TO WHAT SHE MEANT BY HE DROPPED HIS

2    RIGHT HAND, AND SAYING IT LOOKED LIKE HE WAS GOING FOR A GUN

3    IS PRECISELY THAT.  SHE DOESN'T SAY SHE SAW A GUN.  THERE'S

4    NO PLACE IN EITHER STATEMENT WHERE SHE SAID SHE SAW A WEAPON,

5    OR, FOR THAT MATTER, A CELL PHONE.

6              THE COURT:  IT SEEMS TO ME THAT IT'S PERMISSIBLE

7    LAY TESTIMONY UNDER RULE 701, AND HAVING MADE THE DECISION

8    THAT THE STATEMENTS ARE GOING TO COME IN IT'S LEGITIMATE TO

9    HAVE IT BE -- TO HAVE IT BE --

10             MR. ROTHANS:  YOUR HONOR, BOTH 364 AND 366 ARE NOW

11   READY TO PLAY.

12             THE COURT:  ALL RIGHT.  IN THAT CASE, LET'S BRING

13   IN THE JURY.

14             THE CLERK:  PLEASE RISE FOR THE JURY.

15                       (JURORS ENTER.)

16             THE CLERK:  PLEASE BE SEATED.

17             THE COURT:  LADIES AND GENTLEMEN, WELCOME BACK, AND

18   THANK YOU FOR YOUR PATIENCE.  THE FINAL WITNESS IS GOING TO

19   BE PRESENTED TO YOU THROUGH A COUPLE OF BRIEF TAPE RECORDINGS

20   THAT WERE MADE SHORTLY AFTER THE INCIDENT.  THIS IS JESSE

21   WILLIS-COFIELD WHO WAS IN THE DONUT KING SHOP AT THE TIME.

22             THERE IS NO EVIDENCE THAT ANYBODY ASSOCIATED WITH

23   THE GRISSOM FAMILY IS KEEPING HER FROM TESTIFYING; RATHER,

24   FOR REASONS THAT ARE NOT THE FAULT OF EITHER THE PLAINTIFFS

25   OR THE DEFENDANTS, SHE IS NOT AVAILABLE TO TESTIFY LIVE, AND

```
 1   THEREFORE, I'VE DECIDED THAT YOU WILL HEAR A PORTION OF THE

 2   STATEMENTS THAT SHE MADE, AND WE WILL NOW GO AHEAD AND PLAY

 3   THOSE AND THEN THAT WILL BE THE LAST EVIDENCE -- THE LAST

 4   WITNESS IN THE CASE.

 5            MR. GALIPO:  YOUR HONOR, COULD THE RECORD REFLECT

 6   THAT THESE WERE -- I THINK YOU ALREADY MENTIONED -- THEY WERE

 7   STATEMENTS GIVEN TO LAW ENFORCEMENT AS OPPOSED TO A

 8   DEPOSITION?

 9            THE COURT:  CORRECT.

10            THESE WERE NOT -- AS SIMILAR TO OTHER STATEMENTS

11   WHICH YOU'VE HEARD REFERENCE, THERE WAS -- ONE WAS MADE TO

12   DETECTIVE BROWN AND DEPUTY DISTRICT ATTORNEY, THAT WILL BE

13   THE FIRST STATEMENT THAT YOU HEAR, AND THEN THE SECOND

14   STATEMENT WAS MADE TO SERGEANT REPUCCI AND THAT WILL BE

15   THE -- THAT WILL BE THE SECOND STATEMENT.

16            ALL RIGHT.

17            (AUDIO PLAYED, NOT REPORTED.)

18            MR. GALIPO:  YOUR HONOR, COULD THE -- COULD THE

19   RECORD REFLECT THAT THE NEXT STATEMENT THAT'S BEING PLAYED I

20   THINK ACTUALLY WAS CHRONOLOGICALLY THE FIRST ONE TAKEN AT THE

21   SCENE BY SERGEANT REPUCCI?

22            THE COURT:  IS THERE A STIPULATION ON THAT AS TO

23   WHICH STATEMENT OCCURRED FIRST?

24            MR. ROTHANS:  YES, YOUR HONOR.

25            364 WAS THE SECOND ONE IN TERMS OF SEQUENCE, 366
```

```
1    WAS TAKEN FIRST.

2              THE COURT:  ALL RIGHT.  SO STIPULATED.

3              LADIES AND GENTLEMEN, YOU SHOULD REGARD THAT AS

4    BEING AN ESTABLISHED FACT.

5              ALL RIGHT.  YOU CAN PLAY THE SECOND STATEMENT --

6    THE -- WHICH WAS FIRST IN TERMS OF CHRONOLOGY.  EXHIBIT 366.

7                   (AUDIO PLAYED, NOT REPORTED.)

8              THE COURT:  ALL RIGHT.  DOES THE DEFENSE REST?

9              MR. ROTHANS:  WE DO, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I'M

11   NOW GOING TO EXCUSE YOU FOR THE DAY.  THE LAWYERS AND I ARE

12   STILL GOING TO BE WORKING.  TOMORROW MORNING, I WILL INSTRUCT

13   YOU ON THE LAW AND THEN THE LAWYERS WILL PRESENT THEIR

14   CLOSING ARGUMENTS, AND, AT THAT TIME, AS OPPOSED TO THE

15   OPENING STATEMENTS IN WHICH THEY'VE BEEN DEALING WITH THE

16   EVIDENCE, THEY'LL BE ABLE TO APPLY THE LAW TO THE FACTS, DRAW

17   ANALOGIES, USE PERSUASION, DO ANYTHING THEY CAN THINK OF TO

18   TRY TO PERSUADE YOU AS TO WHAT YOUR VERDICT SHOULD BE, AND

19   THEN AFTER THAT I'LL HAVE A HANDFUL OF CLOSING ARGUMENTS --

20   CLOSING INSTRUCTIONS FOR YOU, AND THEN THE CASE WILL BE

21   SUBMITTED TO YOU FOR YOUR DELIBERATIONS.

22             NOW, ON THE EVE OF YOUR DELIBERATIONS REMAINS VERY

23   IMPORTANT, THAT YOU NOT INVESTIGATE THE CASE, THAT YOU NOT

24   DISCUSS THE CASE WITH ANYONE.  VERY SOON, YOU WILL BE ABLE TO

25   DISCUSS IT, AND, IN FACT, WILL HAVE A DUTY TO DISCUSS IT WITH
```

```
 1    EACH OTHER.  IN THE MEANTIME, I WISH YOU A GOOD NIGHT AND THE

 2    LAWYERS AND I WILL BE HERE WORKING IN ORDER TO MAKE SURE THAT

 3    WE HAVE EVERYTHING READY FOR YOU TOMORROW MORNING.

 4              PLEASE COME -- BE HERE FOR TRIAL TO START AT 9:30

 5    INSTEAD OF 9:00 O'CLOCK.

 6              THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

 7              THE CLERK:  PLEASE RISE FOR THE JURY.

 8                       (JURORS EXIT.)

 9              THE COURT:  ALL RIGHT.  ON THE JURY INSTRUCTIONS,

10    THE ONE ISSUE IS WHETHER UNDER FORM INSTRUCTION 9.22, POINT

11    NUMBER 6 SHOULD BE ADDED AS THE AVAILABLE ALTERNATIVE METHODS

12    TO TAKE THE -- IT SAYS "PLAINTIFF," BUT, OBVIOUSLY, WE SHOULD

13    CHANGE THAT TO "SUSPECT" -- INTO CUSTODY.  THE PLAINTIFFS

14    WANT THIS LANGUAGE, THE DEFENSE DOES NOT.

15              LET ME BRIEFLY HEAR FROM BOTH OF YOU ON WHETHER

16    POINT NUMBER 6 SHOULD BE INCLUDED.

17              MR. GALIPO:  FIRST OF ALL, I THINK IT SHOULD

18    PROBABLY BE THE DECEDENT INTO CUSTODY, BUT IN EVERY SINGLE

19    SHOOTING CASE I'VE EVER DONE, THAT HAS BEEN GIVEN.  I THINK

20    IT'S APPROPRIATE.  CLEARLY, THERE HAVE TO BE OTHER OPTIONS

21    SHORT OF KILLING SOMEONE, HOLDING FIRE, GIVING A COMMAND TO

22    DROP IT, GIVING A WARNING THAT WAS GOING TO SHOOT, USING LESS

23    THAN LETHAL OPTIONS.  THERE'S BEEN A LOT OF EVIDENCE BOTH

24    FROM THE OFFICERS AND EXPERTS ON OTHER OPTIONS THAT WERE

25    AVAILABLE.  SO, CLEARLY, WE BELIEVE THAT THAT IS APPROPRIATE
```

```
 1    IN THIS CASE.

 2              THE COURT:  ALL RIGHT.  NOW, MS. WILLIAMS?

 3              MS. WILLIAMS:  YOUR HONOR, THE DEFENSE MAINTAINS

 4    THAT UNDER THE CIRCUMSTANCES OF THIS CASE AND THE FELONY

 5    TRAFFIC STOP AND ALL THE EVIDENCE THAT WE'VE HEARD, THAT IT

 6    WOULD BE INAPPROPRIATE TO OFFER THE FACTORS AS TO THE

 7    AVAILABILITY OF ALTERNATIVE MEASURES TO TAKE THE DECEDENT

 8    INTO CUSTODY.  MOREOVER, IN THE USE INSTRUCTIONS, IN THE JURY

 9    INSTRUCTIONS THEMSELVES, THERE IS A CITATION TO THE *BREWER*

10    *VS. CITY* OF NAPA CASE WHERE THE NINTH CIRCUIT HELD THAT IT IS

11    NOT ERROR FOR A TRIAL COURT TO REFUSE INSTRUCTING A JURY AS

12    TO THAT SIXTH AND FINAL ELEMENT.  SO THE DEFENSE SUBMITS THAT

13    INSTRUCTION IS UNNECESSARY AND INAPPROPRIATE.

14              THE COURT:  ALL RIGHT.  I APPRECIATE THAT AS A --

15    WHAT THE NINTH CIRCUIT HAS SAID IS THAT IT'S WITHIN THE

16    COURT'S DISCRETION, AND I DO THINK IT IS APPROPRIATE TO ADD

17    THAT HERE.

18              ON THE PUNITIVE DAMAGES, I THINK IT WOULD BE --

19    IT -- WELL, IT'S JUST GOING TO SAVE TIME, I THINK, FOR THE

20    JURY TO HAVE AS A FINAL QUESTION ON THE FORM WHETHER THESE

21    THINGS WERE MET.  AND, FRANKLY, I DON'T THINK WE EVEN

22    NECESSARILY HAVE TO TELL THEM WHY THERE -- IT'S BEING ASKED

23    OR EVEN USED AT THIS POINT, THE PHRASE "PUNITIVE DAMAGES."

24    IT'S SIMPLY WHETHER OR NOT THAT FINDING IS GOING TO BE MADE,

25    ALTHOUGH I'M HAPPY TO HEAR ARGUMENT ON THAT POINT.
```

```
1            SO, IN ANY EVENT, LET ME -- AND THAT -- AND THEN

2    THE BIFURCATION WOULD BE IS IF THEY DO MAKE THAT FINDING,

3    THEN WE WOULD -- AND WE'LL HAVE TO MAKE SURE THIS IS GOING TO

4    BE VERY QUICK, YOU KNOW, THE -- TO JUST THEN ASK THEM, SAY,

5    LOOK, HERE IS SOME ADDITIONAL EVIDENCE, CERTAIN AMOUNT OF

6    ARGUMENT AS TO THE AMOUNT OF THE -- OF WHAT THE -- AN

7    APPROPRIATE AMOUNT OF THE DAMAGES WOULD BE, AND THEN SUBMIT

8    IT TO THEM TO ANSWER THAT QUESTION.  BUT, AGAIN, LET ME HEAR

9    FROM PLAINTIFFS AND LET ME HEAR FROM THE DEFENSE.

10            MS. WILLIAMS:  YOUR HONOR, IF I MIGHT, JUST BEFORE

11   WE MOVE ON TO THAT, ON THE --

12            THE COURT:  YES?

13            MS. WILLIAMS:  -- ON THE 9.22 INSTRUCTION --

14            THE COURT:  YES?

15            MS. WILLIAMS:  -- THE PLAINTIFFS' PROPOSED

16   INSTRUCTION WAS -- HAD AN ADDITIONAL LAST PARAGRAPH THAT

17   WAS -- THAT'S NO PART OF THE MODEL JURY INSTRUCTIONS.  AND

18   JUST FOR CLARIFICATION PURPOSE, THE INSTRUCTION THAT'S GOING

19   TO BE GIVEN TO THE JURY WILL BE THE NINTH CIRCUIT MODEL

20   INSTRUCTION, 9.22 VERBATIM WITH FACTOR SIX; CORRECT, NOT THE

21   ADDITIONAL LAST PARAGRAPH?

22            THE COURT:  AND CHANGING "PLAINTIFF" TO "DECEDENT."

23            MS. WILLIAMS:  VERY WELL.

24            THANK YOU.

25            MR. GALIPO:  DON'T GO TOO FAR, JILL, BECAUSE WE'LL
```

```
1   DO THIS QUICK.

2           I AGREE WITH YOUR PROPOSAL, YOUR HONOR.  I THINK WE

3   DON'T EVEN NEED TO MENTION PUNITIVE DAMAGES OR SECOND PHASE.

4   WE JUST MERELY -- THERE WILL BE A QUESTION WHETHER HE --

5   OFFICER MARTINEZ ACTED WITH MALICE, OPPRESSION OR IN RECKLESS

6   DISREGARD OF THE DECEDENT'S RIGHTS, AND THEN THEY'LL HAVE AN

7   INSTRUCTION ON THOSE DEFINITIONS, AND I THINK THAT'S THE

8   SIMPLEST WAY TO HANDLE IT.

9           THE COURT:  AND MS. WILLIAMS?

10          MS. WILLIAMS:  WELL, THE DEFENSE'S RULE 50 MOTION

11  WOULD BE TO DISMISS THE PUNITIVE DAMAGES ASPECT RELATIVE TO

12  OFFICER MARTINEZ BECAUSE THERE'S NO EVIDENCE AT ALL THAT'S

13  BEEN PRESENTED DURING THE TRIAL THAT THERE WAS ANY MALICE,

14  OPPRESSION OR RECKLESS DISREGARD.  AND THAT'S THE DEFENSE

15  POSITION ON THAT.

16          WITH RESPECT TO ANY SPECIFIC JURY INSTRUCTIONS

17  THAT'S GOING TO BE GIVEN, IF IT'S JUST LIMITED TO THE

18  DEFINITIONS OF WHAT MALICE, OPPRESSION OR RECKLESS DISREGARD

19  IS, THAT'S WHAT THE DEFENSE WOULD REQUEST.

20          THE COURT:  WELL, THIS IS WHAT WE'RE GOING TO -- IT

21  WILL JUST BE THE THIRD PARAGRAPH OF 5.5, AND WE WILL TAKE OUT

22  "YOU MAY AWARD DAMAGES ONLY IF YOU FIND THAT THE DEFENDANT'S

23  CONDUCT" -- AND THEN IT SAYS -- THE FINAL QUESTION ON THE

24  SPECIAL VERDICT FORM WILL ASK WHETHER YOU FIND THAT THE

25  DEFENDANT'S CONDUCT THAT HARMED THE DECEDENT WAS MALICIOUS,
```

```
 1    OPPRESSIVE, AND THEN, BLAH, BLAH, BLAH, YOU KNOW, AND THEN

 2    DONE ACCORDINGLY.  AND THEN THAT WILL BE -- AND THAT'S ALL

 3    THAT'S GOING TO BE ASKED, YOU KNOW, RIGHT NOW.

 4              MS. WILLIAMS:  VERY WELL.

 5              MR. GALIPO:  THANK YOU, YOUR HONOR.

 6              SO JUST --

 7              THE COURT:  AND THEN I'LL -- CONSISTENT -- AND I'LL

 8    LISTEN TO THE RULE 50 MOTION.  IT'S JUST -- I JUST WANT TO

 9    GET THE JURY INSTRUCTIONS BEGIN TO GET SET AWAY BECAUSE I

10    JUST WANT TO MAKE SURE EVERYTHING'S FINE FOR TOMORROW

11    MORNING.  WE CAN ALWAYS TAKE IT OUT.

12              ALL RIGHT.  MR. GALIPO, GO AHEAD.

13              MR. GALIPO:  YES.  THANK YOU, YOUR HONOR.

14              SO THE PROPOSED INSTRUCTION WILL START WITH

15    "CONDUCT IS MALICIOUS IF IT IS ACCOMPANIED BY"?

16              THE COURT:  AND THEN IT JUST SAID -- THE FINAL

17    QUESTION ON THE SPECIAL VERDICT FORM WILL ASK YOU WHETHER --

18    WILL ASK YOU WHETHER THE DEFENDANT'S CONDUCT THAT HARMED THE

19    DECEDENT WAS MALICIOUS, OPPRESSIVE OR IN RECKLESS DISREGARD

20    OF THE DECEDENT'S.

21              MR. GALIPO:  AND THEN GO RIGHT INTO THE DEFINITION?

22              THE COURT:  AND THEN CONDUCT IS MALICIOUS IF IT IS

23    ACCOMPANIED BY ILL-WILL OR SPITE.

24              MR. GALIPO:  THANK YOU.

25              THE COURT:  NOW, THE THING I DON'T UNDERSTAND HERE
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1    IS WHY THE -- THE ORDER, OBVIOUSLY, AND IS ALWAYS THE CASE

 2    WHERE IT'S MALICIOUS, OPPRESSIVE OR IN RECKLESS DISREGARD,

 3    AND THEN THAT'S NOT THE ORDER OF THE DEFINITIONS WITHIN.  THE

 4    THING IS NOT CONSISTENT WITH THAT.  SO, I MEAN, IT SEEMS TO

 5    ME THAT AS LONG AS SOMEBODY'S TYPING IT UP SEPARATELY MAYBE

 6    WE COULD JUST REORDER IT SO THE ORDER OF THE DEFINITIONS

 7    TRACK THE ORDER OF THE ELEMENTS THAT ARE SET FORTH IN THE --

 8    IN THAT LIST.  IT JUST ALWAYS STRIKES ME AS KIND OF WEIRD.

 9            MR. GALIPO:  YES, I OFTEN WONDERED THE SAME THING.

10    THE ONLY THING I CAN THINK OF IS THE RECKLESS DISREGARD WAS

11    EASIER TO PUT AT THE END OF THE SENTENCE, BUT THEN I'M NOT

12    SURE WHY THEY DIDN'T ORDER IT AT THE END.

13            THE COURT:  CORRECT.

14            SO -- ALL RIGHT.  NOW, ON THE SURVIVOR ISSUE, I

15    APPRECIATE THE BRIEFS -- FIRST OF ALL, I APPRECIATE

16    MS. WILLIAMS FOR BRINGING IT TO MY ATTENTION BECAUSE I WAS,

17    FRANKLY, UNAWARE THAT THIS WHOLE ISSUE EXISTED.  AND I

18    APPRECIATE THE BRIEFS OF COUNSEL ON THIS POINT AND LAST NIGHT

19    I LOOKED AT THE CASES.  AND, YOU KNOW, THE -- AS MS. WILLIAMS

20    POINTS OUT, THE NINTH CIRCUIT HASN'T RULED ON THIS -- YOU

21    KNOW, THE CALIFORNIA SUPREME COURT OBVIOUSLY HAS BEEN PRETTY

22    EXPLICIT, THERE ARE CASES GOING BACK AND FORTH.  NONETHELESS,

23    I -- IN THE ABSENCE OF THE NINTH CIRCUIT RULING ON IT, AND I

24    WISH THEY WOULD GO AHEAD AND RULE ON IT SO WE KNOW ONE WAY OR

25    THE OTHER -- IN PART, BECAUSE THE GUYTON CASE SEEMS TO BE
```

```
 1    FOLLOWED MORE CONSISTENTLY.  AND, IN PART, BECAUSE THE COTTON
 2    CASE SEEMS TO HAVE HAD THE MOST SOPHISTICATED ANALYSIS OF THE
 3    ISSUE AND IT CHOSE TO APPROVE OF THOSE DAMAGES.  I AM GOING
 4    TO -- OR I SHOULD SAY MY TENTATIVE VIEW IS TO ALLOW IT, BUT
 5    LET ME BRIEFLY HEAR FROM THE CITY, MS. WILLIAMS, SINCE -- YOU
 6    KNOW, IF YOU WANT TO EXPAND ON ANYTHING IN THE BRIEFS OR
 7    THAT.  I JUST -- HAVING DONE THIS, THAT'S MY TENTATIVE VIEW,
 8    BUT I WANT TO GIVE YOU A CHANCE TO CONVINCE ME THAT I'M
 9    WRONG.
10            AND, ALSO, JUST BY THE WAY, I THINK WE REALLY NEED
11    TO HAVE A SEPARATE FORM ON THE VERDICT FORM SO IF THE NINTH
12    CIRCUIT DECIDES THAT THIS IS INCORRECT, THEN -- YOU KNOW,
13    MAYBE IT MEANS THERE WOULD HAVE TO BE AN ENTIRELY NEW TRIAL.
14    OBVIOUSLY, PEOPLE COULD ARGUE IT EITHER WAY, BUT AT LEAST
15    THEN THERE'S SOME BASIS TO TRY TO CALL OUT THOSE DAMAGES
16    WHICH WOULD HAVE ARISEN FROM WHATEVER MISTAKE IS GOING TO BE
17    MADE.
18            SO, ANYWAY, MS. WILLIAMS?
19            MS. WILLIAMS:  BRIEFLY YOUR HONOR, THE WHOLE REASON
20    THAT CERTAIN CALIFORNIA DISTRICT COURTS HAVE DECIDED TO CARVE
21    OUT AN EXCEPTION AND ALLOW RECOVERY OF PAIN AND SUFFERING
22    DAMAGES IN THESE CASES IS BECAUSE THEY HAVE FOUND THAT
23    CALIFORNIA'S LIMITATION ON THE RECOVERY OF PUNITIVE --
24    RECOVERY OF PAIN AND SUFFERING DAMAGES IS INCONSISTENT WITH
25    THE POLICIES UNDERLYING SECTION 1983.
```

```
1              THE UNITED STATES SUPREME COURT, AS THE CALIFORNIA
2    SUPREME COURT NOTED, HAS REASONED THAT THE POLICIES
3    UNDERLYING SECTION 1983 ARE TO COMPENSATE THE THOSE PERSONS
4    WHOSE CIVIL RIGHTS WERE VIOLATED, AND THE UNITED STATES
5    SUPREME COURT, AS THE CALIFORNIA SUPREME COURT NOTED, THAT
6    COMPENSATING SURVIVORS FOR ALLEGED CONSTITUTIONAL VIOLATIONS
7    DOES NOT FLY IN THE FACE OF SECTION 1983'S POLICY OF
8    COMPENSATING THE PERSON ACTUALLY INJURED, AND THAT'S ALL I
9    WOULD ADD.
10             THE COURT:  ALL RIGHT.  I UNDERSTAND THAT ARGUMENT.
11   OBVIOUSLY, I SPEND MUCH OF MY TIME DOING WHAT THE CALIFORNIA
12   SUPREME COURT TELLS ME, EITHER IN HABEAS CASES OR IN EERIE
13   DOCTRINE CIVIL CASES; BUT, IN THIS CASE, I DO HAVE TO MAKE MY
14   OWN DETERMINATION AS TO WHAT FEDERAL LAW IS.  AND I AM -- IN
15   THE ABSENCE OF A DIRECTIVE FROM THE NINTH CIRCUIT, I'M GOING
16   TO FOLLOW THE GUYTON AND THE COTTON CASES, RECOGNIZING I
17   MIGHT BE VERY WRONG.  SO, THANK YOU.
18             MS. WILLIAMS:  THANK YOU.
19             THE COURT:  AND NOW THE FINAL ISSUE WAS -- THAT'S
20   BEEN RAISED IS ON THE COMPARATIVE FAULT.  AND LET ME HEAR --
21   I'LL HEAR FROM THE CITY FIRST ON THIS, AND THEN I'D
22   APPRECIATE IT IF COUNSEL COULD FRAME THE ISSUE FOR ME AND
23   THEN I'LL TELL YOU WHAT I'M THINKING IN THIS REGARD.
24             MS. WILLIAMS:  WELL, YOUR HONOR, PERHAPS THIS MIGHT
25   BE A MOOT POINT AT THIS POINT BECAUSE I HAVE SPOKEN WITH MR.
```

1    GALIPO, WHO'S INDICATED THAT THE PLAINTIFFS ARE KEEPING THE

2    NEGLIGENCE CLAIM, AND DURING OUR CONFERENCE CALL WITH THE

3    COURT'S CLERK LAST NIGHT, MR. GALIPO, I -- WE HAD AGREED THAT

4    I WOULD BE OFFERING A COMPARATIVE FAULT INSTRUCTION, SO

5    THAT'S WHY IT WAS EXCLUDED FROM MY MOST RECENT PROPOSED

6    INSTRUCTION.

7              THE COURT:  I SEE.

8              SO -- RIGHT.  BECAUSE THE -- WHAT YOU WERE DOING

9    WAS WHETHER IT SHOULD BE IN REGARD TO THE BATTERY, SO HERE,

10   IT'S GOING TO BE IN REGARD TO NEGLIGENCE, AND I TAKE IT,

11   THEN, THE PLAINTIFFS AREN'T DISPUTING THAT IF THERE'S GOING

12   TO BE A NEGLIGENCE CLAIM FOR RELIEF, THEN THE INSTRUCTION

13   WOULD BE APPROPRIATE; IS THAT CORRECT?

14             MR. GALIPO:  THAT IS CORRECT, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  SO WHAT ELSE ON THE

16   INSTRUCTIONS CAN WE PROFITABLY PURSUE?

17             MR. GALIPO:  ONE OTHER ISSUE THAT I CAN THINK OF,

18   THE -- ONE OF THE CLAIMS WE HAD WAS A FOURTEENTH AMENDMENT

19   CLAIM, AND THAT HAS -- THE LAW HAS DESCRIBED A DIFFERENT OR

20   HIGHER STANDARD, IF YOU WILL, THAN THE UNREASONABLE FORCE.

21             IN THIS CASE, SINCE -- IF THERE'S A FINDING OF

22   UNREASONABLE FORCE, WE GET TO WRONGFUL DEATH DAMAGES AND THE

23   SURVIVAL DAMAGES, WE DON'T NEED THE FOURTEENTH AMENDMENT

24   CLAIM, AND I -- WE DISCUSSED THIS TO SOME EXTENT WITH NICK

25   AND WITH COUNSEL.  SO I THINK IF WE'RE ALL IN AGREEMENT ON

```
 1    THAT -- OBVIOUSLY, IF THERE'S A FINDING OF NO NEGLIGENCE AND

 2    NO UNREASONABLE FORCE, WELL, THAT'S THE END OF THE CASE, AND

 3    IF THERE IS A FINDING AND THEY GET TO DAMAGES, THEN MY

 4    POSITION IS, IF EVERYONE AGREES ON THAT, WE DON'T NEED THE

 5    FOURTEENTH AMENDMENT, WHICH WILL SIMPLIFY THE JURY

 6    INSTRUCTIONS AND THE VERDICT FORM.

 7              THE COURT:  WHERE -- ANYTHING -- MS. WILLIAMS,

 8    ANYTHING ELSE?

 9              MS. WILLIAMS:  NOTHING, YOUR HONOR.  THE DEFENSE IS

10    OBVIOUSLY AGREEABLE TO PLAINTIFFS' DISMISSING THEIR

11    FOURTEENTH AMENDMENT CLAIM.

12              THE COURT:  ALL RIGHT.  THEN WHAT ARE THE MECHANICS

13    OF GETTING A SET OF INSTRUCTIONS THAT CAN -- THEN WE CAN TALK

14    ABOUT IN THE MORNING AND MAKE SURE THAT WE'RE ALL ON THE SAME

15    PAGE OR RESOLVE ANY LINGERING ISSUES THAT THERE ARE.  WHO'S

16    TAKING THE LABORING OAR ON THIS?

17              MR. GALIPO:  I DON'T WANT TO DISCOURAGE --

18              MS. WILLIAMS:  MAYBE MR. GALIPO IS, I DON'T KNOW.

19              THE COURT:  I THINK IT'S APPROPRIATE FOR THE

20    PLAINTIFFS TO UNDERTAKE THIS.

21              MS. WILLIAMS:  YOUR HONOR, I HAVE ALREADY ACTUALLY

22    STARTED IT, AND BASED UPON WHAT WE'VE ALREADY EXCHANGED, IT

23    SHOULD NOT BE TOO MUCH.

24              THE COURT:  ALL RIGHT.  PLEASE E-MAIL IT TO

25    MS. SANCHEZ AND -- SO I CAN LOOK AT IT IN THE MORNING AND I
```

```
 1    WILL PROBABLY -- WHAT I LIKE TO DO IS TAKE THE INSTRUCTIONS

 2    THAT I STARTED OFF READING UNDER THE -- WHAT IS EVIDENCE, YOU

 3    KNOW, WHAT IS NOT EVIDENCE, AND DIRECT AND CIRCUMSTANTIAL

 4    EVIDENCE, AND REPEAT THOSE FOR THE JURY JUST IN CASE THEY

 5    FIND IT HELPFUL NOW THAT THEY ACTUALLY HAVE TO WEIGH THE

 6    EVIDENCE.  SO IF YOU CAN PUT THAT IN THERE, THEN THAT'S FINE;

 7    AND, IF NOT, I'LL JUST ADD THOSE TOMORROW MORNING WHEN I GET

 8    YOUR SET.

 9             MS. WILLIAMS:  THOSE ARE ALREADY PART OF IT, YOUR

10    HONOR.

11             THE COURT:  ALL RIGHT.  GREAT.

12             MS. WILLIAMS:  AND THEN WITH RESPECT TO THE VERDICT

13    FORM, WILL WE BE DISCUSSING THAT IN THE MORNING AS WELL?

14             THE COURT:  WHERE ARE -- OR WE CAN EVEN DISCUSS IT

15    RIGHT NOW.  SO IF YOU HAVE -- IF YOU WANT TO GIVE ME COPIES

16    OR TELL ME WHAT IT IS YOU'VE AGREED ON AND NOT AGREED ON...

17             MR. GALIPO:  WELL, I'LL GET TO THE VERDICT FORM IN

18    A SECOND.  I JUST -- AND I -- WE COULD ADDRESS THIS IN THE

19    MORNING, BUT THERE'S SEVERAL SPECIAL INSTRUCTIONS THAT ARE

20    NON NINTH CIRCUIT INSTRUCTIONS THAT THE DEFENSE REQUESTED

21    THAT WE OBJECTED TO, SO I DON'T KNOW IF SHE'S GOING TO PUT

22    ALL THOSE IN HER PACKET, BUT I GUESS WE CAN DEAL WITH THAT IN

23    THE MORNING.

24             THE COURT:  WELL, IF YOU'LL -- I CAN -- IF YOU'LL

25    SPECIFY WHICH ONE THOSE ARE, I'LL LEAVE THE BENCH AND TAKE A
```

```
 1    LOOK AT THEM AND WE CAN COME OUT AND TRY TO RESOLVE IT RIGHT

 2    NOW.

 3              MR. GALIPO:  SURE.

 4              THERE'S ACTUALLY ABOUT TEN OR FIFTEEN OF THEM.  I

 5    DON'T KNOW -- THERE WERE SOME THAT WERE REGARDING FORCE CASES

 6    AND HAD SOME REPETITIVE LANGUAGE.

 7              THE COURT:  THIS IS WHAT I'M GOING TO DO:  I'M

 8    GOING TO LEAVE THE BENCH, THE TWO OF YOU TALK AND FIGURE OUT

 9    WHICH OF THOSE THE DEFENSE WOULD LIKE TO HAVE, AND THEN I

10    WILL TAKE A LOOK AT THEM AND WE CAN COME OUT AND DISCUSS

11    THEM.

12              MR. GALIPO:  FAIR ENOUGH.

13              THE COURT:  ALL RIGHT.

14              MR. GALIPO:  THANK YOU, YOUR HONOR.

15              THE CLERK:  ALL RISE.

16              COURT IS IN RECESS.

17                         (RECESS.)

18              THE COURT:  BEFORE DEALING WITH THE JURY

19    INSTRUCTIONS, LET ME HEAR THE RULE 50 MOTION FROM THE

20    DEFENSE.

21              MR. ROTHANS:  FIRST, IF I MAY, YOUR HONOR, I'M NOT

22    SURE THE RECORD IS CLEAR THAT THE FOURTEENTH AMENDMENT CLAIM

23    HAS BEEN DISMISSED.  I HEARD WE DON'T NEED IT AND WE DON'T

24    OBJECT TO IT BEING DISMISSED, BUT I NEVER HEARD ACTUALLY ON

25    THE RECORD THE FOURTEENTH AMENDMENT CLAIM BEING DISMISSED.
```

```
 1              THE COURT:  MR. GALIPO, MR. MC NICHOLAS?

 2              MR. GALIPO:  YES.

 3              WELL, I JUST -- HERE'S MY TAKE:  THERE'S TWO TYPES

 4    OF DAMAGES AVAILABLE IN THE CASE; THE WRONGFUL DEATH DAMAGES

 5    FOR THE LOSS TO THE CHILDREN, AND THE SURVIVAL DAMAGES WHICH

 6    YOUR HONOR HAS RULED ON.  IF WE PROVE UNREASONABLE FORCE,

 7    WHICH -- OR EXCESSIVE FORCE, WHICH WOULD BE ALMOST THE

 8    EQUIVALENT UNDER THE FOURTH AMENDMENT STANDARD AND THE

 9    BATTERY STANDARD, WE WOULD GET WRONGFUL DEATH DAMAGES AND

10    SURVIVAL DAMAGES UNDER THE LAW.  AND GIVEN THAT AND IF THE

11    COURT'S IN AGREEMENT WITH THAT, WHICH I THINK IS THE CORRECT

12    STATEMENT OF THE LAW, THEN YES, WE DON'T NEED THE FOURTEENTH

13    AMENDMENT.  I DON'T WANT TO WITHDRAW IT AND THEN HAVE DEFENSE

14    COUNSEL SAY, AHA, NOW YOU CAN'T GET WRONGFUL DEATH DAMAGES OR

15    NOW YOU CAN'T GET OTHER DAMAGES BECAUSE YOU DROPPED THAT

16    CLAIM.  BUT ASSUMING WE'RE ALL ON THE SAME PAGE, YES, WE'RE

17    WILLING TO DROP THE CLAIM BECAUSE IT'S UNNECESSARY.

18              THE COURT:  RIGHT.

19              WELL, IT SEEMS TO ME THE CLAIM AT THIS POINT IS

20    DUPLICITOUS.  I -- I'M GOING TO LET YOU TRY TO GET THOSE

21    DAMAGES, SO IN LIGHT OF THAT, AS I THINK I'VE MADE CLEAR.

22              SO AS -- IN LIGHT OF THAT RULING, ARE YOU ASKING

23    FOR AN INSTRUCTION ON THE FOURTEENTH AMENDMENT CLAIM OR NOT?

24              MR. GALIPO:  NO, IT'S NOT NECESSARY.

25              THE COURT:  ALL RIGHT.  ALL RIGHT.  SO, THEN, I
```

```
 1    THINK THAT'S YOUR ANSWER, MR. ROTHANS.

 2             MR. ROTHANS:  BECAUSE OUR RULE 50 WAS GOING TO

 3    ADDRESS THAT ISSUE AS WELL, NOW IT'S MOOT.

 4             WE'RE JUST MOVING, YOUR HONOR, VERY BRIEFLY AS A

 5    MATTER OF LAW TO DISMISS THE PUNITIVE DAMAGE PRAYER OR

 6    REQUEST IN THIS CASE.  THE THRUST, I BELIEVE, OF THE EVIDENCE

 7    AND THE THRUST OF COUNSEL'S ARGUMENT, BOTH COUNSEL, IS THAT

 8    OFFICER LUIS MARTINEZ OVERREACTED DUE TO FATIGUE, THAT'S WHAT

 9    I'VE HEARD AS A THEME FROM OPENING STATEMENT, THAT'S WHAT

10    I'VE HEARD FROM WITNESS AFTER WITNESS THEY HAVE ATTEMPTED TO

11    SOLICIT.  HE WAS TIRED.  HE WAS FATIGUED.  HE HAD BEEN ON

12    DUTY MORE THAN 16 HOURS, AND THE TERM "OVERREACTED" HAS

13    PERMEATED THIS COURTROOM THROUGHOUT THIS CASE.  IF THAT IS,

14    IN FACT, THEIR ARGUMENT, THEN THERE'S NO EVIDENCE TO SUPPORT

15    MALICE, OPPRESSION OR A CALLOUS RECKLESS DISREGARD FOR THE

16    RIGHTS OF THE DECEDENT.  IT'S SIMPLY AN OVERREACTION.

17    IT'S -- HE WAS TOO TIRED.  HE WASN'T FOCUSED.  HE WASN'T

18    ATTENTIVE.  SO, FOR THAT REASON, UNDER RULE 50(A)(1), WE MOVE

19    FOR JUDGMENT AS A MATTER OF LAW TO DISMISS THE PUNITIVE

20    DAMAGE REQUEST AS TO OFFICER LUIS MARTINEZ.

21             THE COURT:  MR. GALIPO?

22             MR. GALIPO:  YES, YOUR HONOR.

23             CLEARLY, THE PLAINTIFFS' POSITION IS THAT THERE IS

24    EVIDENCE IN THE RECORD -- AND, AGAIN, THE COURT IS NOT MAKING

25    ANY DECISIONS AT THIS POINT, BUT IF A -- IF JURORS WERE TO
```

```
1    TAKE ALL REASONABLE INFERENCES IN FAVOR OF ALL

2    PLAINTIFFS' FAVORABLE TESTIMONY OF THE EVIDENCE, THERE

3    CERTAINLY IS EVIDENCE FROM WHICH THEY COULD CONCLUDE THAT

4    OFFICER MARTINEZ ACTED WITH MALICE, OPPRESSION OR IN RECKLESS

5    DISREGARD AS DEFINED.  OBVIOUSLY, THERE'S A DISPUTE AS TO

6    WHETHER HE WAS FATIGUED.  HE SAYS HE WASN'T.  THE DEFENSE HAS

7    PUT ON EVIDENCE THAT HE WASN'T, THE JURY COULD VERY WELL

8    CONCLUDE HE WASN'T FATIGUED AT ALL.

9          AND THE OVERREACTION, THAT HAS BEEN MENTIONED

10   BECAUSE SOME JURORS MAY VIEW IT AS AN OVERREACTION.  BUT THE

11   REALITY IS, HE, WHO CLAIMS HE WASN'T FATIGUED, INTENTIONALLY

12   FIRED HIS MP5 AT A MAN'S CHEST ON A THREE-ROUND BURST KNOWING

13   IT WAS LIKELY TO KILL HIM.  IT'S HIS OWN TESTIMONY.  FOUR

14   OTHER OFFICERS WHO HAD THEIR GUNS POINTED AT HIM DID NOT

15   FIRE.  AND SO WHEN YOU'RE LOOKING AT THE DEFINITION WHICH

16   INCLUDES WHETHER OR NOT THERE WAS A PURPOSE TO HARM, I DO

17   THINK IF YOU SHOOT AN MP5 AT SOMEONE'S CHEST, CLEARLY AN

18   INFERENCE COULD BE THAT THERE'S A PURPOSE TO HARM THE

19   INDIVIDUAL; WHETHER THERE WAS AN INDIFFERENCE OR COMPLETE

20   INDIFFERENCE TO HIS RIGHTS OR SAFETY, I THINK ALSO ONE COULD

21   CONCLUDE THERE WAS; AND WHETHER OR NOT THERE WAS A MISUSE OR

22   ABUSE OF AUTHORITY OR POWER, ET CETERA.

23          SO I THINK IF THE JURY ASSUMES THAT MR. GRISSOM WAS

24   SURRENDERING, AND THERE HAS BEEN DISPUTES ABOUT THAT, BUT

25   THERE'S EVIDENCE TO SUPPORT THAT HE WAS SURRENDERING HIS
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    HANDS OUT, NOTHING IN HIS HANDS VISIBLE TO THE OFFICERS, AND

2    IN THAT STATE HE WAS SHOT AND KILLED BY OFFICER MARTINEZ, I

3    THINK THERE IS AMPLE EVIDENCE FROM WHICH THE JURY COULD

4    CONCLUDE THAT OFFICER MARTINEZ ACTED WITH EITHER MALICE,

5    OPPRESSION OR IN RECKLESS DISREGARD OF HIS RIGHTS.

6         THE COURT:  WELL, WHAT WAS THE EVIDENCE -- SEE, I

7    DISAGREE WITH YOU THAT THERE'S AMPLE EVIDENCE.  THERE MAY BE

8    BARELY ENOUGH EVIDENCE, I DON'T KNOW THAT, BUT WHICH -- FOR

9    PURPOSES OF DENYING THE MOTION WOULD BE GOOD ENOUGH, I DON'T

10   KNOW.  I CERTAINLY WOULDN'T SAY THAT THERE'S AMPLE EVIDENCE

11   FOR PUNITIVE DAMAGES.

12        BUT, IN TERMS OF THE MALICE AND THE OPPRESSION,

13   WHAT, REALLY, IS THE EVIDENCE OF THE MALICE OR THE

14   OPPRESSION?

15        YOU KNOW, THIS ISN'T A CASE THAT I'VE -- AS I'VE

16   SEEN THEM, YOU KNOW, IN THE NINTH CIRCUIT WHERE THE OFFICERS,

17   YOU KNOW, BEAT THE PERSON ON THE HEAD WHEN THERE WAS NO

18   JUSTIFICATION, AND, YOU KNOW, JUST THESE OTHER AWFUL THINGS.

19   I MEAN, THERE -- WHERE -- THE MOST IT WOULD SEEM TO ME IS

20   THAT IT WAS -- IN THE RECKLESS DISREGARD IS THAT IF THE JURY

21   WERE TO DETERMINE ALL OF THE FACTS IN THE LIGHT MOST

22   FAVORABLE TO THE PLAINTIFFS, THAT THEY WOULD, AS YOU SUGGEST,

23   FIND THAT HE DID HAVE HIS HANDS UP AND THAT -- YOU KNOW,

24   IT'S -- THERE'S SOMETHING MORE -- IT'S MORE IN THE -- FROM

25   NEGLIGENCE TO GROSS NEGLIGENCE TO RECKLESSNESS THAT IT'S ABLE

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1   TO MEET THAT HIGHER STANDARD.
 2          BUT, FIRST OF ALL, BEFORE WE TALK ABOUT THAT,
 3   WHAT'S THE THING OF THE MALICE OR THE OPPRESSION?  WHERE'S
 4   THE EVIDENCE OF THAT?
 5          MR. GALIPO:  OKAY.  MALICE IS DEFINED AS IF IT'S
 6   ACCOMPANIED BY ILL-WILL OR SPITE OR IF IT IS FOR THE PURPOSE
 7   OF INJURING ANOTHER, THAT'S THE DEFINITION OF MALICE IN THE
 8   INSTRUCTION.  SO CLEARLY SHOOTING SOMEONE IN THE CHEST WITH
 9   AN MP5, THE ARGUMENT COULD BE MADE THAT'S THE PURPOSE OF
10   INJURING SOMEONE BECAUSE YOU KNOW YOU'RE GOING TO INJURE THEM
11   AND MOST LIKELY KILL THEM.
12          TO THE EXTENT THAT MAYBE BECAUSE OF THESE BULLETINS
13   OR BECAUSE, YOU KNOW, HE FIGURED THIS IS A BAD GUY IN HIS
14   MIND, THAT THIS PERSON WAS THE BIG RED BANDIT, THAT HE HAD
15   ROBBED THESE PLACES.  MAYBE IN HIS MIND HE THOUGHT, YOU KNOW,
16   THE GUY DESERVED TO BE KILLED.  I DON'T KNOW.  WE KNOW WE
17   SHOT HIM AND WE KNOW THERE'S A DISPUTE AS TO THE
18   CIRCUMSTANCES BASED ON THE TESTIMONY, SO THAT WOULD BE
19   EVIDENCE, I THINK, OF THE MALICIOUS.
20          AS FAR AS THE OPPRESSION, AN ACT OR ADMISSION IS
21   OPPRESSIVE IF THE DEFENDANT INJURES OR DAMAGES OR OTHERWISE
22   VIOLATES THE RIGHTS OF THE DECEDENT AND/OR PLAINTIFFS WITH
23   UNNECESSARY HARSHNESS OR SEVERITY, SUCH AS BY THE MISUSE OR
24   ABUSE OF AUTHORITY OR POWER OR BY TAKING ADVANTAGE OF SOME
25   WEAKNESS OR DISABILITY OR MISFORTUNE OF THE DECEDENT AND/OR
```

```
1    PLAINTIFFS.  I THINK IT SHOULD JUST BE THE DECEDENT.  BUT,
2    IF, IN FACT, HE WAS GETTING OUT AND IF, IN FACT, HE WAS
3    SURRENDERING, THEN TO SHOOT AND KILL HIM, I WOULD SUBMIT IF
4    HE DID HAVE HIS HANDS VISIBLE WITH NOTHING IN HIS HANDS, FITS
5    SOME OF THOSE CATEGORIES.  AND I UNDERSTAND THAT THE COURT,
6    AT THIS POINT, IS NOT DECIDING WHETHER IT THINKS THAT BY A
7    PREPONDERANCE OF THE EVIDENCE THAT FINDING HAS BEEN MET OR
8    NOT, BUT I THINK THERE'S AT LEAST ENOUGH EVIDENCE IN THE
9    RECORD FOR THAT.
10        THE COURT:  IT DOES STRIKE ME -- WELL, LET ME HEAR
11   FROM MR. ROTHANS FIRST.
12        MR. ROTHANS:  IT WOULD APPEAR, YOUR HONOR, THAT MR.
13   GALIPO IS GRASPING AT STRAWS.  WHAT THE EVIDENCE IS, IS BASED
14   ON THE SHOOTER'S STATE OF MIND AT THE TIME AND THE SHOOTER
15   SAID THE GENTLEMAN HAD SOMETHING CUPPED IN HIS HAND, HE
16   TURNED AROUND SUDDENLY AND HE DROPPED HIS RIGHT HAND TO HIS
17   RIGHT WAISTBAND AREA AND THAT'S WHEN HE FIRED.  THAT'S NOT
18   THE TESTIMONY OF ANYONE ELSE AS TO THE SHOOTER'S STATE OF
19   MIND.  SO HOW WE GET MALICE FROM THAT?  THERE'S NO EVIDENCE
20   HE INTENDED TO TAKE OUT OR KILL THE BIG RED BANDIT.  HE
21   DIDN'T SHOOT HIM WHILE HE WAS IN THE CAR AND NONCOMPLIANT.
22   HE DIDN'T SHOOT HIM WHEN HE FIRST GOT OUT AND RECOGNIZED THAT
23   HE WAS, IN FACT, THAT SUSPECT.  HE DIDN'T SHOOT HIM UNTIL HE
24   DROPPED HIS HAND WITH SOMETHING CUPPED IN IT AND THE OFFICER
25   BELIEVED, AS HE'S TESTIFIED, THAT HE WAS ABOUT TO ARM HIMSELF
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    AND SHOOT THE OFFICER.

2            THERE'S NO EVIDENCE TO SUPPORT A FINDING, A

3    REASONABLE FINDING BY THIS JURY THAT THIS OFFICER POSSESSED

4    MALICE, OPPRESSION OR DEMONSTRATED A CALLOUS DISREGARD FOR

5    THE RIGHTS OF THE DECEDENT.  IN FACT, THE OPPOSITE IS TRUE.

6    HE REACTED IN RESPONSE TO THE MOVEMENTS OF THE SUSPECT AND

7    THERE'S NO QUESTION, AT LEAST FROM OUR PROSPECTIVE, THAT THE

8    PREPONDERANCE OF THE EVIDENCE, WITNESS AFTER WITNESS -- AND I

9    DON'T NEED TO MAKE MY CLOSING ARGUMENT NOW.  I UNDERSTAND

10   THAT, YOUR HONOR, BUT THE PREPONDERANCE IS THE MAN DROPPED

11   HIS HANDS BEFORE HE WAS SHOT.  WITH THAT, THERE CANNOT BE A

12   FINDING OF MALICE, OPPRESSION OR CALLOUS DISREGARD OR

13   RECKLESS DISREGARD OF THE DECEDENT'S RIGHTS ON THE PART OF

14   OFFICER MARTINEZ.  WITH THAT, WE'LL SUBMIT.

15           THE COURT:  I'LL LET THE JURY DECIDE, AND IF THEY

16   SHOULD COME BACK HAVING THE ANSWERED THE QUESTION YES AND

17   THEN DO, IN FACT, AWARD PUNITIVE DAMAGES, OBVIOUSLY YOU'LL

18   HAVE AN OPPORTUNITY UNDER 50(B) TO RAISE THIS ISSUE WITH ME

19   AGAIN, AND THIS WAY YOU'VE OBVIOUSLY PRESERVED IT BY RAISING

20   IT UNDER 50(A).

21           MR. ROTHANS:  THANK YOU, YOUR HONOR.

22           THE COURT:  SO THE MOTION AT THIS POINT IS DENIED.

23           MR. ROTHANS:  MAY I INQUIRE?

24           I HAVE A CITY COUNCIL MEETING AT 6:00 O'CLOCK IN

25   ANOTHER MATTER.  MAY I BE EXCUSED AND LET MS. WILLIAMS ARGUE

```
 1   THE INSTRUCTIONS?

 2           THE COURT:  YOU MAY.  THAT'S WHY I CAME OUT AND

 3   HEARD THIS FIRST, SO YOU'RE EXCUSED.

 4           MR. ROTHANS:  THANK YOU.

 5           THE COURT:  I REMEMBER ONCE I WAS -- HAD A -- FOR A

 6   MUNICIPALITY, HAD A CONFIDENTIAL REPRESENTATION ON -- AND WE

 7   NEEDED TO HAVE -- GET ADVICE FOR THAT CITY COUNCIL FROM

 8   SOMEBODY WHO LIKE YOURSELF OFTEN WORKS AS A CITY ATTORNEY,

 9   AND TRYING TO GET A TUESDAY WHERE THEY -- ALL OF US COULD GET

10   TOGETHER WAS DIFFICULT TO PUT IT MILDLY.  IT WAS JUST BECAUSE

11   HE WAS JUST RUTTING FROM -- AS YOU KNOW, FROM CITY TO CITY TO

12   CITY TRYING TO MEET WITH ALL THE COUNCIL MEETINGS.

13           SO, WITH THAT, YOU'RE EXCUSED AND I'LL LET

14   MS. WILLIAMS GUIDE ME ON THE JURY INSTRUCTIONS.

15           MR. ROTHANS:  THANK YOU.

16           THE COURT:  ALL RIGHT.  MS. WILLIAMS, ON THE

17   INITIAL INSTRUCTIONS, IF YOU COULD GO THROUGH AND MAKE SURE

18   THAT THEY READ APPROPRIATELY FOR THE END OF THE CASE, SUCH AS

19   THESE INSTRUCTIONS ARE PRELIMINARY INSTRUCTIONS -- THAT'S

20   OBVIOUSLY NO LONGER THE CASE TO DEAL WITH THAT.

21           ALL RIGHT.  NOW, THERE WERE SOME INSTRUCTIONS FROM

22   BOTH THE PLAINTIFF AND THE DEFENDANTS, SOME SPECIAL

23   INSTRUCTIONS.  LET ME RUN THROUGH THOSE BRIEFLY AND YOU CAN

24   TELL ME WHETHER THEY'RE STILL IN PLAY.

25           PLAINTIFFS' INSTRUCTION NUMBER 1, THE STIPULATIONS
```

```
 1   OF FACT, THERE WAS AN ISSUE AS TO THREE AND FOUR WHETHER IT
 2   WAS INTENTIONAL AND THAT LEJOY GRISSOM DIED AT THE SCENE.  I
 3   DON'T -- IF THAT'S NOT STIPULATED, IT'S NOT STIPULATED, SO I
 4   DON'T REALLY SEE -- IS THAT STILL SOMETHING THAT THE PARTIES
 5   ARE ARGUING ABOUT?
 6              MR. GALIPO:  APPARENTLY.
 7              I THINK THAT THEY AGREE THAT THE SHOOTING WAS A
 8   SEIZURE AND THEY AGREED HE DIED FROM THE GUNSHOT WOUNDS, BUT
 9   I THINK THEY DON'T WANT TO INCLUDE THAT IN THE INSTRUCTION.
10              IS THAT -- DO I HAVE THAT RIGHT?
11              MS. WILLIAMS:  CORRECT, YOUR HONOR, THE DEFENSE
12   DOES NOT WITH TO STIPULATE TO THREE AND FOUR.
13              THE COURT:  ALL RIGHT.  WELL, IF YOU AREN'T
14   STIPULATING, THEN YOU AREN'T STIPULATING, SO THOSE SHOULD BE
15   TAKEN OUT.  I MEAN, I SUPPOSE THE JURY REALLY COULD
16   POTENTIALLY BE READ ANYTHING THAT WAS A STIPULATED FACT IN
17   THE PRETRIAL ORDER, SO I DON'T RECALL THAT NECESSARILY THOSE
18   TWO THINGS IN THAT LANGUAGE WERE INCLUDED IN THAT.
19              THE PLAINTIFFS' INSTRUCTION NUMBER 2, IT JUST SEEMS
20   TO BE TAKEN -- WE'VE ALREADY TALKED ABOUT THE FINAL PARAGRAPH
21   AS TAKEN OUT AND IT WILL BE 9.22 WITH NUMBER 6 LEFT IN.
22              THE PLAINTIFFS' INSTRUCTION NUMBER 3, THE EXCESSIVE
23   FORCE AS TO THE SHOOTING, AGAIN, I THINK -- IS THAT SOMETHING
24   THAT THE PLAINTIFFS ARE STILL ASKING FOR AT THIS POINT?
25              MR. GALIPO:  IS THAT THE DEADLY FORCE INSTRUCTION?
```

```
 1            THE COURT:  YES.

 2            IT SAYS, "YOU MUST BALANCE THE AMOUNT OF FORCE

 3    APPLIED AGAINST THE USE OF THAT FORCE."

 4            MR. GALIPO:  YES, WE WOULD ASK FOR IT.

 5            THE COURT:  ALL RIGHT.  IT'S -- THAT IS -- THE

 6    REQUEST IS DENIED.  IT'S COVERED BY 9.22.

 7            THE FOURTH -- INSTRUCTION NUMBER 4 ON THE

 8    FOURTEENTH AMENDMENT, INTERFERENCE WITH FAMILIAL

 9    ASSOCIATION --

10            MR. GALIPO:  WITHDRAWN.

11            THE COURT:  -- THAT HAS BEEN WITHDRAWN.

12            MR. GALIPO:  YES.

13            THE COURT:  INSTRUCTION NUMBER 5, NEGLIGENCE, THE

14    ESSENTIAL FACTUAL ELEMENTS -- THIS KIND OF GOES IN WITH I

15    THINK WHERE THE DEFENSE -- I GUESS THE DEFENDANTS HAD ONE

16    WHERE THEY WERE TALKING ABOUT THE PLAINTIFFS IN ALL OF THIS.

17            I MEAN, WHERE ARE YOU ON WHAT THE PROPER NEGLIGENCE

18    INSTRUCTION SHOULD BE?

19            MR. GALIPO:  I'M NOT SURE.  THE ONE ISSUE WAS

20    WHETHER IT SHOULD BE A REASONABLY CAREFUL PERSON OR A

21    REASONABLY CAREFUL POLICE OFFICER -- I'M NOT SURE WHERE WE

22    CAME OUT ON THAT.  AND -- BUT MS. WILLIAMS IS APPROACHING.

23            MS. WILLIAMS:  WELL, A COUPLE OF THINGS.  ON THE

24    STANDARD OF -- WELL, I'LL DEAL WITH THIS ONE FIRST.  FIRST,

25    THE DEFENSE SUBMITS, AS A GENERAL MATTER, AND PERHAPS THIS
```

```
1    ISN'T AN ISSUE FOR THE JURY INSTRUCTION, BUT RATHER MORE FOR
2    THE SPECIAL VERDICT FORM, THE DEFENSE SUBMITS THAT UNDER THE
3    HERNANDEZ VS. CITY OF POMONA CASE, THERE'S NO BASIS FOR
4    FINDING -- THERE'S NO BASIS FOR A NEGLIGENCE CLAIM AGAINST A
5    POLICE OFFICER ARISING SOLELY OUT OF A SHOOTING.  THERE'S NO
6    SEPARATE LOWER STANDARD.  RATHER, UNDER THE CALIFORNIA PENAL
7    CODE AND UNDER THE FOURTH AMENDMENT AND GRAHAM VS. CONNOR,
8    THE STANDARD IS AN OBJECTIVELY REASONABLE OFFICER AS OUTLINED
9    IN 9.22.
10           SO THE DEFENSE SUBMITS THAT IT'S ERROR TO INSTRUCT
11   THE JURY THAT SOME LESSER STANDARD COULD BE APPLIED AND THAT
12   OFFICER MARTINEZ, WHILE HE NOT -- MAY NOT HAVE COMMITTED A
13   CIVIL RIGHTS VIOLATION, COULD BE LIABLE UNDER A THEORY OF
14   NEGLIGENCE.  AND THE HERNANDEZ VS. CITY OF POMONA CASE, WHICH
15   IS A CALIFORNIA SUPREME COURT CASE, RECOGNIZES THAT THERE'S
16   NEVER BEEN A CASE ALLOWING THAT THEORY OF LIABILITY.  THERE'S
17   BEEN CASES ALLOWING NEGLIGENCE BASED ON ACTS THAT LED UP TO A
18   SHOOTING OR ACTS OF OTHER OFFICERS, FOR INSTANCE, IN THEIR
19   TACTICS, BUT NEVER BASED ON THE SHOOTING ALONE.  SO THAT'S
20   THE SOURCE OF THE DEFENSE, I GUESS, STRUGGLING WITH A
21   NEGLIGENCE INSTRUCTION IN THIS CASE.
22           THE COURT:  ALL RIGHT.  WELL, MR. GALIPO, WHAT IS
23   YOUR -- WHAT IS THE RESPONSE TO THIS?
24           OBVIOUSLY THERE'S NOT A MONELL ISSUE HERE.  THERE'S
25   NOT A TACTICS NEGLIGENCE ISSUE HERE.  I MEAN, IT -- TO WHAT
```

1    DEGREE BY HAVING THIS NEGLIGENCE THING HERE IS IT GOING TO

2    SUGGEST THAT THERE IS THIS LESSER STANDARD?  I MEAN, I

3    THINK -- OR IS THAT WHAT IT IS THAT THE PLAINTIFFS ARE

4    CONTENDING IS LEGALLY PERMISSIBLE?

5            MR. GALIPO:  WELL, I THINK THERE IS CASE LAW,

6    INCLUDING CALIFORNIA SUPREME COURT CASE LAW UNDER THE GROUP

7    CASE, THAT SAYS YOU CAN HAVE A NEGLIGENCE SHOOTING, WHICH IS

8    A LOWER STANDARD THAN THE CONSTITUTION OF VIOLATION, AND SO I

9    THINK EVEN ONE OF THE PROPOSED INSTRUCTIONS SUBMITTED BY THE

10   DEFENSE WAS THAT NEGLIGENCE IS A LOWER STANDARD THAN A CIVIL

11   RIGHTS VIOLATION.  THEY CITE CASES FOR IT, AND JUST BECAUSE

12   YOU FIND NEGLIGENCE DOESN'T MEAN YOU FIND A CIVIL RIGHTS

13   VIOLATION.  SO I RESPECTFULLY DISAGREE, THAT I DO THINK THERE

14   IS A DIFFERENT STANDARD THAT APPLIES.

15           I MEAN, IF THE COURT TAKES THAT VIEW, THEN,

16   OBVIOUSLY, THAT ALSO WIPES OUT CONTRIBUTORY NEGLIGENCE

17   BECAUSE IF YOU DON'T HAVE NEGLIGENCE, YOU DON'T HAVE

18   CONTRIBUTORY NEGLIGENCE, SO, OBVIOUSLY, THAT COULD EFFECT OUR

19   VERDICT FORM AND OTHER INSTRUCTIONS.

20           THE COURT:  RIGHT.

21           WHICH IS WHAT I'M WRESTLING WITH NOW.  I MEAN, I --

22   LET ME SEE IF I'VE GOT THE --

23           MR. GALIPO:  ONE OTHER THING I WOULD ADD TO THE

24   ARGUMENT -- AND, AGAIN, I DON'T KNOW HOW THE CLOSING

25   ARGUMENTS ARE GOING TO GO, BUT IT SEEMS LIKE MR. ROTHANS MADE

```
 1    SOME TYPE OF AN ARGUMENT WITH RESPECT TO THE PUNITIVE DAMAGE
 2    ISSUE.  THE EVIDENCE IS HE WAS FATIGUED, HE OVERREACTED.  THE
 3    IMPLICATION IS MAYBE IT WAS NEGLIGENT, BUT IT DOESN'T RISE TO
 4    A CONSTITUTIONAL VIOLATION.
 5             THE COURT:  MS. WILLIAMS.
 6             MS. WILLIAMS:  BRIEFLY, YOUR HONOR.
 7             I WOULD DIRECT THE COURT TO THE *EDISON VS. CITY OF*
 8    *ANAHEIM* CASE, WHICH IS A CALIFORNIA APPELLATE CASE.  BUT, IN
 9    THERE, THE COURT EXPRESSLY HELD THAT REGARDLESS OF WHETHER A
10    CAUSE OF ACTION SOUNDS OF NEGLIGENCE OR IT SOUNDS AN
11    INTENTIONAL TORT, THE STANDARD IS, QUOTE, "WHETHER THE
12    OFFICER USED UNREASONABLE OR EXCESSIVE FORCE."  THERE'S JUST
13    NO JUST SEPARATE OR LOWER STANDARD FOR NEGLIGENCE, AND THAT'S
14    MY ONLY RESPONSE.
15             THE COURT:  RIGHT.
16             IF THAT IS, IN FACT, THE CASE -- MR. GALIPO, THIS
17    MUST COME UP IN VIRTUALLY EVERY CASE, AND I DON'T SEE WHERE
18    I'M --
19             MR. GALIPO:  IT DOES, AND I HAVE TO TELL YOU THAT
20    THE VAST MAJORITY OF JUDGES ALLOW NEGLIGENCE TO GO TO THE
21    JURY.  SOMETIMES I WONDER IF IT'S MORE CONFUSING THAN
22    HELPFUL, QUITE FRANKLY, BECAUSE THEN YOU GET INTO OTHER
23    ISSUES LIKE COMPARATIVE NEGLIGENCE AND APPORTIONMENT AND ALL
24    THAT TYPE OF STUFF.  AND SOMETIMES I'M RELUCTANT TO DO IT
25    BECAUSE I DON'T KNOW WHERE THESE JURORS ARE AT, AND SOMETIMES
```

```
 1   THE JURORS MIGHT THINK, WELL, I'M NOT SO SURE IT'S A

 2   CONSTITUTIONAL VIOLATION, BUT HE PROBABLY WAS NEGLIGENT, AND

 3   SO I'M SOMETIMES RELUCTANT TO GIVE IT UP BECAUSE I WANT TO

 4   HAVE, YOU KNOW, SOME FALL-BACK POSITION, DEPENDING ON WHERE

 5   THEY'RE AT.

 6          THE COURT:  BUT A FALL-BACK -- DO YOU DISAGREE THAT

 7   THE STANDARD, THERE STILL HAS TO -- IT'S STILL GOING TO BE

 8   GOVERNED BY THIS OBJECTIVELY REASONABLE OFFICER STANDARD.

 9          MR. GALIPO:  I DON'T KNOW IF I NECESSARILY AGREE.

10   THE COURTS HAVE NOT SPECIFIED YET.  THERE IS -- I THINK

11   THERE'S A CASE NOW -- IS IT THE *HAYES* CASE THAT'S BEING

12   DECIDED BY THE SUPREME COURT THAT'S BEEN UNDER SUBMISSION FOR

13   SOMETIME AS TO WHETHER YOU CAN HAVE PRE-SHOOTING NEGLIGENCE

14   AND NEGLIGENCE SEPARATE AND APART FROM THE SHOOTING ITSELF.

15          THE COURT:  THOSE ARE NOT THE ISSUES.  REGARDLESS

16   OF WHAT MIGHT HAPPEN, THOSE ARE NOT THE ISSUES IN THIS CASE.

17   SO, I MEAN, THIS REALLY IS WHETHER THE SAME SET OF FACTS, AS

18   GOVERNED, GIVE RISE TO TWO CLAIMS FOR RELIEF, ONE OF WHICH IS

19   THE 1983 AND ONE OF WHICH IS THE NEGLIGENCE UNDER STATE LAW.

20   SO THAT'S THE ONLY THING THAT WE HAVE TO DECIDE HERE, AND

21   WHAT I'M HEARING FROM YOU IS IT IS OFTEN THE CASE THAT JURIES

22   GET BOTH ISSUES.  BUT WHAT I'M HEARING FROM MS. WILLIAMS IS

23   THAT REGARDLESS OF THAT, THERE'S STILL -- IT'S ESSENTIALLY

24   GOVERNED BY THE SAME STANDARDS.

25          MR. GALIPO:  WELL, THAT'S WHERE I DON'T COMPLETELY
```

```
 1    AGREE WITH HER BECAUSE THERE'S CASES, INCLUDING CALIFORNIA

 2    SUPREME COURT CASES, THAT HOLD IT'S NOT THE SAME STANDARD.  I

 3    DO AGREE THERE ARE SOME CASES THAT SAY OR SUGGEST IT IS THE

 4    SAME STANDARD.  SO IT IS VERY UNCLEAR IN THE CURRENT CONTEXT

 5    OF THE LAW WHETHER IT IS OR IS NOT THE SAME STANDARD.  AND

 6    THIS ISSUE DOES COME UP VERY OFTEN, AND IN THE MAJORITY OF

 7    THE CASES IT DOES GO TO THE JURY, BUT THAT'S THE STATE OF THE

 8    LAW AS I UNDERSTAND IT.  IT'S UNCLEAR.

 9            THE COURT:  WELL --

10            MR. GALIPO:  CAN I TALK WITH MR. MC NICHOLAS FOR

11    ONE MINUTE?

12            THE COURT:  YES.

13                (PLAINTIFFS' COUNSEL CONFER.)

14            MR. GALIPO:  UNFORTUNATELY, WE HAVEN'T COME TO A

15    CONSENSUS, THAT WE CAN WITHDRAW IT.

16            THE COURT:  WELL, BASICALLY ON WHAT INSTRUCTION 17

17    IN THE PACKET, NEGLIGENCE BASIC STANDARD OF CARE, IT SAYS,

18    "YOU MUST DECIDE HOW A REASONABLY CAREFUL POLICE OFFICER

19    WOULD HAVE ACTED IN THE SAME SITUATION AS LUIS MARTINEZ."

20    THAT REALLY IS SAYING REASONABLY CAREFUL.  I MEAN, EVERY --

21    THEY'D STILL BE GOVERNED BY POST.  YOU KNOW, IT'S REALLY

22    GOING TO BE THE SAME --

23            MR. GALIPO:  WELL, I GUESS ONE DISTINCTION -- I'M

24    SORRY.

25            THE COURT:  SO, I MEAN, IF I GIVE THAT, I MEAN, IT
```

1    SEEMS -- AND THEN THE SUBSTANTIAL FACTOR AND THERE WILL BE

2    THE CONTRIBUTORY -- THE COMPARATIVE NEGLIGENCE INSTRUCTION

3    ADDED ON, SO THAT WOULD BE -- THAT WOULD BE, THEN, THE

4    SAME -- IT'S REALLY IS GOING TO BE PRETTY MUCH THE SAME SORT

5    OF THING.

6         MR. GALIPO:  ONE OF THE ISSUES THAT I THINK

7    NEGLIGENCE INCORPORATES ACTIONS AND INACTIONS; WHEREAS, THE

8    FOURTH AMENDMENT INSTRUCTION IS MORE DEALING WITH THE SEIZURE

9    AND THE INTENTIONAL SHOOTING.  YOU KNOW, SOME PEOPLE MIGHT

10   WONDER WHY NOT A COMMAND, WHY NOT A WARNING, SOME OF THE

11   INACTIONS THAT TOOK PLACE COULD ADD TO THE FACTORS IN

12   CONSIDERING WHETHER SOMEONE WAS NEGLIGENT.  SO THAT COULD BE,

13   JUST BASED ON THE PURE LANGUAGE OF THE INSTRUCTION, A

14   DISTINCTION BETWEEN THE TWO.

15        THE COURT:  ALL RIGHT.  I'M GOING TO GIVE THE

16   NEGLIGENCE INSTRUCTION, BUT I'M GOING TO USE WHAT WAS

17   SUBMITTED TO ME AS INSTRUCTION 17, NEGLIGENCE, BASIC STANDARD

18   OF CARE, WHICH INCLUDES THE LANGUAGE THAT I JUST READ, AND

19   THEN THE CAUSATION IS A -- WAS A SUBSTANTIAL FACTOR AFTER

20   THAT AND THEN WE'LL HAVE TO INCORPORATE IN THE COMPARATIVE

21   NEGLIGENCE INSTRUCTIONS.

22        MS. WILLIAMS:  YOUR HONOR, ONE OF THE THINGS I WAS

23   NOTICING AS I WAS GOING THROUGH THE INSTRUCTIONS LAST NIGHT.

24   ON THE BASIC STANDARD OF CARE ONE -- RIGHT NOW, IT SAYS ONE

25   SHOULD DECIDE HOW REASONABLY CAREFUL POLICE OFFICER WOULD

```
1     ACT.  BECAUSE WE ARE ALSO ASSERTING A COMPARATIVE FAULT

2     INSTRUCTION, I WAS GOING TO ADD JUST AN ADDITIONAL SENTENCE

3     THAT ONE MUST DECIDE HOW A REASONABLY CAREFUL PERSON WOULD

4     ACT IN THE SAME CIRCUMSTANCES AS LEJOY GRISSOM.  I THINK THAT

5     BECAUSE BOTH ARE AT ISSUE, THAT ADDITIONAL --

6               MR. GALIPO:  WE DON'T HAVE A PROBLEM WITH THAT.

7               MS. WILLIAMS:  -- SENTENCE SHOULD BE ADDED.

8               THE COURT:  ALL RIGHT.  THAT -- I UNDERSTAND --

9     THAT WILL BE FINE.

10              MR. MC NICHOLAS:  YOUR HONOR, CAN I HAVE ONE MOMENT

11    WITH MR. GALIPO?

12              THE COURT:  YES.

13                   (PLAINTIFFS' COUNSEL CONFER.)

14              MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  PLAINTIFFS' INSTRUCTIONS

16    NUMBER 6 ON DAMAGES, IS THAT SOMETHING IN WHICH THE PARTIES

17    STILL HAVE A DISPUTE, APART FROM THE ISSUE OF SURVIVORSHIP AS

18    NOTED?

19              MR. GALIPO:  I THINK -- WELL, I'LL LET MS.

20    WILLIAMS -- I THINK THE MAIN ISSUE WAS WHETHER THE SURVIVAL

21    DAMAGE CATEGORIES WOULD BE ALLOWED, BUT GIVEN THE COURT'S

22    RULING --

23              MS. WILLIAMS:  IN LIGHT OF THE -- I MEAN, THE

24    DEFENDANTS OBVIOUSLY STILL OBJECT TO THE PAIN AND SUFFERING;

25    HOWEVER, DEFENDANTS UNDERSTAND THE COURT'S RULING.  THE ONLY
```

```
 1   QUESTION OR PROBLEM I HAVE WITH PLAINTIFFS' INSTRUCTION
 2   NUMBER 6 IS ELEMENT NUMBER 2 IN THE DAMAGES FOR THE MINOR
 3   CHILDREN WHERE THEY HAVE THE LOSS OF LEJOY GRISSOM'S
 4   FINANCIAL SUPPORT.
 5           MR. GALIPO:  WE AGREE TO WITHDRAW THAT.
 6           THE COURT:  CORRECT, THAT'S BEEN STIPULATED, SO
 7   PLEASE MAKE SURE THAT HAPPENS.
 8           MS. WILLIAMS:  OTHER THAN THAT, THE DEFENSE IS --
 9           THE COURT:  ALL RIGHT.  SO YOU CAN INCORPORATE THAT
10   IN THE -- AND THEN PUNITIVE DAMAGES, WE'VE -- YOU KNOW, IT
11   WILL JUST BE THE -- THAT WE'VE GONE OVER, SO THAT'S TAKEN
12   CARE OF.
13           NOW, ON THE DEFENDANT'S SPECIALS -- LET'S SEE.  THE
14   JUDICIAL NOTICE IS -- YOU KNOW, THEY'VE HEARD WHERE THE
15   RADIOSHACK IS.  THAT DOESN'T NEED TO BE IT.  AND THEN,
16   OBVIOUSLY, LAYLA GRISSOM IS -- I'VE ALREADY RULED ON, SO
17   THAT'S NO.
18           THE ESSENTIAL FACTUAL ELEMENTS ON DEFENSE NUMBER 2,
19   WE'VE DISCUSSED, SO THAT'S TAKEN CARE OF.
20           OKAY.  DEFENSE NUMBER THREE, DOES THE DEFENSE WANT
21   THIS PRESUMPTION OF NEGLIGENCE PER SE?
22           MS. WILLIAMS:  IF THE COURT IS DENYING THE
23   DEFENDANT'S REQUEST, I WILL SUBMIT ON MY PAPERS.
24           THE COURT:  ALL RIGHT.  I'M GOING TO -- LOOK, I'M
25   NOT EVEN SURE IT'S REALLY -- LOOK, I DON'T MEAN TO SAY THAT I
```

```
 1    KNOW BETTER THAN YOU DO WHAT'S IN THE INTEREST OF OFFICER
 2    MARTINEZ AND CULVER CITY, BUT IT DOES STRIKE ME THAT THIS --
 3    IT'S POTENTIALLY CONFUSING.  IT'S ALMOST -- I MEAN, YOU'RE
 4    FREE TO ARGUE THESE THINGS, OBVIOUSLY, UNDER COMPARATIVE
 5    NEGLIGENCE.  I THINK OF HAVING THIS IS JUST KIND OF GOING TO
 6    SIDETRACK THE JURY OF, WELL, IS HE GUILTY OF THAT, OR -- I
 7    MEAN, IT JUST -- I DON'T EVEN KNOW IF IT'S THAT HELPFUL.
 8    BUT, AGAIN, I DON'T WANT TO PRESUME THAT I KNOW BETTER THAN
 9    YOU WHAT'S HELPFUL TO YOUR CLIENT.  WHAT I DO KNOW IS THAT
10    IT'S GOING TO COMPLICATE THINGS AND MAKE IT CONFUSING FOR THE
11    JURY, SO I'M INCLINED TO NOT GRANT IT BECAUSE -- YOU'RE FREE
12    TO ARGUE WHATEVER YOU WANT AS TO WHY HE WAS COMPARATIVELY
13    NEGLIGENT.
14              MS. WILLIAMS:  VERY WELL.
15              THANK YOU.
16              THE COURT:  NUMBER 4, I THINK IN A WAY -- AGAIN, I
17    THINK THE PROBLEM HERE IS THAT IT'S POTENTIALLY CONFUSING IN
18    THE SENSE THAT TO A LARGE DEGREE I THINK THE STANDARD FOR THE
19    NEGLIGENCE AND THE CIVIL RIGHTS IS NOT THAT DIFFERENT AND I
20    THINK -- I'M NOT SURE THIS IS NECESSARILY EVEN IN THE
21    INTEREST OF THE DEFENDANTS.  BUT, AGAIN, I DON'T WANT TO
22    PRESUME THAT I KNOW THAT BETTER THAN THEIR OWN LAWYERS DO.
23    WHAT I DO KNOW IS THAT I THINK -- I DON'T KNOW THAT IT'S
24    REALLY ADDING EVERYTHING.  WE'VE GOT SOMETHING DEFINING
25    NEGLIGENCE AND YOU HAVE SOMETHING DEFINING THE CIVIL RIGHTS
```

1    VIOLATION, BUT LET ME -- LET ME HEAR -- IT SEEMS TO ME THAT

2    IT'S NOT -- IT DOESN'T SEEM TO BE A MISSTATEMENT OF THE LAW,

3    SO LET ME HEAR FROM THE DEFENSE AND THEN THE PLAINTIFFS IN

4    REGARD TO DEFENDANT'S NUMBER 4.

5              MS. WILLIAMS:  WITH RESPECT TO THIS ONE, YOUR

6    HONOR, IT IS -- MR. ROTHANS POINTED OUT IN THE ARGUMENT ON

7    THE RULE 50 MOTION MUCH OF THE PLAINTIFFS' CASE HAS BEEN

8    FOCUSED ON OFFICER MARTINEZ PURPORTEDLY BEING FATIGUED, AND

9    CONDUCT OF OFFICER MARTINEZ THAT DOES NOT RISE TO THE LEVEL

10   OF EXCESSIVE FORCE AS DEFINED BY *GRAHAM VS. CONNOR* AND ALL

11   THE PERTINENT CASES.  IT'S THE DEFENSE'S POSITION THAT

12   THERE'S -- THAT THE SAME STANDARD FOR THE USE OF FORCE AND

13   USE OF DEADLY FORCE APPLIES UNDER BOTH THE FOURTH AMENDMENT

14   AND UNDER CALIFORNIA STATE LAW NEGLIGENCE AND INTENTIONAL

15   TORTS.

16             THE COURT:  BUT WHAT ABOUT THE LANGUAGE FROM NINTH

17   CIRCUIT 9.18 IS GETTING IN THERE THAT'S SAYING IT IS NOT

18   ENOUGH IF THE PLAINTIFFS ONLY PROVE THAT OFFICER MARTINEZ

19   ACTED NEGLIGENTLY, ACCIDENTALLY OR INADVERTENTLY IN

20   CONDUCTING THE SEIZURE?  DOESN'T THAT REALLY COVER THIS?

21             MS. WILLIAMS:  WELL, PERHAPS, THEN WE SHOULD

22   INCLUDE 9.18, BECAUSE IN OUR CONVERSATION WITH THE -- WITH

23   THE COURT'S CLERK LAST NIGHT, WE TALKED ABOUT NOT OFFERING

24   9.18 BECAUSE WHETHER OR NOT THERE WAS A SEIZURE IS NOT THE

25   FOCUS OF THE CASE.

```
1              THE COURT:  I SEE.

2              SO, IN THAT CASE, IF THAT ISN'T GOING TO COME IN,

3    MR. GALIPO, DO YOU STILL HAVE AN OBJECTION TO NUMBER 4 COMING

4    IN IF THE DEFENSE WANTS IT?

5              MR. GALIPO:  SEE, THAT'S -- THAT'S WHERE I'M HAVING

6    AN ISSUE.  ON THE ONE HAND, THE DEFENSE IS ARGUING THAT IT'S

7    THE SAME STANDARD, AND THIS INSTRUCTION SAYS IT'S A DIFFERENT

8    STANDARD.

9              THE COURT:  WELL, FIRST OF ALL, THERE'S A

10   REPRESENTATION MADE BY MS. WILLIAMS THAT THERE'S CERTAIN CASE

11   LAW IN CALIFORNIA THAT'S JUST SAYING THAT, ESSENTIALLY, IT'S

12   THE SAME STANDARD.  BUT REGARDLESS OF THAT, WHERE IT ENDS UP

13   BEING IS THAT IF YOU'RE SAYING HE -- IF THE -- IF THERE WAS

14   AN IMMINENT FEAR OF DEATH OR GRAVE BODILY HARM, THEN IF

15   THAT -- IF A REASONABLE POLICE OFFICER WOULD HAVE FIRED UNDER

16   THOSE CIRCUMSTANCES, THEN THAT'S -- OR IF THAT'S HOW THE

17   CONSTITUTIONAL VIOLATION IS DEFINED, THEN THERE REALLY ISN'T

18   MUCH DIFFERENCE BETWEEN THE NEGLIGENCE AND THE CONSTITUTION

19   OF VIOLATION AS A PRACTICAL MATTER.  I MEAN, SO -- BUT,

20   NONETHELESS, TO THE EXTENT THAT YOU ARE GETTING THE

21   NEGLIGENCE, IT DOES SEEM TO ME THAT THE DEFENSE IS ENTITLED

22   TO ONE OR THE OTHER.

23             MR. GALIPO:  WELL, THE TWO ISSUES ARE HERE.  I

24   THINK, AS I UNDERSTAND 9.18, IT DEALS WITH THE ACTUS REUS.

25   IT DEALS WITH THE ACT AS TO WHETHER THAT HAS TO BE
```

```
 1    INTENTIONAL IN THIS CASE, INTENTIONALLY PULLING THE TRIGGER
 2    AS OPPOSED TO INADVERTENT DISCHARGE.  AND SO ONCE YOU HAVE AN
 3    INTENTIONAL ACT, THEN YOU GET -- THEN THAT'S A SEIZURE AND
 4    THEN YOU DO THE STANDARD, SO THAT'S WHERE THIS IS A LITTLE
 5    BIT CONFUSING.
 6         ALSO, UNDER THE TORT LAW, I GUESS ONE COULD ARGUE
 7    THAT BATTERY IS A TORT, A STATE TORT, AND I THINK THE CASES
 8    DO SAY THAT THE STANDARD UNDER THE FOURTH AMENDMENT AND THE
 9    BATTERY OF WHETHER THE FORCE IS EXCESSIVE OR UNREASONABLE IS
10    ANALOGOUS.  SO I THINK THIS IS CONFUSING AS STATED AND I
11    THINK WE'RE GOING TO HAVE A SEPARATE INSTRUCTION ON THE
12    NEGLIGENCE AND ON THE FOURTH AMENDMENT.
13         THE COURT:  NOW -- WELL, YOU'RE RIGHT AS TO SAYING
14    THAT 918 IS ACTING IN REGARD TO -- IS IN REGARD TO THE ACTUS
15    REUS, SO THAT POINT IS WELL-TAKEN.
16         THE -- THAT BEING SAID, I MEAN, THE -- I THINK IF
17    THE JURY IS GOING TO BE HEARING ABOUT THESE VARIOUS CAUSES OF
18    ACTION, THEN IT SEEMS TO ME THAT WE HAVE TO FOLLOW THROUGH
19    AND GIVE THEM SOME GUIDANCE IN TRYING TO KEEP THEM SEPARATE.
20    YOU KNOW, LOOK, MY VIEW IS, IS I'D BE HAPPY TO JUST JUNK ALL
21    OF THEM AND JUST ASK THEM SPECIFIC QUESTIONS THAT
22    THEY NEED -- THAT THERE NEED TO BE DETERMINED ON, WHETHER
23    THERE'S LIABILITY, AND THEN GIVE THEM THE INSTRUCTIONS THEY
24    NEED TO ANSWER THOSE QUESTIONS.
25         WITH THAT BEING SAID, YOU KNOW, HOW -- THE BASIC
```

```
 1    LEGAL POINT HERE, WHICH IS BEING MADE, IS THAT NEGLIGENCE IN

 2    AND OF ITSELF IS NOT -- DOES NOT GIVE RISE TO LIABILITY UNDER

 3    42 USC 1983 IS CORRECT.  SO WHAT CAN WE DO TO KEEP THESE TWO

 4    CLAIMS FOR RELIEF SEPARATE WHILE AT THE SAME TIME NOT

 5    CONFUSING THE JURY?

 6              MR. GALIPO:  THAT'S A GOOD QUESTION.

 7              THE COURT:  WELL, IF YOU'RE NOT GOING TO COME UP

 8    WITH AN ALTERNATIVE, THEN I'M -- AND IF THERE'S NOT GOING TO

 9    BE 918, WHICH I'M GLAD IS NOT BEING GIVEN BECAUSE I THINK

10    IT'S INAPPROPRIATE, IS TO HAVE IT NOT USED HERE -- THEN WHAT

11    ARE -- WE AREN'T -- IF NO ONE'S GOING TO MAKE AN ALTERNATIVE,

12    I'M GOING TO GIVE DEFENDANTS NUMBER 4.

13              SO WHAT'S THE ALTERNATIVE HERE?

14              MR. GALIPO:  SO IS THE COURT SAYING THAT IF

15    NEGLIGENCE IS IN -- THE COURT'S INCLINATION IS TO GIVE

16    SOMETHING ALONG THE LINES OF THAT INSTRUCTION?

17              THE COURT:  CORRECT.

18              MR. GALIPO:  WE'RE JUST BATTLING WITH THE TACTICAL

19    DECISION OF WHETHER WE SHOULD JUST WITHDRAW NEGLIGENCE,

20    THAT'S THE DISCUSSIONS WE'VE BEEN HAVING.

21              THE COURT:  AS A FORMER TRIAL LAWYER, I APPRECIATE

22    THOSE INSTRUCTIONS -- THOSE CONSIDERATIONS.  AT THE SAME

23    TIME, THE JURY IS GOING TO GET INSTRUCTED AT 9:30 TOMORROW

24    MORNING.  SO WE'VE GOT TO MAKE A DECISION HERE.

25              MR. MC NICHOLAS:  YOUR HONOR, AS THE PLAINTIFFS'
```

```
 1    LAWYER, OR I SHOULD SAY AS A PLAINTIFFS' LAWYER, AND, IN THIS
 2    CASE, ONE OF THE PLAINTIFFS' LAWYERS, I ABSOLUTELY APPRECIATE
 3    WHAT THE COURT IS SAYING ABOUT KEEPING THE JURY INSTRUCTIONS
 4    CLEAR BECAUSE -- OR I SHOULD SAY, AS A RESULT OF THAT, MY
 5    CLOSING ARGUMENTS OFTEN FOCUS ON OR SPEND SOME TIME ON
 6    DIFFERING CLAIMS.  SO THE COURT ASKED HOW DO WE KEEP THIS
 7    STRAIGHT IN THE JURORS' MINDS, AND THE COURT READS, YOU KNOW,
 8    THE FORM INSTRUCTIONS.
 9            DOES THE COURT READ THE TITLES TO THE INSTRUCTIONS
10    OR JUST THE INSTRUCTIONS?
11            THE COURT:  NO.  I THINK THAT IS SHOULD REALLY JUST
12    BE -- THAT THE -- I DON'T READ THE TITLES AND THE COPY THAT
13    GOES TO THE JURORS SHOULD NOT HAVE THE TITLES.  IT'S JUST
14    INSTRUCTION NUMBER WHATEVER, YOU KNOW, NUMBER 1, 2, 3, 4, 5,
15    BUT THE TITLES ARE OUT.  THAT'S JUST FOR US.
16            MR. MC NICHOLAS:  SO MY QUESTION IS -- AND I
17    DON'T -- I HONESTLY DON'T KNOW THE ANSWER.  WITH RESPECT TO
18    THE SPECIFIC STANDARDS ON NEGLIGENCE, WHAT DOES THE COURT
19    FEEL ABOUT SAYING, YOU KNOW, THE NEXT INSTRUCTION, THE
20    NEGLIGENCE INSTRUCTION AND READS IT; THE NEXT INSTRUCTION,
21    THE NEGLIGENCE INSTRUCTION AND READS IT?  AND THEN WHEN IT
22    READS THE FOURTH AMENDMENT INSTRUCTION, SAYS, THIS IS A
23    CONSTITUTIONAL FOURTH AMENDMENT INSTRUCTION, AND THAT WAY IN
24    OUR CLOSING ARGUMENTS WHAT I OFTEN DO IS WHEN I HAVE MULTIPLE
25    CAUSES OF ACTION I REFER THEM -- DIFFERENT DOORS TO THE SAME
```

1    ROOM, YOU MAY NOT -- WE MAY NOT BE ABLE TO WALK-THROUGH ONE

2    DOOR, BUT WE MAY BE ABLE TO WALK-THROUGH THE OTHER DOOR.

3             BUT IF THE COURT IS NOT OPPOSED, AND I UNDERSTAND

4    THAT TRIAL -- ALL TRIAL JUDGES TAKE THE TITLES OFF, BUT IF

5    THAT'S A PARTICULAR CONCERN IN THIS MATTER, IS IT A PROBLEM

6    TO JUST SIMPLY IDENTIFY THE NEGLIGENCE STANDARDS AS, YOU

7    KNOW, A NEGLIGENCE INSTRUCTION AND THE CONSTITUTIONAL

8    STANDARD AS A CONSTITUTIONAL STANDARD, AND THAT THEY HAVE TO

9    APPLY DIFFERENT STANDARDS TO A DIFFERENT CLAIM?

10            THE COURT:  THIS IS WHAT I'M -- I DON'T LIKE THE

11   IDEA OF DOING THAT.  WHAT I'M GOING TO DO -- MS. WILLIAMS,

12   YOU MAY PUT THIS IN.  I'M GOING TO TAKE OUT THE PHRASE

13   "NEGLIGENCE ACTS DO NOT INCUR LIABILITY UNDER 42 USC 1983"

14   BECAUSE SOME OF THESE ACTS MIGHT BE BOTH UNREASONABLE AND

15   NEGLIGENT OR BOTH, AND IT SUGGEST THAT IF THEY LOOK ON

16   SOMETHING AS POTENTIALLY BEING NEGLIGENT, IT COULDN'T

17   CONTRIBUTE TO THE 1983.  I MEAN, I KNOW WHAT YOU MEAN AS A

18   LAWYER, THAT IT'S A SEPARATE STANDARD.

19            SO WHAT I'M GOING TO DO IS THESE TWO -- YOU MAY PUT

20   THESE TWO SENTENCES EITHER IN ANOTHER INSTRUCTION, YOU KNOW,

21   IN ONE OF THE NINTH CIRCUIT INSTRUCTIONS, OR AS A SEPARATE

22   INSTRUCTION WHERE IT SAYS, "CONDUCT THAT AMOUNTS TO NOTHING

23   MORE THAN NEGLIGENT DOES NOT CONSTITUTE CIVIL RIGHTS

24   VIOLATION."  THE STANDARD OF REASONABLENESS UNDER THE FOURTH

25   AMENDMENT IS NOT THE SAME AS THE STANDARD OF REASONABLE CARE

1    UNDER -- INSTEAD OF TORT LAW JUST PUT NEGLIGENCE.  SO -- AND

2    THEN YOU MAY USE THOSE -- YOU CAN EITHER HAVE THOSE TWO

3    SENTENCES AS A SEPARATE INSTRUCTION, OR YOU CAN ADD THEM TO

4    ONE OF THE OTHER 1983 INSTRUCTIONS.

5              MS. WILLIAMS:  I WILL PROBABLY PUT THEM AT THE END

6    OF 9.22.

7              THE COURT:  RIGHT.

8              I THINK THAT WOULD -- THAT, I THINK, MAKES SENSE.

9              ALL RIGHT.  DEFENSE REQUESTED INSTRUCTION NUMBER 5,

10   I BELIEVE HAS BEEN RESOLVED.  THAT WAS THERE, THE 9.22 ISSUE.

11             MS. WILLIAMS:  ONE CLARIFICATION ON THAT YOUR

12   HONOR, THE ONE THAT THE DEFENSE PROPOSES LISTS ALL THE

13   FACTORS TO BE CONSIDERED IN THE EXACT ORDER THAT THE MODEL

14   JURY INSTRUCTION LISTS.  THE PLAINTIFFS HAVE REORGANIZED

15   THEIRS.  I WAS GOING TO INCLUDE VERBATIM WHAT THE NINTH

16   CIRCUIT MODEL INSTRUCTION IS INCLUDING THE FINAL SIX FACTORS.

17             MR. GALIPO:  THAT'S FINE.

18             THE COURT:  THAT'S CORRECT, AND THEN MAKE IT

19   "DECEDENT" INSTEAD OF "PLAINTIFF."

20             DEFENSE NUMBER 6 IS OFFICER'S GOOD-FAITH BELIEF IN

21   HIS CONDUCT.  IT DOES SEEM TO ME THAT THIS IS DUPLICATIVE OF

22   9.22 AND IT MIGHT BE CONFUSING, SO THE ANSWER TO THAT IS NO.

23             AND THEN NUMBER 7, THE DUTY TO COOPERATE WITH

24   POLICE AND SUBMIT TO DETENTION, THAT'S SOMETHING THAT YOU CAN

25   WEAVE INTO YOUR ARGUMENT ON COMPARATIVE FAULT.  I DON'T

```
 1    REALLY SEE THAT AS HAVING THIS AS A SEPARATE 1983 INSTRUCTION
 2    IS APPROPRIATE.
 3              THE -- NUMBER 8 IS, I THINK, ARGUMENTATIVE IN THE
 4    LITERAL SENSE.  YOU KNOW, I DON'T MIND HAVING INSTRUCTIONS
 5    THAT ARE TAILORED TO THE CASE, BUT I DO THINK THEY SHOULDN'T
 6    BE MANY ARGUMENTS.  AND CERTAINLY THIS ARGUMENT WHICH WAS
 7    REALLY ENDORSED EVEN BY MR. -- THE FACT OF THIS IS SOMETHING
 8    EVEN MR. CLARK DOESN'T OBJECT TO AND SAID SO FROM THE STAND,
 9    SO THERE YOU HAVE PLENTY OF OPPORTUNITY TO ARGUE THIS WITHOUT
10    HAVING IT AS ITS OWN SPECIAL INSTRUCTION.  SO NUMBER 8 WILL
11    NOT BE GIVEN.
12              NUMBER 9, THE FOURTEENTH AMENDMENT HAS BEEN
13    WITHDRAWN BY THE PLAINTIFFS, AND THEREFORE, THIS IS MOOTED.
14              THE DAMAGES WE'VE ALREADY -- DEFENSE NUMBER 10 HAS
15    BEEN RESOLVED IN THE MANNER THAT WE'VE DISCUSSED, SO
16    THEREFORE, THAT REQUEST IS MOOTED.
17              THE -- I THINK -- NUMBER 11, I'VE BEEN SOMEWHAT
18    WRESTLING WITH.  YES, IT IS TRUE THAT THE DAMAGES ARE
19    OTHERWISE DEFINED.  ON THE OTHER HAND, THERE ARE THESE STATE
20    TORT CAUSES OF ACTION HERE THAT THE PLAINTIFFS WANT, AND IT
21    SEEMS TO ME THAT IF CALIFORNIA BELIEVES THAT THIS IS
22    APPROPRIATE TO HAVE AS A MODEL INSTRUCTION IN THAT REGARD,
23    THEN IT PROBABLY SHOULD BE GIVEN, GIVEN THAT WE HAVE THE
24    STATE COURT CAUSES OF ACTION.  THIS IS "YOU MUST NOT CONSIDER
25    OR INCLUDE AS PART OF ANY AWARD ATTORNEYS' FEES OR EXPENSES
```

```
1    THAT THE PARTIES OCCURRED IN BRINGING OR DEFENDING THIS
2    LAWSUIT."
3              MR. GALIPO:  I'LL SUBMIT, YOUR HONOR.
4              THE COURT:  ALL RIGHT.  SO I WILL ALLOW THAT TO BE
5    INCLUDED, NUMBER 11.
6              AND THEN NUMBER 12, THE IMPEACHMENT EVIDENCE, I
7    THINK IS -- HAS BECOME MOOT.  NINTH CIRCUIT 2.8 HAS BECOME
8    MOOTED.  THERE WAS NOT EVIDENCE OF LYING UNDER OATH OR A
9    FELONY THING.
10             NUMBER 13, NO PUNITIVE DAMAGES HAS BEEN MOOTED.
11             THE ARGUMENTS MUCH COUNSEL ARE NOT EVIDENCE OF
12   DAMAGES, YOU KNOW, MY FIRST INSTINCT WAS, WELL, NO, OF COURSE
13   NOT.  I MEAN, THEY'VE BEEN TOLD A BUNCH OF TIMES THAT WHAT
14   COUNSEL SAY ISN'T EVIDENCE AND WHY -- THIS IS KIND OF
15   ARGUMENTATIVE.  IT SET IT OUT.
16             ON THE OTHER HAND, YOU KNOW, I WAS NOT, AS I'M SURE
17   BOTH OF YOU ARE WELL AWARE, I WAS NOT A SUPERIOR COURT JUDGE,
18   AND I DO KNOW THAT IN MANY STATE COURT ACTIONS AND IN SOME
19   ACTIONS I'VE SEEN IN FEDERAL COURT, THERE ARE OTHER CHARTS
20   AND, YOU KNOW, THE LAWYERS ARE TRYING TO MAKE THE -- THE
21   PLAINTIFFS' LAWYERS ARE TRYING TO MAKE IT SEEM ALL VERY
22   MATHEMATICAL IN ALL OF THIS, AND, YOU KNOW, YOU SHOULD DO
23   THIS, YOU SHOULD DO THAT.  SO I THOUGHT ABOUT WHETHER THERE
24   IS A BASIS TO HAVE THIS BE A SEPARATE INSTRUCTION, ALTHOUGH
25   ON THE FACE OF IT, IT SEEMS TO ME TO BE SOMEWHAT
```

```
1    ARGUMENTATIVE IN THE SENSE THAT IT'S AN INSTRUCTION WHICH IS

2    BEING USED TO, YOU KNOW, BOLSTER SOMETHING THAT OTHERWISE

3    MIGHT BE MADE.

4              LET ME HEAR FROM MS. WILLIAMS ABOUT THIS, BRIEFLY.

5              MS. WILLIAMS:  YOUR HONOR, THIS INSTRUCTION IS

6    EXACTLY HOW IT READS IN THE CALIFORNIA CIVIL JURY

7    INSTRUCTIONS.

8              THE COURT:  I UNDERSTAND THAT.

9              MS. WILLIAMS:  I HAVE NOT MODIFIED IT AT ALL.

10             THE COURT:  I UNDERSTAND THAT.

11             MS. WILLIAMS:  I THINK UNDER THE EVIDENCE THAT WAS

12   PRESENTED TO THE JURY, THIS INSTRUCTION IS VERY IMPORTANT,

13   BECAUSE, AS FAR AS THE PLAINTIFFS' DAMAGES GOES, THERE WAS

14   MAYBE A TOTAL OF 20 MINUTES OF TESTIMONY OUT OF A SEVEN-DAY

15   TRIAL RELATIVE TO DAMAGES.  THERE'S BEEN NO NUMBERS OR CHARTS

16   OR ANYTHING LIKE THAT, AS THE COURT HAS SAID, AND, INDEED, I

17   EXPECT THAT THE PRIMARY -- ANY FINDING OF DAMAGES WOULD BE

18   BASED SOLELY ON ARGUMENTS OF COUNSEL.  SO I THINK UNDER THE

19   CIRCUMSTANCES OF THIS CASE, THIS INSTRUCTION IS CRITICAL.

20             THE COURT:  MR. GALIPO?

21             MR. GALIPO:  YES.

22             WE'RE OBJECTING TO IT.  I THINK -- YOU KNOW,

23   OBVIOUSLY, WE'RE PUT IN A POSITION TO COMMENT ON THE EVIDENCE

24   AND TO COMMENT ON WHAT THE DAMAGES ARE.  IT ALMOST SUGGESTS

25   YOU SHOULD DISREGARD WHAT THE ATTORNEYS ARE SAYING.  WE HAVE
```

1    TO TRY TO GIVE THE JURY SOME GUIDANCE BASED ON THE EVIDENCE,

2    AND SO I JUST THINK IT'S AN ARGUMENTATIVE AND UNNECESSARY

3    INSTRUCTION AND I RARELY SEE IT GIVEN IN FEDERAL COURT.

4          THE COURT:  ON THE OTHER HAND, PUT IT IN YOUR

5    PACKET, MS. WILLIAMS, AND I'LL THINK ABOUT IT TONIGHT.  I

6    ACTUALLY CAME OUT HERE INTENDING NOT TO GIVE IT AND NOW I

7    WANT TO THINK ABOUT IT BECAUSE -- LOOK, MR. GALIPO, WE -- I

8    THINK MS. WILLIAMS' POINT -- BOTH POINTS SHE MADE ARE VERY

9    WELL-TAKEN, ONE OF WHICH IS CALIFORNIA HAS THE SAME ISSUES,

10   BUT IT STILL HAS SEEN FIT TO HAVE THIS BE A MODEL INSTRUCTION

11   AND YOU ARE ASKING FOR THE STATE CLAIMS FOR RELIEF.

12         THE SECOND THING IS, YOU KNOW, IN THE REAL WORLD,

13   YOUR ARGUMENT TOMORROW OR -- MR. MC NICHOLAS' ARGUMENT IS

14   GOING TO BE -- IT'S GOING TO BE SO MUCH MORE DETAILED AND

15   EXPLICIT AND SOPHISTICATED THAN THE VERY VAGUE, ALBEIT,

16   MOVING TESTIMONY.  I DON'T -- I WANT TO SAY TO THE GUARDIANS

17   AD LITEM, I DON'T -- I'M SURE THE JURY PAID ATTENTION TO THE

18   TESTIMONY OF YOUR CHILDREN, AND I DON'T MEAN TO SUGGEST THEY

19   WON'T, BUT IN TERMS OF TRANSLATING THAT MOVING TESTIMONY INTO

20   DOLLARS AND CENTS, THEN THERE'S A REASON WHY CALIFORNIA HAS

21   SEEN FIT TO HAVE THIS BE A MODEL INSTRUCTION.  SO I'LL -- YOU

22   CAN INCLUDE IT FOR RIGHT NOW AND I MIGHT TAKE IT OUT IN THE

23   MORNING, BUT I'LL THINK ABOUT IT ON THAT AND DECIDE TOMORROW

24   MORNING.

25         ALL RIGHT.  SO IS THERE ANYTHING ELSE, THEN, IN

```
 1    REGARD TO THE INSTRUCTIONS THAT WE NEED TO GO OVER?

 2              MR. MC NICHOLAS:  A THOUGHT JUST STRUCK ME, YOUR

 3    HONOR, MY LAST POINT HERE, IS:  DOES THE COURT HAVE OR THE

 4    DEFENSE HAVE ANY OBJECTION TO THE BASIC INSTRUCTION ON THE

 5    LIFE EXPECTANCY OF A MALE OF MR. GRISSOM'S AGE BASED ON THE

 6    MORTALITY TABLES THAT ARE IN THE BACK OF THE FORM

 7    INSTRUCTIONS?

 8              THE COURT:  YES, MS. WILLIAMS?

 9              MS. WILLIAMS:  THE DEFENSE OBJECTS TO THAT

10    INSTRUCTION BECAUSE SPECIFICALLY THE WAIVER OF FINANCIAL

11    SUPPORT OR EARNINGS CLAIMS, WHICH IT'S MY RECOLLECTION THAT

12    THE LIFE EXPECTANCY COMES INTO PLAY IN THAT REGARD, HOW LONG

13    WOULD THE DECEDENT HAVE BEEN CONTRIBUTING X AMOUNT OF MONEY

14    TO THE PLAINTIFFS.

15              MR. MC NICHOLAS:  WELL, SHE'S PARTIALLY RIGHT, BUT

16    THE LOSS OF THE LOVE, CARE, COMFORT AND CONSORTIUM IS BASED

17    ON THE TIME THAT THAT RELATIONSHIP WILL LAST.  SO THAT IF YOU

18    ARE A PLAINTIFF IN A WRONGFUL DEATH CASE AND YOU'RE A

19    70-YEAR-OLD CHILD AND YOUR MOTHER WHO IS THE DECEDENT IS 89

20    AND HER LIFE EXPECTANCY IS TWO YEARS, YOU GET TO ARGUE FOR

21    TWO YEARS' WORTH OF DAMAGES, BUT IF YOU'RE A CHILD THAT IS

22    TEN AND YOUR FATHER IS 40 AT THE TIME OF HIS DEATH, YOU GET

23    TO ARGUE FOR 50 OR 55 YEARS WORTH OF DAMAGES.  OF COURSE IT'S

24    GERMANE TO THE DISCUSSION.

25              THE COURT:  YEAH, BUT IT ALSO THEN DOES GET --
```

```
 1   RAISE ISSUES WHICH MY MOTIONS IN LIMINE KEPT OUT AND THAT'S
 2   WHAT THE DEFENSE -- I MEAN, THE PLAINTIFFS WANTED.  YOU KNOW,
 3   THE -- WE -- I DIDN'T ALLOW THE DEFENSE TO GO INTO HOW LIKELY
 4   IS IT THAT SOMEONE WHO'S COMMITTING A SERIES OF ARMED
 5   ROBBERIES IS GOING TO LIVE AND WHAT -- YOU KNOW, WHAT -- AND
 6   IF HE HAD BEEN CONVICTED LIKE HIS SISTER WAS, TO WHAT DEGREE
 7   WOULD HE BE ABLE TO PROVIDE THESE THINGS.
 8            I'M JUST GOING TO LEAVE IT IN THE COMMON SENSE OF
 9   THE JURY.  YOU KNOW, I DON'T THINK WE NEED THE SPURIOUS
10   EXACTITUDE OF THE TABLE, BUT, I MEAN, IF HE HAD BEEN A DOCTOR
11   WHO WAS MAKING X AMOUNT OF DOLLARS FROM HIS PRACTICE, THEN,
12   YOU KNOW, IT WOULD BE APPROPRIATE, BUT I DON'T THINK IT'S --
13   I DON'T THINK IT'S REALLY NECESSARY.
14            MS. WILLIAMS, THE EVIDENCE IN ELECTRONIC FORMAT, I
15   THINK IT JUST -- I THINK THAT SHOULD BE TAKEN OUT.  IT ISN'T
16   GOING TO BE IN ELECTRONIC FORMAT.  IN FACT, THE TWO OF YOU
17   SHOULD DECIDE WHICH EXHIBITS NEED TO GO IN FRONT OF THE JURY
18   BECAUSE WE'RE GOING TO HAVE TO CREATE A SET OF BINDERS THAT
19   HAVE THOSE EXHIBITS AND ONLY THOSE EXHIBITS, SO THAT'S
20   SOMETHING YOU SHOULD START THINKING ABOUT AND WORKING ON.
21            SO IS THERE -- IS THERE ANYTHING ELSE TO --
22            MR. GALIPO:  NOT WITH THE JURY INSTRUCTIONS, BUT I
23   THINK WE SHOULD BRIEFLY DISCUSS THE VERDICT FORM.
24            THE COURT:  I AGREE.  LET HE MAKE SURE THAT MY
25   COURT REPORTER DOESN'T NEED A SLIGHT BREAK BEFORE WE DO THAT.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1                        (OFF THE RECORD.)

 2              THE COURT:  SO LET'S TALK ABOUT THE SPECIAL

 3    VERDICT.

 4              MR. GALIPO:  OKAY, YOUR HONOR.

 5              DO YOU HAVE A -- I WORKED OFF THE DEFENSE'S.

 6              DO YOU HAVE A COPY OF THAT?

 7              THE COURT:  I DO AND NOW LET ME FIND IT.

 8                        (OFF THE RECORD.)

 9              THE COURT:  YES.

10              MR. GALIPO:  SO, THE FIRST ISSUE IS:  THE FOURTH

11    AMENDMENT INSTRUCTION DEFINES -- TALKS ABOUT EXCESSIVE FORCE,

12    AND THE BATTERY INSTRUCTION, WHICH IS THE ANALOGOUS STATE

13    INSTRUCTION TALKS ABOUT UNREASONABLE FORCE.  SO WE'RE IN

14    AGREEMENT ON THE WORDING OF QUESTION NUMBER 1.  I BELIEVE IT

15    SHOULD BE DID HE USE EXCESSIVE OR UNREASONABLE FORCE, AND

16    THEY ONLY WANT EXCESSIVE FORCE.  SO THAT'S OUR ONE POINT OF

17    DISAGREEMENT ON THE FIRST QUESTION.

18              THE COURT:  DOESN'T THE JURY INSTRUCTION DEFINE

19    EXCESSIVE IN TERMS OF UNREASONABLE?  WHAT I THINK IT SHOULD

20    DO IS TRACK WHATEVER THE FINAL INSTRUCTION IS, SO, I MEAN...

21              MR. GALIPO:  THE PROBLEM IS THAT THE NINTH CIRCUIT

22    INSTRUCTION USES EXCESSIVE AND THE BATTERY INSTRUCTION, WHICH

23    IS THE STATE INSTRUCTION, USES UNREASONABLE.

24              THE COURT:  WELL, IS THERE -- DO THE PLAINTIFFS

25    CONTEND THAT THE EXCESSIVE AND THE UNREASONABLE ARE SEPARATE
```

```
 1    THINGS?

 2              MR. GALIPO:  NO, BUT WE JUST BELIEVE, AND I THINK

 3    WE'RE BOTH IN AGREEMENT ON THIS, THERE SHOULD BE ONE QUESTION

 4    THAT SATISFIES -- YOU'RE EITHER GOING TO WIN ON FOURTH

 5    AMENDMENT OR BATTERY, OR YOU'RE GOING TO LOSE ON BOTH --

 6              THE COURT:  THEN WHAT WE'RE GOING TO DO IS USE

 7    EXCESSIVE FOR THE BATTERY CLAIM AS WELL AS FAR THE -- AND

 8    JUST USE "EXCESSIVE" CONSISTENTLY THROUGHOUT.

 9              MR. GALIPO:  AND WE CAN EXPLAIN TO THE JURY IN THE

10    INSTRUCTIONS, IF YOU SEE "EXCESSIVE, OR "UNREASONABLE" --

11              THE COURT:  NO, NO.

12              WHAT I'M SAYING IS:  IN THE INSTRUCTIONS, THERE

13    WILL BE "EXCESSIVE" THROUGHOUT AND NOT "UNREASONABLE" --

14              MR. GALIPO:  OH.

15              THE COURT:  -- AND JUST USE ONE WORD.

16              MR. GALIPO:  SO MODIFY THE BATTERY INSTRUCTION

17    WHERE IT SAYS "UNREASONABLE" TO PUT "EXCESSIVE"?

18              THE COURT:  CORRECT.

19              I MEAN, AS BETWEEN THE TWO WORDS, I THINK EXCESSIVE

20    IS APPROPRIATE.  I MEAN, FIRST OF ALL, I THINK IT'S MORE FAIR

21    TO DETECTIVE MARTINEZ, BUT BEYOND THAT, I MEAN, IT'S -- THE

22    WHOLE SUGGESTION OF POST THAT, YOU KNOW, IT WAS MORE -- AND

23    IT'S CONSISTENT WITH YOUR ARGUMENT THAT THEY DIDN'T NEED TO

24    DO IT.  I JUST THINK "EXCESSIVE" IS A BETTER WORD.

25              MR. GALIPO:  THAT'S OKAY.  I'M FINE WITH THAT.
```

```
1           THE COURT:  BECAUSE, OTHERWISE, IT SUGGESTS THEY'RE
2    TWO DIFFERENT THINGS AND THAT'S -- YOU KNOW...
3           MR. GALIPO:  OKAY.
4           THE COURT:  ALL RIGHT.  OKAY.  SO THEN WHAT'S NEXT?
5           MR. GALIPO:  OKAY.  THEN -- SO QUESTION 2 WE NO
6    LONGER NEED.  QUESTION 3, THE OLD QUESTION 3, WE'RE OBJECTING
7    TO.  WE JUST THINK VERY BASICALLY THERE NEEDS TO BE A
8    QUESTION:  WAS THE DEFENDANT -- WAS OFFICER MARTINEZ
9    NEGLIGENT; YES OR NO?  IF THEY ANSWER YES, WAS HIS NEGLIGENCE
10   A SUBSTANTIAL FACTOR IN CAUSING MR. GRISSOM'S DEATH; YES OR
11   NO?  WAS GRISSOM NEGLIGENT?  WAS HIS NEGLIGENCE A SUBSTANTIAL
12   FACTOR IN CAUSING HIS DEATH?
13          SO WE BELIEVE THERE NEEDS TO BE FOUR QUESTIONS,
14   NEGLIGENCE OF MARTINEZ, CAUSATION ON HIS NEGLIGENCE,
15   NEGLIGENCE OF GRISSOM, CAUSATION ON HIS NEGLIGENCE.  AND SO
16   THAT QUESTION, AS PHRASED, I DON'T QUITE UNDERSTAND IT.
17          THE COURT:  ALL RIGHT.  LET ME HEAR FROM
18   MS. WILLIAMS.
19          MS. WILLIAMS:  WELL, FIRST OF ALL, WITH RESPECT TO
20   THE PLAINTIFFS' PROPOSED QUESTION:  WAS DEFENDANT OFFICER
21   MARTINEZ NEGLIGENT, IT'S THE DEFENDANT'S POSITION IF YOU
22   ANSWER QUESTION 1, WAS THE FORCE EXCESSIVE, THE CASE IS OVER.
23   THAT THERE'S NO ALTERNATIVE BASIS FOR FINDING AGAINST OFFICER
24   MARTINEZ BASED ON NEGLIGENCE.  SO THE DEFENDANT'S OBJECT TO
25   THE PLAINTIFFS' PROPOSED WAS OFFICER MARTINEZ NEGLIGENT.  AND
```

```
 1    IF THE COURT IS IN AGREEMENT WITH THAT, THE DEFENDANTS WILL
 2    WITHDRAW WHAT PRESENTLY READS AS QUESTION 3.
 3              THE COURT:  ALL RIGHT.
 4              MR. GALIPO:  WHAT I DON'T UNDERSTAND IS HOW THEY
 5    COULD TAKE THAT POSITION AND REQUEST AN INSTRUCTION TO GO TO
 6    THE JURY TO SAY YOU CAN HAVE NEGLIGENCE BUT THAT ISN'T
 7    NECESSARILY EXCESSIVE FORCE.  SO THAT'S INCONSISTENT
 8    ARGUMENTS IN MY MIND.
 9              THE COURT:  RIGHT.
10              I -- LOOK, PRESUME I WILL LOOK AT THIS TONIGHT, BUT
11    PRESUME THAT NEGLIGENCE WILL BE THERE AS SOMETHING SEPARATE.
12    AND, MS. WILLIAMS, WHICHEVER -- EACH OF YOU CAN GIVE ME
13    WHATEVER YOU THINK IS YOUR STRONGEST CASE ON THIS POINT AND I
14    WILL READ IT.
15              AND, FOR THE MOMENT, PREPARE -- YOU CAN PREPARE TWO
16    VERDICT FORMS, ONE IN WHICH NEGLIGENCE IS SET OUT SEPARATELY.
17    I DO THINK IT WOULD BE APPROPRIATE IN THAT CASE TO SAY THAT
18    WAS THE DEFENDANT OFFICER LUIS MARTINEZ NEGLIGENT AS OPPOSED
19    TO SAYING IT WAS BELIEVED THAT A USE OF DEADLY FORCE AND WAS
20    PROPER, ALL OF THAT.  AND THEN WAS IT A SUBSTANTIAL FACTOR,
21    AND THEN CAN YOU PUT IN, OBVIOUSLY, WAS GRISSOM, YOU KNOW, AN
22    APPROPRIATE QUESTION ABOUT THE CONTRIBUTORY NEGLIGENCE, AND
23    THEN WE'LL GET THE -- NOW, THE THING IS HERE, HOW -- LET'S
24    SAY -- BECAUSE, OBVIOUSLY, IN REGARD TO IF THERE WAS THE
25    EXCESSIVE FORCE, THERE'S NOT CONTRIBUTORY UNDER -- THE WAY
```

```
1    YOU HAVE IT HERE, THIS IS FINE -- SHOULDN'T THERE BE TWO

2    DAMAGE THINGS WHERE IF THE -- IF QUESTION 1 IS ANSWERED IN

3    THE AFFIRMATIVE, THEN THERE'S A FINDING OF DAMAGES, BUT THEN

4    IF IT'S NOT, THEN THERE WOULD BE -- YOU GO THROUGH THE

5    NEGLIGENCE AND THEN YOU HAVE A SEPARATE DAMAGE THING WHERE

6    YOU WOULD HAVE THE COMPARATIVE THING?  I MEAN --

7              MR. GALIPO:  WELL, TWO ISSUES:  ONE, IF THEY

8    ANSWER -- THEY ONLY GET TO SURVIVAL DAMAGES IF THEY ANSWER

9    QUESTION 1, "YES."

10             THE COURT:  RIGHT.

11             MR. GALIPO:  SO THE VERDICT FORM SHOULD SO DIRECT

12   THEM.  IF THEY ANSWER QUESTION 1, "YES," THEY GET THE

13   SURVIVAL DAMAGES AND WRONGFUL DEATH DAMAGES.

14             NOW, I WOULD SAY, YOUR HONOR, THAT THEY ASK --

15   ANSWER ONE OR TWO GROUPS OF DAMAGE QUESTIONS.  OBVIOUSLY, IF

16   THERE'S A COMPARATIVE NEGLIGENCE FINDING AND THERE'S ONLY A

17   FINDING OF NEGLIGENCE AND NOT EXCESSIVE FORCE, THEN WE CAN

18   WORK OUT THAT REDUCTION POST VERDICT.  IT'S PRETTY SIMPLE TO

19   DO THE MATH.

20             BUT YOU'RE RIGHT THAT THE COMPARATIVE NEGLIGENCE IS

21   NOT AN AFFIRMATIVE DEFENSE TO QUESTION 1.  SO I DON'T KNOW IF

22   WE NEED TWO SEPARATE DAMAGE QUESTIONS, BUT I THINK POST

23   VERDICT, WE CAN DO THE MATH BECAUSE I THINK THE INSTRUCTION

24   MAY EVEN SAY SOMETHING TO THE EFFECT, IF YOU FIND

25   CONTRIBUTORY NEGLIGENCE, DON'T WORRY ABOUT REDUCING THE
```

```
 1    AMOUNT OF THE DAMAGES; THE COURT WILL DO SO, OR SOMETHING TO
 2    THAT EFFECT.
 3             MS. WILLIAMS:  MAY I BE HEARD, YOUR HONOR?
 4             THE COURT:  OF COURSE.
 5             MS. WILLIAMS:  WITH RESPECT TO QUESTION 1, IF THE
 6    PLAINTIFF -- IF THE JURY ANSWERS QUESTION 1, "YES," THAT
 7    WOULD APPLY TO THE PLAINTIFFS' CLAIM UNDER 1983 FOR EXCESSIVE
 8    FORCE AND THE BATTERY CLAIM.  SO -- AND IT WOULD -- AND IF
 9    THE COURT THEN DECIDES IT'S GOING TO GIVE A SEPARATE
10    INSTRUCTION FOR WAS OFFICER MARTINEZ NEGLIGENT AND THE JURY
11    ANSWERS THAT ONE WAY OR ANOTHER, THAT WOULD TELL US IN ONE
12    SINGLE DAMAGES CLAIM, WELL, AS PART OF -- ARE PART OF THOSE
13    DAMAGES SURVIVAL DAMAGES AND ARE PART OF THOSE DAMAGES
14    WRONGFUL DEATH DAMAGES.  I THINK IT CONFUSES THE FACT TO HAVE
15    TWO SEPARATE DAMAGES CLAIMS, BECAUSE IF THEY ANSWER QUESTION
16    1, "YES," THAT WOULD INCLUDE BOTH SURVIVAL AND WRONGFUL DEATH
17    DAMAGES BECAUSE THEIR BATTERY CLAIM IS A WRONGFUL DEATH
18    CLAIM.
19             THE COURT:  RIGHT.
20             MR. GALIPO:  BUT THE REASON WE NEED THE TWO
21    SEPARATE ENTRIES IS, AS THE COURT POINTED OUT, EITHER TO
22    HANDLE ISSUES POST VERDICT OR SETTLEMENT OR APPEAL, WE NEED
23    TO SEE WHAT THEY'RE AWARDING FOR THE CHILDREN, AND WE'RE
24    TAKING THE POSITION THERE SHOULD BE A LINE FOR EACH CHILD --
25    THERE MAY BE AN ISSUE THERE -- AND WHAT THEY'RE AWARDING IN
```

1    SURVIVAL DAMAGES, SO WE CAN LOOK AT IT.  TO THE EXTENT

2    COUNSEL IS SUGGESTING THERE SHOULD BE A NUMBER, WE HAVE NO

3    IDEA WHAT THE DIVISION WAS BETWEEN THE CHILDREN OR BETWEEN

4    WRONGFUL DEATH DAMAGES AND SURVIVAL DAMAGES, I THINK THAT

5    WOULD BE INAPPROPRIATE.

6            THE COURT:  NOW, I'M TEMPTED -- I WANT TO REMIND

7    YOU THAT SINCE THIS HAS TO BE -- IS SETTLED BY 9:30 TOMORROW,

8    I MEAN, MR. GALIPO, YOU'RE ACTING LIKE WHAT WE'RE TALKING

9    ABOUT MAYBE THERE SHOULD BE SOMETHING FOR WHICH -- AT WHAT

10   TIME AND PLACE DO YOU THINK THIS MATTER IS GOING TO GET

11   RESOLVED?

12           MR. GALIPO:  RIGHT NOW I JUST THINK THAT THERE

13   SHOULD BE A -- IT'S VERY SIMPLE.  THERE SHOULD BE A SEPARATE

14   LINE FOR EACH PLAINTIFF.  THERE SHOULD BE ONE QUESTION FOR

15   THE SURVIVAL DAMAGES, THAT THEY ONLY GET THERE IF THEY ANSWER

16   QUESTION 1, "YES."  SO THE VERDICT FORM WILL DIRECT THEM.

17   AND THERE WILL BE ONE QUESTION FOR WRONGFUL DEATH DAMAGES,

18   ONE LINE FOR EACH PLAINTIFF, AND THEY ONLY GET THERE IF THEY

19   ANSWER EITHER "YES" TO ONE OR YES TO THE NEGLIGENCE AND

20   CAUSATION.  SO --

21           THE COURT:  MS. WILLIAMS, WHAT'S YOUR -- I MEAN,

22   THERE -- THAT DOES MAKE A CERTAIN AMOUNT OF SENSE TO ME.  AND

23   WHAT -- WHAT'S YOUR REACTION TO THAT?

24           MS. WILLIAMS:  MY PROPOSAL WOULD BE IF THE COURT IS

25   GOING TO ALLOW A QUESTION AS FAR -- IF THE COURT IS -- WELL,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    REGARDLESS OF WHETHER THE COURT DECIDES ON THE NEGLIGENCE

2    QUESTIONS.  ON WHAT ARE THE PLAINTIFFS' DAMAGES, WE ONLY NEED

3    ONE AND WE CAN HAVE IT TRACK THE PLAINTIFFS' PROPOSED VERDICT

4    FORM, WHICH IS LEJOY GRISSOM'S DAMAGES, AS THE VERDICT FORM

5    READS, AND THE MINOR PLAINTIFFS', TWO LINES, ONE FOR -- THAT

6    WOULD BE CLEAR AS TO THOSE ARE THE SURVIVAL DAMAGES AND ONE

7    LINE THAT WOULD BE CLEAR THOSE ARE THE WRONGFUL DEATH

8    DAMAGES.

9            THE COURT:  AND, I MEAN, AGAIN, THIS IS SOMETHING

10   THAT, PERHAPS, YOU AND THE GUARDIANS AD LITEM MUST HAVE

11   CONSIDERED.

12           IS THERE ANY CLAIM THAT THERE ARE DIFFERENT DAMAGES

13   AS TO EACH OF THE MINOR CHILDREN?

14           MR. GALIPO:  WELL, WE THINK THERE SHOULD BE

15   SEPARATE LINES.  WE DON'T THINK THE COURT SHOULD BE IN THE

16   POSITION OF HAVING AFTER THE FACT TO FIGURE OUT HOW TO DIVIDE

17   IT UP.  UNLESS THE COURT IS GOING TO DIVIDE IT UP SIMPLY

18   EQUALLY, I PERSONALLY THINK THERE SHOULD BE SEPARATE LINES

19   BECAUSE I THINK IT'S AN UNFAIR POSITION TO PUT THE COURT IN

20   TO DECIDE HOW MUCH OF IT GOES TO ONE CHILD --

21           THE COURT:  WELL, I HAVE NO INTENTION OF DOING

22   THAT.  I WOULD JUST DIVIDE IT UP, YOU KNOW, PER CAPITA, SO --

23   AND THAT'S -- AND IS THAT WHAT COUNSEL AND THE GUARDIANS AD

24   LITEM INTEND, OR DO -- IS THERE A BELIEF THAT SOME -- BASED

25   ON THEIR TESTIMONY, THAT SOME OF THE CHILDREN ARE ENTITLED TO

```
 1    GREATER DAMAGES THAN OTHERS?

 2            MR. GALIPO:  I DON'T KNOW WHAT THE JURY WOULD

 3    THINK, BUT I AM OF THE MIND FRAME THAT EACH CHILD SHOULD

 4    RECEIVE EQUALLY.  I AM NOT OF THE MIND FRAME THAT ONE CHILD

 5    SHOULD NECESSARILY GET MORE THAN THE ANOTHER.

 6            THE COURT:  WELL, LET ME -- THAT -- LET HEAR

 7    FROM -- THIS IS SOMETHING WHERE THE FACT THAT THERE ARE

 8    SEPARATE LAWYERS FOR SEPARATE GUARDIANS AD LITEM MATTER.  SO

 9    LET ME HEAR WHETHER MR. MC NICHOLAS AGREES WITH THAT OR NOT.

10            MR. MC NICHOLAS:  I AGREE WITH THAT PREMISE, YOUR

11    HONOR.  BUT, IN MY PRACTICE, WHEN I -- AND I HAVE DONE MANY

12    WRONGFUL DEATH CASES, NOT CIVIL RIGHTS WRONGFUL DEATH

13    CASES -- BUT EACH PLAINTIFF GETS THEIR OWN DAMAGES AND

14    THERE'S -- AND IT WILL SAY WHAT ARE THE DAMAGES FOR DEJAYNE?

15    AND WHAT ARE THE DAMAGES FOR KAILYNN, AND IT WILL HAVE PASSED

16    NONECONOMIC DAMAGES AND FUTURE, AND THERE WILL BE EACH ONE OF

17    THOSE LINES FOR EACH PLAINTIFF.  WHEN YOU HAVE MULTIPLE

18    PLAINTIFFS IN A WRONGFUL DEATH CASE, YOU DON'T JUST LUMP THEM

19    TOGETHER JUST BECAUSE THEY HAPPEN TO BE BLOOD RELATED.

20            THE COURT:  WELL -- BUT UNLESS THERE IS, IN FACT,

21    AN AGREEMENT AMONG COUNSEL AND GUARDIANS AD LITEM THAT

22    THEY'RE ALL ENTITLED TO THE SAME AMOUNT, I -- THAT'S WHAT I'M

23    ASKING YOU RIGHT NOW.  IF THAT IS, IN FACT, THE INTENTION --

24    AND IF YOU WANT TO TAKE A MOMENT AND TALK TO MS. SIMPLIS AND

25    MS. ROSE, YOU CERTAINLY CAN.  BUT, IN THAT CASE, I'M NOT
```

```
 1   GOING TO DIVIDE IT ANY WAY EXCEPT EQUALLY AMONG ALL THE
 2   CHILDREN.  BUT IF -- AND I DON'T INTEND TO DO THAT UNLESS
 3   THAT'S WHAT THE PLAINTIFFS WANT.  SO IF YOU WANT TO -- WOULD
 4   LIKE TO TALK TO YOUR CLIENTS AND SEE IF THAT'S WHAT YOU'RE
 5   GOING TO DO, IN THAT CASE, WE DON'T -- IT'S EASY BECAUSE
 6   WE'LL JUST -- WHATEVER THE ULTIMATE NUMBER IS, IT JUST GETS
 7   DIVIDED UP -- YOU KNOW, IT GETS DIVIDED UP AMONG THE NUMBER
 8   OF CHILDREN.
 9            MR. GALIPO:  MAY WE HAVE ONE MOMENT?
10            THE COURT:  YOU MAY.
11            (PLAINTIFFS' COUNSEL CONFER WITH CLIENTS.)
12            THE COURT:  WHAT I'M GOING TO DO IS LET MY COURT
13   REPORTER GO MOVE HER CAR, COME BACK, AND THEN WE'LL FINISH
14   THIS, AND SO YOU'LL HAVE A CHANCE TO TALK TO YOUR CLIENTS
15   ABOUT WHAT IT IS THAT THEY WOULD LIKE US TO DO.
16            ALL RIGHT.
17                  (OFF THE RECORD.)
18       (WHEREUPON, NO FURTHER PROCEEDINGS WERE REPORTED
19              AND COURT WAS ADJOURNED.)
20                  --000--
21
22
23
24
25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1                    CERTIFICATE OF REPORTER

 2

    COUNTY OF LOS ANGELES      )
 3                             )  SS.
    STATE OF CALIFORNIA        )

 4

 5

 6  I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

 7  UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

 8  CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 9  TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10  CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11  PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12  TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13  OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16  DATED:  AUGUST 2, 2013

17

18       /S/  ROSALYN ADAMS
    _____

19  ROSALYN ADAMS, CSR 11794
    OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT