1          UNITED STATES OF AMERICA

2          UNITED STATES DISTRICT COURT

3          CENTRAL DISTRICT OF CALIFORNIA

4          CENTRAL DIVISION

5                    - - -
           HONORABLE MICHAEL W. FITZGERALD
6          UNITED STATES DISTRICT JUDGE PRESIDING
                     - - -
7

8    KANDACE SIMPLIS, ET AL.,          )
                                       )
9              PLAINTIFF,              )
                                       )
10   VS.                               )   CV 10-09497-MWF
                                       )
11   CULVER CITY POLICE DEPARTMENT,    )     VOLUME II
     ET AL.,                           )
12                                     )
               DEFENDANT.              )
13   _____)

14

15

                    *JURY TRIAL - DAY 6, PM SESSION*
16

                   LOS ANGELES, CALIFORNIA
17
                       MAY 8, 2013
18

19

20

21

22

23             ROSALYN ADAMS, CSR 11794
           FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 410
           LOS ANGELES, CALIFORNIA 90012
25                 (213) 894-2665

1    **APPEARANCES:**

2    **ON BEHALF OF THE PLAINTIFF:**

3              LAW OFFICES OF DALE K. GALIPO
               BY:  DALE K. GALIPO
4              21800 BURBANK BOULEVARD
               SUITE 310
5              WOODLAND HILLS, CALIFORNIA 91367
               (818) 347-3333
6
               MC NICHOLAS AND MC NICHOLAS LLP
7              BY:  MATTHEW S. MC NICHOLAS
               10866 WILSHIRE BOULEVARD
8              SUITE 1400
               LOS ANGELES, CALIFORNIA 90024
9              (310) 474-1582

10

11   **ON BEHALF OF DEFENDANT:**

12             CARPENTER ROTHANS AND DUMONT
               BY:  STEVEN J. ROTHANS
13                   JILL WILLIAMS
               888 SOUTH FIGUEROA STREET
14             SUITE 1960
               LOS ANGELES, CALIFORNIA 90017
15             (213) 228-0400

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 8, 2013; 1:15 P.M.

 2                              --oOo--

 3

 4

 5             THE COURT:  MS. SANCHEZ, GET THE JURY, PLEASE.

 6             THE CLERK:  YES, YOUR HONOR.

 7                         (JURORS ENTER.)

 8             THE COURT:  ALL RIGHT.  COUNSEL, YOU MAY PROCEED.

 9             MR. GALIPO:  THANK YOU.

10             GOOD AFTERNOON.  I HOPE YOU HAD A NICE LUNCH.  THIS

11     IS MY OPPORTUNITY TO RESPOND TO SOME OF THE POINTS MADE BY

12     MR. ROTHANS.

13             THE BURDEN OF PROOF, AS WE'VE DISCUSSED, IS ONLY

14     51 PERCENT.  I WOULD SUBMIT THAT THE EVIDENCE IN THIS CASE

15     THAT THE SHOOTING WAS EXCESSIVE IS ABOUT 90 PERCENT.  IN

16     FACT, I WENT THROUGH A LIST OF REASONS THAT THE FORCE WAS

17     EXCESSIVE, AND, OBVIOUSLY, IF YOU EVEN HAVE ONE GOOD REASON,

18     THAT'S ENOUGH.  I CAME UP WITH OVER 30 REASONS IN THIS CASE

19     THAT THE FORCE WAS EXCESSIVE.  I'M GOING TO SHARE THOSE WITH

20     YOU IN A MOMENT, BUT I WANT TO MAKE A FEW COMMENTS.

21             FIRST OF ALL, WITH RESPECT TO MR. CLARK.  MR. CLARK

22     WAS NOT CRITICAL OF ALL OFFICERS.  IN FACT, HE WASN'T

23     CRITICAL OF ANY OFFICER IN THIS INCIDENT EXCEPT MARTINEZ, AND

24     HE WAS ONLY CRITICAL OF MARTINEZ BASICALLY FOR SHOOTING.

25             SO MR. CLARK, AS YOU HEARD HIS TESTIMONY, IS A VERY
```

1    WELL-RESPECTED EXPERT.  HE HAD OPINIONS AND I THINK THOSE

2    OPINIONS WERE VERY WELL EXPRESSED IN THE CASE.

3            INTERESTINGLY, MR. CHAPMAN, THEIR EXPERT AND

4    MR. CLARK AGREED ON ABOUT 90 PERCENT OF THE ISSUE, INCLUDING

5    ALL THE POST STANDARDS RELATIVE TO DEADLY FORCE, THAT IT ONLY

6    COULD BE USED IN IMMEDIATE DEFENSE OF LIFE.  THIS WAS NOT AN

7    IMMEDIATE DEFENSE OF LIFE SITUATION.  AND, IN FACT,

8    MR. CHAPMAN, HIMSELF, AGREED EVEN IF THE HANDS DROPPED, YOU

9    CAN'T SHOOT A PERSON.  SO WE HAVE ALL THIS TALK ABOUT WHETHER

10   THE HANDS WERE UP OR DROPPED, ONE, BOTH, IT DOESN'T MATTER.

11   IT DOESN'T MATTER.

12           IF YOUR HANDS DROP AND THEY CAN SEE YOUR HANDS,

13   UNLESS YOU HAVE A GUN IN THEM, YOU CAN'T SHOOT SOMEONE.  SO

14   IF YOU GO BACK AND THINK, WELL, DID THE HANDS DROP OR NOT,

15   THAT'S NOT -- THAT'S NOT -- THE ULTIMATE ISSUE IN THIS CASE,

16   BECAUSE, AS I EXPRESSED BEFORE, OFFICER MARTINEZ HAS A

17   COMPLETELY DIFFERENT STORY.

18           LOPEZ, MR. ROTHANS SAID, THE QUESTION IS:  WHAT

19   WOULD A REASONABLE OFFICER HAVE DONE?  WOULD A REASONABLE

20   OFFICER HAVE SHOT?

21           AND I WOULD SUBMIT OFFICER LOPEZ WAS A REASONABLE

22   OFFICER, HE DIDN'T SHOOT.  ZERBEY ACTED AS A REASONABLE

23   OFFICER, HE DIDN'T SHOOT.  THEY SAY, WELL, ZERBEY SAID HIS

24   FINGER WAS GOING TO THE TRIGGER.  BUT YOU'LL RECALL OFFICER

25   ZERBEY ADMITTED IN HIS TESTIMONY HE NEVER SAID THAT IN HIS

```
 1    WRITTEN STATEMENT.

 2              HOW MUCH OF THIS IS ACTUALLY WHAT HAPPENED?  HOW

 3    MUCH IS LAWYER DRIVEN?

 4              YOU'RE GOING TO HAVE TO DECIDE.

 5              FAIRBANKS ACTED AS A REASONABLE OFFICER, HE DIDN'T

 6    SHOOT.  BROWN ACTED AS A REASONABLE OFFICER, HE DIDN'T SHOOT.

 7    FOR THE FIRST TIME I HEARD THAT BROWN COULDN'T SHOOT BECAUSE

 8    HE DIDN'T HAVE A CLEAR LINE OF SIGHT, THAT WAS NEVER IN THE

 9    EVIDENCE.  HE SAID HE WAS IN A POSITION WHERE HE WAS FOCUSED

10    ON, HAD HIS GUN POINTED AT HIM, SO I'M NOT SURE WHERE THAT

11    CAME FROM.

12              NONE OF THESE PEOPLE, INCLUDING THE PERCIPIENT

13    WITNESSES, NOT ONE OF THEM SAW AN OBJECT IN HIS HANDS, SAW

14    HIM RAPIDLY SPINNING TO THE RIGHT, SAW HIM FACING AWAY FOR A

15    PROLONGED PERIOD OF TIME.

16              MS. SCHIFF SAID HE MIGHT HAVE BEEN FACING AWAY FOR

17    A SECOND BEFORE HE TURNED TO FACE THE OFFICERS, BUT HE WAS IN

18    THAT POSITION THE REST OF THE TIME.  NOBODY SAYS THE PHONE

19    LOOKS LIKE A GUN.  EVEN THE ADMISSION OF TESTIMONY, YOU CAN'T

20    SHOOT SOMEONE FOR HAVING A CELL PHONE IN THEIR HAND.

21              I THINK MOST OF YOU PROBABLY HAD THAT IDEA BEFORE

22    YOU GOT HERE AND THAT'S WHERE COMMON SENSE COMES IN.  EVEN IN

23    OFFICER MARTINEZ'S STORY HE SAID I DIDN'T RECOGNIZE THE

24    OBJECT AS A GUN.  NO MENTION AT THE SCENE OF AN OBJECT IN

25    HAND, NO MENTION AT THE SCENE REGARDING THE CELL PHONE.
```

```
1            WHY NOT PRODUCE THE PHONE, MR. ROTHANS SAID?

2            WELL, WAIT A MINUTE, THEY CALLED A WITNESS WHO SAID

3   HE HAD THE PHONE ON HIM.  THE SAME WITNESS THAT PRESUMABLY

4   HAD TALKED TO MR. ROTHANS.  IF THEY THOUGHT THE PHONE WAS

5   GOING TO HELP THEM SOMEHOW OR THEY WANTED YOU TO SEE

6   SOMETHING ON THE PHONE, WHETHER IT'S BLOOD OR SOMETHING ELSE,

7   WHY DIDN'T THEY PRODUCE THE PHONE?

8            THEY SAID, WELL, WHY WEREN'T CERTAIN WITNESSES

9   CALLED OR CHIEF PEDERSEN OR SOME OF THE INVESTIGATORS FROM

10  CULVER CITY?  THEY COULD ALL THESE WITNESSES.  THEY HAVE THE

11  SAME SUBPOENA POWER.  IF THEY THOUGHT THAT ANY OF THESE

12  PEOPLE WOULD HELP THEIR CASE, LAYLA GRISSOM OR ANYONE ELSE,

13  THEY CAN CALL THEM.

14            WHY DIDN'T KHANDI ROSE TESTIFY?

15            THEY COULD HAVE CALLED HER AS A WITNESS.  WE

16  DECIDED IT WASN'T NECESSARY.  WE WANTED YOU TO HEAR FROM THE

17  KIDS.  BUT I GOT IT TO TELL YOU SOMETHING, THIS MAN LOVED HIS

18  CHILDREN AND HIS CHILDREN LOVED HIM UNCONDITIONALLY.

19  CHILDREN DON'T EXPECT PARENTS TO BE PERFECT.  THEY LOVED

20  THEIR PARENTS.  THEY JUST WANT TO BE LOVED.

21            THIS MAN SPENT EVERY DAY WITH HIS CHILDREN, THERE

22  IS NO QUESTION OR SUGGESTION OR DISPUTE IN THE EVIDENCE THAT

23  HE LOVED HIS CHILDREN OR THAT HIS CHILDREN LOVED HIM.

24            THE FIRST MENTION OF A PHONE UNDERNEATH THE CAR A

25  YEAR LATER, A YEAR LATER YOU ASK YOURSELF, USING YOUR COMMON
```

1    SENSE, IF SOMETHING SEEMS A LITTLE STRANGE ABOUT THAT.  THE

2    MENTION OF THE SPINNING AND THE OBJECT IN THE HAND, WHEN DID

3    THAT COME ABOUT?  AFTER HE CONSULTED WITH A LAWYER.  IS THIS

4    WHAT ACTUALLY HAPPENED, OR IS THIS LAWYER DRIVEN?  YOU HAVE

5    TO DECIDE.

6         THE EVIDENCE IS THAT HE WAS CALM AND HE WAS

7    SURRENDERING.  IT'S PRETTY SHOCKING, BUT IT'S TRUE.  THIS MAN

8    WAS SURRENDERING AND TWO DIFFERENT WITNESSES SAID HE WAS TOLD

9    TO TURN OR TURN AROUND.  MAYBE HIS RIGHT HAND DID DROP, BUT

10   THAT'S NO REASON TO KILL HIM.  IT'S THAT SIMPLE.  HE WAS

11   SURRENDERING.  HE DIDN'T RUN.  HE DIDN'T GET OUT WITH ANY

12   WEAPON ON HIM.  HE PUT HIS HANDS OUT THE WINDOW, HE GOT OUT

13   OF THE CAR, HE TURNED, HE PUT HIS HANDS UP.  THIS MAN WAS

14   SURRENDERING.  IF HIS HAND LOWERED, OKAY, MAYBE MARTINEZ

15   OVERREACTED AND SHOT HIM AND KILLED HIM.

16        YOU KNOW WHAT?  WHEN THAT HAPPENED, I CAN ASSURE

17   YOU THIS, AND THIS CAME OUT IN THE TESTIMONY, MARTINEZ SAID,

18   "I WAS SHOCKED AND STARTLED MYSELF."  EVERY SINGLE OFFICER

19   AND EVERY SINGLE PERSON ON SCENE WAS SHOCKED AND STARTLED

20   BECAUSE THEY COULDN'T BELIEVE THAT A MAN WAS JUST KILLED WHO

21   WAS SURRENDERING TO THE POLICE.  IT WAS SHOCKING AND

22   STARTLING, INCLUDING TO THE WITNESSES WHO TESTIFIED HERE, AND

23   YOU PROBABLY GOT THAT FEELING WHEN YOU LISTENED TO

24   MS. MEDEIROS AND MS. SCHIFF.  IT WAS SHOCKING AND STARTLING

25   TO SEE A MAN SURRENDERING SHOT AND KILLED.

```
 1          AND MR. ROTHANS SAID, WELL, IF I SHOWED YOU A VIDEO
 2   OF A 30-SECOND VIDEO, AND THEN I ASKED YOU ALL QUESTIONS AS
 3   TO WHAT YOU SAW, YOU ALL MIGHT HAVE SOME DIFFERENT THINGS.
 4   WELL, I HAVE TO AGREE WITH THAT.  IT'S PROBABLY TRUE THAT IF
 5   YOU WERE ASKED SPECIFIC ITEMS OF CLOTHING, YOU KNOW, YOU
 6   MIGHT GET IT A LITTLE BIT OFF LIKE MS. MEDEIROS DID, BUT YOU
 7   WOULD BASICALLY SAY, WELL, I SAW A PERSON STANDING THERE
 8   FACING THE OFFICERS, HIS HANDS WERE UP, THEY LOWERED A LITTLE
 9   BIT, AND HE WAS SHOT, AND NOTHING WAS IN HIS HANDS; THAT
10   PART, YOU WOULD REMEMBER.  IF YOU ALL SAW THAT FOR 10 OR
11   20 SECONDS, NOT ONE OF YOU IS GOING TO SAY, GEE, I SAW HIM
12   FACING AWAY FOR 20 SECONDS AND THEN SUDDENLY SPINNING WITH AN
13   OBJECT IN HIS HANDS.  IF ONE OF EIGHT OF YOU SAID THAT, THE
14   OTHER SEVEN WOULD BE, LIKE, DID YOU SEE THE SAME VIDEO THAT I
15   DID?
16          MEDEIROS AND COFIELD, WHAT'S IMPORTANT ABOUT THEM?
17   THEY'RE BOTH IN THE DONUT KING.
18          THEY'RE BOTH LOOKING OVER THE CAR.  THEY BOTH COULD
19   SEE HIS HANDS AT THE TIME OF THE SHOOTING.
20          HOW LOW COULD HIS HANDS HAVE BEEN IF THEY COULD SEE
21   THEM AND THERE'S A CAR IN BETWEEN?
22          NOBODY SAYS HE WAS REACHING IN CLOTHING OR IN HIS
23   POCKETS OR IN HIS WAISTBAND OR HAD WHAT APPEARED TO BE A GUN
24   IN HIS HAND.  YOU HEARD MS. SCHIFF -- YOU KNOW, EVERY
25   WITNESS, WHETHER IT WAS EXPLICIT OR IMPLICIT, IS BASICALLY
```

```
1    TRYING TO TELL YOU THIS WAS AN UNJUSTIFIED SHOOTING.  THE
2    OTHER OFFICERS DON'T WANT TO SAY THAT BECAUSE THEY WORK FOR
3    THE SAME DEPARTMENT, BUT THEY'VE GOT TO SAY I DIDN'T SEE A
4    THREAT, I DIDN'T SEE ANYTHING IN HIS HANDS, I DIDN'T SEE AN
5    IMMEDIATE DEFENSE OF LIFE, I DIDN'T SHOOT.  THE WITNESSES ARE
6    BASICALLY TELLING YOU I CAN'T BELIEVE THEY SHOT THE GUY.  BUT
7    THEY WANT YOU TO CONCLUDE THIS IS TOTALLY FINE.  IN FACT, ONE
8    OF THE DESCRIPTORS WERE THIS WAS -- "REALLY WENT SMOOTH."
9    THIS WAS A SMOOTH FELONY TRAFFIC STOP.
10          YOU KNOW, I WAS THINKING IN MY MIND IS THAT BEFORE
11   OR AFTER THE SHOTS HAPPENED?
12          HE WAS PATTED DOWN, NO GUN.  NO GUN IN THE CAR, NO
13   GUN.
14          THEY SAY, WHERE'S THE GUN?
15          IF THEY HAD SOME EVIDENCE OF A GUN, THEY SHOULD
16   PRODUCE IT.
17          YOU HEARD ABOUT THE ROBBERIES.  YOU KNOW, THIS IS A
18   DISTRACTION, LADIES AND GENTLEMEN.  WHAT THEY WANT YOU
19   BASICALLY TO DO -- THEY'RE SAYING, YOU KNOW WHAT?  WE KNOW
20   THIS IS A BAD SHOOTING.  WE KNOW HE SHOULDN'T HAVE BEEN SHOT;
21   HE WAS SURRENDERING, BUT JUST LOOK THE OTHER WAY.  HEY, THIS
22   GUY WAS COMMITTING ROBBERIES, BUT JUST -- WE'RE HOPING YOU
23   WILL GO BACK THERE AND FORGET ABOUT THE FACTS OF THE
24   SHOOTING.  BUT THAT'S NOT YOUR TASK.  THAT'S NOT YOUR ROLE.
25   THAT'S NOT WHAT THE LAW SAYS.
```

```
1              MAJORITY OF THE ARGUMENT IS NOT SPENT ABOUT WHAT
2    HAPPENED OUTSIDE THE CAR BECAUSE THAT DOESN'T HELP THEM.
3    THEY WANT TO TALK ABOUT ALL THE BULLETINS AND THE ROBBERIES.
4    AND IF SOMEONE STARTS TALKING ABOUT THAT, I HOPE SOMEONE WILL
5    REMIND THEM, WAIT A MINUTE, THAT'S NOT THE MAIN ISSUE IN THE
6    CASE BECAUSE EVERYBODY AGREES EVEN IF HE BELIEVED THIS WAS
7    THE GUY, YOU CAN'T SHOOT HIM.  YOU CAN'T SHOOT HIM IN THE
8    CAR.  YOU CAN'T SHOOT HIM GETTING OUT OF THE CAR.  YOU CAN'T
9    SHOOT HIM IF HE'S FACING YOU AND YOU COULD SEE HIS HANDS.
10   EVERYBODY AGREES ON THAT.
11             SO WHAT'S THE POINT OF GOING OVER ALL OF THOSE
12   BULLETINS?
13             20/20 VISION OF HINDSIGHT, YOU COULD SAY THAT ABOUT
14   EVERY CASE.  GEE, YOU CAN'T JUDGE A CASE BY 20/20 VISION OF
15   HINDSIGHT.  WELL, IF THAT'S TRUE, WHY HAVE JURIES?
16             BECAUSE A JURY HAS -- OR JUDGE HAS TO CONSIDER THE
17   EVIDENCE OF WHAT HAPPENED.  WE COULD TELL THE JUDGE, YOU
18   CAN'T DECIDE THE CASE EITHER, JUDGE, BECAUSE YOU'RE LOOKING
19   AT WITH 20/20 VISION OF HINDSIGHT.
20             WE TRIED TO PRESENT THE CASE TO YOU BASED ON THE
21   EVIDENCE THE OFFICER HAD AT THE TIME, INCLUDING FROM OTHER
22   OFFICERS' PERSPECTIVES.  HE SAID, WELL, WAS IT REASONABLE
23   TO -- AND I'M SAYING MR. ROTHANS -- WAS IT REASONABLE TO
24   THINK HE WAS ARMED AND DANGEROUS?
25             SO WHAT.  LET'S ASSUME HE THOUGHT HE WAS ARMED AND
```

1    DANGEROUS.  NOT ONE PERSON WILL COME UP HERE AND SAY, WELL,

2    YOU CAN SHOOT SOMEONE IF YOU THINK THEY'RE ARMED AND

3    DANGEROUS.

4         WHAT DIFFERENCE DOES IT MAKE THAT HE WAS A THREAT?

5    WHAT DIFFERENCE DOES IT MAKE?

6         THEY CONCEDE THEMSELVES IN THE CAR, EVEN WHEN HIS

7    HANDS GO OUT OF VIEW, EVEN WHEN YOU CAN'T SEE HIS HANDS, EVEN

8    WHEN YOU THINK HE MIGHT HAVE BEEN REACHING FOR A WEAPON, YOU

9    CAN'T SHOOT HIM.

10        THE CONDUCT OF MR. GRISSOM -- LET'S COMPARE THE

11   CONDUCT OF MR. GRISSOM TO MARTINEZ.  WELL, THAT'S NOT WHAT

12   THE JURY INSTRUCTIONS ASKED YOU TO DO.  YOU WILL NOT SEE ONE

13   JURY INSTRUCTION THAT SAYS, IF YOU THINK MR. GRISSOM

14   COMMITTED A ROBBERY THAT IT'S OKAY TO SHOOT HIM.

15        THE QUESTION IS:  AT THE MOMENT THE SHOTS WERE

16   FIRED, WAS IT AN IMMEDIATE DEFENSE OF LIFE?

17        IF MR. GRISSOM HAD A GUN IN HIS HAND, DIFFERENT

18   CASE; BUT NOT SHOOTING AN UNARMED MAN WHO IS SURRENDERING.

19   CREDIBILITY.

20        AND, BY THE WAY, I THINK MR. ROTHANS SAID, WELL, I

21   BEEN LIVING WITH THIS CASE FOR THREE YEARS.  WELL, IT

22   PROBABLY IS TRUE BECAUSE WE KNOW HE WAS AT THE SCENE THE DAY

23   OF THE INCIDENT.

24        AGAIN, HOW MUCH OF THIS IS WHAT REALLY HAPPENED AND

25   HOW MUCH IS ATTORNEY-GENERATED?

```
1          SPLIT-SECOND DECISION, OH, GEE, OFFICER MARTINEZ

2    HAD TO MAKE A SPLIT-SECOND DECISION.  YOU COULD SAY THAT

3    ABOUT EVERY SHOOTING.  YOU COULD SAY THAT IN EVERY MURDER

4    CASE.  OH, GEE, THEY KILLED AN UNARMED MAN, BUT IT'S OKAY

5    BECAUSE THEY DID IT IN A SPLIT SECOND.  SO.

6          WHETHER HE SHOT HIM WITH THE MP5 AND THE

7    THREE-ROUND BURST, OR WHETHER HE SHOT HIM TWO OR THREE TIMES

8    WITH A SEMI-AUTOMATIC HANDGUN, IT WOULD STILL BE EXCESSIVE.

9    IT DOESN'T MATTER.  IF ALL OF THOSE OFFICERS WITH A

10   SEMIAUTOMATIC COULD FIRE TWO OR THREE SHOTS WITHIN A SECOND,

11   THEY DIDN'T EVEN FIRE ONE, AND THE REASON IS, THERE WAS NO

12   IMMEDIATE DEFENSE OF LIFE.

13         CREDIBILITY, THERE WAS A MENTION ABOUT CREDIBILITY.

14   I'D LIKE TO TALK FOR A SECOND ABOUT THE CREDIBILITY OF

15   OFFICER MARTINEZ, AND YOU THINK ABOUT HOW CREDIBLE THESE

16   STATEMENTS ARE THAT MR. GRISSOM WAS FACING AWAY FROM HIM FOR

17   10 OR 20 SECONDS.  ANYBODY ELSE SAY THAT?

18         NO.

19         HIS HAND WAS CUPPED.

20         ANYONE ELSE SAY THAT?

21         NO.

22         AND I'M TALKING ABOUT EIGHT WITNESSES, FIVE

23   OFFICERS, THREE PERCIPIENTS.

24         HE HAD AN OBJECT IN HIS HAND.

25         ANYONE ELSE SAY THAT?
```

```
1              NO.

2              HE RAPIDLY SPUN TO THE RIGHT AND WAS SHOT WITHIN A

3     SECOND.

4              ANYONE ELSE SAY THAT?

5              NO.

6              HE SAYS THERE WERE NO COMMANDS GIVEN TO HIM AFTER

7     HE EXITED THE CAR, THAT'S DISPUTED BY OTHER POLICE OFFICERS.

8     HE DOESN'T RECALL HEARING ANY DISCUSSION ON THE SEAT BELT.

9     HE NEVER TOLD ANYONE AT THE SCENE ABOUT SEEING ANY OBJECT IN

10    HIS HANDS.  HE TELLS SOMEONE FOR THE FIRST TIME ABOUT A PHONE

11    A YEAR LATER.  NEVER MENTIONS IT IN HIS STATEMENT.  TRIES TO

12    TELL YOU UNDER OATH HERE HE SAW SOMETHING COMING OUT OF HIS

13    HANDS, AND THEN WE HAD TO IMPEACH HIM WITH THE SWORN

14    TESTIMONY UNDER OATH.  CLAIMS HE WAS NOT FATIGUED AT ALL, BUT

15    FOUR HOURS LATER HE WAS SO EXHAUSTED HE COULDN'T GIVE A

16    STATEMENT, AND HE HAS A COMPLETELY DIFFERENT STORY THAN

17    ANYONE ELSE.  COMPLETELY DIFFERENT STORY.  AND IF YOU'RE

18    GOING TO JUDGE CREDIBILITY, I WOULD SUBMIT HE HAS THE MOST

19    CREDIBILITY PROBLEMS IN THIS CASE.

20             FEW OTHER POINTS I'D LIKE TO POINT OUT.  WAS THE

21    PHONE PLANTED?

22             I NEVER SAID THE PHONE WAS PLANTED.  I THINK WHAT

23    THE EVIDENCE STRONGLY SUGGESTS IS CLEARLY THE PHONE WASN'T IN

24    HIS HAND WHEN HE WAS SHOT.  MR. GRISSOM WAS AS CLOSE TO THE

25    POLICE OFFICERS AS I AM TO YOU.  IF I HAD A PHONE IN MY HAND
```

1   WITH MY HANDS UP, LOOKING AT YOU AND YOU'RE LOOKING RIGHT AT

2   MY HANDS FOR 10 OR 20 SECONDS, IS THERE ANY WAY YOU'RE NOT

3   GOING TO SEE THE PHONE?

4           HE DIDN'T HAVE A PHONE IN HIS HAND.  THAT'S MADE

5   UP.  THAT'S SIMPLY MADE UP.

6           I'M NOT SUGGESTING THAT WASN'T HIS PHONE.  I DON'T

7   KNOW IF IT CAME FROM IN THE CAR, HOW IT GOT THERE.  I DON'T

8   KNOW HOW IT ENDED UP UNDER THE CAR AND THEN OUT OR WHERE IT

9   WAS.  I KNOW IT'S NOT SILVER, AND I KNOW IT DOESN'T LOOK LIKE

10  A GUN.  SO THAT'S ANOTHER CREDIBILITY PROBLEM FOR OFFICER

11  MARTINEZ WHEN HE SAYS IT WAS SILVER, AND I SAW THAT SILVER

12  PHONE UNDERNEATH THE CAR.

13          ADRENALIN, I'M SURE ADRENALIN WAS PUMPING, SURE,

14  BUT THAT DOESN'T MEAN YOU SHOOT AND KILL SOMEONE.  OFFICERS

15  ARE SUPPOSED TO BE TRAINED TO CONTROL THEIR FEAR, CONTROL IT.

16          PERHAPS -- PERHAPS, IF SHOTS WERE FIRED

17  UNNECESSARILY AND THEY WERE UNNECESSARY HERE AND TWO OR THREE

18  CHILDREN WERE KILLED, IT'S NOT JUST FOR THE BENEFIT OF

19  MR. GRISSOM AND HIS CHILDREN WHO LOST THEIR FATHER, IT'S FOR

20  THE BENEFIT OF ALL OF US THAT SHOTS ARE NOT UNNECESSARILY

21  FIRED, AND THAT'S WHAT HAPPENED HERE.

22          ALTERNATIVES, THERE WERE A LOT OF ALTERNATIVES.

23  GEE, WHAT ALTERNATIVES WERE THERE, AS TO SUGGEST THE ONLY

24  ALTERNATIVE WAS TO KILL HIM?

25          GIVE HIM A COMMAND?  WAIT TILL HE HAS A CHANCE TO

```
1    COMPLY WITH THE OTHER COMMANDS IF THEY WERE SAYING PUT YOUR

2    HANDS UP AGAIN?  GIVE HIM A WARNING?  HOLD YOUR FIRE?  A LESS

3    THAN LETHAL OPTION?  SOMETHING.

4         COMMON SENSE, MR. ROTHANS MENTIONED THAT.  I

5    MENTIONED IT.  I THINK IF YOU, LADIES AND GENTLEMEN, AND I

6    KNOW YOU'RE AN INTELLIGENT GROUP, USE YOUR COMMON SENSE, IT'S

7    PRETTY OBVIOUS THAT HE DIDN'T HAVE ANYTHING IN HIS HANDS AND

8    HE WAS SURRENDERING WHEN HE WAS SHOT.  WHETHER HIS HANDS CAME

9    DOWN A LITTLE BIT OR NOT, IT DOESN'T MATTER.  ALL THE EXPERTS

10   HAVE SAID YOU CAN'T SHOOT SOMEONE FOR THAT REASON AND THAT'S

11   WHY THE OTHER OFFICERS DIDN'T SHOOT.

12        NOW, I TOLD YOU I HAVE A LIST.  I WANT TO GIVE IT

13   TO YOU, AND SOME OF THIS HAS BEEN SAID.  THE FIRST QUESTION

14   ON THE VERDICT FORM -- AND, BY THE WAY, I DO WANT TO SAY ONE

15   THING BEFORE I FORGET.  IN HER FIRST STATEMENT, MS. COFIELD

16   SAYS -- THE QUESTION IS:  "YOU SAW HIM DROP HIS HANDS A

17   LITTLE BIT?"  AND THE ANSWER IS:  "YES."  THAT'S THEIR

18   GREATEST WITNESS, WHO DIDN'T EVEN APPEAR IN COURT TO TESTIFY

19   BEFORE YOU.  WE HAD TO GET THAT.  DROPPED HIS HANDS A LITTLE

20   BIT, YES.  EVERY OFFICER AND EXPERT AGREES YOU CAN'T SHOOT

21   SOMEONE FOR THAT REASON.

22        NOW, WHETHER HE WAS CONFUSED OR STARTING TO GET

23   DOWN OR TURNING, YOU CAN'T SHOOT SOMEONE FOR THAT.  NOT IN

24   BROAD DAYLIGHT WHEN YOU CAN SEE HIS HANDS AND NOTHING IN HIS

25   HANDS.  THIS IS NOT LIKE IT HAPPENED IN A DARK ALLEY AND ONE
```

1    SECOND WAS, GEE, I THOUGHT THE GUY HAD A GUN IN HIS HANDS.

2           ALL RIGHT.  HERE'S SOME OF THE REASONS THE FORCE

3    WAS EXCESSIVE AND I WOULD SUBMIT WHY YOUR ANSWER TO QUESTION

4    NUMBER 1 SHOULD BE "YES.  AND I WOULD SUGGEST IF YOU'RE DOING

5    THE SCALES OF JUSTICE IN THIS CASE, ONCE YOU GET PAST THE

6    ROBBERIES, WHICH YOU SHOULD, BECAUSE THAT DOES NOT -- THAT

7    DOESN'T JUSTIFY KILLING SOMEONE, IT'S 90 PERCENT IN FAVOR OF

8    THE PLAINTIFFS.

9           FIRST, THERE WAS DEADLY FORCE USED; HIGHEST LEVEL

10   HAS TO BE LIFE-THREATENING IMMEDIATELY AT THE TIME IT'S USED.

11   THERE WERE NO COMMANDS GIVEN BY OFFICER MARTINEZ.  THERE WAS

12   NO WARNING THAT HE WAS GOING TO SHOOT.  THERE WAS NO OBJECT

13   IN MR. GRISSOM'S HAND.  HE WASN'T RAPIDLY SPINNING AT THE

14   TIME.  HIS HANDS WERE VISIBLE AND NOTHING WERE IN HIS HANDS.

15   HE NEVER PUT HIS HAND IN HIS WAISTBAND.  HE NEVER PUT HIS

16   HANDS IN HIS POCKET.  HE NEVER PUT HIS HAND IN HIS CLOTHING.

17   YOU GOT ROGER CLARK'S TESTIMONY THAT SAYS IT WAS CLEARLY

18   UNJUSTIFIED.  EVEN IF IT HAPPENED THE WAY OFFICER MARTINEZ

19   SAID IT DID, IT WAS UNJUSTIFIED.  YOU GOT CHAPMAN'S TESTIMONY

20   THAT ADMITS IF THE HANDS LOWERED, IT WAS EXCESSIVE, IF THAT'S

21   ALL THAT HAPPENED.

22          THERE WAS NO GUN.  THERE WAS NOTHING THAT LOOKED

23   LIKE A GUN.  NO IMMEDIATE DEFENSE OF LIFE.  ZERBEY DIDN'T SEE

24   AN IMMEDIATE DEFENSE OF LIFE, HE DIDN'T SHOOT.  LOPEZ DIDN'T

25   SHOOT.  FAIRBANKS DIDN'T SHOOT.  BROWN DIDN'T SHOOT.  MOORE'S

1   TESTIMONY CONTRADICTS MARTINEZ, YOU CAN'T SHOOT SOMEONE EVEN

2   IF THEY HAD A CELL PHONE IN THEIR HAND.  THERE WERE OTHER

3   OPTIONS.  HE'S SHOOTING CENTER MASS, BASICALLY TO KILL.  NO

4   WARNING SHOT; CENTER MASS TO KILL.

5         THE BACKGROUND, MEDEIROS' TESTIMONY, SCHIFF'S

6   TESTIMONY, AND EVEN COFIELD'S TESTIMONY, THEIR WITNESS, HANDS

7   DROPPING A LITTLE BIT.  HE HAD COVER.  HE HAD A BULLETPROOF

8   VEST.  HE HAD A VEHICLE AND A DOOR PANEL.  HE HAD COVER.  HE

9   COULD HAVE GIVEN HIM A WARNING.  HE COULD HAVE HELD HIS FIRE.

10        THERE WERE ACTS OF COMPLIANCE.  HE WAS

11  SURRENDERING.  THERE WERE MULTIPLE COMMANDS.  THERE WAS NO

12  VERBAL THREAT EVER BY MR. GRISSOM, AND EVERYONE WAS STARTLED

13  AND SHOCKED, OF COURSE, THAT IT HAPPENED.

14        THE LAST THING I WANT TO ADDRESS AND THEN MR. MC

15  NICHOLAS, I BELIEVE, WANTS TO ADDRESS SOME POINTS AS YOU GET

16  TO DAMAGES.  MR. ROTHANS DIDN'T GIVE A NUMBER.  HE DIDN'T SAY

17  OUR NUMBER WAS INAPPROPRIATE.  HE DIDN'T GIVE ONE.  HE DIDN'T

18  GIVE ONE.  BUT I CAN TELL YOU THIS:  THERE IS NO GREATER LOSS

19  FOR A CHILD THAN TO LOSE THEIR PARENT.  THESE CHILDREN LOVED

20  THEIR FATHER.  THEY'RE GOING TO MISS HIM EVERY DAY OF THEIR

21  LIFE.  WE HAVEN'T HAD THEM INSIDE THE COURTROOM ALL THE TIME,

22  BUT BELIEVE ME, TRAUMATIC, EMOTIONAL, UNBELIEVABLE LOSS,

23  UNBELIEVABLE LOSS.  ALL THE CHILDREN.

24        MR. ROTHANS SAID, WELL, YOU KNOW, I DON'T KNOW WHAT

25  THE COMMENT WAS, JUSTICE IN, JUSTICE, NO JUSTICE AT ALL.  THE

1    RIGHT THING TO DO IN THIS CASE BASED ON THE LAW AND BASED ON

2    THE EVIDENCE THAT YOU HAVE HEARD IS FOR THE FINDING TO BE IN

3    FAVOR OF THE PLAINTIFFS.  THAT'S THE RIGHT THING TO DO.  THAT

4    THE FORCE WAS EXCESSIVE.  AND THEN YOU AWARD WHATEVER DAMAGES

5    YOU THINK ARE APPROPRIATE.

6         I WANT TO THANK YOU VERY MUCH FOR ALL YOUR TIME AND

7    ATTENTION TO THE CASE, AND PARTICULARLY THANK YOU ON BEHALF

8    OF THE CHILDREN.  THANK YOU.

9         MR. MC NICHOLAS:  GOOD AFTERNOON.

10        IN HIS CLOSING, MR. ROTHANS DID HARP, AS MR. GALIPO

11   INDICATED, ABOUT 45 MINUTES OF IT ON EVERYTHING BEFORE

12   MR. GRISSOM GETS OUT OF THE CAR.

13        WHY?

14        IT'S TO CONFUSE AND COMPLICATE, IT'S MISDIRECTION,

15   IT'S TO TAKE YOUR ATTENTION FROM WHERE IT SHOULD BE.

16        YOU LOOKED AT THIS SLIDE AND I'M GOING TO SHOW YOU

17   AGAIN BECAUSE THE POLICE PULLED HIM OVER, IT'S A FELONY

18   TRAFFIC STOP, WE AGREE WITH THAT, BUT THEY ALSO AGREE YOU

19   CAN'T SHOOT HIM.  ANY CHANCE HE WANTS TO TAKE HIS SEAT BELT

20   OFF, WELL, THAT'S FINE, BUT THEY AGREE YOU CAN'T SHOOT HIM.

21   THEN HE SAYS THE DOOR IS BROKE AND HAS HANDS OUT THE WINDOW,

22   BUT THEY AGREED YOU CAN'T SHOOT HIM.  THEN HE OPENS THE DOOR

23   PURSUANT TO COMMANDS AND THEY AGREE YOU CAN'T SHOOT HIM.

24   THEN HE STEPS OUT, AND THEY AGREE YOU CAN'T SHOOT HIM.  AND

25   THEN THEY AGREE THAT HIS HANDS WERE EMPTY AND YOU CAN'T SHOOT

1    HIM.  EVERY STEP OF SURRENDER, YOU CAN'T SHOOT HIM.  YOU

2    CAN'T SHOOT.  YOU CAN'T SHOOT HIM.

3              AND THEN MARTINEZ LET'S FLY THREE BULLETS BECAUSE

4    HE THINKS HE SEES SOMETHING THAT NOBODY SEES.  NOBODY BUT

5    HIM.

6              NOW, THEY TALK ABOUT MS. COFIELD, AS THIS WONDERFUL

7    WITNESS.  WELL, HERE'S A FEW INTERESTING THINGS.  WHEN THEY

8    PLAYED YOU HER STATEMENTS THEY SWITCHED THE ORDER AND MR.

9    GALIPO ACTUALLY HAD TO GET UP AND COMMENT ON THAT.

10             THE COURT:  WELL, I WILL SAY, COUNSEL, THAT, IN

11   PART, AT LEAST, WAS CERTAINLY MY DECISION OR MY FAULT BECAUSE

12   OF THE EXHIBIT NUMBERS BEING 362 AND 364.  I DON'T THINK IT

13   REALLY IS -- THE FACT THAT THEY WERE NOT PLAYED IN THE

14   CORRECT ORDER IS TRUE.  I DON'T THINK IT'S FAIR TO ASCRIBE

15   THAT TO EITHER PARTY.

16             MR. MC NICHOLAS:  FAIR ENOUGH.

17             THE COURT:  SORRY TO INTERRUPT YOU.

18             GO AHEAD.

19             MR. MC NICHOLAS:  BUT THE FIRST STATEMENT WHERE

20   SHE'S UNDER THE STRESS OF THE INCIDENT, SHE SAYS HIS HANDS GO

21   DOWN A LITTLE BIT.  IN THE SECOND STATEMENT, HOURS LATER,

22   WHERE EVERYBODY'S LAUGHING -- THEY'RE LAUGHING.  THEY'RE

23   TALKING ABOUT THEIR BIRTHDAYS.  WE HAVE THE SAME BIRTHDAY.

24   WHERE SHE'S ASKED LEADING QUESTIONS.  REMEMBER SCHIFF WHEN

25   SHE SAID THEY KEPT ASKING YOU, WELL, DID HE DROP HIS HANDS?

1    DID HE DROP HIS HANDS?  DID HE DROP HIS HANDS AND GO FOR

2    SOMETHING?  DID HE DROP HIS HANDS?  THEY KEPT GOING BACK TO

3    IT, AND BACK TO IT, AND BACK TO IT BECAUSE THAT'S WHAT THEY

4    WANT THEM TO SAY.

5          NOW, KEEP IN MIND, I THINK IT WAS MR. MARTINEZ

6    TESTIFIES THAT HE -- HE TESTIFIED THAT HE HAS TESTIFIED AT

7    LEAST FIFTY TIMES.  NOTHING ON CIVIL MATTERS.  THEY'RE ON

8    CRIMINAL MATTERS, BUT THEY ARE PROFESSIONAL WITNESSES.  IT IS

9    PART AND PARCEL OF THEIR DUTY; MEANING, WHEN YOU ARREST

10   SOMEBODY AND YOU -- THEY ARE BOOKED AND THE D.A. DECIDES TO

11   CHARGE THEM, YOU HAVE TO SHOW UP AS THE POLICE OFFICER, AND

12   YOU TESTIFY ABOUT PROBABLE CAUSE AND WHAT YOU SAW.  YOU ARE A

13   PROFESSIONAL WITNESS.  WHICH GOES INTO THE POINT OF IF MR.

14   ROTHANS SHOWED YOU 30 SECONDS OF A TAPE OF THIS INCIDENT,

15   YOU'LL SEE THINGS DIFFERENTLY, PROBABLY, BUT YOU ARE NOT

16   TRAINED POLICE OFFICERS.  AS IS UNDISPUTED IN POST TRAINING,

17   THEY MUST BE ABLE TO ARTICULATE THE OBJECTIVE VERIFIABLE

18   FACTS THAT CAUSED THEM TO KILL SOMEBODY.

19          FOR THE SAME REASON THAT IF I GAVE YOU 30 SECONDS

20   OF A VIDEO CLIP OF A COCKPIT OF A 747 AT 40,000 FEET AND I

21   ASKED YOU TO TELL ME WHAT THE PILOTS ARE DOING, YOU WOULDN'T

22   KNOW BECAUSE YOU'RE NOT A TRAINED PILOT.  OR IF I PUT YOU

23   BEHIND A LOCOMOTIVE GOING 50 MILES AN HOUR HAULING 180 BOX

24   CARS, AND I SAID, "TELL ME WHAT YOU'RE SEEING IN THE CONTROL

25   BOOTH."  WELL, YOU'D SEE KNOBS, BUT THAT'S BECAUSE YOU'RE NOT

1    A TRAINED ENGINEER OR A CONDUCTOR.

2           THE TRAINED POLICE OFFICERS ARE TRAINED TO OBSERVE,

3    DOCUMENT, OBSERVE, DOCUMENT.  SO IT IS AN UNFAIR COMPARISON

4    TO SAY IF HE WERE TO SHOW YOU THE INCIDENT THAT YOU'D RECALL

5    THINGS DIFFERENTLY.

6           NOW, MR. ROTHANS ALSO SAID THAT BRITTANY SCHIFF WAS

7    THE ONLY ONE WHO SAID SHE HEARD A COMMAND TO TURN AROUND.

8    THAT'S NOT TRUE.  OFFICER DERRICK BROWN ALSO SAID HE HEARD A

9    COMMAND TO TURN AROUND ON THAT WITNESS STAND.

10          NOW, REGARDING THE CELL PHONE, AND I KNOW MR.

11   GALIPO TOUCHED ON THIS, BUT IT IS NOT POSSIBLE TO HAPPEN THE

12   WAY MR. ROTHANS IS SUGGESTING.  NOW, YOU REMEMBER DURING THE

13   TRIAL HE ASKED A LOT OF QUESTIONS ABOUT, WELL, COULD YOU SEE

14   UNDER THE PERSON'S BODY?  HE'S A BIG MAN, COULD YOU SEE UNDER

15   THE PERSON'S BODY?

16          WELL, NOW, IT'S CHANGED TO, WELL, HE PROBABLY

17   DRAGGED IT OUT.  NO.  OFFICER BROWN GRABBED HIS HANDS, PULLED

18   HIM OUT.  HE'S WATCHING IT.  THERE ARE OTHER OFFICERS THAT

19   ARE STANDING THERE COVERING HIM.  REMEMBER, SHOTS WERE FIRED.

20   IF THE BODY GOES DOWN HERE (INDICATING) IN THIS ORIENTATION,

21   OFFICER FAIRBANKS IS ABOUT THERE (INDICATING), HE PUSHES

22   FORWARD.  HE'S HERE (INDICATING).

23          DON'T FORGET I ASKED TIMING SEQUENCE AFTER THE

24   SHOTS WERE FIRED WHEN THEY GO TO EXTRICATE THE DRIVER, IT'S A

25   MINUTE TO TWO MINUTES BEFORE THEY COME BACK OVER; RIGHT?  SO

```
 1   THAT MEANS THAT THERE'S FAIRBANKS, TWO MINUTES LOOKING,

 2   MAKING SURE HE'S NOT REACHING FOR SOMETHING.

 3           WHY DIDN'T HE SEE IT?

 4           MAYBE HIS BODY IS BLOCKING IT.  WELL, HE'S STILL

 5   COVERING HIM WHILE THEY'RE PULLING HIM OUT, AND THEN THEY'RE

 6   STILL COVERING HIM WHILE THEY FLIP HIM ONTO AND HIP AND FLIP

 7   HIM BACK ONTO HIS BACK AND FLIP ONTO HIS OTHER HIP, AND FLIP

 8   HIM BACK ONTO HIS BACK.  IT'S NOT POSSIBLE THAT WAY.

 9           NOW, BRITTANY SCHIFF ALSO SAID THEY WERE YELLING

10   FROM EVERYWHERE.  HE SAYS THEY YELLED AT HIM TO TURN AROUND,

11   SO THAT'S TWO WITNESSES THAT SAID THEY HEARD TURN AROUND.  IT

12   IS NOT MATERIAL OTHER THAN THE FACT PEOPLE ARE YELLING

13   DIFFERENT THINGS AND THE OFFICERS ARE NOT COMMUNICATING WITH

14   EACH OTHER AND THEY'RE NOT HEARING WHAT THE OTHERS ARE SAYING

15   AND NOBODY HEARS THEM SAY, "MY SEAT BELT IS ON," AND NOBODY

16   HEARS ZERBEY SAY, "TAKE YOUR SEAT BELT OFF."  CONFLICTING

17   COMMANDS.

18           NOW, EXHIBIT 8 WAS SHOWN TO YOU BY MR. ROTHANS AS

19   MARTINEZ HAD THE BEST VANTAGE POINT.  REMEMBER THIS

20   (INDICATING), HE HAS THE BEST VANTAGE POINT.  I GUESS THAT

21   MEANS THAT CAUSES HIM TO SEE SOMETHING THAT DOES NOT OCCUR,

22   BECAUSE THE OTHER FIVE WELL-RESTED OFFICERS SAW SOMETHING

23   TOTALLY DIFFERENT THAN HE DID.  BUT I'M GOING TO SHOW YOU

24   THIS (INDICATING) PICTURE FROM ABOUT WHERE HE WAS STANDING.

25           AND WHAT DO YOU SEE STRAIGHT IN FRONT OF YOU?
```

1        THAT'S WHERE OFFICER ZERBEY WAS STANDING.  THIS

2   (INDICATING) IS WHERE OFFICER ZERBEY WAS STANDING.  HE HAS

3   THE BEST LINE OF SIGHT.  OFFICER MARTINEZ IS SOMEWHERE OVER

4   HERE (INDICATING) IN THE APEX OF THAT DOOR WITH SOME

5   OBSTRUCTION FROM THE VEHICLE.  ZERBEY, BROWN, LOPEZ,

6   UNOBSTRUCTED VIEW.  AND DON'T FORGET FAIRBANKS WAS OFF TO THE

7   SIDE AND HE SAYS HE HAS AN UNOBSTRUCTED VIEW.  HE DOES NOT

8   HAVE THE GREEN SEBRING.

9        WELL, WHEN THEY TELL YOU THAT MARTINEZ HAS THE BEST

10  VANTAGE POINT, IT IS THE ABSOLUTE OPPOSITE.  HE HAD THE WORST

11  VANTAGE POINT.

12       NOW, THEY'RE CRITICAL OF ROGER CLARK BECAUSE HE

13  TAKES BUSINESS ON BEHALF OF PEOPLE WHO ARE SHOT OR BEATEN BY

14  POLICE OFFICERS.  CLARENCE CHAPMAN, HOWEVER, SAID HE HAS

15  WORKED UP TO 20 TIMES FOR THIS ONE LAWYER IN HIS FIRM.  HE

16  ADMITTED THAT HE CHARGED $12,000 IN THIS CASE.  THAT MEANS

17  THIS FIRM ALONE HAS PAID HIM A QUARTER OF A MILLION DOLLARS.

18  MR. CHAPMAN DOES NOT WANT TO CROSS THE THIN BLUE LINE OF

19  SILENCE, BUT MR. CLARK DID.  HE'S WILLING TO COMMENT ON HIS

20  OWN.  THAT SHOULD BE COMMENDED, NOT CHASTISED.

21       BUT, NONETHELESS, MR. CHAPMAN AS MR. GALIPO POINTED

22  OUT SAID, IF YOU BELIEVE IT THE WAY ZERBEY SAW IT, YOU DON'T

23  SHOOT.  IF YOU BELIEVE IT THE WAY FAIRBANKS SAW, YOU DON'T

24  SHOOT.  IF YOU BELIEVE IT THE WAY BROWN SAW IT, YOU DON'T

25  SHOOT.  WE'LL LET YOU DECIDE WHICH OF THOSE PEOPLE YOU

1   BELIEVE.

2           NOW, MR. ROTHANS IS CRITICAL THAT THERE WAS NO GUN

3   FOUND AT THE SCENE -- SORRY, MR. GALIPO AND I KNOW THE FAMILY

4   SEARCHED THE SCENE.  THAT WASN'T OUR JOB.  WE DIDN'T SEARCH

5   HIS BODY ON THE GROUND.  WE DIDN'T PUT OUR HANDS IN HIS

6   POCKETS.  WE DIDN'T SEARCH HIS CAR.  SORRY.

7           THERE WAS NO GUN FOUND AT THE SCENE, SORRY.

8           HE SAYS THAT THE OFFICERS WEREN'T ASKED QUESTIONS

9   ABOUT A T-SHIRT OR A BLOOD.  AGAIN, MISDIRECTION.  BUT HE

10  DOES SAY, WHICH IS AMAZING TO ME, THAT MARTINEZ WAS ASKED

11  WHAT HAPPENED THAT LED YOU TO SHOOT?

12          WELL, REMEMBER, I CROSS-EXAMINED HIM, AND IN HIS

13  DEPOSITION HE SAID, "I SAW THAT CELL PHONE AND IT WAS

14  ABSOLUTELY IMPORTANT," QUOTE, "ABSOLUTELY IMPORTANT," BECAUSE

15  THAT'S THE REASON I SHOT.  SO WHEN HE'S ASKED THIS QUESTION,

16  AS MR. ROTHANS HAS SAID HE WAS ASKED, WHAT HAPPENED THAT LED

17  YOU TO SHOOT?  WHY DIDN'T HE SAY, "DETECTIVE, I SAW THE SHINY

18  THING.  THEN WHEN I PUSHED UP TO HIM UP, I SAW THE CELL

19  PHONE."  THAT'S WHAT IT WAS, WHICH IS ALSO WHY IN AN

20  ABUNDANCE OF CAUTION THE INVESTIGATORS ALWAYS ASK THE WRAP-UP

21  QUESTION:  IS THERE ANYTHING THAT YOU THINK THAT'S IMPORTANT,

22  IN YOUR MIND, THAT WE HAVEN'T TALKED ABOUT?  AND MARTINEZ

23  ADMITTED THE CELL PHONE WAS ABSOLUTELY IMPORTANT AND THAT IT

24  WAS RESPONSIVE TO THAT QUESTION.

25          NOW, A COUPLE COMMENTS ON DAMAGES AND THEN I'LL SIT

```
 1    DOWN.  WHILE MS. KHANDI ROSE IS NOT MY CLIENT, I AM A LITTLE

 2    TAKEN ABACK BY THE POTENTIAL ASPERSION THAT WHY DIDN'T SHE

 3    TAKE THE STAND.  AND I CAN SAY ON BEHALF OF THOSE PLAINTIFFS

 4    THAT THEY'RE OLD ENOUGH TO TESTIFY, WHICH IS WHY THEY DID.

 5    BUT KAILYNN IS THREE AND SHE'S NOT OLD ENOUGH TO TESTIFY.

 6              YOU REMEMBER HIS HONOR ASKED ONE OF THE KIDS A

 7    QUESTION:  DO YOU KNOW THE DIFFERENCE BETWEEN LYING AND

 8    TELLING THE TRUTH?  WELL, THAT'S HIS JOB AS GATEKEEPER TO

 9    MAKE SURE THAT, WHEN YOU'RE YOUNG LIKE THAT, YOU KNOW THE

10    DIFFERENCE THAT YOU CAN TESTIFY.  SO THESE THREE CHILDREN ARE

11    OLD ENOUGH TO TALK ABOUT THEIR OWN EXPERIENCE, THAT'S WHY

12    THEY TESTIFIED.  THAT'S THE REAL EVIDENCE.  I CAN'T PUT A

13    THREE-YEAR OLD ON THE STAND, SO I HAVE TO PUT HER MOTHER ON.

14    THAT'S WHY KHANDI ROSE DIDN'T TESTIFY.

15              AND, FINALLY, WHEN MR. ROTHANS TALKS ABOUT DAMAGES

16    AND SEEMS TO IMPLY THAT ONE -- WELL, LET'S BACK UP.  HE

17    STATED THAT THE DAMAGES HAVE TO BE REASONABLE TO BE CERTAIN

18    AS TO THE AMOUNT, NOT TRUE.  DAMAGES HAVE TO BE REASONABLY

19    CERTAIN TO HAVE BEEN INCURRED, HAPPENED.  THE AMOUNT DOES NOT

20    HAVE TO BE REASONABLY CERTAIN.  WHAT'S CLEAR IS THE DAMAGE

21    WAS REASONABLY CERTAIN TO HAVE HAPPENED; MEANING, HE'S DEAD.

22              IT'S NOW WITHIN YOUR PROVINCE TO ADJUST THAT

23    THROUGH THE EYES OF A CHILD WALKING THROUGH LIFE.  AND WHEN I

24    SAY, "WALKING THROUGH LIFE," PLEASE, DON'T FOLLOW THE

25    CONTINUED ASPERSIONS BY MR. ROTHANS THAT HE WOULD HAVE BEEN
```

1    CONVICTED OF SOMETHING.  THERE'S ONLY ONE PERSON THAT CAME

2    INTO THIS COURTROOM THAT SAID HE'S ABSOLUTELY SURE THAT THIS

3    WAS THE ROBBER AND THIS IS THE MAN THAT SHOT AND KILLED HIM.

4         IT'S NOT A CRIMINAL TRIAL.  HE WAS SURRENDERING AND

5    HE WAS SHOT AND IT IS ARROGANT TO SAY, WELL, HE PROBABLY

6    WOULD HAVE GONE TO JAIL ANYWAY.  SORRY, YOU DON'T GET TO BE

7    JUDGE, JURY AND EXECUTIONER.  THERE'S THE JUDGE, THERE'S THE

8    JURY.  YOU DECIDE THE FACTS.

9         AND MY FINAL COMMENT, AS MR. GALIPO SAID -- IN LINE

10   WITH WHAT MR. GALIPO SAID, IS MR. GALIPO RECOMMENDED SOME

11   NUMBERS.  I AGREED WITH HIS RECOMMENDATIONS.  MR. ROTHANS IS

12   A SKILLED TRIAL LAWYER AND THE REASON HE DID NOT PROVIDE

13   ALTERNATIVE NUMBERS IS BECAUSE HE KNOWS THAT THE NUMBERS WE

14   SUGGESTED WERE IMMINENTLY REASONABLE FOR THE LOSS A FATHER,

15   FOUR LITTLE KIDS WHO THROUGH THEIR EYES DAD WEARS A AN S ON

16   HIS CHEST.  IT'S JUST THE WAY IT IS.

17        THANK YOU VERY MUCH.

18        THE COURT:  LADIES AND GENTLEMEN, WHEN YOU BEGIN

19   YOUR DELIBERATIONS, YOU SHOULD ELECT ONE MEMBER OF THE JURY

20   AS YOUR PRESIDING JUROR.  THAT PERSON WILL PRESIDE OVER YOUR

21   DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.  YOU WILL THEN

22   DISCUSS THE CASE WITH YOUR FELLOW JURORS TO REACH AGREEMENT

23   IF YOU CAN DO SO.  YOUR VERDICT MUST BE UNANIMOUS.  AND,

24   LADIES AND GENTLEMEN, WHAT THAT MEANS HERE IS ON THE SPECIAL

25   VERDICT FORM THERE'S SOME QUESTIONS, YOUR ANSWERS TO EACH OF

1    THOSE QUESTIONS MUST BE UNANIMOUS.

2            EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT

3    YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE

4    EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

5    LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.  DO NOT HESITATE

6    TO CHANGE YOUR OPINION IF THE DISCUSSION PERSUADES YOU THAT

7    YOU SHOULD.  DO NOT COME TO A DECISION SIMPLY BECAUSE OTHER

8    JURORS THINK IT IS RIGHT.  IT IS IMPORTANT THAT YOU ATTEMPT

9    TO REACH A UNANIMOUS VERDICT, BUT, OF COURSE, ONLY IF EACH OF

10   YOU CAN DO SO HAVING -- AFTER HAVING MADE YOUR OWN

11   CONSCIENTIOUS DECISION, DO NOT CHANGE AN HONEST BELIEF ABOUT

12   THE WEIGHT AND EFFECT OF THE EVIDENCE SIMPLY TO REACH A

13   VERDICT.

14           IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS

15   TO COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE

16   DEPUTY MARSHAL WHO WILL BE ACTING AS THE BAILIFF, SIGNED YOUR

17   PRESIDING JUROR OR BY ONE OR MORE MEMBERS OF THE JURY.  NO

18   MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE WITH ME

19   EXCEPT BY A SIGNED WRITING.  I WILL COMMUNICATE WITH ANY

20   MEMBER OF THE JURY ON ANYTHING CONCERNING THE CASE ONLY IN

21   WRITING OR HERE IN OPEN COURT.

22           IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

23   PARTIES BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU

24   MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER

25   TO ANY QUESTION.  REMEMBER, THAT YOU ARE NOT TO TELL ANYONE,

```
 1    INCLUDING ME, HOW THE JURY STANDS NUMERICALLY OR OTHERWISE

 2    UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN

 3    DISCHARGED.  DO NOT DISCLOSE ANY VOTE COUNT IN ANY NOTE TO

 4    THE COURT.

 5             A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER

 6    YOU HAVE REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOU'RE

 7    PRESIDING JUROR WILL FILL IN THE FORM THAT HAS BEEN GIVEN TO

 8    YOU, SIGN AND DATE IT, AND ADVISE THE COURT THAT YOU ARE

 9    READY TO RETURN TO THE COURTROOM.

10             SO, LADIES AND GENTLEMEN, WHAT WILL BE IN THE

11    COURTROOM WITH YOU ARE A COPY FOR EACH OF YOU OF THESE JURY

12    INSTRUCTIONS, A COPY OF THE EXHIBITS THAT HAVE BEEN ADMITTED

13    INTO EVIDENCE, AND THEN SOME NOTES FOR YOUR USE IF YOU NEED

14    TO COMMUNICATE WITH ME OR IF YOU WISH TO NOTIFY ME THAT YOU

15    HAVE REACHED A UNANIMOUS VERDICT.  I WISH YOU GOOD LUCK ON

16    YOUR DELIBERATIONS.

17             WOULD THE BAILIFF PLEASE COME FORWARD.

18             (BAILIFF SWORN BY THE CLERK. )

19             THE CLERK:  PLEASE STATE YOUR NAME FOR THE RECORD.

20             THE BAILIFF:  VERNON WILLIAMS.

21             THE CLERK:  THANK YOU.

22             THE COURT:  LADIES AND GENTLEMEN, YOU MAY NOW BEGIN

23    YOUR DELIBERATIONS.

24                          (JURORS EXIT.)

25             THE COURT:  ALL RIGHT.  PLEASE BE SEATED.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1          ALL RIGHT.  COUNSEL, MAKE SURE THAT MS. SANCHEZ

2     KNOWS HOW TO REACH YOU IN CASE WE HAVE A NOTE OR A VERDICT.

3     IF COUNSEL ARRIVE AND THE PARTIES ARE NOT HERE, THEN I'LL

4     PROCEED TO START TALKING ABOUT HOW A NOTE SHOULD BE ANSWERED.

5     SO YOU CAN -- AS TO WHERE YOUR CLIENTS ARE AND HOW QUICKLY

6     THEY GET HERE, OBVIOUSLY I HOPE THAT THEY WILL BE, BUT I

7     DON'T INTEND TO DELAY DEALING WITH A NOTE IF THEY HAVEN'T HAD

8     A CHANCE TO GET HERE YET.

9          SO WITH THAT, OBVIOUSLY, I ASSUME YOU'RE GOING TO

10    BE SOMEPLACE CLOSE BY SO YOU CAN GET HERE IN A REASONABLE

11    AMOUNT TIME.

12         MR. GALIPO:  YES, YOUR HONOR.

13         I'LL BE STAYING IN THE BUILDING TODAY AND TOMORROW,

14    DEPENDING ON HOW LONG THE DELIBERATIONS GO.

15         THE COURT:  ALL RIGHT.  ALL RIGHT, THEN.  THANK

16    YOU, COUNSEL.  I APPRECIATED YOUR ARGUMENTS AND WE WILL SOON

17    FIND OUT WHAT IT IS THE JURY INTENDS TO DO.

18         MR. GALIPO:  THANK YOU, YOUR HONOR.

19                    (RECESS.)

20         THE COURT:  COUNSEL, WE HAVE A JURY NOTE 1, WHICH

21    ASKS THE FOLLOWING QUESTIONS:  "WHEN ARE PAST NONECONOMIC

22    DAMAGES AWARDED?  NOW OR AGE 18?"

23         I ASSUME THAT MEANS TO THE MINOR PLAINTIFFS.

24         "WHEN ARE FUTURE NONECONOMIC DAMAGES AWARDED?  NOW

25    OR AGE 18?

1         WE ARE CONFUSED ABOUT THE SPLIT FOR EACH CHILD.

2  WHAT IS THE SIGNIFICANCE FOR THE SPLIT?  WHEN ARE THE LEJOY

3  GRISSOM DAMAGES AWARDED?  NOW OR AGE 18?"

4         SO, OBVIOUSLY, I'LL -- I THINK I HAVE SOME SENSE OF

5  WHAT THE ANSWERS ARE, ALTHOUGH AS TO HOW THE AWARDS ARE

6  MANAGED, WHETHER THEY'RE MANAGED BY THE GUARDIANS AD LITEM OR

7  STILL UNDER THE JURISDICTION OF THE COURT -- I HAD SOME VAGUE

8  SENSE OF HOW THE SUPERIOR COURT DID THIS, BUT, OBVIOUSLY,

9  IT'S -- YOU KNOW, THESE ARE FEDERAL DAMAGES AND HERE IN

10  FEDERAL COURT.

11         SO LET ME HEAR FROM COUNSEL ON HOW -- WHAT THEY

12  BELIEVE THE APPROPRIATE ANSWERS WOULD BE.

13         FIRST OF ALL, TELL ME WHAT THE LAW ACTUALLY IS AND

14  THEN WE CAN DETERMINE HOW THE JURY WILL BE TOLD ABOUT IT.

15         MR. GALIPO:  WELL, THE WAY THAT I'VE ALWAYS HANDLED

16  IT IN MY CASES WITH MINORS, YOUR HONOR, IS FOLLOWING A JURY

17  VERDICT, THE COURT -- WE HAVE A PROCESS BY WHICH THE COURT

18  APPROVES THE DISTRIBUTION OF THE MONEY.  WE NORMALLY HAVE

19  ANNUITIES SET UP FOR THEM, ESPECIALLY WHEN THEY'RE THIS

20  YOUNG, THAT ARE -- WHERE THERE'S NO PAYOUTS BEFORE THE AGE OF

21  18, BUT SOMETIMES THE PAYOUTS ARE STAGGERED TO HELP PAY FOR

22  COLLEGE, 25, WHATEVER THE CASE MAY BE.  SO, I THINK, THE

23  CLEAR ANSWER --

24         THE COURT:  AND THEN WHO DETERMINES THAT AND WHO'S

25  ACTING AS A FIDUCIARY FOR THE CHILDREN?

```
1          MR. GALIPO:  WELL, WHAT HAPPENS IS THE MONEY
2    ACTUALLY -- WE PUT TOGETHER A PETITION, WE ATTACH THE ANNUITY
3    COMPANY'S PROJECTIONS, AND THEN IN THE ORDER THAT THE COURT
4    WOULD REVIEW IT, ONCE THE COURT ACCEPTS IT, THE PAYMENT WOULD
5    BE MADE TO THE ANNUITY COMPANY AND THEN THAT MONEY WOULD BE
6    MADE PAYABLE TO THE MINORS AT THE DATES AND TIMES SPECIFIED
7    IN THE ORDER.
8          THE COURT:  BUT WHO -- YOU KNOW, LOOK, I'M NOT AN
9    INVESTMENT ADVISOR.  WHO BEARS THE RISK THAT THE ANNUITY
10   COMPANY IS GOING TO GO BANKRUPT?  OR, YOU KNOW, I MEAN,
11   WHAT -- I'M SURE WHOEVER IS MAKING THESE DECISIONS WOULD BE
12   AS PRUDENT AS POSSIBLE, BUT THERE'S NO GUARANTEES IN LIFE.
13   I'M JUST, YOU KNOW, TRYING TO SEE WHO IS MAKING THESE
14   DECISIONS.
15         MR. MC NICHOLAS:  YOUR HONOR, IN MY EXPERIENCE --
16   I'VE HANDLED MANY CASES OVER THE YEARS WITH MINORS -- THAT
17   WHAT HAS TO HAPPEN IS WHATEVER THE SITUATION IS IT MUST BE
18   PRESENTED TO THE COURT, THE COURT MUST APPROVE IT.  IF IT'S
19   AN ANNUITY, THERE'S ONLY CERTAIN TYPES OF ANNUITY COMPANIES
20   THAT WILL DO SETTLEMENTS OR VERDICTS AND THEY'RE REINSURED SO
21   WHAT HAPPENS IS IF THAT ANNUITY COMPANY GOES UNDER, THEN
22   THERE IS A REINSURER WHO TAKES OVER FOR THEM.  BUT UNDER ANY
23   CIRCUMSTANCE, THE COURT -- A COURT, AT LEAST THAT'S MY
24   UNDERSTANDING IN THIS CASE -- MUST APPROVE ANY RESOLUTION.
25   IN THAT RESOLUTION THAT IDENTIFIES WHERE THE MONEY GOES AND
```

```
 1   TO WHOM, MEANING IF THERE'S AN ANNUITY, THERE WILL BE A
 2   LICENSED ANNUITY BROKER.  IF THERE'S AN ANNUITY, A DEFENDANT
 3   HAS TO PARTICIPATE IN IT BECAUSE IT -- I MEAN, GENERALLY,
 4   IT'S A SETTLEMENT BECAUSE THEY DON'T HAVE TO, BUT THEY DO.
 5            AND WHAT MR. GALIPO IS SAYING IS TECHNICALLY WHEN
 6   YOU ANNUITIZE PERSONAL INJURY DAMAGES, THE MONEY NEVER
 7   TOUCHES THE PLAINTIFF'S HANDS, THEIR GUARDIAN'S HANDS.  IT
 8   GOES STRAIGHT FROM THE PAYOR TO THE ANNUITY COMPANY SO THAT
 9   THERE'S NO CONSTRUCTIVE RECEIPT BECAUSE THAT HAS TAX
10   IMPLICATIONS.  SO WHATEVER IT IS, THOUGH, MUST BE APPROVED BY
11   THE COURT AND IT'S NOT UNTIL THEY'RE 18 OR OLDER THAT I'VE
12   EVER SEEN A COURT ALLOW MINORS TO COME INTO CONTROL OF MONEY.
13            AND TO ANSWER THE FIDUCIARY QUESTION, WHAT CAN
14   HAPPEN, IS, LET'S SAY THE COURT IN A PARTICULAR CASE -- AND
15   I'M NOT SAYING THIS ONE IN PARTICULAR, LET'S SAY THERE WAS A
16   NEED BECAUSE BOTH PARENTS WERE GONE AND THERE WAS A NEED TO
17   PAY FOR CARE, THERE ARE PROFESSIONAL TRUSTEES AT FIDUCIARY OR
18   FINANCIAL INSTITUTIONS LIKE WELLS FARGO AND BANK OF AMERICA
19   THAT ACTUALLY ACT IN THAT CAPACITY.
20            MR. GALIPO:  I THINK TO ANSWER THE COURT'S SPECIFIC
21   QUESTION, MY UNDERSTANDING, I'VE DEALT WITH MAYBE 20 OF
22   THEM -- THERE'S NO RISK INVOLVED AT ALL.  IT'S NOT LIKE A
23   SITUATION WHERE YOU'RE INVESTING MONEY AND HOPING THINGS GO
24   WELL.  THE WORDING THAT THE COURT WILL HAVE TO APPROVE IS
25   THAT THEY ARE INSURED AND REINSURED AND THERE IS NO RISK.  WE
```

1   WOULD NEVER TAKE ANY RISK WITH THE MINORS' MONEY.

2         TO ANSWER THEIR QUESTION SPECIFICALLY, I THINK THE

3   DAMAGE AWARD WOULD BE AWARDED NOW, BUT THERE WOULD BE NO

4   PAYMENT TO ANY OF THE MINORS TILL AFTER THEY'VE 18TH BIRTHDAY

5   AND THAT WOULD BE DONE SUBJECT TO COURT APPROVAL, SOMETHING

6   TO THAT EFFECT.

7         THE COURT:  AND THEN AS TO WHAT IS -- WHEN IT SAYS,

8   "WE ARE CONFUSED ABOUT THE SPLIT FOR EACH CHILD," WHAT IS THE

9   SIGNIFICANCE FOR THE SPLIT?

10        MR. GALIPO:  I'M A LITTLE UNCLEAR ON THEIR

11  QUESTION, BUT I THINK THAT, AS WE DISCUSSED PREVIOUSLY, THE

12  JURY HAS TO INDEPENDENTLY AWARD DAMAGES FOR EACH OF THE MINOR

13  PLAINTIFFS, IF THEY GET THAT FAR ON THE VERDICT FORM,

14  PURSUANT TO THE INSTRUCTIONS AND THE VERDICT FORM.  I'M NOT

15  REALLY SURE WHAT THEY'RE ASKING BEYOND THAT, OTHER THAN MAYBE

16  WHY THERE'S A SEPARATE LINE FOR EACH MINOR.  AND THEN LEJOY

17  GRISSOM'S DAMAGES, AGAIN, WOULD BE AWARDED NOW, BUT NO ONE

18  WOULD RECEIVE THOSE DAMAGES UNTIL AFTER THE MINOR CHILDREN

19  REACH THE AGE OF 18.

20        THE COURT:  DO YOU THINK THAT -- WHERE IT SAYS FOR

21  THE SPLIT, AND IT'S NOT CLEAR, I GUESS -- IS IT THE SPLIT FOR

22  EACH CHILD?

23        THE OTHER THING IS NOT SO MUCH SPLITTING BETWEEN

24  THE CHILDREN, BUT AS BETWEEN PAST AND FUTURE AS TO EACH

25  CHILD, WHICH, OF COURSE, THE ANSWER THEN WOULD BE IS THE ONE

1   IS FOR DAMAGES FROM THE DATE OF THE DECEDENT'S DEATH TO

2   TODAY?  AND THEN FROM -- AND THEN GOING FORWARD IS FOR THE

3   REST OF THEIR LIVES.

4            MR. GALIPO:  I THINK YOU'RE CORRECT.  I THINK

5   THAT'S PROBABLY WHAT THEY'RE ASKING AND I WOULD AGREE WITH

6   THAT RESPONSE.

7            THE COURT:  ALL RIGHT.  MR. ROTHANS, LET ME HEAR

8   FROM YOU.

9            MR. ROTHANS:  I JUST THINK THERE'S INHERENTLY SOME

10  AMBIGUITY IN THE QUESTION:  "WHEN ARE PAST NONECONOMIC

11  DAMAGES AWARDED?"  WELL, THE VERDICT IS THE AWARD.  THEY'RE

12  BEING AWARDED IF THEY GET TO THOSE QUESTIONS IN THE VERDICT,

13  SO I'M NOT SURE EXACTLY WHAT THEY'RE ASKING THERE.

14           THE COURT:  RIGHT.

15           WHETHER IT APPEARS AWARDED IN THAT LEGAL SENSE OR

16  WHETHER IT'S THEIR WAY OF SAYING PAID OUT, OR THE OTHER THING

17  IS WHETHER THEY'RE ASKING, IS, ARE WE SUPPOSED TO DISCOUNT

18  THE PRESENT VALUE.

19           MR. ROTHANS:  I DON'T KNOW IF THERE'S A PRESENT

20  CASH VALUE ISSUE, IF IT'S THE AWARDING OR THE PAYMENT OUT, OR

21  IF THEY'RE CONCERNED ABOUT MONEY BEING PAID TO THE MOTHERS.

22  I CAN'T TELL.  AND SO RATHER THAN JUST ANSWER THIS QUESTION

23  WITH THE AMBIGUITIES, I THINK WE NEED TO CLARIFY THE

24  QUESTION.  BECAUSE, CLEARLY, AS MR. GALIPO SUGGESTED, IF THE

25  AWARD THEY'RE TALKING ABOUT IS WHEN DO WE ISSUE THE AWARD IN

1    TERMS OF THE JUDGMENT, IT'S NOW, WHEN THEY GET THERE.  IF

2    IT'S PAYOUT, THEN IT'S WHEN THEY TURN 18 AND THEY WOULDN'T

3    HAVE CONTROL UNTIL THEY'RE 18.  BUT I'M NOT SURE THAT'S

4    EXACTLY WHAT THEY'RE ASKING AND I DON'T KNOW THAT WE ALL KNOW

5    THAT.

6              MR. GALIPO:  BUT IF WE ALL AGREE THAT THAT'S THE

7    CASE, I THINK WE SHOULD AT LEAST GIVE THEM SOME RESPONSE AND

8    THEN SEE IF THEY HAVE FURTHER CLARIFICATION.

9              THE COURT:  WHAT I THINK -- WELL, SHOULD WE DO THIS

10   BY NOTE, THEN, OR SHOULD WE JUST BRING THEM OUT HERE AND THEN

11   I THINK I CAN, YOU KNOW, HAVE A -- I THINK I CAN JUST ASK

12   QUESTIONS OF THE FOREPERSON AND THEY'LL ALL BE SITTING HERE

13   AND THEN WE CAN DECIDE -- I THINK IT MIGHT JUST BE EASIER TO

14   DO THAT.

15             SO WITH -- UNLESS COUNSEL OBJECT, I'LL HAVE THE

16   JURY BROUGHT IN HERE AND JUST START OFF AND SORT OF SUMMARIZE

17   OUR REMARKS AND KIND OF OFFER THEM, IF YOU MEAN X, THEN THE

18   ANSWER IS Y, AND THEN TRY TO GET A SENSE OF WHAT THEIR

19   CONCERNS ARE.  OBVIOUSLY, I MEAN, I DON'T THINK WE REALLY

20   NEED TO USE THE TABLES OR THAT, BUT, IN A SENSE, THE CONCEPT

21   OF PRESENT VALUE DOES APPLY.  IT IS A --

22             MR. ROTHANS:  NOT FOR NONECONOMIC, YOUR HONOR.

23             THE COURT:  WELL, I MEAN, IN THE SENSE OF -- LET ME

24   PUT IT THIS WAY:  IN THE SENSE OF THAT IT IS AN AMOUNT WHICH

25   TODAY WILL RECOMPENSE A PLAINTIFF FOR THE LOSS WHICH WOULD BE

1    INCURRED OVER THE COURSE OF -- FOR THE REST OF THEIR LIVES.

2            MR. ROTHANS:  BUT THAT'S DIFFERENT THAN A DISCOUNT

3    FOR PRESENT CASH VALUE, WHICH DOESN'T APPLY TO NONECONOMIC.

4            THE COURT:  RIGHT, IT'S NOT EARNING -- IT'S NOT AN

5    INCOME STREAM.  BUT, I MEAN, THE IDEA IS THAT THEY'RE GOING

6    TO GET -- A SUM IS GOING TO BE AWARDED NOW, BUT THEY WOULD

7    NOT HAVE ACCESS TO THE MONEY UNTIL AGE 18 OR LATER.

8            MR. ROTHANS:  RIGHT.

9            THE COURT:  ALL RIGHT.

10           THE CLERK:  SHALL I BRING IN THE JURY?

11           THE COURT:  YOU MAY.

12           MR. GALIPO:  I THINK YOU'RE RIGHT, THOUGH, ON YOUR

13   INTERPRETATION OF THE SPLIT YES, BUT I'M SURE WE CAN CLARIFY

14   IT AND IT LOOKS LIKE MR. MONROE, THE GENTLEMAN IN THE BACK

15   LOOKS TO BE THE FOREPERSON IF I'M READING THE SIGNATURE

16   RIGHT.

17           THE COURT:  I BELIEVE THAT -- AND SO THAT WOULD BE

18   WHAT, JUROR NUMBER 2?

19           MR. GALIPO:  HE'S THE GENTLEMAN -- THE TALLER

20   GENTLEMAN.  I THINK HE WAS THE FILM PRODUCER OR SOMETHING.

21           THE COURT:  YEAH.

22           THE CLERK:  PLEASE RISE FOR THE JURY.

23                     (JURORS ENTER.)

24           THE CLERK:  PLEASE BE SEATED.

25           THE COURT:  LADIES AND GENTLEMEN, THANK YOU FOR

1    YOUR NOTE WHICH COUNSEL AND I HAVE HAD A CHANCE TO REVIEW.  I

2    JUST WANT TO EXPLORE AND MAKE SURE THAT I UNDERSTAND WHAT

3    YOUR QUESTIONS ARE.

4             JUROR NUMBER 2, YOU'RE THE FOREPERSON?

5             THE FOREPERSON:  YES.

6             THE COURT:  NOW, WHEN YOU SAY, "WHEN ARE PAST

7    NONECONOMIC DAMAGES AWARDED AND FUTURE NONECONOMIC DAMAGES

8    AWARDED," IN TERMS OF BEING AWARDED, IN TERMS OF THE COURT

9    ENTERING A JUDGMENT ON THE BASIS OF A VERDICT, THEN WHEN THEY

10   WOULD AWARD IT WOULD BE NOW.  IF WHAT YOU MEAN IS WHEN WOULD

11   THE PLAINTIFFS RECEIVE THE MONEY, THEN IT WOULD BE ON SUCH

12   TERMS AS THE COURT WILL ORDER, BUT IT WOULD BE THEIR 18TH

13   BIRTHDAY OR LATER, AND THAT'S SOMETHING THAT WOULD BE ORDERED

14   BY ME OR, PERHAPS, NEGOTIATED WITH THE COUNSEL AND THE

15   GUARDIANS AD LITEM IF IT EVER -- IF, IN FACT, YOU WERE TO

16   RENDER A VERDICT IN WHICH THERE WERE MONEY DAMAGES.

17            AND THE SAME IS TRUE WITH THE FUTURE NONECONOMIC

18   DAMAGES, IT'S THE -- YOU, THE JURY, WOULD GIVE A NUMBER NOW

19   WHICH WOULD BE IN THE SPECIAL VERDICT FORM AND THEREFORE

20   WOULD BE INCORPORATED INTO THE COURT'S JUDGMENT, BUT THE

21   ACTUAL ACCESS TO THE FUNDS WOULD NOT BE UNTIL THE PLAINTIFFS

22   REACH THEIR 18TH BIRTHDAY OR LATER ON SUCH TERMS AS THE COURT

23   WILL APPROVE.

24            NOW, WHEN YOU SAY, "THE SPLIT FOR EACH CHILD, WHAT

25   IS THE SIGNIFICANCE FOR THE SPLIT," THAT COULD MEAN TWO

1    THINGS:  ONE IS THE SPLIT BETWEEN PAST AND FUTURE NONECONOMIC

2    DAMAGES, OR IT COULD BE THE SPLIT AMONG THE PLAINTIFFS.

3         SO -- AND IF WHAT YOU MEAN IS THE SPLIT BETWEEN THE

4    TYPES OF DAMAGES, THEN THE PAST NONECONOMIC DAMAGES ARE THE

5    DAMAGES FROM APRIL 2010, THE DATE OF THE INCIDENT, TO THE

6    DATE YOU RENDER YOUR VERDICT, AND THEN THE FUTURE NONECONOMIC

7    DAMAGES WOULD BE DAMAGES FROM THE DATE OF YOUR VERDICT GOING

8    FORWARD INTO THE FUTURE.

9         IF WHAT YOU MEANT, THE SPLIT BETWEEN THE

10   PLAINTIFFS, THEN IT WOULD BE UP TO YOU TO DECIDE HOW MUCH

11   EACH OF THE SEPARATE PLAINTIFFS, AND YOU DID RECEIVE SOME

12   EVIDENCE AS TO EACH OF THE PLAINTIFFS SHOULD GET, WHETHER IT

13   SHOULD BE THE SAME, WHETHER IT SHOULD BE VERY SLIGHTLY OR

14   MORE THAN SLIGHT AMONG OF EACH OF THE PLAINTIFFS WOULD BE A

15   MATTER IN YOUR DISCRETION.  SO IT REALLY IS -- THAT GIVES YOU

16   THE OPPORTUNITY IF YOU DECIDE THAT MONEY DAMAGES ARE

17   APPROPRIATE AND IF YOU DECIDE THERE SHOULD BE A DIFFERENCE AS

18   AMONG THE PLAINTIFFS AS TO WHAT EACH OF THEM SHOULD RECEIVE

19   OR IT COULD BE THAT YOU WOULD BELIEVE THAT EACH OF THEM

20   SHOULD RECEIVE THE SAME AMOUNT, BUT ALL OF THOSE ARE MATTERS

21   ENTIRELY WITHIN YOUR DISCRETION BASED UPON THE EVIDENCE THAT

22   YOU HEARD ABOUT EACH OF THE PLAINTIFFS.

23         DOES THAT -- IS THAT HELPFUL TO YOU IN ANSWERING

24   THIS QUESTION?

25         THE FOREPERSON:  I WOULD SAY YES.

1      THE COURT:  ALL RIGHT.  AND WHEN ARE THE LEJOY

2  GRISSOM DAMAGES AWARDED?  IT'S THE SAME.  THE DAMAGES FLOW TO

3  THE MINORS AS THE HEIRS OF MR. GRISSOM, AND THEREFORE, THEY

4  WOULD BE AWARDED IN THE SENSE THAT -- IN THE LEGAL SENSE, I

5  USE THAT WORD NOW, BUT THE MINORS WOULD NOT HAVE ACCESS TO

6  THAT MONEY UNTIL AT SUCH TIME AFTER THEIR 18TH BIRTHDAY AND

7  ON SUCH TERMS AS WILL EITHER BE NEGOTIATED AMONG THE PARTIES

8  AND APPROVED BY THE GUARDIANS AD LITEM OR WILL BE ORDERED BY

9  THE COURT.

10      I DON'T WANT YOU TALKING AMONG YOURSELVES HERE ON

11  THAT, BUT JUST VERY GENERALLY, MR. FOREPERSON, DO YOU FEEL

12  THAT THAT IS HELPFUL TO YOU IN ANSWERING THESE QUESTIONS?

13      THE FOREPERSON:  YES, THANK YOU.

14      THE COURT:  ALL RIGHT.  IF WE CAN ASSIST YOU IN ANY

15  OTHER WAY, LET US KNOW, AND OTHERWISE I'M GOING TO SEND YOU

16  BACK TO THE JURY ROOM.  YOU CAN EITHER CONTINUE TO

17  DELIBERATE, IF YOU WISH, OR YOU CAN COME BACK TOMORROW AT

18  8:30.

19      AS YOU WERE INFORMED, YOU'RE ENTIRELY IN CHARGE

20  NOW, YOU CAN STAY AS LATE AS YOU WANT, YOU CAN COME IN AS

21  EARLY AS YOU WANT.  IF YOU WANT TO COME IN AT 8:00 O'CLOCK,

22  YOU CAN; IF YOU WANT TO COME IN AT 10:00 O'CLOCK, YOU CAN.

23  YOU'RE ENTIRELY IN CHARGE OF YOUR OWN SCHEDULE AT THIS POINT.

24      WITH THAT, I WILL SEND YOU BACK TO THE JURY ROOM

25  AND WISH YOU GOOD LUCK.

```
 1              THE CLERK:  PLEASE RISE FOR THE JURY.

 2                        (JURORS EXIT.)

 3              THE COURT:  COUNSEL, ANYTHING ELSE?

 4              MR. GALIPO:  NO.

 5              MR. ROTHANS:  NO, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  THEN, I GUESS, MS. SANCHEZ

 7    IS GOING TO SEE WHAT IT IS THEY WANT TO DO, SO IF YOU WANT TO

 8    WAIT AROUND FOR A FEW MINUTES AND SEE IF THEY'RE GOING TO

 9    CONTINUE TO DELIBERATE, THAT WILL BE FINE; OTHERWISE, I WILL

10    ORDER THE JURY NOTE NUMBER 1 TO BE MADE PART OF THE RECORD OF

11    THE COURT AND WE WILL AWAIT THEIR FURTHER DELIBERATIONS.

12              MR. ROTHANS:  THANK YOU.

13                        (OFF THE RECORD.)

14                         (RECESS.)

15              THE COURT:  THE JURY HAS SENT A NOTE THROUGH THE

16    BAILIFF TO THE CLERK, JURY NOTE NUMBER 2.  THE JURY HAS

17    REACHED A UNANIMOUS VERDICT.

18              MS. SANCHEZ, PLEASE CALL IN THE JURY.

19              THE CLERK:  YES, YOUR HONOR.

20              PLEASE RISE FOR THE JURY.

21                        (JURORS ENTER.)

22              THE CLERK:  PLEASE BE SEATED.

23              THE COURT:  GOOD EVENING, LADIES AND GENTLEMEN.

24              I HAVE RECEIVED YOUR NOTE NUMBER 2, WHICH IS

25    MARKED:  "THE JURY HAS RECEIVED A UNANIMOUS VERDICT."
```

```
1           MR. FOREPERSON, IS THAT CORRECT?

2           THE FOREPERSON:  THAT'S CORRECT.

3           THE COURT:  PLEASE HAND THE VERDICT TO THE CLERK.

4           (FOREPERSON HANDS VERDICT TO THE CLERK.)

5                 (THE COURT READS VERDICT.)

6           THE COURT:  THE CLERK WILL READ THE VERDICT.

7           THE CLERK:  UNITED STATES DISTRICT COURT CENTRAL

8    DISTRICT OF CALIFORNIA, DAJAYNE G., DEUJANYE G., AND DYVONN

9    G., BY AND THROUGH THEIR GUARDIAN AD LITEM, KHANDI ROSE; AND

10   KAILYNN G. BY AND THROUGH HER GUARDIAN AD LITEM, KANDACE

11   SIMPLIS, PLAINTIFFS, VERSUS CULVER CITY POLICE DEPARTMENT AND

12   OFFICER LUIS MARTINEZ, DEFENDANTS, CASE NUMBER

13   CV-10-9497-MWF, SPECIAL VERDICT FORM.

14          WE, THE JURY ANSWER THE QUESTIONS SUBMITTED TO US

15   AS FOLLOWS:  ONE, DID OFFICER LUIS MARTINEZ USE EXCESSIVE

16   FORCE AGAINST DECEDENT, LEJOY GRISSOM, ON APRIL 25TH, 2010?

17          YES.

18          QUESTION NUMBER 2:  WHAT ARE LEJOY GRISSOM'S

19   DAMAGES?

20          $825,000.

21          QUESTION 3:  WHAT ARE DEUJANYE G.'S DAMAGES?

22          A), PAST NONECONOMIC DAMAGES, $500,000; B), FUTURE

23   NONECONOMIC DAMAGES, $1,500,000.

24          FOUR:  WHAT ARE DAJAYNE G.'S DAMAGES?

25          A), PAST NONECONOMIC DAMAGES, $500,000; B), FUTURE
```

1    NONECONOMIC DAMAGES, $1,500,000.

2          QUESTION NUMBER FIVE: WHAT ARE DYVONN G.'S

3    DAMAGES?

4          PAST NONECONOMIC DAMAGES, $500,000; B), FUTURE

5    NONECONOMIC DAMAGES, $1,500,000.

6          QUESTION NUMBER 6: WHAT ARE KAILYNN G.'S DAMAGES?

7          A), PAST NONECONOMIC DAMAGES, $500,000; B ), FUTURE

8    NONECONOMIC DAMAGES, $1,500,000.

9          SIGNED BY THE PRESIDING JUROR, DATED MAY 8TH,

10    2013."

11          LADIES AND GENTLEMEN OF THE JURY, IS THIS VERDICT,

12    AS PRESENTED AND READ, THE VERDICT OF EACH OF YOU, SO SAY YOU

13    ONE, SO SAY YOU ALL?

14                (JURORS ANSWER IN KIND.)

15          THE COURT: WOULD COUNSEL LIKE THE JURY POLLED?

16          MR. ROTHANS: YES, YOUR HONOR.

17          THE COURT: THE CLERK WILL POLL THE JURY.

18          THE CLERK: LADIES AND GENTLEMEN OF THE JURY, AS I

19    CALL YOUR NUMBER, IF THIS IS YOUR VERDICT, PLEASE ANSWER

20    "YES." IF THIS IS NOT YOUR VERDICT, PLEASE ANSWER "NO."

21          JUROR NO. 1?

22          THE JUROR: YES.

23          THE CLERK: JUROR NO. 2?

24          THE JUROR: YES.

25          THE CLERK: JUROR NO. 3?

```
 1                THE JUROR:  YES.

 2                THE CLERK:  JUROR NO. 4?

 3                THE JUROR:  YES.

 4                THE CLERK:  JUROR NO. 5?

 5                THE JUROR:  YES.

 6                THE CLERK:  JUROR NO. 6?

 7                THE JUROR:  YES.

 8                THE CLERK:  JUROR NO. 7?

 9                THE JUROR:  YES.

10                THE CLERK:  JUROR NO. 8?

11                THE JUROR:  YES.

12                THE COURT:  ALL RIGHT.  THE VERDICT AS READ AND

13   RECEIVED WILL BE ENTERED ON THE MINUTES OF THE COURT.

14                LADIES AND GENTLEMEN, I WANT TO THANK YOU FOR YOUR

15   SERVICE.  I APPRECIATE YOUR TAKING TIME AWAY FROM YOUR OWN

16   AFFAIRS TO BE HERE.  I APPRECIATE THE ATTENTIVENESS WITH

17   WHICH YOU FOLLOWED THE EVIDENCE AND MY INSTRUCTIONS AND I, OF

18   COURSE, APPRECIATE YOUR DELIBERATIONS TOGETHER TO REACH A

19   UNANIMOUS VERDICT.

20                YOU ARE NOW DISCHARGED.  ALL OF YOUR FIRST

21   AMENDMENT RIGHTS ARE RESTORED TO YOU.  YOU CAN SPEAK TO

22   WHOMEVER YOU WISH.  YOU CAN GO WHEREVER YOU WISH.  YOU CAN GO

23   OVER TO VENICE AND MOTOR IF YOU WISH, AND, SPECIFICALLY, YOU

24   MAY SPEAK IF YOU WISH TO THE PARTIES AND TO THE LAWYERS.

25   THEY OFTEN WISH TO SPEAK TO THE JURORS.  ON THE OTHER HAND,
```

1    YOU ARE NOT OBLIGED TO SPEAK TO ANYONE AND IF YOU WOULD LIKE

2    TO LEAVE WITHOUT SPEAKING TO THEM YOU'RE CERTAINLY FREE TO DO

3    THAT.

4            I WILL BE BACK IN THE JURY ROOM IN A MOMENT TO

5    THANK YOU PERSONALLY; BUT, AGAIN, YOU DON'T NEED TO WAIT FOR

6    THAT.  I KNOW IT'S LATE.  IF YOU WOULD LIKE TO GO BACK TO

7    YOUR FAMILIES, THEN YOU CAN CERTAINLY FEEL FREE TO DO THAT

8    RIGHT NOW.

9            THERE ARE TWO THINGS I WOULD LIKE TO SAY, THE

10   FIRST, AS MR. ROTHANS' CORRECTLY NOTED IN HIS CLOSING

11   ARGUMENT, IS THAT THE BILL OF RIGHTS DOES CONTAIN THE SEVENTH

12   AMENDMENT.  IT DOESN'T HAVE THE SAME CACHE OR THE SAME FAME

13   AS THE FIRST AMENDMENT, WHICH IS OUR RIGHTS TO FREE SPEECH

14   AND RELIGION, OR, PERHAPS, THE SECOND AMENDMENT, OUR RIGHT TO

15   BEAR ARMS, OR THE FOURTH AMENDMENT, WHICH WAS TRAGICALLY

16   INVOLVED IN THE EVENTS OF THIS CASE.  BUT THE SEVENTH

17   AMENDMENT DOES REFLECT THE WISDOM OF THE FOUNDING FATHERS

18   THAT ON LAWSUITS IN FEDERAL COURT IN WHICH MONEY IS INVOLVED,

19   IT IS A JURY THAT SHOULD MAKE THOSE DECISIONS AND CERTAINLY

20   OF ALL THE MANY CASES IN WHICH THERE ARE JURY TRIALS, I THINK

21   THAT NONE ARE MORE IMPORTANT THAN IN THESE SPECIFIC SORTS OF

22   CASES BECAUSE YOU REALLY HAVE BEEN ACTING AS AN ARM OF OUR

23   GOVERNMENT FOR THESE TWO WEEKS AND YOU HAVE HAD A VOICE IN

24   WHAT SORT OF POLICING WE WANT TO HAVE AS A SOCIETY.

25            THE OTHER THOUGHT I'LL LEAVE YOU WITH IS THAT WHEN

```
1    OUR COUNTRY WAS VERY NEW ALMOST 200 YEARS AGO, A FRENCH
2    ARISTOCRAT ALEXIS DE TOCQUEVILLE CAME AND VISITED OUR COUNTRY
3    AND THEN WROTE A COUPLE BOOKS ABOUT IT WHICH SCHOLARS STILL
4    STUDY TO THIS DAY AND WAS SIMPLY AMAZED AT HOW WONDERFUL OUR
5    REPUBLIC WAS AND THE EQUALITY AND THE INVOLVEMENT CITIZENS IN
6    THE AFFAIRS OF THE GOVERNMENT AND JUST THE VITALITY OF DAILY
7    LIFE HERE IN THE NEW UNITED STATES.  AND ONE OF THE THINGS
8    THAT STRUCK HIM WAS THAT THERE WERE CIVIL JURIES.  BLUNTLY,
9    HE THOUGHT -- HE WASN'T -- HE DIDN'T -- WASN'T SURE THAT IF
10   CIVIL JURIES DID A BETTER JOB THAN JUDGES OR OTHERS MIGHT IN
11   REGARD TO CIVIL CASES, BUT HE DEFINITELY FELT THAT FOR THE
12   CIVIL JURORS THEMSELVES, IT WAS A WONDERFUL EXPERIENCE.  IT
13   WAS THEY GOT TO TALK TO EACH OTHER, THEY GOT TO PARTICIPATE
14   IN THE AFFAIRS OF GOVERNMENT, AND I HOPE THAT THAT HAS BEEN
15   YOUR FEELING BEING HERE IN FEDERAL COURT FOR THESE PAST FEW
16   DAYS.
17          WITH THAT, I DISCHARGE YOU.  I BID YOU GOOD NIGHT
18   AND I'LL BE BACK IN THE JURY ROOM IN A FEW MINUTES.
19          THANK YOU VERY MUCH.
20          THE CLERK:  PLEASE RISE FOR THE JURY.
21                  (JURORS EXIT.)
22          THE CLERK:  PLEASE BE SEATED.
23          THE COURT:  ALL RIGHT.  MR. GALIPO, IF YOU WOULD
24   SUBMIT A PROPOSED FORM OF JUDGMENT FOR THE COURT'S
25   CONSIDERATION.
```

```
 1              MR. GALIPO:  THAT WILL BE FINE, YOUR HONOR.

 2              THE COURT:  AND ANYTHING ELSE FROM COUNSEL?

 3              MR. GALIPO:  NOT ON BEHALF OF THE PLAINTIFFS.

 4              MR. ROTHANS:  NO, YOUR HONOR.

 5              THE COURT:  ALL RIGHT.  SINCE YOU ARE HERE IN THE

 6     PRESENCE OF YOUR CLIENTS, I DO WISH TO COMMEND ALL FOUR

 7     COUNSEL ON THE SKILL WITH WHICH THE CASE WAS TRIED.  AS

 8     SOMEONE WHO HAS NOW PRESIDED OVER SEVERAL OF THESE CASES,

 9     THOUGH NOT ALL THAT MANY, I APPRECIATE MS. WILLIAMS'

10     TUTORIALS TO ME ON WHAT THE APPROPRIATE LAW IS, AND WITH

11     THAT, I AM SURE I WILL SEE ALL FOUR OF YOU IN MY COURTROOM

12     OFTEN IN THE FUTURE AND I WILL LOOK FORWARD TO THAT.  AND

13     SPECIFICALLY IN THIS CASE, OBVIOUSLY, IN TERMS OF ANY FUTURE

14     MOTIONS, THOSE CAN BE SCHEDULED PURSUANT TO THE LOCAL RULES.

15              MR. GALIPO:  THANK YOU VERY MUCH, YOUR HONOR.

16              THE CLERK:  ALL RISE.

17              COURT IS ADJOURNED.

18              (WHEREUPON, COURT WAS ADJOURN AT 5:11 P.M.)

19                        --0O0--

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1                 <u>CERTIFICATE OF REPORTER</u>

2

   COUNTY OF LOS ANGELES    )

3                         )  SS.

   STATE OF CALIFORNIA      )

4

5

6    I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

7    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

8    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

9    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16   DATED:  AUGUST 2, 2013

17

18       <u>**/S/  ROSALYN ADAMS**</u>

19   ROSALYN ADAMS, CSR 11794

   OFFICIAL COURT REPORTER

20

21

22

23

24

25