1          UNITED STATES OF AMERICA

2          UNITED STATES DISTRICT COURT

3          CENTRAL DISTRICT OF CALIFORNIA

4              CENTRAL DIVISION

5                 - - -
           HONORABLE MICHAEL W. FITZGERALD
6      UNITED STATES DISTRICT JUDGE PRESIDING
                  - - -
7

8    KANDACE SIMPLIS, ET AL.,         )
                                      )
9              PLAINTIFF,             )
                                      )
10   VS.                              )  CV 10-09497-MWF
                                      )
11   CULVER CITY POLICE DEPARTMENT,   )
     ET AL.,                          )
12                                    )
               DEFENDANT.             )
13   _____)

14

15

                   ***JURY TRIAL - DAY 4***
16
               LOS ANGELES, CALIFORNIA
17
                  MAY 3, 2013
18

19

20

21

22

23          ROSALYN ADAMS, CSR 11794
         FEDERAL OFFICIAL COURT REPORTER
24      312 NORTH SPRING STREET, ROOM 410
        LOS ANGELES, CALIFORNIA 90012
25              (213) 894-2665

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3            LAW OFFICES OF DALE K. GALIPO
              BY:  DALE K. GALIPO
 4            21800 BURBANK BOULEVARD
              SUITE 310
 5            WOODLAND HILLS, CALIFORNIA 91367
              (818) 347-3333
 6
              MC NICHOLAS AND MC NICHOLAS LLP
 7            BY:  MATTHEW S. MC NICHOLAS
              10866 WILSHIRE BOULEVARD
 8            SUITE 1400
              LOS ANGELES, CALIFORNIA 90024
 9            (310) 474-1582

10
     ON BEHALF OF DEFENDANT:
11
              CARPENTER ROTHANS AND DUMONT
12            BY:  STEVEN J. ROTHANS
                   JILL WILLIAMS
13            888 SOUTH FIGUEROA STREET
              SUITE 1960
14            LOS ANGELES, CALIFORNIA 90017
              (213) 228-0400
15

16

17

18

19

20

21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>**I N D E X**</u>

<u>**PAGE**</u>

**AMANDA MEDEIROS** - PLAINTIFFS' WITNESS ............... 10
        DIRECT EXAMINATION BY MR. GALIPO .......... 10
        CROSS-EXAMINATION BY MR. ROTHANS .......... 24
        REDIRECT EXAMINATION BY MR. GALIPO ........ 62
        RECROSS EXAMINATION BY MR. ROTHANS ........ 68

**KANDACE SIMPLIS** - PLAINTIFFS' WITNESS ............... 71
        DIRECT EXAMINATION BY MR. MC NICHOLAS ..... 72
        CROSS-EXAMINATION BY MS. WILLIAMS ......... 76

**ROGER CLARK** - PLAINTIFFS' WITNESS ................... 89
        DIRECT EXAMINATION BY MR. GALIPO .......... 90
        CROSS-EXAMINATION BY MR. ROTHANS .......... 134
        REDIRECT EXAMINATION BY MR. GALIPO ........ 158

<u>**E X H I B I T S**</u>

| **PLAINTIFFS'** | **MARKED FOR IDENTIFICATION** | **IN EVIDENCE** |
|---|---|---|
| 372-048 | -- | 10 |
| 372-239 | -- | 11 |
| 372-179 | -- | 15 |
| 372-129 | -- | 101 |
| 25 | -- | 108 |
| 372-335 | -- | 123 |

| **DEFENDANT'S** | **MARKED FOR IDENTIFICATION** | **IN EVIDENCE** |
|---|---|---|
| | [NONE OFFERED.] | |

1          LOS ANGELES, CALIFORNIA; FRIDAY, MAY 3, 2013; 8:30 A.M.

2                            --o0o--

3

4

5          THE CLERK:  IN THE MATTER OF CASE NUMBER CV

6     10-9497-MWF:  *KANDACE SIMPLIS, ET AL. V. CULVER CITY POLICE*

7     *DEPARTMENT, ET AL.*, JURY TRIAL, DAY FOUR.

8          COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE

9     RECORD.

10         MR. GALIPO:  GOOD MORNING, YOUR HONOR.

11         DALE GALIPO WITH MATT MC NICHOLAS ON BEHALF OF THE

12    PLAINTIFFS.

13         MR. ROTHANS:  GOOD MORNING, YOUR HONOR.  STEVE

14    ROTHANS AND JILL WILLIAMS ON BEHALF OF THE DEFENDANTS.

15         THE COURT:  MR. MC NICHOLAS MAY I ASK YOU WHY

16    YOU'RE NOT WEARING YOUR JACKET WHILE COURT IS IN SESSION?

17         MR. MC NICHOLAS:  I FORGOT THAT IT WAS OFF.

18         THE COURT:  THANK YOU.  COUNSEL, I WANT TO GET

19    STARTED ON THIS.  I'VE BEEN HERE A LITTLE AFTER 8:00 O'CLOCK.

20    IF YOU NEEDED TO RAISE SOMETHING, I WOULD HAVE PREFERRED TO

21    MAKE IT EARLY.

22         MR. ROTHANS:  I APOLOGIZE, YOUR HONOR.  I'VE BEEN

23    HERE FOR A LITTLE WHILE MYSELF.  I WANT TO CLARIFY -- I DON'T

24    WANT TO RUN AFOUL OF THE COURT'S RULINGS AND MOTIONS IN

25    LIMINE DURING THE EXAMINATION OF ROGER CLARK AS TO THE

```
 1   CONVICTION OF LAYLA GRISSOM, ARISING FROM THE APRIL 25, 2010,

 2   ARMED ROBBERY.  I THOUGHT THE COURT HAD CHANGED ITS MIND

 3   BECAUSE THE COURT INDICATED AT ONE POINT, OFF THE RECORD

 4   OUTSIDE THE PRESENCE OF THE JURY, THAT THE COURT HAS BEEN

 5   REMINDED THAT THE CONVICTION THAT I WANTED TO REFERENCE AROSE

 6   FROM THIS VERY INCIDENT, NOT PRIOR CONVICTIONS, AND I WANTED

 7   TO ADDRESS THAT WITH ROGER CLARK.

 8         THE COURT:  I DON'T SEE WHAT POSSIBLE RELEVANCE

 9   THAT COULD HAVE WITH ROGER CLARK.  SO, NO, YOU CAN'T RAISE

10   IT.  I JUST DON'T SEE -- THE FACT THAT THE JURY IS GOING TO

11   BE LEFT WITH THE FIRM CONCLUSION THAT THESE, IN FACT, WERE

12   THE ROBBERS, I THINK, IS INEVITABLE AND -- BUT I DON'T SEE

13   WHY BRINGING UP THAT PARTICULAR CONVICTION IS RELEVANT.

14         MR. ROTHANS:  MAY I MAKE AN OFFER OF PROOF?

15         THE COURT:  YOU MAY.

16         MR. ROTHANS:  THE ISSUE FOR ME WITH MR. CLARK IS

17   THE THOROUGHNESS OF HIS EVALUATION OF THIS CASE AND WHAT,

18   NORMALLY, HE DOES IS TALK ABOUT THE COUNTLESS HOURS HE SPENT,

19   THE THOUSANDS OF DOCUMENTS HE'S REVIEWED, ALL THE WORK HE'S

20   DONE TO FORMULATE THESE OPINIONS --

21         THE COURT:  AND, AS I SAID -- I'M SORRY TO CUT YOU

22   OFF.  AS I SAID EARLIER, I'M GOING TO ALLOW A MODEST AMOUNT

23   OF THAT SO THE JURY KNOWS THAT THEY WERE TAKING IT SERIOUSLY,

24   BUT I REALLY DON'T WANT THAT TO BE THE FOCUS OF THEIR

25   THINKING BECAUSE I DON'T WANT THEM TO APPEAR TO BE THESE
```

```
1    SUPER JURORS.  I DON'T WANT THE JURY TO THINK THEY HAVE
2    ACCESS TO INFORMATION THE JURORS DON'T HAVE.  WHILE THEY CAN
3    SAY THEY'VE REVIEWED DOCUMENTS IN PRIOR STATEMENTS IN
4    PREPARATION, OR IF THEY WANT TO GO TO THE SCENE; IF THEY DID,
5    THAT'S GOING TO BE THE END OF IT.  CERTAINLY, I WOULD NOT
6    WANT TO HAVE EXAMINATION ON AND WOULDN'T WANT THIS EXTRANEOUS
7    FACT BROUGHT THROUGH THE ATTENTION OF SUCH A
8    CROSS-EXAMINATION.  SO, NO, YOU CAN'T INQUIRE ABOUT THAT.
9    OBVIOUSLY, THIS APPLIES TO BOTH EXPERTS, FOR BOTH OF THEM.
10         I WANT THE JURY TO KNOW THEY TOOK THE ASSIGNMENT
11   SERIOUSLY AND DIDN'T JUST WALK IN HERE, BUT I DON'T WANT THAT
12   TO BE THE FOCUS OF EITHER THE DIRECT EXAMINATION OR THE
13   CROSS-EXAMINATION.
14         MR. GALIPO:  MY UNDERSTANDING OF THE COURT'S
15   THOUGHTS ON THE EXPERTS:  THEY CAN TALK ABOUT P.O.S.T.
16   STANDARDS, THEY CAN TALK ABOUT TRAINING; BUT IN TERMS OF THE
17   FACTS OF THE CASE AND OPINIONS, THEY'RE GOING TO BE GIVEN
18   HYPOTHETICALS.
19         THE COURT:  WHICH ARE DRAWN FROM THE ADMISSIBLE
20   FACTS.
21         MR. GALIPO:  WHAT I DON'T THINK IS APPROPRIATE IS:
22   WHAT DID SO-AND-SO SAY IN THIS STATEMENT AND THAT DEPOSITION?
23   BECAUSE THAT MAY BE DIFFERENT FROM WHAT THE JURY HEARD.
24         THE COURT:  CORRECT, EXACTLY.
25         MR. GALIPO:  WE'RE READY TO PROCEED, YOUR HONOR.
```

1       WE'RE PREPARED, YOUR HONOR -- I'M GOING TO GET OUR

2   NEXT WITNESS FROM THE HALLWAY SO SHE'LL BE READY BY THE

3   TIME --

4       THE COURT:  I WANT TO MAKE SURE BOTH COUNSEL

5   REALIZE YOU, OBVIOUSLY, HAVE THE RIGHT TO EFFECTIVELY

6   CROSS-EXAMINE EXPERTS.

7       CERTAINLY, MR. ROTHANS, AS TO LIEUTENANT CLARK,

8   YOU'RE FREE TO SAY WITHIN THE CONFINES OF WHAT THE JURY COULD

9   REASONABLY BELIEVE, SAY -- LET'S SAY THE HYPOTHETICAL IS:

10  THE PERSON WAS STANDING THERE WITH HIS HANDS RAISED AND WAS

11  SHOT.  OBVIOUSLY, LIEUTENANT CLARK WOULD SAY THAT'S NOT

12  ACCORDING TO P.O.S.T.  OBVIOUSLY, THEN YOU WOULD HAVE THE

13  RIGHT TO FOLLOW UP AND SAY WHEN, IF HE WAS SPINNING AROUND OR

14  STANDING THERE.  ISN'T IT TYPICAL THAT PEOPLE WILL BE ORDERED

15  TO FACE AWAY FROM THE OFFICERS?  YOU CAN OBVIOUSLY VARY THE

16  HYPOTHETICALS WITHIN WHAT IT IS THE JURY CAN FIND.  WHAT I

17  DON'T WANT IS EXACTLY WHAT MR. GALIPO RAISED, WHICH IS USING

18  EXPERTS AS A WAY TO DELVE INTO EVIDENCE TIED IN THE CASE BUT

19  NOT IN FRONT OF THE JURY.

20      MR. ROTHANS:  I TOTALLY UNDERSTAND THAT, YOUR

21  HONOR.  I HAVE CROSS-EXAMINED ROGER CLARK A DOZEN TIMES IN

22  FEDERAL COURT DURING TRIALS.  I FIND IT EFFECTIVE TO POINT

23  OUT WHAT HE HAS NOT DONE IN CONNECTION WITH THE CASE, NOT

24  WHAT HE HAS DONE.

25      THE COURT:  WELL, THE PROBLEM IS ASIDE FROM HAVING

1    AN AGAIN IDEA OF THE JURY -- FOR BOTH EXPERT AS A GENERAL

2    IDEA TO THE JURY WHAT IT IS THAT THEY'VE TAKEN THE ASSIGNMENT

3    SERIOUSLY THEN YOU SHOULD BE CROSS-EXAMINING HIM ON THE

4    HYPOTHETICAL.  MAYBE THIS IS A PERSONAL PREDILECTION OF MINE.

5    FRANKLY, I'D BE INCLINED TO MAKE P.O.S.T. STANDARDS PART OF

6    THE -- I'M NOT GOING TO SET MYSELF UP HERE AS THIS JUDGE WHO

7    GOES AGAINST THE WEIGHT OF HOW 1983 CASES ARE TRIED IN

8    FEDERAL COURT.  CLEARLY, THESE EXPERTS ARE GOING TO TESTIFY.

9    I'LL ALLOW IT.  I DON'T THINK IT'S APPROPRIATE FOR JURORS TO

10   RESOLVE THE CASE BY SAYING:  WHICH EXPERT DO WE LIKE BETTER?

11   I'VE SEEN THEM OF BEING OF MARGINAL RELEVANCE TO WHAT THE

12   JURY HAS TO DECIDE.

13            MR. ROTHANS:  CLEARLY, THE ISSUE OF BIAS AMONG

14   OTHERS IS RIPE FOR DISCUSSION.

15            THE COURT:  WELL, OF COURSE.  OBVIOUSLY, I'VE SEEN

16   MR. CLARK TESTIFY SEVERAL TIMES JUST IN FRONT OF ME IN MY

17   YEAR ON THE BENCH.  I'M AWARE OF WHAT YOU'RE SAYING.  YOU CAN

18   OBVIOUSLY RAISE -- I JUST THINK OF WHAT IT IS THAT HE DIDN'T

19   DO IS SOMETHING -- I JUST FIND IT DIFFICULT TO SEE EXACTLY

20   HOW THAT WILL NOT GET INTO EVIDENCE.  THAT SHOULD NOT BE IN

21   FRONT OF THE JURY EXCEPT -- IF HE CAME IN, IF ANYTHING, HE'S

22   PROBABLY WORKED TOO HARD, IF NOT HARD ENOUGH REALLY.  IF YOU

23   WERE GOING TO COME IN AND SAY:  DID YOU SPEND AN HOUR ON THIS

24   BEFORE YOU TOOK THE STAND?  BUT THE ANSWER IS CLEARLY NO.  I

25   DON'T SEE JUST WHAT IT IS HE DIDN'T DO IS PARTICULARLY GOING

```
 1   TO BE HELPFUL TO THE JURORS AS OPPOSED TO YOUR POINTING OUT,

 2   FRANKLY, AS I HAVE SEEN DONE IN OTHER CASES AND QUITE

 3   EFFECTIVELY, THAT THROUGH THE LOGIC THAT HE ESPOUSES HE WILL

 4   SOMETIMES TAKE EXTREME POSITIONS THAT NO JURORS ARE PREPARED

 5   TO ACCEPT TO BE BLUNT.  THAT'S HOW YOU REALLY OUGHT TO BE

 6   CROSS-EXAMINING HIM.  I'M NOT GIVING YOU LEGAL ADVICE WITH

 7   THE CONSTRAINTS I'M LAYING DOWN.  YOU WILL HAVE AMPLE

 8   OPPORTUNITY TO CROSS-EXAMINE HIM AND, LIKEWISE, MR. GALIPO,

 9   FOR YOUR EXPERT.

10             WITH THAT, LET'S GET THE JURORS IN HERE.

11                     (JURORS ENTER.)

12             THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

13             THE JURORS ARE HERE, THE LAWYERS ARE HERE.

14             I APOLOGIZE, AFTER ASKING YOU TO COME IN EARLY,

15   THAT WE'RE GETTING A LATE START.  THE LAWYERS AND I WERE

16   TALKING ABOUT THE BEST WAY FOR THE TWO EXPERT WITNESSES TO BE

17   EXAMINED AND CROSS-EXAMINED.  IT'S SOMEWHAT AN UNUSUAL THING

18   FOR SOMEBODY WHO WAS NOT THERE AT THE PARKING LOT ON

19   APRIL 25TH WHO IS GOING TO BE ALLOWED TO TESTIFY TO YOU AND,

20   THEREFORE, IT'S HELPFUL FOR US TO DISCUSS HOW THAT'S GOING TO

21   HAPPEN.  BUT I DO APOLOGIZE FOR THE FACT I ASKED YOU TO COME

22   IN EARLY.  NOW WE'RE GETTING A BIT OF A LATE START.

23             MR. GALIPO, YOU CAN GO AHEAD.

24             MR. GALIPO:  THE PLAINTIFFS WOULD LIKE TO CALL

25   AMANDA MEDEIROS.
```

1      **AMANDA MEDEIROS, PLAINTIFF'S WITNESS, SWORN**

2            THE CLERK:  PLEASE STATE AND SPELL YOUR NAME FOR

3      THE RECORD.

4            THE WITNESS:  AMANDA MEDEIROS, A-M-A-N-D-A, FIRST

5      NAME; LAST NAME, M-E-D-E-I-R-O-S.

6            THE CLERK:  THANK YOU.

7                      **DIRECT EXAMINATION**

8      BY MR. GALIPO:

9      Q.   GOOD MORNING, MS. MEDEIROS?

10     A.   GOOD MORNING.

11     Q.   WERE YOU A WITNESS TO A SHOOTING INCIDENT THAT OCCURRED

12     IN THE PARKING LOT OF A DONUT KING ON APRIL 25TH, 2010?

13     A.   YES.

14           MR. GALIPO:  AND I HAVE, YOUR HONOR, A FEW EXHIBITS

15     I THINK MAY BE NEW -- 372-048 -- BY AGREEMENT.

16           THE COURT:  IT WILL BE RECEIVED.

17                 (EXHIBIT 372-048 IN EVIDENCE.)

18     BY MR. GALIPO:

19     Q.   CAN YOU SEE THE PHOTO ON YOUR SCREEN?

20     A.   YES.

21     Q.   IS THAT THE DONUT KING THAT YOU WERE AT THAT MORNING?

22     A.   YES.

23     Q.   AND WHO WERE YOU THERE WITH?

24     A.   I WAS THERE WITH A FRIEND.  HER NAME IS FRANCIS.

25     Q.   AND WHAT WERE YOU DOING THERE AT THE DONUT KING THAT

1   MORNING?

2   A.   WE'RE GETTING BREAKFAST TOGETHER.

3   Q.   OKAY.  WE SEE IN THIS PHOTOGRAPH WHAT APPEARS TO BE A

4   GREEN CAR.  DID YOU SEE A GREEN CAR AT ANY POINT THAT MORNING

5   IN THE PARKING LOT?

6   A.   YES.

7   Q.   AT SOME POINT DID YOU SEE SOME POLICE -- ONE OR MORE

8   POLICE VEHICLES BEHIND THE GREEN CAR IN THE PARKING LOT?

9   A.   YES.

10  Q.   NOW, IF YOU RECALL -- AND I'M GOING TO SHOW YOU ANOTHER

11  PHOTO -- AND, AGAIN, YOUR HONOR, I THINK THIS MAY BE A NEW

12  ONE -- 372-239.

13           THE COURT:  IT WILL BE RECEIVED.

14              (EXHIBIT 372-239 IN EVIDENCE.)

15  BY MR. GALIPO:

16  Q.   WHERE IN THE DONUT KING -- WELL, STRIKE THAT.

17           AT SOME POINT WAS THERE SOME TYPE OF A DISTURBANCE

18  INSIDE THE DONUT KING?

19  A.   YES.

20  Q.   AND WAS THAT BEFORE YOU SAW THE GREEN CAR?

21  A.   YES.

22  Q.   AND WHAT WAS THE NATURE OF THAT DISTURBANCE?

23  A.   THERE WAS A GENTLEMAN WHO DID NOT WANT TO PAY FOR THE

24  SERVICE THAT HE WAS GETTING AT THE STORE.

25  Q.   OKAY.  BY THE WAY, DO YOU CURRENTLY WORK?

1    A.   YES.

2    Q.   AND WHAT TYPE OF WORK ARE YOU CURRENTLY DOING?

3    A.   I'M A TRANSLATOR.

4    Q.   OKAY.  SO WAS THERE ANY TYPE OF DISCUSSION OR ARGUMENT

5    THAT WAS GOING ON INSIDE ABOUT THE GENTLEMAN'S REFUSAL TO PAY

6    FOR THE SERVICE?

7    A.   YES.

8    Q.   AND AT SOME POINT WERE THE POLICE CALLED?

9    A.   YES.

10   Q.   AND DO YOU RECALL -- DO YOU REMEMBER WHO CALLED THE

11   POLICE?

12   A.   MY FRIEND DID.

13   Q.   OKAY.  THAT WOULD BE FRANCIS?

14   A.   FRANCIS.  YES, CORRECT.

15   Q.   AND WHERE IN THE DONUT KING WERE YOU SEATED?

16   A.   I WAS SEATED IN FRONT OF THE COUNTER WHERE THEY HAD ALL

17   THE DONUTS.  I WAS SEATED AT THAT VERY FIRST TABLE INSIDE.

18   Q.   OKAY.  I'M GOING TO SHOW YOU ANOTHER -- WELL, I'LL WAIT

19   FOR A MOMENT.  ALL RIGHT.

20          SO WERE YOU, IN PART, WAITING FOR THE POLICE TO

21   ARRIVE?

22   A.   YES, I WAS.

23   Q.   AND AT SOME POINT DID YOU SEE A POLICE CAR ARRIVE?

24   A.   YES, I DID.

25   Q.   AND AT SOME POINT DID YOU SEE THE GREEN CAR?

1    A.   YES, I DID.

2    Q.   AND WAS THE GREEN CAR IN THE POSITION THAT WE SEE IT IN

3    IN THIS PHOTOGRAPH?

4    A.   CORRECT, YES.

5    Q.   AND GOING TO THE PREVIOUS PHOTOGRAPH, AT SOME POINT DID

6    YOU SEE A COUPLE OF PATROL VEHICLES BEHIND THE GREEN CAR?

7    A.   YES.

8    Q.   NOW, WHEN YOU FIRST SAW THE POLICE CARS, DID YOU THINK

9    THEY WERE COMING BECAUSE FRANCIS HAD CALLED?

10   A.   YEAH.

11   Q.   AT SOME POINT DID YOU START THINKING MAYBE THEY WERE

12   THERE FOR ANOTHER REASON?

13            MR. ROTHANS:  OBJECTION, LEADING.

14            THE COURT:  SUSTAINED.

15   BY MR. GALIPO:

16   Q.   WERE YOU WATCHING WHAT WAS GOING ON IN THE PARKING LOT?

17   A.   YES.

18   Q.   AND WHAT WERE YOU GENERALLY OBSERVING AFTER YOU NOTICED

19   THE GREEN CAR AND SOME POLICE CARS?

20   A.   AFTER I NOTICED IT, I SAW THE POLICE CARS AND THEN I

21   TURNED TO THE GREEN CAR TO SEE WHAT WAS GOING ON.

22   Q.   OKAY.  BY THE WAY, AFTER THIS INCIDENT HAPPENED, WERE

23   YOU INTERVIEWED BY ANYONE?

24   A.   AFTER THE INCIDENT HAPPENED, YES, I WAS.

25   Q.   OKAY.  AND THE FIRST INTERVIEW THAT TOOK PLACE, THAT WAS

```
 1    DONE WHERE?

 2    A.   RIGHT OUTSIDE OF THE DONUT SHOP.

 3    Q.   OKAY.  DO YOU REMEMBER WHAT TYPE OF VEHICLE YOU CAME IN

 4    THAT DAY?

 5    A.   I CAME IN MY VEHICLE.  IT WAS A BLACK TOYOTA.

 6    Q.   AND WHAT TYPE OF TOYOTA, IF YOU RECALL?

 7    A.   AN ECHO.

 8    Q.   I'M GOING TO ZOOM IN A LITTLE BIT, AND YOU TELL ME IF

 9    YOU SEE YOUR CAR ANYWHERE IN THIS PHOTO.

10    A.   YES.

11    Q.   AND IS THIS YOUR CAR HERE (POINTING)?

12    A.   YES, CORRECT.

13         THE COURT:  FOR THE RECORD, THE BLACK CAR FACING

14    SOUTH IN THE PARKING LOT RIGHT BY THE DONUT KING.

15         MR. GALIPO:  THANK YOU, YOUR HONOR.

16    BY MR. GALIPO:

17    Q.   NOW, DID A POLICE OFFICER TAKE YOUR STATEMENT THE FIRST

18    DAY?

19    A.   YES.

20    Q.   AND AFTER THAT DID ANYONE ELSE CONTACT YOU REGARDING

21    TAKING A STATEMENT?

22    A.   YES.

23    Q.   DID YOU GIVE ANY OTHER STATEMENTS AFTER THE FIRST DAY?

24    A.   YES, I DID.

25    Q.   AND WERE THOSE DETECTIVES?
```

1    A.   YES.

2    Q.   AND THEN AFTER THAT, AT SOME POINT WAS YOUR DEPOSITION

3    TAKEN IN THIS CASE?

4    A.   YES.

5    Q.   HAVE YOU HAD AN OPPORTUNITY IN THE LAST FEW DAYS TO AT

6    LEAST LOOK AT YOUR TRANSCRIPTIONS OF YOUR STATEMENTS OR YOUR

7    DEPOSITION TESTIMONY?

8    A.   YES.

9    Q.   OKAY.  NOW, WHAT OBSERVATIONS DID YOU MAKE WITH RESPECT

10   TO THE GREEN CAR ONCE YOU STARTED WATCHING THE GREEN CAR?

11   A.   WHEN I TURNED TO THE GREEN CAR, I NOTICED THERE WAS A

12   PERSON GETTING OUT OF IT AND I NOTICED THE CAR AND I SAW

13   SOMEBODY GETTING OUT OF IT.

14   Q.   OKAY.  AND I'M GOING TO SHOW YOU ANOTHER EXHIBIT.

15           THIS WOULD BE 372-179, BY AGREEMENT.

16           THE COURT:  IT WILL BE RECEIVED.

17           (EXHIBIT 372-179 IN EVIDENCE.)

18   BY MR. GALIPO:

19   Q.   THE PERSON THAT YOU SAW GETTING OUT OF THE CAR OUT, OF

20   THE GREEN CAR, WAS THAT PERSON GETTING OUT ON THE DRIVER'S

21   SIDE OF THE CAR OR ON THE PASSENGER'S SIDE?

22   A.   THE PASSENGER.

23   Q.   OKAY.  COULD YOU TELL IF THAT PERSON WAS A MALE OR A

24   FEMALE?

25   A.   MALE.

1   Q.   DO YOU RECALL THE RACE OF THE PERSON, WHETHER THEY WERE

2   AFRICAN-AMERICAN?  HISPANIC?  OR SOME OTHER RACE?

3   A.   HE WAS AFRICAN-AMERICAN.

4   Q.   OKAY.  NOW DO YOU KNOW, DIRECTIONALLY, WHICH WAY THE

5   FRONT OF THAT GREEN CAR IS FACING?

6   A.   WEST.

7   Q.   OKAY.  NOW, WHEN THE AFRICAN-AMERICAN MALE GOT OUT OF

8   THE PASSENGER SIDE OF THE VEHICLE, WHAT DID YOU SEE HIM DO?

9   A.   HE CAME OUT OF THE CAR WITH HIS HANDS UP AND HE STOOD UP

10  NEXT TO THE CAR.

11  Q.   OKAY.  WHEN HE STOOD UP NEXT TO THE CAR, DID HE HAVE HIS

12  HANDS UP?

13  A.   YES, UP.

14  Q.   COULD YOU SEE HIS HANDS FROM WHERE YOU WERE?

15  A.   YES, I SAW HIS HANDS.

16  Q.   AND IF THE FRONT OF THE CAR WAS FACING WEST WHEN HE

17  STOOD UP WITH HIS HANDS UP, WHICH WAY WAS THE GENTLEMAN

18  FACING?

19  A.   HE CAME OUT OF THE CAR AND HE WAS FACING EAST, OR IT'S

20  WHERE THE CARS WERE, WHERE THE POLICE CARS WERE.

21  Q.   ALL RIGHT.  LOOKING AT EXHIBIT 372-048, ARE THOSE THE

22  POLICE CARS YOU'RE SAYING HE WAS FACING IN THAT DIRECTION?

23  A.   YES.

24  Q.   SO IN TERMS OF -- IN TERMS OF THE GREEN CAR WHEN HE GOT

25  OUT AND STOOD UP WITH HIS HANDS UP, JUST SO WE'RE CLEAR, WAS

1  HE FACING TOWARDS THE FRONT OF THE GREEN CAR OR WAS HE FACING

2  TOWARDS THE REAR OF THE GREEN CAR?

3  A.   HE WAS FACING THE REAR OF THE GREEN CAR.

4  Q.   OKAY.  NOW FROM YOUR POSITION IN THE DONUT KING, WAS THE

5  GREEN CAR BLOCKING ANY PART OF YOUR VIEW OF ANY PART OF HIS

6  BODY?

7  A.   YES.

8  Q.   WHAT PART COULD YOU SEE AND WHAT PART COULD YOU NOT SEE

9  ON HIS BODY AS YOU WERE LOOKING AT HIM ONCE HE GOT OUT AND

10  STOOD UP?

11  A.   I WAS ONLY ABLE TO SEE FROM THE CHEST UP.  AND THEN THAT

12  WAS ALL I WAS ABLE TO SEE I COULD NOT SEE FROM THE CHEST

13  DOWN.

14  Q.   OKAY.

15  A.   AND THE MONITOR WAS BLOCKING MY VIEW.

16  Q.   DO YOU HAVE A RECOLLECTION OF WHERE -- MAYBE YOU CAN

17  SHOW THE JURY.  WHEN YOU SAY, "CHEST," WHERE ON HIM DO YOU

18  THINK YOU COULD SEE?  FROM WHAT POINT UP?

19  A.   THE VERY UPPER PART OF THE CHEST, UP TOWARDS THE WHOLE

20  HEAD.

21  Q.   OKAY.  SO TOWARD -- YOU WOULD HAVE BEEN LOOKING OVER

22  WHAT PART OF THE CAR TO SEE HIS UPPER CHEST AND ABOVE?

23  A.   THE TOP, TOP OF THE CAR.

24  Q.   NOW AT THIS POINT, WHEN HE GETS OUT, STANDING WITH HIS

25  HANDS UP AND HE'S FACING EAST OR TOWARDS THE BACK OF THE CAR,

1    WHAT SIDE OF HIM ARE YOU LOOKING AT?

2    A.   IT WAS HIS RIGHT SIDE.

3    Q.   AND DID YOU SEE ANYTHING IN HIS HANDS AT THAT TIME?

4    A.   NO.

5    Q.   CAN YOU DESCRIBE OR SHOW THE JURY HOW YOU RECALL HIM

6    HAVING HIS HANDS WHEN YOU OBSERVED HIM STANDING AND FACING

7    EAST?

8    A.   I OBSERVED HIM STANDING.  HIS HANDS CAME UP TOGETHER

9    WITH HIS HEAD LIKE THIS (INDICATING).

10   Q.   KEEP THEM THERE FOR A SECOND.  INDICATING EACH HAND TO

11   THE SIDE OF THE HEAD, FINGERS SPREAD, PALMS FACING OUT, YOUR

12   HONOR, WITH MAYBE THE FINGER TIPS SOMEWHERE IN LINE WITH THE

13   TOP OF THE HEAD.

14           THE COURT:  ABOVE THE FINGER -- TOP OF THE FINGER

15   TIPS, ABOVE THE EARS.  THE RECORD WILL SO REFLECT.

16           MR. GALIPO:  OKAY, THANK YOU.

17   Q.   AND YOU WERE ABLE TO SEE THAT FROM WHERE YOU WERE?

18   A.   YES, I WAS.

19   Q.   NOW AT THIS POINT, WERE YOU LOOKING AROUND?  WERE YOU

20   FOCUSED ON HIM?  WHAT -- WHERE WERE YOU LOOKING AT THIS

21   POINT?

22   A.   I WAS FOCUSED ON THE GREEN CAR WHERE THE GENTLEMAN WAS

23   GETTING OUT OF THE CAR.

24   Q.   OKAY.  NOW, DID YOU EVER SEE THAT GENTLEMAN GET OUT AND,

25   RATHER THAN FACE EAST TOWARDS THE BACK OF THE CAR, DID YOU

1   EVER SEE HIM GET OUT AND FACE WEST TOWARDS THE FRONT OF THE

2   CAR?

3   A.   NO.

4   Q.   AT SOME POINT IN TIME, DID YOU HEAR WHAT SOUNDS LIKE

5   GUNSHOTS?

6   A.   YEAH.

7   Q.   AND FROM THE TIME THAT YOU SAW THIS AFRICAN-AMERICAN

8   GENTLEMAN STANDING UP, FACING EAST WITH HIS HANDS UP AS YOU

9   DESCRIBED, UP UNTIL THE TIME OF THE SHOTS, WERE YOU LOOKING

10  AT HIM CONTINUOUSLY?

11  A.   YES, I WAS.

12  Q.   COULD YOU TELL FROM WHERE YOU WERE -- WELL, STRIKE THAT.

13           COULD YOU HEAR ANYTHING BEING SAID FROM WHERE YOU

14  WERE INSIDE THE DONUT SHOP?

15  A.   NO.

16  Q.   COULD YOU TELL WHETHER ANY MOUTHS WERE MOVING AT ANY

17  TIME?

18  A.   YEAH, I COULD SEE THEIR MOUTHS MOVING.

19  Q.   DO YOU HAVE AN ESTIMATE AS TO HOW MUCH TIME PASSED FROM

20  THE TIME THE AFRICAN-AMERICAN GENTLEMAN WAS FIRST STANDING,

21  FACING EAST TOWARDS THE BACK OF THE CAR WITH HIS HANDS UP, TO

22  THE TIME YOU HEARD THE SHOTS?

23  A.   THE TIME MUST HAVE BEEN ABOUT 10 TO 20 SECONDS.  IT WAS

24  SO FAST.

25  Q.   THAT'S JUST AN ESTIMATE?

1    A.   YEAH.

2    Q.   NOW, AT THE TIME YOU HEARD THE SHOTS, WERE YOU LOOKING

3    AT THE BLACK -- THE AFRICAN-AMERICAN GENTLEMAN?

4    A.   YES.

5    Q.   AND WHERE WERE HIS -- FIRST OF ALL, COULD YOU SEE HIS

6    HANDS AT THE TIME YOU HEARD THE SHOTS?

7    A.   YES, I COULD.

8    Q.   WHERE WERE HIS HANDS AT THE TIME YOU HEARD THE SHOTS?

9    A.   THEY WERE STILL HERE (INDICATING) LIKE THIS.  THEY WERE

10   STILL UP.

11   Q.   DID YOU SEE ANYTHING IN HIS HANDS AT THE TIME YOU HEARD

12   THE SHOTS?

13   A.   NO, I DID NOT.

14   Q.   DID IT EVER APPEAR TO YOU, BASED ON YOUR OBSERVATIONS OF

15   HIM AFTER HE GOT OUT OF THE CAR -- DID IT EVER APPEAR TO YOU

16   THAT HE WAS GOING TO SHOOT SOMEONE?

17   A.   NO.

18        MR. ROTHANS:  OBJECTION.  CALLS FOR SPECULATION,

19   LACKS FOUNDATION.

20        THE COURT:  OVERRULED.

21   Q.   FROM THE TIME THAT HE FIRST GOT IN THAT POSITION YOU

22   DESCRIBED TO THE TIME OF THE SHOTS, DID HIS HANDS EVER GO OUT

23   OF YOUR VIEW, MEANING BELOW HIS UPPER CHEST SO YOU COULD NO

24   LONGER SEE THEM BECAUSE OF THE CAR?

25   A.   NO.

1  Q.   WHEN YOU HEARD THE SHOTS, DID YOU KNOW WHAT THAT WAS AT

2  FIRST?

3  A.   NO.

4  Q.   HAD YOU EVER HEARD GUNSHOTS BEFORE?

5  A.   NO.

6  Q.   DO YOU RECALL WHETHER YOU HEARD ONE SHOT OR MORE THAN

7  ONE?

8  A.   IT WAS MORE THAN ONE.  IT WAS ABOUT TWO OR THREE,

9  THEN -- IT WAS QUICK SO I THINK -- YEAH, IT WAS ABOUT TWO OR

10  THREE.

11  Q.   AND WHAT DID YOU DO AFTER YOU HEARD THE SHOTS OR --

12  A.   AFTER I HEARD THE SHOTS, I JUST -- I WAS REALLY SCARED.

13  I DIDN'T KNOW SO I WAS LOOKING AROUND TO SEE WHAT WAS GOING

14  ON.  I WAS -- YEAH, SO I JUST LOOKED AT THE GREEN CAR AND I

15  JUST KEPT LOOKING AND WONDERING WHAT'S GOING ON.  I GOT

16  REALLY FRIGHTENED.

17  Q.   YOU TOLD US AT THE TIME YOU HEARD THE SHOTS YOU WERE

18  LOOKING AT THE AFRICAN-AMERICAN MAN AND YOU SAW HIS HANDS UP.

19       DID YOU SEE HIS BODY POSITION CHANGE AFTER YOU

20  HEARD THE SHOTS?

21  A.   NO.

22  Q.   AT SOME POINT, DID HE GO OUT OF YOUR VIEW?

23  A.   YES, HE FELL.

24  Q.   OKAY.  ONCE HE FELL, COULD YOU SEE HIM ANY LONGER FROM

25  WHERE YOU WERE INSIDE THE DONUT SHOP?

1    A.    NO.

2    Q.    NOW, YOU INDICATED THAT AT SOME POINT YOU GAVE A

3    STATEMENT AT THE SCENE; IS THAT CORRECT?

4    A.    YES.

5    Q.    AND HOW LONG WAS IT, APPROXIMATELY, FROM THE TIME OF THE

6    SHOOTING TO THE TIME YOU GAVE THE STATEMENT?

7    A.    IT WAS ABOUT AN HOUR AFTER, TOOK A WHILE FOR US TO TALK

8    TO THE OFFICERS.

9    Q.    OKAY.  DID ANYONE INSTRUCT YOU THAT YOU NEED TO STAY

10   HERE UNTIL YOU'RE SPOKEN TO?

11   A.    WE WERE INSTRUCTED TO STAY INSIDE; YES, ALL OF US.

12   Q.    IF YOU RECALL, WHO INSTRUCTED YOU TO DO THAT?

13   A.    I DO NOT RECALL.

14   Q.    AND DID YOU FOLLOW THAT INSTRUCTION AND STAY INSIDE?

15   A.    YES, I DID.

16   Q.    AT SOME POINT -- WERE YOU THERE THEN WHILE THE

17   PARAMEDICS CAME?

18   A.    YES, I SAW THE PARAMEDICS COME.

19   Q.    DO YOU RECALL WHEN THE PARAMEDICS CAME IN TIME?

20   A.    I DON'T RECALL EXACTLY.

21   Q.    DID YOU SEE ANYTHING AFTER THE SHOOTING WITH RESPECT TO

22   ANY WEAPONS OR GUNS FROM THE OFFICERS?

23            MR. ROTHANS:  VAGUE AND AMBIGUOUS.

24            THE COURT:  SUSTAINED.

25            MR. GALIPO:  I'LL TRY NOT TO BE LEADING.

1          THE COURT:  YOU'LL HAVE TO THREAD THAT NEEDLE, MR.

2   GALIPO.

3          MR. GALIPO:  OKAY.

4   Q.   DID YOU EVER FORM AN IMPRESSION AS TO WHICH OFFICER MAY

5   HAVE BEEN THE SHOOTER AFTER THE SHOOTING?

6   A.   YEAH.

7   Q.   AND WHAT IMPRESSION DID YOU FORM, AND WHAT WAS THAT

8   BASED ON?

9   A.   AT QUICK GLANCE, I JUST CAUGHT A SHOT OF PEOPLE

10  HUDDLING -- OF THE OFFICERS HUDDLING IN ONE CORNER.  AND I

11  DIDN'T KNOW WHAT THEY WERE SAYING.  I SAW THEM QUICKLY HUDDLE

12  TOGETHER AND DISPERSE.  SO BASED ON THAT QUICK GLANCE, I

13  ASSUMED THEY WERE TENDING TO THE PERSON THAT WAS SHOT.  I

14  WASN'T SURE.

15  Q.   DID YOU SEE, FOR EXAMPLE, ANY WEAPON BEING TAKEN FROM

16  ANY OFFICER?

17  A.   I DO NOT RECALL EXACTLY.

18  Q.   NOW WERE YOU ALLOWED TO MOVE YOUR CAR AFTER THE

19  SHOOTING?

20  A.   NO, I WAS NOT.

21  Q.   DID YOU HAVE TO LEAVE THE SCENE AT SOME POINT AFTER YOUR

22  STATEMENT?

23  A.   I DID.

24  Q.   WAS YOUR CAR STILL THERE?

25  A.   YES.

1    Q.   NOW YOU'VE BEEN SUBPOENAED BY MY OFFICE TO APPEAR IN

2    COURT TODAY?

3    A.   YES.

4    Q.   YOU AND I -- DID WE TALK ON THE PHONE FOR THE FIRST TIME

5    YESTERDAY?

6    A.   MM-HUH.  YES, CORRECT.

7    Q.   AND DID WE MEET THIS MORNING AND I SHOWED YOU SOME

8    PHOTOS OF THE SCENE?

9    A.   CORRECT.

10   Q.   DID I ALSO PROVIDE TO YOU TRANSCRIBED COPIES OF THE

11   STATEMENTS THAT YOU HAD PREVIOUSLY GIVEN?

12   A.   YES, THAT'S CORRECT.

13   Q.   AND AT SOME POINT, WERE YOU PROVIDED WITH A COPY OF YOUR

14   DEPOSITION THAT YOU GAVE IN THIS MATTER?

15   A.   YES.

16            MR. GALIPO:  THANK YOU.  THAT'S ALL I HAVE, YOUR

17   HONOR.

18            THE COURT:  MR. MC NICHOLAS.

19            MR. MC NICHOLAS:  NO QUESTIONS, YOUR HONOR.

20            THE COURT:  MR. ROTHANS.

21                      **CROSS-EXAMINATION**

22   BY MR. ROTHANS:

23   Q.   GOOD MORNING, MS. MEDEIROS.

24   A.   GOOD MORNING.

25   Q.   WE'VE MET BEFORE, TRUE?

1    A.   UH-HUH.

2    Q.   THAT'S A "YES"?

3    A.   YES.

4    Q.   THAT'S YOUR DEPOSITION?

5    A.   YES.

6    Q.   AND YOUR DEPOSITION WAS TAKEN IN MARCH OF 2011, MORE

7    THAN TWO YEARS AGO?

8    A.   YES.

9    Q.   VERY WELL.  AND IT WAS CONDUCTED BY THE MC NICHOLAS LAW

10   FIRM; IS THAT TRUE?

11   A.   CORRECT.

12   Q.   MR. GALIPO ASKED YOU SOME QUESTIONS ABOUT YOUR CONTACT

13   WITH HIM, AND HE SAID YOU SPOKE TO HIM YESTERDAY BY

14   TELEPHONE?

15   A.   YES, CORRECT.

16   Q.   HOW LONG WAS THAT CONVERSATION?

17   A.   ABOUT 20 MINUTES.

18   Q.   AND YOU MET WITH HIM THIS MORNING?

19   A.   CORRECT.

20   Q.   HOW LONG WAS THE MEETING THIS MORNING?

21   A.   ABOUT 20 MINUTES.

22   Q.   AND BEFORE MEETING WITH MR. GALIPO THIS MORNING AND

23   TALKING TO HIM YESTERDAY, YOU'VE HAD PREVIOUS CONTACT WITH

24   MR. MC NICHOLAS' FIRM --

25   A.   CORRECT.

1    Q.   -- RIGHT?

2    A.   CORRECT.

3    Q.   HOW MANY TIMES TOTAL, MS. MEDEIROS, WOULD YOU SAY YOU'VE

4    HAD EITHER A TELEPHONE CONVERSATION, AN E-MAIL OR AN

5    IN-PERSON MEETING WITH THE LAWYERS FOR THE PLAINTIFFS OR THE

6    INVESTIGATORS ON THAT SIDE?

7    A.   I WOULD SAY ABOUT FIVE TIMES, FIVE OR SIX.

8    Q.   FIVE DIFFERENT TIMES?

9    A.   YEAH.

10   Q.   YOU WERE INITIALLY CONTACTED.  WAS IT BY CAMERON OF THE

11   MC NICHOLAS LAW FIRM?

12   A.   YES.

13   Q.   AND THAT WAS PRIOR TO YOUR DEPOSITION IN MARCH OF 2011?

14   A.   CORRECT.

15   Q.   YOU MET WITH CAMERON OF THE MC NICHOLAS OFFICE AND

16   ACTUALLY SIGNED A DOCUMENT HE ASKED YOU TO SIGN?

17   A.   CORRECT.

18   Q.   THAT'S BECAUSE THERE WAS SOME RUSH TO GET YOUR

19   DEPOSITION CONDUCTED IN THE CASE, TRUE?

20   A.   CORRECT.

21   Q.   YOU WERE GOING TO BE MOVING TO ESSEX OVER IN ENGLAND TO

22   GO TO THE COLLEGE OF PARANORMAL ACTIVITY?

23   A.   CORRECT.

24   Q.   SO THERE WAS A PUSH TO GET YOUR DEPOSITION DONE BEFORE

25   DEPOSITIONS COMMENCED IN THIS CASE.  SO YOU WENT TO THE

1    OFFICES OF MC NICHOLAS AND MC NICHOLAS, MET WITH CAMERON,

2    SIGNED A DOCUMENT AND HAD A DISCUSSION WITH SOMEBODY ELSE

3    FROM THEIR OFFICE, TRUE?

4    A.   CORRECT.

5    Q.   SINCE THEN YOU'VE OBVIOUSLY HAD SOME CONTACT WITH EITHER

6    MR. GALIPO'S OFFICE OR MR. MC NICHOLAS'S OFFICE ABOUT

7    ARRANGEMENTS TO COME TO THE COURTROOM FOR THIS TESTIMONY?

8    A.   CORRECT.

9    Q.   YOU SAY THERE WERE A TOTAL OF FIVE DISCUSSIONS OR

10   MEETINGS, TRUE?

11   A.   YES.

12        MR. GALIPO:  OBJECTION.  MISCHARACTERIZES HER

13   TESTIMONY.

14        THE COURT:  I THINK THE "FIVE" WAS MEANT FOR THE

15   ENTIRE CONTACTS OF THE PLAINTIFF'S SIDE, INCLUDING THE ONES

16   THAT YOU PREVIOUSLY MENTIONED.

17        I THINK WE'RE EXHAUSTING THIS TOPIC, MR. ROTHANS,

18   SO MOVE ON.

19        MR. ROTHANS:  OKAY.

20   BY MR. ROTHANS:

21   Q.   OTHER THAN AT YOUR DEPOSITION, HOW MANY COMMUNICATIONS

22   HAVE YOU HAD WITH MY OFFICE?

23   A.   I DON'T THINK I HAVE.

24   Q.   HAVE YOU MADE ANY EFFORT SINCE THE INCIDENT IN APRIL,

25   ONCE YOU LEARNED -- EXCUSE ME -- APRIL OF 2010, ONCE YOU'VE

```
 1    LEARNED OF OUR INVOLVEMENT TO REACH OUT TO US TO TELL US MORE

 2    ABOUT WHAT YOU KNEW OR SAW?

 3            MR. GALIPO:  I'M GOING TO OBJECT AS VAGUE AND

 4    AMBIGUOUS AS PHRASED, YOUR HONOR.

 5            THE COURT:  OVERRULED.

 6            THE WITNESS:  I DID NOT.

 7    BY MR. ROTHANS:

 8    Q.   YOUR FRIEND WHO WAS WITH YOU THAT DAY WAS FRANCIS

 9    PRISSIA (PHONETIC), CORRECT?

10    A.   CORRECT.

11    Q.   SHE'S A CRIMINAL DEFENSE LAWYER?

12    A.   YES.

13    Q.   HER WORK IS DEFENDING DEFENDANTS WHO HAVE BEEN CHARGED

14    CRIMINALLY WITH MATTERS AND CROSS-EXAMINING POLICE OFFICERS

15    IN THOSE CRIMINAL PROCEEDINGS?

16    A.   CORRECT.

17            MR. GALIPO:  I'M GOING TO OBJECT AS CALLS FOR

18    SPECULATION AS PHRASED.

19            THE COURT:  AND SEEMS OF DUBIOUS RELEVANCE, SO THE

20    OBJECTION IS SUSTAINED.

21    BY MR. ROTHANS:

22    Q.   AND WHEN WERE YOU PROVIDED A COPY OF A TRANSCRIPTION OF

23    YOUR STATEMENT WITH ONE OF THE CULVER CITY OFFICERS FOR THE

24    FIRST TIME?

25    A.   THE STATEMENT I HAVE WAS PROVIDED TO ME YESTERDAY.
```

1    Q.    THIS IS THE STATEMENT YOU GAVE TO SERGEANT LOPEZ FROM

2    THE CULVER CITY POLICE DEPARTMENT WITHIN AN HOUR OR TWO OF

3    THE INCIDENT?

4    A.    CORRECT.

5    Q.    AND THE FIRST TIME YOU SAW IT WAS YESTERDAY?

6    A.    CORRECT.

7    Q.    SO YOU HAD NOT SEEN IT BEFORE YOUR DEPOSITION YOU WERE

8    GIVEN IN OCTOBER AND SWORN TO TELL THE TRUTH?

9    A.    NO.

10   Q.    AND WHEN WERE YOU FIRST GIVEN A COPY OF THE TRANSCRIPT

11   OF THE INTERVIEW BY THE L.A. COUNTY SHERIFF'S DETECTIVES?

12   A.    YESTERDAY AS WELL.

13   Q.    SO, AGAIN, WHEN YOUR DEPOSITION WAS TAKEN, THEY HAD NOT

14   PROVIDED YOU COPIES OF EITHER OF THOSE STATEMENTS?

15   A.    NO.

16   Q.    MR. GALIPO SHOWED YOU SOME PHOTOGRAPHS THIS MORNING?

17   A.    CORRECT.

18   Q.    IS THAT THE FIRST TIME, MS. MEDEIROS, YOU'D EVER SEEN

19   ANY PHOTOGRAPHS FROM THE L.A. COUNTY SHERIFFS INVESTIGATION

20   IN THIS CASE?

21   A.    CORRECT YES.

22   Q.    BEFORE YOUR DEPOSITION, THE LAWYERS HAD NOT SHOWN YOU

23   ANY PHOTOGRAPHS FROM THE INCIDENT?

24   A.    CORRECT.

25   Q.    AND BACK ON APRIL 25TH, 2010, HOW TALL WERE YOU?

1    A.    5'3".

2    Q.    AND YOU WERE SEATED WHEN THIS INCIDENT OCCURRED?

3    A.    YES.

4    Q.    WERE YOU SEATED THE ENTIRE TIME INSIDE THE DONUT KING

5    THE INCIDENT OCCURRED?

6    A.    NO.

7    Q.    YOU STOOD UP AFTER THE SHOOTING?

8    A.    NO.  I STOOD UP BEFORE THE SHOOTING TO SEE, SO I COULD

9    SEE.

10   Q.    YOU DID NOT TELL SERGEANT LOPEZ FROM THE CULVER CITY

11   POLICE DEPARTMENT THAT YOU STOOD UP BEFORE THE SHOOTING, DID

12   YOU?

13   A.    I DON'T KNOW.  I PROBABLY FORGOT BECAUSE I COULDN'T SEE

14   FROM SITTING, SO I STOOD UP TO SEE.

15   Q.    DID YOU TELL SERGEANT LOPEZ THAT?

16   A.    I DON'T RECALL IF I DID OR NOT.  IT WAS SO LONG AGO, I

17   DON'T RECALL.

18   Q.    WELL, YOU READ THE TRANSCRIPT WHEN?

19   A.    LAST NIGHT.

20   Q.    YOU DIDN'T TELL SERGEANT LOPEZ THAT, DID YOU?

21          MR. GALIPO:  I'M GOING TO OBJECT AS ASKED AND

22   ANSWERED.

23          THE COURT:  OVERRULED.

24          THE WITNESS:  SORRY.

25   BY MR. ROTHANS:

```
 1    Q.   WHEN YOU READ THE TRANSCRIPT OF THE BRIEF STATEMENT YOU

 2    GAVE TO SERGEANT LOPEZ FROM CULVER CITY POLICE DEPARTMENT --

 3    AND YOU READ IT LAST NIGHT -- YOU NOTICED THAT YOU DIDN'T

 4    MAKE ANY REFERENCE TO "STANDING" BEFORE THE SHOOTING, TRUE?

 5    A.   CORRECT.

 6    Q.   AND THE L.A. COUNTY SHERIFF'S DETECTIVES WHO TOOK A

 7    STATEMENT FROM YOU SOME MONTHS AFTERWARDS -- YOU DIDN'T TELL

 8    THEM YOU WERE STANDING, DID YOU?

 9    A.   NO, I DIDN'T MENTION THAT.

10    Q.   IN FACT, YOU TOLD THE SHERIFF'S DETECTIVES,

11    SPECIFICALLY, SERGEANT COCHRAN FROM THE L.A. COUNTY SHERIFF'S

12    HOMICIDE DIVISION, THAT YOU WERE SITTING AT A TABLE INSIDE

13    THE DONUT KING WHEN THE SHOOTING TOOK PLACE, TRUE?

14    A.   IF I SAID THAT, SURE.  CORRECT.

15    Q.   DO YOU HAVE ANY FAMILY MEMBERS OR FRIENDS WHO ARE POLICE

16    OFFICERS?

17    A.   NO.

18    Q.   AND WHAT TIME, MS. MEDEIROS, DID YOU ARRIVE AT THE DONUT

19    KING ON THE MORNING OF APRIL 25TH, 2010?

20    A.   APPROXIMATELY, AROUND 10.

21    Q.   AND YOU REMEMBER WHEN YOUR DEPOSITION WAS TAKEN AT THE

22    MC NICHOLAS OFFICE, CORRECT?

23    A.   CORRECT.

24    Q.   AND EVEN THOUGH IT WAS TWO YEARS AGO, YOU REMEMBER THE

25    COURT REPORTER RAISED HER HAND AND HAD YOU SWORN IN, SWORN TO
```

1    TELL THE TRUTH LIKE MS. SANCHEZ DID TODAY?

2    A.   I DON'T RECALL IT AT THIS TIME, BUT, YES.

3    Q.   YOU'VE READ THE TRANSCRIPT?

4    A.   YES.

5    Q.   YOU SEE THAT YOU WERE ADMINISTERED AN OATH --

6    A.   YES.

7    Q.   -- IN THE BEGINNING OF THE TRANSCRIPT?

8    A.   YES.

9    Q.   YOU CERTAINLY DID YOUR BEST TO TELL THE TRUTH AT THE

10   TIME OF THE DEPOSITION, TRUE?

11   A.   YES, CORRECT.

12   Q.   YOU TESTIFIED AT THE DEPOSITION THAT YOU WALKED TO THE

13   DONUT KING AFTER YOUR FRIEND SPENT THE NIGHT OR WAS STAYING

14   AT YOUR HOUSE; IS THAT CORRECT?

15             MR. GALIPO:  I'M GOING TO OBJECT AS AN IMPROPER USE

16   OF THE DEPOSITION, YOUR HONOR.

17             THE COURT:  COUNSEL, SET IT UP -- JUST ASK WHETHER

18   SHE -- HOW SHE GOT THERE.  AND THEN I THINK THAT -- AND THEN

19   IF THE ANSWER IS INCONSISTENT WITH THE DEPOSITION OR IF YOU

20   BELIEVE IT IS, THEN POINT IT OUT.

21   BY MR. ROTHANS:

22   Q.   WHEN MR. GALIPO WAS QUESTIONING YOU, MS. MEDEIROS, HE

23   ASKED YOU ABOUT THE CAR AND YOU POINTED TO A PHOTOGRAPH THAT

24   YOU SAW FOR THE FIRST TIME THIS MORNING AND SAID, "THAT'S MY

25   CAR RIGHT THERE."

```
1              REMEMBER THAT?

2    A.   MM-HUH, YES.   CORRECT.

3    Q.   DID YOU DRIVE TO THE DONUT KING OR DID YOU WALK TO THE

4    DONUT KING?

5    A.   I DROVE.

6    Q.   COULD WE PLAY THE VIDEO PORTION OF MS. MEDEIROS'

7    DEPOSITION PAGE 14, LINES 2 THROUGH 22?

8              MR. GALIPO:  IF I MAY HAVE ONE MOMENT, YOUR HONOR.

9              MR. ROTHANS:  THEY HAVE THE ORIGINAL.

10             THE COURT:  IF I COULD HAVE A COPY FOR THE COURT.

11             MR. GALIPO:  I HAVE A COPY, YOUR HONOR, A CONDENSED

12   VERSION.

13             THE COURT:  CONDENSED IS FINE.  JUST GET ME A COPY.

14             MR. GALIPO:  THAT'S THE ONLY COPY I HAVE.  I DON'T

15   MIND TO DO IT.

16             DO YOU MIND IF I LOOK AT IT?

17             THE COURT:  LOOK AT IT, THEN GIVE IT TO ME.

18             MR. GALIPO:  THEN I'LL PASS IT TO YOUR CLERK.

19             I HAVE NO OBJECTION, YOUR HONOR.  BUT IF YOU WANT

20   ME --

21             THE COURT:  I WOULD LIKE TO FOLLOW ALONG.

22             MR. GALIPO:  SURE.

23             THE COURT:  WHAT PAGE AND LINE?

24             MR. ROTHANS:  YOUR HONOR, IT'S PAGE 14, LINES 2

25   THROUGH 11.
```

```
 1            THE COURT:  ALL RIGHT.  GO AHEAD.

 2                 (VIDEO PLAYED, NOT REPORTED.)

 3            MR. ROTHANS:  SORRY, YOUR HONOR.  WE WENT BEYOND

 4   LINE 11, I BELIEVE.

 5   Q.  MS. MEDEIROS, HOW LONG HAD YOU BEEN INSIDE OF THE DONUT

 6   KING BEFORE THE SHOOTING TOOK PLACE?

 7   A.  I DON'T RECALL EXACTLY, BUT IT MUST HAVE BEEN ABOUT --

 8   MAYBE 10 MINUTES, JUST ROUGHLY 10, 15.

 9   Q.  SO NOT VERY LONG?

10   A.  NOT VERY LONG.

11            MR. ROTHANS:  IN YOUR DEPOSITION, DO YOU REMEMBER

12   TESTIFYING --

13            MR. GALIPO:  YOUR HONOR, IT'S IMPROPER USE OF A

14   DEPOSITION.

15            THE COURT:  WHAT PAGE AND LINE ARE YOU REFERRING

16   TO, MR. ROTHANS?

17            MR. ROTHANS:  PAGE 18, LINES 8 THROUGH 14.

18            THE COURT:  SHOW THEM TO MR. GALIPO.

19            GO AHEAD.

20            MR. GALIPO:  WE'RE ABLE TO PULL IT UP HERE, YOUR

21   HONOR.  SO IF YOU'LL JUST GIVE ME A MOMENT, PLEASE.

22            THE COURT:  ALL RIGHT.

23            MR. GALIPO:  NO OBJECTION, YOUR HONOR.

24            THE COURT:  GO AHEAD.

25                 (VIDEO PLAYED, NOT REPORTED.)
```

1    BY MR. ROTHANS:

2    Q.   BEFORE THE SHOOTING TOOK PLACE, MS. MEDEIROS, THERE WAS

3    AN INCIDENT INSIDE THE DONUT KING INVOLVING SOMEONE WHO WAS

4    FILLING UP SPARKLETTS BOTTLES WITH WATER AND THEN WANTED TO

5    LEAVE WITHOUT PAYING, CORRECT?

6    A.   CORRECT.

7    Q.   AND THERE WAS A DISCUSSION BETWEEN THE MANAGER OF THE

8    DONUT KING AND THIS PERSON ABOUT THEIR OBLIGATION TO PAY?

9    A.   CORRECT.

10   Q.   AND THAT DISCUSSION ALSO INVOLVED YOUR FRIEND, FRANCIS?

11   A.   CORRECT.

12   Q.   IN FACT, SHE TOLD THIS GENTLEMAN SHE WAS A LAWYER AND HE

13   HAD AN OBLIGATION TO PAY, CORRECT?

14   A.   CORRECT.

15   Q.   THIS WAS GOING ON BEFORE THE POLICE CARS ARRIVED, TRUE?

16   A.   RIGHT.

17   Q.   INSIDE THE DONUT KING BEFORE THE SHOOTING TOOK PLACE,

18   YOU WERE SEATED AT A TABLE FOR A PERIOD OF TIME, TRUE?

19   A.   YES.

20   Q.   AND YOU WERE SEATED FACING IN AN EASTERLY DIRECTION, IN

21   OTHER WORDS, TO THE EAST WITHIN THE DONUT KING?

22   A.   CORRECT.

23   Q.   DO YOU REMEMBER TELLING ANY OF THE L.A. COUNTY SHERIFF'S

24   DETECTIVES THAT YOU WERE ACTUALLY FACING WEST?

25   A.   NO.

1    Q.    YOU DON'T REMEMBER THAT?

2    A.    NO.  I WAS FACING EAST.

3    Q.    DO YOU REMEMBER THE L.A. COUNTY SHERIFF'S DETECTIVES

4    SHOWING YOU A PHOTOGRAPH OF THE INSIDE OF THE DONUT KING AND

5    WHERE THE TABLES AND CHAIRS WERE LOCATED AND ASKING YOU TO

6    PUT AN X WHERE YOU WERE SEATED?

7          YOU DID SO, AND THEN LATER IN THE INTERVIEW DECIDED

8    THAT WASN'T WHERE YOU WERE SEATED AND PUT ANOTHER X ON A

9    DIFFERENT SEAT?

10   A.    OKAY.

11   Q.    DO YOU REMEMBER THAT?

12   A.    RIGHT NOW I DON'T RECALL THAT, BUT, OKAY.

13   Q.    YOU DID READ YOUR INTERVIEW FROM THE SHERIFFS LAST

14   NIGHT?

15   A.    I DID.

16   Q.    DID YOU NOTICE THAT IN THERE?

17   A.    I DID.

18   Q.    NOW, I REALIZE YOU SAW SOME PHOTOGRAPHS BOTH THIS

19   MORNING WITH MR. GALIPO AND IN THIS COURTROOM TODAY, TRUE?

20   A.    YES.

21   Q.    FIRST TIME YOU'D SEEN PHOTOS IN THE LAST THREE YEARS OF

22   THAT LOCATION?

23   A.    I RECALL, YES.

24   Q.    YOU WERE FAMILIAR WITH THE PARKING LOT.  YOU LIVED,

25   ESSENTIALLY, DOWN THE STREET?

1   A.   YES.

2   Q.   BUT IN TERMS OF THE CONDITION OF THE PARKING LOT, THE

3   LOCATION OF THE VEHICLES, THE OTHER FIXED OBJECTS IN THAT

4   PARKING LOT, THE FIRST TIME YOU ACTUALLY SAW PICTURES WAS

5   THIS MORNING?

6   A.   THAT I RECALL, YES.

7   Q.   AND WHEN WE TOOK YOUR DEPOSITION TWO YEARS AGO, YOU WERE

8   ASKED QUESTIONS ABOUT THE PARKING LOT, THE DONUT KING, WHAT

9   YOU REMEMBER FROM THAT DAY; IS THAT TRUE?

10   A.   CORRECT.

11   Q.   AND NOTWITHSTANDING THE FACT THAT YOU SAW SOME PHOTOS

12   THIS MORNING, YOU DIDN'T REMEMBER AT YOUR DEPOSITION HOW MANY

13   CARS WERE PARKED DIRECTLY IN FRONT OF THE DONUT KING, WHICH

14   WOULD HAVE BEEN BETWEEN WHERE YOU WERE SEATED AND THE GREEN

15   SEBRING; IS THAT CORRECT?

16   A.   CORRECT.

17   Q.   YOU REMEMBER EVEN TODAY THAT THERE WAS CARS THERE --

18   THERE WERE CARS PARKED BETWEEN WHERE YOU WERE SEATED IN THE

19   DONUT KING AND WHERE THE GREEN CHRYSLER SEBRING HAD COME TO A

20   STOP?

21   A.   CORRECT.

22   Q.   BUT YOU DIDN'T REMEMBER HOW MANY?

23   A.   CORRECT.

24   Q.   AND, AGAIN, I KNOW YOU'VE SEEN THE PHOTOS THIS MORNING,

25   BUT CAN YOU DESCRIBE -- OTHER THAN YOUR VEHICLE THAT YOU SEE

1    THERE, CAN YOU DESCRIBE ANY OF THE OTHER CARS THAT WERE

2    PARKED LITERALLY IN BETWEEN WHERE YOU WERE SEATED IN THE

3    DONUT KING AND THE GREEN CHRYSLER SEBRING?

4           MR. GALIPO:  I'M GOING TO OBJECT AS VAGUE AS

5    PHRASED, "LITERALLY IN BETWEEN."

6           THE COURT:  OVERRULED.

7           THE WITNESS:  OTHER CARS -- CAN YOU REPEAT THE

8    QUESTION, PLEASE.

9           MR. ROTHANS:  SURE.

10   BY MR. ROTHANS:

11   Q.   WHAT I'M TRYING TO GET TO, MS. MEDEIROS, IS YOU'RE

12   SEATED INSIDE THE DONUT KING AT LEAST FOR A PERIOD OF TIME?

13   A.   MM-HUH.

14   Q.   AND A GREEN CHRYSLER SEBRING AND SOME POLICE CARS SHOW

15   UP?

16   A.   OKAY.

17   Q.   AND I'M TRYING TO FIND OUT BETWEEN WHERE YOU WERE

18   SITTING AND THE PASSENGER'S SIDE, THE OTHER SIDE OF THE

19   SEBRING THAT WAS IN BETWEEN YOU -- AND SO YOU DON'T REMEMBER

20   HOW MANY CARS WERE PARKED IN FRONT OF THE DONUT KING.

21          YOU NOW KNOW FROM THE PHOTOS THAT YOUR CAR WAS ONE

22   OF THEM THOUGH, CORRECT?

23   A.   RIGHT.

24   Q.   CAN YOU DESCRIBE ANY OF THE OTHER CARS THAT WERE

25   LITERALLY BETWEEN YOU AND THE SEBRING AS YOU WERE SEATED IN

1    THE DONUT KING?

2    A.   I DON'T RECALL.

3    Q.   AND TWO YEARS AGO WHEN YOUR DEPOSITION WAS TAKEN, PAGE

4    109, LINES 17 THROUGH 23, YOU DIDN'T REMEMBER WHERE YOUR

5    VEHICLE WAS; DO YOU REMEMBER THAT?

6    A.   YES.  I DIDN'T RECALL AT THAT TIME.

7    Q.   YOU KNOW NOW, HAVING BEEN SHOWN PHOTOGRAPHS THIS MORNING

8    BEFORE COURT AND IN COURT, YOUR CAR WAS ONE OF THOSE PARKED

9    IN FRONT, CORRECT?

10   A.   CORRECT.

11   Q.   YOU DIDN'T REMEMBER THAT WHEN YOU WERE INTERVIEWED BY

12   THE DIFFERENT LAW ENFORCEMENT AGENCIES, DID YOU?

13   A.   CORRECT.

14   Q.   YOU ALSO DID NOT KNOW WHERE YOUR FRIEND FRANCIS PRISSA'S

15   CAR WAS PARKED; IS THAT TRUE?

16   A.   CORRECT.

17   Q.   NOW, DID YOU SEE POLICE CARS ARRIVE AT THE PARKING LOT

18   OF THE DONUT KING ON THE MORNING OF APRIL 25TH, 2010?

19   A.   YES.

20   Q.   AND DID YOU SEE MORE THAN ONE CAR ARRIVE?

21   A.   YES.

22   Q.   AND HOW MANY CARS DO YOU REMEMBER ARRIVING AT THE SAME

23   TIME?

24   A.   I RECALL THAT I SAW TWO.

25   Q.   I'M SORRY?

1    A.    TWO.

2    Q.    I'D LIKE TO PLAY FROM THE WITNESS' DEPOSITION VIDEO

3    CLIPS FROM PAGE 25, LINES 10 THROUGH 16.

4              MR. GALIPO:  ONE MOMENT, PLEASE.

5              THE COURT:  YES.

6              MR. GALIPO:  NO OBJECTION.

7              THE COURT:  GO AHEAD, COUNSEL.

8                  (VIDEO PLAYED, NOT REPORTED.)

9    BY MR. ROTHANS:

10   Q.    WOULD YOU AGREE, MS. MEDEIROS, THAT YOUR MEMORY OF THESE

11   EVENTS WERE MORE FRESH TWO YEARS AGO THAN TODAY?

12   A.    YES.

13   Q.    AND YOU TESTIFIED THAT YOU SAW THREE POLICE CARS --

14   A.    CORRECT.

15   Q.    -- ARRIVE AT THAT LOCATION AT THE SAME TIME?

16   A.    CORRECT.

17   Q.    AND YOU SAW THAT FROM INSIDE THE DONUT KING?

18   A.    CORRECT.

19   Q.    AND DID ANY OF THOSE POLICE CARS HAVE THEIR LIGHTS

20   ACTIVATED OVERHEAD?

21   A.    I DON'T RECALL.

22   Q.    YOU SAW THEM PULL UP?

23   A.    UH-HUH.

24   Q.    AND YOU DON'T REMEMBER IF THEIR LIGHTS WERE ON, ON TOP?

25             MR. GALIPO:  OBJECTION, ASKED AND ANSWERED.

```
 1            THE COURT:  OVERRULED.

 2            THE WITNESS:  I DON'T RECALL THAT DETAIL.

 3    BY MR. ROTHANS:

 4    Q.   YOU WERE ASKED QUESTIONS AT YOUR DEPOSITION, MS.

 5    MEDEIROS, ABOUT DISTANCES, INCLUDING THE DISTANCES WITHIN THE

 6    INSIDE OR INTERIOR OF THE DONUT KING, TRUE?

 7    A.   CORRECT.

 8    Q.   AND YOU DON'T REMEMBER AND CANNOT GIVE US AN ESTIMATE OF

 9    THE DISTANCE FROM THE COUNTER WHERE YOU PLACED YOUR ORDER IN

10    THE DONUT KING, TO ITS FRONT DOORS THAT FACE NORTH ON VENICE

11    BOULEVARD; IS THAT TRUE?

12    A.   YEAH, I COULDN'T GIVE AN ESTIMATE.

13    Q.   OKAY.  NOT REAL GOOD ON DISTANCE?

14    A.   NO.

15    Q.   AND YOU HAVE NO ESTIMATE OF THE DISTANCE FROM WHERE YOU

16    WERE SEATED INSIDE THE DONUT KING TO WHERE THE GENTLEMAN WAS

17    STANDING ON THE OTHER SIDE OF THE GREEN CHRYSLER SEBRING,

18    ALSO TRUE?

19    A.   YEAH, IT'S TRUE.

20    Q.   DO YOU HAVE ANY MEMORY OF HOW MANY DIFFERENT TABLES WERE

21    INSIDE OF THE DONUT KING THAT MORNING?

22    A.   I DON'T RECALL AT THIS MOMENT SINCE IT WAS A WHILE AGO.

23    I -- RIGHT NOW I CAN'T RECALL.

24    Q.   OKAY.  AND, IF YOU DON'T REMEMBER, THAT'S FINE.

25            I'M JUST TRYING TO GET AN UNDERSTANDING OF THE
```

1  LAYOUT OF THE INSIDE OF THE DONUT KING THAT MORNING?

2  A.   CORRECT.

3  Q.   WHERE YOU WERE SEATED, AT LEAST A PERIOD OF TIME BEFORE

4  THIS INCIDENT HAPPENED, NO MEMORY OF THE NUMBER OF TABLES?

5  A.   AT THIS POINT, NO.

6  Q.   AND NO MEMORY OF THE NUMBERS OF CHAIRS?

7  A.   AT THIS MOMENT, NO.

8  Q.   THE TABLE YOU WERE SEATED AT, HOWEVER, WAS LOCATED RIGHT

9  IN FRONT OF THE COUNTER, TRUE?

10  A.   YES.

11  Q.   IN OTHER WORDS, IT WAS CLOSER TO THE COUNTER WHERE YOU

12  PLACE YOUR ORDER THAN IT WAS TO THE FRONT DOORS FACING NORTH?

13  A.   CORRECT.

14  Q.   AND THERE WERE POSTERS AND ADVERTISEMENTS ON THE WINDOWS

15  TO THE DONUT KING, TRUE?

16  A.   CORRECT.

17  Q.   AND YOU REMEMBER I ASKED YOU QUESTIONS ABOUT THE POSTERS

18  AND ADVERTISEMENTS AT YOUR DEPOSITION?

19  A.   CORRECT.

20  Q.   AND SOME OF THOSE POSTERS WERE PRETTY LARGE, WEREN'T

21  THEY?

22  A.   CORRECT.

23  Q.   NOW, AGAIN, YOU HAD NOT SEEN PHOTOS BEFORE YOUR

24  DEPOSITION; YOU SAW PHOTOGRAPHS TODAY.  BUT I WANT YOU TO

25  THINK BACK TO APRIL 25TH.

1           DO YOU REMEMBER HOW MANY DIFFERENT POSTERS WERE IN

2   THE WINDOWS FACING TO THE NORTH, LOOKING TOWARDS VENICE

3   BOULEVARD THAT MORNING?

4   A.   I DON'T RECALL HOW MANY THERE WERE.

5   Q.   YOU ACKNOWLEDGED THERE WERE SOME?

6   A.   THERE WERE SOME.

7   Q.   AND WERE THEY AT THE VERY TOP OF THE WINDOW SO THAT YOU

8   COULD SEE UNDERNEATH EVERY ONE OF THEM?

9   A.   I REALLY DON'T RECALL WHERE THEY WERE PLACED.

10  Q.   OKAY.  I'D LIKE TO SHOW EXHIBIT 372-239, WHICH I BELIEVE

11  HAS BEEN ADMITTED?

12           THE COURT:  IT HAS BEEN ADMITTED.

13  BY MR. ROTHANS:

14  Q.   IF YOU'D TAKE A LOOK AT THAT SCREEN, MA'AM?

15  A.   OKAY.

16  Q.   LOOKING AT EXHIBIT -- EXCUSE ME -- 372-239.

17           IS THAT THE DONUT KING THAT YOU WERE INSIDE OF AT

18  THE TIME OF THE INCIDENT?

19  A.   CORRECT.

20  Q.   IT'S THE DONUT KING THAT'S LITERALLY DOWN THE STREET

21  FROM WHERE YOU WERE LIVING AT THAT TIME?

22  A.   CORRECT.

23  Q.   CORRECT?

24  A.   MM-HUH.

25  Q.   HAVE YOU SEEN THIS PARTICULAR PHOTOGRAPH BEFORE?

1    A.    IN THE MORNING, THIS MORNING.

2    Q.    OKAY.  AND IT'S YOUR UNDERSTANDING THAT THESE WERE TAKEN

3    BY THE L.A. COUNTY SHERIFF'S DETECTIVES LATER IN THE DAY

4    AFTER THE SHOOTING?

5    A.    CORRECT.

6              MR. GALIPO:  I'LL OBJECT.  LACKS FOUNDATION AS TO

7    WHO TOOK THEM, YOUR HONOR.

8              THE COURT:  THE IMPORTANT THING IS WHETHER THE

9    WITNESS BELIEVES IT SHOWS THE SCENE AS SHE REMEMBERS IT.

10   IT'S BEEN ADMITTED.  SHE DOESN'T CARE WHO TOOK IT.

11   BY MR. ROTHANS:

12   Q.    DID MR. GALIPO TELL YOU WHEN THESE PHOTOGRAPHS WERE

13   TAKEN?

14   A.    I DON'T RECALL THAT DETAIL.

15   Q.    IN OTHER WORDS, I WANT TO MAKE SURE YOU UNDERSTAND THESE

16   PHOTOGRAPHS WERE TAKEN THAT DAY, AND NOT A MONTH LATER.

17   A.    OH, YES.

18   Q.    YOU UNDERSTAND THEY WERE TAKEN THAT DAY?

19   A.    YES, I UNDERSTAND.

20   Q.    YOU DON'T KNOW WHO TOOK THEM?

21   A.    I'M NOT AWARE.

22   Q.    DOES THIS PARTICULAR PHOTOGRAPH ADMITTED, 273-329,

23   DEPICT THE DONUT KING YOU WERE INSIDE OF AS IT APPEARED THAT

24   DAY?

25   A.    CORRECT.

1    Q.   YOU SEE SOME POSTERS?

2    A.   CORRECT.

3    Q.   CAN YOU DESCRIBE THEM?

4    A.   THERE'S SOME POSTERS FOR ICE COFFEE, FOR ICE TEA.  AND I

5    CAN'T SEE THE ONES ON THE LEFT.  IT LOOKS LIKE FOOD.  OH,

6    SMOOTHIES ON THE LEFT SIDE, POSTER FOR SMOOTHIES.

7    Q.   DO YOU ALSO SEE SOME GLARE OR REFLECTION ON THE GLASS

8    AND METAL?

9    A.   YEAH, I SEE.

10   Q.   THIS WAS, ROUGHLY, 11:30, 12:00 O'CLOCK IN THE MORNING,

11   TRUE?

12   A.   CORRECT.

13   Q.   SUN WAS IN THE SKY?

14   A.   CORRECT.

15   Q.   WAS A FAIRLY SUNNY DAY, BUT THERE WAS SOME CLOUDS?

16   A.   CORRECT.

17   Q.   DID YOU NOTICE ANY REFLECTIONS OUTSIDE FROM THE GLARE OF

18   THE SUN AT ALL DURING THIS INCIDENT?

19   A.   I DIDN'T -- I DON'T RECALL THAT.

20   Q.   YOU DON'T REMEMBER THAT?

21   A.   NO.

22   Q.   NOW, THIS MORNING WHEN YOU SAW THE PHOTOGRAPHS FOR THE

23   FIRST TIME, THIS IS THE FIRST TIME YOU'VE ACTUALLY SEEN A

24   PHOTO OF THE VEHICLE SINCE APRIL 25TH, 2010, CORRECT?

25   A.   YES.

```
 1   Q.   AND JUST TO BE CLEAR, YOU DIDN'T SEE A PHOTO ON

 2   APRIL 25TH; YOU SAW THE ACTUAL CAR?

 3   A.   CORRECT, YES.

 4   Q.   BUT THE FIRST TIME YOU'VE ACTUALLY SEEN A PHOTOGRAPH

 5   DEPICTING THE SCENE, INCLUDING THE VEHICLE, WAS THIS MORNING?

 6           MR. GALIPO:  OBJECTION.  I'M GOING TO OBJECT AS

 7   CUMULATIVE.  SHE'S BEEN ASKED ABOUT TEN TIMES IF IT'S THE

 8   FIRST TIME SHE'S SEEN PHOTOGRAPHS.  SHE SAID, "YES."

 9           THE COURT:  OVERRULED.

10   BY MR. ROTHANS:

11   Q.   AND YOUR ANSWER WAS "YES," MA'AM, TRUE?

12   A.   CORRECT.

13   Q.   WHAT WE'RE SEEING HERE IN THIS PARTICULAR PHOTOGRAPH --

14   AND JUST FOR THE RECORD, AGAIN, IT'S 372-239 -- YOU DIDN'T

15   SEE THE GREEN CHRYSLER SEBRING FROM THIS ADVANTAGE POINT, DID

16   YOU?

17   A.   FROM THIS POINT, NO.

18   Q.   YOU WERE ON THE OTHER SIDE BEYOND THE PARKED CARS,

19   INSIDE THE DONUT KING, TRUE?

20   A.   CORRECT.

21   Q.   SO YOU WERE LOOKING IN THE DIRECTION OF THE CAMERAMAN OR

22   CAMERAWOMAN WHO TOOK THIS PHOTOGRAPH BEFORE THE INCIDENT?

23   A.   CORRECT.

24   Q.   AND FROM A COMPASS DIRECTION PERSPECTIVE -- ARE YOU

25   FAMILIAR WITH YOUR COMPASS DIRECTIONS?
```

1    A.   MM-HUH, YES.

2    Q.   ARE WE GENERALLY LOOKING SOUTH IN THIS PHOTOGRAPH?

3    A.   IF I'M LOOKING TOWARDS THE DONUT KING, IT'S SOUTH, YES,

4    CORRECT.

5    Q.   YOU WOULD HAVE BEEN LOOKING, GENERALLY, IN A NORTHERLY

6    DIRECTION FOR AT LEAST A PERIOD OF TIME?

7    A.   CORRECT.

8    Q.   NOW, YOU SAID THAT YOU SAW THE GENTLEMAN ON THE OTHER

9    SIDE OF THE CAR AT SOME POINT?

10   A.   YES.

11   Q.   DID YOU ALSO SEE POLICE OFFICERS AT THE SCENE?

12   A.   I DID, BUT I WAS PAYING MORE ATTENTION TO THE GREEN CAR.

13   Q.   BUT DID YOU SEE OFFICERS AT THE SCENE BEFORE THE

14   SHOOTING?

15   A.   BEFORE THE SHOOTING OCCURRED?  WELL, YES.

16   Q.   BECAUSE YOU SAW THE CARS PULL UP --

17   A.   RIGHT.

18   Q.   -- THREE AT THE SAME TIME?

19   A.   RIGHT.

20   Q.   YOU SAW OFFICERS GET OUT?

21   A.   RIGHT.

22   Q.   BECAUSE YOU WERE FACING IN AN EASTERLY DIRECTION, RIGHT?

23   A.   OKAY, MM-HUH.

24   Q.   YOU ALSO SAW THE GENTLEMAN GET OUT OF THE SEBRING ON THE

25   PASSENGER'S SIDE AS WELL?

1   A.   YES.

2   Q.   YOU WOULD AGREE THERE WERE TIMES WHEN YOU WOULD HAVE TO

3   TURN ONE WAY TO SEE THE OFFICERS AND A DIFFERENT WAY TO SEE

4   THE PASSENGER; IS THAT CORRECT?

5   A.   UH-HUH, YES.

6   Q.   YOU SAW THEM OUT THERE BEFORE THE SHOOTING AND BEFORE

7   YOU HEARD THE NOISE?

8   A.   YES.

9   Q.   DID YOU HAPPEN TO NOTICE WHETHER THE SEBRING THAT YOU

10  SAW THAT DAY -- IT'S CLEAR AS A BELL IN THIS PHOTO, BUT THAT

11  DAY DO YOU REMEMBER IF IT WAS A TWO-DOOR OR A FOUR-DOOR?

12  A.   I DON'T RECALL AT THIS MOMENT.  AT THE TIME, I PROBABLY

13  REMEMBERED AND I DID -- I THINK I SAID IT WAS A TWO-DOOR.  I

14  THOUGHT IT WAS A TWO-DOOR, BUT I DON'T RECALL AT THIS MOMENT

15  RIGHT NOW.

16  Q.   AT PAGE 139, LINES 9 THROUGH 12 OF YOUR DEPOSITION, YOU

17  DID NOT REMEMBER WHETHER IT WAS A TWO-DOOR OR A FOUR-DOOR,

18  TRUE?

19  A.   YEAH, CORRECT.

20  Q.   YOU NEVER SAW THE GENTLEMAN IN THE PASSENGER SEAT BEFORE

21  HE GOT OUT OF THE CAR; IS THAT TRUE, MS. MEDEIROS?

22  A.   YES.

23  Q.   AND YOU HAVE NO MEMORY WHATSOEVER OF HOW LONG HE WAS IN

24  THE CAR STOPPED IN THAT LOCATION UNTIL HE GOT OUT, YOU HAVE

25  NO IDEA?

1    A.   I DIDN'T NOTICE THAT, NO.

2    Q.   NOW, WE KNOW THIS INCIDENT'S BEEN MORE THAN THREE YEARS

3    AND YOU'RE HERE TELLING THIS JURY THAT YOU HAVE A DISTINCT

4    MEMORY OF SEEING THE GENTLEMAN GET OUT OF THE CAR, OR AT

5    LEAST ONCE HE WAS OUTSIDE OF THE CAR, WITH HIS HANDS UP ON

6    THE PASSENGER'S SIDE OF THE VEHICLE, CORRECT?

7    A.   CORRECT.

8    Q.   AND YOU'VE GOT A MENTAL IMAGE, A MEMORY OF WHAT YOU SAW

9    THAT MORNING, APRIL 25TH, 2010, TRUE?

10   A.   CORRECT.

11   Q.   YOU ACTUALLY REMEMBER OR THINK THAT HE HAD A HAT ON,

12   DIDN'T YOU?

13   A.   YEAH.  I THINK I SAID THAT.  YEAH, I DID.

14   Q.   DID MR. GALIPO TELL YOU THAT OTHER WITNESSES -- NO ONE

15   SAW HIM WEAR A HAT?

16   A.   NO, I DIDN'T -- I DIDN'T KNOW ABOUT THAT.

17   Q.   BUT YOU TOLD THE DETECTIVES WHO INTERVIEWED YOU AND YOU

18   TESTIFIED AT YOUR DEPOSITION YOU SAW THE GENTLEMAN, WHEN HE

19   GOT OUT, WAS WEARING A HAT?

20        MR. GALIPO:  I'M GOING TO OBJECT AS TO WHICH

21   DETECTIVE INTERVIEW, YOUR HONOR.  VAGUE.

22        THE COURT:  OVERRULED.  BUT MR. ROTHANS SET UP

23   WHETHER SHE CURRENTLY REMEMBERS WHETHER HE WAS WEARING A HAT

24   OR NOT.

25        MR. ROTHANS:  I THOUGHT I'D ASKED THAT QUESTION

```
 1    INITIALLY, YOUR HONOR.  I APOLOGIZE.

 2    BY MR. ROTHANS:

 3    Q.   YOU REMEMBER HIM WEARING A HAT, TRUE?

 4    A.   CORRECT.

 5    Q.   AND YOU HAVE A CLEAR MENTAL VISION OF SEEING HIM GET OUT

 6    OF THE CAR WEARING A HAT?

 7    A.   CORRECT.

 8    Q.   WHAT COLOR WAS THE HAT?

 9    A.   I DON'T RECALL.  I DON'T RECALL WHAT COLOR.

10    Q.   BUT YOU REMEMBER SEEING HIM?

11    A.   YEAH.

12             MR. GALIPO:  OBJECTION.  ASKED AND ANSWERED.

13             THE COURT:  OVERRULED.

14    BY MR. ROTHANS:

15    Q.   DO YOU REMEMBER IF HE HAD KIND OF AN EMBLEM ON THE HAT,

16    FOR EXAMPLE, A "B" FOR BOSTON RED SOX OR -- HEAVEN FORBID --

17    "L.A." FOR THE DODGERS?

18    A.   I DON'T RECALL.

19    Q.   YOU DON'T REMEMBER THE COLOR THAT YOU SAW?

20    A.   I DON'T REMEMBER.

21    Q.   AND READING ALL OF THE DOCUMENTS THAT YOU WERE PROVIDED,

22    DID THAT HELP REFRESH YOUR MEMORY AS TO THE COLOR OF THE HAT?

23    A.   NO, I STILL CAN'T REMEMBER.

24    Q.   DID MR. GALIPO TELL YOU IN YOUR DISCUSSION LAST NIGHT OR

25    TODAY THAT THERE WAS NO HAT FOUND ON THE SCENE OUTSIDE THE
```

1    VEHICLE?

2    A.   NO.

3    Q.   DO YOU HAVE A MEMORY OR AN ABILITY TO GIVE US AN

4    ESTIMATE OF THE GENTLEMAN'S AGE?

5    A.   I -- MAYBE BETWEEN MID 30'S, LATE 30'S.  I CAN'T -- I

6    DON'T REMEMBER.

7    Q.   I WANT TO DISTINGUISH THAT "BETWEEN MID 30'S," AND "I

8    DON'T REMEMBER."

9         IF YOU DON'T REMEMBER, THAT'S CERTAINLY

10   UNDERSTANDABLE.  BUT "MID 30'S" IS DIFFERENT THAN" I DON'T

11   REMEMBER."

12        DO YOU REMEMBER, MA'AM?

13   A.   I THINK -- I'M GOING TO SAY MID 30'S.

14   Q.   ISN'T IT TRUE, MS. MEDEIROS, THAT YOU WEREN'T CLOSE

15   ENOUGH TO BE ABLE TO DETERMINE OR GIVE AN ESTIMATE OF HIS

16   AGE?

17   A.   CORRECT.

18   Q.   AND THAT'S ON PAGE 142, LINES 5 THROUGH 10, WHAT YOU

19   TESTIFIED TO UNDER OATH AT YOUR DEPOSITION, YOU WEREN'T CLOSE

20   ENOUGH THAT YOU COULD SEE TO TELL US ANY IDEA OF HIS AGE?

21   A.   YEAH, I COULDN'T REALLY.

22   Q.   AND IN TERMS OF HIS BUILD, IN OTHER WORDS, TALL AND --

23   A.   MM-HUH.

24   Q.   -- SHORT AND WIDE OR SOMETHING ELSE?

25        YOU DON'T EVEN KNOW, FROM WHAT YOU WERE ABLE TO SEE

1    OVER THE TOP OF THE CAR, WHETHER HE WAS A BIG MAN OR A SMALL

2    MAN, OR COULD YOU, MA'AM?

3    A.   I COULD NOT TELL, NO.

4    Q.   WHEN YOU WERE INTERVIEWED BY SERGEANT COCHRAN OF THE

5    L.A. COUNTY SHERIFF'S DEPARTMENT, DID YOU TELL HIM THAT HE

6    WASN'T VERY MUSCULAR, HE WAS KIND OF SKINNY?

7    A.   YEAH, THAT'S WHAT I -- THAT'S WHAT I SAW.  FROM WHAT I

8    SAW, I ASSUMED THAT, YES.

9    Q.   SO YOU NOW REMEMBER THAT, FROM YOUR MENTAL IMAGE OF

10   SEEING THIS GENTLEMAN ON THE OTHER SIDE OF THE CAR THE

11   MORNING OF APRIL 25, 2010, THE GENTLEMAN YOU SAW WAS KIND OF

12   SKINNY, NOT VERY MUSCULAR OR ANYTHING, CORRECT?

13   A.   RIGHT.  CORRECT.

14   Q.   AND IN TERMS OF HIS CLOTHING, WE KNOW HE WAS WEARING

15   CLOTHING, TRUE?

16   A.   CORRECT.

17   Q.   YOU WERE ABLE TO SEE THE UPPER PART OF HIS CHEST, UPPER

18   PART OF HIS BODY, RIGHT?

19   A.   CORRECT.

20   Q.   YOU SAW HE WAS WEARING A SHIRT OF SOME SORT?

21   A.   CORRECT.

22   Q.   DID IT APPEAR RED TO YOU?

23   A.   I'M SORRY?

24   Q.   DID IT APPEAR RED TO YOU, IN COLOR TO YOU?

25   A.   I DON'T REMEMBER.

1    Q.   YOU READ THE TRANSCRIPT OF YOUR INTERVIEW WITH SERGEANT

2    LOPEZ FROM CULVER CITY P.D. THAT WAS TAKEN SHORTLY AFTER THE

3    INCIDENT?

4    A.   CORRECT.

5    Q.   YOU REMEMBER TELLING SERGEANT LOPEZ HE WAS WEARING A

6    RED, T-SHIRT?

7    A.   IF I SAID IT, YES, CORRECT.

8    Q.   DO YOU REMEMBER READING THAT LAST NIGHT?

9    A.   YES.

10   Q.   SO YOUR RECOLLECTION IS HE'S STANDING ON THE FAR SIDE OF

11   THE SEBRING, WEARING A RED T-SHIRT, SOME UNKNOWN COLOR HAT OR

12   CAP, CORRECT?

13   A.   CORRECT.

14   Q.   AND HE WAS SKINNY, NOT VERY MUSCULAR?

15   A.   CORRECT.

16   Q.   DID YOU ALSO THINK THAT HE WAS WEARING A SWEATSHIRT?

17   A.   I WASN'T CLEAR WHICH WAY IT WAS, BUT I DID SAY THAT I

18   THOUGHT IT WAS A SWEATSHIRT OR A SHIRT.  SO I DID SAY IT WAS

19   A SWEATSHIRT AT SOME POINT.

20   Q.   WHEN YOU SAY, "I DON'T KNOW WHICH WAY IT WAS," YOU DON'T

21   KNOW IF IT WAS A T-SHIRT OR SWEATSHIRT?

22   A.   RIGHT.  I REALLY COULDN'T SAY EXACTLY.

23   Q.   SO WHEN HE HAD HIS HANDS UP, STANDING ON THE FAR SIDE OF

24   THE CAR THAT YOU WATCHED THE ENTIRE TIME, YOU DON'T KNOW IF

25   HE WAS WEARING A LONG-SLEEVE SWEATSHIRT OR A T-SHIRT?

```
1    A.   YES.  I DON'T KNOW.

2    Q.   YOU DID SEE THE GENTLEMAN'S HANDS?

3    A.   MM-HUH, CORRECT.

4    Q.   I'M SORRY.  WHEN YOU SAY "UH-HUH" -- I JUST WANT TO MAKE

5    SURE THE RECORD IS CLEAR -- WAS THAT A "YES"?

6    A.   CORRECT.

7    Q.   AND YOU DID SEE THE GENTLEMAN'S WRIST?

8    A.   CORRECT, THE WRIST.

9    Q.   AT LEAST FROM THE WRIST ABOVE?

10   A.   CORRECT.

11   Q.   YOU DID SEE PORTIONS OF HIS ARMS, IN FACT?

12   A.   CORRECT.

13   Q.   THE LOWER ARMS AS THEY WERE UP ABOVE?

14   A.   CORRECT.

15   Q.   YOU NEVER SAW ANY TATTOOS?

16   A.   I DID NOT.

17   Q.   YOU NEVER SAW TATTOOS ON HIS HAND OR HIS FOREARMS?

18   A.   I DID NOT SEE.

19   Q.   YOU NEVER SAW ANY FACIAL HAIR?

20   A.   I DID NOT.

21   Q.   YOU NEVER SAW A MUSTACHE?  YOU NEVER SAW A GOATEE OR

22   ANYTHING?  HE LOOKED LIKE HE HADN'T SHAVED -- YOU DIDN'T SEE

23   THAT?

24   A.   NO, SIR, I HADN'T.

25   Q.   MR. GALIPO ASKED YOU SOME QUESTIONS ABOUT BEING --
```

1    MOUTHS MOVING, SOME JOKES THERE ABOUT LAWYERS.

2             BUT I'LL STAY AWAY FROM IT, YOUR HONOR.

3             DID YOU HEAR ANYTHING THAT WAS SAID BY ANY POLICE

4    OFFICER BEFORE THE SHOOTING?

5    A.   NO, SIR.  I COULDN'T HEAR.

6    Q.   DID YOU KNOW THAT THINGS WERE BEING SAID OUTSIDE?

7    A.   I ASSUME THEY WERE.  IF THE POLICE WAS THERE, YOU KNOW,

8    THEY'RE PROBABLY SAYING SOMETHING.

9    Q.   YOU ASSUME THEY WERE TALKING TO HIM, BUT YOU DIDN'T HEAR

10   A WORD?

11   A.   I DIDN'T HEAR IT, NO.

12   Q.   UNTIL AFTER THE SHOOTING, YOU DIDN'T HEAR ANY SCREAMING

13   OR YELLING GOING ON, DID YOU?

14   A.   AFTER THE SHOOTING?

15   Q.   NO.  BEFORE THE SHOOTING?

16   A.   OH, BEFORE, NO.

17   Q.   DID IT APPEAR CHAOTIC TO YOU BEFORE THE SHOOTING, OR DID

18   THE CHAOS BEGIN AFTER THE SHOTS WERE FIRED?

19   A.   IN MY OPINION, IT WAS AFTER THE SHOTS WERE FIRED.

20   Q.   AND, OF COURSE, YOU DIDN'T HEAR ANYTHING THAT THE

21   GENTLEMAN WHO GOT OUT OF THE CAR WAS SAYING EITHER; RIGHT,

22   MS. MEDEIROS?

23   A.   NO, I COULDN'T HEAR.

24   Q.   AFTER THE INCIDENT, YOU DID NOT SEE THE OFFICERS

25   HANDCUFF THE DRIVER WHO WAS ON THE DRIVER'S SIDE, CORRECT?

 1    A.   I DID NOT SEE, NO.

 2    Q.   YOU UNDERSTAND WHAT I'M ASKING?

 3    A.   I DID NOT SEE THAT, NO.

 4    Q.   OKAY.  IN FACT, YOU NEVER SAW THE DRIVER -- STRIKE THAT.

 5         IF I COULD WITHDRAW THAT, YOUR HONOR, AND ASK

 6    ANOTHER QUESTION?

 7         THE DRIVER OF THAT SEBRING THAT WE SEE IN THIS

 8    EXHIBIT WAS ACTUALLY CLOSER TO YOUR LOCATION IN THE DONUT

 9    KING THAN THE PASSENGER, TRUE?

10    A.   CORRECT.

11    Q.   YOU NEVER SAW HER UNTIL AFTER SHE WAS TAKEN OUT OF THE

12    CAR?

13    A.   CORRECT.

14    Q.   WHILE SHE WAS SEATED IN THE CAR, YOU COULDN'T TELL US

15    WHAT SHE LOOKED LIKE OR ANY DESCRIPTION, RIGHT?

16    A.   NO, COULD NOT.

17    Q.   AT SOME POINT, MS. MEDEIROS, YOU AND YOUR FRIEND

18    REMAINED AT THE SCENE FOR A PERIOD OF TIME.

19         YOU WERE INTERVIEWED DURING THAT TIME BY SERGEANT

20    LEON LOPEZ FROM THE CULVER CITY POLICE DEPARTMENT, CORRECT?

21    A.   MM-HUH, YES.

22    Q.   THAT WAS A VERY BRIEF INTERVIEW, WOULD YOU AGREE?

23    A.   YES, IT WAS A FAST INTERVIEW.

24    Q.   IN FACT, THE TRANSCRIPT IS JUST ABOUT EIGHT PAGES,

25    RIGHT?

1    A.   CORRECT.

2    Q.   AND YOU WERE TOLD THAT THE L.A. COUNTY SHERIFF'S

3    DETECTIVES WOULD BE RESPONDING TO CONDUCT THE INVESTIGATION,

4    WEREN'T YOU?

5    A.   CORRECT.

6    Q.   YOU AND YOUR FRIEND WAITED FOR ABOUT AN HOUR AND A HALF

7    AND YOUR FRIEND SAID, "THEY CAN'T KEEP US HERE.  WE HAVE TO

8    LEAVE"?

9    A.   CORRECT.

10   Q.   AND YOU KNEW THAT YOU HAD THIS PERTINENT INFORMATION,

11   YOU SAW WHAT YOU'VE TOLD THIS JURY YOU SAW, BUT YOUR FRIEND

12   SAID, "WE'RE OUT OF HERE," RIGHT?

13   A.   CORRECT.

14   Q.   AND YOU HAD A BAR-B-QUE TO GET TO?

15   A.   CORRECT.

16   Q.   IN BEVERLY HILLS?

17   A.   CORRECT, AT A FRIEND'S HOUSE.

18   Q.   RATHER THAN WAIT ANY LONGER FOR THE L.A. COUNTY

19   SHERIFF'S DETECTIVES TO COME WHO WERE GOING TO BE CONDUCTING

20   THIS INVESTIGATION, YOU AND YOUR FRIEND, THE LAWYER, LEFT?

21   A.   YES.

22   Q.   AND THEN AFTERWARDS, MAYBE LATER THAT SAME DAY, DID YOU

23   CALL THE CULVER CITY POLICE DEPARTMENT TO LET THEM KNOW THAT

24   YOU HAD SEEN WHAT HAD TAKEN PLACE?

25   A.   NO, I DID NOT.

1   Q.   YOU'D ALREADY GIVEN THE SERGEANT FROM CULVER CITY A

2   STATEMENT, TRUE?

3   A.   CORRECT.

4   Q.   DID YOU CALL HIM IN THE NEXT COUPLE OF DAYS TO SAY, YOU

5   KNOW, "I KNOW I GAVE A VERY BRIEF STATEMENT AT THE SCENE, BUT

6   I SAW SOME STUFF THAT YOU GUYS REALLY NEED TO HEAR ABOUT."

7           DID YOU EVER CONTACT CULVER CITY IN THE DAYS THAT

8   FOLLOWED?

9   A.   I DID NOT.

10  Q.   YOU KNEW THAT THE L.A. COUNTY SHERIFFS WERE GOING TO BE

11  CONDUCTING THE INVESTIGATION, CORRECT?

12  A.   CORRECT.

13  Q.   DID YOU EVER REACH OUT, CALL THE L.A. COUNTY SHERIFF'S

14  DEPARTMENT HEADQUARTERS IN MONTEREY PARK, TELL THEM YOU HAD

15  INFORMATION, YOU SAW THIS EVENT AND YOU WANTED TO GO ON

16  RECORD AS TO WHAT YOU SAW?

17  A.   NO, I DIDN'T.

18  Q.   BUT SOME WEEKS LATER YOU WERE CONTACTED BY THE L.A.

19  COUNTY SHERIFF'S DETECTIVES?

20  A.   YES.

21  Q.   THEY TOLD YOU THEY WANTED TO TAKE YOUR STATEMENT?

22  A.   CORRECT.

23  Q.   YOU SET IT UP AT THE OFFICE OF YOUR STEPFATHER --

24  A.   CORRECT.

25  Q.   -- WHO HAPPENS TO BE A LAWYER?

```
1   A.   CORRECT.

2   Q.   SO IN THE PRESENCE OF YOUR STEPFATHER THE SHERIFF'S

3   DEPARTMENT CONDUCTED YOUR INTERVIEW?

4   A.   CORRECT.

5   Q.   THAT WAS WEEKS, IF NOT MONTHS, LATER?

6   A.   YES.

7   Q.   DID YOU EVER REACH OUT AT ANY TIME TO CULVER CITY TO LET

8   THEM KNOW IN THE WEEKS THAT FOLLOWED THAT YOU HAD SOME

9   INFORMATION, YOU WANTED TO GIVE A FULL, THOROUGH STATEMENT?

10  A.   NO.

11  Q.   AND YOU WERE CERTAINLY TRUTHFUL WITH SERGEANT LOPEZ FOR

12  THAT BRIEF PERIOD HE INTERVIEWED YOU AFTER THE INCIDENT,

13  TRUE?

14  A.   OF COURSE, YES.

15  Q.   AND YOU WERE CERTAINLY TRUTHFUL WITH SERGEANT COCHRAN

16  FROM THE L.A. COUNTY SHERIFF'S DEPARTMENT WHEN HE INTERVIEWED

17  YOU AT YOUR STEPFATHER'S OFFICE, TRUE?

18  A.   YES.

19  Q.   AND YOU CAME TO REALIZE THAT YOUR FRIEND, FRANCIS -- SHE

20  DIDN'T SEE THE INCIDENT?

21         MR. GALIPO:  I'M GOING TO OBJECT.  THIS CALLS FOR

22  SPECULATION, YOUR HONOR.

23         THE COURT:  AND HEARSAY.  SUSTAINED.

24  BY MR. ROTHANS:

25  Q.   YOUR FRIEND MADE WHAT WE CALL AN "EXCITED UTTERANCE"
```

```
1    AFTER THIS.

2           DID SHE SAY SOMETHING TO YOU IMMEDIATELY AFTER THE

3    SHOOTING?

4           MR. GALIPO:  OBJECT, IT CALLS FOR HEARSAY, AND ASK

5    TO APPROACH IF NECESSARY.

6           THE COURT:  LET'S APPROACH, BRIEFLY.

7                       (SIDEBAR.)

8           MR. ROTHANS:  IF I MAY MAKE AN OFFER OF PROOF.

9    FRANCIS PRISSIA MADE A BIG DEAL IN THE MEDIA.  SHE'S QUOTED

10   IN ALL NEWSPAPER ARTICLES WHAT SHE -- FRANCIS PRISSIA -- SAW.

11   AND WHAT I'M TRYING TO DO -- I DON'T KNOW IF YOU PLAN TO CALL

12   MS. PRISSIA -- IS TO AVOID HAVING THIS WITNESS COME BACK AND

13   TESTIFY -- MY FRIEND SAID WHAT JUST HAPPENED.

14          THE COURT:  IF THAT'S WHAT WE'RE SAYING, HOW

15   IMMEDIATELY AFTER?

16          MR. ROTHANS:  IMMEDIATELY, SOON AS THE SHOTS WERE

17   FIRED.

18          MR. GALIPO:  FIRST OF ALL, WE'RE NOT GOING TO BE

19   CALLING HER -- SHE LIVES IN NEW YORK -- AND SHE WASN'T

20   DEPOSED.  SECOND OF ALL, THE SUGGESTION AT LEAST TO THE

21   QUESTIONING WAS SHE MAY NOT HAVE OBSERVED, SO SHE HEARD SOME

22   SHOTS AND SAID WHAT HAPPENED.

23          THE COURT:  I DON'T KNOW WHERE SHE WAS SITTING, IN

24   THE ABSENCE OF THE ASSERTION BY THE PLAINTIFFS, THAT SHE DID

25   OBSERVE IT.  THEN IF WE DON'T KNOW ENOUGH ABOUT WHERE SHE WAS
```

```
 1   SITTING, ONE, THE JURY COULD FAIRLY DRAW THE INFERENCE YOU'D

 2   LIKE THEM TO DRAW.

 3            MR. ROTHANS:  YOUR HONOR, IN FAIRNESS TO MR.

 4   MC NICHOLAS, THEY PROBABLY SOLVED THE PROBLEM.  THEY DID SAY

 5   IN OPENING STATEMENT, BY NAME, FRANCIS PRISSIA --

 6            MR. GALIPO:  NO.  I SAID, "AMANDA MEDEIROS."  I

 7   BELIEVE THE OTHER NAME WAS NOT MENTIONED.

 8            MR. ROTHANS:  THE RECORD SPEAKS FOR ITSELF THERE'S

 9   A REPRESENTATION FRANCIS PRISSIA WILL NOT TAKE THE STAND,

10   OTHERWISE --

11            MR. GALIPO:  AND THAT IS -- (COUNSEL ARE SPEAKING

12   OVER EACH OTHER).

13            THE COURT:  I'M TOLD, AS THE REPRESENTATION IS

14   OBVIOUS, IF SHE'S IN NEW YORK, SHE WILL NOT BE HERE.

15            THEREFORE, THE OBJECTION -- I DO THINK IT'S LIKELY

16   TO BE AN EXCITED UTTERANCE, BUT I DON'T THINK IT'S RELEVANT

17   TO ANYTHING GOING ON IN THE CASE IN ABSENCE OF THE TESTIMONY.

18            MR. ROTHANS:  THANK YOU, YOUR HONOR.

19            THE COURT:  MR. ROTHANS, YOU MAY PROCEED.

20                      (END SIDEBAR.)

21            MR. ROTHANS:  IF I MAY HAVE JUST A MOMENT, YOUR

22   HONOR.

23                  (PAUSE IN PROCEEDINGS.)

24            MR. ROTHANS:  I HAVE NO FURTHER QUESTIONS.

25            THANK YOU, MA'AM.
```

```
 1              THE COURT:  MR. GALIPO.

 2              MR. GALIPO:  YES.

 3                    REDIRECT EXAMINATION

 4    BY MR. GALIPO:

 5    Q.   DID YOU SIGN UP TO BE A WITNESS IN THIS CASE?  DID YOU

 6    KNOW A SHOOTING WAS GOING TO OCCUR?

 7              MR. ROTHANS:  OBJECTION, LEADING.  VAGUE.

 8              THE COURT:  OVERRULED.

 9              THE WITNESS:  I'M SORRY.  REPEAT THE QUESTION.

10    BY MR. GALIPO:

11    Q.   WHEN YOU WENT TO THE DONUT KING THAT DAY TO GET

12    BREAKFAST, DID YOU KNOW THAT THERE WAS GOING TO BE A SHOOTING

13    IN THE PARKING LOT?

14    A.   ABSOLUTELY NOT.  NO.

15    Q.   HAD YOU EVER SEEN SOMEONE SHOT BEFORE?

16    A.   NO.

17    Q.   IN TERMS OF WHAT YOU OBSERVED OF THE PERSON GETTING OUT

18    OF THE CAR, THE POSITION OF HIS ARMS -- IS THAT SOMETHING

19    THAT YOU THINK IS CLEAR IN YOUR MIND?

20    A.   YES.

21    Q.   WHY IS IT CLEAR IN YOUR MIND?

22    A.   BECAUSE IT REALLY STARTLED ME.  I'VE NEVER SEEN THAT

23    BEFORE.  IT WAS A HUMAN BEING.  SO I'D NEVER SEEN A HUMAN

24    BEING IN THAT POSITION.

25    Q.   IN YOUR POSITION IN THE DONUT KING, LOOKING OVER THE
```

```
 1    CAR, WERE YOU ABLE TO SEE HIS ARMS?

 2    A.   YES.

 3    Q.   FROM THE TIME HE GOT OUT OF THE CAR TO THE TIME OF THE

 4    SHOTS, DID YOU EVER LOOK AWAY FROM HIM?

 5    A.   NO.

 6    Q.   IS THERE ANY QUESTION, IN YOUR MIND, THAT YOU COULD SEE

 7    HIS ARMS OR HANDS AT THE TIME HE WAS SHOT?

 8               MR. ROTHANS:  OBJECTION, LEADING.

 9               THE COURT:  OVERRULED.

10               THE WITNESS:  I'M SORRY.  CAN YOU REPEAT THE

11    QUESTION.

12    BY MR. GALIPO:

13    Q.   IS THERE ANY QUESTION, IN YOUR MIND, THAT YOU COULD SEE

14    HIS ARMS AND HANDS OVER THE ROOF OF THE CAR WHEN DEFENDANT

15    WAS SHOT?

16    A.   THERE'S NO QUESTION IN MY MIND ABOUT THAT.

17    Q.   IN THE 10 TO 30 SECONDS THAT YOU WERE LOOKING AT HIM,

18    WERE YOU TRYING TO FIGURE OUT IF HE HAD ANY TATTOOS?

19    A.   I WASN'T THINKING ABOUT THAT, NO.

20    Q.   OKAY.  WERE YOU TRYING TO SEE IF HE HAD ANY FACIAL HAIR

21    OR NOT?  WAS THAT SOMETHING THAT WAS IMPORTANT TO YOU AT THE

22    TIME?

23               MR. ROTHANS:  OBJECTION, LEADING.

24               THE COURT:  OVERRULED.

25               THE WITNESS:  NO.  I DIDN'T NOTICE ANYTHING LIKE
```

1    THAT AT ALL.

2    BY MR. GALIPO:

3    Q.   AND, IN FACT, WITH RESPECT TO HIM WEARING A HAT, YOU HAD

4    STATED YOU WEREN'T SURE HE HAD A HAT ON; IS THAT FAIR?

5    A.   YES.

6    Q.   NOW, WHEN YOU HAD THIS INITIAL STATEMENT THAT WAS

7    RECORDED BY SERGEANT LOPEZ, DID SERGEANT LOPEZ ASK YOU WHAT

8    YOU SAW RELATIVE TO THE SHOOTING?

9    A.   YES.

10   Q.   AND WOULD YOU SAY IT WAS PRETTY FRESH IN YOUR MIND AT

11   THAT POINT?

12   A.   OH, YES.

13   Q.   AND DID YOU TELL HIM WHAT YOU SAW?

14   A.   I DID.

15   Q.   AND DID HE SPECIFICALLY ASK YOU WHETHER OR NOT YOU COULD

16   SEE THE HANDS OF THE PERSON AT THE TIME OF THE SHOTS?

17          MR. ROTHANS:  OBJECTION, HEARSAY.

18          THE COURT:  OVERRULED.

19   BY MR. GALIPO:

20   Q.   DID HE ASK YOU THAT QUESTION?

21   A.   HE ASKED ME WHAT I SAW, YES.

22   Q.   AND DID HE SPECIFICALLY ASK YOU IF YOU COULD SEE HIS

23   HANDS WHEN HE WAS SHOT?

24   A.   I BELIEVE HE ASKED ME, YES.

25   Q.   AND YOU TOLD HIM WHAT YOU COULD SEE; IS THAT CORRECT?

1    A.   YES, I TOLD HIM WHAT I SAW.

2    Q.   NOW, DID YOU ALSO PROVIDE YOUR PHONE NUMBER FOR THEM SO,

3    IF THEY WANTED TO CONTACT YOU, THEY COULD?

4    A.   I DID.

5    Q.   OKAY.  AND SO WHEN SERGEANT LOPEZ -- WELL, STRIKE THAT.

6           HOW WAS IT THAT YOU WERE INTERVIEWED?  IN OTHER

7    WORDS, HOW DID THEY KNOW, IF YOU KNOW, THAT YOU HAD WITNESSED

8    THE SHOOTING?

9    A.   HOW DID THEY KNOW THAT I KNOW?

10   Q.   YES.  HOW DID THEY PICK YOU OUT TO INTERVIEW, AS OPPOSED

11   TO ANYONE ELSE?

12          THE COURT:  I'M SORRY.  ARE YOU REFERRING TO THE

13   SHERIFF'S DEPARTMENT?

14          MR. GALIPO:  NO.  MY QUESTION'S NOT VERY GOOD.  LET

15   ME TRY AGAIN.

16   Q.   YOU'RE IN THE DONUT KING.  YOU OBSERVE THE SHOOTING AS

17   YOU DESCRIBED.  AND AT SOME POINT, I GUESS, SOMEONE TELLS YOU

18   YOU'VE GOT TO STAY IN THE DONUT KING?

19   A.   RIGHT.

20   Q.   OKAY.  DO YOU KNOW WHY THEY PICKED YOU OUT TO INTERVIEW?

21          MR. ROTHANS:  CALLS FOR SPECULATION.  LACKS

22   FOUNDATION.

23          THE COURT:  OVERRULED.

24          THE WITNESS:  I DON'T KNOW WHY THEY PICKED ME, BUT

25   MY FRIEND WENT OUTSIDE AND TOLD THEM THAT WE HAD INFORMATION

```
 1    AND WE DID TALK TO SOMEONE.  SINCE NOBODY WAS TALKING TO US,

 2    SHE WALKED OUTSIDE AND THEY SAID WE HAVE TO GO OUT.

 3    Q.    THEN AT SOME POINT THEY INTERVIEWED YOU?

 4    A.    YES.

 5    Q.    WHERE WERE YOU, SPECIFICALLY, WHEN SERGEANT LOPEZ DID

 6    THIS RECORDED INTERVIEW OF YOU?  WERE YOU INSIDE THE DONUT

 7    SHOP OR SOMEWHERE ELSE?

 8    A.    NO, RIGHT OUTSIDE.  RIGHT OUTSIDE THE DONUT SHOP.

 9    Q.    WHEN THEY INTERVIEWED YOU, WAS THERE ANYONE ELSE AROUND

10    OR JUST YOU AND HIM WITHIN, LET'S SAY, FIVE FEET OF EACH

11    OTHER?

12    A.    JUST THE TWO OF US.

13    Q.    OKAY.  AND WERE YOU ANSWERING HIS QUESTIONS TRUTHFULLY,

14    TO THE BEST OF YOUR ABILITY, AT THAT TIME?

15    A.    YES, I WAS.

16    Q.    AND DID HE ASK YOU WHETHER YOU ACTUALLY OBSERVED THE

17    SHOOTING?

18    A.    HE DID.  HE ASKED ME EXACTLY WHAT I SAW, YEAH.

19    Q.    DID YOU TELL HIM?

20    A.    MM-HUH.  YEAH, I DID.

21    Q.    AND THEN AFTER PROVIDING YOUR PHONE NUMBER TO SERGEANT

22    LOPEZ, YOU WERE CONTACTED LATER TO SEE IF YOU WERE WILLING TO

23    GIVE AN INTERVIEW?

24    A.    YES.

25    Q.    DID YOU SAY, "NO, I REFUSE TO GIVE AN INTERVIEW"?
```

1    A.    NO.

2    Q.    OKAY.  YOU GAVE ANOTHER INTERVIEW, CORRECT?

3    A.    YES.

4    Q.    AND DID THOSE OFFICERS ALSO ASK YOU WHAT YOU SAW AT THE

5    TIME OF THE SHOOTING?

6    A.    YES.

7    Q.    AND DID THEY ASK YOU, FOR EXAMPLE, IN THAT SECOND

8    INTERVIEW WITH DETECTIVES COCHRAN AND BLAGG, WHETHER YOU

9    COULD SEE THE GENTLEMAN'S HANDS AT THE TIME HE WAS SHOT?

10   A.    YES.

11   Q.    OKAY.  AND WERE YOU GIVING TRUTHFUL ANSWERS TO THE BEST

12   OF YOUR ABILITY DURING THAT INTERVIEW?

13   A.    YES.

14   Q.    OKAY.  THEN AT SOME TIME YOU WERE ASKED TO GIVE A

15   DEPOSITION, CORRECT?

16   A.    CORRECT.

17   Q.    AND AT THE TIME YOU WERE PLANNING TO POSSIBLY LEAVING

18   THE COUNTRY?

19   A.    CORRECT.

20   Q.    DID YOU SAY -- DID YOU REFUSE TO GIVE A DEPOSITION?

21   A.    NO.  I GAVE ONE.

22   Q.    AND AT THE TIME OF YOUR DEPOSITION, WERE SOME OF THE

23   DETAILS IN TERMS OF WHAT COLOR HIS SHIRT WAS OR WHETHER HE

24   HAD FACIAL HAIR MAYBE A LITTLE LESS CLEAR IN YOUR MIND THAN

25   THEY WOULD HAVE BEEN THE DAY OF THE INCIDENT?

```
 1              MR. ROTHANS:  OBJECTION, LEADING.

 2              THE COURT:  SUSTAINED.

 3   BY MR. GALIPO:

 4   Q.   DO YOU THINK YOUR RECOLLECTION OF WHAT HAPPENED, TO SOME

 5   EXTENT, MAY HAVE BEEN BETTER ON THE DAY OF THE INCIDENT WHEN

 6   YOU GAVE YOUR INITIAL RECORDED STATEMENT TO SERGEANT LOPEZ

 7   THAN IT IS NOW OVER THREE YEARS LATER?

 8   A.   YES.

 9   Q.   AND DO YOU THINK WHEN YOU GAVE YOUR SECOND REPORTED

10   INTERVIEW TO DETECTIVES BLAGG AND COCHRAN THAT YOUR MEMORY OF

11   SOME OF THE DETAILS MAY HAVE BEEN A LITTLE BIT BETTER THAN IT

12   IS NOW OVER THREE YEARS LATER?

13   A.   CORRECT.

14   Q.   DO YOU KNOW ANY OF THE PARTIES ON THIS CASE ON EITHER

15   SIDE?

16   A.   NO.

17   Q.   HAVE YOU, TO THE BEST OF YOUR ABILITY, EXPLAINED WHAT

18   YOU SAW AFTER HE GOT OUT OF THE CAR?

19   A.   YES.

20              MR. GALIPO:  THANK YOU VERY MUCH.

21              MR. ROTHANS:  JUST ONE OR TWO FOLLOWUPS, YOUR

22   HONOR.

23              THE COURT:  GO AHEAD.

24                     **RECROSS EXAMINATION**

25   BY MR. ROTHANS:
```

```
1    Q.   YOU JUST TESTIFIED WHEN MR. GALIPO QUESTIONED YOU THAT
2    YOUR MEMORY OF THIS INCIDENT WAS BETTER ON THE DAY OF THE
3    EVENT, APRIL 25TH, 2010, THAN IT WAS WHEN YOU WERE
4    INTERVIEWED BY THE L.A. COUNTY SHERIFF'S DETECTIVES, CORRECT?
5    A.   CORRECT.
6    Q.   AND YOU DID READ YOUR TRANSCRIPT OF THAT INITIAL
7    INTERVIEW OUTSIDE THE DONUT KING LAST NIGHT OR THIS MORNING
8    IN PREPARATION FOR TODAY?
9    A.   CORRECT.
10   Q.   AND YOU DID TELL THE DETECTIVE AT THE SCENE THAT THE
11   GENTLEMAN YOU SAW ON THE OTHER SIDE OF THE SEBRING WAS
12   WEARING A RED T-SHIRT, TRUE?
13   A.   CORRECT.
14           MR. ROTHANS:  THANK YOU, NOTHING FURTHER.
15           THE COURT:  MS. MEDEIROS --
16           MR. GALIPO:  THANK YOU, YOUR HONOR.
17           THE COURT:  MS. MEDEIROS, YOU'RE EXCUSED.  THANK
18   YOU.
19           LADIES AND GENTLEMEN, WE'RE GOING TO TAKE THE FIRST
20   OF OUR BRIEF BREAKS THIS MORNING.  WE'LL BE READY TO START
21   AGAIN AT 10:15.  PLEASE DON'T DISCUSS THE CASE AND DON'T DO
22   ANYTHING TO INVESTIGATE IT.  THANK YOU.
23           THE COURT:  WHO'S YOUR NEXT WITNESS, MR. GALIPO?
24           MR. GALIPO:  CAN I CONFER WITH MR. MC NICHOLAS FOR
25   ONE SECOND?
```

```
 1              THE COURT:  YOU MAY.

 2                   (COUNSEL CONFER.)

 3         MR. GALIPO:  I BELIEVE WE'RE GOING --

 4    MR. MC NICHOLAS IS GOING TO BE CALLING MS. SIMPLIS.

 5         THE COURT:  ALL RIGHT.

 6                   (RECESS.)

 7         THE COURT:  MS. SANCHEZ --

 8         MR. GALIPO:  YOUR HONOR, I THINK THERE'S ONE

 9    STIPULATION WE WANT TO PUT ON THE RECORD REGARDING A WAIVER

10    OF FUTURE EARNINGS THAT MAY AFFECT THE QUESTIONING OF THE

11    NEXT WITNESS, SO COULD WE DO THAT JUST BEFORE WE START?

12         THE COURT:  YOU MAY.

13         MR. GALIPO:  DO YOU WANT ME TO PROPOSE IT?

14         I AM PROPOSING THAT THE PARTIES ARE AGREEING TO

15    WAIVE, SPECIFICALLY, THE CLAIM OF LOST FUTURE EARNINGS OR

16    SUPPORT.  AND MR. MC NICHOLAS, I THINK, HAS GIVEN ME THE

17    AUTHORITY TO MAKE THAT PROFFER AND I UNDERSTAND THAT THE

18    DEFENSE COUNSEL IS WILLING TO STIPULATE TO THAT.  AND BASED

19    ON THAT, THEY WILL NOT GO INTO QUESTIONING ABOUT EARNINGS AND

20    INCOME AND THAT TYPE OF QUESTIONING.

21         THE COURT:  RIGHT.  OBVIOUSLY, THIS WAS REFLECTED

22    IN THE MOTIONS IN LIMINE SO I'LL EXPECT IN THAT CASE THAT

23    THOSE ASPECTS OF MR. GRISSOM'S LIFE THAT WERE -- I VIEWED AS

24    IRRELEVANT FOR THE LIABILITY, BUT MAY BE OF SOME POTENTIAL

25    RELEVANCE DAMAGES, ARE NOT GOING TO BE INQUIRED ABOUT -- GANG
```

```
1    THINGS PRIOR CRIME, DRUG USE, ANYTHING LIKE THAT.

2              MR. GALIPO:  YES.  SO CAN WE JUST GET THE

3    STIPULATION AS -- SO STIPULATED.

4              MR. ROTHANS:  AS LONG AS IT'S CRYSTAL CLEAR, FOR

5    THE RECORD, THIS IS A WAIVER ON BEHALF OF ALL PLAINTIFFS AS

6    TO ALL FUTURE CLAIMS OR INCOME SUPPORT AND EARNINGS FROM THE

7    DECEDENT.

8              MR. GALIPO:  SO STIPULATED.

9              MR. ROTHANS:  SO STIPULATED.

10             MR. MC NICHOLAS:  AND SO STIPULATED.

11             THE COURT:  THE COURT ACCEPTS THAT AND WILL EXPECT

12   THE QUESTIONING TO BE IN ACCORDANCE WITH THAT.

13             MR. GALIPO:  WHAT WE'RE HOPEFUL, YOUR HONOR, IS TO

14   FINISH MS. SIMPLIS.  AND THEN MR. CLARK IS HERE AND WE'RE

15   HOPING TO GET DONE WITH HIM AS WELL BY 12:30.

16             THE COURT:  ALL RIGHT.

17             MS. SANCHEZ, CAN YOU GET THE JURY.

18             THE CLERK:  YES, YOUR HONOR.

19                    (JURORS ENTER).

20             THE COURT:  THE JURORS ARE PRESENT AS ARE COUNSEL.

21             AND MR. MC NICHOLAS, YOU MAY CALL THE PLAINTIFF'S

22   NEXT WITNESS.

23             MR. MC NICHOLAS:  THANK YOU, YOUR HONOR.  PLAINTIFF

24   WILL CALL MS. KANDACE SIMPLIS.

25        **KANDACE SIMPLIS, PLAINTIFF'S WITNESS SWORN**
```

1     THE CLERK:  PLEASE STATE AND SPELL YOUR NAME FOR

2   THE RECORD.

3     THE WITNESS:  KANDACE SIMPLIS, K-A-N-D-A-C-E, LAST

4   NAME SIMPLIS, S-I-M-P-L-I-S.

5     THE COURT:  MR. MC NICHOLAS, YOU MAY PROCEED.

6                    **DIRECT EXAMINATION**

7   BY MR. MC NICHOLAS:

8   Q.   GOOD MORNING, MA'AM.  HOW ARE YOU?

9   A.   I'M GOOD, THANK YOU.

10  Q.   I NEED YOU TO SPEAK UP A LITTLE BIT SO EVERYBODY CAN

11  HEAR YOU.

12  A.   CAN YOU HEAR ME?

13  Q.   HOW OLD ARE YOU?

14  A.   29.

15  Q.   WHAT'S YOUR DATE OF BIRTH?

16  A.   AUGUST 1ST, 1983.

17  Q.   AND, GENERALLY, WHAT AREA WERE YOU BORN AND RAISED IN?

18  A.   LOS ANGELES.

19  Q.   AND DO YOU KNOW WHO LEJOY GRISSOM IS?

20  A.   YES.

21  Q.   WHO IS LEJOY GRISSOM TO YOU?

22  A.   MY HUSBAND.

23  Q.   AT SOME POINT DID YOU HAVE A CHILD WITH MR. GRISSOM?

24  A.   YES.

25  Q.   NOW HOW MANY CHILDREN DO YOU HAVE?

```
 1    A.    TWO.

 2    Q.    BOYS OR GIRLS?

 3    A.    TWO GIRLS.

 4    Q.    WHAT'S THE OLDEST ONE'S NAME?

 5    A.    KYRA.

 6    Q.    AND HOW OLD IS SHE NOW?

 7    A.    SIX.

 8    Q.    NOW MR. GRISSOM IS NOT HER BIOLOGICAL FATHER, CORRECT?

 9    A.    NO.

10    Q.    IS THAT CORRECT?

11    A.    THAT'S CORRECT.

12    Q.    AND YOU HAVE A SECOND DAUGHTER?

13    A.    YES.

14    Q.    WHAT'S HER NAME?

15    A.    KAILYNN.

16    Q.    AND IS THAT MR. GRISSOM'S BIOLOGICAL DAUGHTER?

17    A.    YES.

18    Q.    AND WHEN WAS SHE BORN?

19    A.    DECEMBER 9TH, 2009.

20    Q.    SO ABOUT FOUR MONTHS BEFORE THE SHOOTING?

21    A.    YES.

22    Q.    NOW, ARE THOSE THE TWO YOUNG GIRLS WE HAVE SEEN YOU WITH

23    IN AND OUTSIDE THE COURTROOM?

24    A.    YES.

25    Q.    NOW, ARE YOU AWARE THAT MR. GRISSOM HAD CHILDREN BY
```

1    ANOTHER MOTHER?

2    A.   YES.

3    Q.   AND WHO ARE THOSE CHILDREN?

4    A.   DEUJANYE, DAJAYNE AND DYVONN.

5    Q.   WERE YOU HERE IN THE COURTROOM YESTERDAY?

6    A.   YES.

7    Q.   AND DID ANY OF THOSE CHILDREN TESTIFY?

8    A.   YES.

9    Q.   WHICH TESTIFIED?

10   A.   I BELIEVE IT WAS DEUJANYE AND DYVONN.

11   Q.   NOW PRIOR TO HIS DEATH, DID YOU HAVE A CHANCE TO OBSERVE

12   LAJOY INTERACT WITH YOUR OLDEST DAUGHTER?

13   A.   YES.

14   Q.   GENERALLY, DESCRIBE HIS INTERACTION WITH HER.

15   A.   ALTHOUGH SHE WASN'T HIS BIOLOGICAL CHILD, HE TREATED HER

16   NO DIFFERENTLY; TOOK HER PLACES, TOOK HER TO THE PARK, READ

17   HER STORIES.  HE INTERACTED WITH HER THE SAME WAY HE DID WITH

18   THE OTHER THREE CHILDREN, NO DIFFERENT.

19   Q.   OKAY.  AND WHEN YOU SAY "THE OTHER THREE CHILDREN,"

20   MA'AM, WHAT DO YOU MEAN?

21   A.   WITH HIS THREE BIOLOGICAL CHILDREN, HE NEVER TREATED HER

22   LIKE SHE WAS ANYTHING DIFFERENT TO HIM.  HE TREATED HER LIKE

23   SHE CAME FROM HIM.

24   Q.   OKAY.  AND DID YOU HAVE AN OPPORTUNITY TO SEE HIM

25   INTERACT WITH THE THREE CHILDREN OTHER THAN KAILYNN?

1    A.   YES.

2    Q.   AND DESCRIBE HIS INTERACTION WITH THEM, GENERALLY?

3    A.   HE IS AN EXCELLENT FATHER WITH HIS CHILDREN, MAKING SURE

4    THEY GET TO SCHOOL, HELPING THEM WITH THEIR HOMEWORK, TAKING

5    THEM PLACES, PLAYING WITH THEM, VERY PLAYFUL WITH THEM, LIKE

6    A BIG TEDDY, BASICALLY, WITH HIS KIDS.

7    Q.   WAS HE LOVING TO HIS CHILDREN?

8    A.   VERY MUCH SO.

9    Q.   AND DID KYRA, YOUR OLDEST DAUGHTER, TALK TO YOU ABOUT

10   HER TIME WITH LAJOY?

11   A.   YES.

12   Q.   AND WHAT WOULD SHE TELL ABOUT THAT?

13           MS. WILLIAMS:  OBJECTION, RELEVANCE, YOUR HONOR.

14           THE COURT:  SUSTAINED.

15   BY MR. MC NICHOLAS:

16   Q.   DID YOU EVER TALK WITH -- SPEAK WITH HIS OTHER THREE

17   CHILDREN ABOUT THEIR RELATIONSHIP WITH MR. GRISSOM?

18           MS. WILLIAMS:  OBJECTION, HEARSAY, YOUR HONOR.

19           THE COURT:  MS. SIMPLIS, DID YOU OBSERVE

20   MR. GRISSOM WITH HIS THREE CHILDREN?

21           THE WITNESS:  YES, I DID.

22           THE COURT:  OVERRULED.

23   BY MR. MC NICHOLAS:

24   Q.   AND DID THEY EVER DESCRIBE TO YOU THEIR RELATIONSHIP

25   WITH THEIR FATHER?

```
1    A.   IT WAS VERY CLEAR HOW MUCH THEY LOVED HIM AND WANTED TO

2    BE AROUND HIM AND WITH HIM.  IT'S LIKE A CHILD, HOW THEY

3    CLING TO THEIR MOTHER IS HOW THEY WOULD CLING TO HIM.  THEY

4    JUST WANTED TO BE WITH HIM ALL THE TIME, LIKE, THEY NEVER

5    WANTED HIM TO LEAVE.  HE COULDN'T GO TO THE STORE WITHOUT

6    THEM GIVING HIM A HASSLE.

7    Q.   AND HOW OLD WAS KAILYNN, THE DAUGHTER HE HAD WITH YOU,

8    WHEN MR. GRISSOM WAS SHOT AND KILLED?

9    A.   FOUR-MONTHS-OLD.

10           MR. MC NICHOLAS:  NOTHING FURTHER, YOUR HONOR.

11           THE COURT:  MS. WILLIAMS.
```

### CROSS-EXAMINATION

```
13   BY MS. WILLIAMS:

14   Q.   MS. SIMPLIS, YOU REFERRED TO MR. GRISSOM AS YOUR

15   HUSBAND, CORRECT?

16   A.   YES.

17   Q.   AND YOU HAD FIRST MET MR. GRISSOM WHEN YOU WERE ABOUT

18   18-YEARS-OLD?

19   A.   AROUND THERE.

20   Q.   AND AFTER YOU FIRST MET HIM, YOU DATED BRIEFLY WHEN YOU

21   WERE 18; AND THEN SOME YEARS LATER YOU RECONNECTED WHEN YOU

22   FOUND HIM ON MYSPACE, CORRECT?

23   A.   THAT IS CORRECT.

24   Q.   AND THAT WAS IN 2008 WHEN YOU RECONNECTED WITH

25   MR. GRISSOM AFTER YOU FOUND HIM ON MYSPACE?
```

1    A.   THE VERY END OF 2008, GOING INTO 2009.

2    Q.   IT'S YOUR TESTIMONY TODAY THAT YOU CONTINUED TO DATE

3    MR. GRISSOM, HAD ULTIMATELY MARRIED HIM UNTIL 2008, UNTIL HIS

4    DEATH IN APRIL OF 2010, CORRECT?

5    A.   YES.

6    Q.   AND WE'LL BE REFERRING TO HIM AS YOUR HUSBAND.

7         YOU AND MR. GRISSOM NEVER GOT LEGALLY MARRIED, DID

8    YOU?

9    A.   WE WENT AND OBTAINED A MARRIAGE LICENSE BUT,

10   UNFORTUNATELY, WE WEREN'T UNABLE TO FILE IT.

11   Q.   SO YOU JUST EXCHANGED WEDDING VOWS, INFORMALLY, WITH ONE

12   ANOTHER?

13   A.   YES.

14   Q.   AND AS MR. GRISSOM -- AS YOU CONSIDERED HIM YOUR

15   HUSBAND, WOULD YOU CONFIDE IN HIM?

16   A.   YES.

17   Q.   AND HE WOULD CONFIDE IN YOU?

18   A.   YES.

19   Q.   AND YOU WOULD SHARE THE DETAILS OF YOUR DAILY LIFE WITH

20   HIM?

21   A.   HE WAS MY DAILY LIFE.

22   Q.   AND HE WOULD SHARE THE DETAILS OF HIS DAILY LIFE WITH

23   YOU?

24   A.   YES.

25   Q.   YOU SHARED HOUSEHOLD EXPENSES?

1    A.    YES.

2    Q.    YOU WORKED TOGETHER AS A TEAM TO RAISE YOUR KIDS?

3    A.    YES.  WELL, NOT ALL OF OUR KIDS.

4    Q.    WHEN YOU SAY YOU WORKED AS A TEAM RAISING YOUR KIDS, YOU

5    AND MR. GRISSOM WORKED AS A TEAM TO RAISE --

6    A.    FOUR OUT OF THE FIVE.

7    Q.    -- FOUR OUT OF THE FIVE, MEANING --

8    A.    HE DIDN'T GET A CHANCE TO RAISE KAILYNN.

9    Q.    SO WHEN YOU SAY YOU WORKED AS A TEAM TO RAISE THE KIDS,

10   YOU'RE REFERRING TO KYRA AND THE OTHER THREE CHILDREN HE HAD

11   FROM ANOTHER WOMAN, CORRECT?

12   A.    YES.

13   Q.    AND ON ANY GIVEN DAY AFTER YOU HAD RECONNECTED WITH

14   MR. GRISSOM IN 2008, YOU WOULD KNOW HIS GENERAL WHEREABOUTS,

15   CORRECT?

16   A.    IF I ASKED, YES.

17   Q.    AND HE KNEW WHERE YOU WERE ON ANY GIVEN DAY?

18   A.    YES.

19   Q.    AND, IF MR. GRISSOM WASN'T HOME, YOU WOULD KNOW HOW TO

20   GET IN TOUCH WITH HIM, CORRECT?

21   A.    YES.

22          MR. MC NICHOLAS:  I'M GOING TO OBJECT TO RELEVANCE

23   AT THIS LINE OF QUESTIONING.

24          THE COURT:  LET'S BRIEFLY APPROACH SIDEBAR.

25                    (SIDEBAR.)

```
 1              THE COURT:  MS. WILLIAMS, I SEE WHERE YOU'RE GOING

 2   ON THIS.  WHAT IS THE RELEVANCE OF THE KNOWLEDGE OF THIS

 3   WITNESS AS TO THE SERIES OF ROBBERIES WHICH ARE --

 4              MS. WILLIAMS:  IT IS NOT GOING TOWARDS THIS --

 5              THE COURT:  TELL ME WHERE.

 6              MS. WILLIAMS:  I AM FINISHED WITH THOSE

 7   ESTABLISHING QUESTIONS -- SETTING UP FOR QUESTIONS CONCERNING

 8   HER INTERACTION WITH MR. GRISSOM DURING THE LAST SIX MONTHS

 9   OF HIS LIFE, DURING THE TIME WHEN KAILYNN WAS BORN.

10              MR. MC NICHOLAS:  HER INTERACTION IS IRRELEVANT.

11   SHE'S NOT A PLAINTIFF.  I WAS VERY SPECIFIC IN MY QUESTIONS

12   AS TO THE OBSERVATIONS WITH THE CHILDREN.  I DIDN'T ASK HER

13   WHAT SHE DID WITH HIM.  I DIDN'T ASK HER ANYTHING WHICH --

14   THE PLAINTIFFS ARE CHILDREN AND THE MEASURE OF DAMAGES IS

15   LOSS OF VALUE OF RELATIONSHIP WITH THE CHILDREN.  IT HAS

16   NOTHING TO DO WITH INTERACTION OF THIS WITNESS WITH

17   MR. GRISSOM BECAUSE WHERE THEY'RE GOING TO TRY TO GO IS:  HE

18   WAS IN JAIL TWO OR THREE MONTHS ON A TICKET ISSUE, WHICH IS

19   TOTALLY IRRELEVANT, 403.  BUT THOSE ARE MY OBJECTIONS.

20              THE COURT:  I DO FEEL THAT THAT WOULD BE 403 IF

21   IT'S NOT IRRELEVANT, WHICH IT VERY WELL MIGHT BE.

22              MS. WILLIAMS:  WELL, YOUR HONOR --

23              THE COURT:  I GUESS THE POINT IS -- IT SEEMS TO ME

24   IS SHE TESTIFIED IN REGARD TO THE DAUGHTER.  HE WAS THERE

25   EVERY MOMENT OF THOSE FOUR MONTHS, DEVOTED TO HER AND SUCH
```

1    AND SUCH.  THEN I WOULD SEE THE RELEVANCE AS IT IS.  I'M NOT

2    SURE THAT YOU SEE THE RELEVANCE OF THE TICKET OR THE

3    INCARCERATION.

4           MS. WILLIAMS:  YOUR HONOR, I HAVE NO INTENTION OF

5    MAKING ANY REFERENCE TO MR. GRISSOM BEING INCARCERATED.

6    HOWEVER, I THINK I AM ENTITLED TO PROBE THIS WITNESS ON THE

7    FACT THERE WERE THREE MONTHS DURING WHICH SHE HAD NO CONTACT

8    WITH MR. GRISSOM AND, AT A MINIMUM -- BECAUSE THE ONLY

9    PLAINTIFF MR. MC NICHOLAS IS REPRESENTING IS THE INFANT

10   CHILD -- AT A MINIMUM EXPLORE THE CONTACT HE HAD WITH THAT

11   INFANT CHILD FROM THE MOMENT SHE WAS BORN UNTIL THE TIME HE

12   DIED.

13          MR. ROTHANS:  COULD I DO THAT?

14          THE COURT:  MS. WILLIAMS IS DOING AN EXCELLENT JOB

15   OF REPRESENTING YOUR CLIENT.

16          THE PROBLEM WITH THAT IS I DO THINK IT COULD GET

17   INTO SOME 403 STUFF.  ALSO, I THINK THE WAY TO CLEAR THIS UP

18   IS MAKE SURE THE JURY INSTRUCTIONS ARE CLEAR TO THE JURY AS

19   TO WHAT THE DAMAGES -- AS TO WHAT THE DAMAGES ARE.  I MEAN

20   I'VE TRIED TO LIMIT THEM TO PRESENT -- THERE'S LIMITS,

21   OBVIOUSLY.  THE JURY KNOWS HE'S GOING TO AT LEAST THE FINAL

22   ROBBERY, IF NOT ALL OF THOSE.  SO I THINK --

23          MS. WILLIAMS:  I HAVE --

24          THE COURT:  SO I THINK, GIVEN THAT THAT'S GOING TO

25   BE THERE, IT'S NOT AS IF THEY WERE SAYING HE WAS SUCH A SWEET

1     FELLOW, HE COULDN'T HAVE POSSIBLY BEEN RUNNING AROUND WITH A

2     CHROME REVOLVER --

3          MR. ROTHANS:  COULD I HAVE A MOMENT, YOUR HONOR?

4                    (DEFENSE COUNSEL.)

5          MS. WILLIAMS:  YOUR HONOR, MR. MC NICHOLAS HAS SAY

6     THE ONLY PLAINTIFFS IN THIS CASE ARE THE CHILDREN, HOWEVER

7     ASKED MS. SIMPLIS ABOUT LEJOY'S RELATIONSHIP WITH KYRA, AND

8     THE GIRL WHO IS NOT HIS.  AND THE DAMAGES INSTRUCTION THE

9     JURY WILL BE SEEKING IS THE LEVEL OF CARE, COMPANIONSHIP,

10    COMFORT, WHICH LEJOY NOT ONLY GAVE HIS CHILDREN WHEN HE WAS

11    LIVING, BUT IN THE FUTURE.

12          I HAVE NO INTENT OF SUGGESTING HOW WONDERFUL HE

13    COULD HAVE BEEN IF HE WAS RUNNING AROUND WITH A GUN, ROBBING

14    STORES.  MY ONLY FOCUS HERE IS THE AMOUNT OF TIME LEJOY WAS

15    ACTUALLY WITH MS. SIMPLIS.

16          THE COURT:  ALL RIGHT.  AS TO THAT -- AS TO -- IF

17    IT'S LIMITED BECAUSE THE INSTRUCTIONS ARE LIMITED TO THE

18    BIOLOGICAL CHILD SO IF YOU LIMIT JUST VERY -- JUST A COUPLE

19    OF QUESTIONS AS TO HOW MUCH TIME DID HE ACTUALLY SPEND WITH

20    HIS BIOLOGICAL DAUGHTER AFTER SHE WAS BORN.  WE AREN'T GOING

21    TO BE IMPEACHING WITH IT -- WITH INTRINSIC EVIDENCE.  IT WILL

22    BE VERY BRIEF HERE.

23          MS. WILLIAMS:  I'M --

24          MR. GALIPO:  SHE MIGHT SAY THAT.

25          MS. WILLIAMS:  IT'S THEIR CLIENT.

```
 1              THE COURT:  THE POINT IS THAT THAT IS THE RISK THAT

 2    I THINK YOU'RE TAKING ON THIS.  I MEAN FROM YOUR POINT OF

 3    VIEW IT'S, LIKE -- I THINK IT'S APPROPRIATE TO ASK THE

 4    QUESTION.  REALLY THEN IT'S UP TO MS. SIMPLIS TO ANSWER IT,

 5    HOW SHE FEELS IT'S TRUTHFUL OR NOT.

 6              MR. GALIPO:  YOU WANT TO APPROACH THE WITNESS TO

 7    TELL HER NOT TO SAY THAT?

 8              MR. MC NICHOLAS:  WELL, IF THE COURT IS OKAY WITH

 9    ME APPROACHING THE WITNESS TO TELL HER NOT TO MENTION THAT HE

10    WAS --

11              THE COURT:  ALL RIGHT.  I'LL ALLOW IT.  WHAT THE

12    JURY WILL THINK OF IT, I HAVE NO IDEA, BUT I'LL ALLOW YOU TO

13    DO THAT.  SO YOU MAY GO AHEAD AND DO THAT, JUST A COUPLE

14    QUESTIONS ABOUT HOW MUCH TIME WAS ACTUALLY SPENT.

15              MR. GALIPO:  MAKE SURE YOU WHISPER.

16              MR. MC NICHOLAS:  THANK YOU.

17                        (END SIDEBAR.)

18              THE COURT:  MR. MC NICHOLAS, YOU MAY APPROACH YOUR

19    CLIENT VERY BRIEFLY.

20              AND THEN, MS. WILLIAMS, YOU MAY CONTINUE.

21            (COUNSEL APPROACHES WITNESS STAND.)

22             (PAUSE IN PROCEEDINGS.)

23              THE COURT:  MS. WILLIAMS, YOU MAY PROCEED.

24              MR. MC NICHOLAS:  THANK YOU.

25              THE COURT:  YOU'RE WELCOME, MR. MC NICHOLAS.
```

```
 1    BY MS. WILLIAMS:

 2    Q.   MS. SIMPLIS, WHAT WAS YOUR DAUGHTER KAILYNN'S DATE OF

 3    BIRTH?

 4    A.   DECEMBER 9, 2009.

 5    Q.   DID MR. GRISSOM GO WITH YOU TO THE HOSPITAL WHEN YOU

 6    GAVE BIRTH TO YOUR YOUNGEST DAUGHTER, KAILYNN?

 7    A.   NO.

 8    Q.   DID MR. GRISSOM COME AND VISIT YOU AT THE HOSPITAL WHEN

 9    YOU GAVE BIRTH TO KAILYNN?

10    A.   NO.

11    Q.   HOW OLD WAS KAILYNN THE FIRST TIME THAT MR. GRISSOM EVER

12    SAW HER?

13    A.   SHE WAS TWO-MONTHS-OLD.

14    Q.   AND DID YOU HAVE ANY CONTACT AT ALL OR DID MR. GRISSOM

15    SEND ANY COMMUNICATION TO KAILYNN DURING THAT FIRST TWO

16    MONTHS?

17    A.   NO.  NO, MA'AM.

18    Q.   NOW AT SOME POINT WHEN KAILYNN WAS TWO MONTHS, THAT

19    WOULD HAVE BEEN AROUND FEBRUARY 2010, CORRECT?

20    A.   YES.

21    Q.   OKAY.  AND IN FEBRUARY OF 2010, DID MR. GRISSOM THEN

22    PROCEED TO HAVE DAILY CONTACT WITH YOUR YOUNGEST DAUGHTER,

23    KAILYNN?

24    A.   WASN'T DAILY.  HE WAS WORKING WITH HIS FATHER.

25    Q.   OKAY.  AND WHEN YOU SAY "WORKING WITH HIS FATHER," WHAT
```

1    WAS HE DOING?

2    A.   HE WAS HELPING HIS FATHER, TRUCK DRIVING.

3    Q.   AND MR. GRISSOM'S WORK WITH HIS FATHER, WOULD THAT

4    REQUIRE HIM TO BE GONE OUT OF TOWN FOR PERIODS OF TIME?

5    A.   YES.

6    Q.   AND HOW MANY DAYS PER WEEK WAS MR. GRISSOM GONE, WORKING

7    WITH HIS FATHER?

8    A.   IT VARIED.

9    Q.   AND WOULDN'T YOU ESTIMATE ABOUT FIVE DAYS A WEEK?  ISN'T

10   THAT WHAT YOU ESTIMATED FOR ME, PREVIOUSLY?

11   A.   YES.  IT COULD HAVE BEEN MORE OR LESS.

12   Q.   OKAY.  SO MR. GRISSOM WAS GONE BETWEEN FEBRUARY OF 2010

13   AND APRIL OF 2010, FOR ABOUT FIVE DAYS A WORK WORKING WITH

14   HIS FATHER, CORRECT?

15   A.   YES.

16   Q.   OKAY.  AND WASN'T MR. GRISSOM ALSO GONE DURING THAT SAME

17   PERIOD OF TIME ANOTHER TWO DAYS A WEEK, STAYING AT HIS

18   MOTHER'S HOME IN LOS ANGELES?

19   A.   HE WAS ASSISTING HER.

20   Q.   OKAY.  BUT MY QUESTION WAS:  WASN'T HE GONE ANOTHER TWO

21   DAYS A WEEK STAYING WITH HIS --

22   A.   ADDITIONAL TWO DAYS, NO.  IT WAS WITHIN THAT SAME TIME

23   PERIOD.  IF HE WAS GONE THREE DAYS, HE CAME BACK TO SEE HIS

24   MOTHER.  IT VARIED ON HOW HE CAME IN AND OUT OF TOWN.

25   Q.   SO YOU WOULD ESTIMATE BETWEEN THE FEBRUARY 2010 AND

```
 1    APRIL OF 2010 TIMEFRAME, MR. GRISSOM WAS GONE AT LEAST FIVE

 2    DAYS A WEEK, EITHER ON THE ROAD, WORKING WITH HIS FATHER OR

 3    WITH HIS MOTHER IN LOS ANGELES, CORRECT?

 4    A.   RIGHT.

 5    Q.   MR. GRISSOM WOULDN'T TAKE YOUR INFANT DAUGHTER, KAILYNN,

 6    WITH HIM WHEN HE WOULD WORK ON THE ROAD WITH HIS FATHER,

 7    WOULD HE?

 8    A.   NOT AT ALL.

 9    Q.   HE WOULDN'T TAKE KAILYNN WITH HIM WHEN HE WOULD GO TO

10    HIS MOTHER'S HOUSE, WOULD HE?

11    A.   MY DAUGHTER WAS BREASTFED SO SHE WASN'T GOING ANYWHERE.

12    Q.   THE ONLY TIMES MR. GRISSOM SAW KAILYNN DURING THE

13    FEBRUARY 2010 TIMEFRAME UNTIL THE TIME OF HIS DEATH WAS THE

14    COUPLE OF DAYS A WEEK WHEN HE WAS AT HOME?

15    A.   YES.  AND THERE WAS ONLY ONE HOLIDAY, WHICH IS EASTER.

16    Q.   NOW THERE WAS A BRIEF PERIOD OF TIME WHEN -- WELL, BACK

17    THAT UP.

18         YOU AND MR. GRISSOM BEGAN LIVING TOGETHER AT

19    SOMETIME IN FEBRUARY 2009, CORRECT?

20    A.   GIVE OR TAKE, GENERALLY, FEBRUARY.

21    Q.   OKAY.  AND YOU'VE TESTIFIED THAT YOU CONTINUED TO LIVE

22    WITH MR. GRISSOM UNTIL APRIL OF 2010, CORRECT?

23    A.   YES.

24    Q.   AND -- BUT THERE'S A PERIOD WHERE MR. GRISSOM DIDN'T SEE

25    KAILYNN, CORRECT?
```

1    A.   YES.

2    Q.   OKAY.  AND AT SOME POINT IN 2009, DID MR. GRISSOM'S

3    THREE CHILDREN FROM THE OTHER WOMAN COME AND LIVE WITH YOU

4    AND YOUR DAUGHTER, KYRA, AND MR. GRISSOM?

5    A.   YES, THEY WERE WITH US.

6    Q.   HOW LONG WAS THAT PERIOD OF TIME?

7    A.   NOT EXACTLY SURE.

8    Q.   DIDN'T YOU TESTIFY FOR ME, PREVIOUSLY, THAT THEY LIVED

9    WITH YOU FOR ABOUT SIX MONTHS?

10   A.   THAT COULD BE THE AMOUNT OF TIME.  IT'S BEEN THREE

11   YEARS.  I'M NOT REALLY SURE.

12   Q.   OKAY.  AND THEN AFTER THAT PERIOD OF TIME WHEN THOSE

13   THREE CHILDREN CAME TO LIVE WITH YOU, HOW FREQUENTLY WOULD

14   MR. GRISSOM SEE THOSE OTHER THREE CHILDREN?

15   A.   THE SAME AMOUNT OF TIME HE SAW ALL OF THE CHILDREN.

16   IT'S ALL THE SAME, EXCEPT FOR WHEN THEY STARTED SCHOOL.

17   Q.   WELL, WHEN YOU SAY "ALL OF THE CHILDREN," WHAT CHILDREN

18   ARE YOU REFERRING TO?

19   A.   ALL OF THE CHILDREN, EXCEPT KAILYNN.  KAILYNN WASN'T

20   BORN YET.

21   Q.   SO AFTER THE THREE CHILDREN FROM MS. ROSE -- DYVONN,

22   DEUJANYE, DAJAYNE -- AFTER THEY STOPPED LIVING WITH YOU AND

23   MR. GRISSOM, HOW FREQUENTLY DID YOU SEE MR. GRISSOM INTERACT

24   WITH THOSE THREE CHILDREN?

25   A.   HE WAS WITH THEM EVERY DAY.

1   Q.   EVERY SINGLE DAY?

2   A.   YES.  HE TOOK THEM TO SCHOOL EVERY DAY.

3   Q.   WHERE DID THOSE THREE CHILDREN GO TO SCHOOL?

4   A.   I DON'T REMEMBER THE NAME OF THE SCHOOL.

5   Q.   YOU AND MR. GRISSOM AT THAT TIME IN, SAY, THE

6   SEPTEMBER 2009 TIMEFRAME, YOU ARE LIVING IN CANOGA PARK,

7   CORRECT?

8   A.   YES.  AND HIS CHILDREN WERE IN LOS ANGELES.

9   Q.   MR. GRISSOM WOULD TAKE THE CHILDREN TO SCHOOL EVERY DAY?

10  A.   YES.

11  Q.   WHERE DID THEY GO TO SCHOOL?

12  A.   I DON'T RECALL THE NAME OF THE SCHOOL.

13  Q.   DID MR. GRISSOM HAVE A CAR?

14  A.   NO.

15  Q.   HOW WOULD HE TAKE THEM TO SCHOOL?

16  A.   IF HE GOT A RIDE, THE BUS.  I DIDN'T GET INTO DETAILS ON

17  HOW HE WAS DOING WHAT HE WAS DOING.

18  Q.   DID MR. GRISSOM SEND ANY CHRISTMAS PRESENTS TO KAILYNN

19  DURING DECEMBER 2009?

20  A.   NO.

21          MS. WILLIAMS:  I DON'T HAVE ANY OTHER QUESTIONS,

22  YOUR HONOR.

23          THE COURT:  MR. MC NICHOLAS?

24          MR. MC NICHOLAS:  NO QUESTIONS.

25          THE COURT:  MS. SIMPLIS, YOU'RE EXCUSED.

```
1              THE WITNESS:  THANK YOU.

2              MR. GALIPO:  MAY I GET OUR NEXT WITNESS?

3              THE COURT:  YOU MAY.

4              MR. ROTHANS, THE NAME OF YOUR WITNESS?  I MEAN THE

5    NAME OF YOUR EXPERT WITNESS AGAIN?  PLEASE REMIND ME.

6              MR. ROTHANS:  CHIEF CLARENCE CHAPMAN.  THAT'S NOT

7    HIM TESTIFYING NOW.

8              THE COURT:  I REALIZE THAT.

9              MR. ROTHANS:  CHAPMAN.

10             THE COURT:  THANK YOU.

11             MR. GALIPO:  MAY I CALL MY NEXT WITNESS?

12             THE COURT:  YOU MAY.

13             MR. GALIPO:  THE PLAINTIFFS CALL ROGER CLARK,

14   PLEASE.

15             THE COURT:  LADIES AND GENTLEMEN, IN REGARD TO NOT

16   ONLY MR. CLARK, BUT ALSO MR. CHAPMAN WHO WILL TESTIFY LATER,

17   I'LL WANT TO READ SOMETHING TO YOU.

18             AND THEN, MR. CLARK, YOU CAN TAKE YOUR OATH.

19             SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE,

20   ARE PERMITTED TO STATE OPINIONS AND THE REASONS FOR THOSE

21   OPINIONS.  OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY

22   OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT

23   AS MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE

24   WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE

25   OPINION AND ALL THE OTHER EVIDENCE IN THE CASE.
```

```
1            ALL RIGHT.  MS. SANCHEZ, YOU CAN ADMINISTER THE

2    OATH.

3            ROGER CLARK, PLAINTIFF'S WITNESS SWORN

4            THE CLERK:  PLEASE STATE AND SPELL YOUR NAME FOR

5    THE RECORD.

6            THE WITNESS:  ROGER ALMA CLARK, R-O-G-E-R A-L-M-A,

7    C-L-A-R-K.

8            THE COURT:  LADIES AND GENTLEMEN, LET ME AD

9    SOMETHING SPECIFIC ABOUT THE FORM OF THE TESTIMONY.  AS I

10   MENTIONED EARLIER EITHER WITH REGARD TO MR. CLARK OR

11   MR. CHAPMAN, THEY WEREN'T THERE.  SO WHY ARE YOU HEARING FROM

12   THEM?  AND THE REASON WHY, AS YOU'VE ALREADY HEARD, THERE ARE

13   VARIOUS -- THERE'S VARIOUS STANDARDS, INCLUDING THESE

14   P.O.S.T. STANDARDS YOU'VE HEARD REFERENCE TO.  AND A

15   CONVENIENT WAY FOR YOU TO GET THE CONTENT OF THOSE STANDARDS

16   IS TO HAVE THEM BROUGHT IN IN THIS QUESTION-AND-ANSWER FORM

17   AT USING EITHER MR. CLARK OR MR. CHAPMAN.

18            IN ADDITION TO THAT, IT'S HELPFUL -- OR IT MAY OR

19   MAY NOT PROVE HELPFUL TO YOU, BUT YOU WILL HEAR THE TESTIMONY

20   AND JUDGE FOR YOURSELVES TO HAVE THOSE STANDARDS APPLIED IN

21   DIFFERENT SITUATIONS.  SO WHAT THE ATTORNEYS ARE GOING TO DO

22   IS TALK ABOUT HOW THE STANDARDS APPLY IN CERTAIN HYPOTHETICAL

23   SITUATIONS.  THIS MIGHT STRIKE YOU AS SORT OF STRANGE OR

24   OVERLY FORMAL, BUT YOU'LL QUICKLY REALIZE THESE HYPOTHETICALS

25   ARE BASED ON VARIOUS VIEWS OF THE EVIDENCE THAT YOU MAY --
```

```
 1    MAY NOT TAKE.  SO THE PURPOSE OF THIS IS NOT TO LET THE
 2    SITUATION -- EITHER MR. CLARK OR MR. CHAPMAN TAKE THE PLACE
 3    OF YOUR OWN JUDGMENT AS TO THE EVIDENCE OR HOW THE LAW SHOULD
 4    BE APPLIED BUT, IF YOU SO FIND IT, PROVIDE YOU WITH THEIR
 5    TESTIMONY WHICH MAY OR MAY NOT PROVE HELPFUL TO YOU IN TRYING
 6    TO REACH A DECISION IN THIS CASE.
 7            WITH THAT, MR. GALIPO, YOU CAN PROCEED.
 8            MR. GALIPO:  THANK YOU.
 9                      DIRECT EXAMINATION
10    BY MR. GALIPO:
11    Q.   GOOD MORNING, MR. CLARK.
12    A.   GOOD MORNING.
13    Q.   DO YOU HAVE A BACKGROUND IN LAW ENFORCEMENT?
14    A.   YES.
15    Q.   WHAT DEPARTMENT DID YOU WORK FOR?
16    A.   THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT.
17    Q.   HOW MANY YEARS DID YOU WORK FOR THAT DEPARTMENT?
18    A.   27-AND-A-HALF YEARS.
19    Q.   WHAT WAS YOUR RANK AT THE TIME OF YOUR RETIREMENT?
20    A.   LIEUTENANT.
21    Q.   WHEN YOU FIRST STARTED, WHAT YEAR DID YOU FIRST START
22    WITH THAT DEPARTMENT?
23    A.   I WAS SWORN IN IN 1965.
24    Q.   AND WERE YOU PROMOTED AT SOME POINT?
25    A.   YES.
```

```
1    Q.    AND CAN YOU TAKE US THROUGH YOUR SERIES OF PROMOTIONS

2    FROM POLICE OFFICER.  WHAT WAS YOUR FIRST PROMOTION?

3    A.    THE FIRST PROMOTION WAS SERGEANT.  I WAS A DEPUTY

4    SHERIFF FOR SIX YEARS, THEN SERGEANT FOR SIX YEARS.

5    Q.    AND THEN YOU SAID "LIEUTENANT."

6          IS THAT HIGHER THAN A SERGEANT?

7    A.    YES.

8    Q.    AND HOW LONG WERE YOU A LIEUTENANT FOR?

9    A.    15-AND-A-HALF YEARS BEFORE MY RETIREMENT.

10   Q.    WHAT YEAR DID YOU RETIRE FROM THE SHERIFF'S DEPARTMENT?

11   A.    1993.

12   Q.    SINCE THAT TIME HAVE, YOU BEEN SERVING AS AN EXPERT

13   CONSULTANT ON POLICE CASES?

14   A.    YES.

15   Q.    HAVE YOU TESTIFIED BEFORE IN COURTROOMS REGARDING POLICE

16   CASES?

17   A.    YES.

18   Q.    AND DO YOU HAVE AN ESTIMATE AS TO HOW MANY TIMES YOU'VE

19   TESTIFIED IN COURT BEFORE?

20   A.    I'VE TESTIFIED OVER 250 TIMES IN COURTS IN TRIALS.

21   Q.    NOW I ASKED -- WELL, YOU WERE ASKED BY SOME OF THE

22   LAWYERS INVOLVED IN THIS CASE TO LOOK AT SOME OF THE

23   MATERIALS AT SOME POINT; IS THAT CORRECT?

24   A.    THAT'S CORRECT.

25   Q.    AND I'M GOING TO THROW OUT SOME CATEGORIES.  AND YOU
```

1    JUST SIMPLY TELL ME IF YOU HAVE REVIEWED THOSE OR NOT.

2              PHOTOGRAPHS OF THE SCENE?

3    A.   YES, MANY, HUNDREDS.

4    Q.   DID YOU FEEL IN THIS PARTICULAR CASE IT WAS NECESSARY

5    FOR YOU TO GO TO THE SCENE IN ORDER TO FORM YOUR OPINIONS?

6    A.   NO.

7    Q.   DID YOU FEEL THE PHOTOGRAPHS WERE ADEQUATE IN

8    CONJUNCTION WITH THE OTHER INFORMATION YOU HAD?

9    A.   YES.

10   Q.   DID YOU REVIEW STATEMENTS OF OFFICERS?

11   A.   I DID.

12   Q.   DID YOU REVIEW DEPOSITION TESTIMONY OF OFFICERS?

13   A.   YES.  THERE WERE 12 DEPOS IN THIS CASE.

14   Q.   ALL RIGHT.  AS THE JUDGE INDICATED, WHEN I GET TO THAT

15   PART OF MY QUESTIONING I'M GOING TO ASK YOU HYPOTHETICALS,

16   AND I'M GOING TO TRY TO ASK HYPOTHETICAL QUESTIONS BASED ON

17   EVIDENCE PRESENTED IN COURT, AS OPPOSED TO WHAT YOU MAY HAVE

18   READ IN A DEPOSITION.  OKAY?

19   A.   YES.

20   Q.   BEFORE WE GET TO THAT, WERE YOU INVOLVED AS A LIEUTENANT

21   IN RUNNING A -- OR COMMANDING A GROUP CALLED NORSAT?

22   A.   YES.

23   Q.   WHAT WAS THAT?

24   A.   NORSAT WAS A MULTI-AGENCY TASK FORCE.  WE HAD FIVE

25   FEDERAL OFFICERS THAT WERE PERMANENTLY ASSIGNED -- AN FBI,

1    IRS, DEA, A.T.F. AND A SECRET SERVICE AGENT -- IN ADDITION TO

2    POLICE OFFICERS FROM PARTICIPATING AGENCIES AND MOSTLY DEPUTY

3    SHERIFFS ASSIGNED TO THE SHERIFF'S DEPARTMENT.

4    Q.   WHAT WOULD THAT ORGANIZATION DO?

5    A.   THAT TASK FORCE WAS ONE OF TWO SPECIFIC TASK FORCES

6    OPERATING IN THE COUNTY THAT WERE ASSIGNED FOR HIGH-RISK,

7    VERY HIGH-LEVEL INVESTIGATIONS AND APPREHENSIONS AND

8    SURVEILLANCES, KIDNAPPINGS, ROBBERIES EXTORTIONS; 80 PERCENT

9    OF THE CASES WERE HOMICIDES OR MULTIPLE HOMICIDES, CAREER

10   CRIMINALS, CAREER ORGANIZATIONS, POLICE CORRUPTION, THOSE

11   TYPES OF THINGS.

12   Q.   HOW LONG DID YOU RUN THAT GROUP FOR?

13   A.   I COMMANDED THAT UNIT FOR FIVE-AND-ONE-HALF YEARS.  I

14   WAS THE LAST UNIT I COMMANDED BEFORE MY RETIREMENT IN 1993.

15   Q.   WOULD THAT UNIT ACTUALLY GET INVOLVED IN THE ARREST OF

16   THESE CAREER CRIMINALS OR PEOPLE INVOLVED IN HOMICIDES AND

17   OTHER SERIOUS CRIMES?

18   A.   YES, THAT WAS PART OF YOUR TASK AND WE ARRESTED AT 500 A

19   YEAR, IN ADDITION TO THE OTHER TYPES OF OPERATIONS -- THE

20   INVESTIGATION, SURVEILLANCE, AND SO FORTH.  THE APPREHENSION

21   PIECE WAS THE FINAL PART OF YOUR ASSIGNMENT.  LIKE I SAID,

22   500 A YEAR, SO THAT WOULD BE RIGHT AT 2500 DURING THE TIME I

23   COMMANDED THE UNIT.

24   Q.   SO THERE WERE 500 ARRESTS ON AVERAGE PER YEAR OF THESE

25   CAREER CRIMINALS?

1   A.   THAT'S CORRECT.

2   Q.   AND THEN THE LAST FIVE YEARS THAT YOU COMMANDED THIS

3   UNIT, HOW MANY SHOTS WERE FIRED IN TAKING THESE CAREER

4   CRIMINALS INTO CUSTODY?

5   A.   WE HAD THE FIRST THREE MONTHS A SHOT FIRED, ONE A MONTH,

6   WHICH WAS TYPICAL FOR THE HISTORY OF THESE TYPES OF UNITS AND

7   THEN WE WENT THE ENTIRE REST OF THE TIME WITHOUT FIRING A

8   SHOT ON EITHER SIDE.  SO THERE WAS NO SHOTS FIRED BY EITHER

9   OFFICER OR SUSPECT.

10  Q.   WERE YOU INVOLVED IN TERMS OF SUPERVISING OR TRAINING

11  OFFICERS WITH RESPECT TO PROPER TACTICS TO USE IN

12  APPREHENDING THESE CAREER CRIMINALS SO THAT SHOTS WOULD NOT

13  NEED TO BE FIRED?

14  A.   YES.

15  Q.   DURING YOUR TIME AS A POLICE OFFICER, WERE YOU INVOLVED

16  IN EITHER SUPERVISING OR TRAINING OTHER OFFICERS WITH RESPECT

17  TO THE USE OF FORCE?

18  A.   YES.

19  Q.   WOULD THAT INCLUDE THE USE OF DEADLY FORCE?

20  A.   IT DID.

21  Q.   WERE YOU INVOLVED IN TRAINING OR SUPERVISING OFFICERS

22  WITH RESPECT TO TACTICS?

23  A.   YES.

24  Q.   WHAT ARE TACTICS?

25  A.   WELL, TACTICS IS A GREEK WORD.  IT COMES FROM PUTTING

1   ALL THINGS IN ORDER.  AND TACTICS ARE VERY IMPORTANT IN THE

2   POLICE PROFESSION BECAUSE IT SETS A CERTAIN PATTERN OF

3   PUTTING THINGS IN ORDER SO THAT THINGS CAN BE DONE SAFELY AND

4   EFFICIENTLY, MOSTLY SAFELY.  AND THE CONNECTION FOR SAFETY IS

5   NOT ONLY FOR THE OFFICER, BUT IT ALSO INCLUDES SAFETY FOR THE

6   PUBLIC AND SAFETY FOR THE SUSPECT.  AND THEY ALL ARE LINKED

7   TOGETHER.  THEY ALL SEEM TO BE PART AND PARCEL OF ONE ASPECT

8   OF THE OPERATION.

9   Q.   JUST TO JUMP AHEAD FOR A MOMENT.

10          ARE YOU FAMILIAR WITH THE TERM "FELONY TRAFFIC

11  STOP"?

12  A.   YES, THAT'S PART OF THE TRAINING.

13  Q.   ARE TACTICS IMPORTANT WITH RESPECT TO OFFICERS DOING A

14  FELONY TRAFFIC STOP?

15  A.   THEY ARE.  IT'S PART OF THE FUNDAMENTAL TRAINING AT THE

16  ACADEMY.  THERE'S A CURRICULUM 1 OF 42, THAT ON -- IT'S

17  CALLED VEHICLE PULLOVERS.  THERE'S THREE CATEGORIES, ONE OF

18  WHICH IS CALLED HIGH-RISK PULLOVER.

19  Q.   NOW YOU MENTIONED SAFETY TO EVERYONE:  SAFETY TO THE

20  OFFICERS, SAFETY TO THE PUBLIC, AND SAFETY TO THE SUSPECT OR

21  INDIVIDUAL THEY'RE TRYING TO TAKE INTO CUSTODY?

22  A.   YES.

23  Q.   NOW P.O.S.T. -- WE'VE HEARD A LITTLE BIT ABOUT THAT.

24  WHAT IS POST?

25  A.   P.O.S.T. STANDS FOR PEACE OFFICERS STANDARDS AND

1    TRAINING AND IT'S PUBLISHED BY THE CALIFORNIA PENAL CODE

2    THERE'S A SECTION 832, THAT SETS FORTH THE CURRICULUM AND

3    CATEGORIZES LEVELS OF CERTIFICATION BUT SPECIFIES THAT ALL

4    OFFICERS, BEFORE THEY CAN BE OFFICERS IN CALIFORNIA AND

5    EXERCISE POLICE POWERS, MUST BE WHAT WE CALL POST-BASIC AND

6    THAT, AS I SAID, IS A CURRICULUM.  IT'S DONE AT THE ACADEMY;

7    42 SPECIFIC LEARNING SKILLS MUST BE PASSED INDIVIDUALLY AND

8    CERTIFIED FOR THE OFFICER BEFORE HE OR SHE CAN BE POLICE

9    OFFICERS.

10   Q.   IS THERE A SPECIFIC LEARNING DOMAIN ON THE USE OF FORCE?

11   A.   YES.  THERE'S A SPECIFIC LEARNING DOMAIN ENTITLED "USE

12   OF FORCE."  THEN THERE ARE OTHER LEARNING DOMAINS THAT HAVE

13   TO DO WITH APPREHENSION METHODS, TACTICS PATROL TECHNIQUES,

14   FIREARMS, THOSE TYPES OF THINGS, AND THEY'RE ALL RELATED TO

15   EACH OTHER.

16   Q.   WHAT LEARNING DOMAIN DEALS SPECIFICALLY WITH USE OF

17   FORCE?

18   A.   IT'S LEARNING DOMAIN NUMBER 20, AND IT'S TITLED "USE OF

19   FORCE."  IT USED TO BE CALLED "LEGAL AND MORAL USE OF FORM

20   AND FIREARMS," AND HAS IN IT A NUMBER OF CHAPTERS, ONE OF

21   WHICH SPECIFIES THE USE OF LETHAL FORCE AND THE ASPECTS OF

22   LETHAL FORCE AND WHEN OFFICERS ARE AUTHORIZED TO USE THAT

23   FORCE.

24   Q.   ARE YOU SAYING THERE'S A CHAPTER WITHIN LEARNING DOMAIN

25   20 THAT DEALS WITH THE USE OF DEADLY FORCE?

```
1    A.   YES.

2    Q.   DO OFFICERS HAVE TRAINING WITH RESPECT TO WHEN IT IS OR

3    NOT APPROPRIATE TO USE DEADLY FORCE?

4    A.   YES.

5    Q.   DOES P.O.S.T. IN LEARNING DOMAIN 20 IN THE CHAPTER ON

6    DEADLY FORCE TEACH THAT DEADLY FORCE IS A LAST RESORT?

7    A.   YES.

8    Q.   DO YOU AGREE WITH THAT?

9    A.   VERY MUCH SO.

10   Q.   DOES P.O.S.T. TEACH THAT DEADLY FORCE SHOULD ONLY BE

11   USED IN THE DIREST OF CIRCUMSTANCES?

12   A.   YES, AND ONLY WHEN IN THE ABSENCE OF A REASONABLE

13   ALTERNATIVE.

14   Q.   OKAY.  WITH RESPECT TO THAT, DOES P.O.S.T. TEACH THAT

15   DEADLY FORCE SHOULD ONLY BE USED WHEN NO OTHER REASONABLE

16   MEASURES ARE AVAILABLE OR THEY ALL HAVE BEEN EXHAUSTED?

17   A.   CORRECT.

18   Q.   DO YOU AGREE WITH THAT?

19   A.   I DO, INDEED.

20   Q.   WHY?

21   A.   AS OFFICERS ARE TAUGHT, AND I AGREE, THAT THE USE OF

22   LETHAL FORCE IS A UNIQUE LEVEL OF FORCE BECAUSE, TYPICALLY,

23   IT MEANS THAT THE OUTCOME IS GOING TO BE DEATH AND THERE IS

24   NO POSSIBLE RETURN.  SO THERE ARE SPECIFIC THINGS TAUGHT TO

25   OFFICERS ABOUT THIS VERY SERIOUS AND POINT-OF-NO-RETURN WHEN
```

1    THEY USE THIS LEVEL OF FORCE.

2    Q.    DOES P.O.S.T. TEACH ABOUT THE REVERENCE FOR HUMAN LIFE?

3    A.    YES.

4    Q.    AND THAT A WARNING THAT DEADLY FORCE IS GOING TO BE USED

5    MUST BE GIVEN WHEN FEASIBLE?

6    A.    CORRECT.

7    Q.    NOW, IN THE CONTEXT OF USING FORCE AND DEADLY FORCE,

8    DOES P.O.S.T. TEACH ABOUT SUBJECTIVE FEAR?

9    A.    YES, THERE'S A SECTION IN LEARNING DOMAIN 20 ABOUT FEAR.

10   Q.    IS IT ENOUGH TO USE DEADLY FORCE FOR AN OFFICER TO SAY,

11   "SUBJECTIVELY, I WAS IN FEAR.  I THOUGHT MAYBE HE WAS GOING

12   TO HURT SOMEONE OR KILL SOMEONE"?

13          IS THAT ENOUGH BY ITSELF FOR AN OFFICER TO USE

14   DEADLY FORCE?

15   A.    NO.

16   Q.    DOES P.O.S.T. TEACH THAT?

17   A.    YES.

18   Q.    WHAT DOES P.O.S.T. TEACH WITH RESPECT TO MANAGING FEAR?

19   A.    WELL, THAT THERE HAS TO BE A REALISTIC ACTUAL REASON FOR

20   THE FEAR.  IT'S CALLED AN OBJECTIVELY REASONABLE FEAR, NOT A

21   SUBJECTIVE FEAR.  SO IT HAS TO BE BASED ON ARTICULABLE FACTS

22   AND THAT HAS TO BE THE BASIS, NOT FOR WHAT THE OFFICER MIGHT

23   IMAGINE OR THINK THROUGH, NOT BEING WHAT IS PRESENTED TO THEM

24   AS JUSTIFIABLE FOR USE OF FORCE.  THERE COULD BE -- I CAN

25   GIVE EXAMPLES.  IF I HAVE SOMETHING HAPPENING IN MY LIFE AND

1   I THINK SOMEONE IN THIS COURTROOM MIGHT BE ARMED, I CANNOT

2   REACT TO THAT, THAT'S NOT OBJECTIVELY REASONABLE.

3   Q.    OVERREACTION -- HAVE YOU REVIEWED OFFICER INVOLVED

4   SHOOTING CASES BEFORE WHEN THE SHOOTING OFFICER OVERREACTED?

5   A.    YES, I HAVE.

6   Q.    AND, IN GENERAL, IF AN OFFICER OVERREACTS AND USED

7   DEADLY FORCE IS THAT AN EXAMPLE OF A CASE OF UNREASONABLE OR

8   EXCESSIVE FORCE?

9   A.    YES.

10   Q.    IN THIS CASE, DID I ASK YOU TO LOOK AT DIFFERENT FACTUAL

11   SCENARIOS TO GIVE OPINIONS AS TO WHETHER OR NOT USE OF DEADLY

12   FORCE WAS EXCESSIVE OR UNREASONABLE?

13   A.    YES.

14   Q.    YOU MENTIONED SOMETHING ABOUT AN OBJECTIVE STANDARD.

15   DOES THAT RELATE TO WHAT AN OBJECTIVELY REASONABLE POLICE

16   OFFICER WOULD DO IN THE SAME SITUATION, AS OPPOSED TO WHAT

17   THE INVOLVED OFFICER MAY HAVE DONE?

18         MR. ROTHANS:  OBJECTION.  MAY CALL FOR A LEGAL

19   CONCLUSION AS PHRASED.

20         THE COURT:  VERY TECHNICALLY, BUT I'LL OVERRULE THE

21   OBJECTION.

22         THE WITNESS:  AS I REMEMBER THE QUESTION, THERE --

23   THE USE OF FORCE AND THE OBJECTIVELY REASONABLE ASPECT IS

24   LINKED, CONNECTED TO THE TACTICS AS WELL.  THAT'S THE WAY I

25   TOOK THE QUESTION.

1    Q.   LET ME ASK IT THIS WAY:  WHEN YOU ARE ASKED UNDER A

2    CERTAIN SET OF FACTS WHETHER THE USE OF DEADLY FORCE IS

3    REASONABLE OR NOT, WHAT STANDARD ARE YOU APPLYING?

4    A.   OH, I APPLY WHAT'S TAUGHT AT P.O.S.T.  AND, AS I SAID,

5    IT'S CONNECTED TO -- IF THE PROPER PROCEDURES WERE FOLLOWED

6    OR NOT AND THEN THAT WOULD RISE TO IF FEAR WOULD BE

7    OBJECTIVELY REASONABLE OR NOT AS WELL.

8    Q.   OKAY.  NOW ARE OFFICERS TAUGHT IF THEY SEE SOMEONE WITH

9    A GUN IN THEIR HAND -- THAT FACT ALONE -- IT'S OKAY TO SHOOT

10   THEM?

11   A.   NO, THAT FACT ALONE WOULD NOT BE OBJECTIVELY REASONABLE.

12   Q.   ARE OFFICERS TAUGHT, JUST BECAUSE THEY SEE SOMEONE WITH

13   A KNIFE IN THEIR HAND, THEY COULD SHOOT THEM AUTOMATICALLY?

14   A.   NO.

15   Q.   ARE OFFICERS TRAINED IF THEY SEE A GUN IN SOMEONE'S

16   HAND, ONE COMMAND THEY CAN GIVE IS TO "DROP IT"?

17   A.   THAT'S THE PROPER TACTIC OF THE COMMAND, NOT "MOVE,"

18   "FREEZE" -- "DO NOT MOVE.  DROP WHAT YOU HAVE IN YOUR HAND."

19   THOSE TYPES OF COMMANDS WOULD BE APPROPRIATE.

20   Q.   ARE OFFICERS TRAINED, IF THEY SEE WHAT THEY BELIEVE TO

21   BE A GUN, THEY SHOULD YELL OUT "GUN" SO OTHER OFFICERS KNOW

22   WHAT THEY SAW?

23   A.   YES.

24   Q.   NOW, YOU HAVE LOOKED AT SOME PHOTOGRAPHS AS YOU

25   INDICATED, CORRECT?

```
 1    A.   YES, I DID.

 2              MR. GALIPO:  AND I'M NOT SURE IF THIS IS IT OR NOT,

 3    YOUR HONOR, BUT 372-129.

 4              THE COURT:  IT WILL BE RECEIVED.

 5              (EXHIBIT 372-129 IN EVIDENCE.)

 6    BY MR. GALIPO:

 7    Q.   YOU LOOKED AT SOME PHOTOGRAPHS OF A GREEN CHRYSLER

 8    SEBRING AND A COUPLE OF PATROL VEHICLES BEHIND IT IN A

 9    PARKING LOT?

10    A.   YES.

11    Q.   NOW, I WANT YOU TO ASSUME -- I'M GOING TO ASK YOU A FEW

12    HYPOTHETICALS, THEN I MAY ASK YOU SOME FOLLOW-UP QUESTIONS.

13              I WANT YOU TO ASSUME THAT INVOLVED OFFICERS HAD

14    INFORMATION THAT AN INDIVIDUAL HAD COMMITTED SOME ARMED

15    ROBBERIES AND ON THE MORNING OF APRIL 25TH, 2010; THEY

16    RECEIVED INFORMATION OF A ROBBERY AT RADIOSHACK, AND THEY

17    WERE NOTIFIED BY ONE OFFICER, AN OFFICER LOPEZ, ROY LOPEZ,

18    THAT HE BELIEVES HE HAS THE POSSIBLE SUSPECT WHO WAS

19    COMMITTING THE ROBBERIES AND/OR THE ROBBERY THAT MORNING AND

20    HE HAD STOPPED THE VEHICLE IN THE PARKING LOT OF THE DONUT

21    KING.

22              DO YOU HAVE THAT IN MIND SO FAR?

23    A.   YES.

24    Q.   AND FURTHER ASSUME THAT AFTER OFFICER LOPEZ GOT THERE,

25    OTHER OFFICERS ARRIVED, INCLUDING OFFICER ZERBEY AND
```

```
1    FAIRBANKS, OFFICER MARTINEZ, OFFICER BROWN AND OFFICER MOORE.
2              DO YOU HAVE THAT ADDITIONAL FACT IN MIND?
3    A.   YES.
4    Q.   NOW, FIRST OF ALL, IN YOUR OPINION UNDER THESE FACTS,
5    WOULD IT BE APPROPRIATE FOR THE OFFICERS TO DO A FELONY
6    TRAFFIC STOP?
7    A.   YES.  WHAT YOU DESCRIBED WOULD BE A HIGH-RISK FELONY
8    TRAFFIC STOP.
9    Q.   AND LOOKING -- OKAY.
10             NOW, WHILE THE PEOPLE ARE IN THE CAR, I WANT YOU TO
11   ASSUME THAT ONE OR MORE OFFICERS ON SCENE BELIEVE EVEN WITH
12   MORE CERTAINTY THAT THE RIGHT-FRONT PASSENGER IS, IN FACT,
13   THE SUSPECT, THEY SEE A TATTOO OR WHAT APPEARS TO BE A TATTOO
14   ON HIS HAND OR HE LOOKED BACK TOWARDS HIM AND THEY BELIEVE
15   THAT'S HIM.
16             CAN YOU ASSUME THAT FACT?
17   A.   YES.
18   Q.   IS IT OKAY, BASED ON PEACE OFFICERS STANDARDS AND
19   TRAINING TO OPEN FIRE ON THE CAR?
20             MR. ROTHANS:  VAGUE AND AMBIGUOUS AS PHRASED.
21             THE COURT:  OVERRULED.
22             THE WITNESS:  NO, YOU WOULD NOT SHOOT INTO THE CAR
23   WITH THAT SET OF FACTS.
24   Q.   WHY NOT?
25   A.   WELL, WHAT THE TERM IS THERE'S NO IMMEDIATE DEFENSE OF
```

1   LIFE, THERE'S NO I.D.O.L.  THAT'S AN ACRONYM USED BY LOT OF

2   AGENCIES.  SO THE VEHICLE IS STOPPED.  THERE'S A CONTAINMENT

3   WHICH IS THE FIRST STEP IN THE HIGH-RISK PULLOVER AND

4   EXTRACTION.  AND THERE'S NO IMMEDIATE ACTION; THERE'S NO

5   ACTION THAT'S AN IMMEDIATE THREAT TO LIFE.

6   Q.   WELL, LET'S JUST FOLLOW UP ON THAT POINT.

7        DOES P.O.S.T. IN THEIR LEARNING DOMAIN 20 ON THE

8   USE OF FORCE CATEGORIZE DIFFERENT TYPES OF CONDUCT THAT A

9   SUSPECT MAY BE ENGAGED IN?

10   A.   YES, IT DOES.

11   Q.   WHAT ARE THE CATEGORIES?

12   A.   WELL, THERE ARE FOUR.  THERE'S COOPERATIVE AND WHAT'S --

13   WHEN A SUBJECT IS COOPERATIVE, WHAT'S EXPECTED FOR THE

14   OFFICER IS VERBAL SKILLS AND OFFICER PRESENCE.  THEN THERE'S

15   RESISTIVE BEHAVIOR, USUALLY DIVIDED INTO TWO PARTS:  ACTIVE

16   AND PASSIVE, THAT'S NOT ASSAULTIVE ON THE OFFICER.  THE NEXT

17   CATEGORY IS ASSAULTIVE/COMBATIVE.  AND THE LAST CATEGORY IS

18   LIFE THREATENING.  NOW THERE'S --

19   Q.   LET ME STOP YOU FOR A MOMENT.  I APOLOGIZE.

20        JUST SO THE JURY UNDERSTANDS SOME OF THESE TERMS,

21   WHAT DOES "PASSIVE RESISTANCE" MEAN?

22   A.   PASSIVE RESISTANCE IS SIMPLY NOT DOING WHAT YOU INSTRUCT

23   THE SUBJECT TO DO, THEY JUST DON'T MOVE.

24   Q.   WHAT WOULD BE AN EXAMPLE?

25   A.   WELL, AN EXAMPLE WOULD BE:  GET OUT OF THE CAR FOR A

1    FELONY TRAFFIC STOP, OR SOMEONE'S IN A DEMONSTRATION MODE AND

2    GET OFF THE SIDEWALK AND THEY STAY THERE, THEY DON'T MOVE.

3    THAT WOULD BE A -- BUT THEY'RE NOT MOVING OR SQUIRMING OR

4    JERKING AWAY, THAT TYPE OF THING.

5    Q.   DOES P.O.S.T. TEACH THAT DEADLY FORCE IS APPROPRIATE IN

6    A CASE OF PASSIVE RESISTANCE?

7    A.   IT IS NOT APPROPRIATE.

8    Q.   WHAT'S AN EXAMPLE OF ACTIVE RESISTANCE?

9    A.   WELL, ACTIVE RESISTANCE IS RUNNING AWAY, JERKING AWAY,

10   PULLING AWAY, BUT IT'S NOT DIRECTED AT THE OFFICER OR A

11   PHYSICAL CONFRONTATION WITH THE OFFICER.  THAT WOULD BE AN

12   ACTIVE RESISTANCE.  ALSO, IT CAN BE VERBAL -- "I'M NOT GOING

13   TO DO WHAT YOU'RE" -- THAT'S THE LOW END.  AND IF THE OFFICER

14   TRIES TO MOVE THE PERSON, THEY JERK AWAY.

15   Q.   DOES P.O.S.T. TEACH YOU TO USE DEADLY FORCE WITH A CASE

16   OF ACTIVE RESISTANCE?

17   A.   NO.  WHAT YOU DO THERE IN THE TOTALITY OF THE

18   CIRCUMSTANCES, TYPICALLY, IS JUST A FIRM GRIP TYPE TECHNIQUE

19   THAT THE OFFICER USES.

20   Q.   THEN YOU SAID THERE'S ASSAULTIVE/COMBATIVE.

21        WHAT IS THAT?

22   A.   WELL, THAT'S WHEN THE SUBJECT GOES AFTER THE OFFICER,

23   TRIES FIGHT IN A COMBATIVE WAY IN THE ARREST OR THE

24   APPREHENSION.  AND, OF COURSE, THE OFFICER IS ALWAYS -- HAS

25   THE RIGHT TO PROTECT HIM OR HERSELF AND TO USE THE TOOLS THAT

1   ARE AVAILABLE TO DO THAT.

2   Q.   DOES P.O.S.T. TEACH IF SOMEONE'S ASSAULTIVE/COMBATIVE,

3   IN THAT CATEGORY THE OFFICER CAN USE DEADLY FORCE?

4   A.   IF THE ASSAULTIVE COMBATIVE RISES TO THE LEVEL OF GREAT

5   BODILY HARM OR A LETHAL THREAT, BUT THAT IS THEN THE WHOLE

6   BUSINESS MOVES INTO THIS LAST AND MOST SPECIALIZED CATEGORY

7   AND THAT'S CALLED THE "LETHAL THREAT" OR "THREAT AGAINST

8   LIFE."

9   Q.   I WANT TO TAKE THIS STEP BY STEP.  LIFE THREATENING IS

10  THE HIGHEST CATEGORY, CORRECT?

11  A.   RIGHT.  SO IN THAT ASSAULTIVE/COMBATIVE, YOU TRY TO USE

12  O.C. SPRAY, THE TASER, THE BATON, THOSE TYPES OF THINGS WOULD

13  BE TYPICAL.  IF THERE'S A THREAT TO GREAT BODILY HARM, THAT'S

14  ANOTHER HIGH-END ASPECT OF COMBATIVE/ASSAULTIVE.

15  Q.   NOW, YOU MENTIONED THE ACRONYM I.D.O.L., CORRECT?

16  A.   YES.

17  Q.   WHAT DOES THAT STAND FOR?

18  A.   IMMEDIATE DEFENSE OF LIFE.

19  Q.   SO IN TERMS OF USING DEADLY FORCE, DOES THERE HAVE TO BE

20  AN IMMEDIATE DEFENSE OF LIFE SITUATION?

21  A.   YES.

22  Q.   DOES IT HAVE TO BE -- IS IT ENOUGH FOR THE OFFICER TO

23  SAY, "I THOUGHT IT WAS IMMEDIATE DEFENSE OF LIFE"?

24  A.   NO.  AND THIS IS WHERE THE LINK TO TACTICS COMES IN

25  BECAUSE THE TACTICS GIVES THIS OFFICER AN OPPORTUNITY TO MAKE

```
 1    THE CORRECT ASSESSMENT AND DETERMINATION WHETHER OR NOT THIS
 2    IRREVERSIBLE USE OF FORCE IS GOING TO BE USED.
 3    Q.   LET ME GO BACK TO MY HYPOTHETICAL.
 4          LET'S ASSUME THAT AT SOME POINT OFFICER LOPEZ GETS
 5    BEHIND THIS SEBRING, PUTS ON HIS OVERHEAD LIGHTS, AND IN A
 6    VERY SHORT DISTANCE THE SEBRING PULLS OVER AND STOPS IN THE
 7    PARKING LOT OF DONUT KING.
 8          DO YOU HAVE THAT IN MIND?
 9    A.   YES.
10    Q.   AND LET'S ASSUME THAT THE PEOPLE DO NOT GET OUT AND RUN,
11    THEY STAY IN THE CAR.
12          DO YOU HAVE THAT IN MIND?
13    A.   YES.
14    Q.   AND LET'S FURTHER ASSUME THAT THEY'RE TOLD TO PUT THEIR
15    HANDS UP AND THEY DO.
16          DO YOU HAVE THAT IN MIND?
17    A.   YES.
18    Q.   AT THIS POINT IF YOU HAD TO LOOK AT COOPERATIVE,
19    PASSIVE-RESISTANCE, ACTIVE/RESISTANCE, ASSAULTIVE/COMBATIVE,
20    WHERE WOULD THAT CATEGORY BE?
21    A.   WE'RE IN THE COOPERATIVE CATEGORY, AND IT'S GOING WELL.
22    Q.   LET'S SAY WHILE THEY'RE IN THE CAR THAT FOR SOME PERIOD
23    OF TIME, WHETHER IT IS THREE SECONDS OR FIVE SECONDS, THE
24    MALE PASSENGER WHO'S IN THE FRONT-PASSENGER SEAT, HIS LEFT
25    HAND GOES OUT OF THE OFFICERS' VIEW.  IT DROPS DOWN.  SO FROM
```

1    WHERE THEY'RE AT THEY CAN'T SEE IT FOR SOME PERIOD OF TIME.

2              DO YOU HAVE THAT IN MIND?

3    A.   YES.

4    Q.   WOULD IT BE OKAY TO SHOOT THEN?

5    A.   NO.

6    Q.   WHY NOT?

7    A.   BECAUSE, ALTHOUGH IT'S SUSPICIOUS AND CONTRARY TO THE

8    ORDER, IT'S STILL NOT IN THE CATEGORY OF A LETHAL THREAT TO

9    THE OFFICERS AS THEY ARE POSITIONED, AND SO YOU WOULD WAIT

10   AND GET -- GIVE AN -- YOU'D -- ONE OF THE THINGS YOU'D WANT

11   TO DO IS MAKE SURE THERE'S ABSOLUTE CLEAR INSTRUCTION, NO

12   IMPEDIMENTS TO THAT INSTRUCTION.  AND YOU WOULD MAKE THAT

13   COMMAND AGAIN, BRING YOUR HAND UP, AND DON'T MOVE IT BACK.

14   Q.   LET'S ASSUME THE COMMAND IS GIVEN AGAIN TO PUT THE HANDS

15   UP AND THEY PUT THEM BACK UP, HOW WOULD YOU CHARACTERIZE THAT

16   CONDUCT?

17   A.   WELL, THAT'S AN INDICATION THEN THAT THERE'S -- THEY

18   HEAR THE COMMAND AND THEY'RE RESPONDING TO IT AND THEY'RE

19   DOING WHAT THEY'RE TOLD, OR HE OR SHE IS DOING WHAT THEY'RE

20   TOLD.

21   Q.   IN TERMS OF A FELONY TRAFFIC STOP, IN YOUR OPINION, IS

22   IT IMPORTANT FOR ONLY ONE OFFICER TO BE GIVING THE COMMANDS?

23   A.   IT'S ABSOLUTELY ESSENTIAL AND NECESSARY THAT ONLY ONE

24   OFFICER GIVES THE COMMAND.

25   Q.   AND WHY IS THAT?

1    A.   WELL, THE TERM WE USE IS CALLED "TACTICAL

2    COMMUNICATION," BECAUSE IT ELIMINATES AS BEST WE CAN THE

3    CONFUSION THAT IS CREATED BY MULTIPLE COMMANDS.  THERE HAS TO

4    BE AN ABSOLUTE CLARITY OF COMMAND TO GIVE THE BEST CHANCE OF

5    SUCCESS.  IT'S A FUNDAMENTAL TACTIC.  SO THERE'S ONE OFFICER

6    GIVING THE INSTRUCTIONS AND THE INSTRUCTIONS IS SET IN A

7    CERTAIN PATTERN.  AND ALL OFFICERS ARE FAMILIAR WITH THIS

8    PATTERN, THE OBJECTIVES FOR A HIGH-RISH EXTRACTION.

9    Q.   WELL, ARE OFFICERS TRAINED THAT IF THREE OR FOUR PEOPLE

10   ARE YELLING AT A PERSON AT THE SAME TIME, THAT COULD CAUSE

11   THE PERSON CONFUSION?

12   A.   THAT'S EXACTLY WHAT THEY'RE TRAINED.  IT BEGINS AT THE

13   ACADEMY.

14   Q.   OKAY.  NOW I WANT TO MOVE FORWARD WITH MY HYPOTHETICAL,

15   AND IN THIS HYPOTHETICAL I WANT YOU TO ASSUME -- AND I'M

16   GOING TO SHOW YOU EXHIBIT 25 THAT I THINK IS IN EVIDENCE,

17   YOUR HONOR.  BUT MAYBE WE'D BETTER DOUBLE-CHECK.

18           THE COURT:  IT IS NOT, BUT IT WILL BE RECEIVED.

19           MR. GALIPO:  OKAY.  THANK YOU.

20               (EXHIBIT 25 IN EVIDENCE.)

21           MR. ROTHANS:  MAY I SEE IT FIRST, YOUR HONOR?

22           THE COURT:  I'M SORRY.

23           MR. GALIPO:  IT'S BY AGREEMENT.

24   BY MR. GALIPO:

25   Q.   OKAY.  I WANT YOU TO ASSUME FOR PURPOSES OF THIS

1   HYPOTHETICAL THAT OFFICER MARTINEZ WHO'S THE SHOOTING OFFICER

2   POSITIONS HIMSELF ON THE DRIVER'S SIDE OF C63.

3            DO YOU HAVE THAT IN MIND?

4   A.   YES.

5   Q.   I WANT YOU TO FURTHER ASSUME THAT OFFICER ZERBEY

6   POSITIONS HIMSELF ON THE DRIVER'S SIDE OF C62.

7            DO YOU HAVE THAT IN MIND?

8   A.   YES.

9   Q.   I WANT YOU TO FURTHER ASSUME THAT OFFICERS LOPEZ AND

10  BROWN ARE ON THE PASSENGER SIDE OF C62.

11           DO YOU HAVE THAT IN MIND?

12  A.   YES.

13  Q.   I ALSO WANT YOU TO ASSUME THAT OFFICER FAIRBANKS IS

14  SOMEWHERE NORTH OF THE VEHICLE NEAR, WHERE THE MARK IS WITH

15  THE 3, AND HE HAS AN MP5 IN HIS HANDS.

16           CAN YOU ASSUME THAT?

17  A.   YES.

18  Q.   AND FURTHER ASSUME THAT OFFICER MARTINEZ HAS AN MP5 AND

19  THE THREE OTHER OFFICERS HAVE SEMI-AUTOMATIC HANDGUNS IN

20  THEIR HANDS.

21           CAN YOU ASSUME THAT?

22  A.   YES.

23  Q.   AND THE OFFICERS HAVE SAID THEY HAVE SOME COVER EITHER

24  BEHIND THE DOOR OR A PORTION OF THE VEHICLE AND WERE WEARING

25  BULLETPROOF VESTS.

```
 1              DO YOU HAVE THOSE ADDITIONAL FACTS IN MIND?

 2   A.   YES.

 3   Q.   NOW WOULD IT BE APPROPRIATE, IN YOUR OPINION, AT THAT

 4   TIME TO ORDER THE MALE PASSENGER OUT OF THE VEHICLE?

 5   A.   YES.

 6   Q.   OKAY.  AND WHAT TYPE OF COMMANDS WOULD BE APPROPRIATE TO

 7   DO THAT?

 8   A.   WELL, YOU'D GIVE A SEQUENCE.  NOW TYPICALLY WHAT'S

 9   TAUGHT IS YOU HAVE THE INDIVIDUAL PUT THEIR HANDS OUT THE

10   WINDOW BECAUSE THE HANDS ARE KEY.  THE HANDS WILL HOLD THE

11   WEAPON -- AND SO WE CONCENTRATE ON THE HANDS AND WE WANT THE

12   HANDS IN VIEW -- AND INSTRUCT THE SUBJECT -- IN THIS CASE IT

13   WAS -- THE SUSPECT WAS A MALE.  AND SO -- AND HE WAS A

14   PASSENGER, THEREFORE, HE WOULD COME OUT -- BE THE FIRST TO

15   COME OUT OF THE VEHICLE.

16   Q.   OKAY.

17   A.   AND -- I'M SORRY.

18   Q.   I DON'T KNOW.  WERE YOU FINISHED?

19   A.   NOT QUITE.  SO YOU'D HAVE THEM INSTRUCT THEM, "OPEN THE

20   DOOR FROM THE OUTSIDE AND LEAVE YOUR HANDS WHERE WE CAN SEE

21   THEM."

22   Q.   OKAY.  SO LET ME GIVE YOU THIS HYPOTHETICAL.

23              LET'S ASSUME THAT THEY'RE BEGINNING TO ASK THE

24   PERSON TO GET OUT OF THE VEHICLE.  OFFICER ZERBEY IS GIVING

25   THE MAJORITY OF THE COMMANDS.  AT SOME POINT THE PERSON SAYS
```

1   WORDS TO THE EFFECT, "I HAVE MY SEATBELT ON.  IS IT OKAY TO

2   TAKE MY SEATBELT OFF?"

3          DO YOU HAVE THAT IN MIND?

4   A.   YES.

5   Q.   WHAT WOULD THAT TELL A POLICE OFFICER IN TERMS OF

6   TRAINING IF SOMEONE IN THE CAR ASKED PERMISSION TO TAKE HIS

7   SEATBELT OFF?

8   A.   THIS IS A GOOD INDICATOR BECAUSE THERE'S A CONNECTION

9   BETWEEN THE OFFICER GIVING THE COMMAND AND THE SUBJECT SO

10  THAT THIS PHASE -- THE SUCCESSFUL EXTRACTION CAN OCCUR WITH

11  THE INSTRUCTION.  SO SPECIFIC INSTRUCTIONS ARE GIVEN AND THE

12  OFFICER, OF COURSE, WOULD NOT BE SURPRISED THAT THE SEATBELT

13  IS STILL ON, AND IT WILL NECESSARILY HAVE TO BE RELEASED IF

14  HE'S GOING TO GET OUT OF THE CAR.

15          SO THEN THERE WOULD BE AN INSTRUCTION ON "KEEP ONE

16  HAND OUT.  YOU CAN UNDO THE BELT, AND THEN KEEP YOUR" --

17  "BRING YOUR HAND BACK SO WE CAN SEE IT."

18          AND THEN THERE WOULD BE A SET OF INSTRUCTIONS ON

19  WHAT TO DO, WHEN TO GET OUT OF THE CAR.  AND THE INSTRUCTION

20  WOULD BE, "WHEN I TELL YOU, YOU WILL DO THIS.  DO YOU

21  UNDERSTAND?"

22          AND THERE WOULD BE AN ACCEPTANCE, "YES, I

23  UNDERSTAND."

24          AND THEN THE OFFICER WOULD SAY, "OKAY, UNDO THE

25  SEATBELT."

1    Q.   OKAY.  SO ASSUME THAT HE ASKED IF HE CAN UNDO HIS

2    SEATBELT.  OFFICER ZERBEY SAYS, "YES."  HE DOES IT.  HE PUTS

3    HIS HANDS OUT THE WINDOW.  THE OFFICER CAN SEE BOTH HIS

4    HANDS.  THERE'S NOTHING IN HIS HANDS.  HE'S THEN ASKED TO

5    OPEN THE CAR DOOR FROM THE OUTSIDE.  AND HE SAYS, "I CAN'T,

6    IT'S BROKEN."

7           AND THE OFFICER SAYS, "OKAY, YOU CAN GO AHEAD AND

8    OPEN IT FROM THE INSIDE."  AND HE DOES.

9           DO YOU HAVE THOSE FACTS IN MIND?

10   A.   YES.

11   Q.   NOW, WITH RESPECT TO THE SEATBELT, THE HANDS OUT THE

12   WINDOW, THE COMMUNICATION IN OPENING THE DOOR AFTER BEING

13   ASKED TO GET OUT OF THE CAR, WOULD YOU VIEW THOSE AS

14   COOPERATIVE?  RESISTIVE?  ASSAULTIVE/COMBATIVE, LIFE

15   THREATENING?

16   A.   AS ALL COOPERATIVE.

17   Q.   OKAY.  SO NOW I'M UP TO THE POINT WHERE HE'S OUT --

18   GETTING OUT OF THE CAR.

19          DO YOU HAVE THAT IN MIND?

20   A.   YES.

21   Q.   NOW, I'M GOING TO GIVE YOU A FEW DIFFERENT

22   HYPOTHETICALS.  AND THE REASON I'M DOING THIS, MR. CLARK, IS

23   DIFFERENT WITNESSES RECALL THE EVENT A LITTLE DIFFERENTLY.

24   OKAY?

25   A.   OKAY.

1    Q.   ALL RIGHT.  I WANT YOU TO ASSUME THAT IN THIS CASE

2    MR. GRISSOM, AFTER BEING ASKED TO GET OUT OF THE CAR, GETS

3    OUT OF THE CAR AND HE GETS OUT WITH HIS HANDS UP EVEN BEFORE

4    BEING ASKED TO PUT HIS HANDS UP.  ASSUME THAT TO BE TRUE.

5              WHAT, IF ANYTHING, WOULD THAT TELL A REASONABLY

6    TRAINED OFFICER?

7    A.   THAT'S AN INDICATION OF COMPLIANCE AND SURRENDER BECAUSE

8    WHAT YOU JUST DEMONSTRATED AS THE TYPICAL MOVE, IT'S

9    UNIVERSAL, SHOWING THE PALMS OUT AND THE HANDS -- THAT'S A

10   MOTION TO SURRENDER, HOLDING YOUR HANDS UP.  YOU WOULD EXPECT

11   THIS WOULD BE INSTRUCTED BUT IF IT'S SPONTANEOUS THEN IT'S

12   EVEN BETTER.

13   Q.   WE'LL DO A LITTLE VARIANCE ON THAT.  LET'S ASSUME HE

14   GETS OUT AND AS HE'S GETTING OUT, HIS HANDS LOWER SOME.  HE'S

15   ASKED TO PUT HIS HANDS UP.  HE PUTS THEM BASICALLY TO THE

16   SIDE OF HIS HEAD THE WAY I HAVE (DEMONSTRATING).

17             DO YOU HAVE THAT IN MIND?

18   A.   YES.

19   Q.   WHERE WOULD THAT CATEGORIZE IN TERMS OF COOPERATIVE,

20   RESISTIVE, ASSAULTIVE/COMBATIVE?

21   A.   THAT'S COOPERATIVE.

22   Q.   OKAY.  DO YOU SHOOT HIM IN THIS POSITION, BASED ON THE

23   HYPOTHETICAL I'VE GIVEN YOU?

24   A.   NO, THAT'S PROGRESS TO SURRENDER.

25   Q.   NOW, I WANT YOU TO FURTHER ASSUME THAT MR. GRISSOM,

1    AFTER GETTING OUT WITH HIS HANDS UP AND/OR BEING TOLD TO PUT

2    HIS HANDS UP GETS OUT -- AND I'M GOING FROM A SEATING

3    POSITION -- GETS OUT, TURNS AND FACES IN THE OFFICER'S

4    DIRECTION WITH HIS HANDS UP TO THE SIDE OF HIS HEAD, PALMS

5    OUT.

6             DO YOU HAVE THAT IN MIND?

7    A.   YES.

8    Q.   OKAY.  DO SHOOT HIM?

9    A.   NO.

10   Q.   WHY NOT?

11   A.   WELL, HE'S NOT A THREAT.  HE'S IN THE ACT OF

12   SURRENDERING AND THERE'S NO THREAT TO LIFE.

13   Q.   WHAT IF THE OFFICERS SAY, "YEAH, BUT WE THOUGHT WE WERE

14   SURE HE WAS THE ARMED ROBBERY SUSPECT AND WE HAD INFORMATION

15   THERE MIGHT BE A GUN INVOLVED."

16             IS IT OKAY TO SHOOT HIM THEN?

17   A.   NO.

18   Q.   NOW, WOULD YOU EXPECT UNDER THE CIRCUMSTANCES OF THIS

19   CASE AND THE HYPOTHETICAL I'M GIVING YOU AND ASSUMING IT WAS

20   ABOUT 11:30 IN THE MORNING, IT WAS LIGHT OUTSIDE, THE

21   OFFICERS ARE -- WOULD YOU EXPECT OFFICERS TO BE FOCUSED ON

22   HIS HANDS AT THAT POINT?

23   A.   YES.

24   Q.   WHY?

25   A.   BECAUSE THAT'S WHERE -- IF THERE'S GOING TO BE A THREAT,

```
1    THAT'S WHERE IT'S GOING TO COME FROM, HIS HANDS, AND HANDS

2    WILL HOLD A WEAPON.

3    Q.   OKAY.  YOU HAVE REVIEWED -- I DON'T WANT TO KNOW THE

4    DETAILS -- BUT HAVE YOU REVIEWED THE STATEMENT OF OFFICER ROY

5    LOPEZ?

6    A.   I HAVE.

7    Q.   AND HIS DEPOSITION?

8    A.   YES.

9    Q.   LET'S ASSUME, HYPOTHETICALLY, THAT OFFICER LOPEZ IS ON

10   THE PASSENGER SIDE OF C62, HE HAS HIS GUN POINTED DIRECTLY AT

11   MR. GRISSOM; OFFICER LOPEZ SEES MR. GRISSOM GET OUT OF THE

12   CAR, IMMEDIATELY FACES TOWARDS THE OFFICERS WITH HIS HANDS

13   UP.

14            YOU HAVE THAT IN MIND SO FAR?

15   A.   YES.

16   Q.   HE SEES HIM PUT HIS HANDS DOWN.  HE'S ASKED TO PUT HIS

17   HANDS BACK UP.  THEN HE SEES HIM LOWER HIS HANDS IN SOME

18   FASHION, BUT CAN STILL SEE HIS HANDS AND COULD SEE HE HAS

19   NOTHING IN HIS HANDS.

20            DO YOU HAVE THAT IN MIND?

21   A.   YES.

22   Q.   WOULD IT BE OKAY TO SHOOT UNDER THAT SCENARIO?

23   A.   NO.

24   Q.   EVEN IF I LOWER MY HANDS?

25   A.   EVEN IF YOU LOWER YOUR HANDS.
```

```
 1    Q.   WHY NOT?

 2    A.   WELL, YOU HAVE NO -- WITH RESPECT TO IN YOUR HAND AND

 3    THE MOVEMENT, HAVING DONE THIS HUNDREDS OF TIMES AND SEEN

 4    IT -- THIS IS A DYNAMIC EVENT.  AND THE SUSPECTS THAT YOU

 5    DEAL WITH, THERE'S AN AREA OF CONFUSION AND THEY THINK IT'S

 6    OKAY AND THEY HAVE TO BE -- THE INSTRUCTIONS HAVE TO BE

 7    REINFORCED.  THEY HAVE TO BE REPEATED FOR THE CLARITY SO IT'S

 8    NOT AT ALL UNUSUAL FOR SOME SORT OF MOVEMENT OF THE HANDS, UP

 9    AND DOWN, IN THIS SCENARIO.

10    Q.   LET'S ASSUME THAT OFFICER ROY LOPEZ HAS HIS WEAPON

11    POINTED RIGHT AT MR. GRISSOM AND HE NEVER SHOOTS.

12         COULD YOU ASSUME THAT?

13    A.   I CAN ASSUME THAT.

14    Q.   UNDER THE HYPOTHETICAL I GAVE YOU OF HIS OBSERVATIONS,

15    IN YOUR OPINION, WAS IT APPROPRIATE FOR HIM NOT TO SHOOT?

16         MR. ROTHANS:  YOUR HONOR, IMPROPER OPINION.  ALSO

17    BEYOND RULE 26 IN THE REPORT.

18         THE COURT:  WELL, AS TO THAT, SUSTAINED ON --

19    OVERRULED.  OVERRULED.  YOU CAN ASK.  AND YOU CAN ANSWER.

20         THE WITNESS:  NO.  IT'S CORRECT FOR OFFICER LOPEZ

21    NOT TO SHOOT IN THAT SCENARIO.

22    Q.   WHY WAS IT CORRECT FOR HIM NOT TO SHOOT?

23    A.   BECAUSE OF HIS POSITION AND BECAUSE HIS VIEW AND THERE'S

24    NO IMMEDIATE THREAT TO LIFE AT THAT POINT AND, THEREFORE,

25    WOULD NOT -- YOU WOULD NOT BE JUSTIFIED IN USING LETHAL
```

1    FORCE.

2    Q.   WHAT IF SOMEONE SAYS, "WELL, I THOUGHT MAYBE HE WAS

3    GOING TO REACH IN HIS WAISTBAND OR POCKET," HE HADN'T DONE

4    THAT YET, "AND I COULD STILL SEE HIS HANDS."

5         WOULD IT BE OKAY TO SHOOT IF SOMEONE THOUGHT HE WAS

6    GOING TO REACH IN HIS WAISTBAND?

7    A.   NO.  JUST BECAUSE YOU'RE AFRAID THAT MIGHT HAPPEN

8    DOESN'T MEAN IT'S GOING TO.  YOU WOULD WAIT FOR MORE

9    ASSURANCE THAT THAT WAS WHAT WAS GOING TO OCCUR BEFORE YOU

10   WOULD SHOOT, AND THAT IS WHY YOU KEEP THIS TACTIC IN THAT

11   POSITION OF ADVANTAGE.  HE'S -- THE SUBJECT IS BEING HELD AT

12   GUNPOINT.

13   Q.   LET ME ASK YOU THIS:  ONCE HE'S OUT OF THE VEHICLE AND

14   FACING TOWARDS THE OFFICERS WITH HIS HANDS UP, IN A FELONY

15   TRAFFIC STOP SITUATION WHAT WOULD BE THE NEXT SERIES OF

16   COMMANDS YOU WOULD EXPECT TO HEAR?  IN OTHER WORDS, WHAT'S

17   THE NEXT STEP FOR THE PERSON?

18   A.   THE NEXT STEP IS WHAT -- WOULD GO ONE OF TWO WAYS.  BUT

19   TYPICALLY, IT'S "TURN AROUND, STEPPING BACK SLOWLY TO THE

20   SOUND OF MY VOICE."  YOU WILL -- "WHEN I TELL YOU TO STOP,

21   YOU'RE GOING TO GET ON YOUR KNEES WITH YOUR HANDS STILL OUT,

22   THEN YOU'RE GOING TO GO FACE FORWARD WITH YOUR HANDS STRAIGHT

23   OUT AND YOU'RE GOING TO LAY FLAT ON THE CEMENT.  DO YOU

24   UNDERSTAND WHAT I'VE TOLD YOU?"

25         THEN YOU TYPICALLY -- I'M GOING TO TURN AROUND,

1    KEEP MY HANDS IN VIEW, STEP BACK UNTIL YOU TELL ME TO STOP.

2    I'M GOING TO GET ON MY KNEES WHEN YOU TELL ME AND I'M GOING

3    TO GET FLAT OUT WHEN YOU TELL ME.  THEN YOU SAY, "TWO

4    OFFICERS WILL COME UP, ONE WILL HAVE YOU AT GUNPOINT.  DO NOT

5    MOVE."  AND THEN THAT'S THE STEPS TO THE APPREHENSION.

6         SO THE OTHER TYPICAL THING IS THAT YOU TELL HIM

7    "GET DOWN, KEEP YOUR HANDS OUT.  GET DOWN ON YOUR KNEES, NOW.

8    GO FORWARD AND STAY FLAT, HANDS OUT, AND TWO OFFICERS WILL

9    COME UP.  DO YOU UNDERSTAND?"  AND YOU EMPHASIZE NUMEROUS

10   TIMES, "DO NOT MOVE."  THAT WAY, THERE'S A SAFE APPREHENSION.

11   Q.   YOU HAVE REVIEWED OFFICER ZERBEY'S STATEMENT AND

12   DEPOSITION, CORRECT?

13   A.   YES.

14   Q.   LET'S ASSUME, HYPOTHETICALLY, THAT OFFICER ZERBEY WAS TO

15   THE DRIVER'S SIDE OF C62.  HE SAW MR. GRISSOM GET OUT OF THE

16   VEHICLE AND IMMEDIATELY TURN CLOCKWISE, IN HIS COLLECTION,

17   WITH HIS HANDS UP TO THE SIDE OF HIS HEAD.

18        DO YOU HAVE THAT IN MIND SO FAR?

19   A.   YES.

20   Q.   HE THEN OBSERVES MR. GRISSOM DROP HIS HANDS AND HE ASKS

21   HIM TO PUT HIS HANDS BACK UP, AND MR. GRISSOM PUTS HIS HANDS

22   BACK UP SOMEWHERE TO THE SIDE OF HIS HEAD.

23        DO YOU HAVE THAT IN MIND?

24   A.   YES.

25   Q.   HE THEN SEES EITHER ONE OR BOTH OF MR. GRISSOM'S HANDS

1    DROP TO ABOUT THE LEVEL OF HIS CHEST.

2              DO YOU HAVE THAT IN MIND?

3    A.   YES.

4    Q.   PALMS STILL OUT, HANDS STILL VISIBLE.  HE CAN SEE

5    THERE'S NOTHING IN THE HANDS.

6              DO YOU HAVE THAT IN MIND?

7    A.   YES.

8    Q.   WOULD IT BE OKAY UNDER THAT SCENARIO TO SHOOT

9    MR. GRISSOM?

10   A.   NO.

11   Q.   WHY NOT?

12   A.   BECAUSE HIS HANDS ARE IN VIEW AND HE HAS NO WEAPON SO

13   THERE'S NO THREAT TO LIFE AT THAT POINT.

14   Q.   ARE YOU IN ANY WAY CRITICAL OF OFFICER ZERBEY FOR NOT

15   FIRING?

16   A.   NO.  IN FACT, I WOULD BE CRITICAL IF HE DID FIRE.

17   Q.   DO YOU THINK IT WAS APPROPRIATE FOR OFFICER ZERBEY TO

18   NOT FIRE?

19   A.   YES, THAT'S MY FINE.

20   Q.   OFFICER BROWN -- YOU'VE READ HIS STATEMENT AND

21   DEPOSITIONS, CORRECT?

22   A.   YES.

23   Q.   LET'S ASSUME OFFICER BROWN SEES SOMETHING VERY SIMILAR.

24   MR. GRISSOM GETS OUT, TURNS CLOCKWISE, FACES THE OFFICER,

25   HANDS UP.  THERE'S SOME MOVING OF THE HANDS UP OR DOWN AT

```
 1    SOME POINT, BUT HE CAN STILL SEE THE HANDS, NOTHING IN THE
 2    HANDS.
 3              WOULD IT BE OKAY TO SHOOT?
 4    A.   NO.
 5    Q.   SAME REASONS AS BEFORE?
 6    A.   YES.  AND WHAT NEEDS TO BE ADDED HERE, ABSENT OTHER
 7    INSTRUCTION WHAT WOULD BE -- WHAT HAPPENS OFTEN IS THE PERSON
 8    YOU'RE DEALING WITH EXPECTS TO GET DOWN AND MAKES THAT KIND
 9    OF A MOVEMENT TO GET DOWN.
10    Q.   IN OTHER WORDS, THEY HAVE THEIR HANDS UP.  THEY MIGHT
11    SAY, "MAYBE I'VE GOT TO START GETTING DOWN," AND DIPPED THEIR
12    HANDS A LITTLE BIT?
13    A.   YES, BECAUSE THAT'S WHAT THEY EXPECT IS GOING TO HAPPEN.
14    Q.   DO YOU THINK IN ANY WAY IT WAS INAPPROPRIATE -- I WANT
15    YOU TO FURTHER ASSUME THAT OFFICER BROWN HAD HIS GUN POINTED
16    RIGHT AT MR. GRISSOM?
17    A.   YES.
18    Q.   IN YOUR OPINION, DO YOU THINK IT WAS APPROPRIATE FOR
19    OFFICER BROWN NOT TO SHOOT?
20    A.   YES, NOT APPROPRIATE TO SHOOT.
21    Q.   OKAY.  AND THEN JUST TO GIVE YOU OFFICER FAIRBANKS'
22    PERSPECTIVE, YOU REVIEWED HIS STATEMENT AND DEPOSITION,
23    CORRECT?
24    A.   YES.
25    Q.   AND YOU UNDERSTAND HE HAD A VIEW, LOOKING AT THE
```

1    PASSENGER SIDE OF THE CAR; HE WAS AT AN ANGLE, CORRECT?

2            MR. ROTHANS:  OBJECTION, LEADING.

3            THE COURT:  SUSTAINED.

4            JUST -- MR. GALIPO, JUST SET UP THE HYPOTHETICAL.

5            MR. GALIPO:  SURE, NOT A PROBLEM.

6    BY MR. GALIPO:

7    Q.   LET'S ASSUME THAT -- IF I COULD JUST HAVE ONE MOMENT,

8    YOUR HONOR.

9            TRYING TO SEE IF I CAN FIND A GOOD PHOTO.  ONE

10   MOMENT.

11           THE COURT:  LADIES AND GENTLEMEN, LET'S TAKE OUR

12   SECOND BREAK THIS MORNING AND BE READY TO START AGAIN AT

13   11:45.

14           MR. GALIPO:  THANK YOU, YOUR HONOR.

15                    (JURORS EXIT.)

16           THE WITNESS:  MAY STEP DOWN?

17           THE COURT:  YOU MAY.

18           MR. GALIPO, ONE TIME -- I KNOW -- I REALIZE I WANT

19   YOU TO SET UP THE HYPOTHETICALS.  AT THE SAME TIME IN TERMS

20   OF THE LEADING -- THE REASON I SUSTAINED THE LEADING, IN A

21   SENSE, IT WAS NOT NECESSARILY MY INTENT TO HAVE YOU BE ABLE

22   TO DO A CLOSING ARGUMENT THROUGH THE WITNESS.  AT THE SAME

23   TIME, I AGREE YOU SHOULD BE ABLE TO PRESENT HIM WITH VARIOUS

24   HYPOTHETICAL SITUATIONS FROM THE POINT OF VIEW OF THE

25   OFFICERS.  I WANT TO BE CONSISTENT WITH HOW BOTH EXPERTS ARE

```
 1   TREATED AND HOW THE CROSS-EXAMINATION IS GOING TO GO.  SO I
 2   GUESS, IN THAT SENSE, JUST AS LONG AS YOU MAKE SURE THAT THE
 3   HYPOTHETICAL IS WHAT WAS PRESENTED HERE IN COURT AND IS NOT
 4   JUST DRAWN FROM THE STATEMENT IN THE DEPOSITION THEN I
 5   GUESS -- REALLY, I THINK THE QUESTION ISN'T SO LEADING
 6   THAT -- INHERENT IN SETTING IT UP.  IT'S MORE THAT IT BE
 7   ACCURATE AS TO WHAT THAT WITNESS SAID HERE IN COURT.
 8              OBVIOUSLY, MR. ROTHANS, YOU CAN VARY IT IF YOU FEEL
 9   THAT IT WAS DIFFERENT, YOU CAN GIVE A DIFFERENT THING -- IF
10   YOU FEEL IT'S ULTIMATELY UP TO THE JURY TO DECIDE, NOT ONLY
11   WHICH HYPOTHETICAL IS THE TRUE STATE OF AFFAIRS, BUT WHAT
12   THEIR RECOLLECTION IS OF THE TESTIMONY AS TO THE VARIOUS
13   WITNESSES.
14              SO, WITH THAT, I GUESS THE MAIN THING IS THAT TO
15   JUST -- I DON'T WANT THE JURY, AS I'VE SAID, TO FEEL THAT
16   EITHER EXPERT KNOWS MORE ABOUT THE CASE THAN THEY KNOW AND,
17   THEREFORE, HAS ANY SUPERIOR INFORMATION TO DETERMINE IF THE
18   SHOT WAS JUSTIFIED OR NOT.
19              MR. GALIPO:  OKAY.  THANK YOU, YOUR HONOR.
20              THE COURT:  ALL RIGHT.  MR. ROTHANS.
21              MR. ROTHANS:  UNDERSTOOD.
22              THE COURT:  ALL RIGHT.
23                        (RECESS.)
24              THE COURT:  MS. SANCHEZ, YOU CAN GET THE JURY.
25              THE CLERK:  YES, YOUR HONOR.
```

```
 1              THE COURT:  MR. GALIPO, YOU MAY PROCEED.

 2              MR. GALIPO:  THANK YOU, YOUR HONOR.  BY AGREEMENT

 3    YOUR HONOR, I'M NOT SURE THIS ONE IS ADMITTED 372-335.

 4              THE COURT:  IF IT ISN'T, IT WILL BE RECEIVED.

 5              (EXHIBIT 372-335 IN EVIDENCE.)

 6    BY MR. GALIPO:

 7    Q.   MR. CLARK, WITH RESPECT TO OFFICER FAIRBANKS, I WANT YOU

 8    TO ASSUME THAT HE TOOK A POSITION SO THAT HE'S LOOKING

 9    TOWARDS THE PASSENGER SIDE OF THE SEBRING.

10              DO YOU HAVE THAT IN MIND?

11    A.   YES.

12    Q.   AND HE HAS AN MP5 AND IT'S POINTED IN THE DIRECTION OF

13    THE SEBRING.

14              DO YOU ALSO HAVE THAT IN MIND?

15    A.   YES.

16    Q.   LET'S ASSUME OFFICER FAIRBANKS SEES THE -- MR. GRISSOM

17    GETS OUT, TURNS CLOCKWISE -- GETS OUT, TURNS CLOCKWISE AND

18    FACE THE OFFICERS BEHIND HIM.  OKAY?

19              YOU WITH ME SO FAR?

20    A.   YES.

21    Q.   AND HE SAYS THE HANDS ARE UP.  THEY DROP AT SOME POINT.

22    THEY GO BACK UP.  AND LET'S ASSUME THEN THAT OFFICER

23    FAIRBANKS OBSERVES HIS RIGHT HAND, MEANING MR. GRISSOM'S

24    RIGHT HAND DROPPING DOWN TO THE RIGHT KIND OF ALMOST TOWARDS

25    THE CAR."
```

1           DO YOU HAVE THAT IN MIND?

2    A.   YES.

3    Q.   WOULD IT BE APPROPRIATE TO SHOOT, ASSUMING THOSE FACTS?

4    A.   NO.

5    Q.   WHY NOT?

6    A.   WELL, THERE'S NO WEAPON SEEN.  THERE'S NO WEAPON IN

7    HAND.  AND I EXPLAINED THE MOVEMENT, HOW IT CAN BE TAKEN IN A

8    VARIETY OF WAYS AND, THEREFORE, YOU WOULD NOT SHOOT.  YOU'D

9    STILL HAVE AN ADVANTAGE.

10   Q.   IF, HYPOTHETICALLY, NO OFFICER AT ANY TIME BEFORE THE

11   SHOOTING YELLED A COMMAND TO DROP IT, WHAT, IF ANYTHING, DOES

12   THAT TELL YOU?

13           MR. ROTHANS:  INCOMPLETE HYPOTHETICAL, VAGUE AND

14   AMBIGUOUS.

15           THE COURT:  OVERRULED.

16   BY MR. GALIPO:

17   A.   YOU WOULD EXPECT, IF THERE WAS A WORRY ABOUT SOMETHING

18   IN THE HAND, THEN YOU WOULD GIVE THE COMMAND, "DROP IT."  BUT

19   I TOOK A -- NOBODY SAW ANYTHING IN THE HAND.

20   Q.   ALL RIGHT.  NOW, I NEXT WANT TO ASK YOU A HYPOTHETICAL

21   WITH RESPECT TO OFFICER MARTINEZ'S RECOLLECTION.  OKAY?

22   A.   ALL RIGHT.

23   Q.   BEFORE I DO THAT, ARE OFFICERS TRAINED IN SHOOT,

24   DON'T-SHOOT SCENARIOS?

25   A.   YES.  THEY RECEIVE A LOT OF TRAINING IN THAT REGARD.

1    Q.    CAN YOU TELL THE JURY ABOUT WHAT THAT IS?

2    A.    WELL, IT EXTENDS TO A VARIETY OF METHODS.

3          IN MY DAY, WE HAD WHAT WE CALLED HOGAN'S ALLEY.

4    THE OFFICER WOULD BE PLACED TO WALK A PATH, THINGS WOULD

5    SPRING UP; AND IT WAS DESIGNED TO SHARPEN THE RECOGNITION

6    SKILLS AND THE ACTION REACTION.  ONE POP-UP MIGHT BE A WOMAN,

7    A CHILD; ANOTHER SUSPECT WITH A GUN, ETCETERA.  AND THEN THE

8    OFFICER IS TRAINED ON MAKING THOSE DECISIONS.  OFTEN THERE

9    WOULD BE OPPORTUNITIES FOR GOING TO COVER AND THINGS THAT

10   HAVE EVOLVED TO METHODS -- WE HAD A LASER VILLAGE USING LASER

11   WEAPONS.  THERE'S AN EXCELLENT SIMULATION TRAINING NOW CALLED

12   FATS, WHERE AN OFFICER IS PLACED IN FRONT OF SCREENS AND IT'S

13   INTERACTIVE LIKE MANY OF THE TRAININGS YOU SEE FOR PILOTS,

14   SHIP CAPTAINS, AND A VARIETY OF THINGS.  A VARIETY OF

15   PROBLEMS WERE PUT IN FRONT OF THE OFFICER FOR CHOICES, A LOT

16   OF THOSE.  IN FACT, IT'S VERY, VERY HEAVY ON RECOGNITION,

17   WEAPON RECOGNITION, DECISION MAKING, DETERMINING WHETHER

18   THAT'S AN I.D.O.L. OR NOT, THOSE TYPES OF THINGS.  A SPRINKLE

19   THROUGHOUT THOSE SCENARIOS ARE BENIGN KNOBS, HANDS SUCH AS

20   WALLETS AND OTHER THINGS BEING CELL PHONES, THOSE THINGS.

21   Q.    ARE OFFICERS TRAINED WITH RESPECT TO DISTINGUISHING, FOR

22   EXAMPLE, A CELL PHONE FROM A GUN?

23   A.    YES.  A CELL PHONE IS A VERY COMMON OBJECT NOW.

24   OFFICERS KNOW WHAT A GUN LOOKS LIKE AND THAT'S CONSTANTLY

25   REENFORCED TO DETERMINE AN OBJECT IN THE HAND AS WHAT TYPE OF

1    WEAPON, IF IT IS A WEAPON AT ALL.

2    Q.   IN YOUR MIND, MR. CLARK, IN TERMS OF POLICE TRAINING, A

3    GUN HAS CERTAIN PARTS TO IT, CORRECT?

4    A.   YES, IT DOES.

5    Q.   AND DOES A CELL PHONE HAVE THE PARTS TO IT THAT A GUN

6    HAS?

7    A.   NO.

8    Q.   CAN YOU EXPLAIN JUST A FEW?

9    A.   WELL, LOOKING FOR THE TYPICAL THING IS A BARREL.  THE

10   OFFICER INSTANTLY RECOGNIZES A REVOLVER FROM A

11   SEMI-AUTOMATIC.  THE FEATURES -- TRIGGER, TRIGGER GUARD,

12   PISTOL GRIP, THE SLIDE, THE BARREL -- THOSE THINGS ARE VERY

13   EASY TO SPOT.

14   Q.   YOU AT SOME POINT SAW A PICTURE OF A BLACK CELL PHONE,

15   RELATED TO THIS CASE, ON THE GROUND?

16   A.   YES.  IN FACT, YOU CAN SEE IT IN THIS PICTURE.

17   Q.   AT LEAST BASED ON YOUR BACKGROUND AND EXPERIENCE, DID

18   THAT BLACK CELL PHONE LOOK LIKE A GUN TO YOU?

19   A.   NO.

20   Q.   WITH RESPECT TO OFFICER MARTINEZ, ASSUME THESE FACTS.

21   ASSUME THAT OFFICER MARTINEZ IS ON THE DRIVER'S SIDE OF C63.

22   THE DOOR'S OPEN.  HE'S USING THE DOOR.  AND THE FRONT OF THE

23   ENGINE COMPARTMENT HAS SOME COVER.  HE HAS BULLETPROOF VEST,

24   AN MP5 IN HIS HANDS POINTED AT MR. GRISSOM, AS MR. GRISSOM IS

25   GETTING OUT OF THE VEHICLE.

1            DO YOU HAVE THAT MIND SO FAR?

2    A.   YES.

3    Q.   AND ASSUME THAT OFFICER MARTINEZ OBSERVES MR. GRISSOM AS

4    HE GETS OUT OF THE VEHICLE.  HE CAN SEE HIS HANDS AND NOTHING

5    IN HIS HANDS.

6            DO YOU HAVE THAT MIND?

7    A.   YES.

8    Q.   I WANT YOU TO ASSUME FOR PURPOSES OF THIS HYPOTHETICAL

9    THAT OFFICER MARTINEZ INITIALLY SEES MR. GRISSOM STANDING IN

10   A NORTH DIRECTION, BUT SLIGHTLY NORTHEAST, WITH HIS LEFT HAND

11   UP, PALM OUT, THE RIGHT HAND CUPPED SOMEHOW.

12           DO YOU HAVE THAT IN MIND?

13   A.   YES.

14   Q.   OKAY.  BUT HE DOESN'T SEE ANY OBJECT IN THE HAND.  HE

15   JUST SEES IT CUPPED AT THIS POINT.

16           DO YOU HAVE THAT FACT IN MIND?

17   A.   YES.

18   Q.   I WANT YOU THEN TO ASSUME THAT OFFICER MARTINEZ OBSERVES

19   MR. GRISSOM TURN HIS BACK TO HIM AND THE OTHER OFFICERS FOR A

20   PERIOD OF APPROXIMATELY 10 TO 20 SECONDS.

21           DO YOU HAVE THAT IN MIND SO FAR?

22   A.   YES.

23   Q.   AND THEN I WANT YOU TO ASSUME THAT MR. GRISSOM SUDDENLY

24   FROM THIS POSITION WITH HIS BACK TO THE OFFICER (INDICATING)

25   SPINS TO HIS RIGHT, HIS LEFT HAND STAYS UP TO THE SIDE OF HIS

1    HEAD, HIS RIGHT HAND IS PALM OUT LOWERING DOWN, AND OFFICER

2    MARTINEZ SEES SOMETHING SHINY AND METALLIC OR APPEARS TO BE

3    SHINY AND METALLIC IN HIS RIGHT HAND.

4            DO YOU HAVE THAT IN MIND?

5    A.   YES.

6    Q.   BUT OFFICER MARTINEZ SAYS HE DID NOT SPECIFICALLY MAKE

7    THE OBJECT OUT AS A GUN WHEN HE SAW THIS.

8            DO YOU HAVE THAT IN MIND?

9    A.   YES.

10   Q.   AND I FURTHER WANT YOU TO ASSUME THAT NOBODY YELLED

11   "GUN."  NOBODY SAID, "DROP IT."  AND NO COMMANDS THAT DEADLY

12   FORCE WAS GOING TO BE USED WERE GIVEN.

13           DO YOU HAVE THOSE FURTHER FACTS IN MIND?

14   A.   YES.

15   Q.   AND FACTS ASSUME THAT OFFICER MARTINEZ SHOT WITHIN A

16   SECOND OF THIS TURN, SEEING THIS SHINY OBJECT.

17           DO YOU HAVE THAT IN MIND?

18   A.   YES.

19   Q.   ASSUMING THOSE FACTS TO BE TRUE, IN YOUR OPINION, WOULD

20   THE USE OF DEADLY FORCE BY OFFICER MARTINEZ BE REASONABLE?

21   A.   NO.

22   Q.   WHY NOT?

23   A.   WELL, THERE'S NO IMMEDIATE THREAT TO LIFE, EVEN IF THE

24   OBJECT IN THE HAND HAS NOT BEEN IDENTIFIED AS A WEAPON AND

25   THE POSTURE YOU DEMONSTRATE IS NOT CONSISTENT WITH DEPLOYING

1    A GUN.  AND IN THE CONTEXT OF SEEING THE HANDS PRIOR, THERE

2    IS NO WEAPON THAT HAS BEEN NOTED.  AND THIS IS ALL IN MY --

3    TAKING YOUR SCENARIO AS PART OF THE DYNAMIC OF THE

4    APPREHENSION.  IT NEVER GOES PRECISELY AS YOU EXPECT IT TO.

5    THERE'S GOING TO BE SOME MOVEMENTS AND MISUNDERSTANDINGS, SO

6    NOTHING THAT YOU DESCRIBED TO ME WOULD -- LET ME ADD THIS, IN

7    MY OPINION, BECAUSE THE POSITION OF ADVANTAGE STILL STAYS

8    WITH THE OFFICER AND THE OFFICER WOULD WAIT TO BE SURE THAT

9    THAT ISN'T A LETHAL THREAT.

10   Q.   WHAT DO YOU MEAN BY THE "POSITION OF ADVANTAGE"?

11   A.   WELL, THIS PARTICULAR OFFICER, MARTINEZ, AS YOU

12   EXPLAINED, IS BEHIND THE ENGINE BLOCK AND THEN FURTHER BEHIND

13   THE BARRICADE OF THE DOOR.  SO OF ALL OF THE POSITIONS, HE

14   APPEARS TO BE IN THE BEST POSITION OF ADVANTAGE AND SAFETY

15   THAN ALL THE OTHER OFFICERS.

16   Q.   AND IF HE IS IN THAT POSITION OF ADVANTAGE OR SAFETY,

17   DOES THAT IN ANY WAY RELATE TO WHETHER HE SHOULD HAVE GIVEN A

18   COMMAND BEFORE SHOOTING?

19   A.   WELL, THAT'S THE POINT OF THE TACTIC, THE POSITION OF

20   COVER OR THE BEST COVER.  IT GIVES THE OFFICER MORE TIME SO

21   COVER AND DISTANCE ALLOWS TIME; TIME ALLOWS PROPER ASSESSMENT

22   AND EVALUATION.

23   Q.   AND ONE OTHER POINT I WANT TO ADD TO THE HYPO, AND YOU

24   TELL ME WHETHER IT AFFECTS YOUR OPINION ONE WAY OR THE OTHER.

25   ASSUME THE EXPRESSION ON MR. GRISSOM'S FACE WAS CALM, NOT

1    ANGRY, AND HE NEVER VERBALLY THREATENED ANY OF THE OFFICERS.

2              ASSUMING THOSE ADDITIONAL FACTS, WOULD THAT AFFECT

3    YOUR OPINION ONE WAY OR THE OTHER?

4    A.   IT IS BODY LANGUAGE YOU LOOK FOR AS YOU'RE EVALUATING

5    THE SITUATION IN GIVING THE COMMANDS, LOOKING FOR THE TOKENS

6    AND MOVEMENTS OF COMPLIANCE AND COOPERATION.  AND YOU NOTE,

7    WHEN THAT DOESN'T OCCUR, THOSE ARE ALL FACTORS IN THE

8    CIRCUMSTANCE DEALING WITH THIS CIRCUMSTANCE.

9    Q.   WHAT IS THE GOAL OF A SUCCESSFUL FELONY TRAFFIC STOP?

10   WHAT IS THE GOAL THAT OFFICERS ARE TRAINED?

11   A.   WELL, THE ENTIRE PROCESS WHICH -- BEGINNING WITH THE

12   CONTAINMENT, THEN MOVING THROUGH THE STEPS IS THE FINAL

13   PIECES.  SAFE APPREHENSION.  AND SAFE APPREHENSION SPEAKS

14   THREE THINGS:  THE OFFICER, THE PUBLIC, AND THE SUSPECT.

15   Q.   IS BACKDROP OR BACKGROUND IMPORTANT OR SHOULD THAT BE

16   CONSIDERED WHEN OFFICERS ARE USING DEADLY FORCE?

17   A.   YES.  THAT'S PART OF THE FACTS IN TRAINING.  IT'S ALWAYS

18   PART OF THE TRAINING AND IS TAUGHT IN BACKGROUND.  L.A.P.D.

19   HAS AN ACRONYM CALLED BALK (PHONETIC).  THE VERY FIRST THING

20   STANDS FOR BACKGROUND, FIRST CONSIDERATION, BECAUSE WE'RE IN

21   AN URBAN SETTING.  THERE ARE CIVILIANS.  THERE HAS TO BE A

22   CONSIDERATION PRIORITY TO SAFETY FOR THE CIVILIANS.

23   Q.   ASSUMING THIS HYPOTHETICAL I GAVE YOU WITH MR. MARTINEZ,

24   THERE ARE CIVILIANS IN THE BACKGROUND, INCLUDING CHILDREN.

25              WOULD THAT WEIGH INTO YOUR OPINION ONE WAY OR THE

```
1    OTHER AS TO WHETHER HE SHOULD HAVE SHOT?

2    A.   IT CERTAINLY DOES.

3    Q.   HOW SO?

4    A.   YOU'D HOLD YOUR FIRE BECAUSE YOU WOULD NOT PUT INNOCENT

5    PERSONS IN JEOPARDY.  YOU WOULD HOLD YOUR FIRE, PARTICULARLY

6    IN THE SCENARIO YOU MENTIONED, BECAUSE OFFICERS ARE IN COVER,

7    A CONTAINMENT HAS BEEN ESTABLISHED, AND YOU COULD NOT FIRE

8    PUTTING OTHERS AT RISK.

9    Q.   OKAY.  JUST A FEW OTHER QUESTIONS I HAVE FOR YOU,

10   MR. CLARK.

11        ASSUME, HYPOTHETICALLY, THAT OFFICER MARTINEZ

12   UNLIKE THE OTHER OFFICERS THAT I WENT THROUGH WAS ON HIS 17TH

13   HOUR STRAIGHT OF WORK.  ASSUME HE HAD STARTED THE SHIFT THE

14   NIGHT BEFORE, I BELIEVE, AT 7:00 P.M.  HE WAS EXPECTING TO

15   GET OFF AT 7:30 IN THE MORNING SO HE CAN GO SLEEP, BUT ABOUT

16   6 O'CLOCK IN THE MORNING HE WAS TOLD HE NEEDS TO STAY ON FOR

17   SOME HOURS, AND BY THE TIME OF THE SHOOTING HE HAD BEEN ON

18   DUTY FOR WHATEVER THE MATH IS -- MAYBE 16-AND-A-HALF HOURS OR

19   SO.

20        I SEE MR. ROTHANS STANDING SO I THINK THERE MIGHT

21   BE AN OBJECTION COMING.

22        THE COURT:  MR. ROTHANS?

23        MR. ROTHANS:  IF WE COULD HAVE A SIDEBAR, MOTION IN

24   LIMINE NUMBER 2.

25        THE COURT:  I THINK -- WE DON'T NEED TO DO THIS.
```

1    THE OBJECTION IS SUSTAINED.  I DON'T THINK THIS REALLY IS A

2    TOPIC ON WHICH THERE NEEDS TO BE SPECIALIZED TESTIMONY.

3             MR. GALIPO:  THAT'S NINE, YOUR HONOR.

4    BY MR. GALIPO:

5    Q.   MR. CLARK, YOU AND I HAVE WORKED ON OTHER CASES BEFORE;

6    IS THAT TRUE?

7    A.   YES.

8    Q.   HOW MANY CASES ALL TOGETHER -- ALL TOGETHER IN THE LAST

9    20 YEARS HAVE YOU BEEN CONSULTED AS AN EXPERT ON,

10   APPROXIMATELY?

11   A.   OVER A THOUSAND.

12   Q.   AND YOU AND I HAVE WORKED TOGETHER ON APPROXIMATELY 20

13   OR SO CASES?

14   A.   YES.

15   Q.   IS IT YOUR UNDERSTANDING THAT I SPECIALIZE IN THESE

16   TYPES OF CASES?

17   A.   YES.

18   Q.   AND IN TERMS OF YOUR TESTIMONY IN THESE TYPES OF CASES,

19   ARE YOU -- DO YOU GENERALLY TESTIFY IN THESE TYPES OF CASES,

20   A CIVIL CASE, ON BEHALF OF THE PLAINTIFFS?

21   A.   YES.

22   Q.   HAVE YOU BEEN IN THE PAST RETAINED TO REPRESENT POLICE

23   OFFICERS?

24   A.   YES.

25   Q.   AND IS THAT BOTH IN CIVIL AND CRIMINAL CASES?

1   A.   YES.

2   Q.   NOW, WHEN YOU -- DO YOU ACCEPT EVERY CASE THAT YOU'RE

3   GIVEN IF AN ATTORNEY LIKE ME SAYS, "HEY, LOOK AT THIS CASE.

4   WOULD YOU BE AN EXPERT?"

5           DO YOU ACCEPT ALL YOUR CASES OR WHAT IS YOUR

6   PROCEDURE?

7   A.   I ACCEPT CASES ON A CRITERIA.   I TURN DOWN A LOT OF

8   CASES, BUT MY FOCUS IS ON THE PROFESSIONAL STANDARD AND, WHEN

9   I SEE A DEPARTURE FROM AT STANDARD, THAT TAKES MY INTEREST

10  AND I EVALUATE THE CASE ON THAT BASIS.

11  Q.   SO IF YOU'RE GIVEN A CASE AND YOU REVIEW A SHOOTING AND

12  YOU THINK THE SHOOTING WAS JUSTIFIED, WHAT WOULD YOU TELL THE

13  PLAINTIFF'S ATTORNEY?

14  A.   WELL, WHAT I DO TELL THEM IS I CANNOT GIVE MY SERVICES

15  TO THAT AND I TELL THEM WHY, TYPICALLY.   I DON'T CHARGE FOR

16  THAT EITHER BECAUSE OFTEN YOU SEE THOSE TYPES OF THINGS WHERE

17  THE PROFESSIONAL STANDARD HOLDS AND SO I DO NOT TAKE THAT

18  CASE.

19  Q.   OKAY.   BY THE TIME YOU EITHER GIVE A DEPOSITION OR TRIAL

20  TESTIMONY, YOU HAVE ALREADY AGREED TO ACCEPT A CASE?

21  A.   THAT'S CORRECT.

22  Q.   AND IF IT'S A USE OF FORCE CASE, THEN YOU ALREADY WOULD

23  HAVE FORMED AN OPINION THAT THE FORCE, AT LEAST SOME OF IT,

24  WAS EXCESSIVE OR UNREASONABLE?

25  A.   YES, SOME ASPECTS.   CERTAIN OTHER ASPECTS ARE

1    REASONABLE.

2    Q.   SO BY THE TIME YOU GIVE DEPOSITION OR TRIAL TESTIMONY

3    LIKE THIS, YOU WILL HAVE ALREADY FORMED AN OPINION FAVORABLE

4    TO THE PLAINTIFF OR YOU WOULDN'T HAVE TAKEN THE CASE?

5    A.   THAT'S CORRECT.

6    Q.   AFTER LOOKING AT THIS CASE, YOU AGREED TO TAKE THIS

7    PARTICULAR CASE?

8    A.   YES.  AND I HOPE I'VE BEEN CLEAR AS TO WHY, MY OPINION.

9              MR. GALIPO:  THANK YOU.

10             THAT'S ALL I HAVE, YOUR HONOR.

11             THE COURT:  MR. MC NICHOLAS?

12             MR. MC NICHOLAS:  NO QUESTIONS, YOUR HONOR.

13             THE COURT:  MR. ROTHANS.

14                     **CROSS-EXAMINATION**

15   BY MR. ROTHANS:

16   Q.   GOOD AFTERNOON, MR. CLARK.

17   A.   GOOD AFTERNOON.

18   Q.   SIR, YOU ARE NO STRANGER TO THAT WITNESS STAND, ARE YOU?

19   A.   NO, I'M NOT.

20   Q.   IN FACT, YOU HAVE BEEN CRITICIZING POLICE OFFICERS FROM

21   WITNESS STANDS IN VARIOUS COURTROOMS FOR THE PAST 20 YEARS?

22   A.   YES.

23   Q.   SINCE YOU RETIRED FROM THE SHERIFF'S DEPARTMENT?

24   A.   YES.

25   Q.   AND YOU ARE HERE AGAIN TESTIFYING, CRITICIZING THE

1    POLICE OFFICERS?

2    A.    IN THIS REGARD, YES.

3    Q.    AND TWO WEEKS AGO YOU WERE IN A FEDERAL COURTROOM

4    TESTIFYING AGAINST ONE OF MY CLIENTS IN A POLICE MISCONDUCT

5    CASE, WEREN'T YOU?

6    A.    CORRECT.

7    Q.    THREE WEEKS AGO YOU WERE IN A FEDERAL COURTROOM

8    TESTIFYING FOR ONE OF MR. GALIPO'S CLIENTS, CRITICIZING

9    POLICE OFFICERS, WEREN'T YOU SIR?

10   A.    THAT'S CORRECT.

11   Q.    HOW MANY TIMES JUST IN THE LAST MONTH, LAST 30 DAYS,

12   SIR, EARLY APRIL TO EARLY MAY, HAVE YOU BEEN IN A COURTROOM

13   TESTIFYING, CRITICIZING POLICE OFFICERS IN A COURTROOM?

14   A.    YES, SIR.  FOUR OR FIVE TIMES, AS I RECALL.

15   Q.    AND, OF COURSE, YOU GET PAID FOR YOUR TIME?

16   A.    WHEN I TAKE THE CASE PRO BONO, I DO NOT GET PAID, BUT

17   TYPICALLY I GET PAID.

18   Q.    ANY PRO BONO CASES, SIR, THE LAST MONTH?

19   A.    NO.

20   Q.    IN TERMS OF YOUR EDUCATIONAL BACKGROUND, YOU DO NOT HAVE

21   A BACHELORS DEGREE; IS THAT TRUE?

22   A.    THAT'S CORRECT.

23   Q.    YOU CLEARLY WERE HIRED IN THIS CASE BY THESE LAWYERS TO

24   CRITICIZE THE POLICE OFFICERS FROM CULVER CITY; IS THAT TRUE?

25              MR. GALIPO:  I'M GOING TO OBJECT TO THE QUESTION,

1    VAGUE AS PHRASED, YOUR HONOR.

2            THE COURT:  WELL, I THINK AS OFFICERS -- TIE IT

3    INTO THE DEFENDANT.

4    BY MR. ROTHANS:

5    Q.   YOU WERE HIRED, MR. CLARK, BY THESE LAWYERS -- MR. MC

6    NICHOLAS, MR. GALIPO AND THEIR STAFF -- TO CRITICIZE

7    DETECTIVE LUIS MARTINEZ AND THE CULVER CITY POLICE

8    DEPARTMENT; IS THAT TRUE?

9    A.   NO.  I WAS HIRED TO EVALUATE THE CASE AND GIVE AN

10   OPINION, AND THE OPINION IS CRITICAL OF OFFICER MARTINEZ.

11   Q.   JUST A COINCIDENCE?

12   A.   NO.

13           MR. GALIPO:  I'LL OBJECT AS ARGUMENTATIVE.

14           THE COURT:  OVERRULED.

15           THE WITNESS:  NO, IT'S NOT A COINCIDENCE.  I WOULD

16   NOT HAVE TAKEN THE CASE IF I DID NOT SEE A DEPARTURE.

17   BY MR. ROTHANS:

18   Q.   AT THE TIME THEY HIRED YOU, THEY PAID YOU MONEY AS A

19   RETAINER TO HAVE YOU LOOK AT THE FILE?

20   A.   YES, THEY THEN PAID RETAINER.

21   Q.   $2,500?

22   A.   THAT'S CORRECT.

23   Q.   YOU COULDN'T HAVE PREJUDGED THE CASE UNTIL YOU HAD A

24   CHANCE TO LOOK AT THE MATERIALS?

25   A.   THAT'S RIGHT.

1    Q.   YOU'D GET THE RETAINER FEE ALONG WITH THE MATERIALS,

2    $2,500?

3    A.   NO, THAT'S NOT CORRECT.  I ALSO VET THE CASE BEFORE

4    ACCEPTING RETAINER AND THERE HAVE BEEN TIMES I'VE RETURNED

5    THE CASE AND RETAINER.

6    Q.   HOW DO YOU VET IT, SIR?

7    A.   I HAVE EXTENSIVE CONVERSATIONS AND I REVIEW, TYPICALLY,

8    WHAT'S CALLED THE O.I.S.0, OFFICER INVOLVED SHOOTING REPORT

9    AT LEAST ON THAT -- AT LEAST THAT MUCH.  OFTEN THERE ARE

10   DEPOSITIONS.  I BELIEVE I SAW THE DEPOSITION OF MARTINEZ, BUT

11   I DID REVIEW HIS STATEMENT TO THE O.I.S. INVESTIGATORS BEFORE

12   ACCEPTING THE CASE.

13   Q.   YOU HAVE EXTENSIVE CONVERSATIONS WITH THE LAWYERS?

14   A.   YES.

15   Q.   YOU HAVE NOTES?

16   A.   NO.  I HAVE THE REPORT.

17   Q.   SO YOU HAVE EXTENSIVE CONVERSATIONS WITH THE LAWYERS AT

18   THE OUTSET BEFORE YOU DECIDE TO TAKE A CASE, BUT YOU DON'T

19   TAKE ANY NOTES FROM THOSE CONVERSATIONS?

20   A.   NO.

21   Q.   AND THEY'RE PAYING YOU TO BE HERE TODAY, AREN'T THEY

22   SAY?

23   A.   YES, I'M BEING PAID FOR MY TESTIMONY.

24   Q.   HOW MUCH?

25   A.   $300 AN HOUR.

1    Q.   DID YOU INCLUDE TRAVEL TIME?

2    A.   NOT TO LOS ANGELES.

3    Q.   YOU FROM L.A. COUNTY LINE?

4    A.   FROM SAN DIEGO.

5    Q.   SO FROM SAN DIEGO HERE, TRAVEL TIME, PLUS THE TIME IN

6    THE COURTROOM?

7    A.   I CHARGE THE TIME IN THE COURTROOM.

8    Q.   AND IF YOU ARE REQUIRED TO COME BACK NEXT TUESDAY FOR

9    TRIAL, YOU'D BE PAID FOR THAT DAY AS WELL?

10   A.   I WOULD BE.

11   Q.   BY THESE LAWYERS?

12   A.   I WOULD ASSUME SO.

13   Q.   THIS INCIDENT HAPPENED IN APRIL 2010, AS I BELIEVE THE

14   JUDGE HAS ALREADY INDICATED.

15            YOU WEREN'T THERE AT THE TIME?

16   A.   THAT IS CORRECT.

17   Q.   YOU WEREN'T A WITNESS TO THE SHOOTING?

18   A.   I WAS NOT.

19   Q.   YOU WERE NOT PART OF THE HOMICIDE OR OFFICER INVOLVED

20   SHOOTING TEAM THAT RESPONDED TO THE SCENE THAT DAY?

21   A.   NO, I WAS NOT.

22   Q.   AND YOU WERE HIRED FOR THE FIRST TIME MORE THAN A

23   YEAR-AND-A-HALF AFTER THE INCIDENT; IS THAT TRUE?

24   A.   THAT'S CORRECT.

25   Q.   YOU HAVE, AS MR. GALIPO ASKED, WORKED WITH THESE TWO

1    LAWYERS IN THE PAST?

2    A.   YES, BOTH.

3    Q.   YOU'VE HAD CASES WITH MR. MC NICHOLAS IN THE PAST?

4    A.   I'VE HAD THREE.

5    Q.   YOU'VE HAD MULTIPLE CASES WITH MR. GALIPO IN THE PAST?

6    A.   YES.

7    Q.   IN FACT, THE FEDERAL RULES REQUIRE THAT AS PART OF YOUR

8    DESIGNATION OF BEING AN EXPERT WITNESS IN A FEDERAL CASE, YOU

9    MAKE A DISCLOSURE OF THE PREVIOUS TESTIMONY WHETHER AT A

10   DEPOSITION OR A TRIAL IN THE PREVIOUS FOUR YEARS, CORRECT?

11   A.   THAT'S CORRECT.

12   Q.   AND YOU ALWAYS MAKE THAT DISCLOSURE AS PART OF YOUR

13   DESIGNATION IN THESE FEDERAL CASES, TRUE?

14   A.   THAT'S CORRECT.

15   Q.   THE DESIGNATIONS THAT YOU PROVIDED WHICH SHOW YOUR

16   TESTIMONY FOR THE PRIOR FOUR YEARS -- THAT WOULD BE 2009

17   THROUGH 2013 -- YOU HAVE TESTIFIED FOR MR. GALIPO, JUST MR.

18   GALIPO, 36 TIMES; IS THAT TRUE?

19        MR. GALIPO:  I'M GOING TO OBJECT AS VAGUE AS TO

20   WHETHER THAT INCLUDES DEPOSITIONS AND TRIALS IN THE SAME

21   CASE?

22        THE COURT:  OVERRULED.

23        YOU CAN FOLLOW UP ON YOUR REDIRECT.

24        THE WITNESS:  ANSWER?

25        THE COURT:  THE QUESTION STANDS.

1           THE WITNESS:  YES, THAT WOULD INCLUDE -- THAT WOULD

2    BE DUPLICATE NOTATIONS IF THERE WAS A TRIAL, BUT THAT'S

3    CORRECT.  THE RECORD OR THE LIST I GAVE YOU IS ACCURATE.

4    BY MR. ROTHANS:

5    Q.   WHEN YOU SAY "DUPLICATE NOTATIONS," LET'S BE CLEAR.

6           YOU TESTIFY AT A DEPOSITION; THE DEFENSE LAWYERS

7    FOR POLICE DEPARTMENTS ARE REQUIRED TO PAY YOU FOR YOUR TIME

8    FOR DEPOSITIONS.  THAT'S THE WAY THE RULES GO, ISN'T IT?

9    A.   THAT'S RIGHT.

10   Q.   AND THAT'S DONE IN CASES WHERE MR. GALIPO HAS RETAINED

11   YOU.  THEN YOU ALSO TESTIFY IN A COURTROOM LIKE TODAY; YOU'RE

12   PAID BY THE LAWYERS WHO BROUGHT YOU IN, TRUE?

13   A.   TRUE.

14   Q.   THIRTY-SIX DIFFERENT TIMES IN THE PAST, FOUR YEARS,

15   YOU'VE DONE THAT ON CASES INVOLVING MR. GALIPO, RIGHT?

16   A.   THAT'S CORRECT, THAT WOULD BE AN ACCURATE LIST.

17   Q.   YOU SPENT A LOT OF TIME ON THIS PARTICULAR CASE, SIR?

18   A.   SPENT ABOUT 30 HOURS ON IT.

19   Q.   AND THAT'S 30 HOURS IN THE PAST THREE YEARS SINCE THIS

20   INCIDENT OCCURRED?

21   A.   YES.  I LOOKED AT THE CASE IN PREP FOR THE TESTIMONY,

22   BUT I HAVEN'T SEEN -- I HADN'T DONE ANYTHING WITH IT UNTIL

23   AFTER I GAVE THE DEPOSITION ON JANUARY 11TH OF LAST YEAR.

24   Q.   I'M SORRY.  I DIDN'T UNDERSTAND THAT ANSWER.

25           I'M LOOKING FOR TOTAL NUMBER OF HOURS YOU HAVE

1    SPENT IN YOUR REVIEW OF THIS CASE SINCE YOU WERE RETAINED?

2    A.   WELL, IF WE TAKE FOR THE TESTIMONY TODAY, IT WOULD BE

3    THEN 35 TO 40 HOURS.

4    Q.   DO YOU FEEL THAT YOU'VE DONE A THOROUGH JOB?

5    A.   TO THE BEST OF MY ABILITY, WITH THE MATERIALS PROVIDED.

6    Q.   DID YOU TELL MR. GALIPO THAT THERE WERE MATERIALS THAT

7    HE DID NOT PROVIDE THAT YOU WOULD LIKE TO HAVE SEEN?

8    A.   THE FILE APPEARS VERY COMPLETE, AND I DID NOT TALK TO

9    HIM ABOUT ANY OTHER MATERIAL.

10   Q.   TO BE CLEAR, DID YOU ASK EITHER MR. MC NICHOLAS OR MR.

11   GALIPO TO PROVIDE YOU WITH ADDITIONAL DOCUMENTS YOU WOULD

12   LIKE TO HAVE SEEN WHILE REVIEWING THIS FILE?

13   A.   NO.

14   Q.   YOU HAVE LOOKED AT HUNDREDS OF DOCUMENTS, TRUE?

15   A.   YES.

16   Q.   INCLUDING SEVERAL PHOTOGRAPHS?

17   A.   THOUSANDS -- WELL, NOT THOUSANDS.  HUNDREDS OF

18   PHOTOGRAPHS.

19   Q.   AND HOW MANY HOURS DID YOU SPEND IN YOUR WORK IN THIS

20   CASE MEETING WITH LAYLA GRISSOM?

21   A.   I DID NOT MEET WITH ANY PRINCIPLE IN THIS CASE.

22   Q.   I DON'T KNOW WHAT "PRINCIPLE" MEANS.  LAYLA GRISSOM IS

23   NOT A PLAINTIFF IN THIS CASE.

24   A.   I DID NOT SPEND ANY TIME INTERVIEWING ANY PERSON IN THIS

25   CASE.

 1    Q.    DO YOU KNOW WHO LAYLA GRISSOM IS?

 2    A.    YES.  SHE'S THE SISTER.

 3    Q.    SHE WAS THE DRIVER OF THIS VEHICLE, TRUE?

 4    A.    CORRECT.

 5    Q.    YOU SPENT NO TIME WITH HER?

 6            THE COURT:  COUNSEL, SHE HAS NOT TESTIFIED.  IT

 7    DOES NOT SEEM SHE'S GOING TO TESTIFY.  MOVE ON.

 8    BY MR. ROTHANS:

 9    Q.    HAVE YOU SPENT TIME WITH ANY FAMILY MEMBERS TO DISCUSS

10    WITH THEM MR. GRISSOM?

11            MR. GALIPO:  YOUR HONOR, I'M GOING TO OBJECT AS

12    403, BEYOND THE SCOPE.

13            THE COURT:  SUSTAINED.  MOVE ON.

14    BY MR. ROTHANS:

15    Q.    YOU'VE NEVER MET ANY OF THE OFFICERS INVOLVED IN THIS

16    INCIDENT, HAVE YOU, SIR?

17    A.    NO.

18    Q.    YOU NEVER MET OFFICER -- OR DETECTIVE LUIS MARTINEZ,

19    HAVE YOU, SIR?

20    A.    NO.

21    Q.    OFFICER ZERBEY?

22    A.    NO.

23    Q.    OFFICER FAIRBANKS?

24    A.    NO.

25    Q.    OFFICER BROWN?

1    A.   NO.

2    Q.   OFFICER MOORE?

3    A.   NO.

4    Q.   YOU DON'T KNOW ANYTHING ABOUT THESE OFFICERS OR THEIR

5    BACKGROUNDS, DO YOU, SIR?

6              MR. GALIPO:  I'M GOING TO OBJECT, YOUR HONOR, AS

7    VAGUE AS PHRASED.  HE REVIEWED THE DEPOS, BUT IT'S BEYOND THE

8    SCOPE, AS I UNDERSTAND.

9              THE COURT:  SUSTAINED.

10   BY MR. ROTHANS:

11   Q.   HAVE YOU SEEN ANY TRAINING RECORDS OF DETECTIVE LUIS

12   MARTINEZ?

13   A.   NO.

14   Q.   HAVE YOU REACHED OUT, SIR, AND TALKED TO ANY PROSECUTORS

15   IN CONNECTION WITH THIS CASE?

16             MR. GALIPO:  AGAIN, YOUR HONOR.

17             THE COURT:  MR. ROTHANS, MOVE ON.

18             ASK AN ALTERNATIVE HYPOTHETICAL, IF YOU HAVE ONE.

19   MOVE ON.  WE DISCUSSED THIS.

20             DO YOU REMEMBER WHAT WE DISCUSSED?

21             MR. ROTHANS:  I DO, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  THEN MOVE ON.

23   BY MR. ROTHANS:

24   Q.   IN CONNECTION WITH YOUR WORK IN THIS CASE, MR. CLARK,

25   YOU'VE NOT SPENT A MINUTE IN THE PARKING LOT OR IN THE DONUT

1    KING WHERE THE SHOOTING TOOK PLACE; IS THAT TRUE?

2    A.   THAT IS CORRECT.

3    Q.   YOU TESTIFIED -- WHEN MR. GALIPO ASKED YOU QUESTIONS,

4    YOU DIDN'T THINK IT WAS NECESSARY -- YOU DECIDED --

5            THE COURT:  MR. ROTHANS, THE JURY IS NOT GOING TO

6    DO THAT.  I AM NOT GOING TO DO THAT.  ALL OF US ARE BASING

7    THIS -- THE DECISIONS THAT WILL BE MADE ON THE PHOTOGRAPHS.

8            THE PURPOSE OF THIS TESTIMONY, AS I HAVE SAID, IS

9    TO HELP THE JURY UNDERSTAND P.O.S.T. AND APPLY IT.  IF YOU

10   HAVE ALTERNATIVE HYPOTHETICALS, THEN ASK THEM.

11           MR. ROTHANS:  RESPECTFULLY, YOUR HONOR, I THINK

12   THIS GOES TO THE HEART OF SOME OF HIS OPINIONS AND THOSE

13   HYPOTHETICALS.  IF I MAY HAVE A LITTLE BIT OF LATITUDE.

14           THE COURT:  NO.  YOU MAY ASK HIM VARIATIONS ON THE

15   EVIDENCE THAT'S BEEN SUBMITTED HERE IN COURT.  I DO NOT

16   EXPECT HIM TO HAVE BEEN AT THE PARKING LOT.  I DON'T CARE IF

17   HE WAS AT THE PARKING LOT.  AS I SAID, THE JURY WILL NOT BE

18   THERE.  I WILL NOT BE THERE.  MOVE ON.

19   BY MR. ROTHANS:

20   Q.   BASED ON HYPOTHETICALS MR. GALIPO GAVE YOU, MR. CLARK,

21   DO YOU HAVE ANY INFORMATION FROM THOSE HYPOTHETICALS AS TO

22   WHERE THE SUN WAS IN THE SKY?

23   A.   IT WAS 11 -- ONLY FROM THE TIME, WHICH WAS 11:30 --

24   RIGHT AT 11:30 WHICH WOULD BE AT NOON, BUT I DO NOT KNOW THE

25   PRECISE LOCATION OF THE SUN ON THAT DAY.

1    Q.    WE KNOW THE TIME OF DAY OF THE SHOOTING.

2    A.    WELL, THAT'S ALL I KNOW.

3    Q.    FROM THESE HYPOTHETICALS MR. GALIPO WAS GIVING YOU --

4    PRESENTING TO YOU ABOUT DIFFERENT POSITIONS, DIFFERENT

5    ANGLES, DO YOU HAVE ANY KNOWLEDGE AS TO WHERE THE SHADOWS

6    WERE IN THE PARKING LOT AT THE TIME OF THE SHOOTING?

7              MR. GALIPO:  YOUR HONOR, I'LL OBJECT AS BEYOND THE

8    EVIDENCE OF WHAT'S BEEN IN THE CASE ABOUT THE SHADOWS.

9              THE COURT:  OVERRULED.  TO THE EXTENT THAT'S THE

10   CASE, THEN CERTAINLY THAT CAN BE POINTED OUT.

11             THE WITNESS:  I ONLY KNOW WHAT WAS TESTIFIED TO AND

12   I DO NOT KNOW ABOUT SHADOWS.

13   BY MR. ROTHANS:

14   Q.    THE PHOTOGRAPHS THAT YOU WERE PROVIDED, THE DOZENS AND

15   DOZENS OF PHOTOGRAPHS, DO YOU HAVE ANY INFORMATION IN TERMS

16   OF WHAT TIME OF DAY THOSE WERE TAKEN?

17   A.    NO.  I DO NOT KNOW THE TIME EACH PHOTOGRAPH WAS TAKEN.

18   Q.    WELL, I DON'T -- ALL OF PHOTOS WERE TAKEN BY THE

19   SHERIFFS.

20             ANY INFORMATION -- WHAT TIME OF DAY, HOUR AFTER THE

21   INCIDENT, OR SIX HOURS OR SOMETHING IN BETWEEN?

22   A.    NO.  I DO NOT KNOW THE TIME OR HOW LONG IT TOOK TO TAKE

23   THE PHOTOGRAPHS.

24   Q.    THERE ARE SHADOWS IN SOME OF THOSE PHOTOGRAPHS FROM THE

25   FIXED OBJECT?

```
 1   A.   I BELIEVE YOU CAN SEE SHADOWS IN SOME OF THE

 2   PHOTOGRAPHS.

 3   Q.   YOU WOULD AGREE YOU HAVE NO PERSONAL KNOWLEDGE AS TO

 4   WHERE SHADOWS WERE FROM THE CHRYSLER SEBRING OR SHADOWS CAST

 5   BY MR. GRISSOM, HIMSELF, AT THE TIME OF THIS PARTICULAR

 6   SHOOTING; IS THAT TRUE?

 7   A.   I HAVE NO KNOWLEDGE OF SHADOWS IN THIS -- AT THIS

 8   INCIDENT.

 9   Q.   IN YOUR WORK IN CONNECTION WITH THIS CASE, HAVE YOU

10   SPOKEN TO DETECTIVES BLAGG AND COCHRAN AT THE L.A. COUNTY

11   SHERIFF'S DEPARTMENT?

12        MR. GALIPO:  YOUR HONOR, I'M GOING TO MAKE THE SAME

13   OBJECTION --

14        THE COURT:  SUSTAINED.

15   BY MR. ROTHANS:

16   Q.   IN TERMS OF YOUR BACKGROUND, TRAINING AND EXPERIENCE

17   THAT LED TO THE OPINIONS IN THIS COURTROOM, SIR, YOU'VE

18   INDICATED YOU RETIRED 20 YEARS AGO FROM THE SHERIFF'S

19   DEPARTMENT, TRUE?

20   A.   YES.

21   Q.   THE LAST TIME YOU MADE AN ARREST AS A DEPUTY SHERIFF WAS

22   WHEN RONALD REAGAN WAS IN; IS THAT TRUE?

23   A.   YES.

24   Q.   THE LAST TIME THAT YOU WERE A PATROL DEPUTY OR PATROL

25   SERGEANT WAS 40 YEARS AGO?
```

1    A.   THAT WOULD BE CORRECT.

2    Q.   AND WHEN YOU LEFT THE DEPARTMENT IN 1993, YOU WERE

3    UNHAPPY?

4    A.   I WAS HAPPY TO RETIRE ALL IN ONE PIECE AND HEALTHY.  AND

5    THERE WERE ASPECTS OF THE CAREER THAT I WASN'T HAPPY ABOUT,

6    BUT CERTAINLY I'M VERY HAPPY TO HAVE BEEN RETIRED AND TO BE A

7    RETIRED L.A. COUNTY SHERIFF.

8    Q.   THE QUESTION WAS, SIR:  AT THE TIME YOU RETIRED IN 1993,

9    WERE YOU UNHAPPY WITH THE SHERIFF'S DEPARTMENT?

10   A.   I WAS -- I SAID I WAS DISAPPOINTED IN A CERTAIN CASE.

11   OTHER THAN THAT, NO; DISAPPOINTED IN REGARDS TO THE CASE.

12   Q.   YOU WERE A LIEUTENANT FOR 15-PLUS YEARS?

13   A.   CORRECT.

14   Q.   YOU APPLIED TO BE CAPTAIN THREE DIFFERENT TIMES?

15   A.   YES.

16   Q.   YOU WERE GIVEN A BAD SCORE BY ONE OF YOUR SUPERIORS?

17   A.   THAT IS CORRECT.

18   Q.   YOU GRIEVED IT WITH THE L.A. COUNTY CIVIL SERVICE

19   COMMISSION?

20   A.   NO.  I DID NOT GRIEVE IT; I APPEALED, AND PREVAILED.

21   Q.   YOU WERE APPOINTED CAPTAIN?

22   A.   NO.

23   Q.   YOU HAD THE SCORE CHANGED?

24   A.   I HAD THE SCORE CHANGED, WHICH WAS SUFFICIENT FOR WHAT I

25   WANTED TO DO.

1    Q.   YOU NEVER BECAME A CAPTAIN, SO YOU RETIRED 1993 AS A

2    LIEUTENANT?

3    A.   RIGHT.   THE CAPTAIN -- I WAS NOT PROMOTED TO CAPTAIN.

4    Q.   YOU FELT THERE WAS A CONSPIRACY SOMEWHAT AGAINST YOU AT

5    THE TIME, DID YOU NOT?

6    A.   REGARDING THE SCORE, CORRECT.

7    Q.   YOU HAVE NEVER SERVED AS A REGULAR INSTRUCTOR AT L.A.

8    COUNTY SHERIFF'S ACADEMY; IS THAT CORRECT?

9    A.   NOT ASSIGNED TO THE ACADEMY, BUT TO OTHER SCHOOLS OF THE

10   ACADEMY, I WAS.

11   Q.   FULL-TIME STAFF TRAINING ACADEMY -- YOU NEVER SERVED IN

12   THAT CAPACITY?

13   A.   NO.   THAT WAS NOT ONE OF MY ASSIGNMENTS.

14   Q.   DO YOU HOLD YOURSELF OUT AS AN EXPERT ON BALLISTICS?

15          MR. GALIPO:   YOUR HONOR, I'M GOING TO OBJECT AS

16   BEYOND THE SCOPE.

17          THE COURT:   OVERRULED.

18          THE WITNESS:   NOT AS A SCIENTIFIC BALLISTICS

19   ANALYST.   I'M NOT -- AS A GENERALIST DETECTIVE I'VE TESTIFIED

20   MANY TIMES.

21   BY MR. ROTHANS:

22   Q.   YOU'VE NOT DRAFTED ANY SPECIFIC P.O.S.T. LEARNING

23   DOMAINS?

24   A.   CORRECT.

25   Q.   YOU'VE NEVER BEEN EMPLOYED BY P.O.S.T.?

1    A.   NO.

2    Q.   YOU'VE NEVER SERVED AS A P.O.S.T. STAFF MEMBER IN ANY

3    SEMINARS?

4    A.   NO.

5    Q.   YOU'VE NEVER BEEN CERTIFIED BY P.O.S.T. AS A USE OF

6    FORCE INSTRUCTOR?

7    A.   NO.  WE DID NOT HAVE THE CERTIFICATIONS WHEN I WAS

8    LECTURING ON THAT LEARNING DOMAIN.

9    Q.   SOMETHING THAT'S PREVENTED YOU IN THE LAST 20 YEARS FROM

10   GOING BACK AND GETTING THE CERTIFICATION?

11   A.   WELL, I'M RETIRED AND MY WORK AS A CONSULTANT -- SO

12   THAT'S WHAT I DO.

13   Q.   YOU'VE NEVER BEEN A CONSULTANT FOR POST THOUGH CORRECT?

14   A.   THAT IS CORRECT.

15   Q.   AND WHILE YOU WERE A SHERIFFS EMPLOYEE, WHILE YOU WERE A

16   LIEUTENANT OR BELOW WITH THE SHERIFF'S DEPARTMENT, BEFORE

17   RETIRING YOU HAD ONLY REVIEWED TWO OR THREE DIFFERENT OFFICER

18   INVOLVED SHOOTINGS?

19   A.   AS PART OF THE SHOOTING REVIEW COMMITTEE, CORRECT.

20   THOSE WERE AD HOC ASSIGNMENTS; COLLATERAL ASSIGNMENTS WOULD

21   COME RANDOMLY.

22   Q.   SINCE THEN YOU'VE REVIEWED HUNDREDS SINCE RETIRING?

23   A.   I'VE REVIEWED HUNDREDS THROUGHOUT THE COUNTRY.

24   Q.   TWO OR THREE WHILE YOU WORKED FOR THE SHERIFF'S

25   DEPARTMENT?

1    A.    AS AN EVALUATOR, YES, THAT IS CORRECT WHICH WOULD --

2    WHICH PRODUCED A FORMAL PRESENTATION TO THE DEPARTMENT, THAT

3    IS TRUE.

4    Q.    YOU NEVER WORKED FOR THE L.A. COUNTY SHERIFF'S HOMICIDE

5    UNIT THAT INVESTIGATED OFFICER INVOLVED SHOOTINGS; IS THAT

6    TRUE?

7    A.    THAT IS CORRECT.

8    Q.    YOU NEVER TAUGHT A COURSE ON HOMICIDE INVESTIGATIONS?

9    A.    NO, I HAVE NOT.

10   Q.    YOU DID NOT USE OR DEPLOY AN MP5 IN THE FIELD AS A

11   POLICE OFFICER?

12   A.    NO.

13   Q.    YOU NEVER TAUGHT OR TRAINED ANYONE ON THE USE OF AN MP5?

14   A.    I HAVE NOT.

15   Q.    YOU'VE NEVER FIRED OR USED A MP5?

16   A.    NO, I'VE NOT FIRED OR USED THE MP5.

17   Q.    NOR HAD YOU RECEIVED ANY TRAINING ON AN MP5 WHILE STILL

18   A SWORN PEACE OFFICER?

19   A.    THAT'S CORRECT.  WE HAD .35 REMINGTON AND A 30 30 LIVE

20   ACTION.

21   Q.    WOULD IT BE FAIR TO SAY YOU DO NOT CONSIDER YOURSELF AN

22   EXPERT ON USE OF THE MP5?

23   A.    I'M NOT AN EXPERT ON THE MP5.

24   Q.    HOW MANY TIMES, MR. CLARK, HAVE YOU TESTIFIED AGAINST

25   THE L.A. COUNTY SHERIFFS, YOUR FORMER EMPLOYER, SINCE YOU

1    RETIRED 20 YEARS AGO?

2    A.   I THINK CLOSE TO 50 TIMES, THAT WOULD BE AN ESTIMATE.  I

3    DON'T KEEP TRACK OF IT.  AND I WAS EMPLOYED ONCE ON A CASE I

4    ACCEPTED FOR THEIR DEFENSE.

5    Q.   AT NO TIME HAS THE L.A. COUNTY SHERIFF'S DEPARTMENT

6    ASKED YOU TO COME BACK AND PROVIDE ANY TRAINING, TRUE?

7    A.   THAT'S TRUE.

8    Q.   AND YOU ALSO DO WORK IN CRIMINAL MATTERS?

9    A.   YES.  I HAVE TAKEN A NUMBER OF CRIMINAL CASES FROM TIME

10   TO TIME, ABOUT A HUNDRED OR SO.

11   Q.   ALSO WORKED ON CRIMINAL MATTERS WITH MR. GALIPO?

12   A.   ONE.  ONE TIME.  IN FACT, THAT'S THE FIRST CASE WE HAD.

13   Q.   YOU NEVER HAVE BEEN RETAINED BY THE PROSECUTION IN A

14   CRIMINAL PROCEEDING?

15   A.   I HAVE NOT.

16   Q.   AND NO LAW ENFORCEMENT AGENCY HAS HAD YOU TESTIFY FROM A

17   WITNESS STAND AS AN EXPERT FOR THEM IN ANY CASE IN 20 YEARS?

18   A.   NOT YET.

19        MR. ROTHANS:  I'M SORRY, YOUR HONOR, IF I MAY HAVE

20   A MOMENT?

21        THE COURT:  YOU MAY.

22             (PAUSE IN PROCEEDINGS.)

23   BY MR. ROTHANS:

24   Q.   AS PART OF YOUR WORK IN THIS CASE, YOU WERE GIVEN

25   BOLO'S?

1    A.    I'M SORRY?

2    Q.    BE-ON-THE-LOOKOUT BULLETINS?

3    A.    THEY ARE INCLUDED IN THAT PACKAGE, THE O.I.S. REPORTS AS

4    WELL AS OTHER DOCUMENTS SUBMITTED.

5    Q.    THE HYPOTHETICALS MR. GALIPO PRESENTED TO YOU EARLIER

6    DURING DIRECT EXAM, HE DID NOT INCLUDE ASSUMPTIONS THAT ONE

7    OR MORE OF THE OFFICERS, INCLUDING THE SHOOTER, WAS AWARE OF

8    A SERIES OF ARMED ROBBERIES.

9            YOU'RE AWARE OF THAT; IS THAT TRUE?

10           MR. GALIPO:  I'M GOING TO OBJECT AS

11   MISCHARACTERIZES --

12           THE COURT:  LADIES AND GENTLEMEN, YOU'LL REMEMBER

13   WHAT THE HYPOTHETICALS CONSISTED OF.  THE DEFENSE CAN

14   CERTAINLY INQUIRE ABOUT THIS NOW.

15           GO AHEAD, MR. ROTHANS.

16           THE WITNESS:  WELL, I RECALL THE VERY FIRST

17   HYPOTHETICAL PRESENTED TO ME INCLUDED THE ARMED ROBBERY FACT,

18   AND THE FACT THAT THE TATTOO WAS OBSERVED, AND THERE WAS SOME

19   FACIAL RECOGNITION AS WELL.  I RECALL THAT IT'S THE VERY

20   FIRST HYPOTHETICAL -- THE VERY FIRST HYPOTHETICAL INVOLVED

21   SUSPICION BY THE OFFICERS OF THE SUSPECT BEING INVOLVED IN

22   ONE ARMED ROBBERY.

23           NO.  I RECALL THE HYPOTHETICAL WAS THAT THIS ENTIRE

24   PULLOVER -- AND BECAUSE OF THEIR KNOWLEDGE AND EXPECTATION OR

25   THE SUSPICION THIS WAS THE CAR WAS, IN FACT, BECAUSE OF A

1    SERIES OF ROBBERIES THAT OCCURRED THAT THEY HAD BEEN ON THE

2    LOOKOUT FOR -- THE TERM B.O.L.O. IS "BE ON THE LOOKOUT."

3    IT'S A TYPE OF BROADCAST.

4    BY MR. ROTHANS:

5    Q.   I WANT YOU TO ASSUME, HYPOTHETICALLY, THERES A SERIES OF

6    ARMED ROBBERIES IN SOUTHERN CALIFORNIA OVER THE MONTHS

7    PRECEDING APRIL 25, 2010.  I WANT YOU TO ALSO ASSUME THAT ON

8    THE MORNING OF APRIL 25, 2010, A RADIOSHACK IS THE SUBJECT OF

9    AN ARMED ROBBERY BETWEEN, ROUGHLY, 11:00 O'CLOCK  AND 11:30

10   IN THE MORNING.  I WANT YOU TO ASSUME A TRAFFIC STOP WAS DONE

11   ON A VEHICLE THAT MAY BE DRIVING ERRATICALLY EASTBOUND ON

12   VENICE BOULEVARD, AND THE TRAFFIC STOP RESULTS IN VEHICLE

13   PULLING INTO A PARKING LOT AT MOTOR AND VENICE.

14            WITH ME SO FAR?

15   A.   YES.

16   Q.   IF ONE OR MORE OF THE OFFICERS IS AWARE OF THESE

17   B.O.L.O.'S, OR BE-ON-THE-LOOKOUTS BULLETINS THAT HAD BEEN

18   PUBLISHED AND DISTRIBUTED PRIOR TO THAT EVENT AND THE CALL IS

19   ABOUT STOPPING A POSSIBLE ARMED ROBBERY SUSPECT, WOULD IT BE

20   REASONABLE FOR ONE OR MORE OF THE OFFICERS TO SUSPECT THAT

21   ONE OR MORE OF THE SUBJECTS IN THE CAR MAY BE ARMED?

22   A.   YES.

23   Q.   YOU CERTAINLY WOULD EXPECT THEM TO THINK THAT, WOULDN'T

24   YOU?

25   A.   I'M SORRY?

1    Q.   YOU CERTAINLY WOULD EXPECT THAT OFFICERS WOULD AND

2    SHOULD ANTICIPATE THAT THE SUBJECTS IN THE CAR MAY BE ARMED?

3    A.   THAT'S THE VERY NATURE OF THE HIGH-RISK PULLOVER, AND

4    YOU ARE CORRECT; AND LOPEZ DID A VERY GOOD JOB.

5    Q.   YOU'RE TALKING ABOUT A VERY GOOD JOB IN THE FELONY

6    TRAFFIC STOP?

7    A.   RIGHT.  HE SPOTTED THE CAR AND INITIATED THE

8    ANNOUNCEMENT, AND THE CONTAINMENT WAS SET.

9    Q.   AND I WANT YOU TO ASSUME THAT AFTER THE VEHICLE COMES TO

10   A STOP IN THE PARKING LOT THAT THE SUBJECTS INSIDE THE

11   VEHICLE, BOTH DRIVER AND PASSENGER, CONTINUE TO MOVE AROUND,

12   SQUIRMING AND TURNING, AND DROPPED THEIR HANDS PERIODICALLY

13   WHILE INSIDE THE CAR.

14        YOU HAVE THAT ON MIND?

15   A.   YES.

16   Q.   WOULD IT BE REASONABLE FOR OFFICERS TO SUSPECT THAT ONE

17   OR MORE OF THEM MAY HAVE A WEAPON INSIDE THE CAR AND MAY

18   EITHER BE RETRIEVING IT OR CONCEALING IT?

19   A.   THEY WOULD CONSIDER THAT.

20   Q.   THEY SHOULD CONSIDER THAT, SHOULDN'T THEY?

21   A.   YES, THEY SHOULD CONSIDER IT AND DEPORT ACCORDINGLY,

22   WHICH THEY DID, AS I UNDERSTAND IT.

23   Q.   I WANT YOU TO ASSUME AT SOME POINT THE PASSENGER EXITS

24   THE VEHICLE, GETS ON THE PASSENGER SIDE REGARDLESS OF WHICH

25   DIRECTION IN HIS MOVEMENTS, HAS HIS HANDS IN THE AIR FOR A

1    PERIOD OF TIME.

2            SHOULD THE OFFICERS EXPECT OR ANTICIPATE THAT THAT

3    SUBJECT, GIVEN THAT TRAFFIC STOP, THE PREVIOUS HISTORY OF AN

4    ARMED ROBBERY AND A HISTORY OF ARMED ROBBERIES, MIGHT BE

5    ARMED?

6    A.   IN TERMS OF IN HIS HANDS, NO.  IT WAS NOTHING IN HIS

7    HANDS.

8    Q.   I DIDN'T SAY ANYTHING ABOUT HIS HANDS, MR. CLARK?

9    A.   SO IN THE CAR -- THERE COULD BE A WEAPON IN THE CAR, OF

10   COURSE.

11   Q.   SO IF A SUSPECT GETS OUT OF A VEHICLE KNOWING THAT IT

12   MAY BE THE SUSPECT FROM A RECENT ARMED ROBBERY, A FELONY

13   TRAFFIC STOP IS CONDUCTED, THE PASSENGER GETS OUT AND SHOWS

14   HIS HANDS; ARE YOU SAYING THAT AN OFFICER SHOULD KNOW EVERY

15   SINGLE ITEM THAT'S ON OR IN HIS PERSON?  IN HIS WAISTBAND?

16   POCKET?  IN HIS SOCK OR SHOE?  IS THAT WHAT YOU'RE SAYING?

17   A.   NOT AT ALL.  AND SHOWING YOUR HANDS IS A VERY GOOD

18   THING.  AND IT IS THE ROAD TO SAFE APPREHENSION, BUT THE

19   OFFICERS WOULD BE CAUTIOUS AND COGNIZANT OF OTHER

20   POSSIBILITIES.  AND THAT IS WHY WE FOLLOW THE PROTOCOLS WE DO

21   FOR THE SAFE APPREHENSION.

22   Q.   THE OFFICER SHOULD BE COGNIZANT OF OTHER

23   RESPONSIBILITIES.  THAT WOULD INCLUDE THE SUSPECT WHO MAY NOT

24   HAVE ANYTHING IN HIS HANDS AT THE MOMENT, MIGHT HAVE A WEAPON

25   ON HIS PERSON.

```
1              WOULD YOU AGREE THAT'S SOMETHING AN OFFICER SHOULD

2    BE SUSPICIOUS OF?

3    A.   THE OFFICER IS SUSPICIOUS OF IT AND IS MINDFUL OF IT,

4    YES.

5    Q.   AND DURING THE TIME THAT YOU WORKED FOR THE SHERIFF'S

6    DEPARTMENT 20 YEARS AGO AND BEYOND, YOU NEVER TAUGHT, NOR

7    WERE YOU TAUGHT AN OFFICER HAS TO WAIT TILL HE SEES A GUN

8    POINTED AT A SHERIFF'S DEPUTY BEFORE HE MAY USE DEADLY FORCE?

9              MR. GALIPO:  OBJECT AS INCOMPLETE HYPOTHETICAL AS

10   PHRASED.

11             THE COURT:  OVERRULED.

12             THE WITNESS:  THERE ARE SETS OF FACT AND TIMES WHEN

13   YOU WOULD NOT WAIT TO SEE THE GUN TO SHOOT.  BUT IN THIS SET

14   OF FACTS, AS I UNDERSTAND THE HYPOTHETICALS, YOU WOULD, BUT

15   THERE COULD BE TIMES WHEN YOU WOULD NOT.

16   BY MR. ROTHANS:

17   Q.   THE QUESTION WAS A LITTLE DIFFERENT, MR. CLARK.

18             DID YOU EVER TEACH A SHERIFF'S DEPUTY WHEN YOU

19   WORKED FOR THE SHERIFF'S DEPARTMENT THAT HE OR SHE SHOULD NOT

20   USE DEADLY FORCE IN SELF-DEFENSE OR DEFENSE OF OTHERS UNLESS

21   THE GUN IS ACTUALLY IN THE PERSON'S HAND POINTED AT THE

22   DEPUTY?

23   A.   NO.

24   Q.   IS IT TRUE, SIR, FROM YOUR BACKGROUND, TRAINING AND

25   EXPERIENCE THAT LAW ENFORCEMENT OFFICERS IN CALIFORNIA ARE
```

1    TAUGHT THAT CONDUCTING A VEHICLE PULLOVER CAN BE ONE OF THE

2    MOST DANGEROUS DUTIES AN OFFICER CAN PERFORM?

3    A.   YES.

4    Q.   IS IT ALSO YOUR UNDERSTANDING, BASED ON YOUR TRAINING

5    BACKGROUND AND EXPERIENCE, THAT OFFICERS AT P.O.S.T.

6    ACADEMIES ARE TAUGHT THAT VIOLENT ACTS HAVE TAKEN PLACE

7    DURING VEHICLE PULLOVERS ARE AMONG THE LEADING CAUSE OF

8    OFFICER INJURY AND DEATH?

9    A.   WELL, THEY -- IN THE CALCULUS OF DEATHS IN THE

10   PROFESSION THAT'S UP THERE, IT'S NOT THE NUMBER ONE, BUT IT

11   IS CERTAINLY RIGHT IN THE TOP CATEGORY.  AND THAT IS WHY

12   EXACTLY, THAT'S THE PREFACE OF WHY WE DO THE TACTIC FOR THE

13   HIGH-RISK PULLOVER AS WE DO.  AND IT'S A MUSCLE MEMORY

14   TRAINING.  IT'S DONE A LOT DURING REHEARSAL.

15   Q.   LEARNING DOMAIN 22, SPECIFICALLY, TELLS OFFICERS IN

16   P.O.S.T. ACADEMIES THAT VIOLENT ACTS TAKE PLACE DURING

17   VEHICLE PULLOVERS ARE ONE OF THE LEADING CAUSES OF OFFICER

18   DEATH; IS THAT TRUE?

19   A.   THAT'S RIGHT.  DOMESTIC VIOLENCE IS THE NUMBER ONE IN

20   THE NUMBER OF INCIDENTS OF VIOLENCE ON OFFICERS.

21   Q.   HOW MANY OCCASIONS, MR. CLARK -- AND I'M ALMOST DONE,

22   YOUR HONOR -- SINCE 1993 HAVE YOU TAKEN A WITNESS STAND IN

23   FRONT OF A JUDGE AND JURY AND TESTIFIED THAT THE USE OF

24   DEADLY FORCE WAS REASONABLE?

25   A.   OH, I'VE TESTIFIED ON A LOT OF ASPECTS OF DEADLY FORCE.

1    I GAVE THE CASE-SPECIFIC IN MY DEPOSITION, BUT THE TIME --

2    THE CASES I TAKE WHERE DEADLY FORCE IS USED AND THAT IS THE

3    ISSUE I HAVE TESTIFIED THAT IS INAPPROPRIATE.  SO...

4    Q.  I'M NOT SURE I UNDERSTAND YOUR ANSWER.

5         THE COURT:  IS THERE A NUMBER, MR. CLARK?  THE

6    QUESTION -- I WILL ASK YOU FOR A NUMBER.

7         THE WITNESS:  ON REFLECTION OF THE QUESTION, I

8    WOULD SAY EVERY TIME I'VE TESTIFIED.  EVERY TIME IN COURT

9    I'VE TESTIFIED THE USE OF FORCE WAS NOT -- USE OF LETHAL

10   FORCE WAS NOT APPROPRIATE.

11   BY MR. ROTHANS:

12   Q.  EVERY TIME IN 20 YEARS?

13   A.  WHEN IT IS THE ISSUE, YES, THAT'S THE KIND OF CASE I

14   WOULD TAKE.

15        MR. ROTHANS:  NOTHING FURTHER.

16        THANK YOU, YOUR HONOR.

17        MR. GALIPO:  IF I COULD HAVE FIVE MINUTES, AND

18   WE'LL BE FINISHED.

19        THE COURT:  YOU MAY.  WE'LL FINISH THIS.

20        MR. GALIPO:  THANK YOU.

21                    **REDIRECT EXAMINATION**

22   BY MR. GALIPO:

23   Q.  AS WE TALKED ABOUT EARLIER, MR. CLARK, WHEN YOU'VE COME

24   TO COURT WHEN THE ISSUE WAS WHETHER THE DEADLY FORCE WAS

25   REASONABLE OR NOT, THOSE WERE CASES WHERE YOU ACCEPTED AFTER

1    FORMING THE OPINION IT WAS UNREASONABLE?

2    A.   THAT IS CORRECT.

3    Q.   NOW, DID YOU SAY IN THIS CASE THAT YOU WOULD HAVE TO SEE

4    A GUN IN MR. GRISSOM'S HAND FOR THE SHOOTING TO BE

5    REASONABLE?

6    A.   YES.

7    Q.   AND, IN FACT -- AND MR. ROTHANS SAID, WELL, AREN'T THERE

8    CASES, POSSIBLY, WHEN YOU DON'T HAVE TO HAVE THE GUN POINTED

9    AT THE OFFICER?

10           I ASSUME IF THE PERSON SHOOTING THE OFFICERS AND

11   THERE'S GUNFIRE GOING ON, EVEN WITHOUT SEEING THE GUN YOU CAN

12   SHOOT IN SELF-DEFENSE, TRUE?

13   A.   YES, YOU WOULD.

14   Q.   IS THAT THE TYPE OF EXAMPLE YOU'RE REFERRING TO?

15   A.   THAT'S THE TYPE OF EXAMPLE I HAD IN MIND.

16   Q.   ISN'T THERE A HYPOTHETICAL P.O.S.T. IN CHAPTER 20 THAT

17   TALKS ABOUT A FELON HAVING A GUN, SHOOTING AT THE OFFICERS

18   WITH THE GUN AND THEN PUTTING THE GUN DOWN, WHETHER IT'S

19   APPROPRIATE FOR THE OFFICERS TO SHOOT HIM?

20   A.   YES.  THAT SCENARIO IS PRESENTED AS AN EXAMPLE OF THE

21   CONSTANT EVALUATION THAT'S REQUIRED IN THE OFFICER'S -- THAT

22   LEARNING DOMAIN MAKES IT CLEAR YOU WOULD NOT SHOOT.

23   Q.   THAT'S IN A CASE WHERE SOMEONE WAS SHOOTING AT THE

24   POLICE OFFICERS?

25   A.   RIGHT, BECAUSE THERE'S NOW SURRENDER.

1    Q.    NOW, IN ALL MY HYPOTHETICALS THAT I GAVE YOU EARLIER,

2    DID YOU ASSUME OR WERE YOU ASSUMING FROM MY FIRST

3    HYPOTHETICAL THAT THE OFFICERS HAD INFORMATION AND BELIEVED

4    THIS PERSON WAS THE SUSPECT IN MULTIPLE ARMED ROBBERIES?

5    A.    YES, THAT THAT WAS THE REASON FOR THE PULLOVER.

6    Q.    WELL, ISN'T IT OKAY JUST FOR THE OFFICERS TO INFLICT THE

7    DEATH PENALTY AND SHOOT THE PERSON NO MATTER WHAT THEY DO IF

8    THEY'VE COMMITTED ARMED ROBBERY?

9    A.    NO.

10   Q.    WHY NOT?

11   A.    BECAUSE OFFICERS ARE TAUGHT THAT OUR JOB IS NOT TO

12   EXECUTE DEFENDANTS.  OUR JOB IS TO DO THE APPREHENSION AND

13   BRING THE PERSON TO JUSTICE THROUGH THE JUSTICE SYSTEM; THAT

14   IS OUR OATH.  AND, ALSO, OFTEN THIS IS A TOTAL MISTAKE IN THE

15   SET OF FACTS THE OFFICER IS GOING ON THAT THE PERSON IS A

16   ROBBERY SUSPECT, TURNS OUT IT'S A MISTAKE.  SO WE DO NOT

17   OPERATE ON THE ASSUMPTION THAT WE CAN GO AHEAD AND SHOOT JUST

18   BECAUSE WE HAVE SOME LEVEL OF CONFIDENCE THAT THAT IS OUR

19   SUSPECT.

20   Q.    UNDER THE HYPOTHETICALS I GAVE YOU, DID THE FACT THE

21   OFFICERS DID NOT SEE A GUN OR ANYTHING THAT LOOKED LIKE A GUN

22   IN HIS HAND AT THE TIME OF SHOOTING -- WAS THAT IMPORTANT TO

23   YOU?

24   A.    YES, IT IS IMPORTANT.

25   Q.    IT WAS IMPORTANT THEY NEVER SAW HIM REACHING IN HIS

1    POCKET OR WAISTBAND?

2    A.   YES.   THAT'S PART OF WHY I SAID IT WOULD NOT BE

3    APPROPRIATE TO SHOOT HIM.

4    Q.   NOW YOU HAVE TAUGHT AT RESERVE ACADEMY, TRUE?

5    A.   YES.

6    Q.   MR. ROTHANS SAID IF YOU'RE CRITICIZING OFFICERS IN THIS

7    CASE, THERE WERE MULTIPLE OFFICERS ON SCENE, CORRECT?

8    A.   YES.

9    Q.   HOW MANY OFFICERS ARE YOU CRITICIZING IN THIS CASE?

10   A.   ONE.

11   Q.   AND THAT WOULD BE OFFICER MARTINEZ WHO IS THE ONLY ONE

12   WHO SHOT?

13   A.   YES.

14   Q.   HE ASKED YOU WHETHER YOU TESTIFIED IN A CASE FOR ME

15   THREE WEEKS AGO.

16          YOU REMEMBER THAT QUESTION?

17   A.   I DO.

18   Q.   ALL RIGHT.   THAT WAS A CASE WHERE THE GUY --

19          THE COURT:   MR. GALIPO, WE'RE -- THE JURY IS

20   FOCUSED ON THIS CASE.   THE COURT IS FOCUSED ON THIS CASE.

21          MR. GALIPO:   FAIR ENOUGH.   FAIR ENOUGH.

22   BY MR. GALIPO:

23   Q.   AND YOU HAVE -- ON HOW MANY OCCASIONS HAVE YOU BEEN,

24   APPROXIMATELY, RETAINED ON BEHALF OF A POLICE OFFICER IN ANY

25   TYPE OF HEARING?

A.   I HAVE AT LEAST -- PROBABLY THREE-DOZEN TIMES, BOTH ON

CRIMINAL CASES AND MOSTLY CIVIL.  AND I HAVE -- I'VE BEEN

RETAINED BY AN AGENCY IN NORTHERN CALIFORNIA FOR THEIR

DEPARTMENT.  THEY INCLUDE L.A.P.D. OFFICERS AS WELL AS

SHERIFFS DEPUTIES.

            MR. GALIPO:  THANK YOU.

            MAY I HAVE ONE MOMENT.  YOUR HONOR?

            THE COURT:  YOU MAY.

                  (PLAINTIFF'S COUNSEL CONFER.)

BY MR. GALIPO:

Q.   IN ALL OF THE HYPOTHETICALS I GAVE YOU -- ANY OF THEM --

WAS THERE, IN YOUR OPINION, ANY IMMEDIATE DEFENSE OF LIFE

SITUATION?

A.   NO.

            MR. GALIPO:  THANK YOU.

            THE COURT:  MR. ROTHANS?

            MR. ROTHANS:  NOTHING FURTHER, YOUR HONOR.

            THE COURT:  MR. CLARK, YOU'RE EXCUSED.

            THE WITNESS:  THANK YOU, YOUR HONOR.

            THE COURT:  LADIES AND GENTLEMEN, I'M GOING TO

EXCUSE YOU NOW FOR THE WEEKEND.  I REMIND YOU THAT MONDAY WE

WILL NOT BE HERE.  I'LL BE HERE.  I'LL BE DEALING WITH ALL OF

THE CIVIL AND CRIMINAL MATTERS THAT I'VE NOT BEEN DEALING

WITH THIS WEEK WHILE I'VE BEEN WITH YOU.  TRIAL WILL RESUME

ON TUESDAY, AT 9:00 O'CLOCK.

1           I, ONCE AGAIN, WANT TO REMIND YOU NOT TO DISCUSS

2      THE CASE WITH ANYONE.  IT MIGHT BE EASY TO DO WHEN YOU'RE

3      SEEING FAMILY AND FRIENDS OVER THE WEEKEND IF YOU HAVE AN

4      IDLE MOMENT.  IT WOULD BE EASY TO GO ONLINE TO FIND OUT ABOUT

5      THE LOCATION OF SOME OF THE NAMES YOU'VE HEARD.  I, AGAIN, AM

6      ORDERING YOU NOT TO DO THAT.  THE BASIS FOR YOUR VERDICT IN

7      THIS CASE WILL BE AND MUST BE WHAT OCCURS HERE IN THE

8      COURTROOM.  THANK YOU VERY MUCH AND ENJOY YOUR WEEKEND.

9                          (JURORS EXIT.)

10          THE COURT:  MY LAW CLERK, MR. DANELLA, HAS REVIEWED

11     THE JURY INSTRUCTIONS, AND I'VE REVIEWED THEM TOO, BUT NOT

12     NEARLY AS THOROUGHLY.  WE ARE OF THE VIEW THAT IT WOULD BE

13     HELPFUL FOR COUNSEL TO GET TOGETHER AND TRY TO UPDATE THE

14     JURY INSTRUCTIONS.  SO I AM GOING TO DIRECT COUNSEL TO MEET

15     AND CONFER ON THAT AND SOMETIME ON MONDAY AFTERNOON -- THIS

16     MIGHT EVEN BE TELEPHONICALLY -- I WOULD LIKE YOU TO CONFER

17     OFF THE RECORD WITH MR. DANELLA.  JUDGE RHYMER HAD ME DO THAT

18     AS A NEW LAWYER AND I DO THINK THAT'S HELPFUL TO JUST HAVE

19     YOU TALK WITH THE LAW CLERK IN A SENSE OF JUST AMONG

20     YOURSELVES AS TO WHICH INSTRUCTIONS ARE APPROPRIATE ON THE

21     RECORD.  YOU'LL BE ABLE TO RAISE ANY OBJECTIONS YOU HAVE WITH

22     ME.  THIS WILL PROBABLY HAPPEN MORE THAN ONCE.  HERE, IT

23     SEEMS -- IT'S NOT ONLY YOU'RE FAR APART, WHICH IS FINE, I'LL

24     MAKE RULINGS IF I HAVE TO.  YOU'RE NEEDLESSLY FAR APART.  IF

25     YOU TALK TO EACH OTHER THERE WILL BE A LOT OF AGREEMENT THAT

```
 1    CAN BE REACHED BEFORE I HAVE TO COME IN AND RULE ONE WAY OR

 2    THE OTHER.

 3            SO -- AND I THINK AS MR. ROTHANS SUGGESTED

 4    YESTERDAY AND MR. GALIPO, AS WELL, PART OF THIS IS JUST

 5    SIMPLY FOCUSSING ON WHAT THE REAL ISSUES ARE IN THE CASE.  I

 6    MEAN IF THERE'S A LEGAL DISPUTE, SUCH AS MS. WILLIAMS RAISED

 7    ON SURVIVOR DAMAGES, GET ME THE CASES.  I'LL RULE.  I

 8    UNDERSTAND THAT, BUT I DON'T WANT TO HAVE APPLES AND ORANGES

 9    AND SHIPS PASSING IN THE NIGHT IN REGARD TO THESE

10    INSTRUCTIONS IF BOTH PARTIES HAVE -- ARE ON THE SAME PAGE AS

11    TO WHAT THE REAL ISSUES ARE IN THE CASE.

12            SO I'LL FIGURE OUT WHAT YOUR AVAILABILITY IS MONDAY

13    AFTERNOON.  LIKE I SAID, MAYBE IF THERE -- IF THERE'S TIME

14    FOR YOU TO PREPARE A NEW SET OF INSTRUCTIONS ON WHICH YOU

15    AGREE, THEN ONES ON WHICH YOU DON'T AGREE, WE CAN DO THIS BY

16    PHONE, AND MR. DANELLA CAN SPEAK TO YOU BY PHONE.  FOR THAT

17    TO HAPPEN, THERE HAS TO BE A COMMON SET OF PAPERWORK,

18    OBVIOUSLY.  EITHER JUST DO YOUR BEST TO TALK ABOUT THIS,

19    DECIDE IF THERE'S SOME AGREEMENT AND GET A NEW SET OF AGREED

20    UPON INSTRUCTIONS AND DISPUTED INSTRUCTIONS.  IF IT'S

21    IMPOSSIBLE FOR YOU TO DO THAT BY MONDAY AFTERNOON, THEN WE'LL

22    USE THE ONES THAT CURRENTLY EXIST AS THE BASIS FOR THE

23    DISCUSSION.

24            ANY COMMENTS ON THAT, MR. GALIPO?

25            MR. GALIPO:  NO.  THAT'S AGREEABLE, YOUR HONOR.
```

```
 1              THE COURT:  MR. ROTHANS?

 2              MR. ROTHANS:  NO.  THAT'S FINE, YOUR HONOR.

 3              THE COURT:  ALL RIGHT.  ANYTHING ELSE?

 4              MR. GALIPO:  JUST WITH REGARDS TO SCHEDULING.

 5              THE COURT:  YES.

 6              MR. GALIPO:  WE ANTICIPATE RESTING OUR CASE VERY

 7    EARLY TUESDAY MORNING.  I ONLY WOULD POSSIBLY HAVE THE

 8    GUARDIAN AND OTHER CHILD, TO MY KNOWLEDGE.  AND WE'RE STILL

 9    DEBATING WHETHER, IN FACT, WE'RE ACTUALLY GOING TO CALL

10    EITHER ONE OR BOTH.

11              I WANT TO LET THE COURT AND MR. ROTHANS KNOW SO HE

12    CAN LINE UP ALL HIS WITNESSES, BUT I ANTICIPATE WE'LL BE

13    RESTING OUR CASE FIRST THING TUESDAY MORNING.

14              THE COURT:  ALL RIGHT.  LET ME -- IT WAS CERTAINLY

15    APPROPRIATE FOR MS. SIMPLIS TO SEVEN ESPECIALLY WHERE THE

16    PLAINTIFF'S DAUGHTER IS SO YOUNG, AND ALSO WHERE SHE WAS A

17    PERCIPIENT WITNESS TO THE RELATIONSHIP WITH THE OTHER THREE

18    PLAINTIFFS.  BUT IT CLEARLY DOES RAISE CERTAIN ISSUES,

19    ESPECIALLY WHERE MS. SIMPLIS AND MS. ROSE ARE NOT,

20    THEMSELVES, THE PLAINTIFFS, AND THEY'RE NOT CLAIMING FOR LOSS

21    OF CONSORTIUM OR SOMETHING LIKE THAT.

22              I HOPE THAT THE TESTIMONY WITH MS. ROSE, IF THERE'S

23    GOING TO BE ANY, WILL BE VERY FOCUSED AND WE WON'T NEED TO

24    HAVE A REPEAT OF A LENGTHY SIDEBAR OR RAISING ISSUES THAT

25    IT'S -- IT WILL BE IN KEEPING WITH WHAT I'VE INDICATED I
```

1     THINK IS APPROPRIATE HERE.  TO THE EXTENT SHE WANTS TO

2     CORROBORATE WHAT HER CHILDREN HAVE SAID, THEN I -- THAT'S

3     CERTAINLY RELEVANT.  I DON'T KNOW THAT IT'S NECESSARILY

4     NECESSARY, BUT IT'S NOT FOR ME TO SAY WHAT'S NECESSARY, IF

5     THAT'S WHAT YOU AND YOUR CLIENT WANT TO DO.  I JUST WANT TO

6     MAKE SURE THAT THE TESTIMONY IS BRIEF, RESPECTFUL, AND,

7     LIKEWISE, THE CROSS-EXAMINATION IS FOCUSED AND DOES NOT GET

8     INTO EXTRANEOUS ISSUES.

9              MR. GALIPO:  MESSAGE IS RECEIVED.  AGAIN, I HAVEN'T

10    DECIDED IF WE'RE GOING TO CALL HER IN LIGHT OF THE OTHER

11    TESTIMONY; BUT IF WE DO, WE'LL CERTAINLY DO IT WITHIN THOSE

12    PARAMETERS.

13             THE COURT:  MR. ROTHANS.

14             MR. ROTHANS:  I JUST WANTED TO INQUIRE OF MR.

15    GALIPO, WHETHER HE NEEDS THE PARAMEDIC WHO WAS SUPPOSED TO BE

16    HERE YESTERDAY, OR IS THAT NO LONGER NECESSARY?

17             MR. GALIPO:  IT'S NO LONGER NECESSARY.

18             THE COURT:  ALL RIGHT.

19             GIVEN THE FIRE UP IN MALIBU, I'M SURE HE HAS MORE

20    IMPORTANT THINGS TO DO.

21             MR. ROTHANS:  I WANT TO CONFIRM.  I NEED TO HAVE

22    ALL MY WITNESSES LINED UP TO GO FIRST THING TUESDAY.  NOT

23    KNOWING IF YOU'RE CALLING ANYONE --

24             MR. GALIPO:  THAT IS CORRECT.  LET ME KNOW BY THE

25    END OF THE DAY MONDAY WHO YOU HAVE IN MIND.  THAT WILL BE

 1    FINE.

 2                MR. ROTHANS:  ABSOLUTELY.

 3                THANK YOU, YOUR HONOR.

 4                THE COURT:  ALL RIGHT, THEN.  IF THAT IS ALL, THEN

 5    I WISH COUNSEL A GOOD WEEKEND AND I WILL SEE YOU AGAIN ON

 6    TUESDAY MORNING EITHER IN -- MS. SANCHEZ WILL BE IN TOUCH

 7    WITH YOU EITHER BY PHONE OR IN PERSON ON MONDAY AFTERNOON TO

 8    START DISCUSSING THE JURY INSTRUCTIONS.

 9                MR. GALIPO:  I'M SORRY, YOUR HONOR.  ONE LAST

10    POINT.

11                MR. MC NICHOLAS GAVE ME THAT LOOK WHEN HE SAID

12    MONDAY AT THE END OF THE DAY.  IF THERE'S ANY POSSIBILITY TO

13    GET AN IDEA AT THE END OF THE DAY TODAY OR EARLY MONDAY AS TO

14    WHO THE WITNESSES ARE GOING TO BE, I THINK, IT WOULD BE

15    APPRECIATED.

16                MR. ROTHANS:  JUST NOW LEARNING I'M GOING TO NEED

17    WITNESSES SO I'VE GOT TO CONTACT THEM, FIND OUT THEIR

18    AVAILABILITY.  I WON'T KNOW BY THE END OF TODAY, BUT WILL NOT

19    EVERYTHING TO GET HIM KNOW BY 5:00 O'CLOCK TOMORROW,

20    SATURDAY.

21                MR. GALIPO:  ABSOLUTELY.  FINE.

22                MR. ROTHANS HAS MY CELL PHONE.

23                (WHEREUPON, COURT WAS ADJOURNED AT 1:46 P.M.)

24                          --000--

25

1                    CERTIFICATE OF REPORTER

2

    COUNTY OF LOS ANGELES      )
3                              )  SS.
    STATE OF CALIFORNIA        )

4

5

6    I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

7    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

8    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

9    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16   DATED:  AUGUST 11, 2013

17

18        **/S/  ROSALYN ADAMS**

19   ROSALYN ADAMS, CSR 11794
     OFFICIAL COURT REPORTER
20

21

22

23

24

25